No. 25-3023

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————

CHICAGO HEADLINE CLUB, et al.,

Plaintiffs-Appellees,

v.

KRISTI NOEM, in her official capacity as Secretary, U.S. Department
of Homeland Security, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of Illinois

———————————

**EMERGENCY MOTION FOR STAY PENDING APPEAL AND
IMMEDIATE ADMINISTRATIVE STAY**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney
  General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
COURTNEY L. DIXON
DAVID L. PETERS
  *Attorneys, Appellate Staff
  Civil Division
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 598-6735*

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................ 1

STATEMENT ..................................................................................................... 2

ARGUMENT ...................................................................................................... 7

I.      The Government Is Likely To Prevail On The Merits. ........................... 8

        A.      Plaintiffs Lack Standing. ........................................................... 8

        B.      The Injunction Is Overbroad And Unworkable. ...................... 12

        C.      Plaintiffs' Claims Lack Merit. ................................................. 17

II.     The Remaining Stay Factors Decisively Favor The Government. ....................... 21

CONCLUSION ................................................................................................. 22

CERTIFICATE OF COMPLIANCE

**INTRODUCTION**

The role of the Judiciary is to resolve concrete cases and controversies, not to act as general overseer of the Executive. But in response to the government's efforts to enforce the Nation's immigration laws after years of non-enforcement during an unprecedented wave of illegal immigration, courts have issued sweeping, programmatic injunctions that usurp executive authority and empower judges to superintend law-enforcement activities under threat of contempt. The predictable result is to broadly obstruct the enforcement of the Nation's laws, chill the exercise of executive power, and subvert the constitutional structure.

This case is a perfect example. This Court previously issued a writ of mandamus to quash an order of this district court that "infringe[d] on the separation of powers" by "set[ting] the court up as a supervisor" of the agency's law-enforcement activities. Order, *In re Noem*, No. 25-2936 (7th Cir. Oct. 31, 2025). The district court has now issued an extraordinary preliminary injunction that no less reflects an improper aggrandizement of the judicial role and a violation of the separation of powers. What began as a complaint by journalists and protestors alleging that DHS officers targeted them with crowd-control devices at a handful of protests in September and early October has transformed into an instrument for judicial micromanagement of federal law-enforcement operations in the Chicago area. Indeed, this injunction is so granular it consumes *eight pages*, governing everything from body-worn cameras, to agent identification, to the content of warnings before

rioters may be dispersed, to when agents may use chokeholds, tackle suspects, or deploy tear gas.

This Court should grant an immediate administrative stay and a stay pending appeal. This overbroad and unworkable injunction has no basis in law, threatens the safety of federal officers, and violates the separation of powers. Plaintiffs lack standing to seek this sweeping prospective relief based solely on past incidents of alleged misconduct that they only speculate may recur. Nor can plaintiffs' claims support the relief ordered, which is untethered from the constitutional and statutory provisions that plaintiffs invoked and which reaches well beyond plaintiffs to restrain all DHS operations within the Northern District of Illinois. The injunction is also unworkable in practice, transforming a single district court into a supervisory tribunal for adjudicating the lawfulness of federal officers' day-to-day operations. Indeed, plaintiffs have already alleged more than a half dozen violations of the court's orders—tellingly, based on incidents that involved no named plaintiff at all.

This Court's prompt intervention is once more required to stay this untenable injunction, protect the safety of the public and law-enforcement officers, and restore the balance of power between the Executive and Judicial Branches.

## STATEMENT

1.     U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) are agencies within DHS charged with enforcing and administering federal immigration laws. *See* 6 U.S.C. §§ 202, 211(c)(8), 252(a)(3).

DHS is also charged with protecting federal property and "persons on the property." 40 U.S.C. § 1315(a)-(b).

During 2025, there has been an increase in violent protests and attempts to impede DHS's renewed enforcement of the Nation's immigration laws. In Los Angeles, violent protestors attacked federal officers with concrete chunks and commercial-grade fireworks. In Portland, agitators assaulted federal officers with rocks, bricks, and incendiary devices. And near Dallas, a man opened fire on an ICE field office, killing two detainees and injuring another.

Similar events have unfolded in the Chicago area. Protests have occurred throughout the region and have often turned violent. *See* DE173-1, DE173-2[1]; *see also Chicago police respond to report of shots fired at federal agents amid immigration operations*, WASHINGTON POST (Nov. 8, 2025), https://www.washingtonpost.com/national /2025/11/08/chicago-federal-immigration-enforcement-protests/0c3a3e68-bcfa-11f0-b389-38cf5ff33d6f_story.html. To provide just a few examples: an individual interrupted an encounter with a suspected alien and "threw a closed-fist punch toward an agent's face," DE173-2, at 12; caltrops—a type of spike designed to damage tires—were thrown directly into the path of a DHS vehicle, *id.* at 13; and a "rock or a piece of concrete was thrown" through the open window of a DHS vehicle, barely missing several agents, *id.* at 15. Moreover, cartels and criminal organizations—

---

[1] Numbered docket entries in the district court case, No. 1:25-cv-12173, are abbreviated "DE#, at #."

3

including the Latin Kings—have reportedly placed "bounties" on senior DHS officers operating in the area. *Id.* at 19.

    **2.**    This case originally centered on protests at a DHS facility in Broadview, Illinois, that is used for processing individuals arrested by CBP and ICE. DE173-1, at 5. Over the course of several days in September and early October, protestors "positioned themselves in the ingress and egress of both of [the facility's] entryways, blocking government vehicles from entering or exiting the facility." *Id.* at 15. Demonstrators slashed employees' car tires and damaged vehicles. *Id.* at 20-25. Violent protestors threw "bottles, rocks, potatoes, and other objects at federal officers and vehicles"; "shot fireworks toward officers"; and attacked moving vehicles attempting to enter the facility. DE173-1, at 9-12. Several protestors were found to be carrying concealed firearms and other weapons. *Id.* at 16-17. And during the weekend of September 19-21, DHS found an improvised explosive device near the facility. *Id.* at 17. The protests at Broadview have left more than 30 DHS employees injured. *Id.* at 18. During several protests, officers responded by issuing dispersal orders and by deploying non-lethal crowd-control devices, such as chemical irritants and pepper balls. *See* DE173-2, at 10-11.

    Since October 3, "state and local officials have taken primary responsibility [of] crowd control and arrests" at Broadview, and federal officers have not deployed any crowd-control devices at the facility. DE173-1, at 37.

**3.**    Plaintiffs consist of six individual protestors, three journalists, and four religious practitioners, as well as four press organizations.  Plaintiffs allege that, during protests at the Broadview facility and at a few other incidents, DHS officers targeted them with nonlethal crowd-control devices in a manner that violated the First and Fourth Amendments as well as the Religious Freedom Restoration Act (RFRA).  Plaintiffs sought to represent a putative class of protestors and subclasses of journalists and religious practitioners.

On October 9, the district court entered a temporary restraining order (TRO) imposing various restrictions on DHS officers operating in the judicial district.  DE42. The court subsequently placed additional burdens on the government in a largely self-directed effort to monitor compliance with the order.  *See* DE52, at 3:18-23 (calling a hearing *sua sponte* after "seeing images on the news, [and] in the paper").  The court amended the TRO to impose additional restrictions on officers, including requirements related to the use of body-worn cameras that plaintiffs did not request. *See* DE66, DE146.  The court also directed DHS to make certain officials available to answer questions from the court, seemingly prompted in part by the court's review of non-record materials, such as extra-record videos taken and "sen[t] in" by members of the public.  DE144, at 9:8-9.  The court then *sua sponte* ordered a senior DHS officer to "appear in court, in person" to provide daily "report[s]" to the court.  DE146, at 1. This Court issued a writ of mandamus to vacate the daily in-person requirement because it "put[] the court in the position of an inquisitor rather than that of a neutral

adjudicator" and "infringe[d] on the separation of powers."  Order, *In re Noem*, No. 25-2936 (7th Cir. Oct. 31, 2025).

    **4.**    On November 6, the district court issued an oral ruling from the bench granting plaintiffs' request for a preliminary injunction and announcing its "factual findings" and legal conclusions.  DE256, at 21:11-12.  The court concluded that the use of crowd-control devices during several incidents—overwhelmingly involving non-plaintiffs away from the Broadview facility—were unjustified and violated the First and Fourteenth Amendments as well as RFRA.  The court subsequently issued a written order and indicated that "a written opinion [would] follow … within 14 days" to "further explain[]" and "provid[e] supporting evidentiary and case citations." DE250, at 1.

    The eight-page injunction imposes a host of restrictions on officers operating in the "judicial district."  DE250, at 1.  Among other things, the injunction restricts officers' ability to issue dispersal orders against "any person whom they know or reasonably should know is a Journalist"; to issue dispersal orders absent limited "exigent circumstances"; to use crowd-control devices such as chemical irritants, absent "an immediate threat of physical harm to another person"; and to use "hands-on physical force" unless necessary to "effectuate an … arrest."  *Id.* at 1-4.  The order also requires officers to give "at least two separate warnings" before using any crowd-control device; to have "visible identification … conspicuously displayed in two

separate places"; and to activate "body-worn cameras" whenever "engaged in enforcement activity" unless expressly exempted by DHS policy.  *Id.* at 4-6.

The court also certified a class consisting of "[a]ll persons who are or will in the future non-violently demonstrate, protest, observe, document, or record at [DHS] immigration enforcement and removal operations in the" district as well as two subclasses consisting of individuals engaging in either "religious expression" or "news gathering or reporting" at such operations.  DE252, at 3.

The government requested that the injunction be stayed to facilitate this Court's review; the district court denied the request.  DE256, at 46:6-20.

## ARGUMENT

The federal government is entitled to an administrative stay and a stay pending appeal of the preliminary injunction.  An administrative stay is warranted given the highly unusual nature of the court's order, which was issued orally and supported by incomplete factual findings and conclusions of law that will be supplemented in a forthcoming opinion that could come as late as two weeks after the initial bench ruling.  An order based on uncertain findings and conclusions that are subject to change violates the basic requirements for the issuance of a preliminary injunction.  *See* Fed. R. Civ. P. 52(a)(2), 65(d).  The government disagrees with those findings and conclusions, but it also should not be forced to comply with—or seek appellate review of—such an uncertain order.  Nor should this Court's ability to review the injunction be handicapped by piecemeal and incomplete rulings issued weeks apart.

In any event, the government is entitled to a stay pending appeal because, even on the current record, it is likely to succeed on the merits, it will suffer irreparable harm absent a stay, and the balance of the equities and public interest favor a stay. *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009). This injunction exceeds the judicial power under Article III, imposes highly reticulated constraints found nowhere in the Constitution or federal law, and threatens public safety while offending the separation of powers.

## I.     The Government Is Likely To Prevail On The Merits.

### A.     Plaintiffs Lack Standing.

At the outset, the injunction is improper because plaintiffs lack standing to seek sweeping prospective relief based on allegations that they suffered harm during past protests. Such standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, 2025 WL 2585637, at *2 (U.S. Sept. 8, 2025) (Kavanaugh, J., concurring). Plaintiffs must show a threat of future injury without reliance on a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

The Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), illustrates these principles. There, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. The Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use of the chokeholds" because no "immediate threat" existed that the plaintiff would be

subjected to another chokehold "without any provocation or resistance on his part"—even though the police department allegedly had a policy of "routinely apply[ing] chokeholds" in such situations. *Id.* at 105. Applying *Lyons*, this Court has repeatedly recognized that plaintiffs lack standing to seek prospective injunctive relief merely because they were subject to allegedly improper law-enforcement conduct in the past. *See, e.g., Schirmer v. Nagode*, 621 F.3d 581, 585 (7th Cir. 2010); *Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004).

This precedent forecloses standing here. Plaintiffs' claims primarily arise from a handful of alleged incidents during protests at the Broadview facility in late September and early October. *See* DE80, at 6-13. Those prior incidents, which occurred approximately one month ago, do not establish that plaintiffs are likely to face the "same events" in the future, *Campbell*, 373 F.3d at 836, even assuming plaintiffs intend to "return to Broadview," DE80, at 9. Indeed, since those incidents occurred, "state and local officials have taken primary responsibility [of] crowd control and arrests" at Broadview, so federal officers have "not deploy[ed] any" crowd-control devices at the facility. DE173-1, at 37. That undisputed fact alone should have defeated these plaintiffs' standing.

The alleged injuries of the other named plaintiffs—based on the use of crowd-control devices during a few immigration-enforcement actions that they happened to witness in and around Chicago, *see* DE80, 10-11 (allegations of individual plaintiffs Beale, Villa, and Crespo)—are even more tenuous. Plaintiff Beale, for example,

alleges that he was exposed to tear gas when he observed an immigration-enforcement activity while on his way "to the gym." *Id.* at 10. Such allegations fall far short of establishing that "the same events are likely to happen" *to those plaintiffs* in the future. *Campbell*, 373 F.3d at 836. It is pure speculation that plaintiffs will again happen upon immigration-enforcement operations and that DHS officers will respond to their presence with allegedly unlawful force.

That conclusion is underscored by DHS policies expressly providing that officers may use force only when "no reasonably effective, safe, and feasible alternative appears to exist," DE173-1, at 26, and only if it is "*objectively reasonable* in light of the facts and circumstances confronting [the officer] at the time force is applied," DE173-3, at 2. DHS further expressly prohibits officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." DE35-3, at 2. Even if an individual officer acted otherwise, it was contrary to DHS policy and cannot support standing to seek agency-wide relief.

The district court emphasized what it viewed as an "ongoing and sustained pattern" of alleged misuse of force by DHS officers. DE256, at 22:15. Those findings were, at minimum, overstated. Regardless, as *Lyons* makes clear, it is not enough to establish standing for prospective relief to show that allegedly improper conduct occurs "routinely" or even pursuant to a government "policy." 461 U.S. at 105. Indeed, the court so thoroughly disregarded *Lyons* that the injunction purports to bar "[u]sing chokeholds," DE250, at 4, which is of course the exact relief at issue in

*Lyons.* To obtain such prospective relief, there must be a substantial possibility that the *plaintiff* faces a "realistic threat" of the allegedly improper conduct occurring again, *Lyons*, 461 U.S. at 106 n.7, which plaintiffs have not established for the reasons already explained.

It makes no difference that some of plaintiffs' asserted injuries are framed in First Amendment terms. This Court has made clear that *Lyons* applies even where a party's conduct involves First Amendment conduct. *See Schirmer*, 621 F.3d at 586 (applying *Lyons* to First Amendment challenge). And allegations of a "subjective 'chill,'" like those the district court invoked, "are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972); *see* DE256, at 23:12-24:10; *see also* DE255, at 28:3-22; 114:1-12; 159:22-160:2 (named plaintiffs stating that their protest activity continued). Plaintiffs' class allegations likewise "add[] nothing to the question of standing" because the "named plaintiffs who represent a class must allege and show that they personally have been injured." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016) (quotation marks omitted).

Finally, the organizational plaintiffs' suggestion that they have standing because they must "divert significant resources to tracking and responding to attacks on journalists by federal agents," DE80, at 7, is foreclosed by *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), which squarely rejected the proposition that

11

"standing exists when an organization diverts its resources in response to a defendant's actions." *Id.* at 395.

**B.     The Injunction Is Overbroad And Unworkable.**

The jurisdictional defects in the district court's injunction are underscored by its legal overbreadth and practical unworkability. The injunction goes well beyond remedying plaintiffs' cognizable injuries and places the district court in the untenable position of superintending day-to-day law-enforcement activities.

1.     The district court's injunction contravenes *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which holds that courts lack equitable authority to grant "relief that extend[s] beyond the parties." *Id.* at 843. Here, the injunction reaches all DHS immigration-enforcement action in the Chicago area. The injunction thus extends far beyond "the parties named as plaintiff," *id.* (quotation marks omitted), and does much more than "only incidentally" advantage nonparties, *id.* at 851.

The district court's flawed class certification order cannot justify the injunction's scope. Among other defects, the classes apply to overbroad and ill-defined categories of people, such as anyone that merely "document[s]" or "observe[s]" any enforcement and removal "operation[]." DE252, at 3; *see Rahman v. Chertoff*, 530 F.3d 622, 625 (7th Cir. 2008) (a class defined by the word "detention" was too vague). Crucially, many, if not most, of those class members will "have suffered no injury at the hands of the defendant[s]," which means not only that the "class should not be certified" but also that the grant of class-wide relief is

12

fundamentally unwarranted. *Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009). That is particularly so given that Congress has expressly barred granting class-wide relief to enjoin or restrain the government from engaging in measures it deems appropriate to effectuate the apprehension of aliens as authorized by 8 U.S.C. §§ 1221-1231. *See* 8 U.S.C. § 1252(f)(1); *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022). The court questioned whether the class included "a great number of uninjured individuals," DE256, at 6, but *plaintiffs* bear the burden of showing that class certification is appropriate, and the handful of allegedly unlawful incidents that plaintiffs cite plainly involve only a small fraction of the class, which includes anyone who merely witnesses an immigration-enforcement action.

Even for those that may claim injury, the class includes different groups engaged in different activities purportedly harmed in different ways in different places at different times. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015). The subclasses are equally vague and subjective, as membership turns on whether everyday activities like singing or recording a video are for the subjective purpose of "religious expression" or "news gathering." DE252, at 3.

Equally clearly, the class-certification order flouts Rule 23(a)'s commonality requirement. *See* Fed. R. Civ. P. 23(a)(2). Here, plaintiffs' claims inherently require "individualized, plaintiff-specific assessment[s]," *McFields v. Dart*, 982 F.3d 511, 517 (7th Cir. 2020), such as "what force was used, what a particular class member was doing, what other protestors may have been doing, what the officers objectively

13

observed, and a host of other factors," *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1260 (9th Cir. 2024).  None of those inquiries is capable of class-wide resolution, particularly as the class reaches "a broad range of injuries based on a medley of [law-enforcement] conduct and policies, some of which occurred during different protests, at different times, and in different places."  *Id.* at 1263.  The district court erroneously concluded that commonality was satisfied because the class asserts common injuries arising from defendants' allegedly unlawful conduct.  *See* DE252, at 10.  But it is not enough that class members purportedly "have all suffered a violation of the same provision of law."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Plaintiffs' claims are also atypical of the class.  *See* Fed. R. Civ. P. 23(a)(3).  A "claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members."  *McFields*, 982 F.3d at 517 (quotation marks omitted).  Here, plaintiffs' claims arise almost exclusively from the deployment of crowd-control devices at a limited number of protests at the Broadview facility.  But the class applies far more broadly to anyone who even witnesses immigration-enforcement activity in Chicago.  Most, if not all, class claims will "present[] fundamentally unique circumstances" that "defeat any essential characteristics across the claims."  *Id.* at 518 (quotation marks omitted).  The district court ignored these "*overwhelming* factual distinctions," *id.*, in concluding that plaintiffs' claims sufficiently mirrored those of other class members, *see* DE252, at 13.

**2.**     The injunction independently constitutes an abuse of discretion because the district court failed to account for "what is workable," as equity demands. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (quotation marks omitted). The injunction restricts officers' ability to issue dispersal orders and to deploy crowd-control devices whenever journalists and protestors are present. DE250, at 1-3. But the injunction never defines the term "protester." And it defines "journalist" by reference to several non-exclusive "indicia" that are merely "illustrative" and "are not requirements." *Id.* at 5. The injunction thus fails to "describe" the people protected by the injunction "specifically" and "in reasonable detail," as required. Fed. R. Civ. P. 65(d)(1)(B)-(C). In the context of chaotic and rapidly evolving protests, moreover, officers may be unable to differentiate between members of the press, peaceful protestors, and violent rioters, especially where there is imminent physical danger to officers and the public. *See* DE173-1, at 37-38 (explaining unworkability of the court's requirements).

     The injunction is unworkable in many other respects. It prohibits officers from using crowd-control devices "if it is reasonably foreseeable that doing so could result in injury," DE250, at 2, but that blanket restriction contains, for example, no exception for protecting property or for where protestors block the only ingress or egress points available to federal officers. Likewise, the injunction requires "two separate" and audible "warnings" before the use of any crowd-control device—so on threat of contempt, officers must assess whether there is time for one warning (much

less two) in a rapidly evolving situation in which there is no way to guarantee that everyone who might be affected by such devices was able to hear and understand these warnings.

**3.**     Compounding these errors, the injunction places the district court in the position of superintending officers' day-to-day decision making.  Officers' real-time judgments about who is covered by the injunction or whether one of its legalistic exceptions applies may now be second-guessed in contempt proceedings.  That is already playing out in practice.  The district court has ordered multiple DHS officers to appear in court to answer court-directed questioning and to guarantee to the court's satisfaction the government's compliance with the court's orders.  And plaintiffs have repeatedly alleged TRO violations, which have required protracted district court litigation over the incidents, even though none of the alleged violations have involved the named plaintiffs or the Broadview facility.  *See* DE90; DE94; DE118; DE140; DE174; DE188; DE201.

As this Court previously recognized, orders of this kind "infringe on the separation of powers."  Order, *In re Noem*, No. 25-2936 (7th Cir. Oct. 31, 2025).  There are good reasons why courts should not place themselves in the untenable position of micromanaging day-to-day federal law-enforcement operations in this manner.  *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453 (1990).  It is the role of the Executive, under the direction of the President, not the federal courts, to oversee the execution of the laws.  Federal courts "do not possess a roving

commission" to "exercise general legal oversight of the . . . Executive Branch[]."
*TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-25 (2021); *see also Rizzo v. Goode*, 423
U.S. 362 (1976). But that is precisely what this injunction purports to do.

### C.     Plaintiffs' Claims Lack Merit.

The government is also likely to prevail on the merits of plaintiffs' claims. The
district court's incomplete factual findings and conclusions of law make a
comprehensive response to the court's merits ruling infeasible, as it is far from clear
on which grounds and on which findings the court's rulings rest. That the
government is forced to seek review on such an incomplete record only underscores
the harm imposed by the court's improper injunction. For purposes of this stay
request, it should suffice to show that the limited reasoning provided by the court is
deeply flawed and that plaintiffs' claims do not justify the sprawling injunction the
court issued.

1.     **First Amendment.** The district court suggested that defendants'
crowd-control efforts violated the First Amendment because they infringed on
plaintiffs' speech and news-gathering rights. DE256, at 24:1-30:1. But law
enforcement may take reasonable steps to disperse crowds "[w]hen clear and present
danger of riot, disorder, interference with traffic upon the public streets, or other
immediate threat to public safety, peace, or order, appears." *Cantwell v. Connecticut*, 310
U.S. 296, 308 (1940). The district court dismissed this notion on the ground that even
a threat of "serious injury" to officers cannot justify a dispersal order. DE256, at

26:24-25.  But nothing requires offers to await actual violence, bodily harm, or disorder to protect themselves and the public.  *See Vodak v. City of Chicago*, 639 F.3d 738, 743 (7th Cir. 2011); *Puente v. City of Phoenix*, 123 F.4th 1035, 1063 (9th Cir. 2024). And, here, the district court recognized that protests involved acts of violence directed at DHS officers, even if the court excused such violence as the product of mere "bad eggs."  DE256, at 16:7-9.  The court also erroneously suggested that "acts of vandalism, assault on, or threatening officers, [and] forcible obstruction" could be addressed individually, *id.* at 26:16-19, but when confronted with crowds containing violent elements interspersed throughout, law enforcement "cannot be expected to single out individuals; they may deal with the crowd as a unit."  *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977).  Otherwise, the presence of any non-violent protestor would preclude officers from taking measures to maintain order and ensure public safety.

Analogous errors undergird the district court's suggestion that DHS officers retaliated against plaintiffs based on alleged First Amendment activity.  DE256, at 31:13-32:23.  The court disregarded the most obvious alternative explanation for defendants' conduct—namely, that any purported injury incidentally resulted from officers' crowd-control efforts.  *See* DE173-1, at 38 (explaining that crowd-control devices are designed to "disperse widely").  That plaintiffs were allegedly affected by those efforts hardly supports the inference that plaintiffs' conduct was "a substantial

18

or motivating factor" in DHS's actions. *Kingman v. Frederickson*, 40 F.4th 597, 601 (7th Cir. 2022) (quotation marks omitted).

Crucially, moreover, plaintiffs' claims suggest—at most—that individual officers at certain incidents purportedly used force too readily or in excess of what was necessary. Even if true in hindsight, such allegations do not show that defendants as a whole engaged in a course of conduct of infringing First Amendment rights, nor do they support the attribution of retaliatory intent as a matter of law to defendants.

Even more fundamentally, plaintiffs' claims cannot support entry of this injunction, which imposes requirements untethered to plaintiffs' alleged claims—such as requirements related to what uniforms officers must wear and when body-worn cameras must be activated. Those requirements have no grounding in the First Amendment. Nor does the injunction's exceptions for "Journalists" from otherwise valid dispersal orders, as it is black-letter law that the press lacks a "constitutional right of special access to information not available to the public generally," *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972), and the public has no First Amendment right to disregard valid dispersal orders.

**2.    Fourth Amendment.** The district court likewise erred in suggesting that plaintiffs' Fourth Amendment claims justified the injunction because the government's use of force was an unlawful "seizure." DE256, at 35:19-23. A seizure "requires the use of force" that "*objectively* manifests an intent to restrain." *Torres v. Madrid*, 592 U.S. 306, 317 (2021). At most, certain officers both at Broadview and the

handful of other incidents at issue deployed crowd-control devices with the intent to "*disperse* or *exclude* persons from an area," which does not "involve the necessary 'intent to *restrain*' that might give rise to a 'seizure.'" *Puente*, 123 F.4th at 1052.[2]

Even if there were isolated incidents in which individual officers ran afoul of the Fourth Amendment's reasonableness standard, that would not justify injunctive relief, let alone the relief ordered here. The "normal[] and adequate" remedy for an "improper … seizure[s]" is retroactive individualized relief, *Campbell*, 373 F.3d at 835, not a programmatic injunction constraining DHS's operations throughout the Chicago region. Indeed, this injunction adopts mechanical rules and constraints that cannot be grounded in the Fourth Amendment, which abhors categorical rules and is dependent on particular facts and circumstances.

**3.** **RFRA**. Equally unavailing was the district court's suggestion that the four religious practitioners were likely to succeed on their RFRA claims. DE256, at 34:19-25. Those plaintiffs assert that their beliefs compel them to minister and pray at the Broadview facility. *See* DE80, at 11-13. But there are various means by which they may satisfy such broad religious beliefs short of interspersing themselves amongst disruptive and often violent protests. Indeed, plaintiffs' own declarations

---

[2] Although substantive-due-process standards may be implicated where a person is injured by law enforcement outside the context of a seizure, *see Hess v. Garcia*, 72 F.4th 753, 765 (7th Cir. 2023), plaintiffs asserted no such claims here, which renders irrelevant the district court's cursory suggestion that that defendants' conduct satisfied even that heightened standard, *see* DE256, at 35:19-20.

make clear that they could simply move down the street. *See, e.g.*, DE22-2, at 3. At most, then, defendants restricted "one of a multitude of means" by which plaintiffs could practice their religious beliefs, which does not constitute a substantial burden. *Henderson v. Kennedy*, 253 F.3d 12, 15 (D.C. Cir. 2001); *see also Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995) (same). And even if the four plaintiffs did establish a RFRA violation, the district court offered no explanation for how that would justify a sweeping programmatic injunction issued on a class-wide basis applicable to DHS operations anywhere in the Chicago area.

## II.    The Remaining Stay Factors Decisively Favor The Government.

As demonstrated, the district court's injunction interferes with officers' ability to respond to disruptive protests in the Chicago region. Constraining officers in this manner irreparably harms the government and the public interest by endangering the safety of officers and the public. It also raises grave separation-of-power concerns. Plaintiffs, by contrast, have not even shown that the harms they allege from a handful of protests one month ago are likely to recur. That is particularly so given that, as explained, DHS policies already require officers' use of force to be reasonable and to comport with the First and Fourth Amendments.

The court thus abused its discretion by entering a sweeping injunction that inappropriately constrains officers' ability to control disruptive and violent protests and improperly places the court in the position of superintending law-enforcement conduct at the expense of the Executive Branch.

## CONCLUSION

The Court should stay the preliminary injunction pending appeal and should

grant an immediate administrative stay pending consideration of this motion.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney*
  *General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
COURTNEY L. DIXON
 /s/ *David L. Peters*

DAVID L. PETERS
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 598-6735*
  *David.l.peters@usdoj.gov*

NOVEMBER 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,189 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ David L. Peters*
David L. Peters

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system on all counsel of record.


*/s/ David L. Peters*
David L. Peters

**APPENDIX**

# TABLE OF CONTENTS

**Page**

Preliminary Injunction Order, DE250 ........................................................ A001

Temporary Restraining Order, DE42 ........................................................ A009

Modified Temporary Restraining Order, DE66........................................... A015

Amended Complaint for Injunctive and Delcaratory Relief, DE80........................ A023

Notification of Docket Entry, DE146 ........................................................ A088

Declaration of Rusell Hott, DE173-1........................................................ A090

Declaration of Daniel I. Parra, DE173-2 ................................................... A130

Opinion and Order, DE252 ................................................................... A158

Hearing Tr. (Nov. 6, 2025), DE256........................................................ A174

Notice of Appeal, DE257 ..................................................................... A236

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT COURT OF ILLINOIS
## EASTERN DIVISION

<table>
<tr><td>CHICAGO HEADLINE CLUB, et al.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td><em>Plaintiffs</em>,</td><td>)</td><td><strong>No. 25-cv-12173</strong></td></tr>
<tr><td></td><td>)</td><td><strong>Hon. Sara L. Ellis</strong></td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>KRISTI NOEM, Secretary, U.S.</td><td>)</td><td></td></tr>
<tr><td>Department of Homeland Security, in her</td><td>)</td><td></td></tr>
<tr><td>official capacity, et al.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td><em>Defendants</em>,</td><td>)</td><td></td></tr>
</table>

### Preliminary Injunction Order

Plaintiffs filed a Motion for a Preliminary Injunction Order [82, 86] against Defendants. Having held a hearing on November 5 and 6, 2025, the Court finds that Plaintiffs have met their burden to support the issuance of a Preliminary Injunction. The Court orally issued its ruling, containing findings of facts, conclusions of law, and stated reasons why the Court issued the injunction pursuant to Federal Rules of Civil Procedure 52(a)(2) and 65(d), on November 6, 2025, and indicated that a written opinion will follow further explaining the Court's ruling and providing supporting evidentiary and case citations within 14 days of the issuance of this Order. Accordingly, the Court grants the motion and orders as follows:

1.     It is hereby ORDERED that Defendants, their officers, agents, assigns, and all persons acting in concert with them (hereafter referred to as "Federal Agents"), are ENJOINED in this judicial district from:

  a.     <u>Interactions with Journalists:</u> Dispersing, arresting, threatening to arrest, threatening or using physical force against any person whom they know or reasonably

1

**A1**

should know is a Journalist, unless Federal Agents have probable cause to believe that the individual has committed a crime unrelated to failing to obey a dispersal order lawfully issued to non-Journalists. Federal Agents may order a Journalist to change location to avoid disrupting law enforcement, as long as the Journalist has an objectively reasonable amount of time to comply and an objectively reasonable opportunity to report and observe;

b. <u>Dispersal of Others:</u> Issuing a crowd dispersal order, meaning a lawful command given by an authorized Federal Agent for all persons to leave a designated area, that requires any Class member to leave a public place that they lawfully have a right to be, unless dispersal is justified by exigent circumstances such that immediate action is objectively necessary in order to preserve life or prevent catastrophic outcomes as defined by Department of Homeland Security Use of Force Policy (updated Feb. 6, 2023), Section XII.E;

c. Using riot control weapons—including kinetic impact projectiles (KIPs), Compressed Air Launchers (e.g., PLS and FN303), Oleoresin Capsicum (OC) Spray, CS gas, CN gas, or other chemical irritants, 40 mm Munitions Launchers, less-lethal shotguns, Less-Lethal Specialty Impact-Chemical Munitions (LLSI-CM), Controlled Noise and Light Distraction Devices (CNLDDs), Electronic Control Weapons (ECWs)—on any Class member, unless such force is objectively necessary to stop the person from causing an immediate threat of physical harm to another person;

d. Using riot control weapons (including those described above) at identified targets if it is reasonably foreseeable that doing so could result in injury to any Class member, unless such force is objectively necessary to stop the person from causing an immediate threat of physical harm to another person;

e.      Deploying CS or CN gas canisters, OC spray, or other chemical irritants into a group of people or in residential or commercial areas in a manner that poses a reasonably foreseeable risk of injuring any Class member who is not causing an immediate threat of physical harm to another person;

f.      Deploying CS or CN gas canisters, Controlled Noise and Light Distraction Devices (CNLDD), or Less-Lethal Specialty Impact and Chemical Munitions (LLSI-CM) so as to strike any Class member, unless such force is objectively necessary to stop an immediate threat of the person causing serious bodily injury or death to another person;

g.      Deploying CS or CN gas canisters, Controlled Noise and Light Distraction Devices (CNLDD), or Less-Lethal Specialty Impact and Chemical Munitions (LLSI-CM) above the head of any Class member, unless such force is objectively necessary to stop an immediate threat of the person causing serious bodily injury or death to another person;

h.      Firing Compressed Air Launchers (e.g., PLS and FN303), or Munitions Launchers (e.g., 40mm), or KIPs so as to strike the head, neck, groin, spine, or female breast of any Class member, unless such force is objectively necessary to stop an immediate threat of the person causing serious bodily injury or death to another person;

i.      Striking any Class member with a vehicle, unless such force is objectively necessary to stop an immediate threat of the person causing serious bodily injury or death to another person;

j.      Using hands-on physical force such as pulling or shoving to the ground, tackling, or body slamming any Class member who is not causing an immediate threat of physical harm to others, unless objectively necessary and proportional to effectuate an apprehension and arrest;

3

A3

k.       Using chokeholds, carotid restraints, neck restraints, or any other restraint technique that applies prolonged pressure to the neck that may restrict blood flow or air passage against any Class member, unless such force is objectively necessary to stop an immediate threat of the person causing serious bodily injury or death to another person;

l.       Using any riot control weapon, including those listed in this Order, against any Class member, without first giving at least two separate warnings at a sound level where the targeted individual(s) can reasonably hear it, unless justified by exigent circumstances when immediate action is necessary in order to preserve life or prevent catastrophic outcomes, as defined by Department of Homeland Security Use of Force Policy (updated Feb. 6, 2023), Section XII.E. Such warnings shall explain that Federal Agents may employ riot control weapons or force, give the targeted individual(s) reasonable time to avoid the use of force, and provide a reasonable opportunity to comply;

m.       Seizing or arresting any Class member who is not resisting a lawful and authorized crowd dispersal order (as defined in 1.b. above), unless there is specific probable cause to believe that the person has committed a crime for which a custodial arrest is warranted and for which the Federal Agent has lawful authority to make an arrest; and

n.       Defendants shall not be liable for violating this injunction if any Class member is incidentally exposed to riot control devices after such a device was deployed in a manner that complies with this injunction.

2.       To facilitate the Defendants' identification of Journalists protected under this Order, the following are examples of indicia of being a Journalist: visual identification as a member of the press, such as by displaying a professional press pass, badge, or credentials; wearing distinctive clothing or patches that identify the wearer as a member of the press; or carrying

4

**A4**

professional gear such as professional photographic or videography equipment. Other indicia of being a Journalist under this Order include that the person is standing off to the side of a protest, not engaging in chanting, sign holding, or shouting slogans, and is instead documenting protest activities, although these are not requirements. These indicia are illustrative, and a person need not exhibit every indicium to be considered a Journalist under this Order. Defendants shall not be liable for incidental violations of this Order if Defendants establish that the affected individual lacked any of the illustrative indicia of a Journalist described in this provision.

3.       It is further ORDERED that all Federal Agents, excepting those who do not wear a uniform or other distinguishing clothing or equipment in the regular performance of their official duties or are engaged in undercover operations in the regular performance of their official duties, must have visible identification of a unique, personally assigned, and recognizable alphanumeric identifier sequence affixed to their uniforms and conspicuously displayed in two separate places. The same unique and personally assigned identifier sequence must remain conspicuously displayed in two separate places despite changes to a Federal Agent's uniform or tactical gear.

4.       It is further ORDERED that all Federal Agents, excepting those who do not wear a uniform or other distinguishing clothing or equipment in the regular performance of their official duties or are engaged in undercover operations in the regular performance of their official duties, that are, have been, or will be equipped and trained with body-worn cameras ("BWCs") shall activate them when engaged in enforcement activity unless expressly exempted by CBP, ICE, or DHS policy.

a.       The definitions of "body worn cameras" shall be as defined in DHS Policy Statement 045-07 Section VIII and CBP Directive 4320-020B Section 6.2: Audio/video/digital recording equipment combined into a single unit and typically worn

on clothing or otherwise secured to a person, e.g., affixed to the outside of the carrier/tactical vest facing forward.

b.      For the purposes of this Order, the definition of "enforcement activity" shall be as defined in ICE Directive 19010.3 Section (3.6)(8) and CBP Directive 4320-020B Section 6.4. Such activities include but are not limited to:

     i.      Protecting Federal Government facilities;

     ii.     Responding to public disturbances;

     iii.    Interacting with members of the public while conducting Title 8 enforcement activities in the field; and

     iv.     When responding to emergencies.

c.      Enforcement activities where BWCs are not required to be worn or activated for the purposes of this Order are:

     i.      Where agents are conducting undercover activity or confidential informants will or may be present;

     ii.     Information-gathering surveillance activities where and when an enforcement activity is not planned;

     iii.    Onboard commercial flights;

     iv.     Controlled deliveries; and

     v.      Custodial interviews conducted inside jails, prisons, detention centers, or DHS owned or leased facilities.

d.      This provision requiring BWCs shall not apply to Federal Agents operating at any port of entry into the United States including but not limited to Chicago O'Hare International Airport and Chicago Midway International Airport.

e.    Federal Agents shall not be liable for violating this provision (i) for failure to record due to equipment failure beyond the control of Federal Agents, or (ii) in the event that cloud storage for storing recordings made by BWCs should become unavailable, through no fault of Federal Agents, either due to (a) the lapse in appropriations, or (b) license or contract expiration.

5.    It is further ORDERED that Defendants widely disseminate notice of this Order. Specifically, Defendants are ORDERED to provide copies of this Order, in either electronic or paper form, no later than 10 p.m. Central Time on November 6, 2025, to all those described below:

a.    all law enforcement personnel, officers, and agents of the Federal Agents currently or subsequently deployed in the Northern District of Illinois, including but not limited to all personnel operating within this District who are part of Operation Midway Blitz or any equivalent operation by a different name; and

b.    all employees, officers, and agents of Federal Agents with supervisory or management authority over any law enforcement officers or agents currently or subsequently deployed in the Northern District of Illinois, up the chain of command to and including the Secretary of Homeland Security and other named Defendants.

6.    It is further ORDERED that Defendants shall issue guidance to officers and agents to implement this Order. Defendants shall file with this Court such guidance and any directives, policies, or regulations implementing the guidance within 5 business days of issuance of the Order, with a continuing obligation to immediately file with this Court any subsequent changes or revisions to that guidance or implementing directives, policies, or regulations through the period of this Order.

7.      It is further ORDERED that in the event that Plaintiffs seek relief for an alleged violation of this Order, Plaintiffs should make good faith attempts to meet and confer with Defendants at least 24 hours before filing a request for relief and Defendants must respond to the motion for relief as ordered by the Court.

8.      It is further ORDERED that in the interest of justice, the Court orders Plaintiffs to provide $0 in security, and the Court rules that any other requirements under Rule 65(c) of the Federal Rules of Civil Procedure are satisfied.

9.      The parties shall meet and confer and provide a joint status report within 7 days setting forth proposals for ensuring that Federal Agents present in the Northern District of Illinois while this action is pending remain informed of the limitations imposed by this Order.

10.     This Preliminary Injunction Order is entered at 11:48 a.m. Central Time on this 6th day of November 2025 and shall remain in effect pending further proceedings before this Court.

Date: November 6, 2025

_____
Sara L. Ellis
U.S. District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT COURT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO HEADLINE CLUB, *et al.*, | ) | |
| | ) | No. 25-cv-12173 |
| *Plaintiffs,* | ) | |
| | ) | Hon. Sara L. Ellis, |
| v. | ) | District Judge |
| | ) | |
| | ) | |
| KRISTI NOEM, Secretary, U.S. | ) | |
| Department of Homeland Security, in her | ) | |
| official capacity, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**Temporary Restraining Order**

Plaintiffs filed an Emergency Motion for a Temporary Restraining Order [21] against Defendants.  Having held hearings on October 6, 8, and 9, 2025, the Court finds that Plaintiffs have met their burden to support the issuance of a Temporary Restraining Order.  Accordingly, the Court grants the motion and orders as follows:

1.      It is hereby ORDERED that Defendants,[1] their officers, agents, assigns, and all persons acting in concert with them (hereafter referred to as "Federal Agents"), are temporarily ENJOINED in this judicial district from:

      a.      Dispersing, arresting, threatening to arrest, threatening or using physical force against any person whom they know or reasonably should know is a Journalist, unless Defendants have probable cause to believe that the individual has committed a crime. Defendants may order a Journalist to change location to avoid disrupting law enforcement,

---

[1] President Trump, one of the named Defendants, is not included in this Order.

as long as the Journalist has an objectively reasonable time to comply and an objectively reasonable opportunity to report and observe;

b.     Issuing a crowd dispersal order requiring any person to leave a public place that they lawfully have a right to be, unless dispersal is justified by exigent circumstances as defined by Department of Homeland Security Use of Force Policy (updated Feb. 6, 2023), Sections III.F and XII.E;

c.     For purposes of this Order, a crowd dispersal order is a lawful command given by a Federal Agent for all persons to leave a designated area when three or more persons are committing acts of disorderly conduct that are likely to cause substantial harm in the immediate vicinity;

d.     Using riot control weapons—including kinetic impact projectiles (KIPs), Compressed Air Launchers (e.g., PLS and FN303), Oleoresin Capsicum (OC) Spray, CS gas, CN gas, or other chemical irritants, 40 mm Munitions Launchers, less-lethal shotguns, Less-Lethal Specialty Impact-Chemical Munitions (LLSI-CM), Controlled Noise and Light Distraction Devices (CNLDDs), Electronic Control Weapons (ECWs)—on members of the press, protesters, or religious practitioners who are not posing an immediate threat to the safety of a law enforcement officer or others;

e.     Using riot control weapons (including those described above) at identified targets, if it is reasonably foreseeable that doing so could result in injury to the press, protesters, or religious practitioners who are not posing an immediate threat to the safety of a law enforcement officer or others, unless such force is necessary to stop an immediate and serious threat of physical harm to a person;

f.      Firing CS or CN gas canisters, Controlled Noise and Light Distraction Devices (CNLDD), or Less-Lethal Specialty Impact and Chemical Munitions (LLSI-CM) so as to strike any person, including by deploying these weapons above the head of the crowd, unless the person poses an immediate threat of causing serious bodily injury or death to a person in equivalent circumstances to those where the officer is authorized to use deadly force;

g.      Firing Compressed Air Launchers (e.g., PLS and FN303), or Munitions Launchers (e.g., 40mm), or KIPs so as to strike the head, neck, groin, spine, or female breast, or striking any person with a vehicle, unless the person poses an immediate threat of causing serious bodily injury or death to a person in equivalent circumstances to those where the officer is authorized to use deadly force;

h.      Using force, such as pulling or shoving a person to the ground, tackling, or body slamming an individual who poses no immediate threat of physical harm to others, unless necessary and proportional to effectuate an apprehension and arrest;

i.      Using any riot control weapon, including those listed in this Order, without giving at least two separate warnings when feasible at a sound level where the targeted individual(s) can reasonably hear it.  Law enforcement officers determine feasibility by considering whether the resulting delay of issuing the warning and allowing reasonable time and opportunity for individuals to voluntarily comply is likely to create an immediate threat of causing physical harm to the officer or others.  Such warnings shall explain that Defendants may employ riot control weapons, give the targeted individual(s) reasonable time to avoid the use of force, and provide a reasonable opportunity to comply;

j.      Seizing or arresting any non-violent protester who is not resisting a lawful crowd dispersal order, unless there is specific probable cause to believe that the individual has committed a crime for which a custodial arrest is warranted and for which the law enforcement officer has lawful authority to make an arrest; and

k.      To facilitate the Defendants' identification of Journalists protected under this Order, the following are examples of indicia of being a Journalist: visual identification as a member of the press, such as by carrying a professional press pass, badge or credentials; wearing distinctive clothing or patches that identify the wearer as a member of the press; or carrying professional gear such as professional photographic or videography equipment. Other indicia of being a Journalist under this Order include that the person is standing off to the side of a protest, not engaging in chanting, sign holding, shouting slogans, or otherwise protesting, and documenting protest activities, although these are not requirements. These indicia are illustrative, and a person need not exhibit every indicium to be considered a Journalist under this Order. Defendants shall not be liable for unintentional violations of this Order in the case of an individual who does not wear a press pass, badge, or other official press credential, professional gear, or distinctive clothing that identifies the person as a member of the press.

l.      Defendants shall not be liable for violating this injunction if a protester, journalist, or religious practitioner is incidentally exposed to crowd control devices, chemical dispersal agents, or physical force if such device or force was used in a manner that complies with this injunction.

2.      It is further ORDERED that all Federal Agents, excepting those who do not wear a uniform or other distinguishing clothing or equipment in the regular performance of their official

duties or are engaged in undercover operations in the regular performance of their official duties, must have visible identification (for which a unique recognizable alphanumeric identifier sequence will suffice) affixed to their uniforms or helmets and prominently displayed, including when wearing riot gear.

3.    It is further ORDERED that Federal Agents widely disseminate notice of this Order. Specifically, Federal Agents are ORDERED to provide copies of this Order, in either electronic or paper form, no later than 5 p.m. on October 9, 2025 to any individuals scheduled to work at the Broadview ICE Facility on October 10, 2025 and no later than 11:59 p.m. on October 10, 2025 to all others described below:

a.    all law enforcement personnel, officers, and agents of the Federal Agents currently or subsequently deployed in the Northern District of Illinois, including but not limited to all personnel in the Chicago region who are part of Operation Midway Blitz or any equivalent operation by a different name; and

b.    all employees, officers, and agents of Federal Agents with supervisory or management authority over any law enforcement officers or agents currently or subsequently deployed in the Northern District of Illinois, up the chain of command to and including the Secretary of Homeland Security and other named Defendants.

4.    It is further ORDERED that Defendants shall issue guidance to officers and agents to implement this order.  Defendants shall file with this Court any directives, policies, or regulations implementing the guidance within 5 business days, with a continuing obligation to immediately file with this Court any subsequent changes or revisions to that guidance through the period of this Order.

5

A13

5.     It is further ORDERED that in the event that Plaintiffs seek relief for an alleged violation of this Order, Plaintiffs should make good faith attempts to meet and confer with Defendants at least 24 hours before filing a request for relief and Defendants must respond to the motion for relief as ordered by the Court.

6.     It is further ORDERED that in the interest of justice, the Court orders Plaintiffs provide $0 in security, and the Court rules that any other requirements under Rule 65(c) of the Federal Rules of Civil Procedure are satisfied.

7.     The parties shall meet and confer and provide a joint status report within 7 days setting forth proposals for ensuring that Federal Agents present in the Northern District of Illinois while this action is pending remain informed of the limitations imposed by this Order.

8.     This Temporary Restraining Order is entered at 11:30 A.M. on this 9th day of October 2025 and shall remain in effect for fourteen (14) calendar days.

_____
Sara L. Ellis
U.S. District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT COURT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| CHICAGO HEADLINE CLUB, *et al.*, | ) | |
| | ) | No. 25-cv-12173 |
| *Plaintiffs,* | ) | |
| | ) | Hon. Sara L. Ellis, |
| v. | ) | District Judge |
| | ) | |
| | ) | |
| KRISTI NOEM, Secretary, U.S. | ) | |
| Department of Homeland Security, in her | ) | |
| official capacity, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**Modified Temporary Restraining Order**

Plaintiffs filed an Emergency Motion for a Temporary Restraining Order [21] against Defendants. Having held hearings on October 6, 8, and 9, 2025, the Court finds that Plaintiffs have met their burden to support the issuance of a Temporary Restraining Order. After a further hearing on October 16, 2025, the Court finds it necessary to modify the previously entered Temporary Restraining Order. Accordingly, the Court orders as follows:

1.     It is hereby ORDERED that Defendants,[1] their officers, agents, assigns, and all persons acting in concert with them (hereafter referred to as "Federal Agents"), are temporarily ENJOINED in this judicial district from:

a.     Dispersing, arresting, threatening to arrest, threatening or using physical force against any person whom they know or reasonably should know is a Journalist, unless Defendants have probable cause to believe that the individual has committed a crime. Defendants may order a Journalist to change location to avoid disrupting law enforcement,

---

[1] President Trump, one of the named Defendants, is not included in this Order.

1

**A15**

as long as the Journalist has an objectively reasonable time to comply and an objectively reasonable opportunity to report and observe;

    b.    Issuing a crowd dispersal order requiring any person to leave a public place that they lawfully have a right to be, unless dispersal is justified by exigent circumstances as defined by Department of Homeland Security Use of Force Policy (updated Feb. 6, 2023), Sections III.F and XII.E;

    c.    For purposes of this Order, a crowd dispersal order is a lawful command given by a Federal Agent for all persons to leave a designated area when three or more persons are committing acts of disorderly conduct that are likely to cause substantial harm in the immediate vicinity;

    d.    Using riot control weapons—including kinetic impact projectiles (KIPs), Compressed Air Launchers (e.g., PLS and FN303), Oleoresin Capsicum (OC) Spray, CS gas, CN gas, or other chemical irritants, 40 mm Munitions Launchers, less-lethal shotguns, Less-Lethal Specialty Impact-Chemical Munitions (LLSI-CM), Controlled Noise and Light Distraction Devices (CNLDDs), Electronic Control Weapons (ECWs)—on members of the press, protesters, or religious practitioners who are not posing an immediate threat to the safety of a law enforcement officer or others;

    e.    Using riot control weapons (including those described above) at identified targets, if it is reasonably foreseeable that doing so could result in injury to the press, protesters, or religious practitioners who are not posing an immediate threat to the safety of a law enforcement officer or others, unless such force is necessary to stop an immediate and serious threat of physical harm to a person;

     f.     Firing CS or CN gas canisters, Controlled Noise and Light Distraction Devices (CNLDD), or Less-Lethal Specialty Impact and Chemical Munitions (LLSI-CM) so as to strike any person, including by deploying these weapons above the head of the crowd, unless the person poses an immediate threat of causing serious bodily injury or death to a person in equivalent circumstances to those where the officer is authorized to use deadly force;

     g.     Firing Compressed Air Launchers (e.g., PLS and FN303), or Munitions Launchers (e.g., 40mm), or KIPs so as to strike the head, neck, groin, spine, or female breast, or striking any person with a vehicle, unless the person poses an immediate threat of causing serious bodily injury or death to a person in equivalent circumstances to those where the officer is authorized to use deadly force;

     h.     Using force, such as pulling or shoving a person to the ground, tackling, or body slamming an individual who poses no immediate threat of physical harm to others, unless necessary and proportional to effectuate an apprehension and arrest;

     i.     Using any riot control weapon, including those listed in this Order, without giving at least two separate warnings when feasible at a sound level where the targeted individual(s) can reasonably hear it. Law enforcement officers determine feasibility by considering whether the resulting delay of issuing the warning and allowing reasonable time and opportunity for individuals to voluntarily comply is likely to create an immediate threat of causing physical harm to the officer or others. Such warnings shall explain that Defendants may employ riot control weapons, give the targeted individual(s) reasonable time to avoid the use of force, and provide a reasonable opportunity to comply;

j. Seizing or arresting any non-violent protester who is not resisting a lawful crowd dispersal order, unless there is specific probable cause to believe that the individual has committed a crime for which a custodial arrest is warranted and for which the law enforcement officer has lawful authority to make an arrest; and

k. To facilitate the Defendants' identification of Journalists protected under this Order, the following are examples of indicia of being a Journalist: visual identification as a member of the press, such as by carrying a professional press pass, badge or credentials; wearing distinctive clothing or patches that identify the wearer as a member of the press; or carrying professional gear such as professional photographic or videography equipment. Other indicia of being a Journalist under this Order include that the person is standing off to the side of a protest, not engaging in chanting, sign holding, shouting slogans, or otherwise protesting, and documenting protest activities, although these are not requirements. These indicia are illustrative, and a person need not exhibit every indicium to be considered a Journalist under this Order. Defendants shall not be liable for unintentional violations of this Order in the case of an individual who does not wear a press pass, badge, or other official press credential, professional gear, or distinctive clothing that identifies the person as a member of the press.

l. Defendants shall not be liable for violating this injunction if a protester, journalist, or religious practitioner is incidentally exposed to crowd control devices, chemical dispersal agents, or physical force if such device or force was used in a manner that complies with this injunction.

2. It is further ORDERED that all Federal Agents, excepting those who do not wear a uniform or other distinguishing clothing or equipment in the regular performance of their official

duties or are engaged in undercover operations in the regular performance of their official duties, must have visible identification (for which a unique recognizable alphanumeric identifier sequence will suffice) affixed to their uniforms or helmets and prominently displayed, including when wearing riot gear.

3.    It is further ORDERED that all Federal Agents who are conducting immigration enforcement operations in the Northern District of Illinois, excepting those who do not wear a uniform or other distinguishing clothing or equipment in the regular performance of their official duties or are engaged in undercover operations in the regular performance of their official duties, that are currently equipped and trained with body-worn cameras ("BWCs") shall activate them when engaged in enforcement activity unless exempted by CBP, ICE, or DHS policy.

    a.    The definitions of "body worn cameras" shall be as defined in DHS Policy Statement: Body Worn Camera: Audio/video/digital recording equipment combined into a single unit and typically worn on clothing or otherwise secured to a person, e.g., affixed to the outside of the carrier/tactical vest facing forward. DHS Policy Statement 045-07 VIII.

    b.    For the purposes of this Order, the definition of "enforcement activity" shall be as defined in ICE directive 19010.3 (3.6)(8): All aspects of ICE Enforcement Activities, planned and orchestrated in advance, conducted by ICE LEOs with certain exceptions listed at 3.7. Such activities include but are not limited to:

        1.    At-large arrests, including searches incident to such arrests;

        2.    Brief investigatory detentions, including frisks conducted during brief investigatory detentions;

5

A19

3.      Executing, and attempting to execute, criminal and administrative arrest warrants and in-person issuance of subpoenas;

4.      Executing and attempting to execute a search or seizure warrant or order;

5.      Execution of a Removal Order, to include aboard Special High-Risk Charter Flights and to conduct verification of Commercial Removal;

6.      Deploying to protect Federal Government facilities;

7.      Responding to public, unlawful/violent disturbances at ICE facilities;

8.      Interactions with members of the public while conducting the above-listed activities in the field;

9.      When responding to emergencies.

c.      Enforcement activities where BWCs will not be worn or activated for the purposes of this Order are:

1.      Where agents are conducting undercover activity or confidential informants will or may be present;

2.      Information-gathering surveillance activities where and when an enforcement activity is not planned;

3.      Onboard commercial flights;

4.      Controlled deliveries; and

5.      Custodial interviews conducted inside jails, prisons, detention centers, or ICE owned or leased facilities.

6

A20

      d.     This provision requiring BWCs shall not apply to Federal Agents operating at any port of entry into the United States including but not limited to Chicago O'Hare International Airport and Chicago Midway International Airport.

      e.     Defendants shall not be liable for violating this provision (i) for failure to record due to equipment failure or (ii) in the event that cloud storage for storing recordings made by BWCs should become unavailable either due to (a) the lapse in appropriations, (b) license or contract expiration, or (c) any other reason through no fault of Defendants.

4.     It is further ORDERED that Federal Agents widely disseminate notice of this Order. Specifically, Federal Agents are ORDERED to provide copies of this Order, in either electronic or paper form, no later than 5 p.m. on October 9, 2025 to any individuals scheduled to work at the Broadview ICE Facility on October 10, 2025 and no later than 11:59 p.m. on October 10, 2025 to all others described below:

      a.     all law enforcement personnel, officers, and agents of the Federal Agents currently or subsequently deployed in the Northern District of Illinois, including but not limited to all personnel in the Chicago region who are part of Operation Midway Blitz or any equivalent operation by a different name; and

      b.     all employees, officers, and agents of Federal Agents with supervisory or management authority over any law enforcement officers or agents currently or subsequently deployed in the Northern District of Illinois, up the chain of command to and including the Secretary of Homeland Security and other named Defendants.

5.     It is further ORDERED that Defendants shall issue guidance to officers and agents to implement this order. Defendants shall file with this Court any directives, policies, or

regulations implementing the guidance within 5 business days, with a continuing obligation to immediately file with this Court any subsequent changes or revisions to that guidance through the period of this Order.

6.    It is further ORDERED that in the event that Plaintiffs seek relief for an alleged violation of this Order, Plaintiffs should make good faith attempts to meet and confer with Defendants at least 24 hours before filing a request for relief and Defendants must respond to the motion for relief as ordered by the Court.

7.    It is further ORDERED that in the interest of justice, the Court orders Plaintiffs provide $0 in security, and the Court rules that any other requirements under Rule 65(c) of the Federal Rules of Civil Procedure are satisfied.

8.    The parties shall meet and confer and provide a joint status report within 7 days setting forth proposals for ensuring that Federal Agents present in the Northern District of Illinois while this action is pending remain informed of the limitations imposed by this Order.

9.    This Modified Temporary Restraining Order is entered at 5:00 P.M. on this 17th day of October 2025.  To allow the parties to prepare for the preliminary injunction hearing scheduled for November 5, 2025 and the Court time to rule thereafter and for good cause shown, the Modified Temporary Restraining Order shall remain in effect until November 6, 2025.

_____
Sara L. Ellis
U.S. District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

CHICAGO HEADLINE CLUB, BLOCK CLUB )
CHICAGO, CHICAGO NEWSPAPER GUILD )
LOCAL 34071, NABET-CWA LOCAL 54041, )
RAVEN GEARY, CHARLES THRUSH, )
STEPHEN HELD, WILLIAM PAULSON, )
AUTUMN REIDY-HAMER, LEIGH KUNKEL, )
DAVID BEALE, RUDY VILLA, JENNIFER )
CRESPO, REVEREND DAVID BLACK, FATHER )
BRENDAN CURRAN, REVEREND DR. BETH )
JOHNSON, REVEREND ABBY HOLCOMBE, on )
behalf of themselves and others similarly situated, )
                                                     )
     *Plaintiffs,*                          )
                                                     )
     v.                                      )
                                                     )
KRISTI NOEM, Secretary, U.S. Department of )
Homeland Security (DHS); TODD LYONS, Acting )
Director, U.S. Immigration and Customs )
Enforcement (ICE); MARCOS CHARLES, Acting )
Executive Associate Director, Enforcement and )
Removal Operations, ICE; RUSSELL HOTT, )
Chicago Field Office Director, ICE; SAM OLSON, )
Chicago Field Office Director, ICE; SHAWN )
BYERS, Chicago Deputy Field Office Director, )
ICE; RODNEY SCOTT, Commissioner, U.S. )
Customs and Border Protection (CBP); KYLE )
HARVICK, Deputy Incident Commander, CBP; )
GREGORY BOVINO, Chief Border Patrol Agent, )
CBP; DANIEL DRISCOLL, Director of the Bureau )
of Alcohol, Tobacco, Firearms and Explosives )
(ATF); WILLIAM MARSHALL, Director of the )
Federal Bureau of Prisons (BOP); PAMELA )
BONDI, Attorney General of the United States; )
KASH PATEL, Director of the Federal Bureau of )
Investigation (FBI); FARON PARAMORE, )
Director of the Federal Protective Service (FPS); )
U.S. DEPARTMENT OF HOMELAND )
SECURITY; U.S. DEPARTMENT OF JUSTICE; )
UNIDENTIFIED FEDERAL OFFICER )
DEFENDANTS; UNIDENTIFIED FEDERAL )
AGENCY DEFENDANTS; STEPHEN MILLER, )
White House Deputy Chief of Staff, and DONALD )
J. TRUMP, President of the United States, )
                                                     )
     *Defendants.*                            )

No. 25-cv-12173

Hon. Sara L. Ellis,
District Judge

**PLAINTIFFS' FIRST AMENDED
COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF**

## FIRST AMENDED COMPLAINT

Plaintiffs CHICAGO HEADLINE CLUB, BLOCK CLUB CHICAGO, CHICAGO NEWSPAPER GUILD LOCAL 34071, NABET-CWA LOCAL 54041, RAVEN GEARY, CHARLES THRUSH, STEPHEN HELD, WILLIAM PAULSON, AUTUMN REIDY-HAMER, LEIGH KUNKEL, DAVID BEALE, RUDY VILLA, JENNIFER CRESPO, REVEREND DAVID BLACK, FATHER BRENDAN CURRAN, REVEREND DR. BETH JOHNSON, and REVEREND ABBY HOLCOMBE, on behalf of themselves and others similarly situated, by their undersigned attorneys, hereby complain against Defendants KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations, ICE; RUSSELL HOTT, Chicago Field Office Director, ICE; SAM OLSON, Chicago Field Office Director, ICE; SHAWN BYERS, Chicago Deputy Field Office Director, ICE; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection (CBP); KYLE HARVICK, Deputy Incident Commander, CBP; GREGORY BOVINO, Chief Border Patrol Agent, CBP; DANIEL DRISCOLL, Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); WILLIAM MARSHALL, Director of the Federal Bureau of Prisons (BOP); PAMELA BONDI, Attorney General of the United States, KASH PATEL, Director of the Federal Bureau of Investigation; FARON PARAMORE, Director of the Federal Protective Service; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF JUSTICE; UNIDENTIFIED FEDERAL OFFICER DEFENDANTS; UNIDENTIFIED FEDERAL AGENCY DEFENDANTS; STEPHEN MILLER, White House Deputy Chief of Staff and U.S. Homeland Security Advisor; and DONALD J. TRUMP, President of the United States, in their official capacities, as follows:

2

**A24**

## INTRODUCTION

1.      The federal government has sent federal forces to cities across the United States in order to prevent the press, elected officials, religious leaders, and civilians engaged in peaceful protest from exercising their First Amendment rights.

2.      All over the country, federal agents have shot, gassed, and detained individuals engaged in cherished and protected activities.

3.      Never in modern times has the federal government undermined bedrock constitutional protections on this scale or usurped states' police power by directing federal agents to carry out an illegal mission against the people for the government's own benefit.

4.      This lawsuit concerns the right of the demonstrator Plaintiffs to exercise their First Amendment rights to peacefully protest and to exercise their religion in the Northern District of Illinois, including the area around the ICE facility in Broadview, Illinois, and in other places where demonstrators are opposing the Administration's federal incursion into the Chicagoland area. And it concerns the rights of the journalist Plaintiffs, as well as ordinary community members, to observe, record, and report on the federal agents' activities and the public's demonstrations against them.

5.      Plaintiffs endeavor to protect their basic constitutional rights to express their views opposing the lawlessness unleashed on the Chicagoland area, and to safely report on that public outcry, without fear of again being shot, gassed, and beaten by federal agents.

6.      Following the announcement of "Operation Midway Blitz" in early September 2025, the Trump Administration has ramped up immigration enforcement operations and deployed federal officers throughout the Northern District of Illinois.

7.      Civilians, elected officials, and religious leaders in the community have gathered at protests sites throughout the Northern District of Illinois, including daily protests outside of the Broadview ICE facility, spontaneous protests and demonstrations at locations where ICE and other Federal Officers are brutally enforcing the immigration laws, and elsewhere, to make their voices heard in opposition to the federal government's policies and actions. The demonstrations have taken place since the onset of Operation Midway Blitz and the scaling up of federal forces in this District. Demonstrations and protests are ongoing. The vast majority of protesters are animated but peaceful. The people of faith gather in prayer. Collectively, they express their views with chants, prayer, and uplifted voices.

8.      Local and national press have continuously covered the federal law enforcement deployment to Chicago and elsewhere in this District, sending reporters to the scenes of numerous protests. They have written countless news articles, keeping the public informed and facilitating public debate in furtherance of the bedrock American democratic principle that the government is accountable to its people.

9.      Federal agents have responded with a pattern of extreme brutality in a concerted and ongoing effort to silence the press and civilians. Dressed in full combat gear, often masked, carrying weapons, bearing flash grenades and tear gas canisters, and marching in formation, federal agents have repeatedly advanced upon those present who posed no imminent threat to law enforcement. Snipers with guns loaded with pepper balls, paintballs, and rubber bullets have trained their weapons on the press, on civilians, and even on religious leaders engaged in worship. Federal agents have tackled and slammed people to the ground; they have lobbed flash grenades and tear gas canisters indiscriminately into crowds; they have fired rubber bullets and

pepper balls at selected individuals; and they have cursed and shouted at demonstrators to provoke them.

10.    In addition, federal agents have repeatedly fired less lethal crowd-control munitions directly at clearly identifiable members of the press who were engaged in reporting. They have subjected members of the press to tear gas. And members of the press have been threatened and arrested by federal officers while reporting on protests for no reason other than in retaliation for documenting the federal response to the demonstrations.

11.    Many civilians and press are being injured and sickened, to the point of serious injuries. Some are being randomly singled out for arrest. They are tackled to the ground, handcuffed, and marched into captivity at the Broadview ICE facility and elsewhere, where they are detained *incommunicado* for hours.

12.    No legitimate purpose exists for this brutality or for these arrests. The officers are not physically threatened. No government property is threatened. Defendants are acting to intimidate and silence the press and civilians engaged in protected First Amendment activities.

13.    Plaintiffs seek this Court's protection of their constitutional rights, and they ask the Court to enjoin and prevent Defendants from further use of their unconstitutional tactics.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and 1367.

15.    Venue is proper under 28 U.S.C. § 1391(b). A substantial part of the events giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

### Journalist Plaintiffs

16.     Plaintiff CHICAGO HEADLINE CLUB is a non-profit membership organization of professional journalists working in the Chicagoland area with hundreds of professional journalist members. The Chicago Headline Club is the largest chapter of the Society of Professional Journalists, a national non-profit organization. The Chicago Headline Club's mission is to support member (and non-member) journalists in the Chicagoland area and to promote the values of a free press. The organization pursues this mission by offering trainings, networking opportunities, legislative advocacy, scholarships for young journalists, and by maintaining a legal defense fund to support journalists' First Amendment rights. Several journalist members of the Chicago Headline Club have been shot at with pepper balls by federal officers and subjected to other force while reporting at the Broadview facility.

17.     Plaintiff BLOCK CLUB CHICAGO is a nonprofit news organization registered in the State of Illinois. The organization delivers daily, nonpartisan, and essential coverage of Chicago's diverse neighborhoods through its newsletter, news website, and social media pages. Block Club's website is read by more than a million unique readers each month. Block Club has been covering the protests at the Broadview facility since mid-September. During that time, at least four Block Club reporters or photographers were hit with pepper balls by federal officers at the Broadview ICE facility and were at risk of enduring other forms of force, despite standing on public ways and apart from the crowd, wearing visible press credentials, and displaying other visible indications they were there as members of the press. The danger to Block Club's journalists has made it far harder to carry out its reporting at Broadview.

18.     Plaintiff THE CHICAGO NEWSPAPER GUILD LOCAL 34071 (CNG) is a member-led union that is a member chapter of The NewsGuild-CWA. The Guild's membership includes journalists at the Chicago Tribune, Chicago Reader, Chicago Sun Times, and City Bureau, as well as other members including Cook County Court Interpreters and the staff of labor unions and non-profits based in the Chicago area. As a labor union, CNG bargains collective agreements, and represents and organizes workers. CNG has several members who have been targeted by federal officers while reporting at the Broadview ICE facility despite being visibly identifiable as members of the press and not violating any laws or disobeying any lawful orders.

19.     Plaintiff NABET-CWA LOCAL 54041 is the Chicago chapter of the National Association of Broadcast Employees & Technicians nationwide membership union for news media. Local 54041 represents photographers and other journalists at Chicagoland broadcast news channels such as WLS (ABC affiliate), WFLD (Fox affiliate), WMAQ (NBC Universal affiliate), WSNS (Telemundo affiliate), and WGBO (Univision affiliate), and others. NABET's mission includes advocating for its members' working conditions and aiding them in the practice of journalism. As the federal violence toward journalists at the Broadview ICE facility has intensified, Plaintiff NABET-CWA has been forced to divert significant resources to tracking and responding to attacks on journalists by federal agents. At least two NABET-CWA members have been assaulted by federal agents while practicing their profession at Broadview in the past two weeks: one member was subjected to a cloud of tear gas when federal agents ordered him to get out of his clearly marked press vehicle, and the other was shot at close range in the chest with pepper balls by a federal agent.

20.    The organizations listed in paragraphs 16 to 19 above bring this action on their own behalf and, as applicable, on behalf of their members.

21.    Plaintiff RAVEN GEARY is a resident of Chicago, Illinois. Plaintiff Geary is an investigative journalist and co-founder of Unraveled Press, a local media organization. Plaintiff Geary has been reporting on the protests and federal response at the Broadview ICE facility since the beginning of September 2025. In that time, Plaintiff Geary, who always wears her press credentials as well as a helmet with "PRESS" on it, has been fired at by federal agents with pepper balls on several occasions, including on the morning of Friday, September 25, when she was hit directly in the face by an officer who shot her from approximately 30 feet away while she was standing in a public parking area, taking a picture of him. Despite the violence she has experienced, she intends to return to Broadview to continue reporting on the protests and the federal crackdown on them.

22.    Plaintiff CHARLES THRUSH is a journalism student and a contract reporter for Plaintiff Block Club Chicago. Plaintiff Thrush has been sent by Block Club Chicago to the Broadview ICE facility to report on the protests and the federal agents' actions targeting them. Plaintiff Thrush was shot in the hand while clearly identifiable as a member of the press, standing apart from protesters and videotaping as federal agents fired pepper balls at two peaceful protesters attempting to shelter behind a collapsible umbrella. Plaintiff Thrush was also subjected to tear gas and had to run to safety when officers indiscriminately fired chemical agents and kinetic crowd control devices into the crowd. Plaintiff Thrush intends to return to the Broadview ICE facility to continue reporting on the protests, but he has refrained from doing so on at least one occasion due to (and his Block Club editors') fear for his safety.

23.    Plaintiff STEPHEN HELD is a journalist and resident of Chicago. Plaintiff Held has been attending the protests at the Broadview ICE facility since they began in September and is well known to the federal officers at the facility as a member of the press. Plaintiff Held documents the protesters and the federal officer response to them with a video camera and on social media for Unraveled Press, which he co-founded. Plaintiff Held has been shot in the groin by federal officers. And on Saturday September 27, 2025, he was arrested while on a public parkway videoing officers arresting a protester and attempting to obey conflicting instructions from angry federal officers. Plaintiff Held, who was wearing no fewer than four visible indications that he was a member of the press, was tackled, thrown to the ground, handcuffed, and brought inside the Broadview facility. Hours later, he was released with no charges because he had done nothing wrong. Plaintiff Held wants to continue his work reporting at the Broadview ICE facility but is afraid that he will again be targeted if he returns.

**Other Plaintiffs**

24.    Plaintiff WILLIAM PAULSON is a 67-year-old retired union painter and student at the City Colleges of Chicago who came to the Broadview ICE facility to express his opinions in opposition to ICE's tactics in enforcing the immigration laws and to bear witness there. While Plaintiff Paulson was on the public way and in the company of other protesters, a group of ICE officers emerged from behind the fence surrounding the ICE facility and, without warning or ordering dispersal, began lobbing canisters of tear gas into the crowd and throwing flash bang grenades. He was overwhelmed and began to vomit. He wishes to return to Broadview to protest, but he is reluctant to do so.

25.    Plaintiff AUTUMN REIDY-HAMER is an Oak Park resident and mother who came to the Broadview ICE facility to protest because she disagrees with rounding up

immigrants, separating them from their families, and denying them access to lawyers. She wanted to gather with neighbors and elected officials to speak out against this peacefully and to say that the federal officers' actions do not represent her as a citizen and constituent. A federal officer threw a flash-bang grenade next to her resulting in temporary hearing loss and ringing in her ear. Federal officers also tear gassed her. She is unable to safely exercise her First Amendment rights in the face of federal officers' actions.

26.     Plaintiff LEIGH KUNKEL is a 38-year-old resident of Chicago. She went to the Broadview ICE facility on the morning of Friday September 26th to show solidarity for the members of her community who were being held inside and support those bravely taking a peaceful stand by protesting outside. She was struck in the back of the head and then in the nose by pepper balls shot by a federal officer from close range. When she was shot, she was taking cover behind a van after federal officers had begun shooting pepper balls into the crowd without any warning or apparent justification. She left the protest with welts, a bloody nose, and a newfound fear of exercising her First Amendment rights. She will return to the Broadview ICE facility to continue protesting and bearing witness, but she is afraid that when she does so, she will again be met with physical violence.

27.     Plaintiff DAVID BEALE is a father and Chicago resident. On October 3, 2025, as he biked to the gym, he saw ICE vehicles in his neighborhood on the Northwest Side of Chicago. He stopped to observe their activity, and along with other neighbors told ICE that he didn't want anyone to get hurt, cared about his neighbors, and expressed his belief that what ICE was doing was wrong. In response, an ICE officer called him a "faggot." And, without warning, an ICE agent threw a cannister of tear gas at the crowd, including Mr. Beale. Because of these events, Mr. Beale is reluctant to engage in similar interactions with ICE officers going forward.

28.     Plaintiff RUDY VILLA is a Chicagoan and community leader who, along with others, has worked to observe ICE activities in Chicago while trying to ensure that protests remain peaceful. On October 4, 2025, he went to an area in Brighton Park where he heard that there were people protesting ICE in response to ICE having shot someone. Mr. Villa was wearing a bright safety vest he had recently purchased. While there, he observed ICE/CPB agents trying to rile up the crowd and pointing a pepper ball gun at them. Then, without warning, they started shooting pepper balls at the crowd, including at women and children. They also, without warning, shot tear gas into the crowd.

29.     Plaintiff JENNIFER CRESPO is a Chicagoan and an attorney who has also worked to observe ICE activities in Chicago and ensure that the community can peacefully exercise its constitutional rights. On October 4, as she stood on the sidewalk working with local law enforcement to ensure the protests remained peaceful and calm, she was tear gassed by federal agents. She remains committed to exercising her First Amendment rights and helping others do the same but is fearful of being harmed.

**Religious Freedoms Plaintiffs**

30.     Plaintiff REVEREND DAVID BLACK is an ordained minister in the Presbyterian Church (PCUSA) who serves as Senior Pastor and Head of Staff at the First Presbyterian Church of Chicago in the Woodlawn neighborhood. As Rev. Black stood in the street offering prayers and urging ICE officers stationed on the roof of the Broadview ICE facility to repent from their unnecessarily brutal enforcement of the immigration laws, the ICE officers suddenly and without warning fired upon him, striking him repeatedly in the head with pepper balls. Moments later he was sprayed in the face with tear gas by officers on the street.

Rev. Black is called by his faith to return to Broadview to pray for ICE officers there, but his experience requires him to overcome fear in order to do so.

31.    Plaintiff FATHER BRENDAN CURRAN is a Catholic priest and a member of the Dominican Friars with the Province of St. Albert the Great, USA. He is the North American Dominican promoter for justice and peace and a member of the Dominican International Commission for Justice and Peace. He has been regularly attending Friday prayer vigils at Broadway Detention Center for 19 years and was among the original Catholic priests to start those vigils. For approaching two decades, Father Curran has peacefully led other religious adherents in praying the rosary for people detained at Broadway Detention Center, and for employees of ICE. Up until September 12, 2025 he had done so peacefully, but beginning on that date, on the dates he gathered to pray, the intimidating and violent conduct of federal agents, including ICE officers pointed guns from the roof of the building on their vigil, forced them to move their religious activity away from the ICE facility. Father Curran desires to continue to gather to lead others in prayer and expressions of their faith but he is in genuine fear that he will be shot, struck with pepper balls, sprayed with tear gas, or otherwise harmed if he continues to express his religious beliefs.

32.    Plaintiff REVEREND DR. BETH JOHNSON is an ordained minister in the Unitarian Universalist Church and serves a congregation in the suburbs of Chicago. She felt called by her faith to go to the area around the Broadview Detention Center to minister and witness to ICE activities there. On multiple occasions, as she gathered with other religious adherents at Broadview, praying and singing religious songs, she was tear gassed, shot with pepper balls and rubber bullets, and ultimately had to leave the area because of difficulty

breathing. Reverend Dr. Johnson wants to continue to express her religious beliefs at the

Broadway Detention Center, but is fearful that she will be harmed if she does so.

33.    Plaintiff REVEREND ABBY HOLCOMBE is a pastor at River Forest United

Methodist Church and the Urban Village Church – West in River Forest, Illinois. Reverend

Holcombe's faith called her show up for people detained at the Broadview ICE facility, to pray,

preach, sing, and provide spiritual comfort and healing for people at the facility. On September

19, 2025, she showed up at the facility, wearing her clerical collar, and witnessed people being

hit by and suffering the side effects of being tear gassed. As she herself was preaching, she was

targeted and shot at by ICE agents on the roof of the facility, forcing her to leave the area. On

October 10, 2025, she returned to the facility, tried to bring communion to folks detained inside

the facility, but was turned away. Although she would like to return to Broadview to continue her

religious practices, she has been traumatized by what she has experienced, and she has had to

limit her activities because of the risk of being injured.

### Defendants

34.    Defendant KRISTI NOEM is Secretary of U.S. Department of Homeland Security

(DHS). DHS is a Cabinet-level Department of the U.S. government. Its stated missions include

anti-terrorism, border security, immigration, and customs. It was created in 2002, combining 22

different federal departments and agencies into a single Cabinet agency.

35.    Defendant TODD LYONS is Acting Director and the senior official currently

performing the duties of the Director of the U.S. Immigration and Customs Enforcement (ICE),

an agency housed within DHS. Its stated mission is to "[p]rotect America through criminal

investigations and enforcing immigration laws to preserve national security and public safety."

36.     Defendant MARCOS CHARLES is Acting Executive Associate Director of Enforcement and Removal Operations within ICE.

37.     Defendant RUSSELL HOTT is the Chicago Field Office Director for ICE. ICE employees have been stationed at Broadview ICE facility and are among the federal officers who have used excessive force against protesters. After this Court entered an order directing Director Hott to appear before this Court on October 20, 2025 in order to answer questions about ICE's activities in Chicago, DHS informed the Court that Defendant Hott had returned to Washington, D.C., purportedly to resume responsibilities as field operations director in D.C.

38.     At least as of October 20, 2025, Defendant SAM OLSON is the interim Chicago Field Office Director for ICE.

39.     Defendant SHAWN BYERS is the Deputy Field Office Director for ICE in Chicago.

40.     Defendant RODNEY SCOTT is the Commissioner of the U.S. Customs and Border Protection (CBP). CBP is an agency within DHS. Its stated mission is to "[p]rotect the American people, safeguard our borders, and enhance the nation's economic prosperity." CBP employees have been stationed at Broadview ICE facility and are among the federal officers who have used excessive force against protesters.

41.     Defendant KYLE HARVICK is a Deputy Incident Commander with CBP.  In his role with CBP, he has been involved in directing CBP agents to use excessive force against protesters and journalists.

42.     Defendant GREGORY BOVINO is titularly the Chief Patrol Agent of the U.S. Border Patrol's El Centro Sector. After leading similarly violent and unlawful immigration enforcement efforts in Los Angeles in the summer of 2025, Bovino was reassigned to Chicago in

14

**A36**

September 2025. He has direct responsibility for all DHS activities in Chicago. On September 27, 2025, he personally directed federal officers to use excessive force against protesters and journalists at Broadview, and he personally used such force himself.

43.     Defendant DANIEL DRISCOLL is the Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). The ATF's stated mission is "[t]o conduct investigations utilizing our unique expertise, partnerships, and intelligence to enhance public safety by enforcing the laws and regulations and uphold the Constitution of the United States of America." ATF employees have been stationed at the Broadview ICE facility and are among the federal officers who have used excessive force against protesters and journalists.

44.     Defendant WILLIAM MARSHALL is the Director of the Federal Bureau of Prisons (BOP), an agency within the U.S. Department of Justice. BOP employees have been stationed at Broadview ICE facility and are among the federal officers who have used excessive force against protesters and journalists.

45.     Defendant PAMELA BONDI is Attorney General of the United States, and in that position, oversees the U.S. Department of Justice.

46.     Defendant KASH PATEL is the Director of the Federal Bureau of Investigation (FBI). The FBI is an agency within the Department of Justice responsible for federal law enforcement. FBI agents are among the federal officers who have used excessive force against protesters and journalists.

47.     Defendant FARON PARAMORE is the Director of the Federal Protective Service (FPS). FPS is responsible for protecting federal property, including deputizing DHS officers as needed.

48.     Defendant U.S. DEPARTMENT OF HOMELAND SECURITY (DHS) is a department of the executive branch of the United States government, responsible for coordinating immigration enforcement actions. ICE, CBP, and the DHS Management Directorate are component agencies within the Department of Homeland Security. Homeland Security Investigations (HSI) is a subordinate agency housed within ICE, while the Federal Protective Service (FPS) is a subordinate agency housed within the DHS Management Directorate. Likewise, CBP contains multiple law enforcement offices, including the U.S. Border Patrol and Office of Field Operations.

49.     Defendant U.S. DEPARTMENT OF JUSTICE (DOJ) is a department of the executive branch of the United States government, responsible for enforcing federal law. The ATF, FBI and the Bureau of Prisons are component agencies within the DOJ.

50.     UNIDENTIFIED FEDERAL OFFICER DEFENDANTS are unidentified agents and officers of federal agencies, acting under color of federal law and within the scope of their employment and duties with the respective agencies by which they are employed or for which they are agents, who are participating in the unlawful conduct described in this Complaint.

51.     Defendants UNIDENTIFIED FEDERAL AGENCIES are unidentified agencies or departments of the U.S. government whose employees or agents, acting under color of federal law and within the scope of their employment and duties with the respective agencies by which they are employed or for which they are agents, are participating in the unlawful conduct described in this Complaint.

52.     Defendant STEPHEN MILLER is the White House Deputy Chief of Staff and U.S. Homeland Security Adviser, who has directed the actions of federal agencies and agents at issue in this case.

**A38**

53.     Defendant DONALD J. TRUMP is the President of the United States and chief executive with responsibility for the federal agencies and agents acting under his authority.

54.     Each of the defendants is sued in their official capacity.

## ALLEGATIONS OF FACT

### The Trump Administration Deploys or Threatens to Deploy
### Federal Law Enforcement Officers and Military to Cities Across the United States

55.     During the summer and fall of 2025, the Trump Administration has deployed federal forces, including federal law enforcement officers and military forces, to cities across the United States.

56.     These deployments have been made under the guise of immigration enforcement and purportedly to protect federal employees. In truth, however, the deployments are calculated to provoke unrest, they are targeted at populations who disagree with the Trump Administration, and they are designed to suppress dissent, speech, and the press.

57.     The Trump Administration has conducted no assessment that any threat to federal employees or civilians requires displacing local law enforcement with federal forces. Instead, the Trump Administration has focused on jurisdictions where political leaders and civilian populations disagree with them and express different viewpoints.

58.     In particular, Defendant Deputy Chief of Staff Stephen Miller has directed the deployment of federal forces, acknowledging in interviews and social media posts that he himself (and not the President) is exercising the authority to "put federal law enforcement and national guard" into American municipalities.  He has recognized that by doing so he is causing the risk of riots and unrest. *Id.* According to Defendant Noem, Defendant Miller has provided direction "night and day" to DHS regarding the use of federal forces in American cities.

59.     Defendant Miller has said without providing any basis and ignoring the facts that "[t]he chaos in Chicago, NY, San Fran & Dem cities across the US is solely the result of Dem officials freeing criminals over & over until they kill." He has falsely asserted "the Democrats—like Newsom and Pritzker and Schumer—are relentlessly attacking the same law enforcement heroes the cartels are targeting with violence." Defendant Miller has said, "Ideological screening is foundational to the national interest."

60.     President Trump and his administration have referred to American civilians engaged in protected First Amendment activities as "anarchists," "agitators," "violent mobs," "crazy people," and "the enemy from within."

61.     Following demonstrations last weekend across the United States, the President showed his disdain for protesters with whom he disagrees by posting on social media an AI-generated video of himself, crowned and flying a fighter jet, dumping diarrhea on marchers in American cities.

62.     In every city to which they have been deployed, federal forces have used unjustified violence against the press, elected officials, religious leaders, and private individuals engaged in peaceful and protected activities, using extreme force indiscriminately and arresting people without any legal basis.

63.     These federal forces are not trained to conduct local policing, and their presence is superfluous to trained local police agencies, who are well-equipped to address issues of local law enforcement. Local officials have roundly disclaimed the need for federal assistance in policing.

### Injunctive Relief in Los Angeles Prohibits Federal Forces
### From Violently Suppressing Lawful Protests

64.     In early June 2025, the Trump Administration, without notice to local officials, began a series of indiscriminate immigration raids across Los Angeles, in which masked federal

officers in paramilitary gear brandished rifles and abducted community members from churches, local businesses, and courthouses.

65.     Rallying to oppose the actions taken against their friends and neighbors, community members protested at locations in which ICE officers were believed to be holding community members, including the Federal Building at the Roybal Complex.

66.     The overwhelming majority of the protesters exercised their First Amendment rights in a peaceful, nonviolent, and legally compliant manner. While there were isolated instances of individuals acting unlawfully, state and local law enforcement officials responded to such actions in a prompt, professional manner.

67.     Nevertheless, the Trump Administration deployed thousands of National Guard troops and federal law enforcement officers to Los Angeles, purportedly to quell the violence.

68.     Instead, the federal forces escalated the violence against civilians in Los Angeles, launching attacks on the press and peaceful protesters. Among other tactics, the federal forces fired volleys of tear gas, pepper balls, chemical spray, and rubber bullets indiscriminately into crowds of civilians.

69.     The Trump Administration's deployment of federal forces and the tactics used in Los Angeles are at issue in *Los Angeles Press Club v. Noem*, No. 2:25-cv-05563 (C.D. Cal. 2025) (Vera, J.). In that litigation, the district judge, among other things, has preliminarily enjoined the federal defendants from "[u]sing crowd control weapons (including kinetic impact projectiles ("KIP"s), chemical irritants, batons, and flash-bang grenades) on members of the press, legal observers, and protesters who are not themselves posing a threat of imminent harm to a law enforcement officer or another person." *L.A. Press Club*, No. 2:25-cv-05563, Doc. No. 55

at 43 (Sept. 10, 2025), appeal filed, *L.A. Press Club v. Noem*, No. 25-5975 (9th Cir. Sep. 19, 2025).

70.     As the federal deployment of forces in Los Angeles continued, President Trump warned that the deployment in California was "the first, perhaps, of many" federal efforts to suppress protected First Amendment activities, and that civilians demonstrating in future would be met with "equal or greater force."

### Federal Forces Are Deployed in Washington, D.C.

71.     Shortly thereafter, in August 2025, the Trump Administration deployed federal forces in Washington, D.C.

72.     Despite a historic decrease in the rate of violent crime in that city, President Trump declared that local crime was an emergency and assumed control of the city's Metropolitan Police Department.

73.     At the same time, the Trump Administration deployed thousands of National Guardsmen in Washington, D.C., authorizing them to carry firearms. A majority of these guardsmen were from out-of-district.

74.     In response, thousands of residents have gathered to peacefully protest the deployment of federal forces and National Guard on city streets.

75.     These forces have patrolled the capital's main tourist areas and neighborhoods across the city, fully armed, traveling in armored vehicles, and wearing military fatigues.

76.     The District of Columbia filed a lawsuit on September 4, 2025, seeking declaratory and injunctive relief to enjoin the overreach by the executive branch. The issues are currently being litigated.

### The Trump Administration Deploys Federal Forces to
### Portland, Memphis, and New Orleans

77.     In Portland, Oregon, civilians began peaceful protests at an ICE facility in early

June. Federal agents responded to these protests by using tear gas, pepper balls, and smoke

grenades indiscriminately, and by arresting protesters.

78.     On September 27, 2025, President Trump, stating that he was acting at the request

of Defendant Noem, ordered Secretary of Defense Pete Hegseth, "to protect War ravaged

Portland and any of our ICE facilities under siege from attack by Antifa, and other domestic

terrorists. I am also authorizing Full Force if necessary," even though there was no evidence of

any siege or attack in Portland. The Trump Administration has federalized and will imminently

deploy National Guardsmen to Portland, and it has reportedly considered sending troops from the

82nd Airborne Division, an elite combat division of the U.S. Army, to Portland.

79.     In response to the threat and deployment of the National Guard in Portland,

peaceful protests have continued at the ICE facility. Federal agents have tackled protesters and

indiscriminately used chemical agents.

80.     In New Orleans, Louisiana, the Trump Administration has made similar threats to

deploy military forces. On September 3, President Trump said, "We're making a determination

now—do we go to Chicago, or do we go to a place like New Orleans where we have a great

governor, Jeff Landry, who wants us to come in and straighten out a very nice section of this

country that's become quite tough, quite bad. So we're going to maybe Louisiana and you have

New Orleans, which has a crime problem. We'll straighten that out in about two weeks, it will

take us two weeks. Easier than D.C."

81.     Leaked plans from the Pentagon in mid-September showed the federal

government's intention to deploy 1,000 National Guardsmen to cities in Louisiana, including

**A43**

New Orleans, contingent on Governor Jeff Landry requesting the National Guard. Governor

Landry made that request on September 29, asking Secretary Hegseth to deploy 1,000

guardsmen to address "ongoing public safety concerns regarding high crime rates," although

New Orleans is currently experiencing some of its lowest crime rates in decades.

82.    In Memphis, Tennessee, the Trump Administration has taken similar action. On

September 15, President Trump signed an order establishing a "Memphis Safe Task Force," in

response to the "dire" situation in Memphis where "tremendous levels of violent crime [] have

overwhelmed its local government's ability to respond effectively," although some crime rates

have declined in the last twenty months. This task force includes the deployment of federal

agents as well as military forces. A member of President Trump's administration told the task

force that they are "unleashed," and that the goal was to "bulldoze the criminal elements in the

city, and therefore liberate the law-abiding citizens." On October 10, National Guard members

patrolled at a sporting goods store and at a tourist welcome center in Memphis.

83.    On October 17, 2025, public officials with the City of Memphis and Shelby

County, Tennessee, sued officials over the deployment, arguing that it violated Tennessee law.

*Harris, et al., v. Lee, et al.*, 25-1461-I, Complaint (TN Chancery Ct. Oct. 17, 2025).

**The Trump Administration Has Recently Deployed Federal Forces to Chicago**

84.    In his first term in office, President Trump vowed to send a "surge" of federal law

enforcement officers to Chicago "whether they like us there or not," to deal with protesters and

crime in a city that President Trump called "stupidly run" "by liberal Democrats."

85.    Beginning in August and September 2025, President Trump again focused on

Chicago, saying that he would send federal forces, purportedly to address a crime spike.

President Trump called Chicago a "killing field" and the "murder capital of the world." He said

"Chicago is the worst and most dangerous city in the World, by far …. I will solve the crime problem fast, just like I did in DC. Chicago will be safe again, and soon." He added that, in his view, the people of Chicago were "screaming" for help, in particular "African American ladies, beautiful ladies are saying, please, President Trump, come to Chicago, please."

86.    The President's statements about crime in Chicago are lies. Chicago has seen record reductions in the frequency of violent crime in recent years, and its violent crime rate per capita is lower than many other cities in the United States, including Kansas City, Cincinnati, Indianapolis, and Little Rock. The past summer was the least violent in Chicago since 1965.

87.    Illinois Governor J.B. Pritzker has said, "There is no emergency that warrants the deployment of troops" to Chicago. Mayor Brandon Johnson has added, "We do not want or need military occupation in our city."

88.    Nonetheless, on August 22, 2025, President Trump signed an executive order directing the newly retitled Secretary of War to establish quick reaction forces within the National Guard to assist local, state, and federal law enforcement.

89.    On September 6, 2025, President Trump escalated his rhetoric, describing his planned operations in Chicago as a "war," this time emphasizing immigration enforcement, instead of crime. President Trump shared the image below on social media, depicting the Chicago skyline ablaze, swarming with military helicopters, with the title "Chipocalypse Now," and the statement "I love the smell of deportations in the morning. Chicago about to find out why it's called the Department of WAR":





90.     On September 8, 2025, DHS announced that ICE and CBP officers would join the deployment to Chicago as part of a campaign named "Operation Midway Blitz." The press release announcing Operation Midway Blitz stated that the operation would "target the criminal illegal aliens who flocked to Chicago and Illinois because they knew Governor Pritzker and his sanctuary policies would protect them and allow them to roam free on American streets."

91.     Since then, DHS leadership and hundreds of federal agents have swarmed City streets. The Pentagon approved plans for DHS to base federal operations at the Great Lakes Naval Station, the largest military base in Illinois. Defendant Bovino, who led operations in Los Angeles, has taken over operations in Chicago. Defendant Noem has been present in Chicago as well, directing federal forces personally.

92.     Defendant Miller has been a "key architect" and leader of the Trump Administration's actions in Chicago. He is the leader of the Trump Administration's overall immigration policy. He also has hundreds of thousands of dollars of stock in Palantir, a tech company whose data systems ICE uses, giving him a strong personal incentive for ICE to increase its operations, whatever the cost. In June of 2025, he set a goal for ICE to arrest 3,000 people every day across the United States.

93.     In keeping with Defendant Miller's and the remaining Defendants' plans, roving patrols of masked, militarized, and often unidentifiable agents have been seen on streets from Chicago's city center to its suburbs. Federal agents have killed civilians, and they have used extreme and unlawful force against individuals. They have illegally stopped, detained incommunicado, and arrested hundreds of people, including many citizens. Federal agents have arrested elected officials without any basis. They have conducted military-style raids on civilian apartment complexes, terrorizing residents, including children, and demolishing personal property. They have blown off the doors of people's houses with explosive devices. They have shot at people. They have thrown tear gas canisters on city streets. They have conducted operations at hospitals, schools, and places of worship.

94.     Defendants made no credible assessment prior to the start of Operation Midway Blitz that the operation was necessary to protect federal employees or civilians in the Chicago area.

95.     The Trump Administration has stated explicitly its intention to illegally suppress speech and assembly, use illegal force, and conduct illegal detentions of individuals who oppose them.

a.     Defendants have focused their federal incursions on cities in "blue" states, where Democrats make up the majority of voting constituents, like Chicago and Los Angeles, or blue cities in red states, like Memphis and New Orleans. President Trump has said that such cities pose "a war from within," and that he instructed the Secretary of Defense that "we should use some of these dangerous cities as training ground for our military."

b.     President Trump recently commented that Democrats follow "the devil's ideology."

c.     Defendants have focused in particular on political opponents. For example, President Trump has specifically said he is deploying federal forces to Chicago "against Pritzker."

d.     Defendants have focused on journalists and media organizations they do not agree with, repeatedly referring to journalists as "disgusting," "crooked," "dangerous," and, most significantly, as "the enemy of the American people." President Trump has suggested that critical media coverage of his administration is "illegal" and "no longer free speech."

e.     Defendant Miller has described people peacefully protesting against ICE's actions in Chicago as engaging in "domestic terrorism and seditious insurrection."

f.     Defendant Miller has also called the Democratic Part "a domestic extremist organization" that is "devoted exclusively to the defense of hardened criminals, gangbangers, and illegal alien killers and terrorists."

g.     Defendants have made clear that they are against protests in general, and that protesters should be met with violence as a consequence of speaking out. For instance, President Trump stated that protesters in the Chicago area were "going to be met with

26

**A48**

equal or greater force" to that used in Los Angeles. Defendant Noem added, "The more

that they protest … the harder ICE is going to come after them." Trump has said that "In

the good old days" protesters were treated "very, very rough. And when they protested

once, you know, they would not do it again so easily."

h.      Defendants have focused on viewpoints that they do not like. For example, on

September 25, President Trump issued a presidential memorandum directing the National

Joint Terrorism Task Force to investigate, prosecute, and disrupt individuals and groups

that criticize law enforcement and border control policies and actions because such

actions were "anti-American." This theme has been conveyed to federal officers stationed

at the Broadview ICE facility. Secretary Noem has promised the agents stationed at

Broadview that they will be given full authority to "hammer" and arrest the protesters for

"the way that they're talking, the way that they're speaking, who they're affiliated with."

i.      Meanwhile, Defendants have ignored and, in some cases, even sought to defend

viewpoints that support Defendants' policies and actions. For example, on October 3,

Defendant Bondi dispatched the DOJ Civil Rights Division to investigate the arrest of

conservative-leaning journalist Nick Sorter who has supported the Trump

Administration's policies and actions, despite calling for the arrest of other journalists

who have criticized those same policies and actions.

j.      Defendants have stated clearly that they intend to illegally arrest civilians. The

DHS has stated that it is now federal government policy to conduct arrests based on

"reasonable suspicion," rather than the probable cause standard required by the Fourth

Amendment. Similarly, Defendant Bovino has indicated an intent to use arrests as a

27

**A49**

means of suppressing free speech by referring to the newly-erected "free speech zone"

outside the Broadview ICE facility as a "free arrest zone."

96.     Governor Pritzker said that the Trump Administration's rhetoric and operations in

Chicago are authoritarianism.

97.     Many people in the Chicagoland area are opposed to the Trump Administration's

actions. Following a longstanding tradition of protest, individuals in Chicago have led peaceful

marches, demonstrations, and other protests throughout the region. The Broadview ICE facility

became the initial focal point for those protests. As the Department of Homeland Security has

ramped up violent immigration enforcement actions throughout the Northern District of Illinois,

the individual Plaintiffs and others have gathered non-violently to protest, observe, document, or

record these operations.

### To Suppress Media Coverage of DHS Violence
### And Peaceful Protest, Defendants Attack the Press

98.     As President Trump and other high-level Administration officials intensified their

anti-immigrant and anti-Chicago rhetoric, Operation Midway Blitz was rolled out, and federal

officials continued to fill the Broadview ICE facility with immigration detainees and other

arrestees, the Broadview location became an active center for protest and dissent. Protest and

dissent expanded throughout the Northern District of Illinois, as DHS's violent and unrestrained

immigration enforcement caused incidents around the District that angered and disturbed

residents and others.

99.     The protests at the Broadview ICE facility and elsewhere, DHS unjustified

violence, and the federal government's violent attempts to silence protesters became a story of

great interest to the local Chicago media and was also covered in the national press. Much of the

coverage described the federal officers' abusive tactics. Defendants sought and are seeking to quash this coverage by attacking and intimidating members of the Press on the ground.

100.    Federal immigration officers have repeatedly and intentionally singled out persons whom they know to be members of the Press for violence, assault, and intimidation. These assaults are not incidental or unintentional. They are undertaken by design to intimidate journalists on scene and to frustrate and suppress coverage of the federal officers' actions toward protesters and immigration detainees.

101.    The attacks on individual journalists are too numerous to list in full. The following incidents are merely illustrative.

a.    Leigh Giancreco is a freelance reporter who was sent by Block Club Chicago to report on the Broadview protests. Even though she was wearing a black helmet labeled PRESS, a neon yellow vest, and press credentials, federal officers shot pepper balls at her, striking her repeatedly.

b.    Plaintiff Raven Geary is a journalist with Unraveled Press who has been covering the actions of ICE at the Broadview facility and throughout Chicago for months and is known as a member of the press to many of the federal agents stationed at Broadview. Nevertheless, and while wearing visible press credentials and press patches, she was shot with a pepper ball in the face without warning while standing in a public parking lot taking a photo of a federal officer.

c.    Plaintiff Charles Thrush is a freelance reporter in his final year of journalism school at DePaul University. He is a contract reporter for Block Club Chicago covering the protests. At the Broadview facility, wearing his press credential around his neck, Mr. Thrush was singled out, fired upon, and struck with a pepper ball. The federal officer shot

29

A51

Mr. Thrush despite the fact he was standing at a distance from the protesters and even though (or because) he was clearly displaying his press credential.

d.      Colin Boyle is a photojournalist who was reporting on the protests in collaboration with Mr. Thrush. Mr. Boyle wore a black backpack clearly marked PRESS and a hat with a Velcro PRESS patch as well as his Chicago Police Department-issued press credentials. He was carrying two cameras. As he photographed peaceful protesters being fired upon by federal officers, Mr. Boyle was also struck with pepper balls.

e.      Shawn Mulcahy is the News Editor of the Chicago Reader and a member of the Chicago News Guild. At the Broadview facility, he wore press credentials, wore a helmet marked PRESS, and carried a notebook. On September 26, 2025, while Mr. Mulcahy was clearly engaged in journalistic activity, a federal officer shot him with a rubber bullet or foam round. Later that same day, ICE agents threw tear gas canisters at Mr. Mulcahy and a group of other journalists.

f.      On the morning of September 29, 2025, in a well-publicized incident, a journalist with CBS Chicago was targeted while in her car driving near the Broadview ICE facility checking on the status of the protests. A federal agent standing behind the fence shot pepper balls at the journalist's car, and chemicals went through her window. There were no protests or activities at Broadview at the time. The journalist had to stop her car and get out as the chemicals engulfed the interior of her vehicle. The Illinois State Police and Broadview Police are investigating the attack.

g.      On October 14, an incident in which an ICE vehicle crashed into another car, CBP officers deployed tear gas throughout the neighborhood on an assembled group of protesters, including clearly-identifiable journalists.

h.      Journalist Paul Goyette was targeted with a flash bang grenade thrown just 18 inches from his leg.

i.      Matthew Kaplan and other journalists reporting on an event in Chicago's East Side neighborhood were targeted with tear gas.

j.      Journalist Steve Held was tear gassed while he was reporting on an incident in the Brighton Park neighborhood of Chicago.

102.    The purpose of these and other attacks was to frighten these and other journalists so that the federal officers' violence and suppression of dissent would go unreported.

**Protests at Broadview in September and October 2025 as Operation Midway Blitz Ramped Up; Federal Officers Responded with Brutality in an Effort to Quash Dissent**

103.    At the onset of Operation Midway Blitz, the Broadview ICE facility became a center of focus for protest and dissent. Growing numbers of people from all walks of life came to Broadview to express their disagreement with the presence of Department of Homeland Security officials in the Northern District of Illinois and their violent tactics, as well to dissent from other Trump Administration policies. Protests and prayer vigil at Broadview occurred on a near-daily basis throughout the month of September and into October and are expected to continue.

104.    The protesters have expressed and continue to express their views by chanting and singing, through prayer, and, in some cases, by shouting their condemnation of the actions of ICE and other immigration enforcement authorities. With only a few exceptions, the protests at the Broadview ICE facility have been peaceful and non-threatening to the federal officers and the operations within and around the facility. The protesters staged and are staging their demonstrations of dissent on public property (sidewalks, parkways and the street) in front of and adjacent to the Broadview ICE facility.

105.    The Broadview ICE facility is located at 1930 Beach Street in Broadview, Illinois. The multi-story brick structure is set back from Beach Street and surrounded by a fence, and as of Tuesday September 23, 2025, is protected by a second fence that blocks part of Beach Street. Beach Street is a public way. It is within the jurisdiction of the Broadview Police Department, which is responsible for patrol of Beach Street and other public thoroughfares in Broadview.

106.    Acting on direction from agency heads and from high level officials, including the Secretary of Homeland Security, the United States Attorney General, President Trump himself, and the other Defendants named in this complaint, the federal officers at Broadview and elsewhere in the Northern District of Illinois have determined, and remain determined, to deploy physical brutality, tear gas, mace and pepper spray; exploding pepper balls and rubber bullets; flash grenades; and other tactics specifically designed to intimidate, to instill fear, and to silence those who are present to protest, report, observe or document. These tactics are being used to silence and to retaliate against those who are protesting in opposition to the immigration policies of the Trump Administration and perceived political enemies.

107.    The federal authorities have stationed a small group of enforcement officers on the roof of the Broadview ICE facility. Those officers bear weapons that can discharge exploding chemical pellets and rubber bullets, as well as lethal firearms. From their location on the rooftop, they can survey the crowd of protesters below and can target and shoot at individual protesters. Many protesters and those gathering to pray have felt intimidated by the officers' armed presence while they protest and pray. Those gathered have been injured by pepper balls and rubber bullets that these rooftop snipers have aimed in the direction of their faces and torsos.

108.    Other federal enforcement officers are assigned to apparent platoons that muster in the courtyard area in front of the Broadview ICE building. These officers, like the officers on

32

**A54**

the rooftop, wear cloth masks, dress in army-style fatigues, and carry weapons, tear gas canisters, flashbang grenades, and other implements. In response to the protests, these groups of officers sometimes surge beyond the ICE facility fence without warning and storm the protesters. They attack by slamming individual protesters to the ground, wielding batons and shields, throwing tear gas canisters indiscriminately at groups of protesters, and macing individual protesters in the face at close range, among other things. These are tactics that the federal officers have honed and deployed against dissenters around the country.

109.    There is no legitimate law enforcement purpose for these actions. The protesters do not take actions that threaten the federal officers. The federal officers' brutality is not a response to the violation of any previously given order to disperse or to desist. Rather, the brutality described in the prior paragraphs is deployed solely to silence dissent, to intimidate, and to instill fear.

110.    These tactics (including the use of tear gas and mace along with rubber and pepper balls in particular) create a risk of significant physical harm and injury. Exposure to tear gas can cause long-term respiratory damage among other physical and psychological harms, and flashbangs risk blasting a radius of shrapnel every time they are deployed.

111.    The individual acts of brutality by federal officers are too numerous to catalogue. By way of example only, the following acts of violent intimidation have been employed against innocent, non-threatening individual protesters over the course of September and up to the filing of this complaint:

a.    On September 19, ICE officers approached a group of protesters seated on Beach St. and, without warning or giving a dispersal order, grabbed the protesters, picked them up, and threw one protester onto the ground. The incident is recorded on video.

33

A55

b.      On that same day, ICE officers fired a barrage of rubber bullets and pepper balls from the roof of the Broadview facility into the crowd of protesters below while federal officers on the ground bombarded protesters with flashbang grenades and tear gas. Protester Madeline Sullivan attempted to help the injured, but became overwhelmed, disoriented and ill. Sullivan vomited and continues to suffer back and neck pain.

c.      Daniel Shouse protested on September 22 and 24. On the first day, without warning and with no provocation, an ICE officer repeatedly shot him with a paintball gun. The second day, officers shoved him without provocation and nearly ran him over as he attempted to avoid an intersection. Mr. Shouse sought treatment in a hospital.

d.      Autumn Reidy-Hamer, a resident of Oak Park, came to protest on September 26 and 27. She was part of a group that federal officers sprayed with tear gas and pepper spray without warning or provocation. She saw officers push and shove protesters without warning or provocation.

e.      William Paulson, aged 67, was part of a group of protesters who were protesting peacefully only to be approached by federal officers who tackled a protester and threw him hard to the ground. For no apparent reason and without warning, federal officers from behind the Broadview facility fence lobbed tear gas canisters into the group.

f.      Throughout the evening and night of September 27, federal officers released roaming clouds of tear gas at non-threatening protesters, fired exploding pepper pellets and rubber bullets at protesters from close range, pushed and shoved peaceful protesters and confiscated their signs. All of these violent and unprovoked responses are recorded on video. Some were witnessed by Mr. Paulson.

34

A56

g.      Michelle Narvaez, who came to the Broadview ICE facility on September 22 and

again on September 24 to protest the federal officers' violence and suppression of free

speech, witnessed federal agents use flashbang grenades, tear gas and pepper balls against

non-threatening protesters. She saw federal officers, with no warning, shoot a 16-year-old

child who was approaching the Broadview facility to drop off possessions for his

detained father after he was instructed to approach the facility by an officer inside.

h.      Rev. David Black, an ordained Presbyterian minister, came to Broadview on

September 19, visibly attired in clerical garb, to protest, to pray, and to minister to ICE

officers by encouraging them to change their ways, was repeatedly struck in the face

when ICE snipers fired exploding at him from the roof of the Broadview facility.

Moments later he was doused with chemical spray that ICE agents directed at his face.

These events are recorded on video.

i.      Rev. Dr. Beth Johnson, an ordained minister in the Unitarian Church, was fired

upon without warning or justification as she and other protesters and clergy members

stood on the sidewalk singing "We Shall Not Be Moved" and other traditional songs of

protest. Rev. Dr. Johnson was wearing her clerical collar.

j.      Rev. Abby Holcombe was shot at with some kind of projectile as she stood in

front of a group of worshipers, wearing her clerical collar that clearly identified her as a

pastor, as she prayed for people to "love [their] neighbor."

k.      Rev. Quincy Worthington witnessed ICE agents repeatedly shooting with pepper

balls a handicapped woman lying on the ground unable to get up, resulting in her needing

an ambulance. As he explained, "Here there's no warning, no provocation.  They just

open up on you. Sometimes we can't even determine what they're trying to do."

l.      Juan Munoz, a Trustee of the Township of Oak Park Board, peacefully protested

and observed at Broadview on October 3, ultimately standing behind a barrier as directed

by an on-scene federal agent. As he stood there filming, he was thrown to the ground and

zip-tied by Defendant Bovino himself, leading to his detention at Broadview for 8 hours.

During those 8 hours, he was used as a prop by Defendant Noem and Defendants, who

displayed him and others who had been arrested by sitting them zip-tied on a barricade as

Noem was interviewed by a pro-Trump YouTuber, Benny Johnson. Noem falsely told

Johnson that Munoz had been arrested for "violent" conduct. During his detention Munoz

was processed, interviewed, ridiculed, but ultimately released without charges by federal

authorities who drove him and others in a van to a local gas station and left them there.

These are examples only, and they could be multiplied many times over. Federal officers, acting

on instructions and encouragement from high government officials, have systematically worked

to intimidate and terrorize non-threatening protesters. They have done so daily since the protests

at the Broadview facility began. These attacks on free speech are continuing and will continue

unless they are enjoined.

112.    The violence perpetrated by the federal officers–particularly the deployment of

massive quantities of toxic chemicals as they attempt to suppress dissent–also affects the

community where the Broadview facility is located.

113.    Clouds of tear gas and other chemicals have sickened residents. By way of

example only:

a.      Jose Juan Alvarado, a resident of Broadview, reports that he and his wife were

sickened and reduced to tears when they went to the grocery store, passing through

clouds of tear gas.

b.      Reggie Thompson has been unable to access services, including grocery delivery and electrical support, because of the federal agents' violent presence. The vast quantities of tear gas have aggravated his asthma.

c.      Local business owner Robert Butler-Bey has experienced emotional distress and has been unable to breathe because of the tear gas.

d.      Dimeko Harden, who lives a block from the Broadview facility, has been unable to retrieve mail, to bring repairmen into her home and to engage in normal activities without experiencing pain and difficulty breathing. She has been forced to keep her teenage son at home, because he suffers from asthma.

114.    The mayor of Broadview, Katrina Thompson, has made federal agents aware of the harm their actions are causing to her community. Mayor Thompson stated "[t]he relentless deployment of tear gas, pepper spray and mace at the ICE facility is endangering nearby village residents, harming police officers, harming firefighters and American citizens exercising their First Amendment rights," Broadview's Chief of Police echoed these concerns, explaining that federal agents have "verbally abused" his officers and stating, "[t]he employment of tear gas, pepper spray, mace, and rubber bullets by ICE … is creating a dangerous situation for the community and our first responders."

**The Federal Officers' First Amendment Violations Expand Beyond Broadview**

115.    In furtherance of Operation Midway Blitz, agents under Defendants' supervision have escalated and expanded their suppression of speech and journalism throughout the Northern District of Illinois, including in the Chicago neighborhoods of Logan Square, Humboldt Park, Brighton Park, and East Side. In multiple separate incidents federal officers deployed the same tactics they have been using at Broadview against spontaneous crowds that had gathered and

were peacefully expressing opposition to Operation Midway Blitz and the tactics being used by ICE and other federal agencies.

**Federal Officers Have Specifically Targeted People
Peacefully Observing and Documenting ICE Activities**

116.    As DHS officers have fanned out throughout Chicago and the Northern District of Illinois, they have specifically targeted regular citizens who are peacefully observing and documenting the officers' actions in their community. People who are staying at a respectful distance, doing nothing to "interfere" with agents' actions other than by documenting and observing, thereby bearing witness to ICE's actions, have been threatened, arrested, and menaced.  By way of example:

a.    On September 18, in the Humbold Park neighborhood, as Arely Barrera was driving around the area, she parked 50-100 feet away from ICE agents making an arrest to document their actions. As she photographed what they were doing, ICE agents in a vehicle without plates drove up to her, blocking her in her parking spot, and aggressively photographed her and threatened her with arrest.

b.    On October 4, in the Brighton Park neighborhood, Rudy Villa went to an area in Brighton Park where he heard that people were protesting ICE in response to an incident in which someone had been shot by ICE agents. Villa purchased his own reflective safety vest and went to the scene and for a time was effectively liaising between protesters and law enforcement present on the scene to help ensure protests remained peaceful. While he was there, he observed ICE and CPB agents trying to rile up the crowd by yelling and pointing a pepper bell gun at assembled protesters. Without any warning, federal agents shot pepper balls at the crowd, including at women and children who were observing the scene. When they were preparing to leave, and without communicating with Rudy or

others who could have helped dissipate the crowd so federal officers could depart, the officers deployed tear gas into the crowd, thereby effectively deploying tear gas through the neighborhood. They then left the area.

c.      On October 10, as Jo-Elle Munchak got out of her car to wordlessly and peacefully record an arrest by a federal immigration agent in the Uptown neighborhood of Chicago. Afterward, when she got back in her car to continue home, federal agents stopped her car, demanded she get out, and aimed at gun at her head, threatening her that if she did this again she would be detained.

d.      On October 12, a crowd gathered as federal agents appeared in Chicago's Albany Park neighborhood. Federal agents ran over the foot of a woman standing in the street. Without any warning, the agents deployed tear gas onto the street, gassing everyone present.

e.      On October 14, after federal agents were involved in a car crash in a neighborhood on Chicago's East Side, residents gathered, some protesting and some simply observing, when CBP agents indiscriminately and without warning deployed tear gas across the area, gassing bystanders, children, and neighborhood residents.

**Federal Officers Have Antagonized Assembled Protestors
And Used Tear Gas Without Warning to Disrupt Protected Speech Activity**

117.      On October 1, in Cicero, Illinois, a CBP agent approached and aimed a gun at Leslie Cortez because she and other residents had been observing and recording immigration agents at a distance.

118.      On October 3, residents of Logan Square spontaneously gathered to express their opposition to the immigration activity occurring in the area. The crowd was peacefully voicing their opposition to the tactics and mission of federal immigration officers. The ICE officers

responded by yelling slurs at the assembled crowd, including calling one protester a "faggot." Then, without warning, an ICE officer threw a canister of tear gas at the assembled protesters.

119.    That same day, Chicago Alderperson Jessie Fuentes went to a hospital in Humbolt Park in response to the staff's request that she respond to help them because ICE agents were at the hospital, scaring staff and patients. Alderperson Fuentes responded, spoke to ICE agents in a common area of the hospital, and informed them that she was an elected official. Agents from ICE and CBP responded by shoving her, swearing at her, handcuffing her, removing her from the hospital, and ultimately releasing her with a warning that if she returned to the hospital she would be arrested.

120.    In Brighton Park, protesters gathered in response to a large and visible presence of ICE and CBP officers on the morning of October 4. A crowd of fifty to seventy-five protesters held signs, filmed, and shouted for ICE to leave Chicago. Chicago Police officers took up a position between the protesters and the federal officers, but at some point the federal officers pushed past the local police officers and began pointing weapons at the protesters and using less-lethal munitions including flashbang grenades, tear gas, and rubber bullets. In one incident in the neighborhood a group of five or six CBP officers shot tear gas canisters, without any warning, into a group of people who were peacefully protesting 30-40 feet away from them. Chicago Police officers and civilians alike were subjected to the tear gas and forced to disperse from the streets and sidewalks.

121.    In Humbolt Park, federal immigration agents encountered protesters yelling "you're not welcome here." Some protesters attempted to block the agents' vehicles and were forcibly moved by the officers. Then, as the officer drove away and without any clear justification, they deployed several canisters of tear gas on the assembled crowd.

122.    On October 12, in Albany Park, federal immigration agents deployed tear gas across a neighborhood in response to protesters gathering to protest their activities, filling local homes with tear gas.

**Federal Officers Have Falsely Arrested Protestors and Bystanders**

123.    Throughout Operation Midway Blitz, federal authorities have routinely falsely arrested and detained people, focusing on those who are expressing disagreement with federal agents' conduct. For example:

a.    On September 30, CBP agents raided an apartment building in Chicago's South Shore neighborhood, arresting and detaining numerous residents of the building who were legal citizens of the United States. Residents of the building were sorted by race and held for hours, zip tied on a bus, until some of them were released. Mayor Brandon Johnson commented about this raid that it "wasn't about public safety. It was certainly not about immigration. This was about a show of authoritarianism, a forceful display of tyranny."

b.    As Scott Blackburn protested outside Broadview Detention Facility on October 3, he saw Defendant Bovino and, recognizing him, told him words to the effect that, "You love to be on television." Bovino told him to move down the street, and as he started to do that, Defendant Bovino stepped across a barrier, tackled Blackburn to the ground, and arrested him. Blackburn was released a few hours later without being charged for any criminal activity.

c.    As described above, Alderperson Jessie Fuentes was arrested at a hospital when, identifying herself as a public official asking a question of ICE agents in a public area of the hospital, she was handcuffed, escorted out of the hospital, and told not to return.

41

**A63**

d.     Stephen Held was arrested videotaping protestors at Broadview on September 27,

2025, wearing multiple visible indicators that he was a member of the press. He was

tackled, handcuffed, and detained inside the Broadview facility for hours before being

released without charges.

e.     Daniel Toerpe was peacefully protesting at Broadview on October 3, when he was

arrested without warning, and without resisting, by Defendant Bovino.  He was held for

hours in Broadview before being released, and was never given any basis for his arrest.

f.     Juan Munoz was peacefully protesting at Broadview on October 3, when he was

also arrested without warning and without resisting by Defendant Bovino. He was held

for over 8 hours before being released without charges.

124.     Many arrested persons have been released without charging. When citations were

issued, they typically lacked merit. Federal grand juries have returned no bills in the cases of at

least three people arrested by federal agents. Moreover, United States District Judge Jeffrey

Cummings recently ruled that ICE in Operation Midway Blitz has committed at least two dozen

violations of a 2018 consent decree in which ICE agreed not to commit warrantless arrests in the

Midwest without probable cause. *Nava, et al. v. DHS, et al.*, No. 18-CV-3757, Dkt. 214 (N.D. Ill.

Oct. 7, 2025).

## RULE 23(b)(2) CLASS ALLEGATIONS

125.     Plaintiffs Held, Paulson, Villa, Crespo, Father Curran, Rev. Black, Rev. Dr.

Johnson, and Rev. Holcombe, (the "Global Class Representatives") seek to bring this action on

their own behalf and on behalf of the class of all persons who are or will in the future non-

violently protest, observe, document, or record Department of Homeland Security immigration

operations in the Northern District of Illinois. This proposed class is hereinafter referred to as the "Class" or the "Global Class." The Class contains two subclasses as follows:

A. **The Religious Exercise Subclass**, which consists of persons who are or will in the future engage in religious expression in the form of prayer, procession, song, preaching, or proselytizing at Department of Homeland Security immigration operations in the Northern District of Illinois.

B. **The Press Subclass**, which consists of all persons who are or will in the future engage in news gathering or reporting at Department of Homeland Security immigration operations in the Northern District of Illinois.

### The Global Class May Be Maintained as a Class Action

126. The Global Class satisfies the requirements for class certification set forth in Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted and refused to act on grounds that generally apply to the Class, including by (1) issuing dispersal orders without proper justification directing members of the Class to leave a public space they have a lawful right to occupy; (2) failing to issue any warning or dispersal order to members of the Class before using riot control weapons on those persons; (3) using riot control weapons on identified persons who are members of the Class even though or because it was reasonably foreseeable that doing so would injure that targeted person; (4) indiscriminately firing CS or CN gas canisters, flashbang grenades, and rubber and exploding pepper balls at members of the Class without proper justification; (5) shoving, pushing and slamming to the ground members of the Class who do not pose any immediate physical threat; (6) seizing and/or arresting members of the Class for no reason; (7) failing to identify themselves with visible identification.

43

**A65**

127.    The Global Class also satisfies all the requirements set forth in Rule 23(a) of the Federal Rules of Civil Procedure.

### Numerosity

128.    The Global Class is composed of thousands of persons who are or will in the future non-violently protest, observe, document, or record Department of Homeland Security immigration operations in the Northern District of Illinois, including at the Broadview ICE facility, Albany Park, Brighton Park, East Side, and elsewhere. The Global Class is so numerous that the joinder of all members is impracticable.

### Common Issues of Fact or Law

129.    There are questions of law and fact common to the Class. These common questions of fact and law include, but are not limited to:

a.    Whether Class Members' newsgathering, religious, protest, observation, and documentation activities are protected under the First Amendment;

b.    Whether Defendants violated Class Members' rights guaranteed by the Fourth Amendment;

c.    Whether Defendants have subjected Class members to a common practice of issuing dispersal orders to leave a public space where they have a lawful right to be, and whether that practice violates the rights of Class Members;

d.    Whether Defendants have subjected Class Members to a common practice of failing to issue dispersal orders before using riot control weapons on Class Members, and whether that practice violates the rights of Class Members;

44

A66

e.    Whether Defendants have subjected Class Members to a common practice of deploying riot control weapons in violation of their rights under RFRA and the First Amendment;

f.    Whether Defendants have subjected Class Members to a common practice of threatening Class Members with detention or arrest and/or detaining and/or arresting Class Members;

g.    Whether Defendants have subjected Class Members to a common practice of threatening Class Members with physical force and/or using force against Class Members;

h.    Whether Defendants have engaged in a common practice of failing to identify themselves as federal agents with visible identification;

i.    Whether Class Members' protected First Amendment activity is a motivating factor for Defendants' above-described common practices;

j.    Whether Defendants' common practices described above are justified by a compelling government interest and if so, whether those practices are the least restrictive means of advancing that interest; and

k.    Whether Defendants' common practices described above would deter a person of ordinary firmness from engaging in protected First Amendment activities at Defendants' immigration operations.

**Typicality**

130.    The claims of the Global Class Representatives are typical of the Class. Each Global Class Representative has or will in the future non-violently protest, observe, document, or record Department of Homeland Security immigration operations in the Northern District of

45

**A67**

Illinois; was subjected to one or more of the violations previously enumerated; and seeks protection to bar the repetition of those violations in the future.

131.    The Global Class Representatives have the same interests and have suffered the same type of injuries as the class members. Their claims are based upon the same or similar legal theories as the claims of the members of the Global Class.

**Adequate Representation**

132.    The Global Class Representatives will fairly and adequately represent the interests of the Class. Each of these Plaintiffs has a strong interest in achieving the relief requested in this Complaint. None of them has any conflict with any other member of the Class.

133.    The Global Class Representatives are represented by the undersigned counsel, who are all experienced in civil rights, class actions, and complex litigation and are familiar with the issues in this case. Collectively, the undersigned class counsel have successfully litigated dozens of class action cases, including for civil rights violations. Class counsel possess deep knowledge concerning the legal issues in this litigation. They have extensive experience managing complex, document intensive litigation.

134.    Counsel for the Global Class Representatives know of no conflicts between members of the Class, the named Plaintiffs, or the attorneys in this action.

**The Religious Exercise Subclass May be Maintained as a Class Action**

135.    Plaintiffs Father Curran, Rev. Black, Rev. Dr. Johnson and Rev. Holcombe (the "Religious Exercise Subclass Representatives") seek to bring this action on their own behalf and on behalf of the subclass of all persons who are or will in the future engage in religious expression in the form of prayer, procession, song, preaching, or proselytizing at Department of Homeland Security immigration operations in the Northern District of Illinois.

136.    The Religious Exercise Subclass satisfies the requirements for class certification set forth in Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted and refused to act on grounds that generally apply to the Religious Exercise Subclass, including by (1) issuing dispersal orders without proper justification directing members of the Religious Exercise Subclass to leave a public space they have a lawful right to occupy; (2) failing to issue any warning or dispersal order to members of the Religious Exercise Subclass before using riot control weapons on those persons; (3) using riot control weapons on identified persons who are members of the Religious Exercise Subclass even though or because it was reasonably foreseeable that doing so would injure that targeted person; (4) indiscriminately firing CS or CN gas canisters, flashbang grenades, and rubber and exploding pepper bullets at members of the Religious Exercise Subclass without proper justification; (5) shoving, pushing and slamming to the ground members of the Religious Exercise Subclass who do not pose any immediate physical threat; (6) seizing and/or arresting members of the Religious Exercise Subclass for no reason; (7) failing to identify themselves with visible identification.

137.    The Religious Exercise Subclass also satisfies all the requirements set forth in Rule 23(a) of the Federal Rules of Civil Procedure.

**Numerosity**

138.    The Religious Exercise Subclass is composed of scores of people who are or will in the future engage in religious expression in the form of prayer, procession, song, preaching, or proselytizing at Department of Homeland Security immigration operations in the Northern District of Illinois, including at the Broadview ICE facility, Brighton Park, Albany Park, and elsewhere. The Religious Exercise Subclass is so numerous that the joinder of all members is impracticable.

**Common Issues of Fact or Law**

139.    There are questions of law and fact common to the Religious Exercise Subclass. These common questions of fact and law include all of the common questions of fact and law that pertain to the Global Class as set forth above in paragraph 129, plus the following questions, among others, that are specific to the Religious Exercise Subclass:

a.    Whether Defendants' actions violate the rights of the Religious Exercise Subclass under the Religious Freedom Restoration Act, 42 U.S.C. 2000bb-1;

b.    Whether Defendants' actions violate the rights of members of the Religious Expression Subclass to the free exercise of religion as guaranteed by the First Amendment.

**Typicality**

140.    The claims of the Religious Expression Subclass Representatives are typical of the Religious Expression Subclass. Each Religious Expression Subclass Representative has engaged in religious expression in the form of prayer, procession, song, preaching, or proselytizing during Department of Homeland Security immigration operations in the Northern District of Illinois in the Northern District of Illinois; was subjected to one or more of the violations previously enumerated; and seeks protection to bar the repetition of those violations in the future.

141.    The Religious Expression Subclass Representatives have the same interests and have suffered the same type of injuries as the class members. Their claims are based upon the same or similar legal theories as the claims of the members of the Religious Expression Subclass.

**Adequate Representation**

142.    The Religious Expression Subclass Representatives will fairly and adequately represent the interests of the Religious Expression Subclass. Each of these Plaintiffs has a strong interest in achieving the relief requested in this Complaint. None of them has any conflict with any other member of the Religious Expression Subclass.

143.    The Religious Expression Subclass Representatives are represented by the undersigned counsel, who are all experienced in civil rights, class actions, and complex litigation and are familiar with the issues in this case. Collectively, the undersigned class counsel have successfully litigated dozens of class action cases, including for civil rights violations. Class counsel possess deep knowledge concerning the legal issues in this litigation. They have extensive experience managing complex, document intensive litigation.

144.    Counsel for the Religious Expression Subclass Representatives know of no conflicts between members of the Religious Expression Subclass, the named Plaintiffs, or the attorneys in this action.

**The Press Subclass May Be Maintained as a Class Action**

145.    Plaintiff Held (the "Press Subclass Representative") seeks to bring this action on his own behalf and on behalf of the subclass of all persons who are or will in the future engage in news gathering or reporting at Department of Homeland Security immigration operations at Department of Homeland Security immigration operations in the Northern District of Illinois.

146.    The Press Subclass satisfies the requirements for class certification set forth in Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted and refused to act on grounds that generally apply to the Press Subclass, including by (1) issuing dispersal orders without proper justification directing members of the Press Subclass to leave a

49

**A71**

public space they have a lawful right to occupy; (2) failing to issue any warning or dispersal

order to members of the Press Subclass before using riot control weapons on those persons; (3)

using riot control weapons on identified persons who are members of the Press Subclass even

though or because it was reasonably foreseeable that doing so would injure that targeted person;

(4) indiscriminately firing CS or CN gas canisters, flashbang grenades, and rubber and exploding

pepper bullets at members of the Press Subclass without proper justification; (5) shoving,

pushing and slamming to the ground members of the Press Subclass who do not pose any

immediate physical threat; (6) seizing and/or arresting members of the Press Subclass for no

reason; (7) failing to identify themselves with visible identification.

147.    The Press Subclass also satisfies all the requirements set forth in Rule 23(a) of the

Federal Rules of Civil Procedure.

## Numerosity

148.    The Press Subclass is composed of scores of people who are or will in the future

engage in news gathering or reporting at Department of Homeland Security immigration

operations in the Northern District of Illinois, including at the Broadview ICE facility, Brighton

Park, Albany Park, and elsewhere. The Press Subclass is so numerous that the joinder of all

members is impracticable.

## Common Issues of Fact or Law

149.    There are questions of law and fact common to the Press Subclass. These

common questions of fact and law include all of the common questions of fact and law that

pertain to the Global Class as set forth above in paragraph 129, plus the following questions,

among others, that are specific to the Press Subclass:

a.      Whether members of the Press Subclass are subject to dispersal orders to the same

degree as the persons who are not professional journalists;

b.      Whether members of the Press Subclass have rights under the First Amendment

that are different in kind and different in scope from the rights of persons who are not

professional journalists.

c.      Whether members of the Press Subclass properly identify themselves as members

of the press at the sites of Department of Homeland Security operations in the Northern

District of Illinois.

**Typicality**

150.    The claims of the Press Subclass Representative is typical of the Press Subclass.

The Press Subclass Representative has engaged in news gathering or reporting during

Department of Homeland Security immigration operations in the Northern District of Illinois;

was subjected to one or more of the violations previously enumerated; and seeks protection to

bar the repetition of those violations in the future.

151.    The Press Subclass Representative has the same interests and has suffered the

same type of injuries as the class members. His claims are based upon the same or similar legal

theories as the claims of the members of the Press Subclass.

**Adequate Representation**

152.     The Press Subclass Representative will fairly and adequately represent the

interests of the Press Subclass. This Plaintiff has a strong interest in achieving the relief

requested in this Complaint. He has no conflict with any other member of the Press Subclass.

153.    The Press Subclass Representative is represented by the undersigned counsel,

who are all experienced in civil rights, class actions, and complex litigation and are familiar with

the issues in this case. Collectively, the undersigned class counsel have successfully litigated dozens of class action cases, including for civil rights violations. Class counsel possess deep knowledge concerning the legal issues in this litigation. They have extensive experience managing complex, document intensive litigation.

154.    Counsel for the Press Subclass Representatives know of no conflicts between members of the Press Subclass, the named Plaintiffs, or the attorneys in this action.

## CLAIMS FOR RELIEF

### COUNT I

### First Amendment of the United States Constitution

155.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

156.    In the manner described more fully above, Defendants violated and are violating Plaintiffs' and class members' rights under the First Amendment of the United States Constitution.

157.    Defendants and the federal agents discussed in this complaint are operating pursuant to an official federal policy, approved by responsible federal agency heads with final policymaking authority, of targeting Plaintiffs and class members with unjustified violence.

158.    Individuals who peacefully gather on the streets, sidewalks and public places of the Northern District of Illinois and in public rights of way to protest have the right to gather, speak, express themselves, gather and report the news, pray, and petition for redress of grievances.

159.    Defendants' actions are designed to chill, suppress, and control speech, reporting, and religious activities that they do not like.

160.    Defendants' actions have severely restricted, and sometimes wholly prevented, Plaintiffs from exercising their First Amendment rights in public streets, sidewalks, and

traditional fora. Defendants' actions have also prevented Plaintiffs from even accessing these traditional public fora. Defendants' actions do not serve any governmental interest, much less a significant or compelling governmental interest, and Defendants' actions are not narrowly tailored.

161.    Plaintiffs' and class members' exercise of their rights to speak, assemble, petition, gather news, and freely practice their religious beliefs is being chilled due to the well-founded fear that they will be brutalized by federal agents for no reason other than engaging in protected activity on the streets and sidewalks of the Northern District of Illinois.

162.    Defendants' actions substantially burden the religious exercise of Rev. Black, Rev. Dr. Johnson, Rev. Holcomb, and Father Curran, as well as similarly situated members of the Religious Exercise subclass.

163.    Defendants' actions would likely deter a person of ordinary firmness from engaging in protected First Amendment activity.

164.    Defendants' ongoing conduct in violation of Plaintiffs' and class members' constitutional rights and liberties has caused and is causing them irreparable harm.

165.    Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT II

## First Amendment Retaliation

166.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

167.     In the manner described more fully above, Defendants violated and are violating Plaintiffs' and class members' rights under the First Amendment of the United States Constitution.

168.     Defendants and the federal agents discussed in this complaint are operating pursuant to an official federal policy, approved by responsible federal agency heads with final policymaking authority, of targeting Plaintiffs and class members with unjustified violence.

169.     Individuals who peacefully gather on the streets of the Northern District of Illinois and in public rights of way to protest have the right to gather, speak, express themselves, gather and report the news, pray, and petition for redress of grievances.

170.     Plaintiffs' and class members' protected activity was and is at least a motivating factor in Defendants' adverse actions, including use of force, against Plaintiffs and class members.

171.     Defendants are retaliating against Plaintiffs and class members precisely because of their protected activity.

172.     Defendants' ongoing conduct in violation of Plaintiffs' and class members' constitutional rights and liberties has caused and is causing them irreparable harm.

173.     Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT III

**Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1**

174.     Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

175.    The Religious Freedom Restoration Act ("RFRA"), provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

176.    Defendants' policy, pattern, and practice of targeting Rev. Black, Rev. Dr. Johnson, Rev. Holcombe, Father Curran, and other similarly situated Religious Exercise subclass members with violence substantially burdens their exercise of religion.

177.    No compelling governmental interest exists that would justify Defendants' use of force against clergy peacefully praying in public spaces, nor is the wanton and gratuitous violence employed by Defendants the least restrictive means of furthering any compelling governmental interests that might exist.

178.    Defendants' ongoing conduct in violation of Plaintiff's and subclass members' rights and liberties under federal law has caused and is causing them irreparable harm.

179.    In the absence of an injunction, Defendants will continue to use force against the Religious Exercise subclass members in an effort to stop them from exercising their religious beliefs.

180.    Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT IV

### Fourth Amendment of the United States Constitution

### Excessive Force and Unreasonable Seizures

181.    Plaintiffs incorporate by reference each of the paragraphs of this Complaint as if restated fully herein.

182.    In the manner described more fully above, Defendants violated and are violating Plaintiffs' and class members' rights to be free from unreasonable seizures, specifically, arrests without probable cause and excessive force under the Fourth Amendment.

183.    Defendants and the federal agents discussed in this complaint are operating pursuant to an official federal policy, approved by responsible federal agency heads with final policymaking authority, of targeting Plaintiffs and class members with unjustified violence and/or arresting them without probable cause to believe that they committed a federal crime.

184.    Defendants intentionally applied physical force, including use of projectiles and chemical weapons, on Plaintiffs and class members. They also restricted Plaintiffs' and class members' freedom of movement through a show of authority.

185.    The force Defendants used was unreasonable.

186.    Defendants have also arrested Plaintiff Held and other similarly situated individuals without probable cause, and solely to suppress, chill, and retaliate against the exercise of their First Amendment rights.

187.    Defendants are prohibited by the Fourth Amendment from making "preemptive arrests."

188.    Defendants' ongoing conduct in violation of Plaintiffs' and class members' rights has caused and is causing them irreparable harm.

189.    In the absence of an injunction, Defendants will continue to use excessive force against and effect seizures without probable cause on Plaintiffs and class members in violation of the Fourth Amendment, pursuant to official federal policy.

190.    Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

56

**A78**

## COUNT V

### Administrative Procedure Act

191.    Plaintiffs incorporate by reference each of the paragraphs of this Complaint as if restated fully herein.

192.    Defendants and the federal agents discussed in this complaint are operating pursuant to a final federal policy, approved by responsible federal agency heads with final policymaking authority, of preventing Plaintiffs and class members from exercising their First Amendment rights and targeting Plaintiffs and class members with unjustified violence.

193.    Defendants intentionally applied physical force, including use of projectiles and chemical weapons, on Plaintiffs and class members. They also restricted Plaintiffs' and class members' freedom of movement through a show of authority.

194.    The force Defendants used was unreasonable.

195.    Federal law provides for the publication of regulations that "prescribe the categories of officers and employees … who may use force (including deadly force) and the circumstances under which such force may be used." 8 U.S.C. § 1357(a).

196.    Federal regulation provides that "Non-deadly force may be used only when a designated immigration officer … has reasonable grounds to believe that such force is necessary." 8 C.F.R. § 287.8(a)(ii).

197.    Federal regulation further provides that "A designated immigration officer shall always use the minimum non-deadly force necessary to accomplish the officer's mission and shall escalate to a higher level of non-deadly force only when such higher level of force is warranted by the actions, apparent intentions, and apparent capabilities of the suspect, prisoner, or assailant." 8 C.F.R. § 287.8(a)(iii).

198.     Federal regulation further provides that "Deadly force is any use of force that is likely to cause death or serious physical injury" and that "Deadly force may be used only when a designated immigration officer … has reasonable grounds to believe that such force is necessary to protect the designated immigration officer or other persons from the imminent danger of death or serious physical injury." 8 C.F.R. § 287.8(a)(2)(i)-(ii).

199.     Defendants' policy and practice of using force against peaceful protesters, journalists, and legal observers fails to take into consideration the risk of harm associated with each weapon used, and permits uses of force that, in violation of 8 C.F.R. § 287.8(a): (1) do not further any legitimate mission assigned to Defendants by law; (2) target the general public; (3) are not based on reasonable grounds to believe such force is necessary; and/or (4) deploy gratuitous violence exceeding the minimum necessary to accomplish any legitimate aims.

200.     Defendants' policy and practice of using excessive force against Plaintiffs and other similarly situated peaceful protesters, journalists, and legal observers is "final agency action" that is "contrary to constitutional right" and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A)-(B).

201.     Defendants' policy and practice of suppressing the speech, religious exercise, reporting and other protected First Amendment activities of Plaintiffs and other similarly situated peaceful protesters, journalists, and legal observers is "final agency action" that is "contrary to constitutional right" and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A)-(B).

202.     Defendants' policy and practice of engaging in policing functions, beyond the scope of "duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the

**A80**

extent necessary to protect the property and persons on the property," 40 U.S.C. § 1315, amounts

to final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. §§ 704, 706(2)(A)-.

203.    Defendants' policy and practice of using excessive force against protestors, press,

and religious practitioners in the course of engaging in general policing functions also exceeds

40 U.S.C. § 1315's limited grant of protective authority, constituting final agency action that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§§ 704, 706(2)(A).

204.    Defendants' policy and practice of making warrantless arrests without the

required individualized flight risk analysis is "final agency action" that is "in excess of statutory

jurisdiction, authority, or limitations" under § 1357(a). 5 U.S.C. §§ 704, 706(2)(C).

205.    As a proximate result of Defendants' APA violations, Plaintiffs and class

members are suffering and will continue to suffer a significant deprivation of their liberty in

violation of the statute.

206.    Defendants' unlawful policies and practices against Plaintiffs and class members,

described herein, have caused and are causing them irreparable harm.

207.    In the absence of an injunction, Defendants will continue to engage in their

unlawful policies and practices against Plaintiffs and class members, described herein.

208.    Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses

relating to this action.

## COUNT VI

## 28 U.S.C. § 2201

## Declaration of Rights

209.    Plaintiffs incorporate each of the paragraphs of the complaint as if restated fully herein.

210.    In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought, under 28 U.S.C. § 2201.

211.    There is an actual controversy within the jurisdiction of this court, in as much as one or more federal defendants have engaged in actions endangering Plaintiffs and class members protesting federal immigration policy on the streets of the Northern District of Illinois. No federal authority has agreed to stop this practice.

212.    Plaintiffs are entitled to a declaration that the acts at issue are unlawful, and an injunction precluding Defendants from continuing them.

## COUNT VII

## Conspiracy

213.    Plaintiffs incorporate each of the paragraphs of this complaint as if restated fully herein.

214.    Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to deprive Plaintiffs and class members of their constitutional rights, all as described in the various paragraphs of this Complaint.

60

A82

215.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiffs and class members of these rights.

216.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

217.     The misconduct described herein was undertaken intentionally, in total disregard of Plaintiffs' and class members' constitutional rights.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for a judgment and the following relief:

1.     A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint restrain Plaintiffs' ability to assemble, peacefully protest, pray, and gather news, in violation of the First Amendment;

2.     A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint constitute a federal unlawful policy of using excessive and retaliatory force, in violation of the First and Fourth Amendments;

3.     A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint present an imminent threat that Plaintiffs will have excessive and retaliatory force used on them, in violation of the First and Fourth Amendments;

4.     A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint constitute a federal unlawful policy of committing arrests without probable cause, in violation of the Fourth Amendment;

5.      A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint present an imminent threat that Plaintiffs will be arrested without probable cause, in violation of the Fourth Amendment;

6.      An order vacating and setting aside Defendants' unlawful policies and final agency actions of suppressing disfavored speech, retaliation, interference with free exercise of religion, excessive force, and policing and defending federal property beyond the lawful authority of the federal officials, 5 U.S.C. § 706; and

7.      An injunction, pursuant to 28 U.S.C. § 2202 and 5 U.S.C. § 702, permanently enjoining the Defendants from engaging in the unlawful actions described in this complaint, and specifically prohibiting Defendants, their officers, agents, assigns, and all persons acting in concert with them from:

a.      Dispersing, arresting, threatening to arrest, threatening or using physical force against any person whom they know or reasonably should know is a Journalist, unless Defendants have probable cause to believe that the individual has committed a crime unrelated to failing to obey a dispersal order. Defendants may ask a Journalist to change location to avoid disrupting law enforcement, as long as the instructions are clear and the press have time to comply and sufficient opportunity to report and observe;

b.      Issuing a dispersal order requiring any person to leave a public place that they lawfully have a right to be, unless dispersal is justified by a commanding officer's finding of a serious threat to public safety;

c.      Using riot control weapons—including but not limited to kinetic impact projectiles (KIPs), Pepper ball or paintball guns, pepper or OC spray, tear gas or other chemical irritants, soft nose rounds, 40 or 37mm launchers, less-lethal shotguns, and

flashbang, Stinger, or rubber-ball grenades—on any person who is not themselves posing a threat of imminent physical harm to a law enforcement officer or another person;

d.     Using riot control weapons (including those described above) at identified targets, if doing so could foreseeably result in injury to any person who is not posing a threat of imminent physical harm to a law enforcement officer or another person, unless such force is necessary to stop an immediate and serious threat of physical harm to a person;

e.     Firing large riot control weapons—including but not limited to tear gas canisters, flashbang, Stinger grenades, or rubber-ball grenades—so as to strike any person, including by deploying these weapons above the head of the crowd, unless the person poses an imminent threat of causing serious bodily injury or death to a person in equivalent circumstances to those where the officer is authorized to use deadly force;

f.     Firing projectile riot control weapons—including but not limited to KIPs, pepper balls, paintballs, and soft nose rounds—at the head, neck, groin, torso, or other sensitive areas of any person, or striking any person with a vehicle, unless that person poses an immediate threat of serious bodily injury to a law enforcement officer or another person;

g.     Using force, such as pulling or shoving a person to the ground, tackling, body slamming, or kettling on individual(s) who pose no immediate threat of physical harm to others, unless necessary and proportional to effectuate an apprehension and arrest;

h.     Using any riot control weapon without giving at least two separate warnings in a manner and at a sound level where it can be heard by the targeted individual(s), unless the threat of physical harm is so serious and imminent that a warning is infeasible. Such warnings shall explain that Defendants may employ riot control weapons, give the targeted individual(s) sufficient time to avoid the use of force, and leave room and

**A85**

opportunity for safe egress. If it appears that the intended audience was unable to hear the warnings, the warning must be repeated prior to the use of riot control weapons;

i.      Seizing or arresting any non-violent person who is not resisting a lawful dispersal order, unless there is specific probable cause to believe that the individual has committed a crime for which a custodial arrest is warranted and for which the federal agent has lawful authority to make an arrest;

8.      An injunction, pursuant to 28 U.S.C. § 2202 and 5 U.S.C. § 702, permanently enjoining the Defendants from engaging in the unlawful actions described in this complaint, and specifically requiring Defendants, their officers, agents, assigns, and all persons acting in concert with them to have visible identification (name and/or badge number) affixed to their uniforms and prominently displayed, including when wearing riot gear; and

9.      Any other relief this Court deems proper.

RESPECTFULLY SUBMITTED,

**CHICAGO HEADLINE CLUB, et al.**

By:     /s/ Locke E. Bowman

*One of Plaintiffs' Attorneys*

Jon Loevy
Locke Bowman
Steve Art
Heather Lewis Donnell
Theresa Kleinhaus
Scott Rauscher
Matt Topic
Julia Rickert
Tara Thompson
Lindsay Hagy
Jordan Poole
Dominique Gilbert
Justin Hill
Aaron Tucek
**LOEVY + LOEVY**
311 N. Aberdeen Street
Chicago, Illinois 60647
(312) 243-5900
steve@loevy.com

Elizabeth Wang
Isaac Green
**LOEVY + LOEVY**
2060 Broadway, Ste. 460
Boulder, CO 80302

David B. Owens
**LOEVY + LOEVY**
℅ Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
Seattle, WA 98145-1110

Wallace Hilke
**COMMUNITY JUSTICE AND CIVIL
RIGHTS CLINIC**
Bluhm Legal Clinic, Northwestern
Pritzker School of Law
375 E. Chicago Ave.
Chicago, IL 60611
(312) 503-2224
wally.hilke@law.northwestern.edu

Craig B. Futterman
**MANDEL LEGAL AID CLINIC**
University of Chicago Law School
6020 S. University
Chicago, IL 60637
(773) 702-9611
futterman@uchicago.edu

Hayden Johnson*
Katie Schwartzmann*
Conor Gaffney*
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave NW, Ste 163
Washington DC 20006
(202) 579-4582
* *Admitted pro hac vice*

Daniel Massoglia
Hannah C. Marion
**FIRST DEFENSE LEGAL AID**
601 S. California Ave.
Chicago, IL 60612
(336) 575-6968
daniel@first-defense.org
hannah@first-defense.org

Kevin M. Fee, Jr.
Rebecca Glenberg
Hirsh Joshi
Priyanka Menon
**ROGER BALDWIN FOUNDATION
OF ACLU, INC.**
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740
kfee@aclu-il.org
rglenberg@aclu-il.org

**A87**

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF NextGen 1.8 (rev. 1.8.4)**
**Eastern Division**

Chicago Headline Club, et al.

       Plaintiff,

v.           Case No.: 1:25−cv−12173

           Honorable Sara L. Ellis

Kristi Noem, et al.

         Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Tuesday, October 28, 2025:

  MINUTE entry before the Honorable Sara L. Ellis: Court hearing held. The Court enters and continues Plaintiffs' motion to modify the TRO [142] to the date of the preliminary injunction hearing on 11/5/2025. The Court orders Defendants to have all Federal Agents operating in Operation Midway Blitz to place an identifier conspicuously on their uniform where one can easily view it and the Agent's equipment does not obscure it. Custom and Border Protection will strive to ensure that all CBP agents working in Operation Midway Blitz have body−worn cameras. Additionally, Defendant Bovino has agreed to have a body−worn camera assigned to him by 10/31/2025 and have completed BWC training. The Court orders Defendants to provide to the Court, under seal, all CBP use of force reports relating to Operation Midway Blitz from 9/2/2025 through 10/25/2025, by COB 10/31/2025. The Court further orders Defendants to provide to the Court, under seal, all BWC video corresponding to the use of force reports from 9/2/2025 through 10/25/2025 filed with the Court by COB 10/31/2025. The Court orders Defendants to provide to the Court, under seal, all additional CBP use of force reports and corresponding BWC video within 24 hours of finalization of the CBP reports. The Court orders Defendant Bovino to appear in court, in person, week days at 5:45 PM (modifying the Court's oral order during the hearing to account for the security needs of the Dirksen Courthouse) in courtroom 1403 to report on the use of force activities for each day. Finally, the Court orders Defendants to provide to the Court, under seal, by COB 10/31/2025 a chart containing the names, dates of arrest or detention, charges or citations, and resolution of the arrest or detention (e.g., released with charging, charged with misdemeanor, charged with felony, given summons, or given citation) for all individuals detained or arrested by CBP from 9/2/2025 through 10/29/2025 that is not directly related to an immigration enforcement violation, such as a failure to appear for an immigration appointment or an outstanding order of removal. The Court denies Defendants' oral motion to stay this order. The Court denies Defendants' oral motion to stay Defendant Bovino's deposition. Emailed notice(rj, )

**A88**

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)**

| | |
|---|---|
| CHICAGO HEADLINE CLUB, et al., | Case No. 1:25-cv-12173 |
| *Plaintiffs*, | |
| | **DECLARATION OF RUSSELL HOTT** |
| v. | |
| Kristi NOEM, et al. | |
| *Defendants*. | |

<u>**DECLARATION OF RUSSELL HOTT**</u>

I, Russell Hott, hereby declare as follows:

1.      I am employed by the United States Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the ERO Washington Field Office. Previously, I served as the FOD of the ERO Chicago Field Office from August 10, 2025, to October 17, 2025. As FOD of the ERO Chicago Field Office, I directed and oversaw ICE's enforcement of federal immigration laws in the states of Illinois, Indiana, Wisconsin, Kansas, Kentucky, and Missouri. This included oversight of ICE's Broadview Processing Center (BSSA), in Broadview, Illinois.

2.      I have been employed by ICE since March 1, 2003. Beginning in the fall of 2024, I served as the Acting Executive Associate Director (EAD) for ERO. In that role, I oversaw the operations of more than 7,800 ERO employees in field offices, at headquarters, and overseas. ERO manages and oversees all aspects of the removal process within ICE, including domestic transportation, detention, alternatives to detention programs, bond management, supervised release, and removal

1

to more than 170 countries around the world. I previously served as Deputy EAD from January

2024. I began my service with the U.S. Government as a detention enforcement officer with the

former Immigration and Naturalization Service in New York, New York. In my nearly 25 years of

service, I have held the following positions with ICE: Assistant Director for Custody Management,

Field Operations, and Enforcement Divisions; FOD for the Washington Field Office; Deputy FOD

for the Boston and Washington Field Offices; Chief of Staff for the ICE Deputy Director; acting

Deputy Assistant Director for Domestic Operations –Western Operations; and Unit Chief in the

Removal Division.

3.      When I was FOD of the ERO Chicago Field Office, the ERO Chicago Field Office had

approximately 180 officers covering six states across two time zones. In the City of Chicago and

its immediate environs, ERO had approximately 65 officers, including 31 at BSSA.

4.      This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion

for Preliminary Injunction. I have reviewed Plaintiffs' Motion and supporting exhibits.

5.      The statements contained in this declaration are based upon my personal knowledge,

reasonable inquiry, and information made available to me in the course of my official duties from

information obtained from records, systems, databases, other DHS employees, and/or information

portals maintained and relied upon by DHS.

**Background**

6.      ICE is the largest investigative branch of DHS and is charged with enforcement of more

than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks,

by combining components of the former Immigration and Naturalization Service and the former

U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and

customs laws and to protect the United States against terrorist attacks. The mission of ICE is to

protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

7.      ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and customs officers under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

8.      The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

**Chicago's Restrictions on State and Local Cooperation with Federal Officials (Chicago Code ch. 2-173)**

9.      In 2012, the Chicago City Council passed the "Welcoming City Ordinance," Chicago Code ch. 2-173, which sought to "clarify the communications and enforcement relationship between the City and the federal government," in addition to "establish[ing] the City's procedures concerning immigration status and enforcement of federal civil immigration laws." Chicago Code § 2-173-005.[1]

10.     This Ordinance explicitly limits local cooperation with federal immigration enforcement in numerous ways. It provides that no agent or agency shall "detain, or continue to detain a person based upon an immigration detainer" or "an administrative warrant, including, but not limited to, those entered into the Federal Bureau of Investigation's National Crime Information Center database, or successor or similar database maintained by the United States." Sections 2-173-020(a)(1). Moreover, no agent shall permit ICE agents "access, including by telephone, to a person being detained by, or in the custody of, the agency or agent," or "use of agency facilities for investigative interviews or other investigative purpose." *Id.* § 2-173-020(a)(2). Nor shall agents "expend their time responding to ICE inquiries or communicating with ICE regarding a person's custody status, release date, or contact information." *Id.* § 2-173-020(a)(3).

11.     It is my understanding Chicago Mayor Brandon Johnson signed an executive order on October 6, 2025, prohibiting federal agents from using certain city-owned spaces for immigration enforcement activities.[2]

---

[1] Available at:
https://www.chicago.gov/content/dam/city/depts/mayor/Office%20of%20New%20Americans/PDFs/WelcomeCityOrdinance.pdf (last visited Oct. 23, 2025).

[2] Available at: https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2025/october/city-property-executive-order.html (last visited Oct. 23, 2025) and https://www.nbcchicago.com/news/local/chicago-politics/chicago-mayor-signing-order-to-stop-federal-agents-from-using-certain-city-owned-spaces/3834094/ (last visited on Oct. 23, 2025.

4

**ICE Broadview Processing Center**

12.     Only a few miles outside of Chicago, the ICE Broadview Processing Center (BSSA) is located at 1930 Beach Street, in Broadview, Illinois. BSSA is an ICE-owned property used for intake and processing of individuals arrested by ICE and Customs and Border Protection (CBP) for appropriate administrative or criminal action.

13.     Since the first week of September 2025, BSSA has been beset by increasingly aggressive, obstructive, and violent protesters. Because this facility is the only one in the area that serves as an intake and initial processing facility for ICE, crowds of people at this location interfere with immigration operations throughout the region, including ICE's targeted operations against criminal aliens.

**Increased Violence Against Federal Officers**

14.     Issues at BSSA began in early September when crowds of protesters, among other things, blocked all means of ingress and egress at BSSA and physically assaulted personnel – law enforcement and non-law enforcement alike – who were attempting to go to and leave work.[3]

---

[3] Photos below available at: https://blockclubchicago.org/2025/09/19/ice-tear-gasses-detains-protesters-outside-broadview-facility/ (last visited October 23, 2025) and https://southsideweekly.com/we-want-them-back-protest-and-state-violence-at-broadview-ice-facility/ (last visited October 23, 2025).





15.   For instance, on September 6, 2025, crowds of protesters arrived at BSSA and interfered

with ICE operations by blocking vehicles and impeding access to the facility. ICE officers advised

the protesters on numerous occasions that they could not block traffic, needed to remain on the

sidewalk, and not come on to federal property towards the gate. On one occasion, a female

individual refused to comply with multiple requests to move from the driveway to make way for

an oncoming vehicle. Instead, she yelled obscenities at the officers and was seen clinching her

hand in the form of a fist as if to punch or push the officers. The officers removed her from

government property, along with another male protestor who puffed his chest and acted aggressively towards an officer. Once the vehicle's pathway was secured, the officers returned to the facility without further incident.

16.    Due to these situations, ICE employees, who parked in an open lot, had to call the office when they arrived, so four officers could come out and escort them into the building. These "security details" retraced their steps when the employees departed. Vandalism of cars in the lots became common. Both government and personally owned vehicles were targeted. As a result, ICE employees would park further from BSSA, and ERO would have to send a van to retrieve them, which would be blocked by protestors. Moving cars were also vandalized. In an attack that was repeated more than a dozen times, one protester would jump on the hood of a car, and another would stand immediately behind the car. While the driver stopped the car in the face of these obstacles, others would run up to the car and slash the tires. My own tires were slashed in this fashion on September 13, 2025.



17.    Not only ICE personnel were impacted. These individuals accosted employees of nearby businesses, mistaking them for ICE employees. At least one of these employees also had their personally owned vehicle vandalized.

18.    Property damage to BSSA and the surrounding area was significant, with graffiti (largely

spray paint and permanent marker) on the building, concrete surfaces, signs, and the flagpole. The

vandalism has included, in multiple locations: "F*CK ICE." BSSA's external plumbing systems

were destroyed by individuals when they broke off plumbing and downspouts. It has not yet been

repaired, exposing the building to damage during inclement weather.



19.     As threats, violence, and obstruction of operations increased, ERO Chicago was required

to respond to increased threats and attacks on its officers and offices at BSSA by shifting its limited

personnel and resources from the enforcement of federal immigration law to protecting its own

employees and facilities. Because the facility is ICE-owned, it is not protected by the Federal

Protective Service (FPS). ERO has been forced to shift resources from within its own organization.

For example, five ERO Special Response Teams (SRTs) were flown into Chicago from various

cities, including El Paso, New York, and Phoenix, to assist with 24-hour security at BSSA. These

ERO SRT teams are typically comprised of 16 officers. In addition, ERO has solicited help from

Bureau of Prisons (BOP), Federal Bureau of Investigations (FBI), Bureau of Alcohol, Tobacco, and Firearms (ATF), Drug Enforcement Administration (DEA), and CBP. The only time that FPS appeared at BSSA was after a fence was installed around the property, to deter violence and protect employees and property, and the crowd moved to the other side of the building near a GSA parking lot.

20.    On the morning of Friday, September 19, 2025, a large crowd of protesters gathered at BSSA and laid down in front of its entry and exit points, obstructing all vehicular traffic and ICE operations for several hours. A Long Range Acoustic Device (LRAD) warning was played multiple times cautioning protesters of possible arrest and use of chemical agents. Despite ICE officers giving multiple verbal warnings to back away from the property and to protest peacefully to the side, the protesters refused to comply and began to grow in both size and aggression towards the ICE and CBP officers. Several protesters were arrested for assault, obstruction, and trespassing that day, including for pepper spraying a federal officer; kicking an officer; deliberately tripping an officer; swinging a backpack at an officer; pulling the face mask and partially and forcefully ripping off an officer's beard ; and throwing bottles, rocks, potatoes, and other objects at federal officers and vehicles. Some of the arrestees forcibly resisted and fought the officers during their arrests. Protesters also shot fireworks toward officers stationed outside BSSA.[4] Fireworks have the potential to cause burns, blindness, and more significant injury, depending on the distance at which the firework explodes. ICE deployed a tactical medic to treat superficial injuries for the arrestees.

---

[4] Photos available at: https://blockclubchicago.org/2025/09/19/ice-tear-gasses-detains-protesters-outside-broadview-facility/ (last visited October 23, 2025) and https://news2share.com/anti-ice-protesters-arrested-tents-dismantled/ (last visited October 23, 2025).










21.    On Saturday, September 20, 2025, protesters again gathered at BSSA. The protests began peacefully and without incident in the morning. However, as the day went on, the aggression escalated as the crowd grew. Protesters again blocked vehicles from entering or exiting the facility, trespassed onto federal property, threw rocks, shook the gates, banged on windows, verbally threatened to kill the officers, and even physically elbowed an officer in the jaw after the officer directed the protester to move aside. At least three vehicles' tires were slashed on the federally leased parking lot. ICE officers continually warned protesters to back away from the property and

11

to protest peacefully without disrupting ICE operations. That same night, one protester approached a government vehicle entering BSSA's parking lot and attempted to slash the vehicle's tires with what appeared to be a knife. As ICE officers approached to effectuate his arrest, the protester sprayed an unknown chemical irritant at the ICE officers.

22.    On Sunday, September 21, 2025, protesters gathered at BSSA. Protesters continued to trespass beyond public property, shook the gates, and banged on the facility's windows despite ICE officers continually warning protesters to peacefully protest away from federal property. In total, ten separate government-owned and personal vehicles had their tires slashed that day in the federally leased parking lot.

23.    The weekends of September 12-14 and 19-21 were particularly violent. Protesters would throw bottles, rocks, and other objects at officers, and even canisters of 2-chlorobenzylidene malononitrile (also known as CS gas), which they brought to throw at federal officers at BSSA. CS is a form of tear gas generally used for crowd control.[5] Under Illinois Criminal Code of 2012, no person shall knowingly manufacture, possess, deliver, sell, purchase, carry, use, or employ in any manner any tear gas weapon or chemical weapon or device, unless issued a permit for commercial use from the Illinois Department of Professional Regulation.

---

[5] Photo available at: https://www.usatoday.com/picture-gallery/news/nation/2025/10/03/chicago-protests-federal-ice-immigration-raids-photos/86503237007/ (last visited October 24, 2025).

A101



24.    At the same time, protesters would attempt to pull off officers' masks. When ERO fired its own CS canisters into the violent crowd, protesters would throw them back. When in scuffles, protesters would attempt (and sometimes succeed) to pull gear, such as gas masks or CS canisters, off officers' uniforms.

25.    Because the larger and more aggressive crowds of protesters have made safe access to BSSA increasingly difficult, ERO Chicago used $100,000 worth of less lethal munitions and chemicals for crowd control in two weeks spanning from September 6, 2025, to September 20, 2025. ICE has never needed to use such munitions at this location previously.

26.    On Monday, September 22, 2025, ICE became aware of protesters' efforts on social media to gather a crowd of 800 by the next day to create a human wall around BSSA. Although the organizers instructed potential participants to remain nonviolent and not impede ICE operations, ERO Chicago's previous experience reasonably led us to conclude that, given the sheer size of the crowd, some among them would, in fact, act to significantly further disrupt ICE operations and vehicular traffic in and out of the facility. Thus, a fence was erected at BSSA the night of September 22-23 to help reduce the possibility of clashes given the expected larger crowds.



‹  REPORTE DE RE...  ➤  Q  ···

**Michael Ford**    ···
2m · 🌐

Stand Together: Build the Unbreakable Shield Wall at Broadview ICE Detention Center

Date: Tuesday, September 23, 2025

Friends, neighbors, and all who believe in justice

Our communities are under siege. In the past two weeks, nearly 550 people across the Chicago area were arrested in "Operation Midway Blitz," a federal crackdown that has torn families apart and instilled fear in our neighborhoods. Peaceful demonstrations outside facilities like Broadview ICE have been met with tear gas and pepper balls—even against elected officials and local leaders standing in solidarity with affected families.

This is not just an attack on individuals—it is an assault on our values, our humanity, and the very fabric of our communities.

But we will not be intimidated. We will not be silenced. We will stand together—peaceful, disciplined, and unyielding.

Our Mission:

We are forming a Shield Wall outside the Broadview ICE detention center: a disciplined, nonviolent demonstration of unity, strength, and moral resolve. This is not a protest. It is a statement: our communities reject detention centers in our neighborhoods and will not remain silent in the face of injustice.

🏠 Home  ▶ Video  🏪 Marketplace  ⊗ Profile  🔔 Notifications  ≡ Menu

---

‹  REPORTE DE RE...  ➤  Q  ···

Our Mission:

We are forming a Shield Wall outside the Broadview ICE detention center: a disciplined, nonviolent demonstration of unity, strength, and moral resolve. This is not a protest. It is a statement: our communities reject detention centers in our neighborhoods and will not remain silent in the face of injustice.

Why a Shield Wall Matters:

- Unity is strength: Thousands standing shoulder to shoulder cannot be ignored.
- Peaceful discipline: Every participant will act lawfully, safely, and nonviolently.
- Symbolic power: Shields, banners, and signs communicate courage, conscience, and commitment without confrontation.
- Visible solidarity: Our collective presence demonstrates the moral and human strength of our communities.

Crafting Your Shield:

Each shield must be ready before the event and carry a symbolic message—a word, a name, or a phrase that represents our shared commitment to justice and humanity. Examples:
- "Families Belong Together,"
- "Justice for Silverio,"
- "No Human Is Illegal."

You can bring your own materials or join one of our community workshops leading up to the event. Together, we will build a wall of solidarity as diverse

🏠 Home  ▶ Video  🏪 Marketplace  ⊗ Profile  🔔 Notifications  ≡ Menu

14

**A103**



27.     On Friday, September 26, 2025, hundreds of protesters gathered at BSSA. The protesters were seen arriving with boxes of fireworks, face masks, gas masks, goggles, knee and elbow protection, and large supplies of food and water. CBP and FPS were also on scene to provide additional support. Protesters positioned themselves in the ingress and egress of both of BSSA's entryways, blocking government vehicles from entering or exiting the facility. An LRAD warning was played multiple times cautioning protesters of possible arrest and use of chemical agents. Federal officers repeatedly gave verbal warnings (up to 10 or 12 times) when a gate was opened to make way for vehicular traffic. With protesters continuing to block traffic and ignore dispersal orders, less than lethal munitions were deployed to create passage for vehicles. At approximately

11:00 am CST, federal officers attempted to push protesters back in order to execute a large removal mission. During the push, federal officers were obligated to deploy non-lethal munitions to regain control over the crowd. At least two violent protesters were arrested for assault. One of the arrestees was found carrying a concealed handgun and was handed over to local authorities for further criminal processing.

28.     On Saturday, September 27, 2025, another large crowd of disruptive protesters gathered at BSSA. CBP and ATF were also on scene to provide additional support. Protesters continued to block vehicular traffic to and from BSSA this day. When one government vehicle approached with emergency lights activated, federal officers gave multiple commands for protesters to clear the roadway. One male protester, in particular, refused to comply. When federal officers physically attempted to move him to the side of the road, he fell to the ground and struck a federal agent's wrist. The protester was arrested for assault of a federal agent. The crowd of protesters also deployed fireworks toward federal law enforcement personnel. One protester approached within striking distance and threatened to kill multiple federal agents. After threatening the federal agents, he attempted to flee by jumping on a civilian vehicle and breaking the windshield. While forcibly resisting his arrest, the protester grabbed a federal agent's helmet, exposing the federal agent to pepper spray and restricting the agent's vision. The protester was ultimately restrained and arrested for assault of a federal officer. In another instance, a female protester pushed a federal agent, resulting in a struggle on the ground when federal officers attempted to extend a safety perimeter around the BSSA facility. Upon her arrest, a pistol and pocketknife were found on the protester. Protesters' signs that had been affixed to government property without authorization were taken down for safety and order concerns. Due to the level of aggression and violence experienced, a bearcat armored vehicle was deployed to the scene for additional support. Approximately 12

individuals were arrested on this date for assault, resisting, or impeding certain officers or employees.[6]

29.    Over the weekend of September 27-28, 2025, ERO discovered a round, green ball with a wick. Its purpose was unclear, but in an abundance of caution, ERO contacted the Bureau of Alcohol, Tobacco, Firearms, and Explosives, which labeled it an Improvised Explosive Device and removed it from the scene.[7]



30.    Protesters have sought to permanently maim ERO personnel. When standing close to officers, protesters have used "Aztec Death Whistles," which sound like a human screaming and

---

[6] Available at: https://www.justice.gov/usao-ndil/pr/five-individuals-charged-federal-court-chicago-assaulting-or-resisting-federal-agents (last visited Oct. 25, 2025).
[7] Available at: https://x.com/DHSgov/status/1972297960319832252 (posted Sep. 28, 2025) (last visited Oct. 24, 2025).

**A106**

are generally 100-110 decibels in volume. They also used bullhorns. At close quarters, either could cause long-term or even permanent hearing loss. Protesters have also shone strobe lights and lasers in offers' faces, risking their sight.

31. On Friday, October 3, 2025, protesters once again gathered at BSSA and blocked the facility's vehicular traffic. Personnel from CBP, FBI, ATF, BOP, DEA, as well as local authorities were also on scene conducting crowd control operations in anticipation of DHS Secretary Kristi Noem's visit that day. At one point, a line of federal agents moved forward to push the crowd out of the roadway. Multiple verbal commands were issued by the federal agents to move back in order to facilitate a safe distance away from vehicles and federal agents securing the area to allow operations to proceed. For the protesters who refused to comply, federal agents followed up with physical nudges or pushes. Upon being pushed, one disruptive male protester pushed and assaulted Border Patrol Chief Gregory Bovino, who then fell forward. The male protester was charged for assaulting, resisting, or impeding certain officers or employees. Multiple other arrests of disruptive protesters were made that same day. This was the last day that chemical munitions were deployed at BSSA. Beginning on or around October 3, 2025, local authorities constructed designated protest zones and provided additional perimeter security for the BSSA facility.

32. It is clear that these protesters are organized. At times, they appear to gather offsite and then are brought onsite in vans. After several hours, the vans return with new protesters and take the people who have been outside for several hours away with them. When they arrive, protesters are armed with shields, gas masks, protective padding, and other tools that indicate that protesters are prepared or expecting to physically engage with federal personnel.

33. Some protesters have been successful in their attempts to harm officers. More than thirty ERO officers have been injured during the assaults on federal law enforcement, including a torn

**A107**

ACL, a beard being ripped from an officer's face, multiple lacerations, cuts, and bruises, multiple hospitalizations, and a hyper-extended knee from an officer being tackled by a protester at the legs.

34.     Personnel have not been harmed or threatened only at BSSA. More than twenty officers have been doxed with their home addresses posted on social media, their families threatened, and their personal property damaged. Cartels and the Latin Kings gang have placed $10,000-$50,000 bounties on the murder of immigration officers.[8]

35.     Protesters have followed vehicles leaving BSSA, often up to 50 miles, to photograph license plates and occupants of the vehicles. Such photographs are then posted online to crowdsource the identification of the vehicles and to dox ICE employees. In addition to ERO officers, the doxing websites display names, photographs, and other personal information of non-DHS employees, such as Department of Justice personnel, and DHS employees who are not in public-facing positions, such as support staff and attorneys.[9]

36.     As indicated multiple times above, there has been significant property damage to government property and government-owned vehicles. Below are some photographs of damage caused by violent protesters.

---

[8] *See, e.g.*, "Latin Kings Gang Member Arrested in Illinois After Placing Hit on Commander at Large Border Patrol Chief Bovino," DHS Press Release, Oct. 6, 2025, https://www.dhs.gov/news/2025/10/06/latin-kings-gang-member-arrested-illinois-after-placing-hit-commander-large-border (last visited Oct. 25, 2025).
[9] *See ICE List – Put ICE on ice*, https://icelist.is/ (last visited Oct. 24, 2025); *Stop ICE Plate Tracker*, https://www.stopice.net/platetracker/ (last visited Oct. 24, 2025).













22

**A111**











37.     As BSSA's staff became overwhelmed by this concentrated attack, ERO Chicago took additional steps to directly respond to the above-referenced violence. On or about September 8, 2025, ERO Chicago mandated 6-day, 12-hour duty shifts for its SRT operators. SRT operators are uniquely trained to serve in high-risk situations, such as serving warrants under hazardous conditions, arresting dangerous criminals, and assisting other law enforcement agencies during critical incidents. The addition of SRT operators to control the security risks at BSSA aimed to ensure that the most highly trained officers were safeguarding BSSA, officers, agents, and bystanders from unnecessary and unlawful violence. Among other things, SRT members created paths for ERO vehicles to enter and exit and pushed the crowds away from the building as the protesters threatened violence. The addition of SRT members to secure BSSA and the ongoing 12-hour shifts has diverted important limited resources away from federal law enforcement operations outside of BSSA. And despite the presence of SRT members and ICE's significant expenditure of resources, some protesters continue to exhibit violent and obstructive behavior.

38.     On at least twenty-five occasions, ERO Chicago solicited assistance from Homeland Security Investigations, another component within ICE, as well as ATF, DEA, and FBI, to add

agents from its SRTs and SWAT teams, to address the escalating violence.

39.     Of ERO's 31 BSSA officers, approximately 21 were diverted to secure the outside perimeter of the facility. This diversion of resources has caused the processing of aliens to slow down at BSSA, created a strain on BSSA employee work hours, and has caused another ICE facility to facilitate in the processing of aliens. Beginning on or around September 7, 2025, BSSA officers were mandated to increase their workload from an eight-hour five-day per week schedule to a twelve-hour six-day per week schedule. Because of this diversion away from officers' regular duties of transporting and booking, on or around September 14, 2025, the BSSA facility sent an entire plane of approximately 131 unprocessed aliens to the El Paso facility for processing, which then had the domino effect of straining El Paso's resources.

**DHS Use of Force Policy**

40.     In responding to public safety threats, ICE officers and special agents are bound by the DHS use of force policy titled, *Update to the Department Policy on the Use of Force* (Feb. 6, 2023) (Use of Force Policy), available at https://www.dhs.gov/sites/default/files/2023-04/23_0206_s1_use-of-force-policy-update.pdf. The general principle undergirding the Use of Force Policy is the respect for human life and the communities served. To that end, the Use of Force Policy requires that law enforcement officers only use force when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is objectively reasonable in light of the facts and circumstances confronting the law enforcement officer at the time force is applied. Further, physical force must be discontinued when resistance ceases or when the incident is under control.

41.     ICE law enforcement officers are trained in a variety of techniques to aid in appropriately resolving encounters, to include de-escalation where possible. ICE law enforcement officers are

encouraged to employ tactics and techniques that effectively bring an incident under control while promoting public safety and minimizing the risk of unintended injury or serious property damage. However, recognizing the seriousness of public safety threats that ICE law enforcement officers may encounter, the Use of Force Policy does not impose a duty to retreat to avoid the reasonable use of force, nor does it require ICE law enforcement officers to wait for an attack before using reasonable force to stop a threat.

42.     The Use of Force Policy requires ICE law enforcement officers, when feasible, prior to the application of force, to attempt to identify themselves and issue a verbal warning to comply with instructions. However, whether a warning is feasible under the circumstances requires the ICE law enforcement officer to be guided by several considerations, including, but not limited to, whether the resulting delay is likely to increase danger to the ICE law enforcement officer or others, result in the destruction of evidence, allow for a subject's escape, or result in the commission of a crime. However, when circumstances allow for a warning to be issued, ICE law enforcement officers are trained to afford subjects a reasonable opportunity to voluntarily comply before applying force. In an exigent circumstance, for self-defense or defense of another, ICE law enforcement officers are authorized to use any available object or technique in a manner that is objectively reasonable in light of the circumstances. In short, every circumstance is unique and requires a review of all information on the ground. However, the Use of Force Policy strictly prohibits the use of excessive force and warns its officers that DHS does not tolerate excessive force and constitutes it as misconduct. Under the policy, engaging in excessive force or failing to report the use of excessive force will subject the officer to administrative and criminal penalties.

**Impediment to ICE Operations Nationwide**

43.     Over the past few months, there has been a marked increase in aggressive and hostile actors

obstructing the lawful execution of ICE's federal law enforcement mission nationwide. ICE officers have been harassed, attacked, and brutalized; their family members have been doxed and threatened; and Government property has been vandalized and destroyed.

44.    This summer, ICE came under attack in Los Angeles, California, where local law enforcement was unable to adequately provide security to officers and the public.[10] *See* Associated Press Report, "Protests Intensify in Los Angeles After Trump Deploys Hundreds of National Guard Troops," (June 8, 2025).



---

[10] Available at: https://apnews.com/article/immigration-protests-raids-los-angeles-78eaba714dbdd322715bf7650fb543d7 (last visited on Oct. 24, 2025).



45.     On June 6, 2025, protesters turned to violence and began throwing objects at ICE vehicles. Protesters began throwing concrete chunks, bottles of liquid, and other objects at FPS officers as well as attempting to use large rolling commercial dumpsters as a battering ram to breach the parking garage gate and damage the federal building. On June 9, 2025, the federal building had to be shut down due to ongoing violence. On June 14, 2025, the Los Angeles Police Department declared an unlawful assembly outside 300 North Los Angeles Federal Building and Edward R. Roybal Federal Building and U.S. Courthouse after violent opportunists in the crowd of over 1,000 people began assaulting law enforcement officers with rocks, bricks, bottles, fireworks, and other objects. *See* "Officers Deploy Tear Gas, Rubber Bullets to Clear Protestors in Downtown Los Angeles."[11] Protestors blocked the parking garage exits on Alameda Street, preventing ICE transport vehicles from exiting with approximately 130 immigration detainees. As the protests grew, ICE was forced to abandon its use of the U.S. Marshals' transport bus. Only through the

---

[11] Available at: https://ktla.com/news/local-news/no-kings-protestors-ordered-to-disperse-tear-gassed-in-downtown-los-angeles/ (last visited on Oct. 24, 2025).

actions of the National Guard was ICE able to move the detainees.

46.     Moreover, in June 2025, two men were federally charged after throwing Molotov cocktails during immigration enforcement protests in downtown Los Angeles. One of the men was accused of throwing a flaming Molotov cocktail at Los Angeles County Sherriff's deputies who were conducting crowd control. Police arrested the other man who allegedly threw a Molotov cocktail at law enforcement officers when officers approached him.[12] *See* NBC4 Los Angeles News Report, "2 LA County Men Charged in Molotov Cocktail Attacks in Downtown LA and Paramount," (June 11, 2025).

47.     In fact, the 300 North Los Angeles Street Federal Building in downtown Los Angeles, California, was closed for over a week due to protesters assaulting federal, state, and local law enforcement officers with rocks, fireworks, and other objects. Protesters also damaged federal property by spray painting death threats to federal law enforcement officers.[13]

---

[12] Available at: https://www.nbclosangeles.com/news/local/molotov-cocktail-attacks-la-paramount-protests/3721306/ (last visited on Oct. 24, 2025).
[13] Additional photos and videos for those assaults and threatening graffiti can be found here: https://www.dhs.gov/news/2025/06/10/dhs-sets-record-straight-la-riots-condemns-violence-against-law-enforcement (last visited Oct. 24, 2025).







**A120**

48.     Similar violent and hostile activity targeting ICE operations is spreading across the Nation. Protesters at the ERO Portland Office have assaulted federal law enforcement officers with rocks, bricks, pepper spray, and incendiary devices; some attacks have been serious enough for FPS to refer for prosecution. In just one example, on July 4, 2025, ICE officers observed several individuals defacing ICE property with graffiti. As an officer pursued one individual, that individual ran towards the officer and kicked him in the leg, causing the officer to trip. Another individual threw an incendiary device towards the officers, which then detonated near the officers. These actions were severe enough for the U.S. Attorney's Office for the District of Oregon to seek the prosecution of four involved individuals. See e.g., U.S. Attorney's Office District of Oregon Press Release, "Four Defendants Charged with Assaulting Federal Law Enforcement Officers, Other Offenses During Protests Near Local ICE Office (July 8, 2025) (reporting that the U.S. Attorney's Office charged 22 defendants between June 13, 2025, and July 8, 2025, with offenses committed at the Portland ERO building including assaulting federal officers, arson, possession of a destructive device, and depredation of government property.[14]

49.     For more than 100 nights, the ICE facility in Portland, Oregon has effectively been under siege by violent protesters who not only clash with federal law enforcement but create an unsafe environment for Portland residents who live near the facility. These "protests" involve bottle rockets being fired at the ICE building, rocks thrown through windows, lasers targeting ICE officers' eyes, and barricades blocking ICE vehicles in and out of the facility. See Greg Wehner, Portland Police Chief Touts 'Crowd Support' Approach as ICE Facility Faces Ongoing Violence,

---

[14] Available at: https://www.justice.gov/usao-or/pr/four-defendants-charged-assaulting-federal-law-enforcement-offenses-other-offenses#:~:text=Since%20June%2013%2C%202025%2C%20the,and%20depredation%20of%20government%20property (last visited on Oct. 24, 2025).

Fox News (Oct. 5, 2025, 8:28 p.m. EDT).[15]

50.    Upon information and belief, there are reports from nearby residents who have barely slept because the encampment of protesters "blast loud music, engage in anti-government chants over loudspeakers and megaphones, and …. Violently clash with law enforcement officers." Joseph Treviño, Inside the Antifa Siege on 'War Zone' Portland — and the Resistance to the National Guard Cleaning It Up, New York Post (Oct. 1, 2025, 6:02 p.m. ET).[16] In the same vein, protesters have repeatedly tried to burn down the Portland ERO Office, risking the safety of the public at large and lives of both ICE personnel and any detainees who might have been held in the facility, in addition to property damage. For example, on June 11, 2025, federal officers observed a man ignite a flare and set fire to a range of materials that protesters compiled to barricade against a vehicle gate. Other individuals then added items to the pile of materials, growing the flames further. The Federal Bureau of Investigations, FPS, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives investigated this incident, and the U.S. Attorney's Office for the District of Oregon is prosecuting these acts of violent destruction. *See* U.S. Attorney's Office, District of Oregon Press Release, "Four Defendants Charged with Various Offenses Including Arson, Assaulting a Federal Officer, and Depredation of Federal Property During Protests Near Local ICE Office."[17]

51.    Protesters have even gone to such extreme lengths to display their violent proclivities towards ICE officers by assembling and displaying a guillotine outside of the ERO Portland Office.

---

[15] Available at: https://www.foxnews.com/us/portland-police-chief-touts-crowd-support-approach-ice-facility-faces-ongoing-violence (last visited on Oct. 24, 2025).

[16] Available at: https://nypost.com/2025/10/01/us-news/inside-the-antifa-siege-on-war-zone-portland-and-the-resistance-to-the-national-guard-cleaning-it-up/ (last visited Oct. 24, 2025).

[17] Available at: https://www.justice.gov/usao-or/pr/four-defendants-charged-various-offenses-including-arson-assaulting-federal-officer-and (last visited Oct. 24, 2025). *See also* Protesters Place Flammable Material, Lit Flare Against ICE Building, Officers Arrest 3, *Portland Police Bureau* (June 12, 2025, 12:45 a.m. PDT), available at: https://www.portland.gov/police/news/2025/6/12/protesters-place-flammable-material-lit-flare-against-ice-building-officers (last visited on Oct. 24, 2025) and *FOX 12 Oregon* (July 1, 2025, 6:33 p.m. EDT), available at: https://www.kptv.com/2025/07/01/man-facing-federal-charges-starting-fire-portland-ice-facility (last visited Oct. 24, 2025).

*See* Greg Norman, Anti-ICE Portland Rioters Bring Guillotine, Clash with Police, Burn Flag in

'War-Like' Scenes, Fox News (Sept. 2, 2025, 10:53 a.m. EDT).[18]



Anti-ICE protesters are seen rolling out a guillotine on Monday, Sept. 1, 2025, in front of the ICE field office in Portland, Ore.
(X/@KatieDaviscourt)



A flag is seen being burned by the protesters outside the Portland ICE facility on Monday, Sept. 1, 2025.
(X/@KatieDaviscourt)

52.     These threats have gone even further. Upon information and belief, over the past several

months, ICE officers in the Seattle Field Office Area of Responsibility (AOR), particularly those

---

[18] Available at: https://www.foxnews.com/us/anti-ice-portland-rioters-guillotine-clash-police-burn-flag-war-like-scenes (last visited Oct. 24, 2025).

employed in the Portland ERO Office, have been under surveillance and subjected to written, verbal, and physical threats due to their employment with ICE. Several Portland ICE officers have had their names, photographs and even home addresses posted publicly in multiple locations throughout their residential neighborhoods and the Portland metro area, along with threatening messages. Multiple Portland ICE officers have had unknown individuals appear at their residences in vehicles and on foot, peering into their private homes and recording the officers entering and leaving. A sample of one recent flyer containing violent threats and a Portland ICE officer's personal information, including residential address (redacted for safety reasons), can be seen in the DHS Press Release referenced below. ICE has seen a dramatic increase in assault against ICE personnel as these doxxing websites have revealed their identity and their families' identity to the public, exposing personnel and their families to known and suspected violent individuals. *See* DHS Press Release "Anarchists and Rioters in Portland Illegally Dox ICE Officers and Federal Law Enforcement" (July 11, 2025).[19]

53.     These threats against the lives of ICE officers, when considered in the shadow of the recent shooting upon the ICE facility in Dallas, killing two people, cannot be discounted. They are real.

54.     On September 24, 2025, Joshua Jahn carried out a shooting at an ICE facility near Interstate 35E in Dallas, Texas, firing from a rooftop into the sally port.[20] Three detainees in a van were shot; one died at the scene, and another succumbed to injuries six days later.[21] Investigators found anti-ICE notes and a marked round of ammunition, concluding the attack was a premeditated terrorist

---

[19] Available at: https://www.dhs.gov/news/2025/07/11/anarchists-and-rioters-portland-illegally-dox-ice-officers-and-federal-law (last visited Oct. 24, 2025).

[20] Available at: https://www.nbcnews.com/news/us-news/live-blog/dallas-ice-facility-shooting-rcna233585 (last visited Oct. 24, 2025); https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility (last visited Oct. 24, 2025).

[21] Available at https://www.nbcnews.com/news/us-news/live-blog/dallas-ice-facility-shooting-rcna233585 (last visited Oct. 24, 2025); *see also* https://www.kxii.com/2025/09/30/family-says-mexican-man-shot-dallas-ice-facility-has-died-becoming-attacks-second-victim/ (last visited Oct. 24, 2025).

act targeting ICE agents.[22]

55.    On July 4, 2025, a group attacked an ICE facility in Alvarado, Texas, vandalizing property and setting off fireworks.[23] During the incident, a gunman fired on responding police, injuring an officer, who was struck in the neck.[24] Additionally, a month earlier, a man was arrested at a Dallas ICE facility for making a bomb threat.[25]

**Establishment of Broadview Unified Command**

56.    On October 2, 2025, Broadview Police, the Illinois State Police, and other state and local agencies announced a Unified Command "to coordinate public safety measures" around BSSA and "to help protect First Amendment rights." *See* https://isp.illinois.gov/Media/PressReleaseFile/2269. The Unified Command established designated protest areas near BSSA, but not on federal property. *See id.* At the time of my departure as FOD of the ERO Chicago Field Office on October 17, 2025, officers from the Unified Command were on site 24 hours per day to maintain security around the facility. Additionally, the Mayor of Broadview issued a curfew order on October 6, 2025, designating that protests may occur at BSSA only between the hours of 9 AM and 6 PM. *See* https://broadview-il.gov/media/33thwv3u/vob-executive-order-no2025-01.pdf. The Mayor also issued a subsequent order limiting protest activity to Beach Street, and restricting protest activity near the areas of 25th Avenue and Harvard Street.

---

[22] Available at: https://www.azfamily.com/2025/09/24/fbi-says-ammunition-found-dallas-detention-center-contained-anti-ice-messaging/ (last visited Oct. 24, 2025); *see also* https://www.npr.org/2025/09/25/nx-s1-5553470/latest-updates-dallas-ice-shooting (last visited Oct. 24, 2025); https://abcnews.go.com/US/dallas-ice-sniper-suspect/story?id=125909069 (last visited Oct. 24, 2025).

[23] Available at: https://www.keranews.org/news/2025-07-11/prairieland-detention-center-alvarado-u-s-immigration-and-customs-enforcement-shooting-alvarado-police-officer-questions (last visited Oct. 24, 2025).

[24] Available at: https://www.fox4news.com/news/benjamin-song-suspect-immigration-center-attack-previously-sued-over-drag-show-counter-protest (last visited Oct. 24, 2025).

[25] Available at: https://www.aljazeera.com/news/2025/9/25/who-is-joshua-jahn-what-we-know-about-the-dallas-ice-facility-shooting (last visited Oct. 24, 2025).

57.    The introduction of the Unified Command has reduced the need for federal officers to engage with protestors at Broadview. Crowds have continued to gather near BSSA after establishment of the Unified Command, but state and local officials have taken primary responsibility to crowd control and arrests.  From October 3, 2025, until the time of my departure as FOD of the ERO Chicago Field Office on October 17, 2025, federal officers did not deploy any chemical munitions or any less-lethal munitions at BSSA.

**Temporary Restraining Order**

58.    On October 9, 2025, this Court issued a temporary restraining order, which was disseminated to all ICE employees the same day.

59.    On October 17, 2025, this Court issued a modified temporary restraining order, which was disseminated to all ICE law enforcement personnel operating in or deployed to the Chicago Areas of Responsibility.

**Impact of Plaintiffs' Requested Relief**

60.    If the Court grants Plaintiffs' preliminary injunction, such an injunction would be unworkable, unnecessary, and further endanger the safety of law enforcement personnel and the public.

61.    ICE law enforcement officers are responsible for securing impacted areas and may be unable to differentiate between members of the press and other participants. Press markings are publicly available and while law enforcement officers may have no reason to limit press access, their ability to differentiate between actual press and those who have come by press markings through fraudulent means cannot be determined in real-time. Religious observers are even less easily identifiable. When ICE law enforcement officers give a dispersal command for safety reasons, all parties are expected to comply. Any delay in compliance, or the ability to respond to a

lack of compliance, poses a risk to officer safety, public safety, and the safety of any press who may be present.

62.    Crowd control devices are used after crowds have been ordered to disperse, fail to do so, and engage in criminal and assaultive behavior towards law enforcement officers and the public. Due to the nature of some crowd control devices, such as CS gas and flash-bangs, persons who fail to disperse pursuant to lawful orders, but are not posing an immediate threat to law enforcement officers may be impacted due to their proximity to persons who are engaged in violent and/or criminal behavior. These crowd control devices are designed and used not to cause physical injury but to protect law enforcement officers and the public from violent attacks.

63.    Moreover, consistent with the DHS Use of Force Policy, ICE law enforcement officers only use force that is necessary and reasonable based on the totality of the circumstances. ICE law enforcement officers are trained to engage those individuals who pose the greatest threat based on the reasonableness standard. ICE law enforcement officers are trained to give verbal commands and individuals who do not comply with these commands may be perceived as a potential threat. ICE law enforcement officers' responsibility is to ensure the scene is safe for law enforcement personnel and the community, and anyone who does not comply with lawful dispersal commands may be considered a potential threat to law enforcement depending on subsequent actions and continued refusal to leave a restricted area. Also consistent with the DHS Use of Force Policy, ICE law enforcement officers are trained to utilize direct impact munitions only on those individuals who pose a direct threat to law enforcement. If a dispersal order is given and subjects do not comply with this directive, they may be subject to necessary and reasonable uses of force to include the utilization of kinetic impact or chemical munitions and/or diversionary devices. ICE law enforcement officers are trained to give dispersal orders prior to the utilization of any of the

aforementioned law enforcement tools when feasible, and those individuals who do not heed these orders may be exposed to any or all of these. In short, those individuals who do not disperse when receiving the command to do so, identify themselves as a potential threat to law enforcement.

64.    Consistent with the DHS Use of Force Policy, ICE law enforcement officers are trained to give warnings when operationally feasible. A blanket requirement for two separate warnings would prevent officers from responding to exigent circumstances where the utilization of these tools could prevent harm to the public or officers. It is the subject's behavior that dictates the timeline of the utilization of these tools and if the subject or crowd behavior requires a more immediate response, officers cannot and should not compromise safety to meet an arbitrary two-warning standard. In short, ICE law enforcement officers will give commands and warnings to avoid unnecessary exposure; however, ICE law enforcement officers are permitted to use necessary force as appropriate based on the totality of circumstances.

65.    The on-scene supervisor approves all operational contingency plans and the utilization of any impact projectiles and chemical munitions as required. The dynamic nature of operations does not always allow the supervisor to be on scene or personally witness rapidly evolving situations which may require the use of such munitions. ICE law enforcement officers are trained to use discretion and follow all policies when deploying chemical munitions and specialty impact munitions. Regardless of circumstance, all law enforcement officers are held to the necessary and reasonable standard. The deployment of these tools is dictated by the totality of circumstances facing the officer in real-time. The delay required by supervisory notification or presence would unnecessarily place law enforcement officers and community members in harm's way.

66.    ICE officers are required to carry their ICE metal badge and credentials when carrying an ICE-issued firearm, except for officers involved in an undercover operation. ICE metal badges

39

A128

display a unique badge number allowing easy identification of officers. ICE SRT uniforms are

affixed with large, discernible identifier patches unique to each agent or officer that allow for

identification, as needed. These SRT identifiers balance between the need to protect the officers'

safety while also ensuring that officers can be individually identified while on duty.

67.     During my tenure as FOD for ERO Chicago, I did not witness, nor am I aware of, any ICE

employee knowingly targeting journalists, peaceful protecters, or religious practitioners with less

lethal munitions and/or crowd control devices for exercising their First Amendment rights.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws

of the United States that the foregoing is true and correct to the best of my information, knowledge,

and belief.

Executed on this 28th day of October 2025.

_____
Russell Hott
Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)**

| | |
|---|---|
| CHICAGO HEADLINE CLUB, et al., | Case No. 1:25-cv-12173 |
| *Plaintiffs*, | |
| v. | **DECLARATION OF DANIEL I. PARRA** |
| Kristi NOEM, et al. | |
| *Defendants*. | |

<u>**DECLARATION OF DANIEL I. PARRA**</u>

I, Daniel I. Parra, declare and affirm as follows:

1. I am employed by U.S. Border Patrol, an operational component of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system. As part of this mission, CBP Border Patrol Agents are responsible for preventing the unlawful entry of individuals into the United States, apprehending those who attempt to enter illegally or who have violated the immigration laws in accordance with the Constitution and other applicable laws. Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

2. I am the Deputy Chief Patrol Agent of the El Centro Sector and have been in this position since May 8, 2022. In this role, I am responsible for managing U.S. Border Patrol

operations and administrative functions within the El Centro Sector, which encompasses 70 miles of land border, as well as inland areas of California extending to the Oregon State line.  I oversee a workforce of over 1,200 employees and manage a multimillion-dollar budget.

3. I entered on duty with the U.S. Border Patrol on July 28, 2002.  My first assignment as a Border Patrol Agent was at the El Centro Border Patrol Station, El Centro Sector.  Across the span of my career with the U.S. Border Patrol, I have served in a variety of leadership positions ranging in scope and complexity.  These assignments include Supervisory Border Patrol Agent and Field Operations Supervisor, Indio Station, El Centro Sector; Executive Officer of Operations, El Centro Sector; Assistant Chief,  U.S. Border Patrol Headquarters, Law Enforcement Operations Directorate - Pacific Corridor; Deputy Patrol Agent in Charge of Operations, Ajo Station, Tucson Sector; Patrol Agent in Charge, Blythe Station, Yuma Sector; and Division Chief, Law Enforcement Operational Programs, Tucson Sector.  As the Division Chief, I oversaw multiple law enforcement operational programs in Tucson Sector, the largest and one of the busiest sectors in the nation.

4. At present, I serve as the Incident Commander for "Operation Midway Blitz".  In this position, I have operational oversight and am responsible for all U.S. Border Patrol assets and operations in the greater Chicago area, and I operate out of the Border Patrol Incident Command Post (BP ICP) at the Naval Station Great Lakes Installation in Great Lakes, Illinois.  Furthermore, I ensure that all personnel under my command have the proper resources, not only in terms of materiel, but the requisite training needed to operate in such a complex and fluid environment, including instruction in constitutional law, de-

escalation techniques, and safe arrest practices. I oversee logistics, use of force events, personnel, and intelligence.

5. The actions undertaken by CBP law enforcement personnel are informed by their experience and the comprehensive training they receive at various stages of their careers. CBP officers and agents, including law enforcement employees of the U.S. Border Patrol (USBP) and the Office of Field Operations (OFO), must comply with CBP's Use of Force Policy. Pursuant to the CBP Use of Force Policy, officers and agents may use objectively reasonable force only when it is necessary to carry out their law enforcement duties. Before using force, law enforcement personnel are required to consider the totality of circumstances known by the officer or agent at the time of the use of force and weighs their actions against the rights of the subject.

6. The CBP Use of Force policy addresses the deployment of less lethal devices and outlines the circumstances in which they may be utilized. Crowd control devices and less-lethal munitions are utilized during civil disturbances. Due to the dynamic situations encountered during these events, giving warnings and/or commands and time for a subject or subjects to comply may not always be feasible. Under CBP policy, chemical irritants may be utilized when an individual is engaging in active resistance. Active resistance is a type of resistance where a subject physically opposes an officer's or agent's control efforts. Assaultive resistance under CBP policy is defined as resistance characterized by a level of aggression or violence that causes or has the potential to cause physical injury to the officer/agent, others, or self. This includes a subject's attempts, or apparent intent, to make physical contact in an attempt to control or assault the officer/agent.

7.  The CBP Use of Force Policy defines less-lethal force as force that is not likely or intended to cause serious bodily injury or death.  The use of less-lethal devices or weapons is meant for situations where empty-hand physical techniques are not sufficient, practical, or appropriate.  Less-lethal equipment used by CBP officers and agents includes Oleoresin Capsicum (OC) spray (also referred to as pepper spray), collapsible straight batons, Electronic Control Weapons (ECWs and also referred to as TASERs), compressed air launchers that include the Pepperball Launching System (PLS) and FN303, munition launchers that include the 40MM, and Controlled Noise and Light Distraction Devices (CNLDD and commonly referred to as a flash-bang).  Smoke canisters may also be used for crowd control purposes.

8.  Following their initial academy training, CBP law enforcement personnel receive additional on-the-job training and periodic refreshers on a full range of topics, including eight hours of Use of Force training, which is conducted quarterly by all Border Patrol Agents.  Additionally, officers and agents are required to obtain certifications for the use of each CBP authorized less-lethal device they carry and must complete an annual recertification on them each fiscal year.  CBP also offers Mobile Field Force (MFF) training which includes additional specialized training on crowd control operations.  MFF I training includes crowd control familiarization, basic formations, and gas mask proficiency. MFF II training expands into shield and baton proficiency, multiple formations and movement, CS gas exposure, and mass arrest procedures.

9.  The statements contained in this declaration are based upon my personal knowledge and information made available to me in the course of my official duties.

10. On or about September 5, 2025, CBP Border Patrol agents and CBP Officers were deployed to Chicago, Illinois, as part of Operation Midway Blitz, which is a national, multi-agency operation. The operation's purpose is to enforce immigration law through law enforcement efforts. Due to the scope and complexity of the operation, over 200 agents redeployed away from their patrol functions at the border to support this mission.

11. As part of Operation Midway Blitz, CBP personnel, along with personnel from partner federal agencies, participate in a variety of different law enforcement actions in northern Illinois. These enforcement actions primarily revolve around immigration enforcement authorities granted under Title 8 of the U.S. Code but may also involve enforcement of certain portions of the U.S. criminal code under Title 18.

12. CBP officers and Border Patrol agents routinely bring individuals detained under the immigration laws during the ongoing operations to the ICE Broadview Service Station Area (BSSA) located at 1930 Beach Street, Broadview, Illinois for processing and temporary housing.

13. CBP special operations teams are routinely needed to maintain crowd control in Chicago. Demonstrations outside the BSSA and other facilities have devolved into violent riots, where rioters seek to impede and obstruct law enforcement activities. On other occasions, during enforcement actions in the field, Border Patrol Agents have been surrounded and blocked from leaving a scene, requiring the use of less than lethal force to safely exit the situation. CBP's frequent need to react and respond to the violent and obstructive actions of individuals and groups drains law enforcement resources and impacts the Agency's ability to perform its mission responsibilities.

**A134**

14. In my personal observations of the crowds at the BSSA, it is not easy to distinguish between religious observers and the rest of the crowd.  I have not witnessed any observable religious practices in the events I have been involved with.  I have not seen any reporting which would cause me to believe that CBP personnel have directly targeted religious observers for enforcement actions.

15. Similarly, in the highly evolving and chaotic situations that CBP personnel are confronting it can be difficult to identify members of the press.  Again, however, I have not seen any reporting that would cause me to believe that CBP personnel have directly targeted journalists or members of the press for enforcement actions.

16. CBP personnel have encountered aggressive activity from large groups of individuals gathering to actively impede CBP's efforts at the BSSA facility.  On September 12, 2025, CBP Office of Field Operations (OFO) personnel were stationed inside the BSSA facility.  They were advised that law enforcement personnel were attempting to exit the facility in a marked vehicle, but a crowd of individuals was blocking the driveway.  Special Response Team (SRT) operators estimated the size of the crowd to include approximately 200 or more individuals.  Many members of the crowd were wearing masks, gloves, helmets, and carrying improvised shields made of wood and other materials.  SRT operators verbally instructed the crowd to clear the vehicle path for officer safety, but several individuals refused to comply.  An SRT operator then deployed less lethal munitions via a PepperBall launching system (PLS) in the direction of the driveway, to disperse the crowd away from law enforcement vehicles.  From a distance, the PLS is not a precision tool, and it cannot be meaningfully used to target an individual's person.  He did not observe any kinetic impact on any members of the crowd from the deployment.

**A135**

Following the deployment of the less lethal munition, the crowd dispersed, and the vehicles were able to safely exit the BSSA facility.

17. On September 19, 2025, at approximately 8:30am, an ICE ERO vehicle was in the process of exiting the BSSA facility when it was approached by a crowd of approximately 50 individuals. Several individuals obstructed the vehicle's movement by linking arms and sitting on the ground in front of the vehicle or by hitting and pushing the vehicle. Multiple commands were given instructing the crowd to step away from the vehicle. After the individuals failed to comply, Border Patrol Agents discharged less lethal munitions. Agents observed members of the crowd picking up some of these munitions and throwing them back at law enforcement personnel. Agents represented that each volley of less lethal munitions was executed in a controlled and targeted manner, and use of force was assessed in relation to the imminent danger.

18. At approximately 12:00pm that same day, an ERO vehicle attempted to exit the BSSA facility. Twenty-five or more individuals blocked the gate. An advance team of agents decided to exit the gate first and gave instructions for protestors to clear the area and make room for the vehicle. Approximately two to three individuals ignored the commands. Border Patrol Agents deployed less lethal munitions which successfully moved the obstructive individuals away from the gate and allowed the ERO vehicle to exit.

19. Later that evening, a crowd of approximately 120 individuals gathered outside of the BSSA and intentionally blocked the path of a Border Patrol vehicle transporting detainees to the facility. ICE agents responded to the scene to deter the crowd from obstructing the path of the vehicle and protect the detainees, but the crowd refused to move. A CBP team

of OFO SRT officers were instructed to act as a Quick Reaction Team to support law enforcement efforts to clear a path for vehicles entering/exiting the BSSA. Several members of the crowd were wearing masks and goggles and were aggressively yelling profanities towards law enforcement.

20. As SRT officers were advancing, clear commands of "get back" or "move back" were given to the protestors blocking the roadway. The crowd responded with "kill yourself," "fuck ICE," and other threatening statements, and they refused to comply with the SRT officers' commands. Without provocation, individuals within the crowd began throwing dangerous objects including rocks, commercial-grade fireworks, liquid filled bottles, and other unknown hard projectiles directly at officers. An SRT officer reported that he was struck on the right leg above the knee with a rock.

21. In response to escalating danger and to prevent further assaults, SRT officers deployed less lethal munitions to disperse the obstructing rioters and ensure the safety of agents and detainees. Approximately eight subjects were taken into custody for assaulting CBP employees on September 19, 2025.

22. On September 26, 2025, rioters restricted vehicle access to the BSSA by blocking the nearby intersection of 25th Street and Harvard Street, just outside the BSSA, requiring the deployment of a specialized Border Patrol Tactical Unit (BORTAC) which was forced to use less lethal munitions to disperse the obstructing rioters and allow access to the BSSA. CBP deployed additional SRT and Mobile Field Force (MFF) officers to maintain control of the area thereafter as rioters refused to disperse. Border Patrol Agents observed: multiple individuals in the crowd wearing welding gloves; crowd members picking up a deployed CS canister, and rioters throwing the deployed CS canister through the glass

window of an adjacent building located at 2000 S 25th Ave, Broadview, Illinois, which was occupied by non-government workers associated with a business located inside the building.

23. Two individuals aggressively approached law enforcement officers and ignored multiple verbal commands to move away from the street. As Agents attempted to place the individuals under arrest, they became physically combative. Border Patrol Agents deployed less lethal munitions to keep the agitated crowd back in order for law enforcement personnel to safely make the arrests. Following the use of less lethal munitions, the crowd was moved back several times to allow the arrival and departure of vehicles to and from the facility.

24. The following day, on September 27, 2025, rioters again impeded CBP vehicles and personnel from entering and exiting the BSSA. Approximately 100-150 individuals were becoming aggressive and shouting obscenities towards CBP personnel. Several individuals carried homemade shields with profanity written on them, as well as pipes, metal chains, and rocks/bricks. Some individuals began pushing and shoving Border Patrol Agents as well as throwing garbage, liquid-filled bottles and rocks at the Agents. At approximately 7:30 p.m., Border Patrol and OFO SRT teams deployed outside the facility gate to remove the concealed shields and rocks to prevent their continued use against law enforcement. While Border Patrol and SRT were removing the shields and rocks, several members of the crowd became aggressive, physically assaulting government personnel, and several arrests were made as a result.

25. In the next hour, at approximately 8:30 p.m., the crowd's behavior intensified significantly. Multiple individuals began forcefully striking and shaking the BSSA

facility's gate, which is a critical security barrier protecting not only the officers and

agents assigned to the operation but also the detainees housed within the facility, for

whom the Government maintains responsibility.  During this outburst by the crowd,

agents and officers observed members of the crowd re-establishing previously cleared

stash points and placing additional rocks and bricks in strategic locations near the

perimeter of the BSSA facility.

26. Based on the crowd's escalating aggression, the re-deployment of potential weapons, and

the ongoing tampering with the facility's main gate, the decision was made to temporarily

reposition the perimeter for non-government personnel access to one block away from the

BSSA facility to create a safer defensive posture and prevent an imminent breach.  CBP

personnel gave commands to the crowd to move back multiple times and directed them to

the nearest intersection.  A dispersal announcement was also made over the loudspeaker

of an HSI Bearcat vehicle; however, numerous individuals refused to comply and became

assaultive during the movement, including attempts to tackle CBP personnel.  In response

to the active aggression and to safely disperse the crowd, CBP personnel deployed less

lethal munitions in accordance with established policy and training.

27. Following the deployment of less-lethal munitions, CBP personnel effectively pushed the

crowd back to the intersection of Beach Street and Lexington Avenue and away from the

BSSA facility's egress point.  Throughout the night, CBP personnel continued to secure

the facility.  Approximately 50–75 federal officers formed a line to relocate the crowd to

a safe distance away from the perimeter fence.  The main entrance/exit was then opened,

sirens were activated, and announcements were made over the loudspeaker to direct the

crowd to move back from the facility.  During that time the crowd continued to shout

obscenities and made threatening comments such as "Kill yourselves," "Fuck ICE,"

"Fuck you all," "You will get what's coming to you," and "We'll find your hotels."

Based on the events described above, federal agents arrested 11 individuals on September

27, 2025.  Two arrestees were armed with loaded handguns.  A CBP SRT Officer reported

knee pain, bruising on his chin and upper right chest following an altercation with two

individuals who tackled him and slammed him into the BSSA fence.

28. Based on my understanding and belief, CBP personnel have not had to deploy chemical

munitions at the BSSA facility since the introduction of the United Command on or

around October 3, 2025.

29. Away from the BSSA, on multiple occasions as described in more detail below, CBP

personnel have also encountered large groups of individuals gathering to actively impede

CBP's immigration enforcement efforts.  Individuals and large groups have been

increasingly willing to threaten CBP personnel, damage government property, and assault

officers performing their lawful duties.

30. On October 3, 2025, an alleged member of the Latin Kings street gang posted a

$10,000.00 bounty for the killing of the Chief Gregory Bovino.[1]

31. On October 3, 2025, while conducting immigration enforcement operations near North

Pulaski Road and West Wilson Avenue, an individual threw gravel at a rental vehicle

containing several BORTAC agents.  The individual then threw a larger rock that hit the

---

[1] *See* https://www.dhs.gov/news/2025/10/06/latin-kings-gang-member-arrested-illinois-after-placing-hit-commander-large-border (Last Visited Oct. 24, 2025).

side of the vehicle and dented the panel.  BORTAC agents were able to arrest the

individual based on a violation of 18 U.S.C. § 111.

32. At approximately 10:00am, that same day, in the vicinity of 55th Street and South Pulaski

Road, Chicago, CBP SRT officers, in rough duty SRT uniforms, with law enforcement

identifiers clearly visible, were riding in an unmarked minivan when they were followed

by four or five vehicles driven by civilians.  The drivers were honking their horns,

recording the minivan with their cell phones, and shouting out the SRT officers' presence

to the public.  A pickup truck then accelerated to approach the minivan before striking its

rear panel.  After the collision, the truck continued to drive erratically and attempted to

get in front of the minivan before falling back and striking the rear bumper.  To prevent

injury and further damage to the minivan, one SRT officer used a PLS against the

windshield of the truck.  The SRT officers drove to a Chicago Police Station to file a

report.  All three officers reported pain from the vehicle collision. To date, I am not aware

of the Chicago Police Department taking any action on this case.

33.  At around 11:30am on October 3, Border Patrol Agents were conducting immigration

enforcement operations near West 25th Street and South Drake Avenue.  While

conducting a consensual encounter with a suspected alien, an individual ignored agents'

instructions to step away from the encounter and threw a closed-fist punch toward an

agent's face.  Agents were able to execute a controlled takedown and arrested the subject

for assault on a federal officer.

34. Separately, at around 11:50am on October 3, while conducting targeted law enforcement

operations in Cicero, Illinois, agents noticed a blue Ford SUV and a red sedan begin to

follow them. The vehicle operators were using hand gestures to other vehicles to block in

the government vehicle.  These two vehicles continuously attempted to cut the agents off

and swerved into our vehicle in an attempt to make the agents drive off the road and

effectively cut off their lane.  This continued for approximately ten blocks.

35. While waiting at a red light at the intersection of North Drake and West Armitage

Avenues, a crowd began to form around the vehicle, yelling at the agents to leave,

screaming "fuck you," and sticking out their middle fingers.  As the light turned green, an

individual on a motorcycle parked diagonally on the road to block the government

vehicle from the front, while two other vehicles attempted to further box-in the vehicle.

Agents gave commands for the motorcycle to move out of the way.  After verbal

commands were not effective, an agent deployed a CS canister to disperse the crowd

surrounding the vehicle.  Despite the deployment of less lethal munitions, the

motorcyclist refused to move.  One agent exited the vehicle and deployed two baton

strikes on the motorcycle, away from the individual. The baton strikes were effective at

getting the motorcyclist to move out of the way of the government vehicle.

36. Also on October 3, 2025, Border Patrol apprehended an injured detainee who was

subsequently transported to the Humboldt Park Medical Center.  While agents were at the

hospital, approximately 20-30 people gathered, filming agents, and screaming profanities.

Agents observed a male driver in a 2013 Toyota Camry dropping caltrops (a type of

hand-thrown spike) onto the street on West Thompson Street directly into the path of

agents' vehicles.  As an agent exited their vehicle to retrieve the caltrops off the street, the

same driver made a U-turn and threw several more caltrops out the window, landing

directly beneath a government vehicle.  Agents at the scene were able to again

successfully remove the caltrops from the roadway and safely move through the crowd without using force or dispersing less lethal munitions.



37. While two Border Patrol Agents were conducting a hospital watch of the injured detainee inside the hospital, an individual later identified as Jessica Fuentes attempted to gain entry into the room.  Ms. Fuentes did not identify herself, and when agents stopped her from entering the room, she demanded to know if agents had a "signed judicial warrant." When agents again asked Ms. Fuentes to identify herself, she only stated she was an Alderwoman in the area and again demanded to know if the agents had a signed judicial warrant.  An agent told Ms. Fuentes to leave the room.  Ms. Fuentes refused to obey the command, and the agent told her again that she needed to leave the room.  Ms. Fuentes again refused the command, and the agent placed her in handcuffs and informed her she was under arrest for impeding official law enforcement duties and responsibilities.  The agents were then able to remove her from the room.  Ultimately, she was released without being processed or charged with a crime.

38. Later, officers arrived to relieve Border Patrol Agents who were maintaining custody of an injured detainee at a hospital in the Humboldt Park neighborhood of Chicago.  Upon

arrival, individuals confronted the officers, announced that "ICE" was present, blew

whistles and yelled verbal threats.  Given the volatile situation, the agents left the scene,

staged remotely, and coordinated an alternate way to enter the hospital to resume their

duties, causing extra work for both the hospital and CBP.  It took over four hours for a

law enforcement relief team to be able to enter the hospital.  At one point, agents reported

that 20 bicycles and four vehicles chased them throughout Humboldt Park.  To evade the

vehicles and seek to maintain both officer and public safety, CBP personnel were forced

to utilize emergency lights and conduct evasive driving.

39. Once at the hospital, the only way agents could pick up the CBP personnel inside the

hospital was to drive to the emergency room entrance, where a crowd had formed.  The

crowd immediately engulfed the vehicle on all sides, and approximately thirty subjects

surrounded and stood in front of the vehicle.  The individuals disobeyed agents'

commands to move away from the vehicle, began screaming and yelling, and struck the

vehicle with their fists.  A rock or a piece of concrete was thrown at the vehicle, striking

the pillar between the front and rear passenger windows.  Both vehicle windows were

open and if this projectile had hit just a few inches forward or backward, it would have

struck agents directly in the face or head.



40. As agents began attempting to move the crowd back, members of the crowd started pushing and kicking agents. An agent informed the crowd that if they didn't move back, he would deploy chemical munitions. The crowd continued to block the agents' path and attempted to assault agents by pushing and kicking them. The agents then deployed less lethal munitions, which enabled them to safely clear a path through the crowd and exit the hospital.

41. On October 4, 2025, several individuals used their vehicles to box-in a government vehicle used by Border Patrol Agents assigned to a mobile response team on a public road. A black GMC Envoy driven by a male driver and a silver Nissan Rogue driven by a female driver rammed the government vehicle from both sides. Agents exited their vehicle to disperse civilians for safety and to prevent further assault. The female driver then drove her vehicle directly at a Border Patrol Agent. Faced with an imminent threat of death or great bodily harm given the high potential of being run over, an agent discharged his service-issued firearm at the Nissan Rogue, striking the female, who fled the scene but was eventually apprehended. A handgun was later found inside the female driver's purse. Both drivers were criminally charged under 18 U.S.C. § 111(a) and (b).

42. Approximately 200 rioters converged at three separate locations near the scene of the shooting. Over the next four hours, rioters threw objects at agents, including glass bottles and traffic cones, and forcefully pushed the agents. The Chicago Police Department initially refused to assist, but over one hour later, they provided perimeter security. Based upon the situation, CBP personnel were forced to deploy less lethal munitions to disperse the rioters.

43. On October 12, 2025, Border Patrol Agents were conducting immigration enforcement duties in the Albany Park neighborhood on the north side of Chicago. At approximately 12:45 p.m., while agents were arresting an illegal alien, a group began to gather in the area and obstruct the agents' law enforcement efforts and freedom of movement. A Quick Reaction Force (QRF) arrived on scene to assist with crowd control and instructed the crowd to disperse. The crowd ignored verbal commands, and the crowd size increased to approximately 40 individuals, including some who arrived on bicycles and positioned themselves in a fashion to block a government vehicle and Border Patrol Agents from leaving the area.

44. The majority of Border Patrol Agents were wearing rough duty uniforms with body armor, each wearing a visible badge; there were also plainclothes agents operating in the area as well. According to Border Patrol uniform policy, agents authorized to wear plainclothes need not display their badges on their outermost garment, and they were wearing unique alphanumeric identifiers in compliance with the TRO. In some cases, where uniformed agents may not have had immediate access to embroidered patches bearing unique alphanumeric identifiers, bright orange or yellow tape with the unique identifiers handwritten on the tape were worn near the shoulder of their uniforms.

45. As the situation escalated, some of the agents were able to leave the area in their vehicles; however, a number of individuals linked arms to block additional vehicles from leaving. QRF personnel issued multiple warnings, advising the crowd to clear the area before chemical agents were deployed. The crowd continued to grow and ignored verbal commands and hand signals directing them to stand aside. They continued to actively impede the agents' movement. Based on previous experience, the agents became

**A146**

concerned that the longer they remained on the scene, the more dangerous the environment would become, anticipating that social media would broadcast their location and allowing for the threatening crowd to continue to grow. The agents provided warnings to the crowd that they needed to disperse immediately. Due to the totality of the circumstances, handheld CS gas was used.

46. An unidentified person wearing a red shirt attempted to pick up the CS grenade but quickly dropped it after presumably realizing it was too hot to handle. The same individual then kicked the CS grenade toward agents, picked it up again, and threw it, striking an agent's vehicle. Another subject subsequently threw a bicycle toward the agent who originally deployed the first CS grenade. Throughout the incident, the mob continued throwing various objects at agents. As the chemical irritant spread, the crowd began to disperse, allowing the remaining agents to safely clear the area.

47. One agent suffered a sprained elbow during this confrontation as a direct result of his efforts to gain control of the individual that attempted to throw the CS grenade back at the agents.

48. On October 14, 2025, Border Patrol Agents were conducting immigration enforcement in support of Operation Midway Blitz near the 3000 block of east 100th Street, on the southeast side of Chicago.

49. The Border Patrol agents were wearing rough duty uniforms with body armor, each having a visible badge. In some cases, where uniformed agents may not have had immediate access to embroidered patches bearing unique alphanumeric identifiers, bright

orange or yellow tape with the unique identifiers handwritten on the tape were worn near the shoulder of their uniform.

50. At approximately 10:30 a.m., Border Patrol Agents attempted to initiate a consensual encounter with the occupants of a red Ford Escape occupied by at least two individuals. The occupants of the vehicle saw the agents and fled in the Escape, intentionally striking the unmarked Ford Expedition driven by the Border Patrol Agents in the process. As the Escape struck the Agents' vehicle, the two Agents on the side where contact was made were momentarily pinned between the door and the frame of the vehicle, while a third Agent was narrowly able to avoid being struck. The Agents notified nearby units, including an observation unit in the air, and promptly began following the individuals fleeing the scene in the Escape.

51. The Escape drove up and down several streets and alleys, winding his way through the southeast side of the city as the Agents followed closely behind for approximately 25 minutes. As they drove, the driver of the Escape displayed no regard for traffic laws and posted signs. The passenger was attempting to signal passersby that immigration enforcement personnel were in the area while the driver operated the vehicle in an aggressive manner, often slamming the brakes at random intervals in an apparent effort to harass the Agents in the vehicle behind them. As the Agents continued to follow closely behind the Escape in the Expedition, the driver of the Escape suddenly hit the brakes again, causing the Agents' vehicle to hit the Escape from behind. Consequently, both vehicles were damaged—the Expedition's airbags deployed, and the Escape spun around and struck a Toyota RAV4 parked nearby—and both the Expedition and the Escape came

to rest at the intersection of East 105th Street and South Avenue N at approximately 10:34 a.m.

52. The occupants of the Escape fled the scene on foot but were apprehended by CBP within a few minutes.  A crowd began to gather, and approximately two dozen CBP law enforcement personnel formed a perimeter to secure the scene of the disabled vehicles, which was now a crime scene that needed to be protected from outside interference.  CBP personnel notified the Chicago Police of the collision and Chicago Police responded to conduct a traffic investigation.  Initially, the crowd around the intersection was comprised of a few dozen people, but soon CBP personnel were encircled and outnumbered two-to-one, and members of the crowd could be heard shouting things like, "ICE go home," and calling CBP personnel "racists" or "nazis."  Soon, the hostile crowd doubled or tripled in size.

53. As CBP personnel worked to maintain their perimeter, protesters attempted to encroach on the scene of the active investigation related to the collision which was precipitated by the original assault on the agents committed by the driver of the red Escape, the evidence of which—including both damaged vehicles—needed to be preserved.  The crowd became increasingly agitated as uniformed agents attempted to maintain a perimeter.  The crowd continued to shout at the CBP personnel, but the language escalated to profanity-laced threats of violence against the law enforcement personnel such as, "I'll fuck you up," and "I'll rip your fucking head off."  At approximately 11:51 a.m., after repeated verbal instructions to disburse were ignored and in response to individuals beginning to physically shove CBP personnel, a CBP officer deployed a handheld smoke cannister.  A member of the crowd that had gathered around the scene picked up the smoke cannister

and threw it back at Agents, resulting in his immediate arrest for assault of a federal

officer.

54. At approximately 12:12 p.m., tow trucks arrived on scene to transport the damaged Ford

Escape and Expedition to a secure lot.  The gathered crowd, which now greatly

outnumbered the agents, continued to become increasingly aggressive, and eventually

several individuals began to throw objects in the direction of the agents while ignoring

commands to move back.  Two individuals were taken into custody after throwing eggs

and other additional objects at CBP personnel.  Several government vehicles were

damaged, including some with slashed tires and broken windows.

55.  At approximately 12:38 p.m., additional officers from the Chicago Police Department

arrived, but they did not quickly get control of the crowd.  As CBP personnel prepared to

depart the scene, multiple individuals blocked the road and ignored orders to allow the

remaining CBP personnel to depart.  CBP personnel were finally able to disperse the

hostile crowd by deploying approximately seven CS grenades, and despite having to fend

off individuals' attempts to kick or throw the CS grenades back at the CBP personnel, this

deployment of chemical munitions finally allowed the remaining CBP personnel to safely

clear the area.

56. This incident turned volatile very quickly.  As CBP law enforcement personnel were

preparing to turn the scene over to Chicago Police Department, the crowd became

increasingly assaultive very rapidly, throwing rocks and various other objects at the

Agents.  Several CBP personnel reported being hit by various thrown objects, including

at least one Agent who was struck in the face with an egg and another who was struck

with a ping-pong ball-sized rock.  The two agents that were involved in the initial

vehicular assault informed supervisors that they sustained injuries. One BPA was struck in the left shoulder by an 8–10-inch piece of concrete that was thrown from the crowd. One agent reported neck pain and the other reported right knee pain. Due to the assaultive force exerted against them, CBP personnel deployed CS gas to protect themselves and their law enforcement partners and to allow them to depart the scene without further injuries. The crowd was instructed to stand aside by multiple CBP law enforcement officers, and when the crowd did not comply and instead continued to escalate its assaultive behavior, chemical munitions were deployed in a precise and defensive manner.

57. On October 22, 2025, while conducting enforcement operations near a laundromat in the vicinity of 3100 South Pulaski Road in Chicago, CBP personnel, including Chief Gregory Bovino, were confronted by a number of people shouting at them and filming their activities with their smartphone cameras. They insulted individual Agents and then physically began encroaching on the Agents despite being told to back up.

58. The Border Patrol Agents were wearing rough duty uniforms with body armor, each having a visible badge or when the uniformed agents did not have immediate access to embroidered patches bearing unique alphanumeric identifiers, bright orange or yellow tape with the unique identifiers handwritten on the tape were worn near the shoulder. Chief Bovino's personal protective detail, comprised of Agents from CBP's Office of Professional Responsibility (OPR), who were not part of the immigration enforcement operations or assigned to Operation Midway Blitz, and were on the scene in plainclothes, prominently displayed their organizational patches and badges on their body armor.

59. Based on preliminary reports, a female member of the crowd threatened to kill Chief
Bovino, and Agents on the scene immediately took her into custody.  She was
subsequently released, but the case was referred to the FBI for further investigation and
prosecution, including efforts to subpoena the phone camera footage she shot of the
incident.

60. Also on October 22, 2025, Border Patrol Agents were engaged in operations near the
Home Depot store in the vicinity of Ogden Avenue and 26th Street.  Agents noticed a pair
of vehicles had been following them for some distance when one of them, a blue pickup
truck, began driving in an aggressive manner, as if to ram the Border Patrol vehicles
head-on.  While driving recklessly on a crowded street, the driver of the pickup
disregarded a red light and collided with a gray Toyota Corolla.

61. Border Patrol Agents notified Chicago Police, rendered aid to the injured driver of the
Corolla, and arrested the driver of the pickup.  Agents also secured the accident scene
until Chicago police personnel arrived.  While they were at the scene of the accident, a
crowd began to form.  Many were shouting insults at the Agents and carrying signs or
waving flags with slogans like "Fuck ICE" emblazoned on them.

62. Once Chicago Police arrived to take over the scene of the collision, CBP personnel
sought to depart the scene.  As they got into their vehicles, a member of the crowd
suddenly approached from the side and began kicking one of the vehicles, in an apparent
effort to damage it.  One of the occupants, an SRT officer, lowered his window and
deployed OC spray in a short burst (approximately one second in duration) at the
individual kicking the vehicle.  Although the spray was deployed directly at the

individual kicking the vehicle, windy conditions caused the spray to appear to affect two or three other individuals that had also approached the vehicle with unknown intentions.

63. In this instance, CBP personnel inside the vehicle did not give explicit warnings to anyone in the crowd before deploying the OC spray in a targeted fashion against a particular individual because CBP personnel had to act quickly to stop the individual from damaging government property.

64. On October 23, 2025, at approximately 9:50 am, based on preliminary reports, agents reported a big box truck attempted to ram into agents at West 27th Street and South Sacramento Avenue. At the same time, agents reported that they were blocked in at the next intersection located at West 27th Street and South Whipple Street, Chicago, Illinois. A crowd began to gather in the area shouting and gesturing aggressively, incessantly blowing whistles, honking car horns, and throwing fireworks at CBP personnel. As the situation continued to escalate, Agents deployed gas in the area to disperse the crowd that was initially ineffective, but additional back-up arrived, and more gas was deployed, which finally allowed the vehicle transporting the arrestees to depart.

65. At approximately 10:15 am, an unknown male threw a rock directly at an agent and struck him in the head. The agent was wearing his ballistic helmet and did not sustain any injuries.

66. Chicago Police Department (CPD) responded to the area, but when additional Agents attempted to depart, they were surrounded by the crowd. CPD assisted in holding back the crowd while agents attempted to get in their vehicles and leave the area. Simultaneously, several subjects began to throw rocks and other objects. Agents reported

that their back window had been broken near the intersection of West 26th Street and South Sacramento Avenue.  At the same time, agents advised that they were blocked in at the intersection of West 26th Street and South Avers Avenue, Chicago.  Agents advised that additional cars were called in to assist, and CBP personnel deployed less lethal munitions.  Agents reported that a tire on a government vehicle was punctured during the incident.

67. On October 24, 2025, based on preliminary reports, Border Patrol agents conducted immigration enforcement activities near West Henderson Street and N Lakewood Ave. Several individuals began following the agents on bicycles and vehicles, blowing whistles and honking their horns.  At approximately 12:00 PM, agents were attempting to arrest an individual, when a group began to gather in the area.  The crowd size increased to approximately 50 individuals.

68. While agents were attempting to place an arrestee inside their vehicle, a member of the crowd tried to deflate the tire of the vehicle using car keys to push the valve stem on the driver side of the vehicle. Numerous commands were given to the crowd to stop advancing so that agents could exit the area.  While the crowd continued to advance, a civilian vehicle made its way toward the agents to impede their vehicle from exiting the area.  Agents ordered the driver to stop, but the driver continued attempting to impede them from leaving the area.

69. As agents continued to attempt to leave the area, they gave repeated orders for the crowd to stay back.  Members of the crowd ignored these warnings, and continued to try to prevent the egress of the vehicle.  One of the agents ordered the crowd to stay back or else gas would be deployed.  At approximately 12:03pm, the agents gave one last

warning for the crowd to back away, but several individuals continued to ignore the warning. An agent then deployed a pocket CS gas canister approximately 15 feet in front of the vehicle. After this deployment, members of the crowd began to throw objects at the vehicle, including a pumpkin that struck the front driver side of the vehicle and the expended CS gas canister. An agent then deployed a triple chaser CS gas cannister approximately 20 feet in front of the vehicle to again attempt to disperse the crowd and allow the agents to leave the area. This deployment effectively dispersed the crowd and enabled agents to safely leave the area.

70. On October 25, 2025, based on preliminary reports, Border Patrol agents working in support of Operation Midway Blitz in Chicago, Illinois conducted targeted enforcement at W Grace St and N Kildare Ave. At approximately 10:00 AM, agents were attempting to perform immigration enforcement operations.

71. A crowd began to gather in the area and increased to approximately 20-30 individuals, preventing the agents from leaving the area. Multiple orders were given to the group to move out of the way, when a car blocked agent's vehicle in on one side and a bicycle blocked on the other side. The agents subsequently made arrests for violations of 18 USC § 111.

72. The crowd became more agitated and multiple warnings were given to disperse. When the crowd continued to block the agent's movement, they deployed a less lethal munition. The use of the less lethal munition successfully dispersed the crowd allowing agents to safely clear the area.

73. In my twenty-three years of service with the Border Patrol, I have never witnessed the level of combativeness and sustained level of violence directed at law enforcement

personnel in the performance of their lawful government duties that I have seen in Chicago. There is a distinction between peaceful and protected protest activity, and the assaultive behavior, damage to government property, and aggressive actions that CBP personnel are experiencing when performing lawful law enforcement actions.

74. CBP takes its obligations to comply with the Court's TRO seriously and would not want to be held in contempt by the court, but I believe that the TRO entered in this case is adversely affecting CBP law enforcement operations. Because the TRO requires additional considerations outside of the CBP and DHS Use of Force Policy that agents are thoroughly trained on, I believe that agents are improperly hesitating before they can appropriately deploy less lethal munitions. Although the parameters of the TRO have been communicated to CBP personnel, the TRO adds a level of complexity to a dynamic situation for law enforcement, which could potentially harm members of the public, detainees in custody, and CBP personnel.

75. Less lethal munitions are an important force de-escalation tool for law enforcement. While many of CBP's operations in Chicago occur without the need to deploy less than lethal force or munitions, it is important to have the ability to use these measures should circumstances warrant. They permit agents to successfully disperse crowds that are engaging in active resistance and assaultive behavior. On occasions when agents are faced with escalating force—up to and including lethal force—from crowds, less lethal munitions can enable agents to safely exit these volatile scenes without resorting to the use of further physical force or deadly force themselves. An order that would prohibit officers from using less lethal munitions would likely lead to more violent engagements, not less. Consequently, I believe that the issuance of a preliminary injunction in this

case would adversely impact CBP operations, potentially endanger CBP personnel, and

would have a negative impact on public safety.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws

of the United States that the foregoing is true and correct to the best of my information, knowledge,

and belief.

Executed this 30th day of October, 2025, at Great Lakes, Illinois.

_____

Daniel I. Parra
Incident Commander-Operation "Midway Blitz"
U.S. Border Patrol
U.S Customs and Border Protection
U.S. Department of Homeland Security

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| CHICAGO HEADLINE CLUB, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | **No. 25-cv-12173** |
| | ) | **Hon. Sara L. Ellis** |
| v. | ) | |
| | ) | |
| KRISTI NOEM, Secretary, U.S. | ) | |
| Department of Homeland Security, in her | ) | |
| official capacity, et al., | ) | |
| | ) | |
| *Defendants,* | ) | |

<u>**OPINION AND ORDER**</u>

This case arises from protests throughout the Chicagoland area associated with the

federal government's immigration enforcement and removal operations and deployment of

federal agents, which have increased over the past several months.  Plaintiffs[1] allege that federal

agents have targeted peaceful individuals, religious practitioners, and members of the media

participating in or reporting on these protests with excessive force, threats, and/or detention.

Among other things, these federal agents have allegedly fired rubber bullets and pepper balls,

launched flashbang grenades, and indiscriminately sprayed tear gas at protesters, religious

practitioners, and journalists without legal justification or adequate warning.

Plaintiffs filed this suit against Defendants Kristi Noem, the Secretary of U.S.

Department of Homeland Security ("DHS"); Todd Lyons, the Acting Director of ICE; Marcos

---

[1] Plaintiffs divide themselves into three groups.  The Journalist Plaintiffs consist of Chicago Headline Club, Block Club Chicago, the Chicago Newspaper Guild Local 34071 (CNG), NABET-CWA Local 54041, Raven Geary, Charles Thrush, and Stephen Held.  The Demonstrator Plaintiffs consist of William Paulson, Autumn Reidy-Hamer, Leigh Kunkel, Rudy Villa, and Jennifer Crespo.  The Religious Practitioner Plaintiffs consist of Reverend David Black, Father Brendan Curran, Reverend Dr. Beth Johnson, and Reverend Abby Holcombe.

Charles, the Acting Executive Associate Director of Enforcement and Removal Operations at ICE; Russell Hott, the former Chicago Field Office Director of ICE; Rodney S. Scott, the Commissioner of U.S. Customs and Border Protection ("CBP"); Gregory Bovino, the Chief Border Patrol Agent of CBP's El Centro Sector; Daniel Driscoll, the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"); William K. Marshall III, the Director of the Federal Bureau of Prisons ("BOP"); Pamela Bondi, the Attorney General of the United States; DHS; U.S. DOJ; Unidentified Federal Agencies; Unidentified Federal Officers; and Donald J. Trump, the President of the United States (collectively, "Defendants"). In an amended complaint filed on October 21, 2025, Plaintiffs added as Defendants Sam Olson, the interim Chicago Field Office Director of ICE; Shawn Byers, the Chicago Deputy Field Office Director of ICE; Kyle Harvick, the Deputy Incident Commander for CBP; Kash Patel, the Director of the Federal Bureau of Investigation ("FBI"); Faron Paramore, the Director of the Federal Protective Service ("FPS"); and Stephen Miller, the White House Deputy Chief of Staff and U.S. Homeland Security Adviser. Plaintiffs bring claims against Defendants for (1) violations of their First Amendment rights, including First Amendment retaliation; (2) violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1; (3) excessive force and unreasonable seizure in violation of the Fourth Amendment; (4) violations of the Administrative Procedures Act; and (5) conspiracy to violate Plaintiffs' constitutional rights.

Plaintiffs now seek to certify a class of "all persons who are or will in the future non-violently protest, observe, document, or record Department of Homeland Security immigration operations in the Northern District of Illinois." Doc. 80 ¶ 125. They also seek to proceed with two subclasses. The first is a religious exercise subclass for their RFRA claim of "persons who are or will in the future engage in religious expression in the form of prayer, procession, song,

preaching, or proselytizing at Department of Homeland Security immigration operations in the

Northern District of Illinois." *Id.* The second is a press subclass of "all persons who are or will

in the future engage in news gathering or reporting at Department of Homeland Security

immigration operations in the Northern District of Illinois." *Id.* Plaintiffs move to certify these

classes under Federal Rule of Civil Procedure 23(b)(2).

The Court finds that Plaintiffs have carried their burden under Rules 23(a) and 23(b)(2) to

show that certification is appropriate and certifies the following class:

> All persons who are or will in the future non-violently
> demonstrate, protest, observe, document, or record at Department
> of Homeland Security immigration enforcement and removal
> operations in the Northern District of Illinois.

The Court also certifies the following subclasses:

> **Religious Exercise Subclass:** All persons who are or will in the
> future engage in religious expression in the form of prayer,
> procession, song, preaching, or proselytizing at Department of
> Homeland Security immigration enforcement and removal
> operations in the Northern District of Illinois.

> **Press Subclass:** All persons who are or will in the future engage in
> news gathering or reporting at Department of Homeland Security
> immigration enforcement and removal operations in the Northern
> District of Illinois.

## BACKGROUND

The Court will set forth the full factual background and summary of the evidence relied

upon in the forthcoming written opinion on Plaintiffs' motion for a preliminary injunction. The

Court additionally relies on the factual findings stated during the November 6, 2025 hearing.

## LEGAL STANDARD

Class certification is appropriate where a plaintiff can meet the four requirements of Rule

23(a)—numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P.

23(a).  Additionally, a plaintiff must also satisfy one of the three subsections of Rule 23(b).  Fed.

R. Civ. P. 23(b); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).  Here, Plaintiffs

seek certification under Rule 23(b)(2), which requires a finding that "the party opposing the class

has acted or refused to act on grounds that apply generally to the class, so that final injunctive

relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R.

Civ. P. 23(b)(2).  Finally, although not an explicit requirement of Rule 23, the party seeking

certification must demonstrate that the class members are identifiable.  *Oshana*, 472 F.3d at 513.

The Court has broad discretion in determining whether to certify a proposed class.  *Keele

v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).  The party seeking certification bears the burden of

demonstrating that certification is proper by a preponderance of the evidence.  *Messner v.

Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).  The Court must engage in a

"rigorous analysis," resolving material factual disputes where necessary.  *Wal-Mart Stores, Inc. v.

Dukes*, 564 U.S. 338, 350–51 (2011); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th

Cir. 2001).  But "[i]n conducting [the Rule 23] analysis, the court should not turn the class

certification proceedings into a dress rehearsal for the trial on the merits."  *Messner*, 669 F.3d at

811; *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (court should

consider merits questions only to the extent relevant to determining if a plaintiff has met Rule

23's prerequisites).

## ANALYSIS

## I.    Ascertainability

Defendants raise various challenges to the ascertainability of Plaintiffs' proposed classes.

The Seventh Circuit has confirmed that ascertainability is an "implicit requirement" of Rule 23,

focused on the "adequacy of the class definition itself." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). Classes must be "defined clearly and based on objective criteria." *Id.*

### A.    Vague and/or Ambiguous Terms

To start, Defendants argue that the proposed class definitions are "inherently ambiguous" and "too vague" for certification. In particular, they contend that determining whether an individual is an observer, news gatherer, religious practitioner, or bystander is not "clear-cut." Doc. 170 at 7. Similarly, they contend that it is difficult to determine when protesters are non-violent. Defendants do not explain why these terms are vague or ambiguous or cite to any case law finding that similar terms are vague or ambiguous, and the Court finds that this argument strains credulity. As Plaintiffs point out in reply, these terms all have well-known, objective meanings. Doc. 189 at 4 (providing dictionary definitions of "observer" and "bystander"); *see also Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 630 (C.D. Cal. 2007) ("Although class definitions should avoid criteria that are subjective, the words 'peaceful' and 'demonstration' are objectively determinable descriptors of class members' behavior."). The Court therefore finds that these terms are sufficiently defined and objective.

Defendants also argue that the term "immigration operations" is unidentified and could include anything from "DHS officials driving away from a detention facility" to "non-enforcement activity such as immigration airport screening." Doc. 170 at 5. In reply, Plaintiffs propose replacing this term in the proposed class definitions with "immigration enforcement and removal operations." Doc. 189 at 5. Given that Defendants themselves use this modified term when describing the relevant operations,[2] the Court agrees that this modification should remedy Defendants' concerns. The Court therefore modifies the proposed class definitions accordingly.

---

[2] *See Enforcement and Removal Operations*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/about-ice/ero ("ERO manages all aspects of the immigration enforcement process,

### B.    Uninjured Class Members

Defendants next argue that Plaintiffs do not allege or provide evidence to show that Defendants have acted unlawfully towards all or most of the putative class members.  They contend that "a substantial number of" putative class members "have presumably been able to exercise their constitutional rights without incident" and that the "scores of uninjured members seemingly included in Plaintiffs' proposed class also raise serious standing concerns that further undermine the propriety of certification."  Doc. 170 at 7.

The Seventh Circuit has explained that courts should deny certification if it is apparent that the proposed class definition "contains a great many persons who have suffered no injury." *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009).  That said, it is "almost inevitable" that "a class will often include persons who have not been injured by the defendant's conduct . . . because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown."  *Id.*  "Such a possibility or indeed inevitability does not preclude class certification."  *Id.*  There is no "precise tipping point at which a class includes too many people who have not been harmed," and this determination is a "matter of degree" that "will turn on the facts as they appear from case to case."  *Lacy v. Cook Cnty.*, 897 F.3d 847, 864 (7th Cir. 2018) (citing *Messner*, 669 F.3d at 825).

At this stage, the Court cannot say that the proposed class definitions include a great number of uninjured individuals.  Defendants do not provide the Court with any evidence or support for the contention that "it is likely" that many putative class members have "presumably" been able to exercise their constitutional rights without incident.  Doc. 170 at 7.  Plaintiffs, on the other hand, have submitted extensive evidence showing that no-violent civilians and members of

---

including the identification, arrest, detention and removal of aliens who are subject to removal or are unlawfully present in the U.S.").

**A163**

the press have been frequently and consistently subjected to unlawful dispersal orders and excessive force. *See, e.g.*, Docs. 22-1–22-34, 22-41–22-45, 57-1, 73-1–73-30, 77-1, 77-2, 94-1–94-4, 118-1–118-3, 140-1, 140-2, 188-1–188-3, 190-3, 190-4, 190-8, 190-9, 190-15. This evidence further shows that Defendants' actions have had a clear chilling effect on the class members. In light of this, the Court finds that "the balance tips in favor of certification." *Lacy*, 897 F.3d at 864 ("The defendants have not suggested how many of these individuals could not have been injured under the ADA, let alone shown 'a great many' who evaded harm.").

### C.     State of Mind

Defendants further argue that the proposed classes are not sufficiently ascertainable because they would require inquiring into class members' subjective states of mind. For example, they believe that determining whether an individual was praying or news gathering requires a state of mind inquiry. The Court disagrees. Seventh Circuit case law makes clear that "Plaintiffs can generally avoid the subjectivity problem by defining the class in terms of conduct (an objective fact) rather than a state of mind." *Mullins*, 795 F.3d at 660. That is precisely what Plaintiffs have done here—the class definitions refer to conduct, not subjective states of mind.

### D.     Temporal and Geographic Scope

Finally, Defendants argue that Plaintiffs' proposed class definitions lack definiteness due to their lack of an appropriate temporal and geographic scope. The Court again finds this argument unpersuasive.

Defendants' arguments regarding the temporal scope of the class seemingly focus on the fact that the class is open to future members. They argue that this is concerning, because "class membership can vary considerably day to day." Doc. 170 at 6. Defendants cite to no authority supporting this argument. This is unsurprising, as courts "routinely" certify classes that are

**A164**

"open to future members." *Sparger-Withers v. Taylor*, 628 F. Supp. 3d 821, 830–31 (S.D. Ind. 2022)*; see also Plaintiffs #1-21 v. Cnty. of Suffolk*, No. 15 CV 2431, 2021 WL 1255011, at *16 (E.D.N.Y. Mar. 12, 2021) (rejecting argument that proposed class "without temporal limitation" was not ascertainable because "classes for injunctive relief can include future members"), *report and recommendation adopted*, No. 15CV2431, 2021 WL 1254408 (E.D.N.Y. Apr. 5, 2021); *Crissen v. Gupta*, No. 2:12-CV-00355, 2014 WL 4129586, at *14 (S.D. Ind. Aug. 19, 2014) (holding that "the lack of a temporal limitation is not problematic for purposes of ascertainability").

Next, Defendants argue that the proposed class definitions have a "sweeping geographic reach, covering protesters, religious observers, and reporters from Lake Shore Drive to Rockford and Galena." Doc. 170 at 6. Yet they again cite to no authority supporting the proposition that this geographic scope is so expansive to defeat certification. Nor can they, as courts routinely certify classes with much broader geographic scopes than proposed here. *See, e.g.*, *In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*, No. 23-CV-0818, 2024 WL 4333709, at *2 (N.D. Ill. Sept. 27, 2024) (finding nationwide consumer class sufficiently ascertainable); *Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 252, 260 (S.D. Ill. 2015) (proposed class of individuals who purchased defendants' products "in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee" was ascertainable); *Foley v. Student Assistance Corp.*, 336 F.R.D. 445 (E.D. Wis. 2020) (certifying class of "[a]ll persons in the States of Wisconsin, Illinois, and Indiana"). The Court therefore finds that the class is sufficiently ascertainable and turns to the requirements under Rule 23(a).

## II.    Rule 23(a) Requirements

### A.    Numerosity

Rule 23(a) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Generally, numerosity exists where the proposed class includes at least forty members. *See Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 659 (N.D. Ill. 2006). At the time they filed their amended complaint, Plaintiffs represented that the global class was composed of thousands of members. Plaintiffs further contend that the subclasses are sufficiently numerous under Rule 23, with the religious exercise and press subclasses comprising hundreds of members each. Defendants do not contest that Plaintiffs meet the numerosity requirement in this case, and the number of members here more than meets the minimum number necessary for class certification. Thus, the Court concludes that Plaintiffs have met the numerosity requirement.

### B.    Commonality

Commonality requires Plaintiffs to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Their claims must depend upon a common contention of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Even a single common question of law or fact will do. *Id.* at 359. "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014); *Rahim v. Sheahan*, No. 99 C 0395, 2001 WL 1263493, at *13 (N.D. Ill. Oct. 19, 2001) ("Perhaps more importantly here, when a 'question of law refers to

standardized conduct by defendants toward members of the class, a common nucleus of operative facts is typically presented, and the commonality requirement is usually met.'") (citation omitted); *Anderson v. Cornejo*, 199 F.R.D. 228, 239 (N.D. Ill. 2000) ("[A] common question of fact will exist as to whether the practices and policies alleged actually existed").

Plaintiffs argue that commonality is satisfied in this case because "the putative class's claims all derive from Defendants' common course of conduct in unlawfully dispersing, targeting, and retaliating against people exercising their First Amendment rights" in the Northern District of Illinois. Doc. 81 at 8. The Court agrees. Plaintiffs have presented significant evidence that, throughout the course of Operation Midway Blitz, Defendants have regularly and systemically targeted non-violent civilians and members of the press while they are exercising their First Amendment rights. *See, e.g.*, Docs. 22-1–22-34, 22-41-22-45, 57-1, 73-1–73-30, 77-1, 77-2, 94-1–94-4, 118-1–118-3, 140-1, 140-2, 188-1–188-3, 190-3, 190-4, 190-8, 190-9, 190-15. Defendants and their agents have used force indiscriminately, without making individualized assessments as to threat. And while Defendants argue that federal agents have only used force when objectively reasonable and in response to violent mobs and rioters, the government's own evidence in this case belies that assertion. *See* Doc. 232. Further, as the Court explained in its oral ruling on the preliminary injunction, Defendants' accounts of these protests and uses of force are simply not credible.

Plaintiffs have also presented evidence that makes clear that senior officials have encouraged and endorsed federal agents' targeting of non-violent individuals exercising their First Amendment rights. For example, Defendant Noem has instructed federal agents to "go hard" and "hammer" individuals for "the way they are talking, speaking, who they're affiliated with." Doc. 21 n.15. Defendant Bovino followed this up by informing federal agents that a

"free speech zone" outside of the Broadview Detention Center is "now going to be a 'free arrest zone.'" *Id*. He later stated in an interview: "If someone strays into a pepper ball, then that's on them. Don't protest, and don't trespass." Doc. 190-5 at 4:4–6. And during his deposition, he confirmed that he believed federal agents' uses of force throughout Operation Midway Blitz were "more than exemplary." Doc. 238 at 59:9–15.

The Court is not persuaded by Defendants' arguments against a finding of commonality. First, Defendants argue that Plaintiffs do not allege (let alone show) that Defendants' allegedly unlawful conduct has injured all or most of the putative class members. From a factual perspective, however, Plaintiffs *have* provided sufficient evidence to show that Defendants have indiscriminately used force and retaliated against non-violent demonstrators, religious practitioners, and members of the press. Further, the law does not require Plaintiffs to prove that every member of the proposed class has been injured at this stage. *See Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 380 (7th Cir. 2015) ("Plaintiffs need not prove that every member of the proposed class has been harmed before the class can be certified."). As explained above, Defendants have not presented any evidence to show that a great number of class members are uninjured or could not have been injured.

Next, Defendants argue that the classes cannot meet the commonality requirement because the factual circumstances of each putative class members' encounters with federal agents vary, and the legal theories underlying their claims will differ as well. But the fact that individualized inquiries may be necessary for some questions does not defeat commonality. "Neither Rule 23 nor any gloss that decided cases have added to it requires that every question be common." *Suchanek*, 764 F.3d at 756; *see also Lacy*, 897 F.3d at 865 ("Although it is true that the reasonableness of a given accommodation will vary among individuals with differing

11

A168

disabilities, any dissimilarities among the proposed class members will not impede the generation of common answers in this case."); *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 381 (7th Cir. 2015) ("[O]ur cases demonstrate that commonality as to every issue is not required for class certification."); *Patrykus v. Gomilla*, 121 F.R.D. 357, 361 (N.D. Ill. 1988) ("It is insignificant that individual roles and levels of participation among defendants varied or that different degrees of harassment or abuse were inflicted upon individual class members, given the common legal question presented for determination.").

Because the Court finds that Defendants have a common practice that they applied indiscriminately across the classes, there is a "common core of salient facts" in this case which supports a finding of commonality. *See Multi-Ethnic Immigrant Workers Org. Network*, 246 F.R.D. at 630 ("The LAPD's command decisions to declare an unlawful assembly, disperse the crowd, and authorize the use of force constitute the 'common core of salient facts' that support commonality.").

## C.    Typicality

To satisfy typicality, "there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). The typicality requirement is "closely related" to the commonality inquiry, and a "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members." *Keele*, 149 F.3d at 595 (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). Typicality is determined with reference to a defendant's actions, not with respect to specific defenses a defendant may have against certain class members. *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).

The Court finds that Plaintiffs have satisfied the typicality requirement.  Here, the named Plaintiffs' claims arise from the same course of conduct as the claims of the other class members; namely, Defendants' and their agents' indiscriminate use of force against non-violent civilians and members of the press exercising their First Amendment rights.  This is sufficient to support a finding of typicality.

Defendants' arguments regarding typicality again fall flat.  The fact that "each Plaintiff has unique circumstances . . . does not make his claims atypical or inadequately aligned with those of the class." *Zollicoffer v. Gold Standard Baking, Inc*., 335 F.R.D. 126 (N.D. Ill. 2020). "The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *De La Fuente*, 713 F.2d at 232; *see also Multi-Ethnic Immigrant Workers Org. Network*, 246 F.R.D. at 632 ("Defendants nevertheless argue that typicality is lacking because the May Day incident gave rise to *different* rights, injuries, and claims, depending on whether one was a participant, legal observer, or bystander, whether one heard the dispersal order, whether one had physical contact with the police, and whether one suffered physical injury.  Plaintiffs correctly respond that one's status as participant, observer or bystander does not defeat typicality as to their First Amendment claim, because that claim alleges that *everyone* had a First Amendment right to be in the park. Similarly, one's right to be free from excessive force does not depend on whether one was participating in the protest.  Nor do differences in physical contact and injury defeat typicality as to the Fourth Amendment claim, because they are permissible variations within a class.").  Thus, the variations that Defendants identify do not defeat typicality here.

### D.      Adequacy of Representation

To satisfy the adequacy of representation requirement, the class representative must possess the same interest as the class members and not have claims or interests that are antagonistic or conflicting with those of the class.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).  The adequacy inquiry also involves determining whether the proposed class counsel is adequate.  *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).  Defendants do not challenge the adequacy of the proposed class representatives or class counsel.  Plaintiffs have participated in the litigation by signing declarations regarding their experiences demonstrating, protesting, observing, documenting, and/or recording DHS immigration operations in the Northern District of Illinois, and they contend that they are prepared to remain informed and involved with the case, and to testify at deposition or trial if needed.  They further confirm that they understand and will fulfill their obligation to pursue the best interests of the Class.  The Court does not perceive any issues with Plaintiffs' ability to represent the proposed class.  Similarly, Plaintiffs' counsel has adequately represented Plaintiffs throughout the litigation and has significant experience litigating complex federal civil rights cases and class actions.  The Court finds that Plaintiffs have met the adequacy requirements.  Having found that Plaintiffs have satisfied Rule 23(a)'s requirements, the Court moves to consideration of Rule 23(b)(2)'s requirements.

## III.      Rule 23(b)(2)

A court may certify a class under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory

remedy warranted—the notion that the conduct is such that it can be enjoined or declared

unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360,

(citation omitted) (internal quotation marks omitted).  Thus, a court can only certify a Rule

23(b)(2) class if "a single injunction or declaratory judgment would provide relief to each

member of the class." *Id.*  That relief must also be final regarding the class as a whole. *Jamie S.*

*v. Milwaukee Pub. Schs.*, 668 F.3d 481, 499 (7th Cir. 2012).

Plaintiffs seek injunctive and declaratory relief that would not require individualized

determinations because Defendants have acted on grounds that apply generally to the class.

Thus, certification of a Rule 23(b)(2) class is proper.

## IV.    8 U.S.C. § 1252(f)(1)

Finally, Defendants argue that the Court should deny Plaintiffs' motion because 8 U.S.C.

§ 1252(f)(1) bars the requested class-wide relief.  The Court finds Defendants' argument

unavailing, as this issue is more relevant to the merits of Plaintiffs' case than the requirements

for class certification.  As the Seventh Circuit has explained, "surety of prevailing on the merits

is not among" the class certification requirements and "[c]lasses can lose as well as win."

*Bennett v. Dart*, 953 F.3d 467, 469 (7th Cir. 2020).  Thus, whether § 1252(f)(1) bars the

requested injunction would not change the Court's determination as to whether Plaintiffs have

met the Rule 23 requirements for class certification.  If anything, "[t]he pertinent observation

here is that deciding who is correct on these issues will resolve the issues as to the entire class,"

which only serves to "underscore[e] the appropriateness of class certification." *Kidd v.*

*Mayorkas*, 343 F.R.D. 428, 442 (C.D. Cal. 2023) (analyzing § 1252(f)(1) argument in the context

of class certification motion).  Regardless, as explained in the Court's oral ruling on Plaintiffs'

motion for preliminary injunction, the Court concludes that the requested injunctive relief does

not implicate § 1252(f)(1).

## CONCLUSION

The Court therefore finds that Plaintiffs have met the requirements of Rule 23 and grants

Plaintiffs' motion for class certification. The Court certifies the following class:

> All persons who are or will in the future non-violently
> demonstrate, protest, observe, document, or record at Department
> of Homeland Security immigration enforcement and removal
> operations in the Northern District of Illinois.

The Court also certifies the following subclasses:

> **Religious Exercise Subclass:** All persons who are or will in the
> future engage in religious expression in the form of prayer,
> procession, song, preaching, or proselytizing at Department of
> Homeland Security immigration enforcement and removal
> operations in the Northern District of Illinois.

> **Press Subclass:** All persons who are or will in the future engage in
> news gathering or reporting at Department of Homeland Security
> immigration enforcement and removal operations in the Northern
> District of Illinois.

Finally, the Court appoints The Civil Rights and Police Accountability Project of the Edwin F.

Mandel Legal Aid Clinic at the University of Chicago Law School; The Community Justice and

Civil Rights Clinic at Northwestern University Law School; Loevy + Loevy; The Roger Baldwin

Foundation of ACLU, Inc.; and Protect Democracy as class counsel.

Dated: November 6, 2025

_____
SARA L. ELLIS
United States District Judge

| | | |
|---|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT | |
| | NORTHERN DISTRICT OF ILLINOIS | |
| 2 | EASTERN DIVISION | |

```
                                         )
 3                                       )
    CHICAGO HEADLINE CLUB, BLOCK         ) Case No. 25 C 12173
 4  CLUB CHICAGO, CHICAGO NEWSPAPER      )
    GUILD LOCAL 34071, NABET-CWA         )
 5  LOCAL 54041, ILLINOIS PRESS          )
    ASSOCIATION, RAVEN GEARY,            )
 6  CHARLES THRUSH, STEPHEN HELD,        )
    DAVID BLACK, WILLIAM PAULSON,        )
 7  AUTUMN REIDY-HAMER, and LEIGH        )
    KUNKEL,                              )
 8                                       )
                      Plaintiffs,        )
 9                                       )
          v.                             )
10                                       )
    KRISTI NOEM, Secretary, U.S.         )
11  Department of Homeland Security      )
    (DHS); TODD LYONS, Acting            )
12  Director, U.S. Immigration and       )
    Customs Enforcement (ICE);           )
13  MARCOS CHARLES, Acting Executive     )
    Associate Director, Enforcement      )
14  and Removal Operations, ICE;         )
    RUSSELL HOTT, Chicago Field          )
15  Office Director, ICE; RODNEY S.      )
    SCOTT, Commissioner, U.S.            )
16  Customs and Border Protection        )
    (CBP); GREGORY BOVINO, Chief         )
17  Border Patrol Agent, CBP; DANIEL     )
    DRISCOLL, Director of the Bureau     )
18  of Alcohol, Tobacco, Firearms        )
    and Explosives (ATF); WILLIAM K.     )
19  MARSHALL III, Director of the        )
    Federal Bureau of Prisons (BOP);     )
20  PAMELA BONDI, Attorney General       )
    of the United States; U.S.           )
21  DEPARTMENT OF HOMELAND SECURITY;     )
    U.S. DEPARTMENT OF JUSTICE;          )
22  UNIDENTIFIED FEDERAL OFFICER         )
    DEFENDANTS; UNIDENTIFIED FEDERAL     )
23  AGENCY DEFENDANTS; and DONALD J.     )
    TRUMP, President of the              )
24  United States,                       ) Chicago, Illinois
                                         ) November 6, 2025
25                    Defendants.        ) 10:12 a.m.
```

1                TRANSCRIPT OF PROCEEDINGS - IN-COURT HEARING
                      BEFORE THE HONORABLE SARA L. ELLIS
2

     APPEARANCES:
3

     For the Plaintiffs:    LOEVY & LOEVY
4                           BY:  MR. JONATHAN I. LOEVY
                                 MR. STEVEN E. ART
5                                MS. HEATHER LEWIS DONNELL
                                 MS. THERESA KLEINHAUS
6                                MR. SCOTT R. RAUSCHER
                                 MR. DAVID B. OWENS
7                           311 N. Aberdeen Street, Third Floor
                            Chicago, Illinois 60607
8
                            LOEVY & LOEVY
9                           BY:  MS. ELIZABETH C. WANG
                            2060 Broadway, Suite 460
10                          Boulder, Colorado 80302

11                          MANDEL LEGAL AID CLINIC
                            BY:  MR. CRAIG B. FUTTERMAN
12                          6020 South University Avenue
                            Chicago, Illinois 60637
13
                            NORTHWESTERN PRITZKER SCHOOL OF LAW -
14                          COMMUNITY JUSTICE AND CIVIL RIGHTS CLINIC
                            BY:  MR. WALLACE B. HILKE
15                          375 E. Chicago Avenue, 8th Floor
                            Chicago, Illinois 60611
16
                            FIRST DEFENSE LEGAL AID
17                          BY:  MR. DANIEL MASSOGLIA
                            601 S. California Avenue
18                          Chicago, Illinois 60612

19                          ROGER BALDWIN FOUNDATION OF ACLU, INC.
                            BY:  MS. REBECCA K. GLENBERG
20                          150 N. Michigan Avenue, Suite 600
                            Chicago, Illinois 60601
21
     For the Defendants:    U.S. DEPARTMENT OF JUSTICE
22                          BY:  MR. ANDREW I. WARDEN
                                 MR. JEREMY S. NEWMAN
23                          1100 L Street NW
                            Washington, DC 20005
24

25

                                   A175

```
1    Court Reporter:           KELLY M. FITZGERALD, RPR, RMR, CRR
                               Official Court Reporter
2                              United States District Court
                               219 S. Dearborn Street, Room 1412
3                              Chicago, Illinois 60604
                               312-818-6626
4                              kmftranscripts@gmail.com

5                              *   *   *   *   *

6                    PROCEEDINGS REPORTED BY STENOTYPE
           TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        (Proceedings heard in open court:)

2            THE CLERK:  We are here on Case 25 CV 12173, Chicago

3    Headline Club, et al. v. Noem, et al.

4            Counsel, please state your names for the record.

5            Everyone else, please be seated and come to order.

6            MR. ART:  Good morning, Your Honor.  Steve Art for the

7    plaintiffs.

8            MR. BOWMAN:  Locke Bowman for plaintiff.

9            MS. WANG:  Elizabeth Wang for the plaintiffs.

10           MR. LOEVY:  Jon Loevy for the plaintiffs.

11           MR. HILKE:  Wally Hilke for the plaintiffs.

12           MS. KLEINHAUS:  Theresa Kleinhaus for the plaintiffs.

13           MR. OWENS:  David Owens.

14           MR. FUTTERMAN:  Craig Futterman, also for plaintiffs.

15           MR. RAUSCHER:  Scott Rauscher for plaintiffs.

16           MR. MASSOGLIA:  Daniel Massoglia for plaintiffs.

17           MS. GLENBERG:  Rebecca Glenberg for plaintiffs.

18           MR. WARDEN:  Good morning, Your Honor.  Andrew Warden

19   for the defendants.

20           MR. NEWMAN:  Jeremy Newman for the defendants.

21           THE COURT:  All right.  Good morning.

22           MR. ART:  Judge, do we need to do anything before we

23   get started to make sure that the exhibits listed on

24   plaintiffs' list, which is Docket 222 and defendants' list,

25   that is Docket 209, are moved into the record?  Or does the

1   Court consider all of those exhibits on the list to be already

2   into the record?

3           THE COURT:  I -- I consider them to be already in the

4   record.

5           MR. ART:  Thank you, Judge.

6           THE COURT:  Mm-hmm.

7           All right.  So we'll get started.

8           You ready, Kelly?

9           COURT REPORTER:  Yes, Judge.

10          THE COURT:  Okay.

11          So Chicago is home to many artists and poets and

12  writers.  One of them is Carl Sandburg who wrote a poem:

13          Chicago

14          Hog Butcher for the World,

15          Tool Maker, Stacker of Wheat,

16          Player with Railroads and the Nation's Freight

17  Handler;

18          Stormy, husky, brawling,

19          City of the Big Shoulders:

20          They tell me you are wicked and I believe them, for I

21  have seen your painted women under the gas lamps luring the

22  farm boys.

23          And they tell me you are crooked and I answered:  Yes,

24  it is true I have seen the gunman kill and go free to kill

25  again.

1      And they tell me you are brutal and my reply is:  On

2  the faces of women and children I have seen the marks of wanton

3  hunger.

4      And having answered so I turn once more to those who

5  sneer at this my city, and I give them back the sneer and say

6  to them:

7      Come and show me another city with lifted head singing

8  so proud to be alive and coarse and strong and cunning.

9      Flinging magnetic curses amid the toil of piling job

10  on job, here is a tall bold slugger set vivid against the

11  little soft cities;

12      Fierce as a dog with tongue lapping for action,

13  cunning as a savage, pitted against the wilderness,

14      Bareheaded,

15      Shoveling,

16      Wrecking,

17      Planning,

18      Building, breaking, rebuilding,

19      Under the smoke, dust all over his mouth, laughing

20  with white teeth,

21      Under the terrible burden of destiny laughing as a

22  young man laughs,

23      Laughing even as an ignorant fighter laughs who has

24  never lost a battle,

25      Bragging and laughing that under his wrist is the

1     pulse, and under his ribs the heart of the people,

2            Laughing!

3            Laughing the stormy, husky, brawling laughter of

4     Youth, half-naked, sweating, proud to be Hog Butcher,

5     Tool Maker, Stacker of Wheat, Player with Railroads and Freight

6     Handler to the Nation.

7            This is the Chicagoland I see, from Aurora to Cicero,

8     and Chicago to Evanston, to Waukegan.  This is a vibrant place,

9     brimming with vitality and hope, striving to move forward from

10     its complicated history of segregation, police brutality, and

11     gun violence; expressing the joy of community and block

12     parties, street festivals, and Sunday jazz shows on the lawn of

13     Senn High School;

14            Neighbors from every community showing up for each

15     other, by stocking food banks, restaurants offering free meals

16     to those facing cuts in food benefits.  Everyday people

17     standing watch to protect the most vulnerable among us; from

18     standing guard at intersections to help trick-or-treaters cross

19     the street or standing on the sidewalk, to document law

20     enforcement activities and protests against immigration

21     enforcement activities they believe to be unjust; or simply

22     praying the Rosary, to provide comfort to those detained at the

23     Broadview detention facility who are facing fear and

24     uncertainty.

25            The government would have people believe instead that

1  the Chicagoland area is in a vice hold of violence, ransacked

2  by rioters and attacked by agitators.  That simply is untrue.

3  And the government's own evidence in this case belies that

4  assertion.

5          After reviewing all of the evidence submitted and

6  listening to the testimony, I find the defendants' evidence

7  simply not credible.  I watched the defendants' videos that

8  they asked us to watch.  This, and hours and hours and hours of

9  body cam video and video from helicopters, was the best they

10  could provide.

11          I'll note two examples.

12          On September 19th, there was a video of agents opening

13  the gate at Broadview.  The protesters were standing far away.

14  Agents immediately began lobbying flash gang -- I'm sorry --

15  flash-bang grenades and tear gas with no warning whatsoever.

16          On October 4th in Brighton Park, an agent pushed a

17  protester to the ground, then released tear gas and

18  PepperBalls.  After instigating the chaos, some of the

19  protesters threw a drink and some bottles of water.  The agents

20  let the protester up and then tackled him again to the ground

21  and knelt on his head or his neck.

22          There is nothing that plaintiffs set forth in their

23  declarations or testimony that defendants rebutted, even with

24  the body cam footage.  Minor consistencies will add up.

25          For example, we've got the testimony of Defendant

1   Bovino.  In one of the videos, Defendant Bovino obviously

2   attacks and tackles the declarant, Mr. Blackburn, to the

3   ground.  But Bovino, despite watching this video, says that he

4   never used force against Mr. Blackburn, and later denied seeing

5   a projectile hit Reverend Black after watching that video.

6          More tellingly, Defendant Bovino admitted that he

7   lied.  He admitted that he lied about whether a rock hit him

8   before he deployed tear gas in Little Village.

9          Videos of what happened in Little Village, even from

10  the agents' body-worn cameras and helicopter footage, do not

11  match up with agents' descriptions of the chaos that was going

12  on.

13         The number of protesters was about equal, if not less

14  than, the number of agents gathered at the time that Defendant

15  Bovino threw the tear gas canisters.

16         In fact, when he threw the second one, the crowd was

17  running back.  And there was an apparent flash-bang grenade

18  that agents tried to claim were fireworks that the crowd threw.

19  That's simply not true.

20         In Albany Park, agents wrote in their reports and the

21  Department of Homeland Security publicized that a bicyclist

22  threw a bike at agents.  In watching the video, it shows that

23  after agents deployed tear gas, the agents took a protester's

24  bike and threw it to the side.

25         Mr. Hott represents in his declaration that someone

1    ripped a beard off an agent's face.  He also represented that

2    at the Broadview facility a downspout was broken by protesters.

3    However, when questioned about it in his deposition, he

4    acknowledged that he didn't even know if it was a person who

5    caused that damage, much less a protester.

6         Mr. Hewson testified that in Broadview there were

7    people with shields with nails in them that were dangerous.

8    But, again, in looking at this video, at least some of these

9    shields, if not all, were pieces of cardboard.  And the body

10   cam video did not show any aggression that warranted agents

11   going out to attack them.

12        He testified that on body cam -- that on the body cam

13   when he said something, it was "get them."  In listening to

14   that body cam audio and watching it over again, clearly what he

15   said was "hit them."

16        Overall, this calls into question everything that

17   defendants say they are doing in their characterization of what

18   is happening either at the Broadview facility or out in the

19   streets of the Chicagoland area during law enforcement

20   activities.

21        I want to turn to some specific incidents.

22        The Broadview facility has had numerous protests.

23   Father Curran testified that he's been to the Broadview

24   facility for over 19 years every Friday to offer prayers and

25   the Rosary.  They gather on a public pathway on the sidewalk

1    and in the parkway.  He said in September, Broadview had become

2    an utterly militarized zone.  Father Curran realized that it

3    was no longer a safe space for high school and college students

4    to come.  And the protesters themselves had to move their

5    location.  He saw agents launching projectiles at people who

6    were unarmed and not violent in any way.  And he himself was

7    tear-gassed.

8         Emily Steelhammer, who's the executive director of the

9    Chicago Newspaper Guild, described indiscriminate uses of

10   force.

11        A photographer standing off to the side with another

12   group of journalists and photographers recognized some agents

13   whom she had taken pictures of earlier in the week.  She was

14   shot in her rib cage with a PepperBall and then shot again in

15   her back when she turned.

16        On September 26th, journalists from the Chicago

17   Tribune and Chicago Sun-Times were filming an arrest late at

18   night with few protesters around and clear press badges

19   visible, and they had their cameras out.  They were both hit at

20   close range multiple times with PepperBalls.  There were no

21   reports of disobeying law enforcement commands when they were

22   hit.

23        Juan Muñoz, who's an Oak Park trustee, attended a

24   protest on October 3rd.  He heard Mr. Bovino say that he'd give

25   one warning to protesters to move back; if they did not, they'd

1    be arrested.

2         Mr. Bovino then turned to the agents and said, "Arrest

3    them."  Mr. Bovino pushed Mr. Muñoz down and then was --

4    Mr. Muñoz was detained for eight hours.  He was used as a prop

5    for the Department of Homeland Security videos and then

6    released at a gas station a mile and a half away.  Mr. Muñoz

7    has not been back to the Broadview facility, and he's now

8    concerned for his own safety and that of his family.

9         I do acknowledge that after the state and county and

10   the city of Broadview have set up a Unified Command that the

11   level of violence and the issues at the Broadview facility with

12   respect to federal agents has decreased.  But because it has

13   decreased does not mean that it doesn't still have the

14   likelihood to exist.

15        Leslie Cortez testified that on October 1st she was

16   documenting federal immigration agents conducting enforcement

17   activities at a Home Depot in Cicero.  When she returned to her

18   car, federal agents pulled up around her and one drew his

19   weapon at her, aiming it right at her so that she could see

20   inside the barrel, causing her heart to accelerate and make her

21   freeze.  She gathered her courage.  She told the agents that

22   she knew what her rights were; and, ultimately, the agent put

23   down his weapon and left.

24        On October the 3rd in Logan Square, near an elementary

25   school, a crowd gathered when they noticed federal immigration

1    vehicles, and they began protesting.  A motorcycle stopped in
2    front of one vehicle, and that, simply that, prompted the
3    agents to deploy a tear gas canister.

4        On October 4th in Brighton Park, Border Patrol agents
5    claim they were boxed in by about ten vehicles, two of which
6    rammed one of their vehicles.  An agent shot at one of the
7    individuals who allegedly rammed the vehicles, and a group
8    gathered at the scene after hearing what happened.

9        A number of declarants stated that they nonviolently
10   gathered, protested, chanted, and filmed agents, and that
11   without any warning or dispersal orders, agents deployed tear
12   gas indiscriminately into the crowd and threw flash-bang
13   grenades.

14       Rudy Villa stated that he and others formed a barrier
15   between protesters and agents chanting "don't take the bait"
16   and encouraging the protesters to remain peaceful.

17       Alderwoman Julia Ramirez arrived and observed a very
18   calm scene with people chanting.  She noticed that the
19   protesters were well organized, with many chanting "don't take
20   the bait," and she did not observe anyone around her exhibiting
21   violence toward the agents.  She testified that as everyone
22   stood around, PepperBalls were fired without warning and an
23   armored vehicle came through with an agent pointing his gun at
24   the protesters.  She ran away from tear gas while eight and a
25   half months pregnant.

1       Now, admittedly, some in the crowd threw water

2  bottles.  But this did not warrant the indiscriminate shooting

3  of PepperBalls and deployment of tear gas at the crowd without

4  warning.

5       On October 10th, in Edgewater, Jo-Elle Munchak stopped

6  on the drive home when she noticed immigration enforcement

7  activities happening.  She videotaped and yelled out, "It's

8  almost like they're storm troopers or something" and "Smile

9  nice, boys, for the Hague."

10      She was about two and a half car lengths from the

11 agents and had enough room for the agents' vehicle to pull

12 away.  After the agents left, she continued home, turning onto

13 the street on which she lives.

14      One of the agents' cars stopped in the middle of the

15 block and the other one pulled up behind her and blocked her

16 in.  Agents surrounded her car with an agent aiming a gun at

17 her head and other agents banging on her windows, trying to

18 open the doors, and demanding that she get out of the car.

19      On October 12th, in Albany Park, Border Patrol agents

20 were arresting someone when a crowd of neighbors came outside

21 to observe and protest.  And I will say that some of the agents

22 described the protesters to be professional agitators based on

23 their style of dress, possession and use of alert whistles, and

24 using bicycles to follow and alert the community of the agents'

25 presence.

1        Describing rapid response networks, neighborhood moms

2  as professional agitators shows just how out of touch these

3  agents are and how incredible their views are.

4        The agents' cars hit a woman standing in front of the

5  car.  Mr. Harvick recounted that he learned that protesters had

6  linked arms to block agents' exit, which Border Patrol

7  considers active resistance, and then had disobeyed multiple

8  orders to move out of agents' way to let them leave.

9        According to Mr. Parra, based on previous experience,

10  the agents became concerned that the longer they remained on

11  the scene, the more dangerous the environment would become,

12  anticipating that social media would broadcast their location

13  and allow for the threatening crowd to continue to grow.

14        Agents rolled a tear gas canister toward the

15  protesters.  Agents claimed they gave warnings, but the

16  protesters said they didn't hear any warnings or dispersal

17  orders.  And body camera video reflects the agent with a tear

18  gas canister telling another agent that "If they don't want to

19  clear, we're going to pass, or it could be "We're going to

20  gas."  But nothing was said to the crowd.

21        The Department of Homeland Security claimed that a

22  woman threw her bicycle at agents, but the video actually shows

23  an agent throwing it out of the way.

24        On October 14th in East Chicago, a Border Patrol car

25  gave chase to a suspect vehicle in a neighborhood with tight

1  streets, ultimately disabling the suspect vehicle by using a

2  PIT maneuver.  Neighbors came out to see what happened,

3  protesting and yelling at the agents to go home.

4       The use of force reports from Border Patrol note that

5  people yelled things like "ICE go home" and called agents

6  "racists" or "Nazis."

7       Admittedly, again, while the protest remained

8  relatively calm, there were some bad eggs, including those who

9  threw eggs and threw back a smoke canister at agents.  But the

10  agents were able to find those who threw the objects and they

11  actually took them into custody.

12       Plaintiffs' declarants did not identify hearing any

13  warnings or dispersal orders before the agents deployed tear

14  gas.  And while the agents recorded having -- having given

15  repeated warnings to disperse and indicated that they would

16  deploy chemical munitions if they did not, one agent recorded

17  that he deployed a smoke canister to disperse the crowd without

18  giving notification, although he did claim it was because of

19  exigent circumstances.  Another agent indicated it was not

20  tactically feasible to issue warnings prior to the deployment

21  of chemical munitions.

22       One resident, Manuel Garcia, was shot with rubber

23  bullets as he shepherded his girlfriend and 4-year-old daughter

24  home.  And he also helped a woman who had her baby and was

25  trapped in the tear gas.

1        Agents pushed, shoved, tackled protesters, pointed

2   guns at them, threw tear gas, and deployed smoke canisters.

3   Everyone that agents detained were released by the FBI, and

4   none of them are currently charged with assault.

5        In Little Village, the agents were there on

6   October 22nd and 23rd.

7        On October 22nd, Mr. Bovino and other agents were

8   confronted by protesters in a parking lot.  Some of the

9   protesters were recording what happened.  Agents claim that a

10  woman threatened to kill Mr. Bovino.  And Mr. Bovino asked the

11  woman, "Did you make a threat?"  She denied it.  Then agents

12  grabbed her, pulled her to the ground, and placed a knee on her

13  back.

14       Later in Cicero near the Home Depot, an agent sitting

15  in a car deployed OC spray to an individual who had been

16  shouting obscenities in a threatening manner and aggressively

17  kicking the side of the vehicle.  The agent did not give

18  explicit warnings before deploying the OC spray in a targeted

19  fashion because CBP personnel had to act quickly to stop the

20  individual from damaging government property.

21       On October 23rd, Mr. Bovino threw two tear gas

22  canisters over the heads of agents in front of him toward a

23  crowd of protesters without providing verbal warnings.  And I

24  will say this happened after I entered the TRO that required at

25  least two.

1      Mr. Bovino and the Department of Homeland Security

2   claimed that he had been hit by a rock in the head before

3   throwing the tear gas, but video evidence disproves this.  And

4   he ultimately admitted he was not hit until after he threw the

5   tear gas.

6      An agent, without warning, lifted a gun and shot a

7   protester from 5 feet away with a PepperBall that hit his neck.

8      John Bodett did not hear any warnings before tear gas

9   or the projectile was fired, even though he was 25 to 30 feet

10   away.  But he did hear someone say "get them" to the agents

11   before the tear gas was fired.

12      There were no hand gestures or other direction of what

13   officers wanted people to do.  He acknowledged seeing one

14   firework go off straight in the air, something that happens

15   every day.  And he also noted that the Latin Kings' colors are

16   black and gold, not maroon.

17      In Lakeview, on October 24th, Border Patrol agents

18   drove down a one-way residential street and attempted to arrest

19   some construction workers.  A crowd began to gather, screaming

20   things at agents like "go home; cowards don't show their

21   faces."

22      Declarations reflect that observers did not see anyone

23   touch a vehicle or make physical threats or act violently

24   towards the agents, although agents reported that someone tried

25   to deflate the tire of one of their vehicles.

1    Agents did order the crowd to stay back and at least
2  made some comments instructing them that if they did not stay
3  back, they would be gassed.  And then stated things like, "You
4  want gas?  You want gas?"  When an agent deployed gas, he
5  stated, "Have fun!"  And then two additional tear gas canisters
6  were deployed.

7    On October 25th, in Old Irving Park, families were
8  getting ready for a neighborhood Halloween parade when agents
9  arrived on Kildare and arrested a man.  Neighbors gathered and
10  began yelling at the agents.  George Witchek came out in a duck
11  costume and was standing behind a car when, without warning,
12  officers tackled him to the ground, leaving him with a
13  traumatic brain injury.

14    As a federal vehicle slowly drove down the street, a
15  woman stood in front of the vehicle with her bike positioned in
16  front of her.  The car accelerated and ran into her, causing
17  her to fall to the ground.  An agent then rolled a tear gas
18  canister toward people behind the car, and agents surrounded
19  another car that had pulled up around that time, pulling that
20  man out of the car and tackling him to the ground.

21    Neighbors did not hear any audible warnings or orders
22  before agents deployed tear gas, although agents reported that
23  they gave orders to disperse.  Ultimately, the Halloween parade
24  was cancelled and activities stayed on school grounds.

25    On October 25th, in Aurora, two individuals were

1   observing for immigration agents around Aurora when one of them

2   approached an unmarked car in a school parking lot.  An agent

3   in the back seat rolled down the window and motioned for the

4   individual to move away.  That person did.  But the agent

5   nonetheless pepper-sprayed him and tackled him to the ground.

6       The other resident documented what happened, and for

7   his efforts, he was pepper-sprayed and pushed to the ground.

8       Several days later, on October 29th, Elizabeth Pineda

9   heard whistles and pulled into a grocery store parking lot,

10  unintentionally blocking a federal agent's car.  An agent

11  raised his weapon and fired PepperBall projectiles at her

12  windshield.

13      On October 30th, in Gurnee, agents chased two

14  individuals into a high school parking lot.  As people,

15  including a pastor, began recording, an agent threatened to

16  pepper spray the pastor, which then deterred him from

17  recording.

18      And finally, in Evanston, on October 31st, concerned

19  citizens followed federal agents in their vehicles.  Near

20  Lincolnwood Elementary School, agents shoved a man who was

21  speaking to agents without warning.

22      About an hour later near Chute Middle School, a car

23  rear-ended a federal vehicle after that vehicle stopped

24  quickly.  Agents detained three people, including a male

25  bystander, whom they shoved to the ground, put a knee on his

1    back, bashed his head into the street, and punched him in the

2    head at least two times.

3        Despite a statement from the Department of Homeland

4    Security and Mr. Bovino indicating that this individual grabbed

5    the agent's genitals, videos don't bear this out, nor would

6    such force have been appropriate even if this had occurred.

7        Agents also deployed pepper spray at the crowd, and

8    one agent pointed his gun at protesters on two separate

9    occasions.

10       Given the government -- given all the evidence that

11   has been presented so far in this case, those are the factual

12   findings that I am making that support this preliminary

13   injunction.

14       To obtain a preliminary injunction, plaintiffs need to

15   satisfy three threshold requirements:

16       First, that they have some likelihood of success on

17   the merits; second, that there's an inadequate remedy at law;

18   and finally, that they will suffer irreparable harm if the

19   relief is not granted.

20       If plaintiffs satisfy these three factors, then I

21   conduct a balancing test, weighing the harm the denial of the

22   preliminary injunction would cause the plaintiff against the

23   harm to the defendant if I were to grant it.  This balancing

24   process involves a sliding scale approach:  The more likely the

25   plaintiff is to win on the merits, the less the balance of

1    harms needs to weigh in his favor, and vice versa.

2        I'm also to consider the public interest, which

3    includes taking into account any effects on nonparties.

4        So, first, standing.  To establish standing to seek

5    injunctive relief, plaintiffs must allege an actual or imminent

6    threat of suffering a concrete and particularized injury in

7    fact, which plaintiffs can fairly trace to the defendants'

8    conduct and that a favorable judicial decision will likely

9    prevent or redress.  A plaintiff must face a real and immediate

10    threat of future injury.

11        Here, defendants argue that plaintiffs have not

12    established that their injuries are likely to recur so as to

13    warrant injunctive relief, but I disagree.  The individual

14    plaintiffs' risk of future injury is not speculative.  Given

15    the ongoing and sustained pattern of conduct that plaintiffs

16    have documented over the last month and even after I entered

17    the TRO, this conduct shows no sign of stopping.

18        Plaintiffs also indicate that they intend to continue

19    their reporting, ministering, and protesting.  And while things

20    at Broadview have calmed down after the establishment by state

21    and local officials of the Unified Command and designated

22    protest zone, protests have continued there.  And there's no

23    guarantee that state and local police will continue to patrol

24    there, in which case control over the facility's security would

25    revert back to federal agents who have consistently shown a

1   disregard for protesters, journalists, and religious

2   practitioners' First Amendment rights, suggesting that such an

3   officially sanctioned course of retaliation would continue.

4          Unlike in *Lyons*, where the plaintiff could avoid being

5   choked by conducting his activities within the law, thus

6   avoiding exposure to violence, plaintiffs here cannot avoid

7   injury, as they are being threatened and harmed for exercising

8   their constitutional First Amendment rights and acting firmly

9   within the bounds of the law.

10         Therefore, I find that plaintiffs have standing to

11  pursue their claims.

12         Further, for their First Amendment claims, plaintiffs

13  also have standing based on the chilling effect of defendants'

14  conduct, given that some plaintiffs have expressed that

15  defendants' actions have caused them to limit their activities.

16         It doesn't matter that someone continues to go protest

17  or continues to be courageous.  That is irrelevant as to

18  whether there was a chilling effect.  If someone has to think

19  twice or they are making changes to what they do because

20  they've been hit in the head with a PepperBall, they've been

21  tear-gassed, they've stared down the barrel of a gun, or

22  they've been slammed to the ground with their head bashed into

23  the street, claiming that they can't breathe because someone is

24  on their back, all of that would cause a reasonable person to

25  think twice about exercising their fundamental constitutional

1  rights.  And that is a chilling effect.

2         For example, Leslie Cortez testified that the pointing

3  of the gun was a traumatizing experience because she'd never

4  had a weapon drawn at her.  It made her really consider if this

5  is something that's safe to do, even though she wasn't doing

6  anything to obstruct agents.  But it has made her more fearful

7  to document and witness.

8         Reverend Black testified that it took him days before

9  he went back to the Broadview facility; and even then, it was

10 difficult for him.

11        The news organizations have standing to sue on behalf

12 of their members and for their own injuries.

13        An organization has standing to sue on behalf of its

14 members when its members would otherwise have standing to sue

15 in their own right; the interests it seeks to protect are

16 germane to the organization's purpose; and neither the claim

17 asserted nor the relief requested requires the participation of

18 individual members in the lawsuit.

19        To have standing in their own right, organizations

20 must show that defendants' conduct impaired their ability to

21 conduct their business or services.  The news organizations

22 meet these requirements with respect to both associational and

23 organizational standing.

24        So with standing established, I now turn to the

25 substantive requirements for the issuance of a preliminary

1    injunction.

2         The first factor is likelihood of success.  To meet

3    this requirement, the plaintiff must demonstrate that its claim

4    has some likelihood of success on the merits.  What amounts to

5    some depends on the facts of the case at hand because of the

6    Seventh Circuit's sliding scale approach, but it at least

7    requires a strong showing that normally includes a

8    demonstration of how the applicant proposes to prove the key

9    elements of its case.  A mere possibility of success doesn't

10   meet this standard.

11        So I turn to each of the plaintiffs' claims.

12        First Amendment.  The First Amendment bars the

13   government from prohibiting the free exercise of religion or

14   abridging the freedom of speech, or of the press; or the right

15   of the people to peaceably assemble.  The right of peaceable

16   assembly is a right cognate to those of free speech and free

17   press and is equally fundamental.

18        Of all constitutional rights, the freedoms of speech

19   and of assembly are the most perishable, yet the most vital to

20   the preservation of American democracy.

21        The government has no power to restrict expression

22   because of its message, its ideas, its subject matter, or its

23   content.  Protest participation is a pristine and classic form

24   of protected speech.  Undeniably, group demonstrations are

25   quintessentially protected speech.  Sidewalks, parks, streets,

1   and other public ways and the like are traditional public fora,

2   in which the government may impose reasonable time, place, and

3   manner restrictions on private speech but for which

4   content-based restrictions must satisfy strict scrutiny and

5   viewpoint-based restrictions are prohibited.

6          Defendants argue that plaintiffs have not been engaged

7   in First Amendment-protected activity because they've

8   intermingled themselves with rioters and obstructors and other

9   lawless actors, meaning that law enforcement may disperse

10  crowds before they become unmanageable or when a clear and

11  present danger of a riot, disorder, interference with traffic,

12  or other immediate threat to public safety, peace, or order

13  appears.

14         But as I've previously stated, I don't find

15  defendants' version of events credible.

16         Moreover, plaintiffs agree that individuals who have

17  committed isolated acts of vandalism, assault on, or

18  threatening officers, forcible obstruction, may be arrested and

19  prosecuted.

20         While government officials may stop or disperse public

21  demonstrations or protests where clear and present danger of

22  riot, disorder, interference with traffic upon the public

23  streets, or other immediate threat to the public safety, peace,

24  or order appears, an official's fear of serious injury cannot

25  alone justify suppression of free speech and assembly.

1          Instead, to justify suppression of free speech, there

2     must be reasonable ground to fear that serious evil will result

3     if free speech is practiced.  The First and

4     Fourteenth Amendment do not permit a state to make criminal the

5     exercise of the right of assembly simply because its exercise

6     may be annoying to some people.

7          Plaintiffs have marshalled evidence that suggests that

8     they are likely to succeed in showing they engaged in protected

9     speech.  At this stage, I don't find defendants' intermixed or

10    intermingled justification for restricting speech persuasive

11    because the unlawful activity by a few protesters does not

12    transform a peaceable assembly into an unlawful assembly.

13         With respect to newsgathering, the First Amendment

14    protects press plaintiffs' nonviolent newsgathering.  The

15    record indicates that Plaintiffs Block Club Chicago,

16    Raven Geary, and Stephen Held all wear clear press

17    identification when reporting, do not engage in protests, and

18    do not talk with or to federal officers unless to ask them

19    journalistic questions.

20         I reject defendants' implication that plaintiffs are

21    suggesting that the members of the press should receive special

22    treatment.  Instead, the Supreme Court has long recognized a

23    qualified right of access for the press and public to observe

24    government activities.

25         While plaintiffs argue a First Amendment

1  viewpoint-based discrimination claim, I'm not going to reach

2  that claim's merits at this time, because I find that

3  plaintiffs have a likelihood of success on the merits on their

4  content-based claim.

5        To determine whether a challenged regulation is

6  content-based, I first ask whether the regulation draws

7  distinctions on its face based on the message a speaker

8  conveys.

9        Facial distinctions include those which define

10 regulated speech by a particular subject matter or its function

11 or purpose.  Laws that are facially content-neutral may still

12 be considered content-based restrictions on speech if they

13 cannot be justified without reference to the content of the

14 regulated speech or that were adopted by the government because

15 of disagreement with the message that the speech conveys.  Any

16 law distinguishing one kind of speech from another by reference

17 to its meaning now requires a compelling justification.

18       I find that defendants have restricted the plaintiffs'

19 speech, assembly, and press based on their content.  Plaintiffs

20 have been open and vocal about their dislike for defendants'

21 actions, and in return, defendants have publicly announced

22 their attention -- intention to target such protesters.

23       Plaintiffs' declarations and testimony at the

24 preliminary injunction hearing clearly establishes that

25 protesters have gathered at the Broadview facility and around

1   the Chicagoland area to nonviolently express their views

2   opposing Operation Midway Blitz.

3         Plaintiffs' declarations describe the specific

4   language that protesters have used to voice their views

5   opposing the government's immigration enforcement efforts and

6   tactics in Chicago.

7         At the preliminary injunction hearing, several of

8   plaintiffs' witnesses stated that they have participated in

9   demonstrations and protests opposing the government's

10  immigration enforcement efforts in Chicago.  And press

11  personnel have worn clear press identification and have not

12  engaged in violent behavior, even while vigorously covering the

13  immigration officials' activities.

14        In response, Secretary Noem commented that "the more

15  people protest, the harder ICE is going to come after them."

16        President Trump encouraged federal officers to use

17  physical violence against protesters if they get too close.

18  And defendants have consistently expelled and targeted

19  plaintiffs with various uses of force who hold signs, chant,

20  shout, and otherwise assemble against Operation Midway Blitz.

21        Further, while permitting exclusive access to

22  journalists who portray them in a more favorable light,

23  defendants have tackled and arrested at least one member of the

24  media covering the Broadview facility.  Tellingly, defendants

25  do not deny that they would treat pro-ICE demonstrators more

1  favorably.  Accordingly, I find that defendants have placed

2  content-based restrictions on plaintiffs, and strict scrutiny

3  applies.

4          To survive strict scrutiny, defendants must prove that

5  the restriction furthers a compelling interest and is narrowly

6  tailored to achieve that interest.  I don't dispute the

7  defendants have a compelling interest in the protection of

8  federal property and personnel and enforcement of federal laws.

9          Defendants argue that the use of lawful, less-lethal

10  crowd control devices is narrowly tailored to achieve these

11  goals, claiming these devices are the most effective method

12  that law enforcement has to push an entire crowd back from

13  destroying property and blocking traffic.

14          But I find it likely that plaintiffs will succeed in

15  showing that defendants' use of tear gas, pepper bullets, and

16  other less-lethal force is not sufficiently narrowly tailored.

17  Plaintiffs' police practices expert opined that there's no law

18  enforcement purpose to use less-lethal weapons or chemical

19  irritants other than in narrow circumstances addressing a riot

20  or imminent violent actions, and to minimize bodily injury to

21  specific targets.

22          He further concluded that federal agents significantly

23  deviated from standard and accepted practices for how officers

24  are trained to manage the First Amendment rights of

25  individuals, protesters, and journalists.

1      I've already found that defendants' allegations of

2    riots and violence, and therefore their justification for the

3    use of this force, lack credibility from my review of the

4    entire record.

5      Even if plaintiffs can only show that its actions have

6    regulated speech and assembly neutrally, defendants' arguments

7    still fail intermediate scrutiny.  Under intermediate scrutiny,

8    courts consider whether there's a reasonably close fit between

9    the government's means and its ends.  I find it likely that

10   plaintiffs will be able to show that while defendants'

11   interests are significant, defendants' actions are not narrowly

12   tailored to survive immediate scrutiny.

13      The next claim is the First Amendment retaliation.

14      To prevail on a First Amendment retaliation claim,

15   plaintiffs must ultimately show that they engaged in activity

16   protected by the First Amendment; that they suffered a

17   deprivation that would likely deter First Amendment activity in

18   the future; and that the First Amendment activity was at least

19   a motivating factor in defendants' decision to take retaliatory

20   action.

21      Despite defendants' attempts to paint all protesters

22   as violent or disobedient, I find that plaintiffs have provided

23   evidence that they engaged in First Amendment-protected

24   activity.

25      Numerous declarants and witnesses at the preliminary

1  injunction hearing stated that they were shot with less-lethal

2  munitions, gassed, pepper sprayed, threatened with arrests for

3  recording and observing, tackled, and had guns pointed at them.

4  As these declarants and witnesses have stated, such actions

5  would likely deter a person of ordinary firmness from

6  continuing to engage in protected activity.

7          Finally, proof of motive can be established through

8  either direct or circumstantial evidence, including suspicious

9  timing, ambiguous oral or written statements, or behavior

10  towards or comments directed at other people in the protected

11  group.

12          Plaintiffs have provided such evidence here, including

13  public statements made by defendants regarding protesters,

14  including Secretary Noem admonishing agents at Broadview to go

15  hard against people for "the way they're talking, speaking, who

16  they're affiliated with, who they're funded with, and what

17  they're talking about as far as consequences for what we're

18  doing by protecting this country."

19          Plaintiffs have provided declarations and evidence

20  that federal agents have used excessive force against

21  peacefully protesting -- those peacefully protesting the

22  federal agents' presence and operations in the Chicagoland

23  area, as I reviewed.

24          The free exercise and the RFRA -- so R-F-R-A --

25  statute, prohibit the federal government from imposing

1    substantial burdens on religious exercise, absent a compelling

2    interest pursued through the least restrictive means.   In

3    passing RFRA, Congress sought to create a broad statutory right

4    that provides greater protections for religious exercise than

5    is available under the First Amendment.

6          Under RFRA's burden shifting-framework, once a RFRA

7    claimant makes a *prima facie* case that the application of a law

8    or regulation substantially burdens one's religious practice,

9    the burden shifts to the government to justify the burden under

10   strict scrutiny.

11         Earlier this year, the Seventh Circuit, analyzing a

12   line of relevant Supreme Court cases, identified three ways a

13   plaintiff can prove a government policy or act substantially

14   burdens their religious practice:   If the government policy or

15   act compelled them to perform acts undeniably at odds with

16   fundamental tenets of their religious beliefs, put substantial

17   pressure on them to modify their behavior and violate their

18   beliefs, or bears direct, primary, and fundamental

19   responsibility for -- for rendering a religious exercise

20   effectively impracticable.

21         In assessing whether a burden is substantial, we focus

22   primarily on the intensity of the coercion applied by the

23   government and not the centrality of the religious practice in

24   question.

25         Plaintiffs have shown that they're likely to succeed

1   in establishing that defendants' actions put substantial

2   pressure on religious practitioners to modify their behavior

3   and violate their beliefs under highly coercive threats of

4   violence.

5        Plaintiffs contend that defendants have engaged in a

6   policy, pattern, and practice of targeting people visibly

7   engaged in prayer and other religious exercise with

8   PepperBalls, tear gas, and other physical violence without

9   provocation.

10       Plaintiffs have submitted declarations from

11  Reverend Black, Reverend Holcombe, and others describing

12  defendants' targeted actions against religious practitioners,

13  including shooting PepperBalls and other projectiles at

14  Reverend Black and Reverend Holcombe while they were praying.

15       Further, plaintiffs argue that defendants' actions

16  force the religious practitioners to choose between their

17  health and safety on the one hand and authentically practicing

18  their faith on the other.

19       For example, Father Curran stated that he's restricted

20  whom he invites to join prayer vigils at Broadview and stopped

21  using the vigils as an opportunity to provide religious

22  education to Catholic students because of the high risk of

23  violence.  This alleged coercion is enough to show that

24  plaintiffs are likely to establish that the government has

25  substantially burdened religious practice.

1    Now turning to the Fourth Amendment claim.

2    Although plaintiffs make a claim based on arrests

3 without probable cause, I don't find it necessary to reach at

4 this time to decide whether they have a likelihood of success

5 on the merits to decide the preliminary injunction motion.

6    Plaintiffs also make a claim based on excessive force.

7 Excessive force is a form of unreasonable seizure in violation

8 of the Fourth Amendment.  These types of claims are evaluated

9 based on whether the officer's actions were objectively

10 reasonable under the circumstances.  Reasonableness must be

11 judged from the perspective of a reasonable officer on the

12 scene and not on hindsight.

13    The proper application of the standard requires

14 careful attention to the facts and circumstances of each

15 particular case, including the severity of the crime at issue,

16 whether the subject poses an immediate threat to the safety of

17 others, and whether he's actively resisting arrest or

18 attempting to evade arrest by flight.

19    Defendants argue that the proper standard is the

20 14th Amendment shocks the conscience standard for substantive

21 due process and not the Fourth Amendment because no seizure is

22 effectuated because the defendants are seeking to disperse

23 dangerous crowds, not restrain them.  But I disagree.

24    A seizure occurs under the Fourth Amendment when an

25 officer, by means of physical force or show of authority has --

1   has in some way restrained the liberty of a citizen.  Here,

2   plaintiffs have submitted declarations and testimony indicating

3   that the use of less-lethal force, as well as physical contact,

4   has restrained their liberty, instead of being merely used as a

5   measure to disperse a crowd.

6         Officers may not, according to the Seventh Circuit,

7   without provocation, start beating, pepper spraying, kicking,

8   or otherwise mistreating people standing around a restaurant

9   parking lot, even in the middle of the night.

10        The Seventh Circuit has also noted that the use of

11  pepper spray could be considered excessive force if used

12  without justification, noting that assaulting citizens who are

13  safely detained without any provocation violates clearly

14  established constitutional principles.

15        And the Ninth Circuit noted that use of projectile --

16  that use of a projectile filled with pepper spray amounted to a

17  seizure and was unreasonable where the plaintiff posed no

18  visible threat and did not demonstrate an unwillingness to

19  comply with officers' orders.

20        I see little reason for the use of force that the

21  federal agents are currently using.  Pointing guns, pulling out

22  pepper spray, throwing tear gas, shooting PepperBalls, and

23  using other less-lethal munitions do not appear to be

24  appropriate uses of force in light of the totality of the

25  circumstances.  This is particularly a cause for concern where

1    plaintiffs' evidence suggests that federal agents are using

2    this force indiscriminately instead of in a targeted manner.

3    And even if this fell under a 14th Amendment analysis, I would

4    find the use of force shocks the conscience.

5        While the defendants argue that the use of less-lethal

6    force here was a de-escalation technique to reduce the risk of

7    harm to officers and the public, plaintiffs have marshalled

8    ample evidence that agents instead intended to cause protesters

9    harm.

10       The next factor I need to consider is irreparable harm

11   and inadequate remedy at law.

12       Having found that plaintiffs have shown a likelihood

13   of success on their claims, I next consider whether they've

14   demonstrated irreparable harm and whether they have an

15   inadequate remedy at law as to each of their claims.

16       The loss of First Amendment freedoms, even for minimal

17   periods of time, unquestionably constitutes an irreparable

18   injury.  Accordingly, under Seventh Circuit law, irreparable

19   harm is presumed in First Amendment cases.  And although the

20   claim is statutory, RFRA protects First Amendment exercise --

21   I'm sorry -- RFRA protects First Amendment free-exercise

22   rights, so courts apply First Amendment irreparable harm

23   analysis to RFRA claims.

24       Moreover, quantifying a First Amendment injury is

25   difficult and damages are therefore not an adequate remedy.

1   Because I conclude that defendants' conduct likely violates the

2   First Amendment and RFRA, plaintiffs have established that they

3   will suffer irreparable harm and that they have an inadequate

4   remedy at law if I deny the motion for preliminary injunction.

5       A Fourth Amendment violation stemming from an illegal

6   search or seizure does not presumptively cause irreparable harm

7   or suggest an inadequate remedy at law because it's a

8   constitutional tort analogous to a personal injury claim where

9   money damages will be awarded.

10       An inadequate remedy at law does not mean wholly

11   ineffectual, however.  Although the remedy must be seriously

12   deficient as compared to the harm suffered, here, plaintiffs

13   have shown irreparable harm because of the ongoing nature of

14   the alleged violation of their Fourth Amendment rights, with

15   money damages insufficient to compensate them for the

16   repetitive constitutional violations.

17       And I acknowledge that some limited legal remedies

18   exist under the federal torts -- Federal Tort Claims Act, and

19   *Bivens* case law, for at least some Fourth Amendment violations.

20   But given the limited nature of these legal remedies, I do not

21   find that their existence precludes injunctive relief.

22       The next factor is -- the next two factors are the

23   balance of harms and the public interest.

24       I weigh the harms the denial of the preliminary

25   injunction would cause the plaintiffs against the harm to the

1   defendants if I were to grant it.  This balancing process

2   involves a sliding scale approach:  The more likely the

3   plaintiff is to win on the merits, the less the balance of

4   harms needs to weigh in their favor, and vice versa.  When the

5   government is a party, the balance of equities and the public

6   interest factors merge.

7          The government argues that the public has an interest

8   in ensuring public safety and order and preventing attacks on

9   federal property and personnel.  While they do have such an

10  interest, the public also as an interest in its citizens'

11  bodily integrity, the right to peaceful protest, the right to

12  assemble, the right to a peaceful free exercise of religion.

13         Moreover, the public has a strong interest in having a

14  government that conducts itself fairly and according to its own

15  stated regulations and policies.

16         With respect to the First Amendment and RFRA, once a

17  moving party establishes a likelihood of success on the merits

18  in First Amendment cases, the balance of harms normally favors

19  granting preliminary injunctive relief because injunctives --

20  injunctions protecting First Amendment freedoms are always in

21  the public interest.

22         And just as with irreparable harm, the same analysis

23  applies to plaintiffs' RFRA claim.  Because defendants' conduct

24  likely violates the First Amendment, the balance of equities on

25  these two claims weighs in favor of a preliminary injunction.

1      It is difficult to conceive how an injunction

2  requiring the government to comply with the Constitution could

3  possibly be harmful.  The balance of equities favors the

4  plaintiffs, because without a preliminary injunction, they will

5  be subject to defendants' ongoing violations of their Fourth

6  Amendment right to be free from excessive force.  And the

7  public interest is served when courts uphold constitutional

8  rights.

9      The government does argue that the Fourth Amendment

10  decisions are too fact-sensitive for injunctive relief.  And

11  while I acknowledge that there are fact-specific situations

12  where the government, as here, is indiscriminately using force

13  untethered to any specific threat that they are perceiving and

14  failing to conduct any individualized assessment on the

15  appropriate use of forth -- force that is tethered to the facts

16  facing the agents on the ground, an injunction requiring the

17  government to make these individualized assessments that they

18  are required to undertake under the Constitution is not a harm

19  to the government.

20      To put it another way, requiring the government to

21  comply with its obligations under the Constitution, and in

22  particular the Fourth Amendment, is simply not a harm.

23      So finally turning to the scope of relief.

24      Defendants argue that plaintiffs -- that I should deny

25  plaintiffs' motion because I lack jurisdiction to enjoin the

1  Department of Homeland Security's immigration enforcement

2  operations.  Specifically, defendants point to

3  Section 1252(f)(1) of the Immigration and Nationality Act,

4  which provides that regardless of the nature of the action or

5  the claim or of the identity of the party or parties bringing

6  the action, no court, other than the Supreme Court, shall have

7  jurisdiction or authority to enjoin or restrain the operations

8  of Sections 1221 through Sections 1232, as amended by the

9  Illegal Immigration Reform and Immigrant Responsibility Act of

10 1996, other than with respect to the application of such

11 provisions to an individual alien against whom proceedings

12 under such part have been initiated.

13      The Supreme Court has explained that this provision

14 generally prohibits lower courts from entering injunctions that

15 order federal officials to take or refrain from taking actions

16 to enforce, implement, or otherwise carry out the specified

17 statutory provisions.  However, this provision does not

18 categorically insulate immigration enforcement from judicial

19 class-wide injunctions.

20      To trigger Section 1252(f)(1)'s bar, a class-wide

21 injunction must directly enjoin or restrain the operation of a

22 specified statutory provision.  A class-wide injunction which

23 only collaterally impacts the operation of the specified

24 statutory provision will not implicate Section 1252(f)(1).

25      Here, plaintiffs seek to enjoin defendants from

1    violating class members' First and Fourth Amendment rights and

2    require defendants to have visible identification affixed to

3    their uniforms and conspicuously displayed.  The only

4    connection between this relief and Section 1252(f)(1)'s

5    specified statutory provisions is that the class members allege

6    that their First and Fourth Amendment rights are being violated

7    while they're observing, recording, and/or protesting the

8    Department of Homeland Security's immigration enforcement

9    operations.

10         Thus, to the extent that the requested injunctive

11    relief would have any impact on the operation of the specified

12    statutory provisions, I find that such an effect would be

13    entirely collateral in nature and therefore is not barred by

14    Section 1252(f)(1).

15         Defendants additionally argue that plaintiffs are

16    improperly requesting a universal injunction seeking relief on

17    behalf of nonparties.  In June of 2025, the Supreme Court

18    clarified that federal courts cannot issue universal

19    injunctions; in other words, injunctions that prohibit

20    enforcement of a law or policy against anyone.

21         Pursuant to *CASA*, then, the Court must ensure that it

22    does not issue an injunction broader than necessary to provide

23    complete relief to each plaintiff with standing to sue.  But

24    this does not mean that the Court's injunction cannot

25    incidentally benefit a nonparty.

1    Here, in awarding complete relief to plaintiffs, the

2  injunction will necessarily incidentally benefit other

3  protesters, journalists, and religious figures present at

4  protests.

5    Plaintiffs contend that defendants have

6  indiscriminately used force against them, even though they have

7  not engaged in any violent or noncompliant actions.  Given the

8  scale of the protests, defendants likely cannot determine who

9  among the protesters is a plaintiff in this case.

10    Moreover, plaintiffs could not be assured that the

11  injunction has any force if defendants could engage in the

12  crowd control tactics addressed in the injunction with respect

13  to other protesters, journalists, or religious figures present

14  near them, given the fact that these crowd control tactics are

15  designed to have an impact beyond just one individual.

16    For this reason, the injunction does not violate

17  *CASA*'s prohibition on universal injunctions, because the

18  effects on nonparties are incidental to the need to provide

19  complete relief to the named plaintiffs.

20    Only plaintiffs can enforce the preliminary

21  injunction's terms.

22    And the relief that the Court is ordering, enjoining

23  all chilling of First Amendment rights, is in line with other

24  well-accepted jurisdictional and remedial principles with

25  respect to First Amendment claims.

1          First Amendment challenges, if successful, justify an

2     expansive remedy, suspending all enforcement of the challenged

3     practice, to protect an uninhibited marketplace of ideas, and

4     reduce the social costs caused by the withholding of protected

5     speech.

6          Finally, defendants raise a concern about the Court

7     micromanaging law enforcement and the internal operations of

8     law enforcement with a preliminary injunction.  Defendants

9     emphasize that the Court cannot intrude into personnel

10    management decisions of the Executive Branch.  But I'm doing no

11    such thing with this injunction.  I'm not telling defendants

12    how to staff its operations.  I'm not telling defendants whom

13    to hire.

14         And more importantly, both Mr. Hewson and Mr. Bovino

15    stated that they were already following the terms of the

16    temporary restraining order.  They stated that, in fact, it

17    wasn't a change from how they were operating previously.

18    Therefore, any implementation of a preliminary injunction is

19    not going to change how ICE or CBP operates.  It is not

20    micromanaging.  It is simply in accordance with how they say

21    they are conducting their activities.

22         Rule 65(c) provides that a court may issue a

23    preliminary injunction or a temporary restraining order only if

24    the movant gives security in an amount that the Court considers

25    proper to pay the costs and damages sustained by any party

1    found to have been wrongfully enjoined or restrained.

2           However, the case law has somewhat weakened the force

3    of the no or- -- "no order shall issue" language in Rule 65(c).

4           Under appropriate circumstances, a court may excuse

5    bond, notwithstanding the literal language of Rule 65(c), and

6    district courts retain the discretion to determine if a bond

7    must be posted despite that mandatory language.

8           Seventh Circuit case law identifies two scenarios in

9    which a district court may forgo requiring a bond.  First, a

10   court may not require a bond if the enjoined party does not

11   demonstrate it will incur any damages from the injunction;

12   second, a court may forgo a bond when a bond that would give

13   the opposing party absolute security against incurring any loss

14   from the injunction would exceed the applicant's ability to

15   pay, and the district court balances, often implicitly, the

16   relative cost to the opponent of a smaller bond against the

17   cost to the applicant of having to do without a preliminary

18   injunction that he may need desperately.

19          Both scenarios support waiving the bond requirement

20   here.

21          First, I do not find that the training costs that

22   defendants identified to be significant, particularly because a

23   preliminary injunction essentially directs agents and officers

24   to follow the training they've already received on crowd

25   control, as well as what the Constitution demands of them.

1      More importantly, when a court implicitly balances the

2   cost of injunctive relief against the harm to speech if an

3   injunction is denied, free speech prevails.

4      That is the case here, and therefore I will not

5   require plaintiffs to post a bond.

6      As to whether I would stay this order pending appeal,

7   in deciding whether to issue a stay pending appeal, I consider

8   whether the stay applicant has made a strong showing that

9   they're likely to succeed on the merits, whether the applicant

10  will be irreparably injured absent a stay, whether issuance of

11  the stay will substantially injure the other parties interested

12  in the proceeding, and where the public interest lies.

13     The party requesting a stay bears the burden of

14  showing that the circumstances justify an exercise of that

15  discretion.

16     I don't find it appropriate to stay a preliminary

17  injunction pending appeal.  Defendants have not made a strong

18  showing that they're likely to succeed on the merits of their

19  claim, and I fail to see any irreparable injury to defendants

20  if I allow the preliminary injunction to go forward.

21     Defendants have been operating under the rules of the

22  temporary restraining order for the last 28 days.  Instead,

23  staying the injunction pending appeal would substantially

24  injure the plaintiffs and the public who deserve to have their

25  fundamental constitutional rights respected.

1      There are people that have made comments about these

2  rights at issue here, and I just simply want to end with their

3  words.  You may recognize some of them.

4      A Constitution of Government once changed from

5  Freedom, can never be restored.  Liberty once lost is lost

6  forever.  When the People once surrender their share of the

7  Legislature, and their Right of defending the Limitations upon

8  the Government, and of resisting every Encroachment upon them,

9  they can never regain it.  That's what John Adams said to his

10  wife, Abigail, in 1775.

11      For if Men are to be precluded from offering their

12  sentiments on a matter, which may involve the most serious and

13  alarming consequences, that can invite the consideration of

14  Mankind; reason is of no use to us - the freedom of speech may

15  be taken away - and, dumb and silent we may be led, like sheep,

16  to the Slaughter.  That was George Washington in 1783 in the

17  Newburgh address.

18      Freedom of speech is a principal pillar of a free

19  government.  When this support is taken away, the Constitution

20  of a free society is dissolved and tyranny is erected on its

21  ruins.  Republics and limited monarchies divide -- derive their

22  strength and vigor from a popular examination into the actions

23  of the magistrates.  Benjamin Franklin wrote that in the

24  Pennsylvania Gazette.

25      Of that freedom of thought and speech, one may say

1  that it is the matrix, the indispens- -- indispensable

2  condition, of nearly every other form of freedom.  That was

3  from Justice Cardozo in 1969.  Oh, sorry, actually, 1937.

4         In 1799, Thomas Jefferson wrote:  I am for freedom of

5  the press, and against all violations of the Constitution to

6  silence by force and not by reason the complaints or

7  criticisms, the just or unjust, of our citizens against the

8  conduct of their agents.

9         He also noted that:  The only security of all is in a

10  free press.

11        And finally he said:  Our liberty depends on the

12  freedom of the press, and that cannot be limited without being

13  lost.

14        And finally, James Monroe, when he was addressing the

15  Virginia General Assembly in 1785 said:  We hold it for a

16  fundamental and an inane -- sorry -- inalienable truth, that

17  Religion and the manner of discharging it, can be directed only

18  by reason and conviction, not by force and violence.  The

19  Religion then of every man must be left to the conviction and

20  conscience of every man; and it is the right of every man to

21  exercise it as these may dictate.

22        So I will now read into the record the preliminary

23  injunction order that I will also enter in writing.

24        It's hereby ordered that defendants, their officers,

25  agents, assigns, and all persons acting in concert with them

1  (hereafter referred to as "federal agents"), are enjoined in

2  this judicial district from:

3          Interactions with journalists:  Dispersing, arresting,

4  threatening to arrest, threatening or using physical force

5  against any person whom they know or reasonably should know is

6  a journalist, unless federal agents have probable cause to

7  believe that the individual has committed a crime unrelated to

8  failing to obey a dispersal order lawfully issued to

9  nonjournalists.  Federal agents may order a journalist to

10  change location to avoid disrupting law enforcement, as long as

11  the journalist has an objectively reasonable amount of time to

12  comply and an objectively reasonable opportunity to report and

13  observe;

14          Dispersal of others:  Issuing a crowd dispersal order,

15  meaning a lawful command given by an authorized federal agent

16  for all persons to leave the designated area, that requires any

17  class member to leave a public place that they lawfully have a

18  right to be, unless dispersal is justified by exigent

19  circumstances such that immediate action is objectively

20  necessary in order to preserve life or prevent catastrophic

21  outcomes as defined by the Department of Homeland Security use

22  of force policy, updated February 6, 2023, Section XII.E;

23          Using riot control weapons, including kinetic impact

24  projectiles, compressed air launchers, oleoresin capsicum

25  spray, CS gas, CN gas, or other chemical irritants, 40 mm

1  munition launchers, less-lethal shotguns, less-lethal specialty

2  impact chemical munitions, controlled noise and light

3  distraction devices, electronic control weapons, on any class

4  member, unless such force is objectively necessary to stop the

5  person from causing an immediate threat of physical harm to

6  another person;

7        Using riot control weapons, including those that I

8  just described, at identified targets if it is reasonably

9  foreseeable that doing so could result in injury to any class

10  member, unless such force is objectively necessary to stop the

11  person from causing an immediate threat of physical harm to

12  another person;

13        Deploying CS or CN gas canisters, OC spray, or other

14  chemical irritants into a group of people or in residential or

15  commercial areas in a manner that poses a reasonably

16  foreseeable risk of injuring any class member who is not

17  causing an immediate threat of physical harm to another person;

18        Deploying CS or CN gas canisters, controlled noise and

19  light distraction devices, or less-lethal specialty impact and

20  chemical munitions so as to strike any class member, unless

21  such force is objectively necessary to stop an immediate threat

22  of the person causing serious bodily injury or death to another

23  person;

24        Deploying CS or CN gas canisters, controlled noise and

25  light distraction devices, or less-lethal specialty impact and

1  chemical munitions above the head of any class member, unless

2  such force is objectively necessary to stop an immediate threat

3  of the person causing serious bodily injury or death to another

4  person;

5       Firing compressed air launchers, or munition

6  launchers, or KIPs so as to strike the head, neck, groin,

7  spine, or female breast of any class member, unless such force

8  is objectively necessary to stop an immediate threat of the

9  person causing serious bodily injury or death to another

10  person;

11       Striking any class member with a vehicle, unless such

12  force is objectively necessary to stop an immediate threat of

13  the person causing serious bodily injury or death to another

14  person;

15       Using hands-on physical force such as pulling or

16  shoving to the ground, tackling, or body slamming any class

17  member who is not causing an immediate threat of physical harm

18  to others, unless objectively necessary and proportional to

19  effectuate an apprehension and arrest;

20       Using choke holds, carotid restraints, neck

21  restraints, or any other restraint technique that applies

22  prolonged pressure to the neck that may restrict blood flow or

23  air passage against any class member, unless such force is

24  objectively necessary to stop an immediate threat of the person

25  causing serious bodily injury or death to another person;

1           Using any riot control weapon, including those listed

2   in the order, against any class member, without first giving at

3   least two separate warnings at a sound level where the targeted

4   individuals can reasonably hear it, unless justified by exigent

5   circumstances when immediate action is necessary in order to

6   preserve life or prevent catastrophic outcomes, as defined by

7   the Department of Homeland Security use of force policy,

8   updated February 6, 2023, Section XII.E.  Such warnings shall

9   explain that federal agents may employ riot control weapons or

10  force, give the targeted individuals reasonable time to avoid

11  the use of force, and provide a reasonable opportunity to

12  comply;

13          Seizing or arresting any class member who is not

14  resisting a lawful and authorized crowd dispersal order, as

15  defined earlier, unless there is specific probable cause to

16  believe that the person has committed a crime for which a

17  custodial arrest is warranted and for which federal -- the

18  federal agent has lawful authority to make the arrest;

19          And, finally, defendants shall not be liable for

20  violating this injunction if any class member is incidentally

21  exposed to riot control devices after such device was deployed

22  in a manner that complies with the injunction;

23          To facilitate defendants' identification of

24  journalists protected under this order, the following are

25  examples of indicia of being a journalist: visual

1   identification as a member of the press, such as by displaying

2   a professional press badge, pass, or credentials; wearing

3   distinctive clothing or patches that identify the wearer as a

4   member of the press; or carrying professional gear such as

5   professional photographic or videography equipment.  Other

6   indicia of being a journalist under this order include that the

7   person is standing off to the side of a protest, not engaging

8   in chanting, sign holding, or shouting slogans, and is instead

9   documenting protest activities, although these are not

10  requirements.  These indicia are illustrative, and a person

11  need not exhibit every indicium to be considered a journalist

12  under the order.  Defendants shall not be liable for incidental

13  violations of the order if defendants establish that the

14  affected individual lacked any of the illustrative indicia of a

15  journalist described in the provision.

16        It's further ordered that all federal agents,

17  excepting those who do not wear a uniform or other

18  distinguishing clothing or equipment in the regular performance

19  of their official duties or are engaged in undercover

20  operations in the regular performance of their official duties,

21  must have visible identification of a unique, personally

22  assigned, and recognizable alphanumeric identifier sequence

23  affixed to their uniforms and conspicuously displayed in two

24  separate places.  The same unique and personally assigned

25  identifier sequence must remain conspicuously displayed in two

1    separate places despite changes to a federal agent's uniform or

2    tactical gear.

3          It's further ordered that all federal agents,

4    excepting those who do not wear a uniform or other

5    distinguishing clothing or equipment in the regular performance

6    of their official duties or are engaged in undercover

7    operations in the regular performance of their official duties,

8    that are, have been, or will be equipped and trained with

9    body-worn cameras shall activate them when engaged in

10   enforcement activity unless expressly exempted by CBP, ICE, or

11   DHS policy.

12         The definitions of "body-worn cameras" shall be

13   defined in DHS Policy Statement 045-07 Section VII and CBP

14   Directive 4320-020B Section 6.2:

15         Audio, video, or digital recording equipment combined

16   into a single unit and typically worn on clothing or otherwise

17   secured to a person; for example, affixed to the outside of the

18   carrier or tactical vest facing forward.

19         For the purposes of this order, definition of

20   "enforcement activity" shall be as defined in ICE Directive

21   19010.3 Section (3.6)(8), and CBP Directive 4320-020B

22   Section 6.4.  Such activities include, but are not limited to:

23         Protecting federal government facilities;

24         Responding to public disturbances;

25         Interacting with members of the public while

1    conducting Title 8 enforcement activities in the field; and

2             When responding to emergencies.

3             Enforcement activities where body-worn cameras are not

4    required to be worn or activated for the purposes of this order

5    are:

6             Where agents are conducting undercover activity or

7    confidential informants will or may be present;

8             Information-gathering surveillance activities where

9    and when an enforcement activity is not planned;

10            Onboard commercial flights;

11            Controlled deliveries; and

12            Custodial interviews conducted inside jails, prisons,

13   detention centers, or DHS owned or leased facilities.

14            This provision requiring body-worn cameras shall not

15   apply to federal agents operating at any port of entry into the

16   United States, including, but not limited to, Chicago O'Hare

17   International Airport and Chicago Midway International Airport.

18             Federal agents shall not be liable for violating this

19   provision for failure to record due to equipment failure beyond

20   the control of federal agents, or in the event that cloud

21   storage for storing recordings made by body-worn cameras should

22   become unavailable, through no fault of federal agents, either

23   due to the lapse in appropriations, or license or contract

24   expiration.

25            It's further ordered that defendants widely

1    disseminate the notice of this order.  Specifically, defendants

2    are ordered to provide copies of this order, in either

3    electronic or paper form, no later than 10:00 p.m. Central Time

4    on November 6, 2025, to all others described below:

5         All law enforcement personnel, officers, and agents of

6    the federal agents currently or subsequently deployed in the

7    Northern District of Illinois, including, but not limited to,

8    all personnel operating within this district who are part of

9    Operation Midway Blitz or any equivalent operation by a

10   different name; and

11        All employees, officers, and agents of federal agents

12   with supervisory or management authority over any law

13   enforcement officers or agents currently or subsequently

14   deployed in the Northern District of Illinois, up the chain of

15   command to and including the Secretary of Homeland Security and

16   other named defendants.

17        It's further ordered that defendant shall issue

18   guidance to officers and agents to implement this order.

19   Defendants shall file with the Court such guidance and any

20   directives, policies, or regulations implementing the guidance

21   within five business days of issuance of the order, with a

22   continuing obligation to immediately file with the Court any

23   subsequent changes or revisions to that guidance or

24   implementing directives, policies, or regulations through the

25   period of the order.

1       It is further ordered that in the event plaintiffs

2   seek relief for an alleged violation of this order, plaintiffs

3   should make a good faith attempt to meet and confer with

4   defendants for at least 24 hours before filing a request for

5   relief and defendants must respond to the motion for relief as

6   ordered by the Court.

7       It's further ordered that in the interest of justice,

8   I order plaintiffs to provide zero dollars in security.  And I

9   rule that any other requirements under Rule 65(c) of the

10  Federal Rules of Civil Procedure are satisfied.

11      The parties shall meet and confer and provide a joint

12  status report within seven days setting forth proposals for

13  ensuring that federal agents present in the Northern District

14  of Illinois while this action is pending remain informed of the

15  limitations imposed by this order.

16      I am ordering this preliminary injunction at 11:48,

17  Central Time, on the 6th day of November, and it shall remain

18  in effect pending further proceedings before this Court.

19      All right.  The last is the class certification

20  motion.

21      I am going to grant the plaintiffs' motion for class

22  certification.  I do find that I have broad discretion in

23  determining whether to certify a proposed class.  The parties

24  seeking certification bears the burden of demonstrating that a

25  certification is proper by a preponderance of the evidence.

1          And I will issue a written order later today.

2          However, I do find that plaintiffs have met by a

3   preponderance of the evidence the requirements under Rule 23

4   for numerosity, commonality, typicality, and adequacy of

5   representation.

6          I also find under Rule 23(b)(2) that a class should be

7   certified and find defendants' argument unavailing that I

8   should deny plaintiffs' motion because 8, United States Code,

9   Section 1252(f)(1) bars the requested class-wide relief.

10          So the class that I will be certifying -- that I am

11   certifying and will explain further in writing later today is

12   all persons who are or will in the future nonviolently

13   demonstrate, protest, observe, document, or record at

14   Department of Homeland Security Immigration Enforcement and

15   Removal Operations in the Northern District of Illinois.

16          I am certifying a religious exercise subclass, which

17   consists of all persons who are or will in the future engage in

18   religious expression in the form of prayer, procession, song,

19   preaching, or proselytizing at Department of Homeland Security

20   Immigration Enforcement and Removal Operations in the Northern

21   District of Illinois.

22          And I am also certifying a press subclass defined as

23   all persons who are or will in the future engage in

24   newsgathering or reporting at Department of Homeland Security

25   Immigration Enforcement and Removal Operations in the Northern

1    District of Illinois.

2            All right.  There was just a couple of things we need

3    to just tie up.

4            One is directed to the government, which is I had

5    previously ordered Defendant Bovino to have a body camera and

6    use it by last Friday.

7            Do you know whether that's been done?

8            MR. WARDEN:  It's my understanding I believe, yes,

9    that's correct.  We can file a certification on the docket if

10   that would be helpful.

11           THE COURT:  Okay.  That would be.  Thank you.

12           All right.  Then we should set another status date to

13   just take up about the proposals for ensuring that everybody

14   knows of the preliminary injunction order and its terms.

15           So how about next Thursday afternoon?

16           MR. ART:  Good for the plaintiffs, Your Honor.

17           THE COURT:  Mr. Warden?

18           MR. WARDEN:  Thursday afternoon, yes.

19           THE COURT:  Okay.

20           MR. WARDEN:  Excuse me.  The purpose of that

21   conference is just to --

22           THE COURT:  Ensure that everybody knows --

23           MR. WARDEN:  Okay.

24           THE COURT:  -- that the -- it's been disseminated.

25           So why don't we say 3:00 next Thursday.

1          MR. ART:  Very good, Judge.

2          THE COURT:  Does that work for you, Mr. Warden?

3          MR. WARDEN:  I believe so.  Would it be possible for

4   government counsel to appear virtually at that since we're in

5   Washington, D.C. --

6          THE COURT:  Sure.

7          MR. WARDEN:  -- if that's going to be a brief status?

8          THE COURT:  Yep.  That's fine.

9          MR. WARDEN:  Thank you.

10         THE COURT:  All right.  I think that kind of takes up

11  all of my stuff.

12         I know we had talked yesterday about going through and

13  figuring out how to determine what needs to stay under seal and

14  what doesn't.  I think, if it's okay with the parties, that,

15  Mr. Warden, you can kind of take a look at everything that has

16  been submitted under seal.  And then when we come back next

17  Thursday, you can let me know beyond then how much longer you

18  think you would need to do any sort of review.

19         MR. WARDEN:  Yes, that sounds appropriate.

20         THE COURT:  Does that work, Mr. Art?

21         MR. ART:  It works for the plaintiffs.

22         I believe counsel for the intervenors is --

23         MS. DACY:  Excuse me, Your Honor.  Julia Dacy for the

24  media intervenors.

25         So that should work for us if we can attend that

1    status as well, and then we'll address the government's needs

2    for any more time.

3            THE COURT:  Okay.  That sounds great.

4            All right.  And then the only last thing were these

5    violations hanging out that I -- if plaintiffs want to move

6    forward on those, you know, you can file something, and then

7    we'd set a briefing schedule at the next status.

8            Does that make sense?

9            MR. ART:  Yes.  We intend to file something.  We will

10   hopefully do that before the next status, and then we can brief

11   it then.

12           THE COURT:  Okay.  All right.

13           Anything else left outstanding?

14           MR. ART:  On -- on behalf of us and our clients and

15   all of the counsel, thank you so much for the Court's time and

16   to the Court's staff for the tremendous expenditure of time in

17   the past few weeks.  We appreciate it.  We appreciate you

18   protecting this community.  And we appreciate you upholding the

19   constitutional rights of our clients.

20           Thank you, Judge.

21           MR. WARDEN:  We appreciate the Court's time.  Thank

22   you very much, Your Honor.

23           THE COURT:  All right.  And since you did bring that

24   up, Mr. Art, I just want to publicly acknowledge the five

25   people on my staff, who have been absolutely outstanding over

1    the last month.  This case has taxed us unbelievably and never

2    once did I hear a peep of a complaint, any even saying that

3    they were tired.  And we were here late last night and back

4    again early this morning.  I think we all felt like we were

5    back in big firm life.  And not to mention that they aren't

6    being paid.  And they are truly public servants.  I am so proud

7    to work with them and call them my colleagues.

8            So just wanted to say that on the record.

9            All right.  We'll see everybody --

10           MR. ART:  Thank you.

11           THE COURT:  -- next week.

12           THE COURT:  Thanks.

13       (Concluded at 11:58 a.m.)

14

15

16                        *   *   *   *   *

17       I certify that the foregoing is a correct transcript

18   from the record of proceedings in the above-entitled matter.

19   */s/ KELLY M. FITZGERALD*                    *November 6, 2025*
     KELLY M. FITZGERALD, RPR, RMR, CRR
20   Official Court Reporter

21

22

23

24

25

**A235**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO HEADLINE CLUB *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | No. 25-cv-12173 |
| | ) | |
| v. | ) | Hon. Sara L. Ellis, |
| | ) | United States District Judge |
| KRISTI NOEM, Secretary of U.S. | ) | |
| Department of Homeland Security, in her | ) | |
| official capacity, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>NOTICE OF APPEAL</u>

Defendants hereby appeal to the United States Court of Appeals for the Seventh Circuit

this Court's preliminary injunction order, *see* ECF Nos. 250 & 256, including this Court's

Opinion and Order granting class certification, *see* ECF Nos. 252 & 256, to the extent the

Court's grant of a class-wide preliminary injunction depends on that decision.

.

Dated: November 9, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

SARMAD KHOJASTEH
Senior Counsel to the Assistant Attorney
General, Civil Division

ELIZABETH HEDGES
Counsel to the Assistant Attorney General
Civil Division

*/s/ Andrew I. Warden*
ANDREW I. WARDEN
Assistant Director
JEREMY NEWMAN

CHRISTOPHER LYNCH
SAMUEL HOLT
PETER GOLDSTONE
Trial Attorneys
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 616-5084
Fax: (202) 616-8470

*Attorneys for Defendants*

A237