No. 25-3023

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

—————————————

CHICAGO HEADLINE CLUB, et al.,
                                    Plaintiffs-Appellees,


v.


KRISTI NOEM, in her official capacity as Secretary, U.S. Department
of Homeland Security, et al.,
                                    Defendants-Appellants.

—————————————

On Appeal from the United States District Court
for the Northern District of Illinois

—————————————

**BRIEF FOR APPELLANTS**
—————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney
  General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
COURTNEY L. DIXON
DAVID L. PETERS
ELIZABETH HEDGES
DOUGLAS C. DREIER
  *Attorneys, Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 598-6735*

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................ 1

STATEMENT OF JURISDICTION .............................................................. 2

STATEMENT OF THE ISSUE ....................................................................... 3

STATEMENT ..................................................................................................... 3

      A.    Legal Background ................................................................... 3

      B.    Factual Background & Prior Proceedings ..................................... 4

SUMMARY OF ARGUMENT ..................................................................... 15

STANDARD OF REVIEW .......................................................................... 18

ARGUMENT ................................................................................................... 18

I.    The Government Is Likely To Prevail On The Merits. ...................... 18

      A.    The District Court's Written Opinion Does Not Rehabilitate Its Flawed Injunction. ................................................................................ 19

      B.    The District Court Lacked Jurisdiction To Enter The Injunction. ......... 22

      C.    The Injunction Is Overbroad And Unworkable. ..................................... 31

      D.    Plaintiffs' Claims Lack Merit And Cannot Support The Injunction....... 44

II.    The Remaining Equitable Factors Decisively Favor The Government. ........... 56

CONCLUSION ............................................................................................... 58

CERTIFICATES OF COMPLIANCE

CERTIFICATE OF COMPLIANCE

SHORT APPENDIX

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*AP v. Budowich,*
No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025) ....................................... 50

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ...................................................................... 33

*Baltimore Sun Co. v. Ehrlich,*
437 F.3d 410 (4th Cir. 2006) ...................................................................... 50

*Barnes v. Felix,*
605 U.S. 73 (2025) .................................................................................. 44

*Bell v. Keating,*
697 F.3d 445 (7th Cir. 2012) ..................................................................... 23

*Black Lives Matter Los Angeles. v. City of Los Angeles,*
113 F.4th 1249 (9th Cir. 2024) .................................................................. 35

*Branzburg v. Hayes,*
408 U.S. 665 (1972) ................................................................................ 51

*Campbell v. Miller,*
373 F.3d 834 (7th Cir. 2004) ................................................................ 24, 54

*Cantwell v. Connecticut,*
310 U.S. 296 (1940) ................................................................................ 46

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ........................................................................23, 24, 27

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ........................................................................... 23, 27

*Common Cause Ind. v. Lawson,*
937 F.3d 944 (7th Cir. 2019) ...................................................................... 28

*EEOC v. AutoZone, Inc.,*
707 F.3d 824 (7th Cir. 2013) ...................................................................... 41

*Food & Drug Admin. v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) ........................................................................... 16, 28

*Garland v. Aleman Gonzalez,*
596 U.S. 543 (2022) ................................................................ 31

*Gilligan v. Morgan,*
413 U.S. 1 (1973) ............................................................. 29, 30

*Graham v. M.S. Connor,*
490 U.S. 386 (1989) ................................................................ 44

*Henderson v. Kennedy,*
253 F.3d 12 (D.C. Cir. 2001) .................................................... 55

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers,*
994 F.3d 602 (7th Cir. 2021) .................................................... 51

*Kingman v. Frederickson,*
40 F.4th 597 (7th Cir. 2022) .................................................... 46

*Kohen v. Pacific Inv. Mgmt. Co. LLC,*
571 F.3d 672 (7th Cir. 2009) .................................................... 34

*Laird v. Tatum,*
408 U.S. 1 (1972) ................................................................... 27

*Lewis v. Casey,*
518 U.S. 343 (1996) ............................................................ 30, 50

*McFields v. Dart,*
982 F.3d 511 (7th Cir. 2020) ................................................ 35, 36

*Michigan Dep't of State Police v. Sitz,*
496 U.S. 444 (1990) ................................................................ 44

*Missouri v. McNeely,*
569 U.S. 141 (2013) ............................................................ 52, 53

*Mullins v. Direct Digital, LLC,*
795 F.3d 654 (7th Cir. 2015) .................................................... 34

*Nicodemus v. City of S. Bend, Ind.,*
137 F.4th 654 (7th Cir. 2025) .................................................... 48

*Noem v. Vasquez Perdomo,*
No. 25A169, 2025 WL 2585637 (U.S. Sept. 8, 2025) .................... 14, 23, 57

*North Carolina v. Covington*,
    581 U.S. 486 (2017) ................................................... 36

*Puente v. City of Phoenix*,
    123 F.4th 1035 (9th Cir. 2024) .............................. 47, 52

*Rahman v. Chertoff*,
    530 F.3d 622 (7th Cir. 2008) .................................... 3

*Reporters Comm. for Freedom of Press v. AT&T*,
    593 F.2 d 1030 (D.C. Cir. 1978) ............................... 2

*Richwine v. Matuszak*,
    148 F.4th 942 (7th Cir. 2025) ................................. 18

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ........................................ 29, 44, 53

*Roman v. Wolf*,
    977 F.3d 935 (9th Cir. 2020) ................................ 45

*Ryburn v. Huff*,
    565 U.S. 469 (2012) ............................................ 43, 57

*Schirmer v. Nagode*,
    621 F.3d 581 (7th Cir. 2010) ................................ 24, 27

*Society of Divine Word v. U.S. Citizenship & Immigr. Servs.*,
    129 F.4th 437 (7th Cir. 2025) ................................ 54

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ............................................ 28

*Torres v. Madrid*,
    592 U.S. 306 (2021) ............................................ 51, 52

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ............................................ 42, 43

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ................................. 22, 32, 33, 57

*United States v. Stimler*,
    864 F.3d 253 (3d Cir. 2017), *vacated on other grounds*,
    *United States v. Goldstein*, 902 F.3d 411 (3d Cir. 2018) ................ 55

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................ 35

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ................................................................ 46

*Washington Mobilization Comm. v. Cullinane*,
   566 F.2d 107 (D.C. Cir. 1977) .............................................. 47

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................. 56

**Statutes:**

6 U.S.C. § 202 ............................................................................. 4
6 U.S.C. § 111 ............................................................................. 3
6 U.S.C. § 211(c)(8) ................................................................... 3
6 U.S.C. § 252 (a)(3) .................................................................. 4
8 U.S.C. § 1103(a)(5) ................................................................. 3
8 U.S.C. § 1221 ......................................................................... 31
8 U.S.C. § 1226 ......................................................................... 31
8 U.S.C. § 1231 ......................................................................... 31
8 U.S.C. § 1252(f)(1) ................................................. 17, 30, 31
8 U.S.C. § 1357(a)(2) .................................................................. 4
8 U.S.C. § 1357(a)(4) .................................................................. 4
8 U.S.C. § 1357(a)(5) .................................................................. 4
19 U.S.C. § 1589a ....................................................................... 4
28 U.S.C. § 1292(a)(1) ................................................................ 3
28 U.S.C. § 1331 ......................................................................... 2
28 U.S.C. § 1367 ......................................................................... 2
28 U.S.C. § 2680(h) ................................................................... 26
40 U.S.C. § 1315(a) ..................................................................... 4
40 U.S.C. § 1315(b)(1) ................................................................ 4
42 U.S.C. § 2000bb–1(a) ........................................................... 54

**Rules:**

Fed. R. App. P 4(a)(1)(B) ........................................................... 3

Fed. R. Civ. P. 23(a)(2) ............................................................. 35

Fed. R. Civ. P. 23(a)(3) ............................................................. 36

Fed. R. Civ. P. 65(d)(1)(B)-(C) ........................................................................ 40

**Other Authorities:**

DHS, *About DHS*, (last visited Oct. 17, 2025), https://perma.cc/5Z2B-DER8 .......... 3

*DHS says agents were shot at amid chaotic day of immigration enforcement*
  *operations in Chicago area*, CNN (Nov. 12, 2025)
  https://perma.cc/9EKZ-Z48P ................................................................... 6

**INTRODUCTION**

The role of the Judiciary is to resolve concrete cases and controversies, not to act as general overseer of the Executive.  But in response to the government's efforts to enforce the Nation's immigration laws, the district court here issued a sweeping, programmatic injunction that usurps executive authority and empowers the court to superintend law-enforcement activities throughout the Chicago area under threat of contempt.  What began as a complaint by a handful of journalists and protesters alleging that federal officers targeted them with crowd-control devices at a few protests in September and early October has transformed into an instrument for judicial micromanagement of federal law-enforcement operations.  The injunction broadly obstructs the enforcement of the Nation's laws, chills the exercise of executive power, and subverts the constitutional structure.

This Court has already recognized—and been forced to correct—the district court's improper aggrandizement of the judicial role at the expense of the Executive.  The Court previously issued a writ of mandamus to quash an order that "infringe[d] on the separation of powers" by "set[ting] the court up as a supervisor" of the agency's law-enforcement activities.  Order, *In re Noem*, No. 25-2936 (7th Cir. Oct. 31, 2025).  And the Court granted the government's request to stay this preliminary injunction because, among other fundamental defects, it too "impermissibly infring[ed] on principles of separation of powers."  Stay Order 2 (Nov. 19, 2025).

This Court's decision to stay the preliminary injunction was correct, and its reasoning should be dispositive of this appeal. The government is "likely to succeed on the merits" because the injunction has no basis in law. Stay Order 2. Plaintiffs lack standing to seek prospective relief based on past incidents of at most isolated misconduct that they only speculate may recur, and nothing in the court's flawed class certification order cures that jurisdictional defect. The injunction is also "overbroad" and "too prescriptive," *id.*, and plaintiffs' flawed merits claims cannot support the relief ordered, which is untethered from the constitutional and statutory provisions that plaintiffs invoked. Finally, the injunction "irreparabl[y] harm[s]" the government, *id.*, and the equities cut decisively in the government's favor. Each flaw is an independent ground for vacating the preliminary injunction; taken together, they illustrate that the district court plainly abused its discretion in issuing the injunction.

This Court should vacate this untenable injunction, protect the safety of the public and law-enforcement officers, and restore the balance of power between the Executive and Judicial Branches.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1367. App.031.[1] The district court's Article III jurisdiction is

---

[1] "SA.__" citations refer to the attached short appendix. "App.__" citations refer to the government's separately filed appendix. Numbered docket entries in the district court case, No. 1:25-cv-12173, not included in either appendix are cited using the convention "DE#, at #."

contested. *See infra* Part I.B. The government seeks review of the court's preliminary-injunction order, which was entered on November 6, 2025. SA.001. The government filed a timely notice of appeal of the order on November 9, 2025. App.172; *see* Fed. R. App. P 4(a)(1)(B). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in entering a sweeping preliminary injunction on behalf of an expansively defined class that superintends federal law-enforcement operations throughout the Chicago area.

## STATEMENT

### A. Legal Background

Congress established the Department of Homeland Security (DHS) to "keep[] America safe." DHS, *About DHS*, (last visited Oct. 17, 2025), https://perma.cc/5Z2B-DER8; *see generally* 6 U.S.C. § 111. As relevant here, DHS's mission in Chicago encompasses two main objectives: the enforcement of federal immigration laws and the protection of federal personnel and property.

DHS is empowered to "control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). U.S. Customs and Border Protection (CBP) is an agency within DHS charged with "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(8). U.S. Immigration and Customs Enforcement (ICE), another agency within DHS, is likewise charged with

enforcing and administering federal immigration laws, preventing terrorism, and combating transnational criminal threats. *See, e.g.*, 6 U.S.C. §§ 202, 252(a)(3). CBP and ICE officers have criminal and civil arrest authority. *See*, *e.g.*, 8 U.S.C. § 1357(a)(2), (4), (5); 19 U.S.C. § 1589a.

Congress has also charged the Secretary of Homeland Security with "protect[ing] the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property." 40 U.S.C. § 1315(a). To fulfill this responsibility, the Secretary has designated DHS employees for "duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property." *Id.* § 1315(b)(1).

## B.     Factual Background & Prior Proceedings

**1.**     Over the course of 2025, DHS has seen a sharp increase in violent protests and attempts to impede its enforcement of the Nation's immigration laws. In Los Angeles, violent protesters attacked federal officers with concrete chunks and commercial-grade fireworks. In Portland, agitators assaulted federal officers with rocks, bricks, and incendiary devices. And near Dallas, a man opened fire on an ICE field office, killing two detainees and injuring another.

Similar events have unfolded in the Chicago area, particularly following the announcement of Operation Midway Blitz—a focused enforcement of the Nation's

immigration laws in Illinois.  SA.041.[2]  Officers carrying out immigration-enforcement operations have routinely encountered groups of protesters that have actively impeded and threatened DHS personnel.  *See* SA.113, SA.124, SA.129, SA.153 (detailing instances in which crowds impeded officers' activities).  In addition, cartels and criminal organizations—including the Latin Kings—have reportedly placed "bounties" for the murder of senior DHS officers operating in the area.  SA.045.

To provide just a few examples of the disruptive and often violent nature of the protests: an individual threw caltrops—a type of spike designed to damage tires— "directly in the path of agents' vehicles," SA.113; another individual "threw a piece of rock or concrete" through the open window of a DHS vehicle, barely missing several agents, SA.113; on numerous occasions, individuals threw various other items at officers, including rocks, eggs, bottles, and coffee, SA.113, SA.124-25, SA.131, SA.133, SA.151; officers often encountered "aggressive drivers," SA.017, leading to multiple crashes, including with officer-operated vehicles, SA.128, SA.138, SA.160; DHS vehicles were also targeted, including instances in which individuals "hit[]," "rock[ed]," and "graffiti[ed]" vehicles as well as "tr[ied] to deflate" tires, SA.148, SA.151, SA.153; in a common occurrence, crowds surrounded federal agents to obstruct their movement, *see* SA.111, SA.115, SA.124-25, SA.129-30, SA.153; and nearly everywhere, officers have been subjected to verbal abuse that was, at a

---

[2] Unless otherwise indicated, the cited factual material comes from the district court's findings of fact, which are discussed further below.  *See infra* Part.I.A.

minimum, aggressive and threatening in conjunction with the other actions by individuals crowding officers, *see, e.g.*, SA.111 (crowd "yelled at agents to leave, screaming 'fuck you'"); SA.125 ("crowd yelled expletives, like 'fuck ICE'"). More recently, an individual fired gunshots at CBP agents conducing enforcement operations. *DHS says agents were shot at amid chaotic day of immigration enforcement operations in Chicago area*, CNN (Nov. 12, 2025) https://perma.cc/9EKZ-Z48P. A senior CBP officer testified that: "In my twenty-three years of service with the Border Patrol, I have never witnessed the level of combativeness and sustained level of violence directed at law enforcement personnel in the performance of their lawful government duties that I have seen in Chicago." DE173-2, at 26-27.

In many of these situations, federal officers deployed nonlethal crowd-control devices, including chemical munitions, to disperse crowds.

**2.** This case originally centered on protests at a DHS facility in Broadview, Illinois. The Broadview facility is used for the intake and processing of individuals arrested by CBP and ICE, and it is the only such facility in the area. SA.050. Protesters began gathering in significant numbers at Broadview in early September. The early protests were generally peaceful and occurred "without incident." SA.055.

But the scale of the protests and their disruption to DHS's activities escalated significantly over the course of September and into early October. On September 6, deploying a tactic that would later be often repeated, "protesters blocked federal vehicles and impeded their access to the Broadview facility, interfering with ICE

operations." SA.055. Although the details of the incidents differ from day to day,

similar incidents occurred throughout September and into early October:

- On September 12, a DHS vehicle had to "mak[e] a hard left turn to avoid the protesters in the street," SA.056;
- On September 13, a "protester jumped on the hood of a federal vehicle, causing the vehicle to stop and allowing another protester standing behind the vehicle to slash the car's tires," SA.059;
- On September 19, "protesters blocked a car from exiting the facility, locked arms, yelled obscenities, and gave agents the middle finger," SA.060;
- On September 20, "protesters block[ed] vehicles," SA.073;
- On September 26, protesters blocked the street in manner that would not allow "cars through," SA.078;
- On September 27, a protester "refused to move" despite "multiple commands to clear the road in front of the gate to the facility to allow a government vehicle with emergency lights to pass into the facility," SA.092;
- On October 3, a protester "disobeyed agents' verbal commands to move back to let vehicles pass," SA.107.

In several instances, officers attempted to disperse crowds to allow vehicles to

enter and exit the facility, including by deploying nonlethal crowd-control devices

such as chemical munitions, but protesters refused to disperse. For instance, during

the morning of September 19, protesters "obstructed the movement of" a vehicle

attempting to exit the facility. SA.060. Although officers "conveyed multiple

commands and warnings to step away from the vehicle and disperse, protesters did

not comply." SA.060. Officers eventually "launched two to three pepper balls"—a

nonlethal chemical munition designed to disperse crowds—"from about fifteen feet

away to try and get individuals away from the vehicle." SA.062. But "protesters

continued to sit on the bumper, hit the vehicle, yell profanities at agents, and ignore instructions to get away from the vehicle." SA.062. Footage from the incident showed that agents were forced to "attempt[] to physically remove a man sitting on the vehicle's hood." SA.062. Similar incidents occurred throughout that day, *see* SA.063 ("[A]nother vehicle tried to leave the facility and a crowd gathered and refused to disperse despite loud orders to do so."), and on other days, *see* SA.058 (on September 12, "agents told the crowd to clear a path for officer safety, but … several individuals did not comply"); SA.092 (similar on September 27); SA.107 (similar on October 3).

In addition to disrupting DHS's activities at the Broadview facility, many of the protests also became violent. On September 13, a protester attempted to "slash the … tires" of a vehicle entering the Broadview facility, SA.059, and on September 19, protesters repeatedly "hit [a] vehicle" exiting the facility, SA.062. Matters particularly escalated at protests during the night of September 19. One protester repeatedly "kick[ed]" an officer "in the lower body" and "tried to grab tools from agents' vests and belts." SA.065. Protesters "push[ed] agents and thr[ew] objects at them when they tried to arrest an individual," including "rocks, potatoes, water bottles, and other things." SA.065. And later that night, protesters threw "fireworks and a water bottle … at agents." SA.071. On September 20, a protester attempted to "flatten [a] vehicle's tire with what appeared to be a knife," and another "sprayed … officers with an unknown chemical irritant." SA.073. On September 27, a protester "ran at [an]

agent from about ten feet away at full speed, slamming into the agent's upper body and forcing him into the perimeter fence." SA.098. After the protester "resisted arrest," agents "found a loaded Glock pistol in his waistband." SA.098. That same night, agents arrested another individual who "pushed an agent" and was found to have "a gun and a pocketknife." SA.098. And on October 3, a protester pushed an officer, causing him to fall and sustain injuries requiring hospitalization. SA.108.

A DHS officer testified that more than thirty officers and employees have suffered injuries as a result of the protests at the Broadview facility. SA.054. During several (but not all) such incidents, officers responded by issuing dispersal orders and by deploying nonlethal crowd-control devices, such as chemical irritants and pepper balls.

October 3 was the last occasion that federal officers deployed chemical munitions or used nonlethal force at the Broadview facility. SA.101. In early October, state and local law-enforcement agencies announced a Unified Command to coordinate public safety around the Broadview facility, establishing a constant security presence. SA.052. Since then, while crowds have continued to gather and protest, state and local officials have handled crowd control and made arrests when necessary.

**3.** Plaintiffs consist of six individual protesters, three journalists, and four religious practitioners, as well as four press organizations. Most of the plaintiffs— including all the journalists and religious practitioners, as well as three of the individual protesters—alleged that during protests at the Broadview facility, DHS

9

officers targeted them with nonlethal crowd-control devices in a manner that violated the First and Fourth Amendments as well as the Religious Freedom Restoration Act (RFRA). App.032-39. The remaining three individual plaintiffs alleged that they were similarly targeted at a handful of other incidents that they happened to witness in the Chicago area. App.036-37 (allegations of individual plaintiffs Beale, Villa, and Crespo). Plaintiffs sought to represent a putative class of protesters and subclasses of journalists and religious practitioners.

On October 9, the district court granted plaintiffs' motion for a temporary restraining order (TRO), imposing sweeping restrictions on DHS's use of force and crowd-control devices throughout the Chicago area. *See* App.001. The court subsequently placed additional and evolving burdens on the government in a largely self-directed effort to monitor compliance with the order. Among other things, the court *sua sponte* called a hearing after "seeing images on the news, [and] in the paper," at which the court questioned the government about compliance with the TRO. DE52, at 3:18-23. The court then amended the TRO to impose additional restrictions on officers, including requirements related to the use of body-worn cameras that plaintiffs had not requested. *See* App.019.

The district court has also required ever-increasing amounts of reporting and information from the government. For example, the court ordered the government to file for the court's review extensive body-camera footage and a broad category of field-arrest and use-of-force reports on an ongoing basis. *See* App.092. The court

further directed DHS to make certain officials available to answer questions from the court, prompted in part by the court's review of non-record materials, such as extra-record videos taken and "sen[t] in" by members of the public.  DE144, at 9:8-9.

In similar fashion, the court *sua sponte* ordered a senior DHS officer to "appear in court, in person" every day to "report" to the court about DHS's ongoing immigration-enforcement activities in the city.  App.092.  The government petitioned for a writ mandamus of that order, which this Court promptly issued, explaining that the district court had impermissibly placed itself "in the position of an inquisitor rather than that of a neutral adjudicator," "set[] the court up as a supervisor of [a senior officer's] activities," and "infringe[d] on the separation of powers."  Order, *In re Noem*, No. 25-2936 (7th Cir. Oct. 31, 2025).

**4.**    On November 6, the district court issued an oral ruling from the bench granting plaintiffs' request for a preliminary injunction and announcing "factual findings" and "credibility" determinations.  App.130, App.140.  The court concluded that the use of crowd-control devices during several incidents were unjustified and violated the First and Fourteenth Amendments as well as RFRA.  App.117-46.  And the court held that plaintiffs likely had standing to seek, and that equitable factors likely favored, an injunction restricting the use of force and crowd-control devices by federal law enforcement throughout the Northern District of Illinois.  App.131-34, App.146-53.  The court issued a written order and indicated that "a written opinion

11

[would] follow … within 14 days" to "further explain[]" and "provid[e] supporting evidentiary and case citations." SA.001.

The same day, the court certified a class consisting of "[a]ll persons who are or will in the future non-violently demonstrate, protest, observe, document, or record at Department of Homeland Security immigration enforcement and removal operations in the" district. App.096. The court also certified two subclasses consisting of individuals at such operations engaging in either "religious expression" or "news gathering or reporting." App.096.

The injunction spans eight pages of enumerated restrictions on officers operating anywhere in the "judicial district." SA.001. Among other things, the injunction restricts "[d]ispersing" or "arresting" any "Journalist[]"—even when the government lawfully disperses the public—allowing, at most, for the government to "order a Journalist to change location" "as long as" that location provides sufficient "opportunity to report and observe" (Section 1.a.); provides several non-exclusive "indicia" for identifying possible "Journalists" (Section 2); restricts officers' ability to use more than ten named kinds of crowd-control devices unless "objectively necessary" to stop "an immediate threat of physical harm" (Sections 1.c. to 1.h.); bars deployment of "chemical irritants" if there is a "reasonably foreseeable risk of injuring any class member who is not causing an immediate threat of physical harm"—*i.e.*, any non-violent protester or bystander (Section 1.e); restricts numerous specified kinds of "hands-on physical force" and "restraint technique[s]," such as "chokeholds"

12

(Sections 1.j. and 1.k.); requires "at least two separate warnings at a sound level where the targeted individual(s) can reasonably hear it" before crowd-control devices may be deployed, with an exception for "exigent circumstances" "to preserve life or prevent catastrophic outcomes" (Section 1.l.); bars "[s]eizing or arresting any Class member" without "specific probable cause" (Section 1.m.); requires uniform officers to have "visible identification … conspicuously displayed in two separate places" (Section 3); and requires officers to activate "body-worn cameras" whenever "engaged in enforcement activity," unless expressly exempted by DHS policy (Section 4).  SA.001-08.

The government filed an appeal of the district court's preliminary injunction and sought an administrative stay and a stay pending appeal.  App.172.

**5.**     On November 19, a unanimous panel of this Court granted the government's request to stay the injunction pending appeal.  Stay Order (Nov. 19, 2025).  The Court concluded that the government was "likely to succeed on the merits" of its challenge to the injunction for several reasons.  *Id.* at 2.  The Court explained that the injunction was "overbroad" because its "practical effect is to enjoin all law enforcement officers within the Executive Branch" operating anywhere in the Chicago area.  *Id.*  The Court further explained that the injunction "impermissibly infring[ed] on principles of separation of powers" by requiring the government to "submit for judicial review all current and future internal guidance, policies, and directives regarding efforts to implement the order."  *Id.*  And the Court explained

13

that the injunction was "too prescriptive" because, among other things, "it enumerates and proscribes the use of scores of riot control weapons and other devices in a way that resembles a federal regulation." *Id.*

The Court also expressed "reservations about Article III standing," explaining that there were "[o]pen questions" as to "whether plaintiffs have shown that the past harm they allegedly faced is likely to imminently happen to them in the future." Stay Order 2. Such harm, the Court explained, "is insufficient, on its own, to show standing for injunctive relief." *Id.* The Court also noted that changed circumstances in Chicago may "affect both the justiciability of this case and the propriety of injunctive relief." *Id.*

As to the remaining stay factors, the Court explained that the injunction irreparably harmed the government because "[a]ny time that the Government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Stay Order 2 (quoting *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *3 (U.S. Sept. 8, 2025) (Kavanaugh, J., concurring)). The Court further concluded that the equities weighed in favor of "awarding defendants interim relief, especially given the overbreadth of the preliminary injunction." *Id.*

**6.**     On November 20, the district court issued its preliminary-injunction opinion, memorializing the findings it had made in its oral ruling. The court concluded that the individual and organizational plaintiffs established standing to seek

14

prospective relief.  SA.187-95.  It further concluded that plaintiffs were likely to

succeed on the merits of their claims that officers' use of crowd-control devices

infringed on the First and Fourth Amendments as well as RFRA.  SA.195-226.  And

the court concluded that the remaining equitable factors justified the preliminary

injunction, including its application to immigration-enforcement operations

throughout the district.  SA.226-38.  The court also expounded upon its credibility

determinations and findings of fact.  SA.014-187.

## SUMMARY OF ARGUMENT

The district court's preliminary injunction must be vacated.  This Court has

already stayed that injunction, recognizing that the government is "likely to prevail on

the merits" of this appeal.  Stay Order 2 (Nov. 19, 2025).  As the Court recognized in

granting the stay, the sweeping injunction—issued at the behest of a handful of

journalists and individual protesters, nominally to address discrete alleged violations of

the First and Fourth Amendments as well as RFRA, but then expanded to encompass

a vast and sprawling class spanning Chicago—functions like a detailed law-

enforcement operations manual.  It empowers the plaintiffs and the district court to

micromanage how federal agents respond to disruptive and often violent protests

throughout the Chicago area.  But these plaintiffs have no standing to seek that sort

of structural injunction, which is untenably overbroad, dangerously unworkable, and

utterly at odds with Article III and the traditional powers of a court in equity.  Nor

can the detailed strictures of the injunction be reasonably drawn from the

15

constitutional and statutory violations alleged.  For all these reasons, this Court should vacate it.

The district court's preliminary-injunction opinion, issued after this Court's stay order, does nothing to change that conclusion.  The district court memorialized its factual findings and credibility determinations, but the legal defects in the court's order remain unchanged.  And in all events, the court's factual findings are severely flawed and only underscore the court's errors.  The court's conclusion that the government's evidence was not credible as a categorical matter cannot be squared with the court's own findings, which repeatedly substantiate the government's account of events, including that crowds confronting officers at the Broadview facility and elsewhere were often disruptive and violent.

Even accepting the district court's flawed findings, the court lacked jurisdiction to enter the preliminary injunction.  Plaintiffs lack standing to seek prospective injunctive relief based on harms that they allegedly suffered during past protests and that they can only speculate may recur in the future.  The court's alternative theory of standing—that the organizations have standing because they diverted time and resources as a result of DHS's alleged conduct—cannot be reconciled with *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).  And even if plaintiffs established standing to seek some form of prospective relief, they lack standing to seek the sweeping regulation of law-enforcement operations that the district court entered here, both because Article III bars programmatic injunctions of

16

this sort and because the injunction applies to immigration-enforcement activities that the court lacked jurisdiction to restrain under 8 U.S.C. § 1252(f)(1).

The preliminary injunction's jurisdictional defects are underscored by its legal overbreadth and practical unworkability. The injunction covers immigration-enforcement operations throughout the Chicago area and—thanks in part to a class-certification decision that flouts Rule 23—extends to everyone who qualifies as a journalist or protester under the court's expansive understanding of those terms. It also imposes a host of highly reticulated yet vague restrictions on federal officers' ability to address disruptive and violent protests. And it puts the court in the untenable position of superintending the day-to-day operations of federal law-enforcement officers. The injunction is thus "overbroad," "too prescriptive," and "infring[es] on principles of separation of powers," Stay Order 2—fundamental defects that are not cured by the district court's flawed class certification order.

The injunction is also groundless on the merits. The district court fundamentally erred in concluding in a categorical fashion that plaintiffs were likely to prevail on the merits of their claims. Such a categorical conclusion is not only at odds with the court's own factual findings, but also anathema to the context-specific inquiries required by the First and Fourth Amendments as well as RFRA. And even if the court's findings are credited and support granting some form of relief, plaintiffs' claims in no way justify this programmatic injunction imposing the court's preferred crowd-control, use-of-force, arrest, uniform, and body-camera policies.

The remaining equitable factors likewise favor the government. The injunction significantly impedes officers' ability to enforce the Nation's immigration laws and control disruptive and often violent protests, while also unacceptably increasing the risk of serious injury both to officers and to the public. On the other side of the ledger, plaintiffs' alleged harms are insufficient even to support their standing to obtain injunctive relief, much less outweigh the harms engendered by the injunction's interference with federal officers attempting to protect themselves and the public. The district court thus abused its discretion by entering an injunction that has no basis in law and that far exceeds the constitutional and equitable limits on the court's authority.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for an "abuse of discretion." *Richwine v. Matuszak*, 148 F.4th 942, 952 (7th Cir. 2025). The district court's "legal conclusions" are reviewed "de novo," and "its findings of fact for clear error." *Id.*

## ARGUMENT

### I. The Government Is Likely To Prevail On The Merits.

In granting the government's stay request, this Court already concluded that the government is "likely to succeed on the merits" of its challenge to the district court's preliminary injunction. Stay Order 2 (Nov. 19, 2025). That conclusion was correct. The injunction suffers several fundamental defects: the court lacked jurisdiction to

18

issue the prospective relief entered here; the injunction is plainly overbroad, unworkable, and offends the separation of powers; and plaintiffs' merits claims are flawed and cannot support the court's prescriptive injunction. Those fundamental legal defects are fatal to plaintiffs' claims and the court's preliminary injunction.

## A.    The District Court's Written Opinion Does Not Rehabilitate Its Flawed Injunction.

After this Court stayed the injunction, and a full two weeks after the injunction was entered, the district court issued its preliminary-injunction opinion, concluding that plaintiffs had standing, were likely to prevail on the merits, and were entitled to the sweeping injunction. Nothing in the court's opinion rehabilitates its flawed injunction. Most fundamentally, while the opinion memorializes the court's factual findings and credibility determinations, the fundamental *legal* flaws of the court's injunction remain the same. As discussed at length below, *see infra* Part I.B-D, even if the court's findings were accepted, the injunction has no basis in law and infringes on the separation-of-powers, and it should be set aside on that ground, as this Court's stay decision underscores.

Even a cursory review of the court's findings, however, demonstrates that they are severely flawed and only underline the broader errors in the court's analysis. After purporting to "review[] all the evidence submitted," the court made a set of sweeping conclusions regarding the parties' evidentiary presentations. SA.014. The court categorically found the government's "evidence simply not credible." SA.014. The

court likewise stated, without reservation, that the government "did not rebut anything that Plaintiffs set forth in their declarations or testimony." SA.014. But those categorical conclusions cannot be squared with the record or the district court's own findings, which repeatedly substantiate the government's account of the incidents relevant to this litigation, including that protests were often disruptive and violent.

To take one example, a government declarant—Russell Hott—explained that during September and October, protesters at the Broadview facility repeatedly "positioned themselves in the ingress and egress of both of [the facility's] entryways, blocking government vehicles from entering or exiting the facility." DE173-1, at 15. The court questioned Hott's credibility, SA.018, but the court's own findings demonstrate that at nearly every protest at the Broadview facility, that is precisely what happened. *See* SA.055, SA.056, SA.059, SA.060, SA.073, SA.078, SA.092, SA.107. Likewise, another government declarant— Daniel C. Parra—explained that "CBP personnel … encountered large groups of individuals gathering to actively impede CBP's immigration enforcement efforts," and that individuals "threaten[ed] CBP personnel, damage[d] government property, and assault[ed] officers performing their lawful duties." DE173-2, at 11. The court concluded that it could not credit Parra's account of events, SA.019, but again, the court's own findings show that protesters *did* actively impede immigration-enforcement operations, SA.111, SA.115, SA.124-25, SA.129-30, SA.153; threaten CBP personnel, SA.111, SA.114, SA.125; damage government property, SA.113, SA.148, SA.151, SA.153; and assault officers,

SA.113, SA.124-25, SA.131, SA.133, SA.151. The court also repeatedly discounted or disregarded government reports—such as a report that dangerous cartels and gangs placed multi-thousand dollar "bounties" on DHS personnel—without ever explaining why those reports were untrue or not credible. *See* SA.045.

The district court's categorical dismissal of the government's evidence is particularly difficult to square with the fact that the protests at issue here often involved dozens of officers confronting hundreds of protesters, at times for several hours. It is hardly surprising that under such circumstances, different individuals witnessed or recalled different aspects of the encounters. Where those accounts do not align, the court drew the uniform inference that the government's version was not credible. *See, e.g.*, SA.139 (discounting the government's account of an incident where an officer reported that "individuals shouted obscenities 'in a threatening manner' and 'aggressively kick[ed] the side of the vehicle,'" but a protester "did not see any provocation" (alteration in original)). But the much more likely explanation is that officers and protesters witnessed different things. Indeed, the court's own findings show that protesters' accounts of events were often inaccurate or incomplete—in one instance, a declarant stated that he "did not hear any warnings or dispersal orders," but footage from a body-worn camera showed an agent "yelling 'You're gonna get gassed, you've been warned, you're gonna get gassed.'" SA.127.

The court's broad conclusions thus were not only improper in this context, but also contravened by the record itself. That error underscores the sweeping approach

the court has taken with respect to plaintiffs' claims generally.  Indeed, the vast majority of the district court's findings concern incidents at which no named plaintiff was present.  That includes incidents at: Albany Park on October 12, SA.124; East Chicago on October 14, SA.128; Little Village on October 22 and 23, SA.137, SA.140; Lakeview on October 24, SA.152; Old Irving Park on October 25, SA.156; Aurora Park on October 25 and 29, SA.158; Gurnee on October 30, SA.160; Evanston on October 31, SA.161; plus a half dozen other incidents, *see* SA.165.  Those findings have nothing to do with the "claims raised by *these* plaintiffs."  Stay Order 2 (emphasis added).  The fact that the court premised its credibility determinations on them only underscores the extent to which the injunction contravenes the "party-specific principles that permeate [courts'] understanding of equity," *Trump v. CASA, Inc.*, 606 U.S. 831, 845 (2025).

### B.     The District Court Lacked Jurisdiction To Enter The Injunction.

In all events, even accepting the court's flawed findings, the court lacked jurisdiction to enter the preliminary injunction.  Plaintiffs brought claims alleging that federal officials targeted or used excessive force against them during protests at the Broadview facility or during the few isolated incidents that plaintiffs happened to witness around Chicago.  But rather than raise individualized claims for relief, plaintiffs requested far-ranging restrictions on federal law-enforcement officers'

22

actions throughout Chicago.  For several independent reasons, the district court

lacked jurisdiction to enter such reticulated regulation of law-enforcement activities.

**1.    Plaintiffs lack standing to seek prospective relief.**

**a.**    Plaintiffs lack standing to seek prospective relief based on allegations

that they suffered harm during past protests.  This Court expressed "reservations

about Article III standing" on that basis in staying the injunction, and for good

reason.  Stay Order 2.  Standing for prospective relief "does not exist merely because

plaintiffs experienced past harm and fear its recurrence."  *Noem v. Vasquez Perdomo*,

No. 25A169, 2025 WL 2585637, at *2 (U.S. Sept. 8, 2025) (Kavanaugh, J., concurring)

(citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)).  Where, as here, plaintiffs seek

relief from allegedly "unconstitutional behavior," claims of past harm are "too remote

or attenuated to sustain [a court's] jurisdiction under Article III."  *Bell v. Keating*, 697

F.3d 445, 451 (7th Cir. 2012) (citing *Lyons*, 461 U.S. at 105-06).  Plaintiffs must show a

real and immediate threat of repeated injury without reliance on a "speculative chain

of possibilities."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

The Supreme Court's decision in *Lyons* illustrates these principles.  There,

police officers stopped the plaintiff for a traffic violation, seized him, and placed him

in a chokehold, allegedly pursuant to police policy.  461 U.S. at 97.  The Court held

that the plaintiff had not shown that "he was likely to suffer future injury from the use

of the chokeholds" because no "immediate threat" existed that the plaintiff would be

subjected to another chokehold "without any provocation or resistance on his part"—

even though the police department allegedly had a policy of "routinely apply[ing] chokeholds" in such situations. *Id.* at 105. Applying *Lyons*, this Court has repeatedly recognized that plaintiffs lack standing to seek prospective injunctive relief merely because they were subject to allegedly improper law-enforcement conduct in the past. *See, e.g.*, *Schirmer v. Nagode*, 621 F.3d 581, 585 (7th Cir. 2010); *Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004).

*Lyons* and its progeny foreclose plaintiffs' standing here. Most of the plaintiffs' claims arise from a handful of incidents during protests at the Broadview facility in late September and early October. *See* App.032-39. Those prior incidents, which occurred months ago, do not establish that plaintiffs are likely to face the "same events" in the future, *Campbell*, 373 F.3d at 836, even assuming plaintiffs intend to "return to Broadview," App.034. Indeed, since those incidents occurred, state and local officials have taken responsibility for "maintain[ing] security around the Broadview facility," and federal officers have not deployed any crowd-control devices at the facility. SA.101. The district court acknowledged that "incidents have calmed down at Broadview," but concluded that plaintiffs had "no guarantee" that the situation would remain that way. SA.188. Such rampant speculation is not the standard for Article III standing.

The alleged injuries of the other named plaintiffs are equally unlikely to recur. Plaintiffs Crespo and Villa allege that they were exposed to crowd-control devices during one-off protests they attended in early October, App.036-37, but the district

court made no findings that either suffered any injury, much less one that was likely to recur, *see* SA.117 (stating Villa merely "witnessed" an immigration-enforcement activity); SA.169 (same as to Crespo). And plaintiff Beale was allegedly exposed to tear gas only after he happened to observe an immigration-enforcement activity while on his way "to the gym." App.036. To the extent such allegations support standing at all, it is pure speculation that these plaintiffs will again happen upon immigration-enforcement operations in the Chicago area, that DHS officers will respond to their presence with allegedly unlawful force, and that plaintiffs will be harmed as a result.

The unlikelihood that plaintiffs' alleged harms will recur is underscored by the fact that DHS's existing policies prohibit retaliation and require force to be objectively reasonable. DHS expressly prohibits officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." DE35-3, at 2. DHS also authorizes officers to use force "only when no reasonably effective, safe, and feasible alternative appears to exist." DE173-3, at 2. Even then, officers may employ "only the level of force that is *objectively reasonable* in light of the facts and circumstances confronting [the officer] at the time force is applied." *Id.* Officers receive extensive training on these policies, *see* DE173-1, at 26-27, and to the extent an individual officer acted contrary to them, it violated the values DHS is committed to upholding. A person injured by an individual officer defying those policies may have a tort claim against the government for damages, as the

25

district court recognized. SA.228 (citing 28 U.S.C. § 2680(h)). But such past harms cannot support standing to seek agency-wide relief.

The district court asserted that plaintiffs' injuries were likely to recur because, according to the court, officers acted pursuant to an "officially sanctioned common practice" of violating protesters' rights. SA.187. But as explained, DHS's policies expressly require officers to adhere to the First and Fourth Amendments. And the court's own findings undermine any notion of a "common practice" of conduct—the incidents at issue here involved different officers, from different DHS components, using different crowd-control techniques in response to very different circumstances. And in all events, *Lyons* makes clear that it is not enough to establish standing for prospective relief to show that allegedly improper conduct occurs "routinely," 461 U.S. at 105, or even pursuant to a government "policy," *id.* at 106.

The district court attempted to distinguish *Lyons* on the ground that the plaintiffs here cannot avoid harm by "conducting [their] activities within the law." SA.188. But the plaintiff in *Lyons* alleged that he had been subject to excessive force "without any provocation or resistance on his part." 461 U.S. at 105. The question is not whether plaintiffs can avoid the alleged harm, but whether the harm's recurrence is likely, which is patently not the case here. Indeed, the district court so thoroughly disregarded *Lyons* that the injunction purports to bar "[u]sing chokeholds," SA.004, which is the exact relief at issue in *Lyons*.

Plaintiffs also cannot avoid Article III's requirements simply because their asserted injuries are framed in First Amendment terms. *Lyons* no less applies where a party's conduct involves First Amendment conduct. *See Schirmer*, 621 F.3d at 586 (applying *Lyons* to First Amendment challenge). The district court suggested that plaintiffs established standing because their First Amendment activity was "chill[ed]." SA.190. But "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). The court, moreover, principally relied on testimony and declarations of non-plaintiffs. *See* SA.190-91 (relying on testimony of non-parties Cortez, Ramirez, Muñoz, and Boddett). And while the court also referenced the testimony of plaintiffs Rev. Black and Reidy-Hamer, both have "returned to the Broadview facility several times," SA.191; *see also* SA.190 (same as to Rev. Black). The court noted that both claimed to be "afraid" to do so, SA.191, but "[a] fear that [past] harm will recur is insufficient, on its own, to show standing for injunctive relief." Stay Order 2 (citing *Lyons*, 461 U.S. at 107 n.8); *see also Clapper*, 568 U.S. at 417.

**b.**     The district court likewise erred in concluding that the organizational plaintiffs have standing to seek prospective relief. As explained above, none of the named journalist plaintiffs established standing for prospective relief, so the organizational plaintiffs cannot establish standing based on their individual members.

Nor have the press organizations established standing based on their own injuries. The court concluded that the press organizations suffered an Article III

injury because the government "interfered with the news organizations' core business activities," which are "supporting journalists," and "forced them to divert resources away from these core activities." SA.192-93. This theory is incompatible with the Supreme Court's recent decision in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), which squarely rejected the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions." *Id.* at 395 (citation omitted). The plaintiff organizations' allegations of generic setbacks to their respective missions, and the costs they have purportedly incurred as a result, are no different from the allegations rejected in *Alliance for Hippocratic Medicine*. In concluding otherwise, the district court relied on circuit precedent that predates and is contrary to *Alliance for Hippocratic Medicine*. *See* SA.193 (citing *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019)).[3]

## 2. Article III bars programmatic injunctions like this one.

Even if plaintiffs established standing to seek some form of prospective relief, they lack standing to seek the sweeping regulation of law-enforcement operations that the district court entered here. At most, plaintiffs' claims would give them standing to seek relief against retaliatory or excessive force directed at *them*—not "judicial

---

[3] The district court's class certification order, discussed below, *see infra* Part I.C.2, cannot excuse the named plaintiffs' lack of standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016) ("[N]amed plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.").

supervision of [law enforcement] activity" throughout Chicago.  *Reporters Comm. for Freedom of Press v. AT&T*, 593 F.2 d 1030, 1069 (D.C. Cir. 1978) (citing *Rizzo v. Goode*, 423 U.S. 362, 366 (1976)).  Accordingly, for many of the same reasons that the court's injunction contravenes fundamental principles of equity, *see infra* Part I.C, it also has no basis in Article III.

The Supreme Court has repeatedly held that Article III does not permit courts to turn a smattering of past incidents raising individual claims into "a broad call on the judicial power to assume continuing regulatory jurisdiction over the activities" of the government.  *Gilligan v. Morgan*, 413 U.S. 1, 5 (1973).  In *Rizzo,* the plaintiffs alleged widescale illegal and unconstitutional behavior by the police "against all Philadelphia residents in general."  423 U.S. at 367.  The district court imposed "a comprehensive program for dealing adequately with civilian complaints" about police misconduct.  *Id.* at 369.  The Supreme Court held that the district court's order ran afoul of Article III by using speculation about what a "small, unnamed minority of policemen might do to [the plaintiffs] in the future" to justify programmatic relief as to "the entire citizenry of Philadelphia."  *Id.* at 371-72.  Similarly, in *Gilligan*, the plaintiffs claimed that the Ohio National Guard had violated their rights during a period of civil unrest and sought a court order issuing "standards for the training, kind of weapons, and scope and kind of orders to control the … Guard."  413 U.S. at 6.  The Supreme Court held that plaintiffs' claims were properly dismissed, observing that this was not "an action seeking a restraining order against some specified and imminently

threatened unlawful action," but "a broad call on the judicial power to assume

continuing regulatory jurisdiction over the activities of the National Guard,"

"embrac[ing] critical areas of responsibility vested … in the Legislative and Executive

Branches of the Government," which would be "inappropriate for a district judge to

undertake." *Id.* at 6-7.

The district court's injunction flouts these principles.  It transforms a complaint

by journalists and protesters alleging that officers targeted them with crowd-control

devices at a handful of protests into an instrument for ongoing judicial

micromanagement of federal law-enforcement operations in the Chicago area.  Article

III's "actual-injury requirement would hardly serve [its] purpose" if, as here, a small

number of plaintiffs' allegations of past injury could permit "imposition of

systemwide relief." *Lewis v. Casey*, 518 U.S. 343, 357, 359 (1996).  Although the

government raised these issues below, DE173, at 19-21, the district court simply

ignored them.

### 3.    The court lacked authority to restrain law-enforcement operations related to the removal of aliens.

The district court's order also applies to at least some activities that it lacked

jurisdiction to restrain under 8 U.S.C. § 1252(f)(1).  That section provides that, outside

removal proceedings, "[r]egardless of the nature of the action or claim of the identity

of the party or parties bringing this action, no court (other than the Supreme Court)

shall have jurisdiction or authority to enjoin or restrain the operation of the

provisions" in 8 U.S.C. §§ 1221 to 1231.  8 U.S.C. § 1252(f)(1).  The cross-referenced statutes generally govern "the inspection, apprehension, examination and removal of aliens," *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-550 (2022).  To the extent the district court's order applies to law-enforcement activities that are necessary to carry out §§ 1221 to 1231—such as by dispersing crowds that are attempting to prevent the apprehension of an alien—the court clearly lacked jurisdiction to do so.

The district court wrongly asserted that § 1252(f)(1) has no application here because the injunction's "effect would be entirely collateral" to any operation of the relevant immigration laws.  SA.233.  But dispersing a crowd may be the only means of effectuating an apprehension under 8 U.S.C. § 1226.  For example, on October 12, after officers attempted to apprehend a fleeing alien, a crowd "blocked the CBP vehicle within minutes of the arrest, using bicycles, vehicles, and by linking arms, with the crowd obstructing agents' law enforcement efforts and freedom of movement." SA.124.  The court's injunction purports to regulate and restrict—on a class-wide basis—how officers are to conduct those quintessential immigration-enforcement activities, which is what § 1252(f)(1) precludes.

## C.  The Injunction Is Overbroad And Unworkable.

The jurisdictional defects in the district court's injunction are underscored by its legal overbreadth and practical unworkability.  The injunction goes well beyond remedying any cognizable injury and places the court in the untenable position of superintending day-to-day law-enforcement activities.

31

### 1.    The injunction is overbroad.

As this Court recognized in granting the government's stay request, the injunction is plainly "overbroad." Stay Order 2. "In no uncertain terms," the injunction "enjoins an expansive range of defendants, including the President of the United States, the entire Departments of Homeland Security and Justice, and anyone acting in concert with them" throughout the Chicago area. *Id.* In so doing, the injunction contravenes the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which makes clear that courts lack equitable authority to grant "relief that extend[s] beyond the parties," *id.* at 843.

The district court justified the injunction as necessary or "incidental[]" to afford the named plaintiffs full relief. SA.234. But it strains credulity that the injunction's regulation of broad swathes of immigration-enforcement activity across the Chicago area is designed merely to grant the seventeen named plaintiffs full relief. The injunction does not just "incidentally" grant relief to nonparties, *CASA*, 606 U.S. at 851; it *primarily* does so. Indeed, the injunction is likely to relate *only* to non-parties, as evidenced by plaintiffs' myriad claims of violations of the injunction and prior TRO—*none* of which relates to the named plaintiffs, *see* DE90; DE94; DE118; DE140; DE174; DE188; DE201; DE272.

The district court asserted that no narrower relief would suffice because the government "likely cannot determine who among protesters, journalists, and religious practitioners is a Plaintiff" and because "crowd control tactics are designed to have an

impact beyond just one individual." SA.234. But it is up to the government, not the district court, to determine whether complying with a properly limited injunction is sufficiently unworkable in the first instance. *See Arizona v. Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring) ("[T]hat is initially the National Government's problem, not ours.").

More fundamentally, the fact that the district court could not come up with a narrower form of relief does not justify sweeping regulation of immigration-enforcement activity throughout the Chicago area. As the Supreme Cour explained in *CASA*, "[c]omplete relief is not a guarantee—it is the maximum a court can provide" and can be curtailed by considerations of "equity." 606 U.S. at 854. The separation of powers and the impropriety of subjecting law-enforcement officers' decisions to judicial second-guessing on pain of contempt weighs heavily against the kind of injunction that the district court issued here. Nor does the district court's invocation of the First Amendment, *see* SA.235, excuse it from compliance with constitutional and equitable limitations on injunctive relief.

### 2. The flawed class certification order cannot justify the injunction.

The district court likewise erred in asserting that its class certification order "moots" concerns about the injunction's scope. SA.235. The court certified a class of "[a]ll persons who are or will in the future non-violently demonstrate, protest, observe, document, or record at [DHS] immigration enforcement and removal

operations in the Northern District of Illinois," including "[a]ll persons who are or will in the future engage in religious expression" or "news gathering or reporting" in that context. App.097. The vague and sweeping class contravenes the requirements for class certification and cannot justify the injunction's scope.

Among other defects, the class applies to overbroad and ill-defined categories of people, such as anyone that merely "document[s]" or "observe[s]" any enforcement and removal "operation[]." App.097; *see Rahman v. Chertoff*, 530 F.3d 622, 625 (7th Cir. 2008) (a class defined by the word "detention" was too vague). Crucially, many, if not most, of those class members will "have suffered no injury at the hands of the defendant[s]," which means not only that the "class should not be certified," but also that the grant of class-wide relief is fundamentally unwarranted. *Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009). The district court questioned whether the class included "a great number of uninjured individuals," App.099, but *plaintiffs* bear the burden of showing that class certification is appropriate, and the handful of allegedly unlawful incidents that plaintiffs cite plainly involve only a small fraction of the class, which includes anyone who merely witnesses an immigration-enforcement action.

Even for those who may claim injury, the class includes different groups engaged in different activities purportedly harmed in different ways in different places at different times. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015). The subclasses are equally vague and subjective, as membership turns on whether

everyday activities like singing or recording a video are for the subjective purpose of "religious expression" or "news gathering." App.096.

Equally clearly, the class-certification order flouts Rule 23(a)'s commonality requirement. *See* Fed. R. Civ. P. 23(a)(2). Here, plaintiffs' claims inherently require "individualized, plaintiff-specific assessment[s]," *McFields v. Dart*, 982 F.3d 511, 517 (7th Cir. 2020), such as "what force was used, what a particular class member was doing, what other protesters may have been doing, what the officers objectively observed, and a host of other factors," *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1260 (9th Cir. 2024). None of those inquiries is capable of class-wide resolution, particularly as the class reaches "a broad range of injuries based on a medley of [law-enforcement] conduct and policies, some of which occurred during different protests, at different times, and in different places." *Id.* at 1263. The district court erroneously concluded that commonality was satisfied because the class asserts common injuries arising from defendants' allegedly unlawful conduct. *See* App.103. But that is nothing more than an assertion that class members "have all suffered a violation of the same provision of law," which does not suffice for commonality. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Nor can plaintiffs "certify a class by merely alleging that a policy" or practice "applies class-wide." *Black Lives Matter*, 113 F.4th at 1264. There is no dispute that DHS's policies expressly prohibit the use of excessive or retaliatory force, so plaintiffs' claims amount to the assertion that different officers at different protests at different times under

35

different circumstances acted contrary to those policies. Whatever the validity of those assertions, they cannot be resolved on a class-wide basis.

For similar reasons, plaintiffs' claims are atypical of the class. *See* Fed. R. Civ. P. 23(a)(3). A "claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members." *McFields*, 982 F.3d at 517 (quotation marks omitted). Here, plaintiffs' claims arise almost exclusively from the deployment of crowd-control measures at a limited number of pre-planned protests at the Broadview facility. But the class applies far more broadly to anyone who even witnesses immigration-enforcement activity in Chicago. Most, if not all, class claims will "present[] fundamentally unique circumstances" that "defeat any essential characteristics across the claims." *Id.* at 518 (quotation marks omitted). The district court ignored these "*overwhelming* factual distinctions," *id.*, in concluding that plaintiffs' claims sufficiently mirrored those of other class members, *see* App.106.

### 3. The injunction is unworkable.

The injunction independently constitutes an abuse of discretion because the district court failed to account for "what is workable," as foundational principles of equity demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (quotation marks omitted). As this Court explained, the injunction's highly reticulated yet hopelessly vague requirements are "too prescriptive" and "resembles a federal regulation," not a proper exercise of the court's equitable authority. Stay Order 2.

36

For example, Section 1.a. of the injunction bars federal law enforcement from "dispersing" journalists—even during violent protests—and permits journalists to ignore "a dispersal order lawfully issued to non-Journalists." SA.001-02. The problems created by that categorical rule are clear. As DHS officials explained, in a potentially chaotic and rapidly evolving protest, it will be difficult for officers to distinguish journalists within a crowd. *See* SA.183 (Hott explaining that "officers may have difficulty differentiating between members of the press, religious observers, and other protesters"). The injunction's definition of "Journalist" (Section 2) includes several non-dispositive "illustrative" "indicia," such as whether the person has a "professional press pass," is carrying sufficiently "professional gear," or even is just "standing off to the side of a protest." SA.004-05. Figuring out what counts as sufficiently "professional gear," attempting to identify press passes from afar or spotting fakes, and assessing whether a person is sufficiently "off to the side" are not clear inquiries and are challenging to accomplish in the midst of an escalating situation. Yet officers face the threat of contempt if the district court disagrees with their judgment.

The injunction's vague definition of a "Journalist" entitled to this privileged accommodation from dispersal is also ripe for abuse. Because the injunction states that "a person need not exhibit every indicium to be considered a Journalist," SA.005, journalists could remain within the protest and be used as human shields. Indeed, the record shows that at the Broadview protest, self-identified journalists often "entered

the crowd of protesters to get a better perspective of the events." SA.083.  It also means that, even when officers believe that a person "standing off to the side" may pose a safety risk, officers will have to think twice before ordering that person to disperse due to the risk of contempt if the person will qualify as a "Journalist" under the district court's amorphous balancing test.  Moreover, even in situations that allow officers to distinguish journalists, the injunction may require officers to spend time not only finding another location for the journalists to "report and observe," but also monitoring that area to ensure no violent agitators attempt to hide there.  And it is not even clear what officers are supposed to do if journalists refuse to move or allow themselves to be used as a human shield.

The injunction's provisions get no better from there, specifying preconditions for the use of more than ten different kinds of crowd-control devices and a litany of examples of "hands-on physical force" or "restraint technique[s]."  SA.005.  For example, the injunction prohibits "[d]eploying … chemical irritants into a group of people … in a manner that poses a reasonably foreseeable risk of injuring any Class member"—i.e., any protester (a term the court never defined), observer, journalist, etc.—who is not causing an "immediate threat of physical harm to another person." SA.003.  That effectively stops officers from pushing back a crowd even in the presence of violent agitators, so long as a non-violent protester is within the crowd. The myriad other restrictions on use of nonlethal force (Sections 1.c. to 1.k.) likewise depend on whether "force is objectively necessary to stop the person from causing an

immediate threat of physical harm to another person," whether force is "proportional," or similar formulations, leaving officers to guess under threat of contempt what the district court will consider to be "objectively necessary" or "proportional."  SA.002-05.

The same problems exist throughout the injunction's other provisions.  The "two warning" rule in Section 1.l. bars use of crowd control devices against any protester "without first giving at least two separate warnings at a sound level where the targeted individual(s) can reasonably hear it" and "reasonable time" and "opportunity to comply," "unless justified by exigent circumstances."  SA.005.  Officers assessing an escalating or chaotic situation will have to make fast-paced decisions about whether they have time to issue two warnings; whether "the targeted individual(s) can reasonably hear" them, even where crowd-control devices are meant to disperse widely; whether time given for compliance is reasonable; and whether exigent circumstances exist—all at risk of contempt if the district court in hindsight disagrees with the officers' assessments.  Indeed, the record shows that even where officers made "dispersal announcement[s] from [a vehicle's] loudspeaker," SA.097, or "yell[ed]" warnings, SA.127, protesters claimed not to hear them.  Similarly, the injunction prohibits "seizing or arresting any" protester "unless there is specific probable cause" involving "a crime for which a custodial arrest is warranted," SA.005, leading to second-guessing of officers' in-the-moment decisions and potential

contempt allegations every time federal officers have reasonable suspicion—but not probable cause—to temporarily stop an individual.

The obvious problems with the court's categorical rules are not ameliorated by the injunction's inclusion of open-ended exceptions for "objectively necessary" force or "exigent circumstances." SA.001-03. Those vaguely worded exceptions likely run afoul of Rule 65's requirements that conduct prohibited by an injunction must be "specific[]." Fed. R. Civ. P. 65(d)(1)(B)-(C), and they leave officers guessing when they might be held in contempt. For instance, the court's findings show protesters repeatedly surrounded officers conducting immigration-enforcement operations, obstructing agents and their vehicles' egress. *See, e.g.*, SA.124, SA.126. Despite unrebutted testimony that "[b]ased on past experiences," agents were concerned that "the longer they remained on the scene, the more dangerous the environment would become," the court suggested that even in those circumstances, the use of crowd-control devices to allow agents to exit the scene was improper. *See* SA.126 (quoting DE173-2, at 17-18). Officers should not be forced to second guess whether they will be subject to contempt for using crowd-control devices to escape threatening and hostile crowds. Nor are the injunction's problems solved by carveouts for incidents in which a protester is "incidentally exposed to riot control devices after such a device was deployed in a manner that complies with this injunction," as officers will still have to guess whether their conduct "complies" in the first place. SA.004.

It is also no answer that the injunction merely requires officers to follow DHS's own policies, as the district court suggested. SA.236. The injunction dictates officers' conduct and imposes restrictions—from uniform requirements to use-of-force restraints—far beyond what DHS policies provide. And even as to the provisions that resemble DHS policies, the injunction places the district court in the position of superintending officers' compliance with those policies in unpredictable circumstances on pain of contempt. Indeed, for that reason, even injunctions simply telling a party to "obey the law" are improper. *See EEOC v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013) (explaining that such "obey-the-law injunction[s] depart[] from … traditional equitable principle[s]").

The district court dismissed the government's objections to the injunction's workability as "disingenuous" based on a handful of cherry-picked statements from individual officers about their attempts to comply with the similarly sprawling TRO. SA.238. But the experience of the TRO only underscores the workability problems here. The government endeavored to comply with the overbroad TRO ahead of the preliminary-injunction hearing. But during that time, plaintiffs filed more than a half-dozen alleged violations with the court (and raised many more with the government), diverting law-enforcement resources to investigate the alleged incidents and requiring protracted litigation over them, even though none involved the named plaintiffs or the Broadview facility.

Understood in context, moreover, the statements referenced by the court merely confirm that individual officers sought to comply with the court's orders—including the TRO—while also carrying out their duties to enforce the law. *See, e.g.,* DE255, at 216:9-11 (explaining that "we were already abiding by the TRO"). The court also ignored testimony from multiple government witnesses and declarants detailing the various ways in which the court's orders have endangered officers and the public alike, *see* SA.181-84 (noting, but apparently ignoring, the government's testimony about workability), including testimony detailing how officers refrained from deploying crowd-control devices—even where their safety was compromised—for fear of facing contempt of the court's TRO, *see* DE284-7, at 160:10-18.

### 4. The injunction offends the separation of powers.

Compounding these errors, the injunction places the district court in the untenable position of superintending officers' day-to-day decision-making, "impermissibly infringing on principles of separation of powers." Stay Order 2. It is the role of the Executive, not the federal courts, to oversee the execution of the laws. Federal courts "do not possess a roving commission" to "exercise general legal oversight of the … Executive Branch[]." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 423, 423-24 (2021). That principle applies with special force to law-enforcement activities responding to safety risks, which inevitably involve "split-second judgments" and a balancing of factors in "tense, uncertain, and rapidly evolving situations." *Ryburn v. Huff,* 565 U.S. 469, 477 (2012) (per curiam) (quotation marks omitted).

42

The district court nonetheless established itself as overseer of federal law-enforcement operations across Chicago through compliance monitoring and enforcement of detailed regulations for the use of force and crowd-control devices. Indeed, to date, the court has shown every intention of wielding a "roving commission" to superintend the Executive Branch. *TransUnion*, 594 U.S. at 423. In the lead-up to the preliminary injunction, the district court modified the TRO to impose restrictions that plaintiffs had not asked for, scheduled hearings and demanded the government to produce witnesses and reams of information *sua sponte*, and questioned government witnesses on its own based on review of extra-record news or video clips. And the court even *sua sponte* ordered a senior DHS officer to "appear in court, in person" to provide daily "report[s]" to the court, App.092, an order this Court promptly quashed because it "put[] the court in the position of an inquisitor rather than that of a neutral adjudicator," set itself up as the officer's "supervisor," and clearly "infringe[d] on the separation of powers." Order, *In re Noem*, No. 25-2936 (7th Cir. Oct. 31, 2025).

The second-guessing inherent in threatening officers with contempt whenever the district court disagrees with their decisions about exigent circumstances or objective need for law-enforcement action manifestly offends the separation of powers. Article III does not "transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Michigan Dep't of*

*State Police v. Sitz*, 496 U.S. 444, 453-54 (1990).  And "the scope of federal equity power" cannot "be extended to the fashioning of prophylactic procedures for a [government] agency designed to minimize this kind of [alleged] misconduct on the part of a handful of its employees." *Rizzo*, 423 U.S. at 378.  "[I]t is one thing to dissect and scrutinize an officer's actions with the '20/20 vision of hindsight,' 'in the peace of a judge's chambers.'  It is quite another to make 'split-second judgments' on the ground, 'in circumstances that are tense, uncertain, and rapidly evolving.'"  *Barnes v. Felix*, 605 U.S. 73, 89-90 (2025) (Kavanaugh, J., concurring) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  The district court failed to heed those principles—indeed, the opinion is replete with the court's second-guessing of split-second decisions made by law-enforcement officers, such as at what distances crowds may safely stand and how quickly orders must be heeded.  *See* SA.167 (officer "instruct[ed] a woman to stay back, despite the fact that she was already at a distance").

## D. Plaintiffs' Claims Lack Merit And Cannot Support The Injunction.

The district court also erred in concluding that plaintiffs were likely to prevail in showing that the government's crowd-control measures violated the First and Fourth Amendments as well as RFRA.  As a threshold matter, the court improperly resolved those claims in a categorical fashion, making it impossible to determine what specific conduct the court deemed actually unlawful.  Whether a particular use of force or crowd-control device infringed a plaintiff's First Amendment rights,

amounted to an unlawful seizure, or substantially burdened religious exercise is a context- and fact-specific inquiry, as the district court itself recognized, SA.231. The court, however, never explained which specific government actions violated which plaintiffs' rights at what time and in what manner. Instead, the court treated a host of diverse incidents—including many that did not involve plaintiffs at all—as a uniform whole and concluded as a categorical matter that plaintiffs were likely to prevail on the merits of their claims, despite the fact that this suit involves seventeen different individual plaintiffs, raising claims based on dozens of protests across different days, in different locations, and involving scores of different law-enforcement officers. The court's categorical approach was improper and cannot justify the issuance of a preliminary injunction.

Even if the district court's findings are credited and supported granting some form of relief, plaintiffs' claims in no way justify this programmatic injunction imposing the court's preferred crowd-control, use-of-force, arrest, uniform, and body-camera policies. That injunction impermissibly "micromanage[s]" law enforcement "at a granular level beyond what is required to remedy" any cognizable legal claim. *Roman v. Wolf*, 977 F.3d 935, 946 (9th Cir. 2020).

### 1. The First Amendment does not support the district court's detailed restrictions on agents' day-to-day operations.

Plaintiffs' claims that crowd-control measures infringed their First Amendment speech, religious, and news-gathering rights do not support the injunction's regulation

of federal agents' day-to-day operations. At the outset, the district court erred in concluding that the government's crowd-control measures were uniformly driven by an improper content-based or retaliatory motive. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("The government's purpose is the controlling consideration" for claims of content-based restriction); *Kingman v. Frederickson*, 40 F.4th 597, 601 (7th Cir. 2022) (retaliatory animus must be a "substantial or motivating factor" for government's conduct (quotation marks omitted)). There is no dispute that the First Amendment protects individuals' rights to peacefully protest, report, and exercise religion, and that individuals may exercise those rights without facing retaliation for doing so. It is equally well-established, however, that law enforcement may take reasonable steps to disperse crowds "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears." *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940).

The district court dismissed this latter principle as inapplicable here because, according to the court, *all* of the protests "remained peaceful and did not constitute a riot or imminent threat to public safety." SA.200. That sweeping conclusion, however, cannot be squared with the court's own factual findings. At the Broadview protests, officers confronted crowds that "obstructed" and "hit[]" vehicles attempting to exit the facility, while ignoring "multiple commands and warnings to step away from the vehicle and disperse," even after officers "launched two to three pepper balls … to try and get individuals away from the vehicle." SA.060-62. At other times,

46

crowds included members who "kick[ed]" "tripp[ed]," and "push[ed]" officers;

"thr[ew] objects at them," including "rocks, potatoes, water bottles," and "fireworks";

and assaulted officers while carrying loaded firearms.  SA.065, SA.071-72, SA.098.

And crowds on multiple instances surrounded officers to actively "obstruct[] agents'

law enforcement efforts and freedom of movement."  SA.124.  It is simply not

credible to suggest that such violent and disruptive protests do not present sufficiently

"imminent threat[s] to public safety" to justify officers issuing dispersal orders and,

when those are repeatedly ignored, deploying nonlethal crowd-control devices to

restore order.  Nor is it credible to suggest that efforts to actively impede and disrupt

ongoing law-enforcement operations pose no threat to public safety.

Lawful dispersal orders, moreover, do not give rise to First Amendment

liability simply because some crowd members remained peaceful.  When confronted

with crowds containing violent and disruptive elements interspersed throughout, law-

enforcement officers "cannot be expected to single out individuals; they may deal with

the crowd as a unit."  *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120

(D.C. Cir. 1977).  Otherwise, the presence of any non-violent protester would

preclude officers from taking measures to maintain order and ensure public safety.  It

thus is no answer that the district court concluded that none of the named plaintiffs

"engaged in unlawful or violent conduct" and that the "certified class expressly

excludes individuals who did."  SA.201.  The court's own findings demonstrate that

the crowds in which plaintiffs and other class members were interspersed often included disruptive and violent elements. *See supra* pp. 20-21.

The district court pointed to various factors from which it inferred that plaintiffs' First Amendment activity was restricted based on its content or due to retaliatory animus. But many of those inferences are flawed, and they certainly do not establish that different individual officers acted with a single motive that was uniformly improper. The court stressed that protesters were often expressing opposition to the government's conduct when subjected to crowd-control measures. SA.205. But the "First Amendment does not immunize behavior that obstructs or interferes with effective law enforcement or the protection of public safety" simply because individuals also happen to be speaking or engaging in other protected activity. *Nicodemus v. City of S. Bend, Ind.*, 137 F.4th 654, 664 n.8 (7th Cir. 2025) (alteration and quotation marks omitted). The court also inferred an improper motive based on instances where the government purportedly "restricted the speech or behavior of those who were not acting violently or obstructively." SA.205. But a protester may suffer an injury as an incidental result of crowd-control efforts without any retaliatory or content-based motive on the part of officers, especially as the point of many crowd-control devices is to disperse widely, such that persons intermingled with or close to a crowd "may be impacted." DE173-1, at 38.

The court's error is reinforced by its assertion that the government would "treat pro-ICE and CBP demonstrators more favorably." SA.205. To the extent that

is true, it would presumably be because pro-government protests would not be actively impeding the government's lawful immigration-enforcement operations or repeatedly trying to assault federal officers, as was often the case here. The court pointed to no evidence in the record suggesting that, if an individual *was* actively impeding law-enforcement operations and expressing pro-government viewpoints while doing so, they would not be subject to the same type of dispersal measures as someone engaging in the same behavior but professing the opposite sentiment. That just confirms that deployment of crowd-control measures here was due to protesters' conduct, not the content of their speech or retaliatory animus.

The district court's reliance on out-of-context statements by the Secretary and others, *see* SA.205, SA.212, similarly underscores the court's flawed attempt to attribute uniform motives to the many different federal officers involved in the protests here. When viewed in context, the statements merely reflect concern with violence directed at DHS officers. The Secretary, for instance, told officers that "we're going to go hard" against individuals "advocating to harm not just you and your colleagues but your families." SA.048 (citation omitted). And contrary to the district court's contention, the fact that the Secretary granted exclusive access to a select number of journalists in no way demonstrates a content-based restriction, even if those journalists granted access portrayed the Secretary "in a more favorable light." SA.205. The First Amendment does not require the government to grant equal press access to exclusive interviews. *See, e.g., Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 418-

19 (4th Cir. 2006); *AP v. Budowich*, No. 25-5109, 2025 WL 1649265, at *7 n.6 (D.C. Cir. June 6, 2025).

At a minimum, then, the district court's categorical conclusion that the government was never justified in issuing dispersal orders and deploying crowd-control devices cannot be squared with the record. But even if there were instances in which individual officers did use force too readily or in excess of what was necessary, the court clearly erred in issuing this programmatic injunction, which imposes blanket conditions on law-enforcement operations that have no basis in the First Amendment. *See Lewis*, 518 U.S. at 357 ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").

For example, the injunction "enumerates and proscribes the use of scores of riot control weapons and other devices." Stay Order 2. Those blanket conditions apply regardless of the circumstances confronted by officers. But whether individual officers' reactions to threats, violence, or disorder are sufficiently tailored to significant government interests will depend on a totality of the circumstances that cannot be addressed with "prescriptive" conditions that "resemble[] a federal regulation." *Id.* Likewise, the order imposes requirements related to such matters as when body-worn cameras must be activated and what uniforms officers must wear that are wholly untethered from any First Amendment right.

There is also no First Amendment basis for the injunction's provisions restricting officers from "[d]ispersing" journalists. SA.001. The press lacks a

"constitutional right of special access … not available to the public generally," *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972), and nothing in the First Amendment grants journalists a general exception to lawful dispersal orders, *see, e.g.*, *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 612 (7th Cir. 2021) ("reporters are not cloaked with automatic 'strict scrutiny protection' merely because they are members of the press"). The court disclaimed that the injunction granted journalists "special treatment," SA.202, but that is the clear result of the injunction.

### 2. The Fourth Amendment does not permit categorical regulation of law-enforcement conduct.

Plaintiffs' Fourth Amendment claims that the use of crowd-control measures amounted to unlawful seizures also cannot justify the injunction. Many, if not most, of those claims do not implicate the Fourth Amendment at all because a "seizure requires the use of force *with intent to restrain*," as measured by whether the "challenged conduct *objectively* manifests an intent to restrain." *Torres v. Madrid*, 592 U.S. 306, 317 (2021). The "application of force with an objective intent merely to *disperse* or *exclude* persons from an area" does not "involve the necessary 'intent to *restrain*' that might give rise to a 'seizure.'" *Puente v. City of Phoenix*, 123 F.4th 1035, 1052 (9th Cir. 2024). Whether a particular use of force in a particular context objectively manifested an intent to restrain is of course a fact-specific inquiry.

The district court, however, uniformly concluded that *all* "agents' uses of force objectively manifested an intent to restrain or confine protesters," and it dismissed the

notion that any deployment of crowd-control devices were intended merely to disperse crowds. SA.222. Such sweeping conclusions are anathema to the Fourth Amendment, which "will not tolerate adoption of an overly broad categorical approach." *Missouri v. McNeely*, 569 U.S. 141, 158 (2013). The court's own findings, moreover, demonstrate that in many instances officers at the Broadview facility and elsewhere did deploy crowd-control devices such as chemical irritants "merely to *disperse* or *exclude* persons from an area." *Puente*, 123 F.4th at 1052. On September 19, for instance, "an agent deployed a pocket tactical CS munition [i.e., tear gas] approximately ten to fifteen feet in front of him" after "a vehicle tried to leave the facility and a crowd gathered and refused to disperse despite loud orders to do so." SA.063. To the extent that the deployment of a chemical irritant in such circumstances constituted a use of force at all, there is no plausible ground to conclude that the agent's "conduct *objectively* manifest[ed] an intent to restrain" protesters. *Torres*, 592 U.S. at 317.

And even if some officers' uses of force amounted to a seizure, the district court erred in uniformly concluding that that there was no "justification for the extent of the use of force that federal agents have used." SA.063. Whether a seizure was improper under the Fourth Amendment is measured under the "'reasonableness' standard," which is necessarily a context-specific inquiry that must account for the fact that officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

necessary in a particular situation." *Graham*, 490 U.S. at 395.  The court's categorical conclusion that all uses of force were unreasonable was not a "valid substitute for careful case-by-case evaluation of reasonableness." *McNeely*, 569 U.S. at 158.  The conclusion also cannot be squared with the court's own findings, which are replete with instances in which officers reasonably used force in response to disruptive or violent protests.  *See, e.g.*, SA.055 (officers "removed [a] woman from the [Broadview] facility's driveway" after she "refused to move for an oncoming vehicle" despite "numerous" warnings that protesters "could not block traffic, had to remain on the sidewalk, and could not come on federal property"); SA.065 (an officer took a protester into custody after she "stuck her leg out and tripped" the officer).

More fundamentally, even if individual officers ran afoul of the Fourth Amendment's reasonableness standard in isolated incidents, that would not justify injunctive relief governing law enforcement's use of force broadly.  There are sound reasons why courts do not issue injunctions with "prophylactic procedures" to govern Fourth Amendment compliance.  *Rizzo*, 423 U.S. at 378.  "Erroneous grants of injunctive relief that hamper enforcement of the criminal law have the potential to cause havoc." *Campbell*, 373 F.3d at 835.  The "normal[] and adequate" remedy for a Fourth Amendment violation has thus been retroactive individualized relief, not a programmatic injunction constraining law-enforcement operations.  *Id.*  The district court acknowledged that its injunction departed from this "norm[]," but excused its departure on the ground that it was "ordering agents to make the individualized

53

assessments that the Constitution requires them to make." SA.231. That gets things precisely backward. The government already must make individualized determinations under its use-of-force policies and the Fourth Amendment. It is the district court's injunction that departs from that mode of analysis.[4]

### 3. Individual RFRA claims cannot support programmatic relief.

The four religious practitioners' RFRA claims also clearly cannot support the injunction issued here. The plaintiffs are not likely to succeed on those claims, which require a showing that the government "substantially burden[ed] their religious practice." *Society of Divine Word v. U.S. Citizenship & Immigr. Servs.*, 129 F.4th 437, 450 (7th Cir. 2025); *see also* 42 U.S.C. § 2000bb–1(a). Courts evaluate "whether the burden was 'substantial' by looking to acceptable alternative means of religious practice that remained available." *United States v. Stimler*, 864 F.3d 253, 268 (3d Cir. 2017), *vacated on other grounds by United States v. Goldstein*, 902 F.3d 411 (3d Cir. 2018). Where governmental action merely limits "one of a multitude of means" by which practitioners may exercise their religious beliefs, no substantial burden exists. *Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001) (no substantial burden from

---

[4] The same fundamental flaws afflict the district court's alternative suggestion that it found the evidence of past violations to "shock the conscience" under the Fourteenth Amendment. SA.224. Plaintiffs asserted no substantive-due-process claims, App.078-87, so the court's analysis is beside the point. In any event, isolated instances of misconduct would not support the broad regulations that the court issued, which clearly apply to all manner of law-enforcement activity that could not even plausibly be said to "shock the conscience."

enforcing a ban on certain commercial activity on the National Mall because the claimants had other means to satisfy their religious beliefs); *see also Stimler*, 864 F.3d at 259 (no substantial burden where non-criminal means existed to enforce religious divorce law).

Here, the religious practitioners failed to make the requisite substantiality showing because alternative means of religious practice remained available to them. All four plaintiffs assert that their religious beliefs compel them to minister to, and pray on behalf of, those involved in the protests at the Broadview facility. *See* App.037-39. But plaintiffs have various ways in which they may satisfy those broad religious beliefs without engaging in activity that interferes with DHS's efforts to control disruptive and often violent protests. Indeed, as the district court found, plaintiffs could engage in their religious practice simply by moving down the street and away from the site of violent protests. *See, e.g.*, SA.077. At most, then, DHS's attempts to manage protests at the Broadview facility restricted "one of a multitude of means" by which plaintiffs could practice their religious beliefs, which does not constitute a substantial burden. *Henderson*, 253 F.3d at 17.

In any event, the appropriate remedy for a successful RFRA claim is tailored relief to relieve the substantial burden on the individual's religious exercise. Even if these four individual plaintiffs established a RFRA violation based on incidents at the Broadview facility, the district court offered no explanation for how that would justify

a sweeping programmatic injunction issued on a class-wide basis applicable to DHS operations anywhere in the Chicago area.

## II.    The Remaining Equitable Factors Decisively Favor The Government.

The district court independently erred in issuing the preliminary injunction because plaintiffs face no threat of immediate and irreparable harm, and the balance of the equities decisively favors the government.  As explained, *see supra* pp. 23-27, plaintiffs' claims of past harm do not give them standing to seek prospective relief, much less demonstrate an immediate threat of irreparable harm that would justify the "extraordinary remedy" of a preliminary injunction.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Even before plaintiffs initiated this action, state and local officials had taken over crowd control at the Broadview facility.  More recently, as this Court noted, DHS has deployed some officers—including some CBP officers— involved in Operation Midway Blitz to other operations outside Chicago.  *See* Stay Order 2; SA.188 n.71 (noting reporting of such changes).  Those changed circumstances fatally undermine any claim by plaintiffs that a preliminary injunction is necessary to prevent an immediate threat of harm recurring while the district court resolves the merits of their claims.

By contrast, as this Court recognized in granting the government's stay request, the injunction irreparably harms the government and the public interest.  Stay Order 2 ("[D]efendants face irreparable harm.").  As detailed above, the injunction improperly

56

constrains officers' ability to respond to disruptive and often violent protests in the

Chicago region, thereby endangering the safety of officers and the public alike.  It also

interferes with lawful enforcement of the Nation's immigration laws, and "[a]ny time

that the Government is enjoined by a court from effectuating statutes enacted by

representatives of its people, it suffers a form of irreparable injury."  Stay Order 2

(quoting *Noem*, 2025 WL 2585637, at *3 (Kavanaugh, J., concurring)).  And the

injunction turns the separation of powers on its head by installing the district court as

the overseer of every crowd-control and use-of-force decision that law-enforcement

officers make in the context of often "tense, uncertain, and rapidly evolving

situations."  *Graham*, 490 U.S. at 397; *see also CASA*, 606 U.S. at 859 (violations of the

separation of powers constitute a harm to the Executive Branch).  Accordingly, the

balance of equities strongly counsels in favor of vacating the district court's overbroad

injunction.

# CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
COURTNEY L. DIXON
 /s/ *David L. Peters*
DAVID L. PETERS
ELIZABETH HEDGES
DOUGLAS C. DREIER
*Attorneys, Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 598-6735*
*David.l.peters@usdoj.gov*

NOVEMBER 2025

# CERTIFICATES OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32(c) because it contains 13,915 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface. Pursuant to Circuit Rule 30(d), I further certify that all of the materials required by Circuit Rule 30(a) are included in the required short appendix to this brief, and all of the materials required by Circuit Rule 30(b) are included in the separate supplemental appendix filed contemporaneously herewith.

*/s/ David L. Peters*

David L. Peters

**CERTIFICATE OF SERVICE**

I hereby certify that on November 26, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system on all counsel of record.

*/s/ David L. Peters*

David L. Peters

**SHORT APPENDIX**

# TABLE OF CONTENTS

**Page**

Preliminary Injunction Order, DE250 ....................................................... SA.001

Preliminary Injunction Opinion & Order, DE281 ................................................ SA.009

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT COURT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO HEADLINE CLUB, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | **No. 25-cv-12173** |
| | ) | **Hon. Sara L. Ellis** |
| v. | ) | |
| | ) | |
| KRISTI NOEM, Secretary, U.S. | ) | |
| Department of Homeland Security, in her | ) | |
| official capacity, et al., | ) | |
| | ) | |
| *Defendants*, | ) | |

<u>**Preliminary Injunction Order**</u>

Plaintiffs filed a Motion for a Preliminary Injunction Order [82, 86] against Defendants.

Having held a hearing on November 5 and 6, 2025, the Court finds that Plaintiffs have met their

burden to support the issuance of a Preliminary Injunction. The Court orally issued its ruling,

containing findings of facts, conclusions of law, and stated reasons why the Court issued the

injunction pursuant to Federal Rules of Civil Procedure 52(a)(2) and 65(d), on November 6, 2025,

and indicated that a written opinion will follow further explaining the Court's ruling and providing

supporting evidentiary and case citations within 14 days of the issuance of this Order. Accordingly,

the Court grants the motion and orders as follows:

1.      It is hereby ORDERED that Defendants, their officers, agents, assigns, and all

persons acting in concert with them (hereafter referred to as "Federal Agents"), are ENJOINED in

this judicial district from:

    a.      <u>Interactions with Journalists:</u> Dispersing, arresting, threatening to arrest,

threatening or using physical force against any person whom they know or reasonably

1

should know is a Journalist, unless Federal Agents have probable cause to believe that the individual has committed a crime unrelated to failing to obey a dispersal order lawfully issued to non-Journalists. Federal Agents may order a Journalist to change location to avoid disrupting law enforcement, as long as the Journalist has an objectively reasonable amount of time to comply and an objectively reasonable opportunity to report and observe;

      b.    <u>Dispersal of Others:</u> Issuing a crowd dispersal order, meaning a lawful command given by an authorized Federal Agent for all persons to leave a designated area, that requires any Class member to leave a public place that they lawfully have a right to be, unless dispersal is justified by exigent circumstances such that immediate action is objectively necessary in order to preserve life or prevent catastrophic outcomes as defined by Department of Homeland Security Use of Force Policy (updated Feb. 6, 2023), Section XII.E;

      c.    Using riot control weapons—including kinetic impact projectiles (KIPs), Compressed Air Launchers (e.g., PLS and FN303), Oleoresin Capsicum (OC) Spray, CS gas, CN gas, or other chemical irritants, 40 mm Munitions Launchers, less-lethal shotguns, Less-Lethal Specialty Impact-Chemical Munitions (LLSI-CM), Controlled Noise and Light Distraction Devices (CNLDDs), Electronic Control Weapons (ECWs)—on any Class member, unless such force is objectively necessary to stop the person from causing an immediate threat of physical harm to another person;

      d.    Using riot control weapons (including those described above) at identified targets if it is reasonably foreseeable that doing so could result in injury to any Class member, unless such force is objectively necessary to stop the person from causing an immediate threat of physical harm to another person;

2

**SA2**

e.      Deploying CS or CN gas canisters, OC spray, or other chemical irritants into a group of people or in residential or commercial areas in a manner that poses a reasonably foreseeable risk of injuring any Class member who is not causing an immediate threat of physical harm to another person;

f.      Deploying CS or CN gas canisters, Controlled Noise and Light Distraction Devices (CNLDD), or Less-Lethal Specialty Impact and Chemical Munitions (LLSI-CM) so as to strike any Class member, unless such force is objectively necessary to stop an immediate threat of the person causing serious bodily injury or death to another person;

g.      Deploying CS or CN gas canisters, Controlled Noise and Light Distraction Devices (CNLDD), or Less-Lethal Specialty Impact and Chemical Munitions (LLSI-CM) above the head of any Class member, unless such force is objectively necessary to stop an immediate threat of the person causing serious bodily injury or death to another person;

h.      Firing Compressed Air Launchers (e.g., PLS and FN303), or Munitions Launchers (e.g., 40mm), or KIPs so as to strike the head, neck, groin, spine, or female breast of any Class member, unless such force is objectively necessary to stop an immediate threat of the person causing serious bodily injury or death to another person;

i.      Striking any Class member with a vehicle, unless such force is objectively necessary to stop an immediate threat of the person causing serious bodily injury or death to another person;

j.      Using hands-on physical force such as pulling or shoving to the ground, tackling, or body slamming any Class member who is not causing an immediate threat of physical harm to others, unless objectively necessary and proportional to effectuate an apprehension and arrest;

3

**SA3**

k.    Using chokeholds, carotid restraints, neck restraints, or any other restraint technique that applies prolonged pressure to the neck that may restrict blood flow or air passage against any Class member, unless such force is objectively necessary to stop an immediate threat of the person causing serious bodily injury or death to another person;

l.    Using any riot control weapon, including those listed in this Order, against any Class member, without first giving at least two separate warnings at a sound level where the targeted individual(s) can reasonably hear it, unless justified by exigent circumstances when immediate action is necessary in order to preserve life or prevent catastrophic outcomes, as defined by Department of Homeland Security Use of Force Policy (updated Feb. 6, 2023), Section XII.E. Such warnings shall explain that Federal Agents may employ riot control weapons or force, give the targeted individual(s) reasonable time to avoid the use of force, and provide a reasonable opportunity to comply;

m.    Seizing or arresting any Class member who is not resisting a lawful and authorized crowd dispersal order (as defined in 1.b. above), unless there is specific probable cause to believe that the person has committed a crime for which a custodial arrest is warranted and for which the Federal Agent has lawful authority to make an arrest; and

n.    Defendants shall not be liable for violating this injunction if any Class member is incidentally exposed to riot control devices after such a device was deployed in a manner that complies with this injunction.

2.    To facilitate the Defendants' identification of Journalists protected under this Order, the following are examples of indicia of being a Journalist: visual identification as a member of the press, such as by displaying a professional press pass, badge, or credentials; wearing distinctive clothing or patches that identify the wearer as a member of the press; or carrying

4

**SA4**

professional gear such as professional photographic or videography equipment. Other indicia of being a Journalist under this Order include that the person is standing off to the side of a protest, not engaging in chanting, sign holding, or shouting slogans, and is instead documenting protest activities, although these are not requirements. These indicia are illustrative, and a person need not exhibit every indicium to be considered a Journalist under this Order. Defendants shall not be liable for incidental violations of this Order if Defendants establish that the affected individual lacked any of the illustrative indicia of a Journalist described in this provision.

3.     It is further ORDERED that all Federal Agents, excepting those who do not wear a uniform or other distinguishing clothing or equipment in the regular performance of their official duties or are engaged in undercover operations in the regular performance of their official duties, must have visible identification of a unique, personally assigned, and recognizable alphanumeric identifier sequence affixed to their uniforms and conspicuously displayed in two separate places. The same unique and personally assigned identifier sequence must remain conspicuously displayed in two separate places despite changes to a Federal Agent's uniform or tactical gear.

4.     It is further ORDERED that all Federal Agents, excepting those who do not wear a uniform or other distinguishing clothing or equipment in the regular performance of their official duties or are engaged in undercover operations in the regular performance of their official duties, that are, have been, or will be equipped and trained with body-worn cameras ("BWCs") shall activate them when engaged in enforcement activity unless expressly exempted by CBP, ICE, or DHS policy.

a.     The definitions of "body worn cameras" shall be as defined in DHS Policy Statement 045-07 Section VIII and CBP Directive 4320-020B Section 6.2: Audio/video/digital recording equipment combined into a single unit and typically worn

on clothing or otherwise secured to a person, e.g., affixed to the outside of the carrier/tactical vest facing forward.

      b.      For the purposes of this Order, the definition of "enforcement activity" shall be as defined in ICE Directive 19010.3 Section (3.6)(8) and CBP Directive 4320-020B Section 6.4. Such activities include but are not limited to:

            i.      Protecting Federal Government facilities;

            ii.      Responding to public disturbances;

            iii.      Interacting with members of the public while conducting Title 8 enforcement activities in the field; and

            iv.      When responding to emergencies.

      c.      Enforcement activities where BWCs are not required to be worn or activated for the purposes of this Order are:

            i.      Where agents are conducting undercover activity or confidential informants will or may be present;

            ii.      Information-gathering surveillance activities where and when an enforcement activity is not planned;

            iii.      Onboard commercial flights;

            iv.      Controlled deliveries; and

            v.      Custodial interviews conducted inside jails, prisons, detention centers, or DHS owned or leased facilities.

      d.      This provision requiring BWCs shall not apply to Federal Agents operating at any port of entry into the United States including but not limited to Chicago O'Hare International Airport and Chicago Midway International Airport.

e.     Federal Agents shall not be liable for violating this provision (i) for failure to record due to equipment failure beyond the control of Federal Agents, or (ii) in the event that cloud storage for storing recordings made by BWCs should become unavailable, through no fault of Federal Agents, either due to (a) the lapse in appropriations, or (b) license or contract expiration.

5.     It is further ORDERED that Defendants widely disseminate notice of this Order. Specifically, Defendants are ORDERED to provide copies of this Order, in either electronic or paper form, no later than 10 p.m. Central Time on November 6, 2025, to all those described below:

a.     all law enforcement personnel, officers, and agents of the Federal Agents currently or subsequently deployed in the Northern District of Illinois, including but not limited to all personnel operating within this District who are part of Operation Midway Blitz or any equivalent operation by a different name; and

b.     all employees, officers, and agents of Federal Agents with supervisory or management authority over any law enforcement officers or agents currently or subsequently deployed in the Northern District of Illinois, up the chain of command to and including the Secretary of Homeland Security and other named Defendants.

6.     It is further ORDERED that Defendants shall issue guidance to officers and agents to implement this Order. Defendants shall file with this Court such guidance and any directives, policies, or regulations implementing the guidance within 5 business days of issuance of the Order, with a continuing obligation to immediately file with this Court any subsequent changes or revisions to that guidance or implementing directives, policies, or regulations through the period of this Order.

7.      It is further ORDERED that in the event that Plaintiffs seek relief for an alleged violation of this Order, Plaintiffs should make good faith attempts to meet and confer with Defendants at least 24 hours before filing a request for relief and Defendants must respond to the motion for relief as ordered by the Court.

8.      It is further ORDERED that in the interest of justice, the Court orders Plaintiffs to provide $0 in security, and the Court rules that any other requirements under Rule 65(c) of the Federal Rules of Civil Procedure are satisfied.

9.      The parties shall meet and confer and provide a joint status report within 7 days setting forth proposals for ensuring that Federal Agents present in the Northern District of Illinois while this action is pending remain informed of the limitations imposed by this Order.

10.     This Preliminary Injunction Order is entered at 11:48 a.m. Central Time on this 6th day of November 2025 and shall remain in effect pending further proceedings before this Court.

Date: November 6, 2025

_____

Sara L. Ellis
U.S. District Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO HEADLINE CLUB, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 25 C 12173 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| KRISTI NOEM, Secretary, U.S. Department | ) | |
| of Homeland Security, in her official capacity, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

While living in the Ravenswood neighborhood, Carl Sandburg wrote a love letter to his city, Chicago. In the poem *Chicago*, Sandburg noted both the complexity and beauty of a city known for its vitality, pride, strength, courage, tenacity, and joy. This case ultimately turns on whether the Chicagoland area, and Chicago specifically, is the City of Big Shoulders or Chipocalypse Now. The Chicagoland this Court sees from Aurora to Cicero, from Chicago to Waukegan, and all points in between is a vibrant place, brimming with life and hope, constantly rebuilding itself to create a more just society, striving to move forward from its complicated history of segregation, police brutality, and gun violence, and expressing the joy of community in block parties, street festivals, and Sunday jazz shows on the lawn of a high school. Neighbors from every community show up for each other whether by filling little free libraries in parkways, offering free meals to those facing cuts in food benefits, guarding intersections to help trick-or-treaters safely cross the street, standing on the sidewalk to document law enforcement activities and protest against immigration enforcement activities they believe to be unjust, or simply

praying the Rosary to provide comfort and bear witness to those detained at the Broadview

detention facility who are facing fear and uncertainty.

In contrast, Defendants would have people believe instead that the Chicagoland area is in

a vise hold of violence, ransacked by rioters, and attacked by agitators – which justifies the

unprecedented swath of indiscriminate uses of force unleashed on journalists, peaceful

protestors, and religious practitioners.  That narrative simply is untrue.  And, as noted in multiple

instances throughout this Opinion, Defendants' own evidence in this case belies that assertion.

This case arises from protests in the Chicagoland area—including in and around the

Immigration and Customs Enforcement ("ICE") facility in Broadview, Illinois, and on the streets

of the Chicagoland area—regarding the federal government's immigration enforcement

operations and deployment of federal agents to the Chicagoland area, which have increased over

the past several months.  Plaintiffs allege that federal agents have targeted peaceful individuals,

religious practitioners, and members of the media participating in or reporting on these protests

with excessive force, threats, and/or detainment.  Among other things, Plaintiffs allege that

federal agents have fired rubber bullets and pepper balls, launched flashbang grenades, and

indiscriminately sprayed tear gas at protesters, religious practitioners, and journalists without

legal justification or adequate warning.

On October 6, 2025, Plaintiffs[1] filed this class action lawsuit against Defendants Kristi

Noem, the Secretary of U.S. Department of Homeland Security ("DHS"); Todd Lyons, the

Acting Director of ICE; Marcos Charles, the Acting Executive Associate Director of

---

[1] Plaintiffs divide themselves into three groups.  As of the amended complaint, the journalist Plaintiffs consist of Chicago Headline Club, Block Club Chicago, the Chicago Newspaper Guild Local 34071 (CNG), NABET-CWA Local 54041, Raven Geary, Charles Thrush, and Stephen Held.  The protester Plaintiffs consist of William Paulson, Autumn Reidy-Hamer, Leigh Kunkel, Rudy Villa, and Jennifer Crespo.  The religious practitioner Plaintiffs consist of Reverend David Black, Father Brendan Curran, Reverend Dr. Beth Johnson, and Reverend Abby Holcombe.

Enforcement and Removal Operations ("ERO") at ICE; Russell Hott, the former Chicago Field

Office Director of ICE; Rodney S. Scott, the Commissioner of U.S. Customs and Border

Protection ("CBP"); Gregory Bovino, the Chief Border Patrol Agent of CBP's El Centro Sector;

Daniel Driscoll, the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives

("ATF"); William K. Marshall III, the Director of the Federal Bureau of Prisons ("BOP");

Pamela Bondi, the Attorney General of the United States; DHS; U.S. Department of Justice;

Unidentified Federal Agencies; Unidentified Federal Officers; and Donald J. Trump, the

President of the United States (collectively, "Defendants").  In an amended complaint filed on

October 21, 2025, Plaintiffs added as Defendants Sam Olson, the interim Chicago Field Office

Director of ICE; Shawn Byers, the Chicago Deputy Field Office Director of ICE; Kyle Harvick,

a Deputy Incident Commander for CBP; Kash Patel, the Director of the Federal Bureau of

Investigation ("FBI"); Faron Paramore, the Director of the Federal Protective Service ("FPS");

and Stephen Miller, the White House Deputy Chief of Staff and U.S. Homeland Security

Adviser.

Plaintiffs bring claims against Defendants for (1) violations of their First Amendment

rights, including First Amendment retaliation; (2) violation of the Religious Freedom Restoration

Act (the "RFRA"), 42 U.S.C. § 2000bb-1; (3) excessive force and unreasonable seizure in

violation of the Fourth Amendment; (4) violations of the Administrative Procedures Act; and

(5) conspiracy to violate Plaintiffs' constitutional rights.  The Court has certified the following

class:

> All persons who are or will in the future non-violently
> demonstrate, protest, observe, document, or record at Department
> of Homeland Security immigration enforcement and removal
> operations in the Northern District of Illinois.

Doc. 252.  It has also certified the following subclasses:

3

SA11

> **Religious Exercise Subclass:** All persons who are or will in the future engage in religious expression in the form of prayer, procession, song, preaching, or proselytizing at Department of Homeland Security immigration enforcement and removal operations in the Northern District of Illinois.
>
> **Press Subclass:** All persons who are or will in the future engage in news gathering or reporting at Department of Homeland Security immigration enforcement and removal operations in the Northern District of Illinois.

*Id.*

On October 9, 2025, the Court granted Plaintiffs' motion for a temporary restraining order ("TRO"), enjoining Defendants from taking certain actions that would violate Plaintiffs' First and Fourth Amendment rights. Docs. 42, 43, 44. On October 17, 2025, the Court modified the TRO, requiring all federal agents conducting immigration enforcement operations who are equipped and trained with body-worn cameras ("BWCs") to activate them when engaged in enforcement activity, unless exempted by CBP, ICE, or DHS policy. Doc. 66 ¶ 3. The Court held a preliminary injunction hearing on November 5 and 6, 2025. On November 6, 2025, the Court orally issued its ruling and entered a preliminary injunction order, indicating that a written opinion would follow explaining the Court's ruling and providing supporting evidentiary and case citations.[2] Docs. 250, 251, 256. The Court now sets forth its ruling in more detail below.[3]

---

[2] Defendants did not argue before this Court at *any* time that the proposed injunctive relief reaches too broadly and enjoins more parties than necessary or allowable. In connection with the TRO, the Court *sua sponte* raised the question of whether the preliminary injunction can be directed at President Trump. Doc. 43 at 2 n.2; Doc. 44 at 17:23–18:7. Injunctive relief is generally not available against the President, although courts do have "a limited ability to enjoin the President to carry out ministerial, nondiscretionary duties." *Slaughter v. Trump*, No. 25-5261, 2025 WL 2551247, at *9 n.2 (Rao, J., dissenting) (D.C. Cir. Sep. 2, 2025); *see Gonzalez v. Gor*, --- F. Supp. 3d ----, 2025 WL 2813829, at *14-15 (D.P.R. Oct. 3, 2025) (collecting cases). As the Court noted in issuing the TRO, Doc. 43 at 2 n.2, and it repeats now, because Plaintiffs can obtain relief to remedy the harms they face without enjoining the President directly, the Court excepts President Trump from the scope of the injunction at this time. To the extent that Defendants believe that the injunction should be further tailored to only reach certain Defendants or their agents, they should consult with Plaintiffs and then raise the issue with the Court.

## BACKGROUND[4]

### I.    Prefatory Words

Before recounting the facts, the Court briefly notes what this case is not about.  The Court agrees with Defendants that "the merits of this case do not turn on whether [the Court] sympathizes with the current administration's immigration policies or prefers the immigration policies of the prior administration.  The case, likewise, does not turn on whether [the Court] agree[s] with the federal government's immigration enforcement efforts in Chicago or whether [the Court] believes Chicago should be a sanctuary city."[5]  Doc. 255 at 10:18-24.  Nor does this case turn on whether the administration has failed to follow its stated priorities of pursuing the worst of the worst criminals and instead has chosen to go after landscapers, construction workers at Home Depot or Menards parking lots, daycare teachers, and parents walking down quiet streets on their way to run errands or the like.  *See* Stuart Anderson, *Stephen Miller's Order Likely Sparked Immigration Arrests and Protests*, Forbes (June 9, 2025), https://www.forbes.com/sites/stuartanderson/2025/06/09/stephen-millers-order-likely-sparked-

---

[3] The parties filed some of their briefs and exhibits under seal.  In the course of reaching and explaining its decision, the Court has relied on some of these sealed documents and videos.  "Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."  *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *see also Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").  Defendants maintain that certain privileges apply to the documents they filed under seal, with redactions necessary before they enter the public domain.  As the Court has discussed with the parties, the parties have until November 24, 2025 to provide public versions of the sealed documents and videos on which the Court has relied in this Opinion.

[4] The Court limits its factual findings to information the parties presented to it or entered into evidence as of the date of the preliminary injunction hearing, November 5, 2025.  The Court does not consider any subsequent filings that Defendants made because the record closed at the end of that hearing.

[5] Along these lines, although Defendants spend some time discussing Chicago's and Illinois' sanctuary laws and policies, claiming that they have "hindered the federal government's ability to enforce immigration laws in Illinois and Chicago" and "exacerbated the dangers posed by certain illegal aliens," Doc. 173 at 21; Doc. 173-1 ¶¶ 9–11, given that this case does not turn on the existence of these laws and policies, the Court does not discuss them in this Opinion.

5

immigration-arrests-and-protests/ ("The arrests of people at nail salons, restaurants, construction

sites and Home Depot illustrate that targeting dangerous criminals is not the Trump

administration's immigration policy.  The likely triggering action for the arrests and protests in

Los Angeles remains Stephen Miller directing ICE officials to arrest as many people without

criminal convictions as possible."); Axon_Body_4_Video_2025-10-12_1106_D01A2669A at

1:55–2:10 (stopping a woman walking down a quiet residential street);

Axon_Body_4_Video_2025-10-22_1009_D01A33862 at 1:57–2:15 (stopping a man in a

Menards parking lot); Axon_Body_4_Video_2025-10-23_1046_D01A2282F at 2:00–2:21

(stopping, but not detaining, a college student).  Simply put, this case is about whether

Defendants have failed to follow constitutional guidelines about when the use of force is

appropriate and whether Defendants' apparent indiscriminate use of force against protesters,

religious practitioners, and the press violates Plaintiffs' First and Fourth Amendment rights.

## II. Credibility

The Court next addresses the credibility of the parties' evidence and witnesses.  After

reviewing all the evidence submitted to the Court and listening to the testimony elicited at the

preliminary injunction hearing, during depositions, and in other court proceedings, the Court

finds Defendants' evidence simply not credible.[6]

Plaintiffs submitted a mountain of evidence, providing the Court with over eighty

declarations, numerous videos and articles, and other evidence.  Defendants did not rebut

anything that Plaintiffs set forth in their declarations or testimony, even with BWC footage.  For

---

[6] In another case considering some of the same evidence presented to this Court, another court in this district also found that the perceptions of certain of Defendants' declarants, such as Hott and Parra, were not reliable.  *See Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at *5 (N.D. Ill. Oct. 10, 2025) (noting a "troubling trend of Defendants' declarants equating protests with riots and a lack of appreciation for the wide spectrum that exists between citizens who are observing, questioning, and criticizing their government, and those who are obstructing, assaulting, or doing violence"), *motion to stay denied in part*, 155 F.4th 929 (7th Cir. 2025).

their part, Defendants submitted use of force and other investigative reports, hours and hours of BWC footage, surveillance footage from the Broadview facility, and footage from a helicopter over Little Village.  With respect to this footage, Defendants specifically directed the Court to certain videos and timestamps "to aid the Court in its review of those videos."  *See* Doc. 232. Presumably, these portions of the videos would be Defendants' best evidence to demonstrate that agents acted in line with the Constitution, federal laws, and the agencies' own policies on use of force when engaging with protesters, the press, and religious practitioners.  But a review of them shows the opposite—supporting Plaintiffs' claims and undermining all of Defendants' claims that their actions toward protesters, the press, and religious practitioners have been, as Bovino has stated, "more than exemplary."  Doc. 191-3 at 156:6–7; Doc. 238 at 66:65:24–66:1. The Court is mindful of the fact that, as Supervisory Border Patrol Agent Kristopher Hewson testified at the preliminary injunction hearing, BWC footage does not always reveal all the circumstances that agents face in the field.  Doc. 255 at 228:12–19.  But given the extent of the footage in this case, submitted by both sides, the Court finds that, in many cases, video footage "evaporate[s] any factual disputes that would otherwise exist."  *United States v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

For example, Defendants directed the Court to two videos of agents outside the Broadview facility the evening of September 19, 2025.  Doc. 232 at 1.  In those videos, agents stand behind a fence preparing to leave the facility's gates and disperse what Defendants described as an unruly mob.  Axon Body 3 Video 2025-09-19 2045 X60AB474J; Axon Body 3 Video 2025-09-19 2045 X60AB375H.  The scene appears quiet as the gate opens, revealing a line of protesters standing in the street holding signs.  Axon Body 3 Video 2025-09-19 2045 X60AB474J at 1:30; Axon Body 3 Video 2025-09-19 2045 X60AB375H at 1:45.  Almost

7

immediately and without warning, agents lob flashbang grenades, tear gas, and pepper balls at

the protesters, stating, "fuck yea!", as they do so, and the crowd scatters.  Axon Body 3 Video

2025-09-19 2045 X60AB474J at 1:30–6:30; Axon Body 3 Video 2025-09-19 2045 X60AB375H

at 1:45–3:20.  This video disproves Defendants' contentions that protesters were the ones

shooting off fireworks, refusing orders, and acting violently so as to justify the agents' use of

force.[7]  *See* Doc. 172-8 (CBP use of force report for evening of September 19, 2025); *see also*

Axon_Body_4_Video_2025-09-27_2135_D01A37583 at 1:33:52–1:34:06 (agents admitting that

explosions on September 27 were not "fireworks" shot off by protesters but rather "flashbangs").

On September 26, 2025, video from an agent's BWC shows a line of agents standing at

least thirty feet away from protesters outside the Broadview facility on Harvard Street.  Axon

Body 4 Video 2025-09-26 1137 D01A3411W at 2:00; *see also* Doc. 172-11 at 8 ("[T]he crowd

[ ] was approximately 30-40 feet away.").  Despite this distance, the agents start yelling "move

back, move back" to the protesters and then shoot pepper balls and tear gas at them without any

apparent justification.  Axon Body 4 Video 2025-09-26 1137 D01A3411W at 2:21–4:19.  While

the agent wrote in his use of force report that protesters were "becoming increasingly hostile,"

Doc. 172-11 at 7, the BWC video shows that the protesters were simply standing there when

agents first deployed any force.  Axon Body 4 Video 2025-09-26 1137 D01A3411W at 2:21–

4:19.

Defendants also highlighted an October 3, 2025 video, presumably to show that agents

driving the streets faced constant danger from cars ramming them on purpose.  Axon Body 3

---

[7] In one of the videos, someone throws a projectile back at agents, which one individual tells agents
another person did to protect the crowd from the agents' use of force.  Axon Body 3 Video 2025-09-19
2045 X60AB375H at 4:00–5:00.  This is also mentioned in the use of force report, although it is reported
that the crowd threw "dangerous objects" at agents "[w]ithout provocation."  Doc. 172-8 at 19, 21.  The
BWC footage disproves the representation that the crowd threw objects "without provocation," and the
fact that protestors threw objects at agents after they deployed force cannot be used as justification for the
use of force that preceded it.

Video 2025-10-03 1122 X60A9929K at 0:00–4:45.  But instead of leaving this impression, the

video, which almost entirely consists of a view of the back seat of the car and some dialogue

about how the agent's "body cam is on" and he is "still recording," suggests that the agent drove

erratically and brake-checked other motorists in an attempt to force accidents that agents could

then use as justifications for deploying force.  *Id.*  This also calls into question Hewson's

testimony that motorists have rammed into agents every day during the operation.[8]  Doc. 255 at

232:19–22.  On October 4, 2025, in Brighton Park, Defendants directed the Court to BWC

footage of an agent pushing a protester to the ground, with tear gas and pepper balls released

thereafter.  Axon Body 4 Video 2025-10-04 1541 D01A83204 at 16:00–18:00.  The footage

shows the agents allowing the protester they had tackled to the ground to stand up and then

tackling him again, kneeling on his head or neck.  *Id.* at 16:14–17:40.  Only after agents threw

tear gas and pepper balls and pushed the protester to the ground did other protesters throw some

bottles of water at the agents, which cannot support the agents' use of force.  *Compare id.* at

16:00–18:00, *with* Doc. 191-8.

       These are not the only inconsistencies and incredible representations in the record.  While

Defendants may argue that the Court identifies only minor inconsistencies, every minor

inconsistency adds up, and at some point, it becomes difficult, if not impossible, to believe

---

[8] The Court acknowledges that at times agents have dealt with aggressive drivers.  *See, e.g.*,
Axon_Body_4_Video_2025-10-23_1034_D01A39542 at 1:40–6:30.  But this has not been the norm in
the videos that the Court has viewed, with agents instead often treating cars that are merely following
them but not driving aggressively as potential threats.  *See, e.g.*, Axon_Body_4_Video_2025-10-
23_1011_D01A31902 at 2:00–3:20 (showing an agent stating to a woman who had been behind his
vehicle and gotten out to video agents as they stopped at the exit of an alley that "if you keep following
us, you're going to arrest you, you've been warned," but nothing prevented the agents from continuing to
drive); Axon_Body_4_Video_2025-10-23_1012_D01A45488 at 2:00–2:45 (showing that, despite having
a clear path to continue driving, an agent gets out of his vehicle and tells a woman in the car behind him
who was honking that "You know what you're doing is illegal and you could be arrested for impeding
law enforcement.  I'm just warning you . . . following law enforcement, honking, and harassing agents is
impeding law enforcement"); Axon_Body_4_Video_2025-10-25_1045_D01A36942 at 3:42–3:50 (Agent
(tapping on glass of a car behind agents' vehicle): "Stop following us."  Bystander: "They're allowed to
follow you."  Agent: "No they're not.").

almost anything that Defendants represent. The Court discusses these inconsistencies in greater

detail below, highlighting only a few here. For example, Hewson testified that people held

shields with nails in them, Doc. 255 at 199:22–23, 200:19, 201:17–18, 202:10–11, but video

demonstrates that at least some of these shields were merely pieces of cardboard, none of the

shields had nails in them, and nothing warranted the aggression that the agents showed toward

the protesters holding these shields, *see* Axon_Body_4_+_Flex_Video_2025-09-

27_2003_D01A2898X at 2:51–2:59. In Albany Park, agents wrote in their reports and DHS

publicized that a bicyclist threw a bike at agents, Doc 173-2 ¶ 46; Doc. 191-6 at 1, but video

from that event makes clear that agents actually took a protester's bike and threw it to the side

after they had deployed tear gas, Axon_Body_4_Video_2025-10-12_1345_D01A2797W at

1:30–1:40; Doc. 73-1 ¶ 11.

  Hott, who served as the Field Office Director for the ICE ERO Chicago Field Office from

August 2025 to October 17, 2025, and currently serves as the Field Office Director of the ERO

Washington Field Office, represented in his declarations that someone ripped a beard off an

agent's face and that protesters broke a downspout at the ICE Broadview facility. Doc. 35-1

¶¶ 12, 22; Doc. 173-1 ¶¶ 18, 33. But when questioned about these instances in his deposition,

Hott acknowledged that he did not even know if it was a person that caused the damage to the

downspout, much less a protester, and that he did not have proof that the agent's beard was

actually ripped off his face. Doc. 191-4 at 69:6–72:1 (downspouts); *id.* at 78:2–79:11 (beard).

As for the evidence Defendants marshalled through Parra with respect to CBP's actions, Parra

testified in his deposition that he had only been in the field with CBP a "handful of times, four to

five," during Operation Midway Blitz. Doc. 191-9 at 30:7–10. And he made clear that he based

much of his declaration on information he gleaned from use of force reports, with maybe some

(unidentified) review of video footage. *See, e.g.*, *id.* at 81:17–82:16, 85:17–23, 86:15–91:1

(describing that Parra viewed some video footage, but that he could not recall how much or of

what events). Given the inconsistencies between the BWC footage and the use of force reports,

with the BWC footage undermining what agents put in their reports, the Court cannot rely on

Parra's broad generalizations of protesters' actions or Defendants' responses to those actions.[9]

Turning to Bovino, the Court specifically finds his testimony not credible. Bovino

appeared evasive over the three days of his deposition, either providing "cute" responses to

Plaintiffs' counsel's questions or outright lying. When shown a video of agents hitting Rev.

Black with pepper balls, Bovino denied seeing a projectile hit Rev. Black in the head. Doc. 191-

3 at 162:21–165:17; Doc. 22-44 (Ex. 44 at 0:10–12, available at

https://spaces.hightail.com/space/ZzXNsei63k). In another video shown to Bovino, he obviously

tackles Scott Blackburn, one of Plaintiffs' declarants. Doc. 191-3 at 172:13–173:7; Doc. 22-45

(Ex. 45 at 0:19–30, available at https://spaces.hightail.com/space/ZzXNsei63k). But instead of

admitting to using force against Blackburn, Bovino denied it and instead stated that force was

used against him. Doc. 191-3 at 173:9–176:11, 179:11–181:5. Bovino also testified that, in

Little Village on October 23, 2025, several individuals associated with the Latin Kings were

found taking weapons out of the back of their car, and that they, as well as at least one individual

on a rooftop and one person in the crowd of protesters, all wore maroon hoodies. *Id.* at 227:2–

228:21. He further testified that he believed the "maroon hoodies . . . would signify a potential

assailant or street gang member that was making their way to the location that I was present" and

that "there did begin to appear, in that crowd, maroon hoodies, both on top of buildings and in

---

[9] The Court also notes that, in at least one instance, an agent asked ChatGPT to compile a narrative for a
report based off of a brief sentence about an encounter and several images. Axon_Body_4_Video_2025-
10-03_0949_D01A2556T at 00:00–00:42. To the extent that agents use ChatGPT to create their use of
force reports, this further undermines their credibility and may explain the inaccuracy of these reports
when viewed in light of the BWC footage.

the crowd." Doc. 237 at 18:22–19:10. But Bovino also admitted that he could not identify a street gang associated with the color maroon, *id.* at 19:11–13, although Hewson acknowledged that while Latin Kings members usually wear black, "they also can throw on maroon hoodies," Doc. 255 at 264:17–20.[10] Even were maroon hoodies to signify gang membership, the only evidence on footage from the relevant date of individuals dressed in maroon protesting in Little Village consists of a male wearing a maroonish jacket with an orange safety vest over it, Alderman Byron Sigcho-Lopez wearing a maroon sweater with a suit jacket over it, a female in a maroon shirt, a female in a maroon sweatshirt, and a man with a maroon hoodie under a green shirt and vest. Axon_Body_4_Video_2025-10-23_1053_D01A38302 at 10:03–10:33; Axon_Body_4_Video_2025-10-23_1106_D01A32103 at 16:12–17:17. Bovino's and Hewson's explanations about individuals in maroon hoodies being associated with the Latin Kings and threats strains credulity.

Most tellingly, Bovino admitted in his deposition that he lied multiple times about the events that occurred in Little Village that prompted him to throw tear gas at protesters. As discussed further below, Bovino and DHS have represented that a rock hit Bovino in the helmet before he threw tear gas. *See* Doc. 190-1 at 1; Homeland Security (@DHSgov), X (Oct. 28, 2025 9:56 a.m.), https://x.com/dhsgov/status/1983186057798545573?s=46&t=4rUXTBt_W24m-uWR74DQ5A. Bovino was asked about this during his deposition, which took place over three days. On the first day, Bovino admitted that he was not hit with a rock until after he had deployed tear gas. Doc. 191-3 at 222:24–223:18. Bovino then offered a new justification for his use of chemical munitions, testifying that he only threw tear gas after he "had received a projectile, a rock," which "almost hit" him. Doc. 191-3 at 222:24–223:18. Despite being

---

[10] John Bodett testified at the preliminary injunction hearing about his experiences in Little Village. As a resident of that neighborhood, he stated that he observed Latin King colors to be black and gold. Doc. 255 at 84:10–17.

presented with video evidence that did not show a rock thrown at him before he launched the first tear gas canister, Bovino nonetheless maintained his testimony throughout the first and second days of his deposition, *id.* at 225–27; Doc. 237 at 11–17.  But on November 4, 2025, the final session of his deposition, Bovino admitted that he was again "mistaken" and that no rock was thrown at him before he deployed the first tear gas canister.  Doc. 238 at 9:12–21 ("That white rock was . . . thrown at me, but that was after . . . I deployed less lethal means in chemical munitions."); *id.* at 10:20–23 (Q. [Y]ou deployed the canisters, plural, before that black rock came along and you say hit you in the head, correct? A. Yes.  Before the rock hit me in the head, yes.").

Moreover, videos of what happened in Little Village taken from agents' BWCs and helicopters do not match up with agents' descriptions of the alleged chaos they encountered.  DHS tried to claim protesters threw fireworks at agents, *see* Homeland Security (@DHSgov), X (Oct. 28, 2025 at 9:56 a.m.), *supra* (video at 3:14–3:19 with overlaid text stating "artillery shell type firework shot at agents"), when the helicopter and BWC footage indicates that those explosions were instead agents' flashbang grenades, *see* Axon_Body_4_Video_2025-10-23_1056_D01A47477 at 7:43–45; REL146 at 10:03–09.  Moreover, aerial footage from CBP's helicopter shows an agent throwing some type of smoke or gas device on a patch of grass off to the side of 27th Street, which further suggests that CBP, and not protesters, were the ones throwing things that CBP and DHS then used as justification to claim that protesters posed a danger to them.  REL146 at 15:07–16:18.  Defendants, however, cannot simply create their own narrative of what happened, misrepresenting the evidence to justify their actions.

Overall, after reviewing all the evidence, the Court finds that Defendants' widespread misrepresentations call into question everything that Defendants say they are doing in their

**SA21**

characterization of what is happening at the Broadview facility or out in the streets of the

Chicagoland area during law enforcement activities.

## II.    Findings of Fact

Having set forth its general credibility assessment, the Court now recounts its findings

with respect to the evidence in the record.

### A.    Federal Immigration Enforcement

Although this case does not turn on immigration enforcement itself, the Court briefly sets

forth the relevant framework for the federal government's power to enforce immigration law and

the structure it uses to do so. "The Government of the United States has broad, undoubted power

over the subject of immigration and the status of aliens," with "[f]ederal governance of

immigration and alien status . . . extensive and complex." *Arizona v. United States*, 567 U.S.

387, 394–95 (2012). DHS plays a "major role in enforcing the country's immigration laws,"

with immigration officials having "broad discretion" in determining removal matters. *Id.* at 396–

97.

ICE, DHS' largest investigative branch, "focuses on enforcing immigration laws,

preventing terrorism, and combating transnational criminal threats." Doc. 173-1 ¶ 6. ICE has

three operational components: (1) ERO, (2) Homeland Security Investigations ("HSI"), and

(3) the Office of the Principal Legal Advisor. Doc. 35-1 ¶ 6; Doc. 173-1 ¶ 6. ERO's mission is

"to identify, arrest, and remove aliens who present a danger to national security or are a risk to

public safety, as well as those who enter the United States illegally—including those who cross

the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally

reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise

undermine the integrity of [the U.S.] immigration laws and [its] border control efforts." Doc. 35-

1 ¶ 7; Doc. 173-1 ¶ 7.  ERO operates mainly in the interior of the country, managing the

logistical aspects of the removal process, including identifying, apprehending, detaining, and

repatriating non-citizens.  Doc. 35-1 ¶ 8; Doc. 75 at 61:13–19, 62:10–14, 62:24, 63:13–20; Doc.

173-1 ¶ 8.

    Relevant to this litigation, ICE ERO's Chicago Field Office has approximately 180 ICE

officers and covers six states (Illinois, Indiana, Wisconsin, Kansas, Kentucky, and Missouri).

Doc. 35-1 ¶¶ 2–3; Doc. 173-1 ¶¶ 1, 3.  Of these, ERO has about sixty-five officers in the

Chicagoland area, including thirty-one at the Broadview facility. Doc. 173-1 ¶ 3.  Hott

previously served as the Chicago Field Office Director, a role now held by Olson, with Byers,

the deputy field office director, reporting to him.  Doc. 75 at 81:17-82:18.  Several additional

layers of reporting exist between the Chicago Field Office Director and Lyons, the acting ICE

director.  Doc. 75 at 81:17–82:18.  All ICE agents have unique identification or star numbers,

listed on their badges, and they must carry their badges and credentials with them whenever they

carry an ICE-issued firearm, except when involved in an undercover operation.  Doc. 75 at 84:1–

11; Doc. 173-1 ¶ 66.  According to Hott, ICE Special Response Team ("SRT") uniforms, have

"large, discernible identifier patches unique to each agent or officer that allow for identification,

as needed."  Doc. 173-1 ¶ 66.

    CBP, another branch of DHS, has responsibility "for preventing the unlawful entry of

individuals into the United States, apprehending those who attempt to enter illegally or who have

violated the immigration laws in accordance with the Constitution and other applicable laws."

Doc. 173-2 ¶ 1.  CBP agents seek "to secure the border, disrupt human smuggling and trafficking

networks, and ensure consistent enforcement of the immigration laws of the United States."

Doc. 173-2 ¶ 1.  CBP targets specific individuals, pursuing individuals for whom it has specific

intelligence or evidence of their illegal presence in the United States, Doc. 75 at 7:23–25, and also engages in targeted enforcement, in which it uses intelligence about areas and locations of known illegal immigration activity to enforce the immigration laws in those areas, Doc. 75 at 8:1–21. CBP agents operate mainly on the border. *See* Doc. 228 at 12:2–25; Doc. 227 at 16:9–17:8, 18:12–19:8.

In addition to its line agents, CBP has several special operations detachments, which consist of Border Tactical Team ("BORTAC"), Border Search Trauma and Rescue Team ("BORSTAR"), which provides medical assistance, and a Mobile Response Team ("MRT"). Doc. 75 at 14:3–10. BORTAC responds to the most dangerous situations, and its agents are skilled in building entry and serving high-risk search warrants. *Id.* at 14:11–17. Under CBP's command structure, agents report to a supervisor or team lead, who then reports to CBP's tactical operations center, which reports to the operations chief, who reports to the deputy incident commander, who reports to the incident commander. *Id.* at 19:7–24. For targeted enforcement missions, CBP uses strike teams, composed of "several unmarked vehicles, each containing two to three uniform Border Patrol Agents with clear identifiers" having the objective "to locate and apprehend individuals who are present in the United States illegally." Doc. 172-12 at 2. CBP also uses a quick reaction force ("QRF"), "a specialized group of 12 to 15 Special Operations detachment (SOD) agents, each possessing expertise in tactical operations, medical response and managing civil unrest," that "is dedicated to ensuring on-site security for strike teams during targeted enforcement missions, enabling them to operate effectively and safely in non-permissive environments." *Id.*

CBP and ICE agents have criminal and civil arrest authority, which extends beyond immigration violations to other federal offenses. 8 U.S.C. § 1357(a)(2), (4), (5); 19 U.S.C.

SA24

§ 1589a. DHS also has been charged with "protect[ing] the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property," including "areas outside the property to the extent necessary to protect" federal property. 40 U.S.C. § 1315(a), (b)(1).

### B.      Relevant DHS Policies

#### 1.      Use of Force

DHS and its component agencies have issued policy guidance on the use of force by its law enforcement officers. The Court briefly reviews each of the relevant policies below.

##### a.      DHS Use of Force Policy

DHS adopted an updated use of force policy in February 2023, which provides that generally, law enforcement officers ("LEOs") should "use force only when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is **objectively reasonable** in light of the facts and circumstances confronting the LEO at the time force is applied." Doc. 173-3 §§ II.B, III.D.1. The policy instructs LEOs to be guided by "respect for human life and the communities [DHS] serve[s]," *id.* § III.A, and to "employ tactics and techniques that effectively bring an incident under control while promoting the safety of LEOs and the public, and that minimize the risk of unintended injury or serious property damage," *id.* § III.C.1. But the policy indicates that LEOs need not "meet force with equal or lesser force" and "do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat." *Id.* §§ III.D.1, III.D.2. That said, LEOs "should also avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force." *Id.* § III.C.1. The policy emphasizes that "[t]he use of excessive force is unlawful and will not be tolerated." *Id.* § III.H.1.

Under the policy, LEOs can use deadly force "only when necessary, that is when the LEO has a reasonable belief that the subject of such force poses an imminent threat of death or serious bodily injury to the LEO or to another person." *Id.* § VI.A.1.a. LEOs cannot use deadly force solely to prevent a fleeing subject from escaping, unless the LEO has a "reasonable belief that the subject poses a significant threat of death or serious physical harm to the LEO or others and such force is necessary to prevent escape." *Id.* § VI.A.1.b. LEOs may discharge firearms only with the intent to prevent or stop threatening behavior that justifies the use of deadly force. *Id.* § VI.B.1.a. An LEO establishing a grip on, unholstering, or pointing a firearm does not amount to the use of deadly force. *Id.* § VI.B.1.b. The policy further prohibits the use of chokeholds and carotid restraints unless deadly force is authorized and specifically notes that such measures "must not be used as a means to control non-compliant subjects or persons resisting arrest." *Id.* § III.C.2. In exigent circumstances, LEOs can "use any available object or technique in a manner that is objectively reasonable in light of the circumstances." *Id.* § III.F. The policy defines exigent circumstances as "[a] situation that demands unusual or immediate action that may allow LEOs to circumvent usual procedures in order to preserve life or prevent catastrophic outcomes." *Id.* § XII.E.

The policy instructs LEOs to give warnings when feasible prior to using force and, once given, allow a reasonable opportunity for voluntary compliance before applying any force. *Id.* §§ III.E.1, III.E.2. In assessing feasibility, the policy tells LEOs to, among other things, consider whether the resulting delay from giving a warning would "a. Increase the danger to the LEO or others, including any victims and/or bystanders; b. Result in the destruction of evidence; c. Allow for a subject's escape; or d. Result in the commission of a crime." *Id.* § III.E.1.

18

SA26

The policy requires at least annual training in use of force policies, "including related legal updates, discretion in using deadly force and less than lethal force, and de-escalation techniques." *Id.* § III.I.  Training must include "scenario-based learning that simulates operating conditions" as well as "the prohibition on chokeholds and carotid restraints unless the legal standard for deadly force is met" and the "affirmative duty to intervene if a LEO is misusing force or using excessive force." *Id.*  The policy instructs agencies to conduct less lethal use of force training at least every two years, *id.* § IV.B, and requires agents to demonstrate proficiency in each less lethal device they have authorization and certification to carry, *id.* § IV.D.   The policy forbids LEOs from carrying a device for which they are not certified. *Id.*

### b.    CBP Use of Force Policy

CBP's Use of Force Policy, issued in January 2021, largely mirrors DHS' Use of Force Policy.  Doc. 35-10 at 2.  It provides that "[i]n all instances, covered in this policy or not, Authorized Officers/Agents shall only use objectively reasonable and necessary force to effectively bring an incident under control, while minimizing the risk of injury for all involved parties." *Id.* §§ 1.A.4, 1.A.5, 1.C.1.  The policy strictly prohibits the use of excessive force. *Id.* at 3.  The policy provides that agents "do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat." *Id.* § 1.A.9.b.  In an emergency situation, i.e., "an unplanned event or exigent circumstance that occurs with no advanced warning, rapidly evolves, and which requires a reactive response to address an imminent threat," agents can "use any available weapon, device, or technique in a manner that is reasonable and necessary for self-defense or the defense of another person." *Id.* § 1.E.1.

19

SA27

Before using force, the policy instructs agents to issue verbal warnings to comply when feasible, with feasibility determined by a variety of considerations, including whether the resulting delay will "a. Increase the danger to the officer/agent or others, including any victims and or bystanders; b. Result in the destruction of evidence; c. Allow for a subject's escape; or d. Result in the commission of a crime." *Id.* § 1.A.10. If an agent issues warnings, the agent should give the subject a "reasonable opportunity to voluntarily comply before applying force" where feasible. *Id.*

The CBP policy defines varying levels of resistance (passive resistance, active resistance, and two types of assaultive resistance) that call for different uses of force. The policy defines passive resistance as "[a] type of resistance that is not believed to represent an immediate threat or flight risk, and which is not physical resistance to an Authorized Officer's/Agent's control efforts, but is not cooperative." *Id.*, Appendix VI. It defines active resistance as "[a] type of resistance where physical attributes are being used to resist an officer/agent's control efforts. The efforts are not directed toward the officer/agent but rather appear intended to thwart an officer's/agent's control efforts." *Id.* Finally, the policy breaks assaultive resistance into two categories. First, as it relates to physical injury, the policy defines assaultive resistance as "[r]esistance characterized by a level of aggression or violence that causes or has the potential to cause physical injury to the officer/agent, others, or self. This includes a subject's attempts (or apparent intent) to make physical contact in an attempt to control or assault the officer/agent." *Id.* Second, as it relates to serious bodily injury or death, the policy defines assaultive resistance as "[r]esistance characterized by a level of aggression or violence that causes or has the potential to cause serious bodily injury or death to the officer/agent, others, or self." *Id.*

20

**SA28**

The CBP policy allows for the use of "[c]ontact [c]ontrols such as strategic positioning, escort holds, joint manipulation or immobilization, or touch pressure point stimulation" as compliance techniques on those offering passive resistance. *Id.* § 3.B.2.a. The CBP policy also delineates the proper uses of less lethal force, defined as "force not likely or intended to cause serious bodily injury or death." *Id.* § 3.A.1. Use of such force "must be both objectively reasonable and necessary in order to carry out the Authorized Officer's/Agent's law enforcement duties." *Id.* § 3.A.2. Those trained in less lethal force have the following options:

> a. Empty-Hand Strikes: Agents can use strike pressure point techniques to secure compliance on subjects offering active resistance, and other empty-hand strikes as defensive tactics on those offering assaultive resistance, as long as they do not target the throat or spine. *Id.* § 3.B.3. Agents cannot use "choke-holds, neck restraints, and/or any other restraint technique that applies prolonged pressure to the neck that may restrict blood flow or air passage, . . . absent circumstances where deadly force would be objectively reasonable." *Id.* § 3.B.1.a.
>
> b. Oleoresin Capsicum (OC) Spray: Agents can use OC spray for compliance purposes on those offering at minimum active resistance, *id.* § 3.B.4.a, but they should not use OC spray on small children, visibly pregnant individuals, or operators of motor vehicles, *id.* § 3.B.4.c.
>
> c. Collapsible Straight Batons (CSB): Agents may use CSBs as defensive tools on those offering assaultive resistance. *Id.* § 3.B.5.a.
>
> d. Electronic Control Weapons (ECW): Agents may use ECWs to secure compliance on individuals offering active resistance in a way that an agent "reasonably believes may result in injury to themselves or to another person." *Id.* § 3.B.6.a.
>
> e. Compressed Air Launchers (e.g., Pepperball® Launching System (PLS), FN303): The policy defines compressed air launchers as "less-lethal impact/chemical irritant delivery systems that are powered by compressed air" and can deliver various "less-lethal projectiles including kinetic impact, PAVA pepper powder, and non-toxic marking rounds." *Id.* § 3.B.7. Agents can use compressed air launchers for area saturation against individuals who demonstrate active resistance. *Id.* § 3.B.7.a. Agents may also

use them as a kinetic impact delivery system on those demonstrating assaultive resistance. *Id.* § 3.B.7.b. Agents should not use compressed air launchers on small children, the elderly, visibly pregnant individuals, or those operating a conveyance. *Id.* § 3.B.7.d. Agents also should not use compressed air launchers for kinetic impact on those less than three feet away from them unless the use of deadly force is reasonable and necessary, and an agent should not use an FN303 if less than ten feet from the subject unless the use of deadly force is reasonable and necessary. *Id.* §§ 3.B.7.e–f. Agents should not "intentionally target the head, neck, spine, or groin of the intended subject, unless the use of deadly force is reasonable." *Id.* § 3.B.7.g.

f. Munition Launchers (e.g., 40mm): Munition launchers are delivery systems for less lethal specialty impact/chemical munitions designed to deliver an impact projectile, chemical irritant projectile, or combination projectile with more accuracy, higher velocity, and longer range than projectiles deployed by hand. *Id.* § 3.B.8.

g. Less-Lethal Specialty Impact - Chemical Munitions (LLSI-CM): Agents can use a less lethal chemical munition as a compliance tool on subjects offering at minimum active resistance and a less lethal specialty impact munition as a compliance tool on subjects offering at minimum assaultive resistance. *Id.* § 3.B.8.a–b. Agents should not use either on small children, elderly, visibly pregnant individuals, around known flammable materials, or those operating conveyances. *Id.* § 3.B.8.c. Agents also should "not intentionally target the head, neck, groin, spine, or female breast." *Id.* § 3.B.8.d.

h. Vehicle Immobilization Devices (VID): VIDs "are specialized less-lethal devices whose deployment is intended to result in the controlled deflation of a vehicle tire or otherwise cause a vehicle to stop." *Id.* § 4.B.1.

i. Other less-lethal devices or techniques (e.g. Controlled Noise and Light Distraction Devices (CNLDDs)): CNLDDs are pyrotechnic devices that when activated emit bright lights and loud noises to momentarily disorient and confuse subjects and give agents a brief tactical advantage. *Id.* § 3.B.9. Agents can use CNLDDs "with supervisory approval during pre-planned law enforcement operations when actionable intelligence of pre-assault indicators or other relevant intelligence information has been identified which requires their use to gain a tactical advantage" or otherwise as compliance tools on individuals offering at minimum assaultive resistance. *Id.* § 3.B.9.a–b. Agents should not use

22

**SA30**

CNLDDs on small children, elderly, visibly pregnant individuals, or near known flammable materials. *Id.* § 3.B.9.c.

Agents must be certified in each less lethal device that they carry. *Id.* § 3.A.7.a.

The CBP policy also addresses offensive driving techniques ("ODT"), which are driving techniques "intended to end a pursuit through intentional vehicle-to-vehicle impact."[11] *Id.* § 4.C.1. Agents may use ODTs "in situations where the law enforcement benefit and the need to immobilize the subject vehicle and/or otherwise end a vehicle pursuit outweighs the immediate or foreseeable risk of injury to involved subjects and others created by the deployment of a VID or use of an ODT." *Id.* § 4.A.3. In determining whether the use of an ODT is objectively reasonable, agents should consider, among other things, "(1) Vehicle Speed; (2) Proximity of Population Centers; (3) Traffic Flow; (4) Weather or Road Conditions; and (5) Availability of Alternative Measures." *Id.* § 4.A.3.a. The policy classifies ODTs as follows: (1) "Class 1 ODTs are techniques performed at low speeds, under good road/environmental conditions, resulting in a low foreseeable risk of injury to the subject," making them less lethal applications of force; and (2) "Class 2 ODTs are techniques used when the risk of injury to the subject is elevated due to excessive speeds and/or known circumstances" and "should only be authorized when the actions of the subject driver presents an imminent threat of death or serious bodily harm," making them applications of deadly force. *Id.* § 4.C.2. Agents can only use ODTs to end a vehicular pursuit when: (1) a supervisor certified and trained by CBP to manage and authorize the use of ODT has authorized the use of the technique unless an articulable, exigent circumstance warranting deadly force exists; (2) the agent using the ODT has been certified and trained by CBP to use the

---

[11] The CBP Use of Force Policy indicates that it does not supersede a CBP directive on Emergency Driving, Including Vehicular Pursuits by U.S. Customs and Border Protection (CBP Directive 4510-26). Doc. 35-10 § 4.A.4. On January 20, 2025, however, CBP rescinded its most recent guidance related to emergency driving and vehicular pursuits. *See* U.S. Customs & Border Protection, Emergency Driving Including Vehicular Pursuits by U.S. Customs and Border Protection Personnel: Directive 4510-026, https://www.cbp.gov/document/directives/cbp-directive-4510-026.

technique; (3) "[t]he immediate or potential danger to the public created by the use of the ODT is

less than the immediate or potential danger to the public created by allowing the vehicle to

proceed without deployment of the ODT or ending the pursuit via other means is less safe or has

been determined impossible or ineffective;" and (4) the ODT is used in a way consistent with

CBP training and minimizes the risk of injury to all involved and/or damage to property.  *Id.*

§ 4.C.3.  Agents should not use ODTs in school zones where children are present or going to or

from school or where the danger to the public outweighs the enforcement benefit.  *Id.* § 4.C.5.

Otherwise, under the policy, agents can only use deadly force, defined as "force likely to

cause serious bodily injury or death to a person," when necessary, in other words, "when the

officer/agent has a reasonable belief that the subject of such force poses an imminent danger of

serious bodily injury or death to the officer/agent or to another person."  *Id.* §§ 2.A.1–2.  The

policy defines serious bodily injury as "[p]hysical injury that involves protracted and obvious

disfigurement; protracted loss or impairment of the function of a bodily member, organ, or

mental faculty; or a substantial risk of death."  *Id.* § 2.A.2.a.  Agents should not use deadly force

solely to prevent the escape of a fleeing subject, but they may use deadly force to prevent such

an escape "where the officer/agent has a reasonable belief that the subject poses a significant

threat of death or serious physical harm to the officer/agent or others and such force is necessary

to prevent escape."  *Id.* § 2.A.6.  As under the DHS policy, drawing a weapon, establishing a

grip, or pointing a weapon does not constitute the use of deadly force.  *Id.* § 2.A.10.

A CBP agent who uses force must notify their supervisor of the use of force and

document it in a system called E-STAR (Enforcement Action Statistical Analysis and Reporting

System).  Doc. 75 at 16:6–8; Doc. 35-10, Appendix VI (defining E-STAR as "[a] CBP computer

system for recording assaults, reportable uses of force, pursuits, reportable firearms discharges,

and other related data").  The agent must file the report within twenty-four hours of the use of

force and complete it within seventy-two hours.  Doc. 75 at 40:9–14; Doc. 144 at 33:12–16.

CBP's Office of Professional Responsibility investigates all uses of force, and all instances also

go before a use of force review board, which consists of each component of CBP, the Office of

Field Operations, U.S. Border Patrol, Air and Marine Operations, the Office of Chief Counsel,

and the Office of Professional Responsibility.  Doc. 75 at 38:20–39:3.  Harvick noted that agents

"are held to very high standards" and violations of the use of force policies are "not tolerated."

*Id.* at 38:12–19.

### c.    ICE Directive on Firearms and Use of Force

ICE Directive 19009.3, issued May 26, 2023, establishes ICE's policies on the use of

force and provides that ICE officers should "use force only when no reasonably effective, safe,

and feasible alternative appears to exist," and "may use only the level of force that is objectively

reasonable in light of the totality of facts and circumstances confronting the Authorized Officer

at the time force is applied."  Doc. 191-11 §§ 2, 5.1, 5.2.[12]  The policy does not, however, "create

a duty to retreat, a requirement to wait for an attack before using force, an obligation to meet

force with equal or lesser force, or a continuum or checklist of alternative steps that must be tried

before resorting to force."  *Id.* §§ 2 n.1, 5.1.  As with the DHS and CBP policies, the ICE policy

"strictly prohibit[s]" the use of excessive force.  *Id.* § 2.  When feasible, officers are to "employ

tactics to de-escalate by the use of communication or other techniques during an encounter to

stabilize, slow, or reduce the intensity of a potentially violent situation without using physical

force, or with a reduction in force."  *Id.* § 5.1(3).

---

[12] The ICE use of force policy references an ICE Firearms and Use of Force Handbook, which includes
relevant definitions, as well as detailed procedures and requirements.  *See* Doc. 191-11 §§ 3, 5. This
handbook is not in the record.

Agents may use intermediate force, i.e. "physical force that is neither likely nor intended to cause death or serious bodily injury," "only when no reasonably effective, safe, and feasible alternative appears to exist and use only the level of force that is objectively reasonable in light of the totality of facts and circumstances confronting the Authorized Officer at the time force is applied." *Id.* § 5.3(1). Agents may use "intermediate force weapons . . . in situations where empty-hand techniques are not sufficient to bring a disorderly or violent subject under control, but where deadly force is not deemed justified." *Id.* § 5.3(2). Officers may only use deadly force, i.e. "force that is likely to cause death or serious bodily injury," "when the officer has a reasonable belief that a subject of such force poses an imminent danger of serious bodily injury or death to the officer or to another person." *Id.* § 5.4(1), (3).

The ICE policy includes a use of force continuum, describing the levels of force agents can "use to gain control over a resistant subject." *Id.* § 5.5. The five levels consist of: (1) officer presence; (2) verbal commands, with "[o]nly one officer issuing verbal commands at any given time;" (3) soft techniques, such as "[e]mpty-hand techniques with a minimal chance of injury," "escort position," "[c]ome-along holds," "[u]se of touch pressure points," and "[u]se of chemical agents;" (4) hard techniques, which include "[t]echniques that have a greater possibility of injury to subjects," "strikes with a hand, arm, foot, leg, head, or the whole body," "throws," "take-downs," "specified electronic control weapons," "impact weapons when used for striking," and "specialty impact weapons;" and (5) deadly force, such as "[d]ischarge of firearms against persons or animals," "any use of impact weapons to strike the neck or head," "any strangulation techniques, including chokeholds or carotid restraints," "any strikes to the throat," and "use of any edged weapons." *Id.* § 5.5(3). ICE agents must train annually on the ICE use of force policy. *Id.* § 5.1(14).

For use of force events in the field, ICE agents must create reports, which then go into ICE's significant event notification ("SEN") system.  Doc. 75 at 70:14–17, 70:24–71:2; *see also* Doc. 191-4 at 56:16–57:16 (Hott testifying that "anything where a hard technique is utilized" goes into a "UFAD" reporting system).  When force is used at a facility, Byers testified that agents provide more of a general summary of what transpired, which Byers believed goes into a SharePoint folder.  Doc. 75 at 70:18–23, 71:9–72:18.  Reports in the SEN system go to ICE leadership, the Office of Professional Responsibility, a use of force board, and the Office of Firearms and Tactical Programs.  *Id.* at 77:1–12.  According to Byers, these committees meet monthly to review the reported uses of force and their compliance with policy.  *Id.* at 77:8–12, 16–25.

### 2.     BWCs

#### a.     CBP BWC Directive

On August 6, 2021, CBP issued CBP Directive No. 4320-030B, which requires CBP agents to use BWCs "to record official law enforcement encounters, except when doing so may jeopardize [agents] or public safety."  Doc. 40 § 2.2.  The CBP Directive defines enforcement encounters as "those actions taken by Agency personnel to carry out their mission" and include, but are not limited to, "[u]se of force incidents as defined in" CBP's Use of Force Policy, "[o]ther enforcement activities in which a video recording would assist the investigation or prosecution of a crime or when a recording of an encounter would assist in documenting the incident for further law enforcement purposes," and "[o]bserved suspicious or possible illegal activity."  *Id.* § 6.4.  The CBP Directive provides that agents do not need to record when any of the following applies, unless they are engaged in the use of force: (1) receipt of a direct order from a supervisor to deactivate the BWC for specific reasons outlined in but not limited to § 8.7

of the directive; (2) continued recording may compromise agent safety; (3) recording would interfere with the encounter or be inappropriate given the victim or witness' "physical condition, emotional state, age, or other sensitive circumstances," as determined by the "authorized personnel's judgment;" (4) a witness has concerns about retaliation based on cooperation with law enforcement; or (5) recording risks the safety of confidential informants or undercover agents. *Id.* § 8.6. The CBP Directive also instructs agents not to use BWCs to record, as relevant here, individuals engaged in First Amendment protected activity, "unless there is reasonable suspicion to believe that the situation is likely to become hostile or confrontational and evolve into an enforcement action." *Id.* § 8.7.

According to Harvick, each CBP agent participating in Operation Midway Blitz has a BWC. Doc. 75 at 11:4–5. CBP agents receive a four-hour long training on how to operate the BWC and their reporting requirements at the time they receive the BWC. *Id.* at 11:9–18, 12:10–17; Doc. 144 at 19:1–6. On October 28, however, Bovino testified that although the vast majority, approximately 99% of CBP agents, have BWCs, some agents have come from sectors that have not received BWCs yet. Doc. 144 at 18:9–25. Those without BWCs included Bovino, *id.* at 21:5–7, but he obtained one on October 30, Doc. 253.

### b.      ICE BWC Directive

On February 19, 2025, ICE issued ICE Directive 19010.3 related to BWCs. Doc. 38-1. The ICE Directive requires ICE agents to activate BWCs during enforcement activities and deactivate them when the activity has concluded.[13] *Id.* § 4.13. The ICE Directive defines enforcement activities to include but not be limited to:

---

[13] Until all ICE agents have BWCs, the directive applies only to those ICE agents in areas of responsibility where the use of BWCs and BWC responsibilities have been implemented. Doc. 38-1 § 2.2.

1) At-large arrests, including searches incident to such arrests;
2) Brief investigatory detentions, including frisks conducted during
brief investigatory detentions; 3) Executing, and attempting to
execute, criminal and administrative arrest warrants and in-person
issuance of subpoenas; 4) Executing and attempting to execute a
search or seizure warrant or order; 5) Execution of a Removal
Order, to include aboard Special High-Risk Charter Flights and to
conduct verification of Commercial Removal; 6) Deploying to
protect Federal Government facilities; 7) Responding to public,
unlawful/violent disturbances at ICE facilities; 8) Interactions with
members of the public while conducting the above-listed activities
in the field; and 9) When responding to emergencies.

*Id.* § 3.6.  The ICE Directive contains the following exceptions for where agents will not wear or

activate their BWCs:

1) Where agents are conducting undercover activity or confidential
informants will or may be present; 2) Information-gathering
surveillance activities where and when an Enforcement Activity is
not planned; 3) Onboard commercial flights; 4) Controlled
deliveries; and 5) Custodial interviews conducted inside jails,
prisons, detention centers, or ICE owned or leased facilities.

*Id.* § 3.7.  The ICE Directive also includes other exceptions to recording, which, as relevant here,

include not recording: (1) activity that would put the agent or others in a dangerous situation;

(2) for the "sole purpose of recording individuals who are engaged in activity protected by the

First Amendment," but agents should use BWCs where they "are otherwise addressing unlawful

activity, or while engaged in enforcement activities . . . or if a situation becomes violent,

dangerous, or otherwise unlawful, and requires the [agent] to take an Enforcement Action;" and

(3) for the sole purpose of recording a particular person based on a protected category, including

political affiliation.  *Id.* §§ 5.4, 5.6.

ICE SRT officers in Chicago do not have BWCs, and Byers did not believe that any ICE

SRT officers detailed to Chicago for Operation Midway Blitz had BWCs either.  Doc. 75 at

82:22–83:7.

### 3. First Amendment Activities

On May 17, 2019, the Acting Secretary of DHS issued a memorandum regarding First Amendment protected activities, which provides that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights." Doc. 35-3 at 2. The memorandum specifies that the following constitutes information regarding how an individual exercises First Amendment rights: (1) information about one's religious beliefs and practices; (2) information about one's political or personal beliefs or associations, academic or scientific inquiries, or the expressions thereof; (3) information about one's reporting activities and documentation; and (4) information about one's association's with others for lawful purposes, including participation in protests and other non-violent demonstrations. *Id.* at 2–3. According to the memorandum, DHS only collects and maintains records regarding First Amendment activity if expressly authorized by statute. *Id.* at 3.

### C. DHS Agents' Training on Use of Force

### 1. CBP

CBP officers and agents receive basic training at the U.S. Border Patrol Academy on less lethal force, which includes "arrest and control techniques, counter assault techniques, select less-lethal devices, scenario-based training, and the legal application of force." Doc. 35-4 ¶ 6; Doc. 75 at 12:24–13:3. CBP agents must have certifications for every authorized less lethal device they carry and complete an annual recertification on them. Doc. 35-4 ¶ 6; Doc. 75 at 16:16–24; Doc. 173-2 ¶ 8. CBP agents must participate in training in less lethal techniques on a quarterly basis, which includes "arrest and control techniques, counter assault techniques, CBP authorized devices, and scenario-based training." Doc. 35-4 ¶ 6. CBP agents receive eight hours

of use of force training every quarter.  Doc. 75 at 15:9–12; Doc. 173-2 ¶ 8; Doc. 255 at 224:10–15, 226:20–24.

CBP also provides more advanced mobile field force ("MFF") training, which is available but not mandatory for all agents.  Doc. 35-4 ¶ 6; Doc. 74 at 13:4–7; Doc. 173-2 ¶ 8; Doc. 191-3 at 82:6–83:5.  MFF I training addresses "crowd control familiarization, basic formations, and gas mask proficiency," and MFF II training addresses "shield and baton proficiency, multiple formations and movement, CS gas exposure, and mass arrest procedures."  Doc. 35-4 ¶ 6; Doc. 173-2 ¶ 8.  CBP's specialty teams—BORTAC, BORSTAR, MRT, and SRT—also receive additional training in the use of CNLDD and foggers.  Doc. 35-4 ¶ 6.  According to Matthew Harvey, the Director of CBP's Less-Lethal Training Branch of the Law Enforcement Safety and Compliance Directorate, CBP SRT units receive training in responding to civil unrest in urban areas and have deployed to crowd control situations in urban environments.  Doc. 35-4 ¶ 7.  BORTAC agents also conduct special operations in urban and rural environments and receive training in responding to civil unrest in urban areas.  *Id.*  Some special operations detachment agents are also cross-designated under the FPS in crowd control, Doc. 74 at 13:8–12, and Bovino represented that MFF training provides agents with training on how to perform crowd control in urban areas, Doc. 191-3 at 82:6–83:5.

Hewson testified that tear gas "doesn't harm people" and that "after you leave it, it stops those effects within 10 seconds of after getting out of the affected area."  Doc. 255 at 188:21–189:8.  He indicated that agents identify someone as assaultive, or intending to do physical harm "by their mannerisms," explaining further that "[i]f they're within reach to execute a threat, so they're threatening us for bodily harm, and then belayed themselves off in like a fighter stance,

like a boxer stance, hands up and stuff like that, those are indicators they're about to assault us or they're actually physically making contact with us." *Id.* at 225:13–21.

### 2. ICE

Regular ICE training includes an introduction to crowd control, but ICE officers do not otherwise receive regular training on crowd control. Doc. 191-4 at 32:6–11. ICE SRT agents receive special training for high-risk situations, "such as serving warrants under hazardous conditions, arresting dangerous criminals, and assisting other law enforcement agencies during critical incidents." Doc. 35-1 ¶ 24; Doc. 191-4 at 48:4–15. ICE agents receive use of force training quarterly, with ICE SRT agents receiving more than line agents. Doc. 75 at 69:11–25.

For crowd control, ICE agents receive a cross-designation from the FPS. Doc. 75 at 84:17–85:4. ICE SRT officers have additional crowd control devices like kinetic weapons and CS gas, while ICE line agents typically only have tasers, batons, and OC spray. Doc. 75 at 68:16-25; Doc. 75 at 85:13–17; Doc. 191-4 at 48:21–49:11. To use these crowd control devices, SRT agents receive specific training on each device. Doc. 75 at 69:1–9. ICE agents in Chicago also have received trainings from the U.S. Attorney's Office on what qualifies as an arrestable offense, including what constitutes obstruction and active resistance. Doc. 75 at 92:14–23.

### D. Operation Midway Blitz

On September 6, 2025, President Trump posted on social media a photograph of the Chicago skyline on fire and with military helicopters, titled "Chipocalypse Now" and stating "I love the smell of deportations in the morning…" and that "Chicago about to find out why it's called the Department of WAR." Doc. 80 ¶ 89 (reproducing September 6, 2025, 10:38 a.m. Truth Social Post). Later that week, DHS announced the launch of Operation Midway Blitz, touting that the operation "will target the worst of the worst criminal illegal aliens in Chicago"

and that President Trump and Secretary Noem "have a clear message: no city is a safe haven for

criminal illegal aliens. If you come to our country illegally and break our laws, we will hunt you

down, arrest you, deport you, and you will never return." DHS, Press Release, ICE Launches

Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Illegal Aliens

Terrorizing Americans in Sanctuary Illinois (Sep. 8, 2025),

https://www.dhs.gov/news/2025/09/08/ice-launches-operation-midway-blitz-honor-katie-

abraham-target-criminal-illegal.

Operation Midway Blitz "is a national, multi-agency operation" with the purpose of

"enforc[ing] immigration law through law enforcement efforts." Doc. 173-2 ¶ 10. As part of

Operation Midway Blitz, CBP, ICE, and other federal agents "participate in a variety of different

law enforcement actions in northern Illinois" that "primarily revolve around immigration

enforcement authorities granted under Title 8 of the U.S. Code but may also involve enforcement

of certain portions of the U.S. criminal code under Title 18." *Id.* ¶ 11. Over 200 CBP agents

"redeployed away from their patrol functions at the border to support this mission."[14] *Id.* ¶ 10.

On September 16, 2025, Bovino announced his arrival and that of "Operation At Large"

to "continue the mission [they] started in Los Angeles—to make the city safer by targeting and

arresting criminal illegal aliens" in Chicago. James Neveau et al., *Trump Signals He Will Send

National Guard to Chicago 'Against Pritzker'*, NBC Chicago (Sep. 16, 2025),

https://www.nbcchicago.com/news/local/chicago-politics/trump-signals-he-will-send-national-

guard-to-chicago-against-pritzker-after-memphis/3824883/. Bovino indicated that he reports

directly to Noem with respect to his work in the Chicagoland area, Doc. 191-3 at 47:13–17, and

---

[14] According to Harvick, 201 CBP agents, including command staff, are allotted to Operation Midway
Blitz. Doc. 75 at 12:2–3. Harvick did note that CBP has had a surplus of agents at times, so for the two
weeks before October 20, 2025 approximately 232 CBP agents were present in the Chicagoland area.
Doc. 75 at 6–9. Bovino testified that about 220 CBP agents were assigned to the operation. Doc. 191-3
at 46:18-20.

told a reporter for Telemundo that he "take[s] [his] orders from the executive branch," Doc. 94 at 4 n.5 (quoting NBC News Oct. 23, 2025 broadcast, available at https://spaces.hightail.com/space/Amkvop5Eiw). Bovino has been the face of the operation and, at least according to Harvick, is "the tactical commander of all DHS assets" for Operation Midway Blitz. Doc. 75 at 47:16–48:9. Bovino, however, was careful to identify himself only as the Commander of Operation Midway Blitz for CBP assets, but he also noted that he had command of some FBI, Drug Enforcement Administration ("DEA"), ATF, and ICE agents over the course of Operation Midway Blitz. Doc. 191-3 at 11:3–4, 17:4–15, 36:15–25. ICE representatives maintain that they operate independently from CBP, with the two agencies operating in silos but "running [on] parallel" tracks. Doc. 75 at 87:8–14, 88:1–4; Doc. 191-4 at 15:18–16:8; Doc. 191-4 at 19:9–17. According to ICE, ICE and CBP have coordinated on some aspects of the operation, however, engaging in "crosstalk" to deconflict targets and otherwise address requests from the other agency. Doc. 75 at 88:5–16, 101:18–24. Bovino claimed not to know who had control over the ICE officers in Operation Midway Blitz, Doc. 191-3 at 18:2–6, but Hott testified that he generally met with Bovino on a weekly basis for about an hour, Doc. 191-4 at 115:19–116:1. As the Incident Commander for the CBP operation in the Chicagoland area, Parra has operational oversight over and responsibility for all CBP assets and operations related to Operation Midway Blitz. Doc. 35-9 ¶¶ 2, 4; Doc. 173-2 ¶¶ 2, 4. Parra reports directly to the National Incident Command Center. Doc. 35-9 ¶ 4.

Hott testified that ICE agents did not receive any specific orders or guidelines about how to interact with civilians after the start of Operation Midway Blitz. Doc. 191-4 at 31:19–32:5. Byers, however, testified that many of ICE's fugitive operations team members went through crowd control formations training at the beginning of Operation Midway Blitz. Doc. 75 at 85:5–

12.  Byers also indicated that, in May 2025, he instructed all ICE agents at the Broadview facility to give warnings to protesters before deploying force.  *Id.* at 73:4–17.  Specifically, he stated that he told agents to give protesters three commands, including consequences for non-compliance, with pauses in between each command to provide protesters with the opportunity to comply, and that after the third ignored command, agents could attempt to move individuals if they resisted. *Id.* at 73:19–74:5, 75:12–22.  But Byers has not reiterated these instructions since May, meaning that any new agents who arrived at the Broadview facility since then had not received them.  *Id.* at 76:1–6.

Harvick testified that CBP agents did not receive any specific training before coming to Chicago on either crowd control or crowd management.  *Id.* at 18:11–15.  But Harvick noted that around 100 of the 201 CBP agents present for Operation Midway Blitz are special operations detachment agents who have had additional crowd control training.  *Id.* at 13:20–23.  Bovino claimed that CBP agents received specific training for Operation Midway Blitz, Doc. 191-3 at 89:6–13, with Parra elaborating that CBP agents participating in Operation Midway Blitz received a legal refresher on the First and Fourth Amendment put on by the CBP Office of Chief Counsel, Doc. 191-9 at 34:2–13, 36:9–20.  Parra also testified that CBP has conducted a use of force and mobile field force refresher training, which includes training on crowd control, for those participating in the operation.  *Id.* at 35:5–18, 38:21–39:21.  Harvick indicated that special detachment agents have a patch on their left shoulder or front carrier with their star number on it, Doc. 75 at 28:1–6, and that other agents have been told to use yellow duct tape and a sharpie to put their star number on their person so that it is visible at all times, Doc. 75 at 27:17–21, 28:9–23.

**E.    Defendants' View of the Public's Responses to Increased Immigration Enforcement Actions and Defendants' Statements Surrounding First Amendment Activities**

According to Hott, in connection with DHS' increased immigration enforcement actions across the country, recent months have seen "a marked increase in aggressive and hostile actors obstructing the lawful execution of ICE's federal law enforcement mission nationwide," "harass[ing], attack[ing], and brutaliz[ing]" ICE officers, doxing and threatening their family members, and vandalizing and destroying government property. Doc. 173-1 ¶ 43; *see id.* ¶¶ 44–47 (detailing actions in Los Angeles); *id.* ¶¶ 48–52 (detailing actions in Portland); *id.* ¶¶ 54–55 (detailing September shooting at ICE facility in Dallas, Texas and other actions in Texas). Along these same lines, Parra noted that public officials' statements disparaging ICE and CBP have "inflamed animosity towards CBP agents and officers." Doc. 35-9 ¶ 11. He also maintains that "CBP's frequent need to react and respond to the violent and obstructive actions of individuals and groups drains law enforcement resources and impacts the Agency's ability to perform its mission responsibilities." Doc. 173-2 ¶ 13. He testified that he considers a violent riot one where "there is force or a threat of force being made towards my agents." Doc. 191-9 at 60:18–61:1.

According to Defendants, the hostility toward increased federal immigration enforcement actions has been particularly pronounced in the Chicagoland area in response to Operation Midway Blitz. For example, Hott represents that protesters have followed vehicles leaving the Broadview facility for even up to fifty miles to photograph license plates and occupants of vehicles, then posted that information online to crowdsource identification of the vehicles and dox ICE employees.[15] Doc. 173-1 ¶ 35. Hott also claims that over twenty officers have had

---

[15] The Court notes that the two websites on which Hott relies for evidence of doxing, Doc. 173-1 ¶ 35 n.9, have very few listings and little information, with a number of the entries not restricted to Illinois, *see* ICE

36

their home addresses placed on social media.  Doc. 35-1 ¶ 23; Doc. 173-1 ¶ 34.  According to

Hott, someone followed an ERO officer home and confronted him aggressively, and then ten

days later, someone broke into that officer's garage and his government-owned vehicle, stealing

his service weapon.  Doc. 35-1 ¶ 23.  Harvick indicated that most CBP agents have worn masks

to cover their faces to protect them from doxing.  Doc. 75 at 29:12–14, 30:8–11.  But President

Trump seemed to have a different view when protesters in Los Angeles wore masks, stating in a

Truth Social post in June that "MASKS WILL NOT BE ALLOWED to be worn at protests.

What do these people have to hide, and why???"  Donald J. Trump (@realDonaldTrump), Truth

Social (June 8, 2025, 1:41 a.m.), https://truthsocial.com/@realDonaldTrump/posts/

114646378582957392.

DHS has also publicized that cartels and the Latin Kings gang have placed bounties "to

incentivize violence against federal personnel," including a payout of $2,000 for "gathering

intelligence or doxxing agents," "$5,000-$10,000 for kidnapping or non-lethal assaults on

standard ICE/CBP officers," and "[u]p to $50,000 for the assassination of high-ranking

officials."  DHS, Bounties Originating From Mexico Offered to Shoot ICE and CBP Officers in

Chicago (Oct. 14, 2025), https://www.dhs.gov/news/2025/10/14/bounties-originating-mexico-

offered-shoot-ice-and-cbp-officers-chicago (hereinafter, "DHS Oct. 14, 2025 Press Release");

*see also* Doc. 35-1 ¶ 23; Doc. 172-1 at 1; Doc. 173-1 ¶ 34; *see also* Doc. 190-6 at 4–5 (Bovino

stating in a CNN interview on October 8, 2025 that "[h]ere in Chicago, those threats against

agents are manifesting in bounties to be paid out by transnational gangs here on American soil").

DHS has also publicized investigations into "[s]potter networks," which it described as gang

List – Put ICE on ice, https://icelist.is/ (last visited Nov. 10, 2025); Stop ICE Plate Tracker,
https://www.stopice.net/platetracker/ (last visited Nov. 10, 2025).  This exaggeration of what sources
represent undermines the credibility of Hott's other statements related to the harassment of ICE agents
and more generally the credibility of Defendants' representations for why they need to use force against
Plaintiffs, class members, and other individuals in the Chicagoland area.

members having spotters specifically in the Pilsen and Little Village neighborhoods of Chicago "on rooftops equipped with firearms and radio communications" to "track ICE and CBP movements in real-time, relaying coordinates" that then "enable[ ] ambushes and disruptions during routine enforcement actions."  DHS Oct. 14, 2025 Press Release; *see also* Doc. 172-1 at 1 (October 8, 2025 FBI email containing reporting of juveniles on rooftops with walkie talkies acting as spotters to yell "La Migra" to people on the ground with guns).  Bovino echoed these statements, testifying that "several criminal networks are impeding our ability here in the Northern District," including "transnational street gangs like the Latin Kings."  Doc. 191-3 at 139:6–14.  He indicated these criminal elements have used dangerous tactics to assault border patrol agents, including "the ramming, or attempted ramming of border patrol vehicles" and "the use of spotters on rooftops."  *Id.* at 140:1–10.

Meanwhile, Defendants have made statements critical of the First Amendment right to protest or speak critically about the administration's actions.  President Trump, when talking about the military parade held on June 14, said that for any protesters who want to protest, "they will be met with very big force," further describing protesters as "people who hate our country." TIME, *Trump Warns, Military Parade Protests Will Face 'Very Big Force*,' YouTube (June 10, 2025), https://www.youtube.com/watch?v=kuKjAIBP8go&t=52s.  Later, the White House press secretary had to walk these comments back, attempting to clarify that President Trump "supports peaceful protests," "the First Amendment," and "the right of Americans to make their voices heard," but he "does not support violence of any kind" or "assaulting law enforcement officers who are simply trying to do their job."  Stacey Dec, *White House tries to clarify Trump's threat to use 'heavy force' on 'any' military parade protesters*, ABC News (June 11, 2025), https://abcnews.go.com/Politics/white-house-clarify-trumps-threat-heavy-force-

military/story?id=122746297.  In September 2025, President Trump suggested that critical

coverage of him was "illegal," noting that "[w]hen 97 percent of the stories are bad about a

person, it's no longer free speech."  Irie Sentner, *Trump: "It's no longer free speech."*, Politico

(Sep. 19, 2025), https://www.politico.com/news/2025/09/19/trump-no-longer-free-speech-

00574219.  On November 2, 2025, during a 60 Minutes interview, President Trump indicated

that he did not believe that the immigration raids had "gone far enough[,] [b]ecause we've been

held back by the judges," and signaled that he approved of agents' tactics.  Doc. 190-14 (Ex. 132

at 7:05–7:30, available at https://spaces.hightail.com/space/4VxbTIA8CM).

In a July 12, 2025 press conference, Secretary Noem stated that "violence is anything that

threatens [ICE officers] and their safety.  So it is doxing them, it's videotaping them, where

they're at when they're out on operations, encouraging other people to come and to throw things,

rocks, bottles, . . . Molotov cocktails. . . . You don't throw rocks at vehicles like that and you

don't attack them like that unless you are trying to do harm to them physically and to kill them

and to take their lives."  Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents is

'Violence' Following Camarillo, California Farm Raids*, YouTube (July 15, 2025),

https://www.youtube.com/watch?v=uDFX4q6huH8.  Secretary Noem further described reporting

on locations of immigration enforcement agents as illegal because it "is actively encouraging

people to avoid law enforcement activities and operations."  Edward Helmore, *Trump is waging

war against the media – and winning*, The Guardian (July 5, 2025),

https://www.theguardian.com/us-news/ng-interactive/2025/jul/05/trump-attack-us-media.

In a June 7, 2025 BWC video of Bovino in Los Angeles, he stated to federal agents under

his command "[a]rrest as many people, that touch you, as you want to.  Those are the general

orders, all the way to the top, everybody fucking gets it if they touch you."  Doc. 191-3 at 143:4–

17.[16]  Bovino explained that he views someone touching an agent as an assault.  Doc. 191-3 at

146:15–147:3.

On October 3, 2025, Secretary Noem spoke to agents at the Broadview facility before

they began their shift.  She said:

> When we leave here, we're going to go hard.  We're going to
> hammer these guys who are advocating for violence against the
> American people.  What they are doing is advocating to harm not
> just you and your colleagues but your families and they're doxing
> your identities and victimizing people every day by the way that
> they're talking, speaking, who they're affiliated with, who they're
> funded with, and what they're talking about as far as consequences
> for what we're doing by protecting this country.  So we're going to
> go out there and we're going to make sure that there's
> consequences for the way that they're behaving, and then we're
> going to prosecute them.  We're going to bring them to justice.
> We're not taking this anymore. . . .  We're going to give you guys
> all the authority that you need to arrest these individuals who are
> advocating for violence against you.

Benny Johnson (@bennyjohnson), X (Oct. 3, 2025 1:05 p.m.), https://x.com/bennyjohnson/

status/1974174065985470970.  Bovino followed up by telling the agents:

> You're going to be put in full effect . . . That crowd there is, is an
> unsafe crowd on either side. . . . And when they resist, what
> happens?  They get arrested.  So it's now going to be a free arrest
> zone.  And, I'll give them one warning that that'll be for safety of,
> of us and the Secretary to leave.  So they're getting it here as soon
> as we leave.

*Id.*  Secretary Noem finished by stating, "[m]ake sure that these individuals are not allowed to

conduct this kind of activity anymore."  *Id.*

During questioning about this video during his deposition, Bovino agreed that "as part of

[his] mission in the Northern District of Illinois, it is necessary, it is [his] mission, to go hard

against those who are advocating for violence."  Doc. 191-3 at 188:4–8.  He further agreed that

---

[16] The June 7, 2025 BWC video, identified by Plaintiffs as Exhibit 258, is available at
https://iln.box.com/s/sakw09a5oakdbz8nrm8klfoyilel4pqp.

CBP agents would "hammer people that advocate for violence." *Id.* at 192:15–17. Bovino instructed his "officers that when threats are made, which is advocacy of violent threats against law enforcement officers are made, that they are – that is arrestable." *Id.* at 194:4–7; *see also id.* at 194:13–16 (Bovino testifying that he has told agents to "go hard against people that are advocating threats, violence, death against those, in the form of threats"). On October 13, 2025, Bovino posted to X that he "support[s] the right to protest, but public and agent safety is non-negotiable" and indicating a "[z]ero tolerance" policy for such actions. Commander Op At Large CA Gregory K Bovino (@CMDROpAtLargeCA), X (Oct. 13, 2025 11:46 a.m.), https://x.com/CMDROpAtLargeCA/status/1977778019046674796.

In an October 8, 2025 CNN interview, Bovino stated that "[i]f [the City of Chicago is] going to create a sanctuary behind signs, then we'll go behind those signs and ensure that it's not a sanctuary." Doc. 190-6 at 7.[17] Further, he explained, "when someone steps in the way, . . . that may not work out well for them. And if we need to effect an arrest of a U.S. citizen or anyone else, then we'll do that." *Id.* at 8–9.

In an October 23, 2025 CBS News interview, Bovino explained that the uses of force that he had seen in the Chicagoland area have "been exemplary," in other words, "the least amount of force necessary to accomplish the mission." Doc. 190-5 at 4.[18] He further emphasized in his deposition that he believes that "[a]ll uses of force [in the Northern District of Illinois] have been more than exemplary." Doc. 191-3 at 156:6–7. When questioned further in the CBS News interview, Bovino indicated that firing from elevation fell within DHS policy, as could aiming above the waist. Doc. 190-5 at 4–5. He also stated that "[i]f someone strays into a pepper ball,

---

[17] Video of this interview is available at Doc. 190-14 (Ex. 129, available at https://spaces.hightail.com/space/4VxbTIA8CM).

[18] Video of this interview is available at Doc. 190-14 (Ex. 127, available at https://spaces.hightail.com/space/4VxbTIA8CM).

then that's on them. Don't protest, and don't trespass." *Id.* In his deposition, Bovino tried to

explain this statement away by stating that not protesting and not trespassing are mutually

inclusive, meaning that if you protest *and* trespass, DHS policy allows for area saturation with a

pepper ball. Doc. 191-3 at 159:15–160:4.

### F.    Specific Incidents

The Court now addresses specific incidents involving protesters that the parties have

brought to the Court's attention.

#### 1.    Broadview

##### a.    Broadview Facility and its Security

The Broadview facility, located at 1930 Beach Street, is an ICE-owned property

that it uses for intake and processing of individuals arrested by ICE and CBP. Doc. 35-1 ¶ 8

(second ¶ 8); Doc. 173-1 ¶ 12; Doc. 75 at 63:21–23. ICE has used the facility for over forty

years, and it sits near the dead end of a cul-de-sac. Doc. 35-1 ¶ 8. The Village of Broadview

zoned the area around the facility as commercial or industrial, with the closest business having a

separate ingress and egress. *Id.*

Because ICE owns the Broadview facility, FPS does not protect it. Doc. 173-1 ¶ 19.

Instead, ICE has historically protected its own facility. Doc. 75 at 65:1–6. But as protests

increased outside the facility, other federal agencies began helping ICE protect the facility. *Id.* at

65:6–15; Doc. 173-1 ¶ 19. For example, ICE ERO has received help guarding the Broadview

facility from HSI, BOP, FBI, ATF, DEA, and CBP. Doc. 35-1 ¶ 25; Doc. 173-1 ¶¶ 19, 38. ERO

also called in additional support from CBP's BORTAC, SRT , and HSI SRT teams for the

weekend of September 19 to 20, 2025. Doc. 35-1 ¶ 26.

ICE ERO also internally shifted resources to protect the Broadview facility and its employees. Doc. 173-1 ¶ 19. Five ERO SRT groups moved to Broadview from El Paso, New York, Phoenix, and other cities to assist, with each team typically having sixteen officers. *Id*. Adding these SRT members diverted important limited resources away from federal law enforcement operations outside of the Broadview facility. *Id.* ¶ 37. ERO also moved approximately twenty-one of its thirty-one Broadview facility officers to secure the outside perimeter of the facility, which "has caused the processing of aliens to slow down at [the facility], created a strain on [the facility's] employee work hours, and has caused another ICE facility to facilitate in the processing of aliens." *Id.* ¶ 39. Specifically, as of September 7, 2025, all Broadview facility officers increased their workload from five-day eight-hour schedules to six-day twelve-hour schedules. *Id.* ¶¶ 37, 39; Doc. 35-1 ¶ 24. And because ICE shifted officers away from transporting and booking individuals, on September 14, 2025, the Broadview facility sent approximately 131 unprocessed aliens to ICE's El Paso facility for processing, which strained El Paso's resources. Doc. 173-1 ¶ 39.

To further protect its property and personnel, ERO installed high-power, generator-powered lights around the perimeter of the Broadview facility to better see the areas where protesters commonly gathered. Doc. 35-1 ¶ 27. ERO also installed an anti-climb fence outside the Broadview facility overnight between September 22 and 23, 2025. *Id.* ¶ 31. After ERO installed the fence, Byers estimated that the number of agents protecting the facility per shift decreased from about forty to fifty agents to closer to twelve to fifteen agents. Doc. 75 at 66:23–67:1, 67:7–23. He indicated that more agents help on the weekends when protests are larger. *Id.* at 68:8–12. The fence's gate, which took less than two minutes to open, allowed access to the facility, and ICE stationed someone there twenty-four hours a day to open the gate in an

43

**SA51**

emergency. *Id.* ¶ 33. Vehicles could enter or leave the facility by using an alternate point of entry via Harvard Street. *Id.* ¶ 32. According to Hott, the fence did not affect commercial traffic. *Id.* ¶ 8.

Matthew Martin, the Acting Chief of the Broadview Fire Department, indicated that Broadview Police Department officers discovered the fence constructed on Beach Street around the perimeter of the Broadview facility on September 23, 2025 around 2:00 a.m. Doc. 22-36 ¶¶ 2–4. Martin stated that ERO erected the fence without seeking a permit from the Village or even warning the Village. *Id.* ¶ 8. Martin explained that the fence required federal agents to manually open the gate, which they had padlocked. *Id.* ¶ 9. And contrary to Hott, Martin claimed the fence blocked access to various private businesses. *Id.* ¶¶ 7–8. Pursuant to a court order, the federal government removed the fence it had constructed outside the Broadview facility on October 14, 2025. *See Vill. of Broadview v. U.S. Dep't of Homeland Sec.*, No. 25 C 12164, 2025 WL 2896819, at *8 (N.D. Ill. Oct. 9, 2025).[19]

On October 2, 2025, Illinois State Police ("ISP"), the Broadview police, and other state and local agencies announced a Unified Command to coordinate public safety measures around the Broadview facility and help protect First Amendment rights. Doc. 173-1 ¶ 56. The Unified Command established designated protest zones, placing concrete barriers on Beach Street public land. *Id.*; Doc. 35-1 ¶ 37. The Unified Command maintained security at Beach Street, Harvard Street, and South 25th Street on October 3, 2025. Doc. 35-1 ¶ 37.

---

[19] On October 3, 2025, the Village of Broadview sued DHS, Noem, Lyons, and Hott alleging that the federal government's construction of the fence on the Village's property violated state and federal law. *See Vill. of Broadview*, No. 25 C 12164, Doc. 1. On October 9, 2025, a court in this district temporarily enjoined the federal government from maintaining and operating the fence and ordered it to dismantle and remove the fence. *See Vill. of Broadview*, 2025 WL 2896819, at *8. On October 10, 2025, the court converted the temporary restraining order into a preliminary injunction and ordered the fence removed by 11:59 p.m. on October 14. *See Vill. of Broadview*, No. 25 C 12164, Doc. 36.

At the time of Hott's departure from Chicago on October 17, 2025, officers from the

Unified Command were present twenty-four hours a day.  Doc. 173-1 ¶ 56.  The Unified

Command has reduced the need for federal agents to engage with protestors at the Broadview

facility, with state and local officials taking primary responsibility for crowd control and arrests.

*Id.* ¶ 57.  Before the Unified Command took the lead, Hott reports that ERO had arrested

approximately fifty protesters for assault, obstruction, trespassing, and other charges.  Doc. 35-1

¶ 30.  He specifically highlights September 26 and 27, 2025, on which ERO arrested sixteen

protesters, including three with concealed semi-automatic weapons.  *Id.* ¶ 30.

On October 6, 2025, the Village of Broadview issued Executive Order No. 2025-01

placing time restrictions on protests at the Broadview facility, allowing protests and gatherings at

the Broadview facility and the designated protest area of 2000 South 25th Avenue, Broadview,

Illinois from 9 a.m. to 6 p.m.  Doc. 73-30.  The Broadview mayor also limited protest activity to

Beach Street and restricted activity near 25th Avenue and Harvard Street.  Doc. 173-1 ¶ 56.

### b.    Defendants' General Statements about Broadview Protests

According to Defendants, protests at the Broadview facility have interfered with ICE's

immigration operations and devolved into violence.  Doc. 35-1 ¶ 9; Doc. 173-1 ¶ 13.  Hott

recounted protesters at the Broadview facility physically assaulting personnel attempting to go to

and leave work, which forced employees to call the office when they arrive so that additional

officers can escort them from an open lot parking lot to the building, and then to repeat this ritual

to leave.  Doc. 35-1 ¶ 10; Doc. 173-1 ¶ 16.  Hott also reported that people have vandalized

government and employee-owned cars, "with tires slashed and flour poured in a gas tank."  Doc.

35-1 ¶ 10.  He also claimed that protesters mistakenly vandalized the car of a neighboring

business' employee and otherwise accosted other businesses' employees.  Doc. 35-1 ¶ 11; Doc.

173-1 ¶ 17.  Hott also stated that protesters damaged property with graffiti (including with "F*CK ICE") and destroyed the facility's external plumbing systems by breaking off plumbing and downspouts.  Doc. 35-1 ¶ 12; Doc. 173-1 ¶ 18.  ICE allegedly discovered an improvised explosives device on the property.  Doc. 35-1 ¶ 19; Doc. 173-1 ¶ 29.  According to Hott, agents have reported protesters trying to pull off their masks and gear, including CS canisters.  Doc. 35-1 ¶ 17; Doc. 173-1 ¶ 24.  Hott represented that protesters have come in vans and with shields, gas masks, protective padding, and other tools, with the vans returning with new protesters and taking the others away.  Doc. 35-1 ¶ 21; Doc. 173-1 ¶ 32.  According to Hott, over thirty ERO officers have suffered injuries, including a torn ACL, "a beard ripped from an officer's face," lacerations, cuts, bruises, hospitalizations, and a hyper-extended knee.  Doc. 35-1 ¶ 22; Doc. 173-1 ¶ 33.  To respond to the violence at the Broadview facility, Hott represented that ERO Chicago used $100,000 worth of less lethal munitions and chemicals for crowd control between September 6 and September 20, 2025.  Doc. 35-1 ¶ 18; Doc. 173-1 ¶ 24.

According to Parra, at the Broadview facility, "it is not easy to distinguish between religious observers and the rest of the crowd," he "has not witnessed any observable religious practices in the events [he] ha[s] been involved with," and he has "not seen any reporting which would cause [him] to believe that CBP personnel have directly targeted religious observers for enforcement actions."  Doc. 173-2 ¶ 14.  Nor has he "seen any reporting that would cause [him] to believe that CBP personnel have directly targeted journalists or members of the press for enforcement actions."  *Id.* ¶ 15.

### c.    September 5 and 6, 2025

In the first half of September 2025, federal agents' interactions with those gathered outside the Broadview facility remained relatively restrained.  For example, Rev. David Black,

the Senior Pastor and Head of Staff at The First Presbyterian Church of Chicago, protested and ministered at the Broadview ICE facility on September 5 without incident.  Doc. 22-1 ¶¶ 1–2. Black and a large group of clergy members gathered to sing, march, and pray on the street in front of the facility.  *Id.* ¶ 3.  ICE officers, while present, remained behind the facility fence.  *Id.* Rev. Dr. Beth Johnson, an ordained minister who works at the Unitarian Universalist Church of Hinsdale, was also present at the Broadview facility that day.  Doc. 22-3 ¶¶ 1–2.  She wore her religious collar and joined a group called Songs for Liberation on the street, sidewalk, and grass outside the facility to pray the Rosary.  *Id.* ¶ 2–4.  After the group finished praying, agents deployed some pepper balls against the people gathered.  *Id.* ¶ 4.

On September 6, protesters blocked federal vehicles and impeded their access to the Broadview facility, interfering with ICE operations.  Doc. 173-1 ¶ 15.  In response, ICE officers warned protesters that they could not block traffic, had to remain on the sidewalk, and could not come on federal property toward the gate on numerous occasions.  *Id.*  Because a woman refused to move for an oncoming vehicle, yelled obscenities at officers, and clinched her hand in a fist, officers removed the woman from the facility's driveway.  *Id.*  Officers also removed a man who "puffed his chest and acted aggressively towards an officer."  *Id.*

### d.    September 12 and 13, 2025

By mid-September, the number of people visiting the Broadview facility increased and their interactions with federal agents escalated.  Father Brendan Curran, a Catholic priest with the Dominican Friars, attended his weekly prayer vigil[20] at the Broadview facility on the

---

[20] Fr. Curran began Friday prayer vigils at the Broadview facility approximately nineteen years ago.  Doc. 22-2 ¶¶ 1–2; Doc. 255 at 16:3–16.  At these vigils, he would gather with other Catholic priests, nuns, brothers, religious clergy, and lay people to pray for those detained in the facility, their families, and those working at the facility.  Doc. 22-2 ¶ 3; Doc. 255 at 16:19–15.  The prayer vigil would take place in front of the Broadview facility's main entrance ramp, often near the access ramp or on the grass in front of the sidewalk in front of the front entrance.  Doc. 22-2 ¶ 7; Doc. 255 at 17:16–21:18.  The gatherings had

47

morning of September 12 and observed agents in camouflage fatigues and masks on the roof of

the facility with guns pointed in the direction of those gathered to pray. Doc. 22-2 ¶¶ 9–10.

Then, as some agents left the facility and walked towards their vehicles, Fr. Curran observed

them push protesters, even though no protesters took any action to physically threaten the agents.

*Id.* ¶¶ 15–16. Scott Sakiyama, who was also present at the Broadview facility this morning with

"a few peaceful protesters," corroborates this incident, describing twenty SRT agents in tactical

gear and camouflage leaving the facility and an agent pushing his friend as they tried to get out

of the way of a vehicle driving down Harvard Street. Doc. 22-15 ¶¶ 9–10; *see also* Axon_Body_

3_Video_2025-09-12_1254_X60AB375H at 1:30–1:57 (agents pulling protesters out of the

street); Axon_Body_3_Video_2025-09-12_1116_X60AB375H at 00:00–00:05 (agents pulling

and shoving a protester).

More people gathered outside the Broadview facility on the afternoon and evening of

September 12. Ashley Vaughan, who has a neurological condition limiting her mobility and

requiring her to use a mobility cane, attended a protest in the late afternoon and sat down on

public property near where the sidewalk met the road in front of the facility's garage. Doc. 73-

20 ¶¶ 4, 6, 8. Around 4:30 or 5:00 p.m., some officers and a vehicle exited the parking lot's gate,

with the vehicle making a hard left turn to avoid the protesters in the street. *Id.* ¶ 9. Vaughan

continued to sit on the sidewalk in front of the garage, and a larger crowd gathered, with some

singing, drumming, and chanting. *Id.* ¶¶ 10–11. Jaymi Raad described a calm and friendly

atmosphere, with people in lawn chairs or on picnic blankets, and some people reading, praying,

or talking quietly. Doc. 73-23 ¶¶ 2, 4. Raad stood on the street near the facility's garage door

and led protest chants. *Id.* ¶ 10.

---

occurred without any threat of violence for nineteen years until September 2025. Doc. 22-2 ¶ 8; Doc. 255 at 22:1–13 (describing the Broadview facility as having become an "utterly militarized zone"). After ICE erected the fence, the prayer vigil had to move further away from the facility. Doc. 255 at 23:13–21.

Around 5:45 p.m., Vaughan looked up at the agents on the facility's roof and saw a red ball coming toward her face without warning. Doc. 73-20 ¶ 12. The red ball hit her between the eyes, and she subsequently could not open her eyes, find her cane, or get to her feet. *Id.* Raad watched as agents walked out of the garage door, some in gas masks, and, without any dispersal order or warning, started shooting pepper balls at the people in the driveway, including at Vaughan, who could only crawl as agents shot at her. Doc. 73-23 ¶¶ 11–12. The agents continued to shoot objects at the protesters and push them back. *Id.* Suddenly, an agent sprayed something on Vaughan from only a few feet away, causing her eyes, mouth, lungs, and skin to burn and restricting her breathing. *Id.* ¶¶ 12–13. Two protesters helped Vaughan get to her feet and cross the street away from the agents. *Id.*

As Raad helped gather Vaughan's belongings after an ambulance arrived, Raad heard an automated message indicating that it was federal property and that people needed to leave or else force, including chemical weapons, may be used. *Id.* ¶ 16. This was the only such announcement Raad heard while outside the Broadview facility that day. *Id.* Paramedics took Vaughan to the emergency room, where a doctor discharged her with a head injury treated as a mild concussion. *Id.* ¶¶ 15–16.

Defendants claim that someone advised CBP personnel that agents in a marked vehicle could not exit the facility because a crowd blocked them. Doc. 173-2 ¶ 16. CBP SRT agents estimated over 200 people , with many of them in masks, gloves, helmets, and carrying improvised shields, gathered outside the facility. *Id.* However, BWC footage does not support this:

49

**SA57**



Axon_Body_3_Video_2025-09-12_1254_X60AB375H at 2:46 (crowd at approximately 1:00 p.m.).



Axon_Body_3_Video_2025-09-12_1923_X60AB375H at 3:33 (crowd at approximately 6:30 p.m.).

SRT agents told the crowd to clear a path for officer safety, but when several individuals did not comply, an SRT agent used a PLS in the direction of the driveway to disperse the crowd. Doc. 173-2 ¶ 16; Axon_Body_3_Video_2025-09-12_1923_X60AB375H at 2:31–2:50.

According to Parra, because the PLS "is not a precision tool" from a distance, "it cannot be meaningfully used to target an individual's person."  Doc. 173-2 ¶ 16.

On September 13, Hott explained that one protester jumped on the hood of a federal vehicle, causing the vehicle to stop and allowing another protester standing behind the vehicle to slash the car's tires.  Doc. 35-1 ¶ 10; Doc. 173-1 ¶ 16.[21]

### e.     Morning of September 19, 2025

Federal agents escalated their response to protesters, religious practitioners, and the press on September 19, 2025.  Sakiyama observed agents on the roof of the facility shoot pepper balls at people as cars entered and exited the facility.  Doc. 22-15 ¶ 13.  Around 6:34 a.m., Sakiyama recorded ERO agents pull Kat Abughazaleh,[22] a candidate for the U.S. House of Representatives, away from the facility, with one agent throwing her to the ground at Beach and Harvard Streets.  *Id.* ¶ 14.  Abughazaleh had been sitting on the street in front of the facility's driveway entrance holding a sign while protesters shouted "How do you spell fascist?  I-C-E" and "Shame on you."  *See* Kat Abughazaleh (@KatAbughazaleh), X (Sep. 19, 2025 7:20 a.m.), https://x.com/ KatAbughazaleh/status/1969013628398411810; *see also* Axon_Body_4_Video_2025-09-19_ 0713_D01A2734X at 2:15–3:25.

Sakiyama thought he saw agents take pictures of protesters.  *Id.* ¶ 16.  Alexandria Onion, who arrived at the Broadview facility around 7:00 a.m., also saw agents taking pictures or videos of the crowd from the roof.  Doc. 73-26 ¶ 7.  Shortly thereafter, Onion heard an automated message on a loudspeaker, stating that protesters were obstructing justice, infringing on federal processes, and that agents could arrest and subject the protesters to chemical agents.  *Id.* ¶ 8.  The

---

[21] Hott represented that protesters repeated this attack more than a dozen times on different dates.  Doc. 173-1 ¶ 16.

[22] The Court notes that the government later indicted Abughazaleh and five others for a separate incident at the Broadview facility on September 26, 2025.  *See US v. Rabbitt*, No. 25 CR 693 (N.D. Ill.).

message played repeatedly and loudly.  *Id*.  Hott confirmed that agents played a warning over a

Long-Range Acoustic Device ("LRAD") several times, cautioning protesters of arrest and the

use of chemical agents.  Doc. 173-1 ¶ 20.

Around 8:30 a.m., as an ICE ERO vehicle attempted to leave the facility, a CBP agent

reported that protesters obstructed the movement of the vehicle, including by sitting on and in

front of the vehicle and hitting and pushing against it.  Doc. 172-9 at 2.  Another CBP agent

reported that protesters blocked a car from exiting the facility, locked arms, yelled obscenities,

and gave agents the middle finger.  *Id.* at 6.  According to agents, while they conveyed multiple

commands and warnings to step away from the vehicle and disperse, protesters did not comply

and "continued to shout profanities and abusive language."  *Id.* at 3.  Then, a CBP BORSTAR

agent on the roof of the facility used his PLS to launch about three volleys of four to six

projectiles at protesters who stood about sixty feet away, but protesters continued to surround the

vehicle.  *Id*. at 12.  BWC footage from this same event shows a vehicle exiting the facility and

stopping before a crowd of protesters positioned on the sidewalk.  *See*

Axon_Body_4_Video_2025-09-19_0935_D01A0012X at 1:15–1:27.  Some protesters linked

their arms in front of the vehicle, and at least two protesters touched the hood of the vehicle, but

most protesters did not come close to the vehicle or otherwise hit or surround it:[23]

---

[23] The first two minutes of this BWC footage does not include audio, and so the Court cannot hear if
agents gave warnings to the protesters.



*Id.* at 1:28–1:34 (brightness increased by 10%). An agent, standing ten feet away from protesters, deployed a saf-smoke canister "to encourage the protesters to clear the area before the potential use of agitating chemical agents." Doc. 172-9 at 6. A protester later identified as Justice Kopecky threw the canister back at agents. *Id.* at 3. Agents promptly responded by shooting pepper balls at and tackling Kopecky:




Axon_Body_4_Video_2025-09-19_0935_D01A0012X at 1:30–01:38.

**SA61**

Reporting that the saf-smoke did not affect protesters, the agent then used an "Instantaneous Blast Powder CS grenade" from about ten feet away from protesters. Doc. 172-9 at 6. Another agent saw an individual try to kick the gas device back towards the agents and, after the individual missed the kick, motion as if they would pick the gas device up and throw it at the agents. *Id.* at 9. Agents instructed the individual to "stop messing with the device," but they did not listen. *Id.* at 10. An agent then launched about four projectiles from his PLS from about fifteen feet away around 8:37 a.m. toward the individual's feet to prevent them from grabbing the device and throwing it back at agents. *Id.*

Around 8:36 a.m., another CBP agent launched two to three pepper balls from about fifteen feet away to try and get individuals away from the vehicle, but protesters continued to sit on the bumper, hit the vehicle, yell profanities at agents, and ignore instructions to get away from the vehicle. *Id.* at 9. BWC footage shows agents attempting to physically remove a man sitting on the vehicle's hood. Axon_Body_4_Video_2025-09-19_0935_D01A0012X at 2:13–2:34. Around this time, the BWC footage shows an agent throw another canister of tear gas towards protesters, even though the vehicle had already left after the protesters moved many feet back from the existing tear gas and pepper balls. Axon_Body_4_Video_2025-09-19_0935_D01A0012X at 3:25–3:36.

One of the CBP agents noticed a PLS and a hand-thrown munitions ("HTM") grenade in front of him, both of which he retrieved and secured. Doc. 172-9 at 3. He also noticed the crowd coming closer, with some protesters "making lunging movements towards [him] and the agents nearby." *Id.* The agent deployed the PLS around 8:40 a.m., discharging one volley of two to three pepper balls from about five to eight feet to disperse the crowd. *Id.* He stated that he executed each volley "in a controlled and targeted manner, directed at individuals actively

obstructing and impeding the only egress route available for law enforcement vehicles to exit the ERO facility." *Id.* ICE SRT agents then used chemical munitions as well. *Id.* As agents deployed the less lethal munitions, another CBP agent recounted "encounter[ing] assaultive behavior from the crowd as they began to throw and kick [the] deployed less-lethal munitions back at the officers and agents." *Id.* at 6–7.

Then, around 9:00 a.m., as another vehicle tried to leave the facility and a crowd gathered and refused to disperse despite loud orders to do so, an agent deployed a pocket tactical CS munition approximately ten to fifteen feet in front of him. *Id.* at 3. He noted that the crowd was about five to eight feet in front of him, but the wind was blowing toward him, so he considered it more effective to place the munition behind the crowd for the wind to carry to them. *Id.* The CBP agents did not wear BWCs because ICE SRT agents had advised them the crowd would likely try to grab items from them. *Id.* at 4, 7. At least one of the agents reported clearly displaying his call sign on his body armor carrier, however. *Id.* at 2.

Protesters outside the facility relay a slightly different story. Around 8:30 a.m., Onion saw agents dressed in camouflage and military gear wearing bulletproof vests, helmets, and gas masks lined up behind the facility's gate. Doc. 73-26 ¶ 9. Agents opened the gate and drove two cars toward the street, where multiple people stood and about five people lay in the driveway. *Id.* ¶¶ 10–11. Suddenly, agents on the roof shot pepper balls or rubber bullets toward protesters, and a cloud of smoke came from the parking lot.[24] *Id.* ¶ 11. Alderman Byron Sigcho-Lopez[25] did not hear an order to disperse or any other instructions. Doc. 22-5 ¶ 6. He felt a tear gas

---

[24] According to Harvey, CBP officers do not use rubber bullets. Doc. 35-4 ¶ 8.

[25] Sigcho-Lopez serves as the Alderman for the 25th Ward in the City of Chicago, which includes Pilsen, Little Village, University Village, Marshall Square, and the Heart of Chicago neighborhoods. Doc. 22-5 ¶ 1.

canister hit his leg, immobilizing him for several minutes.  *Id*.  Another protester provided

Sigcho-Lopez with an inhaler so he could breathe.  *Id*.

Around 12:00 p.m. the same day, Hott reported that about twenty-five individuals

blocked an ERO vehicle from leaving the Broadview facility.  Doc. 173-2 ¶ 18.  An advance

team of agents left the gate first and instructed protesters to clear the area to make room for the

vehicle.  *Id*.  When two to three individuals ignored the commands, CBP agents used less lethal

munitions to move those individuals away from the gate.  *Id*.

### f.    Evening of September 19, 2025

Protesters also gathered near the Broadview facility in the evening of September 19.

Madeline Sullivan arrived at the Broadview facility around 6:00 p.m. and over the next two

hours watched agents intermittently open the parking lot gate and come out to chase people in

the crowd.  Doc. 22-7 ¶ 6.  In one instance, Sullivan observed agents grab and shove a woman to

the ground who had been peacefully chanting and holding a sign.  *Id*. ¶ 8.  In another instance,

she noticed agents on the roof shooting pepper balls at protesters.  *Id*. ¶¶ 7–8.[26]

Agents reported arresting six individuals between 6:30 and 6:40 p.m.  For example, at

6:30 p.m., CBP Officer Eduardo Forte heard his team lead tell the "arrest team [to] get ready."

Doc. 172-5 at 2; Doc. 172-6 at 2.  He noticed other agents pointing at protester Marcos Rios

trying to get away and went to stop him by running into Rios, who then began resisting.  Doc.

172-5 at 2; Doc. 172-6 at 2.  With the help of other agents, Forte carried Rios into the Broadview

facility.  Doc. 172-5 at 2; Doc. 172-6 at 2.  Forte then rejoined agents helping with crowd control

and noticed agents struggling to detain individuals.  Doc. 172-5 at 2.  As Forte approached a

group to help, Antonio Reyes kicked him, causing Forte to trip and run into his fellow agents.

---

[26] Sullivan noticed that none of the agents wore badges, badge numbers, or names on their uniforms and that all of the agents covered their faces.  Doc. 22-7 ¶ 6.

*Id.* Forte then turned and tackled Reyes, who resisted and tried to grab tools from agents' vests and belts. *Id.*[27] Around 6:52 p.m., CBP SRT Officer Luis Aguirre, Jr. launched about four to five projectiles that hit Reyes' abdominal area because Reyes was kicking Forte in the lower body. Doc. 172-8 at 21. Agents ultimately had to carry Reyes into the facility by grabbing each limb. Doc. 172-5 at 2–3.

Also around 6:30 p.m., a CBP agent saw Nathan Bouchie, who was wearing a helmet, goggles, black backpack, and mask, pick something up and throw it at CBP agents trying to move the crowd back. Doc. 172-2 at 2, 3. The agent saw Bouchie pick up another item, at which point agents took Bouchie to the ground, applied flex cuffs to him, and took him into custody. *Id.* at 2. At this same time, CBP Officer JCLee Guzman exited the facility's fence line and heard the crowd yell "fuck ICE, go home ICE, & fuck you." Doc. 172-4 at 2. Guzman reported giving commands "to the large mob" to move away from the street and then seeing people pushing agents and throwing objects at them when they tried to arrest an individual. *Id.* Guzman then saw Hanna McKeever swing her backpack at agents trying to make an arrest, prompting Guzman to handcuff her and take her to the Broadview facility for processing. *Id.* Around 6:35 p.m., CBP SRT Officer Hunter Way was helping clear the entrance to the facility when he saw protesters throw objects at agents. Doc. 172-3 at 2. As Way moved to apprehend a protester, Hannah Chavez stuck her leg out and tripped Way, causing him to fall to the ground, scrape his knee, and scratch his gas mask lens. *Id.* Way then took Chavez into custody. *Id.*

Around 6:36 p.m., agents reported protesters throwing rocks, potatoes, water bottles, and other things at CBP SRT members. Doc. 172-7 at 23. They observed Maxwell Wolf throw an

---

[27] BWC footage captured Forte's arrest of Reyes. *See* Axon_Body_3_Video_2025-09-19_1947_
X60AB824E at 4:40–4:54 (showing Forte running, tripping, touching the back of the agent standing in front of him, turning around, tackling a man, and yelling "he fucking kicked me!"); Axon_Body_3_
Video_2025-09-19_1952_X60AB824E at 00:00–1:13 (showing agents detaining Reyes and carrying him into the facility).

unknown object about the size of a potato at them, which hit a transport vehicle exiting the facility. Doc. 172-7 at 2–3. After an agent pointed at Wolf, he started running but SRT officers executed a "controlled escort to the ground" and put Wolf in zip tie handcuffs. *Id.* Later that night, agents issued Rios, Reyes, Bouchie, McKeever, Chavez, and Wolf misdemeanor citations pursuant to 8 U.S.C. § 111 and released them. *See* Doc. 172-2 at 2 (Bouchie); Doc. 172-3 at 2 (Chavez); Doc. 172-4 at 2 (McKeever); Doc. 172-5 at 2 (Rios and Reyes); Doc. 172-7 at 2 (Wolf).

In response to the crowd, unrest, and projectiles, several agents deployed stinger balls, pepper balls, and tear gas canisters, with additional use of PLS and pepper balls at 6:45 and 6:50 p.m. Doc. 172-8 at 15–17. One agent reported that he used a PLS to launch one projectile around 6:45 p.m. to push protesters back from the facility gate and clear a path, and that he launched three to four additional projectiles around 6:50 p.m. "to provide cover for multiple SRTO's dealing with an unknown subject on the floor while other violent rioters were trying to interfere." *Id.* at 21.

While agents' BWC footage shows multiple arrests between 6:00 and 7:00 p.m., it does not depict the violent mob that Defendants describe. Protesters were scattered through the street, sidewalks, and grass, and most protesters moved when instructed by agents. *See, e.g.,* Axon_Body_3_Video_2025-09-19_1947_X60AB824E at 2:40–3:35 (showing individuals, though yelling protests at agents, backing up for a vehicle to exit after agents told them to move); Axon_Body_3_Video_2025-09-19_1952_X60AB824E at 2:06–3:23 (showing a line of agents facing scattered individuals, with the closest individuals holding their hands above their heads and moving back to allow a vehicle to pass as agents retreat back into the facility);

Axon_Body_4_Video_2025-09-19_1946_D01A2232X at 5:14–9:05 (showing protesters repeatedly move back after being told to do so by an agent).

Around 7:00 p.m., Rev. Black arrived at the facility and joined a group of 50 to 100 protesters. Doc. 22-1 ¶ 4; Doc. 255 at 125:3–6. Rev. Black, wearing clerical garb, stood slightly in front of the sidewalk on the parking area in front of the facility's fence. Doc. 22-1 ¶¶ 2, 4; Doc. 255 at 126:22–25. Three officers stood on the roof of the facility, masked and in military fatigues with guns. Doc. 22-1 ¶ 4. In a scene captured on video, *see* Doc. 22-44, Rev. Black extended his arms toward the officers with palms outstretched "in a traditional Christian posture of prayer and blessing," *id.*; *see also* Doc. 22-1 ¶ 4; Doc. 255 at 125:17–19, 126:19–21. Rev. Black "urged the ICE officers to repent and to believe the Good News that the Kingdom of God is near." Doc. 22-1 ¶ 4; Doc. 255 at 126:6–9, 127:8–11. Without warning or any orders or requests to disperse, agents fired on Rev. Black, hitting him with exploding pellets of pepper spray on his arms, face, and torso. *Id.* ¶ 5; Doc. 255 at 127:6–7, 155:15–22.



**SA67**

Doc. 22-44 (screenshot). The pellets hit Rev. Black twice on the head, causing him to collapse to his knees. Doc. 22-1 ¶ 5. Others gathered around Rev. Black to protect him. *Id*. One of Rev. Black's friends helped him wash out his eyes. *Id.* ¶ 6; Doc. 255 at 129:5–8. Byers testified that surveillance footage shows that agents gave Rev. Black "multiple commands to remove himself from government property and [he] didn't" before agents hit him with pepper balls. Doc. 75 at 97:3–11. However, the surveillance footage that Defendants produced does not have audio. Doc. 247 at 11:00–14:55 (available at https://iln.app.box.com/s/ 5it2ov2jv2y65p5fl9ww23qp78tmc0zt). And while Rev. Black did stand ever so slightly on federal property instead of on the sidewalk, *see* Doc. 255 at 140:1–145:11 (exchange between Rev. Black and defense counsel over whether he stood on federal property or not and whether others standing on the sidewalk had been shot with a pepper ball), Rev. Black testified that he was never told that he was trespassing or warned that he could be shot for where he stood, *id.* at 149:8–20.

An agent also shot projectiles at Rev. Abby Holcombe, a pastor at River Forest United Methodist Church and Urban Village Church-West in River Forest, Illinois, while she stood near the facility's gate praying for agents' redemption.[28] Doc. 73-14 ¶ 20. Agents similarly shot pepper balls at Rev. Johnson, who was wearing her clerical collar and singing with other clergy on the street and sidewalk, without any warning. Doc. 22-3 ¶ 5–6. Rev. Johnson had to leave to rinse out her eyes and move away from the building considering her severe asthma. *Id.* ¶ 7.

Soon after agents fired pepper balls from the roof, other agents left the facility and started pushing and shoving people toward a driveway across from the facility with their weapons

---

[28] Rev. Holcombe attended the protest on September 19 "to provide spiritual comfort and healing for those protestors who had been affected" by arrests, tear gassing, and rubber bullets. Doc. 73-14 ¶ 13. She notes it was hard to pray with or near protestors because of the agents' tear gas and projectiles and that "[h]ad some people asked [her] to bless them, [she] would not have been able to lay hands on them because they were covered and soaked in chemical agents." *Id.* ¶ 16.

brandished.  Doc. 22-1 ¶ 6.  As Rev. Black stood calmly in the street, speaking into a

megaphone, again without warning, agents deployed pepper spray indiscriminately, with one

officer aiming pepper spray directly at Rev. Black's head:



*Id.*; *see also* Doc. 22-43 (video); Doc. 255 at 129:25–130:6, 131:1–2.  As Rev. Black attempted

to retreat, agents continued to shove him and pepper spray him, leaving all his layers of clothing

and body soaked in pepper spray.  *Id.*  Rev. Black had trouble breathing and experienced a

burning sensation throughout his body.  *Id.* ¶ 7.

        Stephen Held, a co-founder and reporter with Unraveled Press, witnessed agents shoot

pepper balls at and spray Rev. Black on September 19.  Doc. 22-18 ¶¶ 2, 15.  And although Held

wore a helmet marked "PRESS" on the front and back and visibly displayed his press

credentials, *id.* ¶ 5, an ICE SRT officer shot Held with a pepper ball in the groin from close range

while another ICE agent pulled his sweatshirt hood, *id.* ¶ 17.



*Id.* An agent also shot Held in the hip, presumably with a pepper ball, that same day. *Id.* ¶ 18. Held ensured that he did not obstruct the movement of federal vehicles or agents and obeyed orders (to the extent they did not conflict), and that he only interacted with federal agents to ask them questions from a reasonable distance in a non-threatening way. *Id.* ¶ 4.[29]

Defendants' E-STAR use of force reports tell a more violent tale. Around 7:35 p.m., agents claim that they attempted to exit the Broadview facility in marked vehicles but "a crowd of angry rioters" blocked their path. Doc. 172-8 at 21. Agents represent that they gave the crowd "clear commands of 'get back' or 'move back,'" but the crowd responded by yelling "kill yourself," "fuck ICE," or with other threatening statements. *Id.* Some in the crowd then began throwing "rocks, fireworks, water bottles, and other unknown projectiles directly at officers." *Id.*

---

[29] Held has been reporting on events at the Broadview facility since late August, Doc. 22-18 ¶¶ 2–3, and he has experienced verbal threats and intimidation from ICE agents dating back to June 2025 when he reported on ICE activity in the Chicago immigration court, *id.* ¶ 7. On several occasions when reporting at the Broadview facility, ICE agents have shouted Held's name from behind the fence. *Id.* ¶ 8. Held further notes that in June, one agent, identified by badge number 7880, "got within inches of [his] face with [his] back pressed against the wall" and told Held something along the lines of "Someday you and I are going to run into each other outside of [immigration court], and I'm going to remind you of this." Doc. 73-2 ¶¶ 14–15. Held also relates that his colleague told him that the same officer on that same June day told her "If anything happens to my guys, I'm holding you responsible." *Id.* ¶ 16. Held then saw agent #7880 at the Broadview facility, including on September 26, the day that agents shot his colleague in the face with a pepper ball. *Id.* ¶ 17. At times, agent #7880 has shouted Held's name from behind the Broadview facility security fence. *Id.* ¶ 18.

At 7:40 p.m., a CBP agent used a PLS to launch four to five projectiles at the crowd for

area saturation. *Id.* Around 7:45 p.m., another agent reported that he and other CBP and ICE

SRT members tried to clear a path for law enforcement to leave the Broadview facility, but a

crowd of about 125 individuals blocked the driveway, with many wearing masks, gloves,

helmets, and carrying improvised shields. *Id.* at 19. That agent noted that the crowd ignored

verbal instructions to clear a vehicle path and started throwing objects at the agents. *Id.* He

therefore deployed a stinger ball munition in the direction from which individuals threw objects

to disperse the crowd and deter further violence. *Id.* Around this same time, a CBP SRT officer

deployed pepper ball projectile munitions with a PLS in the direction of the crowd to disperse the

group and deter further violence. *Id.* Garza also deployed a pepper ball projectile with the PLS

in the direction of a person who threw a water bottle with an unknown liquid toward the officers

as they started retreating to the facility. *Id.* at 20.

But agents' BWC video shows protesters gathered peacefully and standing on the

opposite side of the street. Axon_Body_3_Video_2025-09-19_2045_X60AB375H at 1:36–1:56.

The footage further shows that only seconds after opening the gate, one agent threw something

that exploded over the heads of the protesters and multiple other agents threw or shot tear gas

canisters, explosive devices, and pepper balls at them, all while shouting "hell yeah, woohoo!"

and "fuck yeah, woo!" *Id.* at 1:56–3:20. The protesters scattered, though someone off-screen

then threw two fireworks and a water bottle back at agents. *Id.* at 3:20–4:20. After agents

retreated inside the facility's gate and started to debrief, two agents slightly ducked and one said,

"they're throwing rocks." Axon_Body_3_Video_2025-09-19_2045_X60AB474J at 11:10–

11:50. However, contrary to agents' reports, *see* Doc. 172-8 at 19, protesters threw these objects

at agents only after agents deployed multiple less lethal munitions against the protesters, not

before.  Around 7:50 p.m., Aguirre states that he launched three to four more projectiles to disperse protesters who continued throwing water bottles and other unknown objects at officers. Doc. 172-8 at 21.

One CBP SRT agent reported that someone hit his right leg above the knee with an approximately three-inch rock, prompting him and other agents to put on gas masks and deploy two tear gas canisters to disperse the crowd so that they could exit the facility around 8:15 p.m. Doc. 172-8 at 18. Sullivan was still present outside the facility at this time and noticed canisters coming from the agents that exploded with a flash of light and clouds of tear gas, all without warning or any dispersal orders.  Doc. 22-7 ¶ 9.  Sullivan could not breathe, her inhaler did not help, and she threw up.  *Id.* ¶ 10.[30]

An ERO Chicago Leadership Advisory email sent at 7:43 p.m. noted that ICE arrested nine protesters on September 19 and had to use CS gas to de-escalate the crowd's aggression. Doc. 172-18 at 10.  Hott reported that agents made several arrests for assault, obstruction, and trespassing, including for "pepper spraying a federal officer; kicking an officer; deliberately tripping an officer; swinging a backpack at an officer; pulling the face mask and partially and forcefully ripping off an officer's beard; and throwing bottles, rocks, potatoes, and other objects at federal officers and vehicles."  Doc. 173-1 ¶ 20.  Hott also reported that protesters shot fireworks toward officers outside the facility.  *Id.*  According to Hott, some arrestees forcibly resisted and fought their arrest.  *Id.*  In a memo that Harvick provided to Parra on September 24, 2025, Harvick wrote that "[a]ll uses of force [on September 19] were within policy and were effective in controlling the crowd."  Doc. 172-9 at 1.

---

[30] Sullivan has had recurring pain in her back and neck after this incident.  Doc. 22-7 ¶¶ 11–12.

### g.    September 20, 21, 22, and 24, 2025

On September 20, Hott related that protests in the morning occurred peacefully and without incident but became more violent as the day went on, with protesters blocking vehicles, trespassing on federal property, throwing rocks, shaking gates, banging windows, verbally threatening to kill agents, and physically elbowing an agent in the jaw after receiving direction to move aside. Doc. 173-1 ¶ 21. Unknown people slashed at least three vehicles' tires in the federally leased parking lot. *Id.* Also, around 10:30 p.m. according to an HSI investigation report, a federal rental vehicle driven by an ERO officer tried to enter the locked facility north parking lot when video surveillance recordings show Rogelio Huerta approaching the passenger side of the vehicle with an object in his right hand and touching the vehicle. Doc. 172-10 at 2. ERO officers observed Huerta attempting to flatten the vehicle's tire with what appeared to be a knife, which he threw to the ground when officers approached to arrest him. *Id.* When ERO officers tried to effectuate an arrest, Huerta resisted, flailing his elbows and thrashing his head, striking one ERO officer in the face and head. *Id.* at 2–3. During the arrest, an unknown individual sprayed ERO officers with an unknown chemical irritant. *Id.* at 3. ERO officers reported that Huerta had stood in front of the driveway throughout the day and agents had given him multiple verbal commands to stay away from government vehicles as they entered the lot, which he ignored. *Id.* at 2. Between 6:30 and 8:30 p.m. that day, multiple ERO officers reported hearing Huerta state that the officers "were all going to die and that he was going to kill them." *Id.* at 2. A September 22, 2025, ABC 7 Chicago news report indicated that agents arrested Huerta for "knocking on the windows" of the vehicle, with Huerta holding the citation he received and referencing the inside of the facility where he was held in the interview. *Id.* at 3.

65

**SA73**

ICE learned of protesters' efforts on social media to gather 800 people to create a human wall around the Broadview facility on September 23, 2025.  Doc. 173-1 ¶ 26.  Because ICE assessed that this gathering would not remain peaceful even though the organizers instructed participants to remain nonviolent and not to impede ICE operations, ERO Chicago decided to construct a fence to reduce the possibility of clashes.  Doc. 173-1 ¶ 26.  In a September 20, 2025 ERO Chicago leadership advisory email, ERO Chicago noted that "intelligence indicate[d] protesters are being trained on physical techniques to assault law enforcement in preparation for the large protest" planned for September 23, 2025.  Doc. 172-18 at 7.  In a September 21, 2025 ERO Chicago leadership advisory email, ERO Chicago noted that "[p]rotesters continue to trespass beyond the public area, violently shake gates and bang on windows, and ICE continues to warn protesters to back away from the property and to protests peacefully away from the operation."  *Id.* at 6.  In a September 22, 2025 ICE ERO leadership advisory email, ERO Chicago confirmed that protesters had slashed eleven vehicles' tires and noted "an extremely well-organized counter surveillance effort on vehicles entering/exiting the facility" where protesters "stag[ed] 'chase' vehicles away from the facility and receiv[ed] real time updates from onsite protesters on the make, model, and plate number of the vehicles as they depart," with the chase vehicles "then following the ICE vehicles in an attempt to identify the hotels and other resources being utilized by ICE and CBP."  *Id.* at 5.  ERO also reported that protesters were "using airtags and other GPS identifiers to track and monitor ICE operations*." Id.*  ICE ERO Chicago further reported that Broadview's police department indicated it had been advised by the city manager not to "respond to any ICE requests for support (emergency or not), not to respond to any vandalism claims stemming from the ICE-owned/civilian-owned/local business-

owned vehicles damaged by violent protesters, and not to patrol Beach Street in front of [the Broadview facility]." *Id.*

On September 22, 2025, agents with paintball guns on the roof of the Broadview facility shot Daniel Shouse, who was peacefully protesting near the facility's vehicle entrance. Doc. 22-10 ¶¶ 2–3. Michelle Narvaez was also present outside the Broadview facility on September 22. Doc. 22-13 ¶¶ 3, 7. She saw an agent on the roof shoot pepper balls without warning at a sixteen-year-old boy, who came to the facility to drop off his father's possessions. *Id.* ¶¶ 7–9.

After the fence was constructed overnight on September 22 and 23, on the evening of September 24, Narvaez returned to join about ten protesters assembled by an aid tent on the sidewalk hundreds of feet from the facility. *Id.* ¶ 10. Suddenly, an agent on the roof of the facility shot pepper balls at them without warning, with several of the pepper balls hitting Narvaez's car. *Id.* Also on September 24, while Shouse was walking to the gas station from a protest at the Broadview facility, a dark grey pickup truck carrying three agents pulled up next to him. Doc. 22-10 ¶ 6. One agent exited the vehicle and shoved Shouse, telling him to get out of the way. *Id.* ¶ 7. After the agent returned to the truck, Shouse started to walk away when suddenly the truck accelerated and went over a curb, hitting Shouse. *Id.* ¶ 8. Shouse suffered cuts and bruises, and he went to the hospital via ambulance, where medical professionals placed him in a neck brace. *Id.* ¶¶ 9–10.[31]

---

[31] A video of the vehicle hitting Shouse is available at Doc. 22-32 n.10 (https://www.cbsnews.com/chicago/news/video-shows-protester-hit-pickup-truck-broadview-ice-facility/?intcid=CNM-00-10abd1h).

### h.    September 26, 2025

### i.    Morning

#### (a)    Protesters and Religious Practitioners

Federal agents continued their escalatory force against those gathered outside the Broadview facility on September 26, 2025, both in the morning and in the evening.  Terrence Roche, a former United States Marine Corps officer, arrived to protest at the Broadview facility around 7:00 a.m.  Doc. 22-11 ¶¶ 2–4.  Joanna Klonsky, a communications consultant, also arrived around 7:00 a.m. and stood and talked with a group of less than thirty people near the Beach Street fence at the north edge of the driveway.   Doc. 73-25 ¶ 3.  Suddenly, Klonsky noticed an agent running across the roof of the facility and, without warning, firing pepper balls into the crowd.  *Id.* ¶ 4.

Around 7:30 a.m., Sarah Garza Resnick arrived at the Broadview facility, where approximately 100 to 150 people had gathered.  Doc. 73-27 ¶ 3.  Resnick stood on the sidewalk and a strip of grass near the driveway to the facility's gate, but she did not block the driveway.  *Id.* ¶ 4.  Shortly thereafter, agents deployed tear gas and fired pepper balls on the crowd, even though neither Resnick, Roche, nor Klonsky heard any warnings.  *Id.* ¶¶ 5–6, 10; Doc. 22-11 ¶ 5; Doc. 73-25 ¶ 6.  Klonsky also notes that no vehicles tried to enter or exit the facility at this time, so she was unsure what provoked agents' actions.  Doc. 73-25 ¶ 6.

Julie Sampson arrived at the Broadview facility around 7:50 a.m.  Doc. 73-28 ¶ 3.  She initially stood near 25th Avenue and Harvard Street, and within ten to fifteen minutes of her arrival, she saw smoke in the air, which made it hard for her to breathe.  *Id.* ¶¶ 3–6.  Agents subjected protesters to another wave of chemical agents approximately ten minutes later.  *Id.* ¶ 8.  As Sampson then walked down Harvard Street, she saw yellow casings on the ground and a

68

volunteer cleaning a white powdery substance from the street with soapy water.  *Id.* ¶ 9.
Sampson also noticed residential homes on 25th Avenue, with kids coming out to go to school
who had to cover their faces because of what was in the air.  *Id.* ¶ 10.

Also beginning around 7:50 a.m. and lasting about forty minutes, Leigh Kunkel observed
an ICE officer standing on the roof of the facility shooting pepper balls into the peaceful,
unarmed crowd by the fence near Lexington and Beach Streets without any verbal warning.
Doc. 22-8 ¶¶ 2–4.  A pepper ball fragment hit Kunkel's fiancé in the eye around 8:15 a.m.  *Id.*
¶ 5.  And around this time, Fr. Curran, who had moved his Friday morning prayer vigil to Beach
and Lexington Streets because of the fence construction, Doc. 22-2 ¶¶ 17, 19, 23, 24, saw
protesters and other religious leaders walking towards the prayer group, *id.* ¶ 29.  As the
protesters approached, Fr. Curran noticed they were coughing, and others were treating them
with water.  *Id.* ¶ 30.  Fr. Curran headed in the direction from where the protesters had come, and
as he walked on Harvard Street, he also began to cough, and his eyes began to tear from tear gas
exposure.  *Id.* ¶¶ 31–32.[32]

Ellen Toobin arrived at the Broadview facility after these initial deployments of chemical
weapons, around 8:30 a.m.  Doc. 73-29 ¶ 2.  She joined a group of fifty to sixty protesters
standing on Harvard Street about thirty yards away from the gate that blocked Harvard at Beach
Street.  *Id.* ¶ 3.  Toobin asked some people why they were not closer to the gate, and one man
with a camera and a bag with a press label said, "because they shoot at us when we go beyond
this point."  *Id.*  Kunkel also moved to the Harvard side of the facility at this time.  Doc. 22-8 ¶ 6.

---

[32] Fr. Curran represents that although he previously had invited and led Catholic high school and college
students to participate in the prayer vigils, he no longer felt it safe to have students at the facility because
of the threat of tear gas, rubber bullets, or other forms of violence.  Doc. 22-2 ¶¶ 38–39; Doc. 255 at
19:2–12, 22:17–23.  As a result, he is only inviting priests and other religious clergy to join and had a
group of students who intended to observe from St. Martin's Catholic High School on September 26,
2025 cancel their attendance.  Doc. 22-2 ¶¶ 39–40.

Around 9:00 a.m., an unmasked man in plain clothes came out from behind the gate and
indicated that he did not represent ICE but needed to get cars through.  *Id.* ¶ 6; Doc. 73-29 ¶ 6.
Protesters parted to let about ten cars through.  Doc. 22-8 ¶ 6.  But as the ninth or tenth car began
to travel up Harvard Street, the crowd grew agitated, with someone shouting "It's ICE."  Doc.
73-29 ¶ 7.  One or two protesters moved toward the car to speak to the driver.  *Id.*

Agents immediately started shooting pepper balls and rubber bullets into the crowd
without instructions or a warning to clear the street.  *Id.* ¶ 8; Doc. 22-8 ¶ 8.  Kunkel ducked
behind a van and shortly thereafter felt a sharp pain in the back of her head.  Doc. 22-8 ¶¶ 9–10.
She turned and saw an agent with his weapon drawn and pointed directly at her.  *Id.* ¶ 12.  Even
though the agent was on the other side of a fence, he then shot a pepper ball at her face from
approximately twenty feet away.  *Id.*



Doc. 22-23 ¶ 8.  Kunkel was wearing a full respirator, which prevented a more severe injury, but
she still suffered a burst blood vessel and needed gauze to stop the bleeding from her nose.  Doc.
22-8 ¶ 13.



*Id.* ¶ 14.

Around this same time, Rev. Johnson, wearing her clerical collar, and Joselyn Walsh stood on the right side of Harvard Street near 25th Avenue singing, praying, and chanting with Songs for Liberation, with Walsh playing her guitar.  Doc. 22-3 ¶ 8; Doc. 73-19 ¶¶ 3–6.  Klonsky also stood in the Harvard Street alley near 25th Street, having just moved there from Beach Street.  Doc. 73-25 ¶ 7.  Agents used tear gas, pepper balls, and rubber bullets against the group without any warning or apparent provocation.  Doc. 73-19 ¶ 6; Doc. 22-3 ¶¶ 9, 11; Doc. 73-25 ¶ 8.  Walsh specifically saw an agent throw a canister toward the group and a flashbang grenade go off near her.  Doc. 73-19 ¶¶ 6.  A projectile, which Walsh believes to be a baton round, went through her guitar, and struck her leg.  *Id.*[33]

---

[33] The Court notes that the government later indicted Walsh and five others, including Abughazaleh, for a separate incident at the Broadview facility on September 26, 2025.  *See US v. Rabbitt*, No. 25 CR 693 (N.D. Ill.).



Doc. 22-16 ¶ 18.  Rev. Johnson had to leave because of her asthma, and she experienced

breathing difficulties for days.  Doc. 22-3 ¶ 12.

Around 9:30 a.m., agents emerged from the gate as Roche stood in the street with other

protesters approximately fifty yards away from the gate.  Doc. 22-11 ¶ 8.  Agents hit Roche with

a projectile in the head, which released CS powder over his head.  *Id.*  Roche did not hear or

observe any warning, order to disperse, or other indication that the agents would use gas or

weapons against the protesters.  *Id.* ¶ 10.  Roche had a lump on his forehead, and a doctor

diagnosed him with a concussion.  *Id.* ¶ 11.  Kunkel returned to the main protest at this time, and

she saw agents release multiple canisters of tear gas into the crowd and continue shooting objects

that caused protesters to flee.  Doc. 22-8 ¶ 16.  She recuperated with other protesters near a

building on the edge of the parking lot, drinking water, eating snacks, and resting.  *Id.* ¶ 17.

There, she saw an agent on the roof target the resting group with pepper balls and break and

damage several windows of a local business.  *Id.* ¶ 17.

Other protesters and religious practitioners also observed and experienced agents' use of force at unspecified times on the morning of September 26.  For example, Autumn Reidy-Hamer attended the protest at the Broadview facility on the morning of September 26.  Doc. 22-12 ¶¶ 1–4.  She observed people singing and chanting things like "This is what democracy looks like," and "Whose streets, our streets" in a "light-hearted, community-building atmosphere," but she did not see any protesters commit acts of violence or throw anything.  *Id.* ¶ 5; Doc. 255 at 106:25–107:17.  She observed federal agents inside the fence attempting to provoke the protesters and then, without any dispersal order or provocation, she saw agents throw and shoot tear gas, pepper balls, and flashbang grenades at the protesters.  Doc. 22-12 ¶ 6; Doc. 255 at 107:19–108:4.  One of the flashbang grenades landed next to Reidy-Hamer, causing her temporary hearing loss and ringing in her ear.  Doc. 22-12 ¶ 6; Doc. 255 at 107:19–21.  Separately, Sakiyama experienced heavy tear gas, and an agent hit one of his friends, who was standing and observing in the back of the crowd without provocation, with rubber bullets, resulting in a concussion diagnosis.  Doc. 22-15 ¶¶ 17–19.  Juan Muñoz, an Oak Park Township Trustee, visited the Broadview facility on September 26,[34] when agents used tear gas, pepper balls, and rubber bullets on protesters without provocation.  Doc. 73-9 ¶ 8.

### (b)    Journalists

Journalists similarly experienced agents' use of force on the morning of September 26.  Charles Thrush, a freelance reporter in his fourth year of journalism school at DePaul University who mostly works for Block Club Chicago, attended Broadview protests on September 26 from 6:00 a.m. to 12:00 p.m. as a contract reporter for Block Club Chicago.  Doc. 22-16 ¶¶ 3–4.  Thrush wore a visible press credential around his neck.  *Id.* ¶ 5.  Although he tried to stand away

---

[34] Muñoz stated that he went to Broadview on "Friday, September 28, 2025."  Doc. 73-9 ¶ 8.  However, as Muñoz clarified during his testimony at the preliminary injunction hearing, this was a scrivener's error and he meant Friday, September 26, 2025.  Doc. 255 at 57:5–9.

from protesters but near enough to observe and video or photograph, sometimes he went into a

crowd to conduct interviews or get a better perspective on events. *Id.* ¶ 6. Thrush observed

"mostly peaceful protesters," who linked arms, blocked roads, threw stuffed animals at cars

driven by federal agents, and heckled federal agents. *Id.* ¶ 7. Thrush observed agents repeatedly

and often without warning fire pepper balls, tear gas canisters, and baton rounds into the crowd

indiscriminately.[35] *Id.* ¶ 11. In several instances, Thrush heard federal officers yell for

protesters to move away from the gate between Harvard Street and Beach Street but then fire

pepper balls or tear gas as the protesters moved away. *Id.* ¶ 12. He noted that it was sometimes

hard to hear the agents' orders because the agents covered their faces with masks. *Id.* ¶ 13.

Around 10:20 a.m., a federal agent directly fired a pepper ball at Thrush, despite his

standing away from protesters on a public street with his press pass visible. *Id.* ¶ 14. At that

time, Thrush was filming officers firing on two protesters holding an umbrella as a shield who

were at least thirty feet from the gate, with Thrush approximately thirty feet away from them as

well. *Id.* ¶ 14. The agent hit Thrush in the center of his left hand, which held his camera up near

his face. *Id.* ¶ 15. Thrush also observed multiple instances in which agents targeted people of

the press, including agents (1) hitting the photographer with whom he was working, Colin Boyle,

with a pepper ball in the leg, (2) throwing a full tear gas canister directly at another photographer

with multiple camera lenses and press identification materials from fifteen feet away, and

(3) repeatedly shooting and hitting Raven Geary, another journalist, in the face with pepper balls.

*Id.* ¶¶ 23–26. Thrush later that same day was tear gassed at fairly close range. *Id.* ¶ 17.

Raven Geary, a co-founder and reporter with Unraveled Press, was also present at the

Broadview facility on the morning of September 26. Doc. 22-17 ¶¶ 2, 9. Geary has reported on

---

[35] Thrush was also at the Broadview protests on the morning of September 19, 2025. Doc. 22-16 ¶ 7. Thrush notes that he heard automated dispersal warnings blasted from live speakers on this date, *id.* ¶ 10, but he did not hear similar warnings or see a similar system used on September 26, *id.* ¶ 11.

protests and other activity at the Broadview facility, *id.* ¶¶ 2–3, and has always worn a visible press credential lanyard around her neck, a helmet labeled "PRESS" on the front and back, and "PRESS" patches on her backpack, *id.* ¶ 4. Like Thrush, she tried to stand away from protesters but near enough to observe and video or photograph, though she sometimes entered the crowd of protesters to get a better perspective of the events. *Id.* ¶ 5. That said, she never interfered with police activities. *Id.*

At 8:58 a.m. on September 26, 2025, without warning, an agent directly aimed at and shot Geary in the face with pepper bullets from across a parking lot while Geary sheltered behind a vehicle with other photographers. *Id.* ¶ 9.



*Id.* Geary's press pass and gear, including a long telephoto lens, were clearly visible. *Id.* Though not specific to September 26, agents had previously targeted Geary with pepper ball rounds several times, and she had photographed the agent who shot her on multiple occasions. *Id.* Geary has experienced verbal threats and intimidation from agents on several occasions. *Id.* ¶ 13. She has also seen agents unholster and draw their actual firearms. *Id.* ¶ 14.

Colin Boyle, Block Club Chicago's director of photography, photographed events at Broadview from around 6:30 a.m. to 12:00 p.m. on September 26. Doc. 22-19 ¶ 6.[36] He had a

---

[36] Boyle has documented various protests at the Broadview facility. Doc. 22-19 ¶¶ 2, 4, 5, 6.

black backpack that said "PRESS," a green hat with a Velcro "PRESS" patch, two cameras, and his press identification card.  *Id.* ¶ 7.  Most agents present, according to Boyle, did not have identification on their uniform, while some had the names of their agencies or names and numbers on their uniforms.  *Id.* ¶ 10.  While on Harvard Street, Boyle stayed mainly near other press and complied with orders to return to the sidewalk.  *Id.* ¶ 16.  But as he photographed protesters and federal agents, pepper ball rounds hit him in his left leg and tear gas seeped into his respirator and visor.  *Id.* ¶ 19.[37]

Paul Goyette, a freelance photographer published in the South Side Weekly, a local Chicago newspaper, and other publications, arrived around 5:45 a.m. on September 26 to photograph the protests.  Doc. 22-21 ¶ 2.  He carried multiple Nikon Z-8 cameras with professional lenses.  *Id.* ¶ 4.  Later that morning, he witnessed a flashbang grenade explode about fifteen feet from him and at approximately 10:40 a.m., he saw agents use OC spray against a protestor who appeared to be doing nothing to agitate or impede federal activity and then arrest him.  *Id.* ¶¶ 6–7.  Around this same time, he also saw agents target members of the press who tried to record the arrest, shooting tear gas in their direction.  *Id.* ¶ 8.  About thirty minutes later, he left the protests after agents used tear gas indiscriminately, causing him to feel like he could not breathe and was going to suffocate.  *Id.* ¶ 10.

Dave Decker, a photojournalist, flew to Chicago from Florida to cover protests at Broadview for Zuma Press Wire.  Doc. 22-23 ¶¶ 2, 4.  He wore a visible press credential lanyard around his neck and carried his camera equipment.  *Id.* ¶ 5.  Around 9:00 a.m., Decker stood next to Kunkel behind a van parked in what he believed to be a public street and faced north to video and photograph the gate to the Broadview facility and the protesters in front of it.  *Id.* ¶ 8.  As he

---

[37] Because of the experiences of Boyle and others, Block Club Chicago has adopted a policy requiring its reporters and journalists to attend protests or anywhere they are likely to encounter federal law enforcement and protesters in teams of two or more to keep themselves safe.  *Id.* ¶ 22; Doc.22-20 ¶ 29.

stood there, two agents stood on the other side of a fence about twenty feet to the east with their weapons drawn. *Id.* Decker heard popping noises, felt impacts on his arm and back, and turned and saw that Kunkel had a bloody nose. *Id.* He then stopped taking pictures and took Kunkel toward the crowd to look for aid. *Id.* Decker later photographed one man who told him that agents had shot him with pepper balls at least thirty times on the back of his body:



*Id.* ¶ 9. An agent also pointed his long gun directly at Decker's camera as he documented the protests that day:



SA85

*Id.* ¶ 10.

Jonathan Farina, a cameraman for the YouTube channel Status Coup News, also documented protests at the ICE facility on September 26.  Doc. 73-4 ¶¶ 3, 4.  While among a crowd of protesters, he represents that he was noticeably identifiable as a press member.  *Id.* ¶ 6.  Farina noticed agents shooting individual members of the press, separate from a crowd of protesters, with rubber bullets and pepper balls, as well as agents on the facility's roof shooting rubber bullets indiscriminately into the crowd.  *Id.* ¶¶ 7, 8.  Agents on the ground hit Farina with pepper balls, with one pepper ball hitting the hand with which he held his camera.  Doc. 73-4 ¶ 9.  Farina recorded and posted his experiences that day.  *See* Status Coup News, *ICE Thugs FORCED to BACK DOWN after SHOOTING UP Unarmed Crowd*, YouTube (Sep. 26, 2025), https://www.youtube.com/watch?v=dos6s28mfjU.

Shawn Mulcahy, the Chicago Reader's news editor who has regularly documented protests at the Broadview facility since September 5, 2025, arrived at the facility in the morning on September 26.  Doc. 22-22 ¶¶ 4, 6, 9.  He wore press credentials around his neck, carried a notepad or filmed activity, and wore a helmet marked "PRESS."  *Id.* ¶ 7.  Agents shot him with a rubber bullet or foam ball while he stood on Harvard Street and filmed an arrest.  *Id.* ¶ 9.  Agents also threw tear gas and shot pepper balls at a group of journalists, including Mulcahy, standing apart from protesters on a public street.  *Id.* ¶ 10.[38]

### (c)    Bystanders

Agents' actions affected individuals beyond those protesting, praying, information gathering, and observing on September 26.  Robert Butler-Bey, who provides janitorial supplies and safety equipment at Equity Industrial Supply, arrived at work on the morning of September

---

[38] Monica Breslin saw agents pointing tasers at the press, but she does not indicate whether this occurred in the morning or evening of September 26.  Doc. 22-9 ¶ 6.

26 but could not get into the business' building because federal agents had blocked off the streets at Roosevelt Road.  Doc. 22-27 ¶¶ 1–2.  He eventually got into his business but ran outside when he heard tear gas canisters and saw protesters running in front of the building.  *Id.* ¶¶ 5–7.  An agent came to speak to him and told him to go back inside his building.  *Id.* ¶¶ 8–9.  Butler-Bey could not breathe because of the tear gas.  *Id.* ¶ 8.  The next day, he, along with other Broadview businesses, received a statement from the Mayor of Broadview warning that ICE would be escalating its actions and shooting tear gas around their businesses.  *Id.* ¶ 12.  Reggie Thompson has had his asthma aggravated because of the pepper spray used at the Broadview facility on September 25 and 26, 2025.  Doc. 22-30 ¶ 4.  He could not get his groceries delivered due to street blockages in front of his house on 25th Avenue on September 26, and on September 23, he could not get his electricity serviced after it went out for the same reason.  *Id.* ¶¶ 5–6.

### (d)    Defendants

Defendants declare that the agents' multiple uses of force on the morning of September 26 were necessary for several reasons, and that agents provided multiple warnings before acting.  For example, according to Hott, hundreds of protesters gathered at the facility on the morning of September 26 "with boxes of fireworks, face masks, gas masks, goggles, knee and elbow protection, and large supplies of food and water."  Doc. 173-1 ¶ 27.  He stated that protesters blocked both entryways, prompting an LRAD warning to play multiple times warning of arrest and the use of chemical agents.  *Id.*  Hott also recounted that officers gave up to ten to twelve verbal warnings every time a gate opened to make way for vehicular traffic.  *Id.*  When protesters ignored these dispersal orders, officers used less lethal munitions to create passage for the vehicles.  *Id.*

Parra also stated that protesters blocked the intersection of 25th Street and Harvard Street, requiring BORTAC agents to use less lethal munitions to disperse the protesters and allow access to the Broadview facility.  Doc. 173-2 ¶ 22.  CBP also deployed additional SRT and MFF officers to keep control of the area because protesters did not disperse.  *Id*.  CBP agents saw "multiple individuals in the crowd wearing welding gloves; crowd members picking up a deployed CS canister, and rioters throwing the deployed CS canister through the glass window of an adjacent building located at 2000 S 25th Ave, Broadview, Illinois, which was occupied by non-government workers associated with a business located inside the building."  *Id*.  According to Parra, two individuals aggressively approached officers and ignored multiple verbal commands to move away from the street, prompting CBP agents to attempt to place them under arrest.  *Id.* ¶ 23.  When the individuals became physically combative, CBP agents used less lethal munitions to keep the crowd back and allow agents to make the arrests.  *Id*.; Doc. 172-11 at 7– 8.  Although individuals and agents clashed many separate times on the morning of September 26, Defendants only submitted to this Court one forty-minute video from the Broadview facility on this date.[39]  *See* Axon_Body_4_Video_2025-09-26_1137_D01A3411W.

### ii.    Evening

Notwithstanding the morning events, protesters again gathered outside the Broadview facility in the evening of September 26.  William Paulson, a sixty-seven-year-old retired union painter, decided to attend protests at the Broadview facility in September 2025 to support the detained and protest the immigration agents' tactics in detaining individuals.  Doc. 22-6 ¶¶ 1, 2, 4.  He arrived at the Harvard Street and Beach Street gate around 7:00 p.m., where protesters stood on the streets, sidewalks, and grass.  *Id.* ¶ 5.  Brad Thomson and Amanda Yarusso, both

---

[39] The use of force reports indicate that another agent also wore and activated a BWC on September 26, although he notes that he activated it late.  Doc. 172-11 at 7.

attorneys, went to the Broadview facility on September 26 to attempt to visit detained clients. Doc. 22-31 ¶ 1; Doc. 22-42 ¶ 1. While Yarusso waited on the Harvard Street side of the facility around 7:30 p.m., she saw agents deploy pepper balls. Doc. 22-42 ¶ 3

As protesters occupied the street around 8:00 p.m. chanting "Whose streets? Our streets!", Paulson heard whistles blowing and law enforcement agents in military fatigues approaching protesters. Doc. 22-6 ¶ 7. Paulson observed agents tackle a man to the ground and form a circle around him before backing up behind the fence. *Id.* ¶¶ 8–9. Several minutes later, he saw agents throwing tear gas canisters at the protesters, with one landing directly in front of the fence and another landing next to Paulson, about twenty-five feet away from the fence and at a distance from other protesters. *Id.* ¶ 9. Paulson did not hear a dispersal order or any warning, nor did he observe any violence or other provocation from the protesters. *Id.* ¶¶ 10–11.

Later, as Thomson and Yarusso waited to speak with their clients, they both observed individuals chanting in protest of ICE deportations and current actions in the Chicago area, with some holding signs critical of ICE and equating ICE to Nazis or fascists. Doc. 22-31 ¶¶ 6–7; Doc. 22-42 ¶ 8. A person on a megaphone spoke about ICE's violence against detainees and protesters and how no accountability existed. Doc. 22-31 ¶ 10. After this statement, around 10:20 p.m., and with no warning, ICE agents deployed five to ten rounds of pepper balls. *Id.* ¶ 11. An agent then shouted, "I'm sick of this" and something along the lines of "Enough is enough." *Id.* ¶ 12. Yarusso similarly recalled hearing an agent say something like "That's enough!" in response to protesters as agents used pepper balls on the crowd. Doc. 22-42 ¶ 10.

### i.    September 27, 2025

On September 27, federal agents again responded to protests throughout the day with escalated force. Earlier in the day, Decker recorded agents pushing people to the ground and

then laughing about it, even as blood oozed from the ears of someone they pushed. Doc. 22-23
¶ 11. While Decker photographed this, an agent shot a pepper bullet towards Decker's face from
about thirty feet away, striking his camera. *Id*. ¶ 12. Around 3:00 p.m., agents told protesters to
move away from a portion of the fence that extended into a parking lot. Doc. 73-24 ¶ 4. Robert
Held,[40] a protester, moved to the left but suddenly felt a spray hit his face with such force that it
either moved the gas mask he was wearing or saturated under it. *Id.* ¶¶ 4–5.

Between 5:30 and 6:00 p.m., Bovino and about forty to fifty agents walked out the gate,
with Bovino commanding that "All pedestrians will move outside the road now or you will be
arrested for impeding. Let's move 'em out!" Doc. 73-24 ¶ 9; *see also* Doc. 22-18 ¶ 23 (S. Held
hearing Bovino announce at 5:56 p.m., "This is your only warning. If you don't clear the road,
you will be arrested"); *see also* Axon_Body_4_Video_2025-09-27_1831_D01A33732 at 00:17–
00:25. R. Held tried to clarify what the agents wanted, but the agents' shouting drowned out his
voice. Doc. 73-24 ¶ 9. As agents started walking down Beach Street, R. Held backed up toward
Lexington Street, trying to comply. *Id.* He heard commands to "get off the roadway," "Buddy,
get off the road," and "Sir, your last time I will tell you, get off the road." *Id.*; *see also*
Axon_Body_4_Video_2025-09-27_1831_D01A33732 at 00:25–1:15. R. Held tried to get out of
the street and away from agents, eventually crossing Lexington Street, but agents ran after him,
telling him that they gave him an order and to get on the ground and put his hands behind his
back. Doc. 73-24 ¶¶ 9–10. They then handcuffed him, put him in a car with another man
groaning in pain, and drove the two men back to the Broadview facility. *Id.* ¶ 10. At some

---

[40] Two individuals with the last name "Held" submitted declarations in this case. *See* Doc. 22-18; Doc.
73-24. Robert Held ("R. Held") visited the Broadview facility to protest, Doc. 73-24 ¶ 2, whereas
Stephen Held ("S. Held") traveled to Broadview as a reporter, Doc. 22-18 ¶¶ 2–3.

point, agents stopped the car and Bovino, with apparent journalists behind him, opened the car door and said to R. Held "Now what do you want to say to me?"  *Id.* ¶ 11.[41]

The other man in the car was Paul Ivery.  Agents had previously identified Ivery as an "agitator" based on "the words he was saying . . . to the effect of 'come and get me, bitch.'" CBP agent Ricardo Cordova was chasing R. Held when he saw Ivery in his periphery, and he decided to change course to go after Ivery instead.  *Id.*; *see also* Axon_Body_4_Video_2025-09-27_1831_D01A38432 at 1:42–2:00.  Ivery attempted to flee by jumping on an occupied civilian's car, which caused the windshield to break. *Id.*; *see also* Doc. 172-15 at 5, 9, 10. Cordova then tackled Ivery to the ground.  Axon_Body_4_Video_2025-09-27_1831_ D01A33732 at 1:37–40.  Cordova alleges that Ivery grabbed the back of Cordova's helmet, which caused the front of the helmet to obstruct his eyes and required other agents to move in and restrain and arrest Ivery.  Doc. 172-15 at 9, 10–11.  During the arrest, agents attempted to turn Ivery to face the ground by pushing on, grabbing, and kneeling on his head:



---

[41] Agents questioned, fingerprinted, and photographed R. Held, but never charged him and released him around 1:30 a.m.  Doc. 73-24 ¶ 12.

Axon_Body_4_Video_2025-09-27_1831_D01A33732 at 1:45–2:53.  Ivery was bleeding from

his elbow, screaming for help, and asking, "What am I arrested for?" *Id.* at 1:45–4:35.  The

agents did not answer Ivery, *id.*, and instead placed him in the car with R. Held.[42]

Around 5:40 p.m., CBP agents took Dana Briggs into custody after he did not listen to

multiple commands to clear the road in front of the gate to the facility to allow a government

vehicle with emergency lights to pass into the facility.  Doc. 172-14 at 2.  When Briggs refused

to move, CBP agents tried to physically move Briggs, at which point Briggs fell to the ground

and struck CBP officer Rachel McCaslin on the wrist.  *Id.*  The government charged Briggs with

misdemeanor assault under 18 U.S.C. § 111 and remanded him into federal custody.  *Id.* at 13.

Briggs pleaded not guilty and has since been released on bond, and although the government and

Briggs were set to proceed to trial on December 8, 2025, the government moved to dismiss the

criminal complaint on November 20, 2025.  *See United States v. Briggs*, No. 25 CR 610-1, Docs.

6, 15, 39 (N.D. Ill.).

Later in the day, Farina livestreamed outside the Broadview facility for nearly three

hours.  Doc. 73-4 ¶ 10; Status Coup News, *BREAKING: ICE ATTACKS Protesters at Chicago

Detention Center*, YouTube (Sep. 27, 2025), https://www.youtube.com/

watch?v=QoobmuQoKWM (hereinafter, "Farina Livestream").  The livestream starts around

sunset as agents opened the fence's gate, with Bovino telling protestors "Everyone's going to

move out of the road now or you're subject to arrest.  I say again, subject to arrest.  Everyone out

of the road now, move, move."  Farina Livestream at 00:01:00–00:01:10.  Protesters move off

the street without incident, the agents and multiple vehicles progress out of the facility, and

---

[42] Although the government charged Ivery with assault under 18 U.S.C. § 111, it then moved to dismiss the criminal complaint without prejudice on October 9, 2025.  Doc. 172-15 at 3, 21; *see also United States v. Ivery*, No. 25 CR 609, Doc. 10 (N.D. Ill.).  The court granted the government's motion and dismissed the case on October 10, 2025.  *Id.*, Doc. 13.

agents return behind the fence without incident. *Id.* at 00:01:10–00:09:40. About thirty minutes later, after the sun had almost fully set, agents again prepared to open the fence's gate and protesters gathered in the street. *Id.* at 00:36:00–00:36:50. While waiting, agents laughed and made jokes about tear gassing protesters. Axon_Body_4_Video_2025-09-27_1955_ D01A2165X at 4:17–4:22 ("Here we go, they're gonna gas 'em"); *id.* at 4:53–4:56 ("I'm going to do this the fun way!"), 6:11–6:16 (holding out tear gas canister and asking, "You ready to go?"). Shortly before going out to confront the protesters, Bovino instructed the agents: "This might be a good one guys, so stay alert." *Id.* at 5:19–5:22.

Defendants describe about 100 to 150 protesters "becoming aggressive and shouting obscenities toward CBP personnel," with some individuals holding homemade shields marked with profanity, pipes, metal chains, rocks, and bricks. Doc. 173-2 ¶ 24. Specifically, around 7:30 p.m., CBP SRTs agent claimed that protesters concealed improvised shields near the perimeter and stockpiled rocks and other objects to use as weapons against law enforcement, with some protesters throwing dangerous objects, including rocks, commercial grade fireworks, and water bottles, at agents. Doc. 172-13 at 12, 13, 18, 20; *see also* Doc. 255 at 246:20–247:9, 251:24–252:9. Agents reported protesters shouting obscenities and making threatening statements, "including verbal expressions wishing death upon" agents. Doc. 172-13 at 12, 13, 14, 18–19, 20. One CBP SRT agent observed an individual wearing a hockey mask with a knife visible on his ankle. *Id.* at 14. Farina kept livestreaming during this time. *See* Farina Livestream at 00:09:30–36:50:00. While his camera did not capture all activity outside the facility's fence, the crowd appeared peaceful, with some protesters shouting various expressions and chants at various times. *Id.*

85

**SA93**

Around 7:30 p.m., agents opened the gate, marched out towards the protesters to remove the shields and rocks, and yelled at protesters to "get off the fucking road." Doc. 173-2 ¶ 24; Farina Livestream at 00:36:51–00:37:10. Without giving protesters time to comply, agents started shoving protesters and grabbing their signs. *Id.* at 00:37:10–00:37:27. An agent, whose voice sounds like Hewson's, shouted "hit 'em" three times, and another agent shoots a weapon, presumably a pepper ball gun, at a protester's legs from close range.[43] *Id.* at 00:37:28–00:37:31. Hewson testified that he said "get 'em, get 'em" at the preliminary injunction hearing. Doc. 255 at 204:10–13. A different agent, who is unidentifiable because of his gas mask but looks like Bovino based on his physique and the tear gas canister he has clipped to the front of his gear, pointed at people standing on the side of the road and shouted "light him up, light him up," after which a different agent fires numerous rounds at people's legs and feet. *Id.* at 00:37:50– 00:38:00. One protester yelled in return "I'm on the sidewalk, motherfucker." *Id.* at 00:37:59– 00:38:03.

Agents targeted protesters who stood on the grass with black plywood shields and ripped them from their hands. *Id.* at 00:38:15–00:38:40. Paulson saw agents also confiscate protesters' signs, boards, and umbrellas. Doc. 22-6 ¶ 13. Hewson testified that agents specifically sought to confiscate protesters' shields given the fact that they had nails protruding from them "to do damage to" agents, treating these plywood pieces that protesters held as weapons. Doc. 255 at 199:16–202:17, 246:20–247:25. Bovino yelled "we good on the shields?" and other agents parrot this question. Farina Livestream at 00:39:26–00:39:35. Agents loaded the shields and other confiscated items into the back of a pickup truck. *Id.* at 00:44:23; Doc. 22-6 ¶ 13. Hewson testified that agents threw the shields out. Doc. 255 at 202:1–5.

---

[43] The person shot may have been Decker. Decker declares that he was filming agents with only one foot in the street when an agent shouted "Get him!" and another agent shot pepper bullets into his legs from about four to five feet away. Doc. 22-23 ¶ 12.

SA94



Farina Livestream at 00:44:23 (with brightness enhanced by 50%).

Agents arrested an individual over a block away from the facility, *id.* at 00:47:08–00:48:05, and then arrested a reporter, *id.* at 00:52:37–00:53:10. Defendants contend that agents arrested these individuals because they became aggressive and physically assaulted the agents. Doc. 173-2 ¶ 24. The reporter whom agents arrested, S. Held, tells a different story. At 7:15 p.m., S. Held, wearing a helmet and backpack marked "PRESS" and displaying his press credentials, recorded agents arresting a man. Doc. 22-18 ¶¶ 5, 28. Several minutes later, agents marched past S. Held, grabbed someone at the fence, and told S. Held to back up. *Id.* ¶ 29. But if S. Held backed up, he would enter the street, which Bovino had previously declared an arrest zone, so he moved to the side away from the person the agents were arresting. *Id.* A CBP agent, whom S. Held believes to be Timothy Donahue, then tackled S. Held, handcuffed him, lifted him off the ground, and took him into the Broadview facility. *Id.* ¶ 30. After S. Held yelled out that he was a journalist and sought out his colleague, Donahue laughed at and mocked him, telling him that "No one can hear you. I'm not gonna help you." *Id.*[44]

Goyette saw agents arresting Held, whom he recognized as a journalist, and so he crossed the street to document the arrest. Doc. 22-21 ¶¶ 12, 14. An agent then put his hand on Goyette's

---

[44] Agents later released S. Held without charges. Doc. 22-18 ¶ 32.

shoulder and said, "you're okay for now, but be careful." *Id*. Goyette interpreted this to mean that he "had been surveilled by federal law enforcement and was known to them" from his activity documenting protests at immigration court in Chicago and at Broadview. *Id*.

BWC footage also shows multiple agents grabbing a protester and tackling him onto the ground. Axon_Body_4_Video_2025-09-27_1955_D01A2165X at 11:00–12:50. The protester was not resisting, yet four agents each grabbed one of his arms or legs and carried him back into Broadview, causing him unnecessary pain. *Id.* Once he was inside the facility, an agent told him that he should "get a job and not come here." *Id.* at 13:45–13:47. After the arrests outside the facility, agents inspected tents set up by protesters on the grass about half a block away from the facility. Farina Livestream at 00:54:15–00:56:16. About thirty minutes later, agents finally retreated inside the facility's fence. *Id.* at 01:01:45–01:05:00.

Another hour of peaceful protesting passed before agents once again prepared to exit the fenced area. *Id.* at 02:05:20–02:06:35. Defendants declare that agents made the decision to "temporarily reposition the perimeter for non-government personnel access to one block away from the [Broadview] facility to create a safer defensive posture and prevent an imminent breach," Doc. 173-2 ¶ 26, because individuals began "forcefully striking and shaking" the fence and "re-establishing previously cleared stash points and placing additional rocks and bricks in strategic locations near the perimeter of" the Broadview facility, Doc. 172-13 at 12, 14, 19, 20; Doc. 173-2 ¶ 25. BWC footage, however, indicates that Bovino may have had a different motivation for repositioning the perimeter:

> Somebody even steps across [the new perimeter], they get it. It's all about arresting people. I think if we push this whole fucking block back, ***that ought to teach them a lesson.*** And if it doesn't, we arrest.

Axon_Body_3_Video_2025-09-27_2003_X60A9676K at 30:25–30:38 (emphasis added).

Resultingly, CBP agents gave commands for protesters to move back and directed individuals to the nearest intersection, making a dispersal announcement from the loudspeaker of an HSI bearcat. Doc. 172-13 at 14, 16, 17, 18; Doc. 173-2 ¶ 26.[45] From watching Farina's livestream, however, the agents' commands and bearcat announcement were unintelligible. Farina Livestream at 02:07:10–02:08:35. In fact, multiple individuals yelled that they could not hear the agents, with someone asking, "what are you saying," and another person yelling that the agents should "get amplified fucking sound." *Id.* at 02:07:13–02:08:35. Paulson, Breslin, Reidy-Hamer, Goyette, and Ian Sampson also stated that they did not hear or could not make out any of the agents' orders at this time. Doc. 22-6 ¶ 16; Doc. 22-9 ¶ 12; Doc. 22-12 ¶ 14; Doc. 22-21 ¶ 15; Doc. 73-21 ¶ 6; Doc. 255 at 111:16–20, 117:8–15.

Agents then moved into the crowd and started pushing and tackling people. Farina Livestream 02:08:30–02:09:30. Agents pushed even those people who stepped out of the street and onto the grass, such as Sampson. Doc. 73-21 ¶¶ 7–9. When Sampson turned around to walk further back from the fence and street, an agent pulled him down by his backpack and dragged him several feet. *Id.* ¶¶ 10–11. Agents told him to stop resisting, but Sampson was trying to cooperate. *Id.* ¶ 12. An agent put his knee into Sampson's back, at one point smashing Sampson's head into the ground. *Id.* ¶ 13.[46]

Federal agents once again reported a different version of events. For example, one CBP SRT agent claimed that he noticed protesters pushing and shoving CBP agents and throwing garbage, water bottles, and rocks at them as the line of agents moved toward the crowd. Doc. 172-13 at 11. He then moved toward a group of protesters on the east side of Beach Street and

---

[45] ICE deployed a bearcat armored vehicle to the scene for support on September 27 because of the "level of aggression and violence." Doc. 173-1 ¶ 28.

[46] Agents held Sampson in the Broadview facility for approximately five hours and released him around 1:30 a.m. Doc. 73-21 ¶ 16. The government never filed criminal charges against him. *Id.* ¶ 17.

ordered them to move back several times to no avail. *Id*. He noted that the group, which was about ten to twelve feet from him, "were standing still, recording and shouting obscenities towards [him] and other officers and agents around [him]." *Id.* He aimed his PLS at the ground in front of the group and shot about five to six projectiles at the ground because, as he noted, the protesters were "being actively resistant and refusing to comply with lawful commands to get back." *Id*. After the group of protesters moved back, he helped a CBP agent with an arrest, during which the subject tried to push and lift him off the ground. *Id*. at 12.

Another CBP SRT agent noted that he repeatedly asked a woman carrying an umbrella to move back, but she did not comply and instead pushed him with her umbrella and body and yelled profanities at him, such as "back the fuck up" and "get the fuck out of my face." *Id.* at 17. A protester, Ray Collins, then ran at the agent from about ten feet away at full speed, slamming into the agent's upper body and forcing him into the perimeter fence. *Id.* Collins resisted arrest but was ultimately taken into custody, after which agents found a loaded Glock pistol in his waistband.[47] *Id.*

Agents also arrested Jocelyne Robledo after she allegedly pushed an agent. Doc. 172-16 at 5. Agents found a gun and a pocketknife on Robledo. *Id.* at 5, 8.[48] In total, agents arrested eleven or twelve individuals for assault, resisting, or impeding federal agents on September 27, two of whom had loaded handguns. Doc. 173-1 ¶ 28; Doc. 173-2 ¶ 27.

---

[47] A grand jury refused to indict Collins, returning a no bill. *See* Jon Seidel, *In unusual move, federal grand jury refuses to indict couple found with guns outside Broadview ICE facility*, Chicago Sun-Times (Oct. 8, 2025), https://chicago.suntimes.com/immigration/2025/10/08/feds-dropping-charges-against-couple-who-lawfully-carried-guns-outside-ice-facility. Subsequently, the government moved to dismiss the criminal complaint against Collins, which the court granted on October 8, 2025. *See United States v. Collins*, No. 25 CR 608, Docs. 25, 26 (N.D. Ill.).

[48] As with Collins, a grand jury refused to indict Robledo, returning a no bill. *See* Seidel, *supra*. Subsequently, the government moved to dismiss the criminal complaint against Robledo, which the court granted on October 8, 2025. *See Collins*, No. 25 CR 608, Docs. 25, 26.

As some agents arrested individuals, others started shooting pepper balls at the crowd and deploying multiple tear gas canisters. Farina Livestream at 2:09:20–2:10:12; *see also* Axon_Body_4_Video_2025-09-27_2137_D01A3459W at 1:40–4:30 (agents deploying tear gas against peaceful protesters who were following directions). Agents also deployed flashbang grenades, even after protesters and press had mostly moved down the block because of the large amount of tear gas. Farina Livestream at 02:10:05–02:11:08; *see also* Axon_Body_4_Video_2025-09-27_2137_D01A3459W at 1:43–2:57 (agent deploying multiple flashbang grenades near peaceful protesters who were following directions). Reidy-Hamer noticed things started exploding above her head and felt tear gas in her eyes and throat. Doc. 22-12 ¶ 13; Doc. 255 at 110:18–111:15. Paulson saw tear gas canisters go over his head and then felt the gas obstruct his sight and breath. Doc. 22-6 ¶¶ 16–17. He also heard agents tackle people to the ground and flashbang grenades going off near him. *Id.* ¶¶ 17–18. As Breslin ran to her car on Beach Street to escape the gas, an agent hit her with a pepper ball on the back of her left calf. Doc. 22-9 ¶ 13. And even after she got in her car to escape the gas, an agent opened Breslin's car door and forced her out of her car. *Id.* ¶ 14. Breslin walked away from the area to be away from the gas and able to breathe. *Id.* ¶ 15.

At 8:39 p.m., ERO Chicago sent out an advisory that about 75 to 100 protesters were onsite and had "recently deployed fireworks towards federal law enforcement," with ERO having "deployed its bearcat armored vehicle in response to the aggression, and the utilization of chemical weapons [was] underway." Doc. 172-18 at 1. Agents later confirmed, however, that "those were not fireworks . . . those were flashbangs" and "no one shot fireworks at" agents. Axon_Body_4_Video_2025-09-27_2135_D01A37583 at 1:33:52–1:34:06. Defendants also state that CBP used less lethal munitions to disperse the crowd because some individuals became

assaultive and tried to tackle CBP agents.[49]  Doc. 173-2 ¶ 26.  Specifically, one CBP SRT officer reported knee pain and bruising on his chin and upper right chest after two individuals tackled him and slammed him into the fence.  Doc. 173-2 ¶ 27.  Goyette, however, observed that protesters were only verbally, not physically, involved with agents at that time.  Doc. 22-21 ¶ 15.

After agents pushed all individuals past the Lexington and Beach Street intersection with physical force and chemical munitions, agents blocked the intersection for over forty-five minutes, occasionally firing pepper balls at the remaining peaceful protesters.  Farina Livestream at 2:10:45–2:56:03; Axon_Body_4_Video_2025-09-27_2134_D01AE5321 at 26:58–27:05 (shooting pepper balls at protester in crowd for pulling down pants and exposing his buttocks), *see id.* at 27:06–27:12 (Protester: "Guys, come on.  Who are you shooting at?"  Agent: "The guy who just pulled his pants down."); Axon_Body_4_Video_2025-09-27_2134_D01A2142X at 30:19–30:30 (shooting pepper balls at protester in crowd for yelling "fuck you, fascist").

At least some of the agents involved in pushing the protesters back and maintaining the perimeter found the experience to be "fun."  Axon_Body_4_Video_2025-09-27_2135_ D01A37583 at 1:26:45–1:26:58 (Agent 1: "This is fucking fun.  This is fun."  Agent 2: "Dude, these are some fucking great experiences for you guys, eh?"); *id.* at 2:04:15–2:04:20 ("Dude, that's a hell of a drug, let me tell ya.  Seeing fucking hippies getting [unintelligible].").

Some protesters wanted to leave, but the agents blocked their cars and stated that individuals could only access their cars if they consented both to a full pat down and a search of their cars.  Farina Livestream at 02:45:53–02:46:17.  For example, when Breslin tried to return to her car around 9:30 p.m., agents blocked the Lexington and Beach Street intersection so that she could not access her vehicle.  Doc. 22-9 ¶ 16.  Agents indicated that they required Breslin to

---

[49] Defendants also note that the crowd yelled obscenities and made "threatening comments," like "Kill yourselves, "Fuck ICE," "Fuck you all," "You will get what's coming to you," and "We'll find your hotels."  Doc. 173-2 ¶ 27.

consent to a search to get to her car and to avoid agents towing it.  *Id.* ¶ 17.  Because she did not

feel like she had a choice, Breslin consented to a full pat down and search of her car.  *Id.*; *see*

*also* Axon_Body_4_Video_2025-09-27_2135_D01A2737M at 44:40–44:48 ("Before you go in

your car, we're going to search your car to make sure there are no weapons.").

Those who physically attended the protests outside the Broadview facility on September

27 were not the only ones affected by the agents' actions.  For example, Dimeko Harden lives in

Maywood, approximately one block east of the Broadview facility.  Doc. 22-28 ¶¶ 1–2.  On

September 27, her husband woke her up around 10:30 a.m. to tell her that tear gas was coming

from the Broadview facility.  *Id.* ¶ 3.  The tear gas affected her when she opened the door to their

house, *id.* ¶ 7, so she kept her son inside that day to ensure the tear gas did not affect his asthma,

*id.* ¶ 9.  That same day, a plumber initially could not get to Harden's house because law

enforcement officers at Lexington Street and 25th Street blocked off the intersection, although

after further requests from Harden's husband, officers let the plumber through an hour later.  *Id.*

¶¶ 12–14.  Additionally, Jose Juan Alvarado and his wife came home around 3:30 p.m. on

September 27 and could not breathe because of the pepper spray coming from the Broadview

facility.  Doc. 22-29 ¶ 3.

### j.    October 3, 2025

After the aforementioned events, state and local agencies announced the Unified

Command on October 2, established designated protest zones, created a path along Harvard

Street for federal agents and vehicles to exit, and maintained security around the Broadview

facility.  Doc. 173-1 ¶ 56; Doc. 35-1 ¶ 37.  Nonetheless, protesters and press gathered on October

3.  October 3 is the last day that federal agents used chemical munitions at the Broadview

facility.  Doc. 75 at 91:14–22; Doc. 173-1 ¶ 31.

Reidy-Hamer, though hesitant to return after her previous experiences, visited the Broadview facility on this date with a friend.  Doc. 22-12 ¶ 16.  From the Lexington and Beach Street intersection, she saw Secretary Noem[50] and Bovino standing on the facility's roof with camera people.  *Id.* ¶ 17.  Reidy-Hamer then walked to the 25th Avenue and Harvard Street side of the facility and heard people yelling that federal agents were shooting pepper balls, so she hung back.  *Id.* ¶ 20.  Federal vehicles and agents dressed in tactical gear and holding weapons exited the facility's fenced area around 9:00 a.m.  *Id.*; Doc. 22-16 ¶ 35.  Thrush, present at the Broadview facility that day in his capacity as a journalist, estimated that the advancing group consisted of about fifty to seventy-five agents from ATF, CBP, ICE, HSI, and BOP.  Doc. 22-16 ¶ 35.  Bovino led the cohort, which walked directly to the protesters gathered in the designated protest zone.  *Id.*; Doc. 73-9 ¶ 10.

Defendants declare that agents approached protesters because they were blocking vehicular traffic, *see* Doc. 173-1 ¶ 31, but Plaintiffs indicate that ISP stopped individuals from getting close to the facility, cleared a path for vehicles in the street, and moved the group hundreds of feet away from the facility's gate, *see* Doc. 73-3 ¶ 4.  Defendants also note that local authorities designated a protest zone and provided additional perimeter security on October 3.  Doc. 173-1 ¶ 31.  Regardless, a line of federal agents moved forward towards the protesters, and, according to Defendants, issued multiple verbal commands to move back to allow a safe distance for vehicles and agents to pass.  Doc. 173-1 ¶ 31.  Yet Plaintiffs indicate that Bovino gave vague and confusing instructions, first saying, "I'm going to give you one chance, start to move back," but then several seconds later saying, "Okay, arrest them."  Doc. 22-12 ¶ 13; *see also* Doc. 255 at 58:5–10 (Muñoz testifying that he heard Bovino say something like "I'm going to give you one

_____
[50] Because of Secretary Noem's visit to the facility, CBP, FBI, ATF, BOP, DEA, and local authorities coordinated crowd control operations.  Doc. 173-1 ¶ 31.

warning, move back," after which he told agents, "Okay, arrest them"). Thrush heard Bovino

state, "this is your first and only warning," and indicated that the crowd should disperse, even

though the protesters were peaceful at that time, not in the street, and at least 250 to 300 feet

from the Harvard and Beach Street gate, making it difficult to understand where the protesters

should go. Doc. 22-16 ¶ 35.

Although protesters remained nonviolent and tried to follow instructions, Doc. 73-9 ¶ 11,

the federal agents started pushing and nudging protesters, Doc. 173-1 ¶ 31, and telling them to

step over a one-foot metal barrier, Doc. 22-12 ¶ 21. Reidy-Hamer complied, but when she

landed on the other side of the metal barrier, ISP officers told her to go back over the metal

barrier in the other direction. *Id.* At that point, federal agents pushed Reidy-Hamer into ISP

officers, and she specifically saw Bovino push her friend, causing the friend to stumble and hit

her knee on the ground, while telling her to "back away, back away." *Id.* ¶¶ 21–22. Reidy-

Hamer grabbed her friend's arm, and they backed away. *Id.* Bovino also pushed Sakiyama, who

was standing on Harvard Street, and told him "Get your ass back." Doc. 22-15 ¶ 28.

The federal agents pushed protesters further back on the green space on 25th Street, using

their hands and fists to grab, punch, and push people to the ground. Doc. 22-15 ¶¶ 36–37.

Thrush saw a BOP officer twist the nipples of and grab the neck of Michael Woolf, a clergy

member visibly dressed in clerical garb:

95

**SA103**



*Id.* ¶ 38.  The BOP officer also tried to grab Thrush, but Thrush showed his press pass and the

BOP officer moved on to grab at someone else.  *Id.* ¶ 39.

Federal agents also arrested multiple people on October 3, including Juan Muñoz, Scott

Blackburn, Daniel Toerpe, and Cole Sheridan.  Blackburn stood in the grassy area on the north

side of Harvard Street past the metal guard rail when the federal agents approached.  Doc. 73-18

¶ 5.  He saw Bovino walking along the guard rail and decided to yell at him, saying something

along the lines of "You don't have to do this, but you want to do this.  You want to be on

television.  You love to be on television."  *Id.* ¶¶ 9–10.  Bovino told Blackburn to "Move down

the block or I'll move you down, right now," but Blackburn did not know in which direction

Bovino meant.  *Id.* ¶ 10.  Blackburn responded, "Yeah.  I'll fucking move, you're such a piece of

. . ." and started to move away.  *Id.* ¶ 11.  Bovino said "What did you say?  You want me to come

over there?" to which Blackburn shook his head and said "no."  *Id.*  But Bovino stepped over the

guard rail, grabbed Blackburn by his right arm, tore his shirt, and then with another agent took

Blackburn down.  *Id.*



*Id.* The agents zip tied Blackburn and searched him. *Id.* ¶¶ 12.[51]

While Muñoz stood behind the guard rail filming, he heard the commotion of Blackburn being tackled behind him and tried to walk away.[52] Doc. 73-9 ¶¶ 14–15.



*Id.* Bovino then grabbed Muñoz by the shoulder, pulled him to the ground, smacked his phone out of his hand, and placed him under arrest, using plastic zip ties around his wrists. *Id.* ¶¶ 14–

---

[51] For a video of Bovino and Blackburn's full interaction, *see* Doc. 22-45.

[52] Before this, one agent told Muñoz to step back behind the metal guard rail, and after Muñoz complied, the agent thanked him, which suggested to Muñoz that he was in a proper location. Doc. 73-9 ¶ 13; Doc. 255 at 59:14–18.

16; Doc. 255 at 61:21–25.  Muñoz identified himself as an elected official and asked what

Bovino was doing.  Doc. 73-9 ¶ 16; Doc. 255 at 61:21–25.  When asked about the incidents

involving Blackburn and Muñoz at his deposition, Bovino stated "no reportable uses of force"

occurred and that instead, "the use of force was against" him.  Doc. 191-3 at 171:17–181:5.

Toerpe also stood among the protesters on Harvard Street, hundreds of feet away from

the facility's fence.  Doc. 73-3 ¶¶ 3–4.  Despite being near the front of the protesters, Toerpe did

not hear any instructions or orders to disperse, though he did notice ISP officers put on gas

masks as the federal agents approached.  *Id.* ¶¶ 8–9.  Bovino walked directly up to Toerpe, told

him he was under arrest, and pulled him to the ground, where other agents then handcuffed him.

*Id.* ¶ 10–11.  Toerpe indicates he was not resisting or doing anything to provoke arrest.  *Id.* ¶ 11.

Agents moved Muñoz, Blackburn, Toerpe, and other arrestees to sit on a guard

rail when several SUVs approached.  Doc. 73-3 ¶ 11; Doc. 73-9 ¶ 18–19; Doc. 73-18 ¶ 13.

Secretary Noem exited one vehicle and YouTuber Benny Johnson started to interview her with

the arrestees as a backdrop.  Doc. 73-9 ¶ 19; Doc. 73-18 ¶ 13.  Other photographers and

videographers who were not wearing press credentials were with the agents.  Doc. 73-9 ¶ 17;

Doc. 255 at 62:5–16.



**SA106**

Doc. 73-9 ¶ 19.  Once Secretary Noem finished the interview and drove away about forty

minutes later, agents asked the arrestees for basic information and then led them away.  *Id.*

¶¶ 23–24; Doc. 73-3 ¶ 13.  They escorted Muñoz, Blackburn, Toerpe, and the other arrestees into

the facility, where FBI agents interviewed them and they remained for almost eight hours.  Doc.

73-3 ¶¶ 13–17; Doc. 73-9 ¶¶ 22–23; Doc. 73-18 ¶¶ 15–21; Doc. 255 at 60:8–10.  Blackburn

recalls agents asking him about how he got to the facility, if he came across state lines, which

social media accounts told him to go there, and who paid him.  Doc. 73-18 ¶ 20.  Eventually,

around 4:30 p.m., agents transported Blackburn, Muñoz, Toerpe, and others to a Qwik Trip gas

station about 1.5 miles away from the Broadview facility and released them without formal

charges, paperwork, or comment.  Doc. 73-3 ¶ 18; Doc. 73-9 ¶¶ 22–23; Doc. 73-18 ¶¶ 36–37;

Doc. 255 at 60:13–61:2; *see also* Doc. 22-8 ¶¶ 18–19 (Kunkel describing agents throwing her

fiancé to the ground outside the Broadview facility, arresting him, holding him from

approximately 9:30 a.m. to 4:30 p.m., driving him to a gas station, and releasing him with no

charges).

The government did, however, formally charge one protester arrested by federal agents

outside the Broadview facility on October 3.  After Cole Sheridan disobeyed agents' verbal

commands to move back to let vehicles pass, Bovino and other agents pushed and nudged him.

Doc. 172-23 at 2, 5.  Specifically, according to CBP agent Jason Epperson's BWC footage,[53]

Epperson nudged Sheridan on the elbow and told him to move back.  *Id.* at 10.  Sheridan shook

his head and lifted his hand in a shrugging manner.  *Id*.  Bovino then stepped in front of

Epperson, pointed at Sheridan, told Sheridan to move back and said, "Move back or you're under

---

[53] The HSI supervisory special agent who prepared an HSI report after this incident indicates that she reviewed Epperson's BWC footage and summarizes it in the report.  *See* Doc. 172-23 at 9–10.  However, Defendants did not submit this footage, nor any BWC footage from the Broadview facility on October 3, to the Court.

arrest." *Id*.  Bovino then nudged Sheridan's right shoulder with his left hand, after which

Epperson tried to push Sheridan in the chest to move him back.  *Id*.  Sheridan did not move,

instead saying "There's people behind me you fucking idiot." *Id*.  Sheridan then went out of

view of the camera but reappeared when several agents tackled him to the ground.  *Id.*[54]

Defendants state that agents restrained Sheridan because he pushed and assaulted Bovino.  *Id*. at

4.  Epperson reported that, in his peripheral vision, he saw Sheridan push and "attempt[ ] to

swing" at Bovino, and that he saw Bovino fall forward after Sheridan pushed him.  *Id.* at 5.

Bovino recounted that Sheridan resisted his commands to move back and pushed him "while he

was physically attempting to move Sheridan back," but Bovino did not recall Sheridan swinging

at him.  *Id.* at 7.  Bovino also stated that he "had fallen and that at that point[,] Sheridan was

taken into custody." *Id*.  Bovino later that day went to the hospital due to injuries he sustained

from his encounters with protestors, including Sheridan.  *Id*.  The government charged Sheridan

by criminal complaint with 18 U.S.C. § 111 (assaulting, resisting, or impeding certain officers or

employees) and took him to the Metropolitan Correctional Center.  Doc. 172-23 at 14.  However,

the government moved to dismiss the criminal complaint against Sheridan on November 3, 2025.

Doc. 190-12.

### k.    News Organizations' Responses to Broadview Incidents

Stephen Griswold, the President of NABET-CWA Local 54051, the Chicago chapter of a

nationwide membership union for news media, Doc. 22-24 ¶ 2, has tracked press violations

occurring in Broadview, *id.* ¶ 6.  In one incident, agents ordered a journalist to exit his press

marked vehicle and exposed him to tear gas, while agents also struck a second journalist multiple

---

[54] Epperson also reported that he saw a woman, later identified as Ella Edelstein, try to pull Sheridan
away from the agents' custody, but that Epperson grabbed her ankle to place her under arrest for
interfering with Sheridan's arrest.  Doc. 172-23 at 5.  As other agents handcuffed Sheridan, Epperson
moved to address Edelstein, restrained her, and later told her, "the moment you put your hands on a
federal officer . . . yes you did, I watched you.  That's a felony." *Id.* at 10.

times in the chest with pepper balls.  *Id.* ¶ 10.  The second journalist was similarly in his marked

news vehicle about twenty-five feet from the first member and trying to assist his co-worker.  *Id.*

Andrew Grimm, President of the Chicago News Guild, a labor union representing around

600 employees in media, interpretation services, non-profit organizations, and staff unions, Doc.

22-25 ¶ 2, and Emily Steelhammer, its executive director, have spoken with members and

reviewed reports of members and other journalists targeted by federal agents while covering the

protests at the Broadview facility, *id.* ¶ 7; Doc. 255 at 29:18–30:6.  They found that the amount

of force journalists have observed, as well as the indiscriminate use of force, is "really quite

unusual from what [journalists] would normally experience at . . . a crowd control protest."  Doc.

255 at 31:8–11.  On September 19, 2025, a tear gas canister landed at the feet of a Chicago Sun-

Times photographer who was wearing her press badge and carrying two large cameras.  Doc. 22-

25 ¶ 8.  Then an agent hit her in the rib cage with a pepper ball, causing her to turn, at which

point an agent hit her in the back with another pepper ball.  *Id.*  This photographer had covered

arrests earlier that day and had been outside the Broadview facility on assignment on September

17 and 18, 2025, with agents having photographed her and her vehicle and waved at her in

passing.  *Id.*  Steelhammer noted that it seemed as if she was directly targeted because no other

journalists around her were shot in that specific incident.  Doc. 255 at 33:21–34:10.

Likewise, Grimm reports that on September 26, 2025, agents hit a Chicago Sun-Times

reporter with five rubber pellets and one pepper ball, and exposed him to tear gas, flashbang

grenades, stinger grenades, and baton rounds, which agents shot above his head.  Doc. 22-25 ¶ 9.

While Sun-Times and Tribune photographers covered a late-night arrest outside the Broadview

facility on September 26, carried and used large cameras, and wore press badges without a large

group of protesters nearby, agents hit them in the legs with pepper balls.  *Id.* ¶ 10; Doc. 255 at

34:13–23.  The Sun-Times reporter saw an ICE agent a few feet away point a grenade launcher

with a baton round at him and pull the trigger, but it was out of ammunition.  Doc. 22-25 ¶ 10.

On September 27, 2025, agents hit a Sun-Times reporter, wearing his press badge and filming

approaching ICE agents on his phone, in the upper left chest with a projectile and later threw a

tear gas canister next to him while he stood on the side on the grass near the front line when

agents came out to clear the roadway at the facility.  *Id.* ¶ 11.  In total, Sun-Times and Tribune

reporters and photographers have experienced the effects of tear gas and pepper spray while

covering protests on September 12, 19, 21, 22, 26, 27, and 28.  *Id.* ¶ 13.

Jeff Arnold, the president of the Chicago Headline Club, a chapter of the Society of

Professional Journalists, which is a non-profit dedicated to supporting journalists and promoting

the free press, Doc. 22-26 ¶ 2, has created an incident tracking database for situations where

federal agents target journalists, *id.* ¶ 10.  Using the database, Chicago Headline Club has

confirmed six incidents where federal agents targeted journalists and has documented another

four reported incidents of assaults on journalists as of October 3, 2025.  *Id.* ¶ 11.  In one

confirmed incident, a CBS news reporter was driving near the Broadview facility in a clearly

marked press van on a public street when federal agents shot pepper balls into her vehicle

through the open driver side front window.  *Id.* ¶ 12.  In another confirmed incident, agents hit

one of Arnold's television reporter colleagues with pepper spray on September 27, 2025.  *Id.*

¶ 15.  She was holding a microphone that said NewsNation on it, following agents' instructions,

and backing up on the sidewalk on Harvard Street at least seventy-five feet from the gate

between Harvard and Beach Streets.  *Id.*

### 2.     Logan Square and Humboldt Park (October 3, 2025)

According to Parra and CBP agents, on October 3, 2025, while CBP agents waited at a red light at North Drake and West Armitage Avenues in Chicago's Logan Square neighborhood, a crowd formed around their vehicle. Doc. 172-32 at 6; Doc. 173-2 ¶ 35. The crowd yelled at agents to leave, screaming "fuck you," and sticking out their middle fingers. Doc. 172-32 at 6; Doc. 173-2 ¶ 35. Meanwhile, as David Beale rode his bicycle toward Armitage and Lawndale, near Funston Elementary School, he noticed a Blackhawk helicopter in the sky, and several federal vehicles, including some marked DHS trucks and other unmarked vehicles. Doc. 73-10 ¶¶ 1–3; Charlie De Mar, *Federal agent throws tear gas canister from SUV on busy Chicago street*, CBS Chicago (Oct. 3, 2025), https://www.cbsnews.com/chicago/news/federal-immigration-agent-throws-tear-gas-canister-logan-square-street/. As people gathered, with many fearful and screaming, Beale observed agents taunt them, including by calling Beale a "faggot." Doc. 73-10 ¶ 5.

A motorcycle parked diagonally in front of agents' vehicle, and agents reported that two other cars tried to further block it in. Doc. 172-32 at 6–7; Doc. 173-2 ¶ 35. Beale approached the driver of the agents' vehicle and told him that "We don't want anyone to get hurt here," explaining that those gathered were concerned neighbors. Doc. 73-10 ¶ 6. Agents claimed in their report that they tried to use a PLS to saturate the area, but the PLS had no air in the tank. Doc. 172-32 at 6–8. One of the agents in the car pulled out tear gas and commented, "I throw the gas outside the -- in front of the vehicle," to which another agent responded, "no, no, no there's too much pedestrians." Axon_Body_4_Video_2025-10-03_1249_D01D00220 at 2:07–2:21. An agent then can be heard yelling "hurry up, dude, please," followed by another agent saying "tiralo" (throw it, in Spanish) and "if they throw it back, shoot 'em." *Id.* at 2:20–2:40.

The agent in the passenger seat of the vehicle then threw a tear gas canister out the window. *Id.* at 2:38–2:42; Doc. 73-10 ¶ 7; Doc. 172-32 at 6–8; Doc. 173-2 ¶ 35; Doc. 190-14 (Ex. 133 at 0:11–0:17, available at https://spaces.hightail.com/space/4VxbTIA8CM).



Doc. 190-14 (Ex. 133 at 0:12) (screenshot). Beale did not hear any order to disperse before the agent threw tear gas. Doc. 73-10 ¶ 11. It also appears that other federal agents launched other less lethal munitions around the same time. Doc. 190-14 (Ex. 133 at 0:22–0:27); Axon_Body_ 4_Video_2025-10-03_1249_D01D00220 at 3:27–3:40 (agents discussing how someone else threw a green-colored less lethal munition). The motorcyclist still did not move, and so one agent stepped out of the car and deployed baton strikes on the motorcycle, which prompted the motorcyclist to move out of the way. Doc. 172-32 at 6–8; Doc. 173-2 ¶ 35; Axon_Body_4_ Video_2025-10-03_1249_D01D00220 at 3:10–3:14.



Axon_Body_4_Video_2025-10-03_1249_D01D00220 at 3:10 (screenshot).

Later that day, protesters gathered outside Humboldt Park Health, a hospital in Chicago's Humboldt Park neighborhood, where an injured detainee had been taken for medical care. Doc. 173-2 ¶ 36. According to agents, they saw a male driver throw spikes directly in the path of agents' vehicles.[55] Doc. 172-34 at 9; Doc. 173-2 ¶ 36. Agents reported successfully removing the spikes from the street and moving the crowd without using force or less lethal munitions. Doc. 172-33 at 5–6; Doc. 173-2 ¶ 36. Agents also reported that it took over four hours for relief agents to enter the hospital because of the crowds, with approximately twenty bicycles and four vehicles having chased them through Humboldt Park. Doc. 172-34 at 9–13; Doc. 173-2 ¶ 38. Agents claimed that individuals struck their vehicle with fists, threw a piece of rock or concrete at their vehicles, and pushed and kicked agents. Doc. 172-34 at 10–15; Doc. 173-2 ¶ 39–40. Around 5 p.m., a CBP agent deployed a volley of four to six pepper ball projectiles with a PLS from a distance of about twenty feet toward a bicyclist who allegedly refused to clear the

_____

[55] Parra indicated the driver threw these spikes on "West Thompson Street." Doc. 173-2 ¶ 36. But no West Thompson Street exists near Humboldt Park Health, with Parra likely meaning West Thomas Street, which borders Humboldt Park Health.

SA113

roadway and yelled "FUCK YOU, YOU FUCKING FASCIST, FUCK YOU NAZI" at another

agent.  Doc. 172-34 at 12, 14, 15.  BWC of the PLS deployment does not have audio, however,

and does not reflect the tense scene that agents reported.  Axon_Body_4_Video_2025-10-

03_1855_D01A3449X at 1:30–1:55.  Instead, the BWC shows a bicyclist barely in the crosswalk

having pepper balls shot at her feet despite agents having plenty of room to maneuver.  *Id.* at

1:30–1:55.





**SA114**

*Id.* at 1:50, 1:52 (screenshots). Hewson reported telling the crowd that if they did not stop acting aggressively, he would deploy chemical munitions. Doc. 172-34 at 13; Doc. 173-2 ¶ 40. When the crowd allegedly did not obey, Hewson reported deploying a triple chaser CS gas canister, which allowed agents to leave. Doc. 172-34 at 10, 13; Doc. 173-2 ¶ 40.

Meanwhile, inside Humboldt Park Health, Jessie Fuentes, the City of Chicago Alderperson representing the 26th Ward, came to the hospital at its staff's request. Doc. 73-5 ¶¶ 2–4. When Fuentes arrived, she learned that federal agents had detained a man who had fallen and broken his leg. *Id.* ¶ 4. Hospital staff took her to a common area, where she encountered two plain clothes agents, one with his face fully covered, who refused to provide their names. *Id.* ¶ 5. Fuentes identified herself as an elected official. *Id.* ¶ 7; Doc. 173-2 ¶ 37. When Fuentes asked agents if they had a warrant, they refused to answer, swore at her, and ordered her to leave. Doc. 73-5 ¶ 6; Doc. 173-2 ¶ 37. Although Fuentes did not touch or impede the agents, they shoved her, grabbed her, and handcuffed her. Doc. 73-5 ¶ 6. The agents took her to a vehicle where she spoke with two additional agents. *Id.* ¶ 8. Eventually, the agents removed her handcuffs, but they threatened her with further arrest if she returned to the hospital. *Id.* ¶ 9; Doc. 173-2 ¶ 37.

### 3.    Brighton Park (October 4, 2025)

On October 4, 2025, protesters and journalists gathered in Chicago's Brighton Park neighborhood, after news spread that federal agents shot a woman near the intersection of Kedzie and 40th Street. Doc. 22-34 ¶¶ 2–3; Doc. 22-41 ¶ 2; Doc. 73-2 ¶ 22; Doc. 73-4 ¶ 13; Doc. 73-7 ¶¶ 1–2; Doc. 173-2 ¶¶ 41–42; Doc. 190-4 ¶ 2. Crowds converged at three locations near the scene of the shooting, and witnesses estimate that these crowds eventually grew to include approximately 200 people. Doc. 73-7 ¶ 4; Doc. 173-2 ¶ 42.

One of the early arrivals on the scene was Julia Ramirez, Alderwoman for Chicago's 12th Ward, who testified during the preliminary injunction hearing. She arrived shortly after hearing about the shooting, at which point there were only approximately fifteen observers and the scene was "really calm." Doc. 255 at 42:21–43:25. Despite this, agents were already wearing masks and "had their guns sort of on them drawn." *Id.* at 43:3–20. The crowd remained calm for another twenty minutes, at which point agents approached a truck and "grabbed the young man that was sitting in the driver's seat." *Id.* at 44:16–22. Ramirez heard the man's mother become distressed, yelling that he was a U.S. citizen and that she did not know why he was being detained. *Id.* at 44:18–22. At that point, the observers began "chanting in protest." *Id.* at 44:25–45:25.

At approximately 11:30 a.m., "all available CBP personnel" were dispatched to the scenes "to assist in providing security." Doc. 191-8 at 1. Shortly thereafter, DHS Press Secretary Tricia McLaughlin "put out preliminary messaging via X account," which DHS and Bovino "retweeted." *Id.* at 6. In this message, McLaughlin confirmed that "[t]here is a growing crowd and we are deploying special operations to control the scene." Tricia McLaughlin (@TriciaOhio), X (Oct. 4, 2025 12:19 p.m.), https://x.com/TriciaOhio/status/1974524869892276682?s=20. CBP agents internally reported that the "crowd [was] full of gang members," with "[r]eports of protesters deploying gas on the northern side of the scene," Doc. 191-8 at 6, but the Court has seen no evidence to support this.

As the crowds grew, Ramirez testified that she witnessed agents driving recklessly and "flying down Kedzie Avenue northbound [in their vehicles] right into the protesters." Doc. 255 at 46:6–20. This began "generating a reaction from the crowd which was almost hit by the federal officers' vehicles multiple times." Doc. 190-4 ¶ 7. Ramirez believed that this was an

attempt to "try to disrupt the organized group and . . . get them to move." Doc. 255 at 46:19–20.

Ramirez further testified that "it wasn't just cars coming through," and that agents drove "what

looked like a tank" into the scene. *Id.* at 47:13–48:24. She testified: "And the scarier part about

it is an agent was on top of that vehicle pointing their gun down at the community. . . I couldn't

even believe that I was living that." *Id.*; *see also* Doc. 73-7 ¶¶ 8–10 ("The ICE and CBP agents

were in a vehicle that I believe is called a 'bearcat.' Someone popped out of the hatch of the

bearcat and was aiming a pepper ball gun at the crowd."); Doc. 22-41 ¶ 4 ("There were several

vehicles in the area and a large, black, armored truck with a person with a rifle coming out of a

hole in the top of the truck.").

Around this same time, agents began shooting protesters with pepper balls. Ramirez

testified that agents did not provide any warnings or orders to disperse prior to shooting the

pepper balls. Doc. 255 at 46:21–47:4; *see also* Doc. 73-7 ¶¶ 13, 16 ("People were shot with

pepper balls . . . There was no warning."). Ramirez noticed a pattern, testifying that "about

every ten minutes they were sending another group of agents in a car sort of zooming through,

riling up people, shooting them with PepperBalls." Doc. 255 at 47:13–16. She further observed

that "it felt like a very organized forum to sort of like work up the people that were in protest.

And this went on, I mean, probably near an hour." *Id.* at 47:16–18.

Multiple witnesses submitted declarations detailing similar observations of the scene.

Rudy Villa arrived shortly before agents began shooting pepper balls. He believed that agents

were "trying to rile up the crowd and the crowd was also angry." Doc. 73-7 ¶ 5. He and others

tried to form a barrier between the protesters and the agents, chanting "Don't take the bait" and

encouraging the protesters to remain peaceful. Doc. 73-7 ¶¶ 6–7. Despite this, he witnessed

agents shooting at least three rounds of pepper balls at the crowd without warning. Doc. 73-7

¶¶ 12–14.  At one point, he found a mother with two young, crying girls in the crowd, and he escorted them across the street to a gas station to get them away from the shooting.  Doc. 73-7 ¶ 15.

The crowds continued to grow throughout this time, and the protesters and the agents were both yelling.  *See, e.g.*, Doc. 22-34 ¶ 5; Doc. 73-7 ¶¶ 5–7; Doc. 190-4 ¶ 10.  Protesters were chanting "get out of our neighborhood," "you don't belong here," "how do you sleep at night," "fuck ICE," and "when do we want ICE out?  Now!"  Doc. 22-34 ¶ 5.  CPD officers then arrived and formed a barrier between the protesters and the agents, which de-escalated the situation.  Doc. 22-41 ¶ 6; Doc. 22-34 ¶ 6; Doc. 73-7 ¶ 11.

Reporter Stephen Held arrived at the scene shortly before 1:00 p.m.  Within half an hour of his arrival, he witnessed agents donning gas masks and holding tear gas launchers.  Doc. 73-2 ¶ 24.  While he saw protesters shouting and chanting, he confirmed that he "did not observe any protesters throwing objects or otherwise inciting violence."  *Id.* ¶ 25.  Multiple other witnesses said the same.  *See* Doc. 22-41 ¶ 10 ("I never observed any protester in the group do anything violent or threatening at any time."); Doc. 22-34 ¶ 9 ("None of the protesters were doing anything violent or threatening against the agents when the agents shot gas canisters at us.").

Despite the reportedly peaceful nature of the protest, agents then began indiscriminately deploying tear gas, without providing any warning to the protesters.  Doc. 73-2 ¶ 27; *see also* Doc. 22-34 ¶ 9 ("Then, without warning, the agents shot silver projectiles that appeared to be tear gas canisters at me and the crowd."); Doc. 73-7 ¶ 20 ("Without making any announcement or warning, there was a huge plume of smoke.").  Ramirez described witnessing this initial deployment, testifying: "It was, again, scary.  People running from the scene, really distressed.  People crying.  Kids on the scene as well.  You know, people trying to clear their face and their

110

eyes." Doc. 255 at 49:13–16; *see also* Doc. 190-4 ¶¶ 15–16.  Approximately thirty minutes after

the initial deployment of tear gas, witnesses saw agents "again indiscriminately and without

visual or audible warning deploy even more gas in the middle of Kedzie Ave." Doc. 73-2 ¶ 30.

Paul Goyette arrived after agents first began deploying tear gas.  As a freelance

photographer, he went to the protest hoping to "add a layer of protection to [his] friends and

neighbors who [were] assembling and voicing their first amendment rights."  Doc. 22-39 ¶ 4.

When he arrived, he immediately saw people "running away saying that tear gas had been

deployed." *Id.* ¶ 7.  He photographed the agents, describing their "appearance and demeanor to

be menacing and intimidating":





*Id.* ¶¶ 8, 10, 17. Goyette was personally present for one of the later tear gas deployments, and despite being incapacitated by the tear gas, he took the photograph below:



*Id.* ¶ 15.

112

Multiple witnesses also observed agents deploying flashbang grenades.  For example, Goyette attempted to return to the intersection of Kedzie and 40th Street after the tear gas smoke began to clear.  *Id.* ¶ 18.  While he was walking, an agent in a vehicle (pictured below) dropped a flashbang grenade eighteen inches from Goyette's leg:



*Id.*  Another journalist, Jonathan Farina, similarly "witnessed a border patrol agent throw a flashbang out of a moving vehicle" and stated that the flashbang "exploded under a vehicle [he] was standing next to."  Doc. 73-4 ¶ 13.  And Brian Orozco, a civil rights attorney, witnessed a flashbang grenade exploding while he was running into an alley after being tear gassed.  Doc. 22-34 ¶¶ 7–8.

BWC footage depicts agents walking up to and forcefully shoving a protester to the ground.  Axon Body 4 Video 2025-10-04 1541 D01A83204 at 16:14–16:16.  After the protester stood up, an agent pushed him again.  *Id.* at 16:16–16:19.  The protester then attempted to push the agents away from him, at which point multiple agents ran up, grabbed him, and forcefully tackled him to the ground.  *Id.* at 16:19–16:37.  Three agents managed to detain the protester, but

then inexplicably let him go. *Id.* at 16:54–17:11. One agent appears to have kicked the protester while walking away. *Id.* at 17:10. The protester attempted to stand up after agents let him go, and agents then immediately and violently tackled him to the ground again. *Id.* at 17:10–17:17. They then pushed and knelt on the protester's head and neck as they handcuffed him:



*Id.* at 17:27–17:40. When asked about the incident a few minutes later,[56] the agent wearing the BWC falsely claims that he got "assaulted by [the] protester." *Id.* at 23:23–23:26.

According to CBP reports, CPD assumed control of all scenes at approximately 3:03 p.m. Doc. 191-8 at 1. At this point, agents "were informed over service radio to use all means necessary to ensure their safe exit, to include the use of deadly force." *Id.*; *see also id.* at 6 ("Please note that ground units were directed from DCPA Parra that agents use all means necessary to ensure their safe exit to include Deadly Force."). CBP agent Hugo Sanchez's incident report confirmed that agents began leaving the scene shortly after 3:00 p.m. Doc. 172-

---

[56] The agent asking about the use of force said he was gathering the information "just to make this shit fucking easier for all of us so we don't get all fucking lawsuits." Axon Body 4 Video 2025-10-04 1541 D01A83204 at 22:59–23:02.

36 at 6. Sanchez was one of three agents inside a vehicle, and he wrote that the crowd

"continued to assault the officers/agents and attempt to throw and kick back the chemical

munitions canisters back onto the road, which were actively releasing chemical agents." *Id.* at 7.

Sanchez responded by deploying "a volley of [pepper balls] for area saturation near the subjects

who were throwing objects and attempting to kick back the CS gas canisters." *Id.* He then

claims to have witnessed an "agitator, a female dressed in black clothing [ ] throwing objects

such as eggs and glass bottles at the convoy," responding by deploying another volley of pepper

balls at the crowd. *Id.* Sanchez's BWC footage does not depict any violent protesters or

protesters blocking agents' vehicles, however. Axon Body 3 Video 2025-10-04 1612

X60AB878H. BWC footage from another agent similarly shows him leaving the scene without

issue. Axon Body 4 Video 2025-10-04 1541 D01A83204 at 26:20–29:23. All CBP personnel

were confirmed safe and accounted for at 3:40 p.m. Doc. 191-8 at 1.

Agents described the protesters at Brighton Park as violent to justify their use of less

lethal force. An incident report stated:

> Over the course of the next four hours, multiple incidents of assault
> on agents and impeding their lawful authority took place. This
> included vehicular assault, the throwing of objects (glass bottles,
> road cones, deployed chemical munitions), and physically pushing
> agents. Agents responded with force to include deployment of
> chemical munitions against violent protesters.

*Id.* at 3; *see also* Doc. 173-2 ¶ 42 ("Over the next four hours, rioters threw objects at agents,

including glass bottles and traffic cones, and forcefully pushed the agents."); Doc. 172-36 at 6

("The situation was highly volatile with subjects throwing rocks and glass bottles as law

enforcement vehicles were attempting to exfil from the area."). Notably, however, Defendants

have not provided witness testimony or video footage to back up their assertion. To the contrary,

BWC footage shows the crowds generally acting peacefully. Axon Body 4 Video 2025-10-04

1251 D01A7881Z at 00:00–8:57; Axon Body 4 Video 2025-10-04 1541 D01A83204 at 00:00–26:20.  The only evidence of protesters throwing objects at agents is BWC video depicting a single incident in which protesters threw two bottles *after* tear gas and pepper balls had already been deployed.  Axon Body 4 Video 2025-10-04 1541 D01A83204 at 16:48–16:51. And the only evidence of a protester pushing agents occurs *after* agents had already forcefully shoved the protester to the ground and pushed him multiple times.  *Id.* at 16:14–37.

### 4.    Albany Park (October 12, 2025)

Around 12:40 p.m. on October 12, 2025, CBP agents, some in rough duty uniforms and others in plainclothes, identified a male and female couple around North Sawyer Avenue and West Wilson Avenue in Chicago's Albany Park neighborhood and attempted to conduct a consensual encounter, but the two people began to flee.  Doc. 172-37 at 10, 11, 13; Doc. 173-2 ¶¶ 43–44.  Agents apprehended one person, but the other escaped.  Doc. 172-37 at 11, 13; Doc. 173-2 ¶ 43.  According to agents, about forty to fifty individuals blocked the CBP vehicle within minutes of the arrest, using bicycles, vehicles, and by linking arms, with the crowd obstructing agents' law enforcement efforts and freedom of movement and prompting agents to call in a CBP QRF team to help with crowd control.  Doc. 172-37 at 10, 11, 12, 13, 14; Doc. 173-2 ¶ 43.  Agents' presence attracted a crowd of neighbors to observe and protest.  Doc. 73-1 ¶¶ 2–4; Doc. 73-16 ¶ 3.  Agents acknowledged that some protesters were area residents, but they noted that others "appeared to be professional agitators based on their style of dress, possession and use[ ] of 'alert whistles' and using bicycles to follow and alert the community of Agent presen[ce] using bicycles."  Doc. 172-37 at 6, 11.  This description of rapid response network members, neighborhood moms and dads, Chicago Bears fans, people dressed in Halloween costumes, and the lawyer who lives on the block as professional agitators undermines the agents' credibility.

Agents reported that the crowd yelled expletives, like "fuck ICE," and called them names like "Nazis" and "Gestapo." Doc. 172-37 at 12. Trevor Mack, who was visiting a friend nearby, noted that one agent held an AR-15 type rifle and another a smaller firearm. Doc. 73-1 ¶ 6. Agents told people to "get back" or "move out of the way" or out of the road, *see, e.g.*, Axon_Body_3_Video_2025-10-12_1337_X60AB878H at 00:15–00:40; Doc. 172-37 at 10, but none of these commands included what would happen if individuals did not comply. Mack observed the lead SUV suddenly move forward into a woman in a bathrobe who had been standing in front of it, who shouted "you ran over my foot!" Doc. 73-1 ¶ 7; Doc. 73-16 ¶ 4; Melody Mercado, *Federal Agents Deploy Tear Gas In Albany Park As Neighbors Block Immigration Arrest*, Block Club Chicago (Oct. 13, 2025), https://blockclubchicago.org/2025/10/13/federal-agents-deploy-tear-gas-in-albany-park-as-neighbors-block-immigration-arrest/[57]; Axon_Body_3_Video_2025-10-12_1338_X60AB561J at 00:49–00:55. Agents reported that protesters threw coffee cups and other items at them, Doc. 172-37 at 7, 10; Axon_Body_3_Video_2025-10-12_1337_X60AB340G at 4:00–4:14, and BWC footage shows at least one coffee cup lid being thrown at the lead SUV after it hit the woman in the bathrobe, Axon_Body_4_Video_2025-10-12_1332_D01A2669A at 5:50–5:54. That same lead SUV also later drove into other protesters standing in front of it in the street, while the driver filmed the interaction, Axon_Body_4_Video_2025-10-12_1332_D01A2669A at 7:50–8:10; Axon_Body_3_Video_2025-10-12_1337_X60AB340G at 2:32–2:40, with the agent who drove the car explaining that he was "driving slowly" and just hit them, Axon_Body_3_Video_2025-10-12_1337_X60AB340G at 4:00–4:14.

---

[57] This article includes a video, also available at https://vimeo.com/1126897112?share=copy, which shows the agent hitting the woman with the car between the 1:52 and 2:17 marks.



Axon_Body_4_Video_2025-10-12_1332_D01A2669A at 7:52 (screenshot).

Although some CBP vehicles managed to leave the area, Doc. 173-2 ¶ 45, other CBP vehicles drove slowly, meaning that eventually they could not turn right from Sawyer onto Wilson because a vehicle had stopped on Wilson near the intersection.  Doc. 73-1 ¶ 8; *see* Melody Mercado, *supra*.[58]  About ten people then stood in front of the agents' vehicles with their arms linked.  Doc. 73-1 ¶ 8.  Harvick indicated that CBP considers linking arms to amount to active resistance.  Doc. 75 at 22:13–17.  According to Parra, "[b]ased on previous experience, the agents became concerned that the longer they remained on the scene, the more dangerous the environment would become, anticipating that social media would broadcast their location and allowing for the threatening crowd to continue to grow."  Doc. 173-2 ¶ 45; *see also* Doc. 75 at 22:7–11 (Harvick testifying that if "others come that become assaultive, the situation gets more and more dangerous the longer [agents] are there," which amounts to "a safety concern, not just

---

[58] This article includes a video, also available at https://vimeo.com/1126897694?fl=pl&fe=vl, which shows the agents' vehicle becoming blocked in between the 1:25 and 2:30 marks.

for [the] Border Patrol agents, but for the detainee [CBP] may have in custody" and "for other people that have come out to see what's going on"); Doc. 172-37 at 10 (an agent noting that "[o]ftentimes, the crowds grow and become violent by ramming [CBP] vehicles, throwing objects at Agents and their vehicles, and physically assaulting Agents").

According to agents' use of force reports, CBP agent Justin Elizalde told the crowd they were violating the law and obstructing agents' duties and that if they did not allow CBP to leave with the arrested individual, they would be subject to arrest and he would deploy chemical munitions. Doc. 172-37 at 10–13. Elizalde reportedly gave the warning "multiple times" and held the CS gas canister above his head to show the crowd. *Id.* at 12–14. He reported that, "[a]fter a considerable amount of time," he deployed the CS canister when the protesters did not obey. *Id.* at 10–12.

BWC video shows an agent, presumably Elizalde, with a tear gas canister telling another agent that "if they don't want to clear, we're going to gas", with the other agent responding, "fuck it, let's go." Axon_Body_3_Video_2025-10-12_1337_X60AB340G at 8:40–8:57. Mack did not hear any warnings or dispersal orders, Doc. 73-1 ¶ 10, and some video footage also does not include any audible warnings that agents would deploy tear gas, Axon_Body_4_Video_ 2025-10-12_1344_D01A2687M at 2:05–2:19 (no audible warnings heard); Axon_Body_4_ Video_2025-10-12_1345_D01A2797W (Elizalde's BWC did not have audio engaged until after tear gas thrown). On at least one BWC, an agent can be seen quickly walking in front of the line of people, yelling "You're gonna get gassed, you've been warned, you're gonna get gassed." Axon_Body_3_Video_2025-10-12_1337_X60A94550 at 9:25–9:35. Then, without giving the protesters an opportunity to comply, contrary to his claim in the use of force report that he waited

"a considerable amount of time," Elizalde rolled a tear gas canister toward the protesters.  Doc. 73-1 ¶ 9; Axon_Body_4_Video_2025-10-12_1345_D01A2797W at 1:16–1:27.

Agents, Parra, and DHS claimed that a woman threw her bicycle at agents, Doc 173-2 ¶ 46; Doc. 191-6 at 1, but video actually shows an agent throwing the bicycle out of the way and pushing someone down after having deployed tear gas, Axon_Body_4_Video_2025-10-12_1345_D01A2797W at 1:30–1:40; Doc. 73-1 ¶ 11.  One resident picked up the tear gas canister and threw it back in the agents' direction, however.  Doc. 75 at 25:2–12; Doc. 172-37 at 11–14; Doc. 173-2 ¶ 46.  The agents' vehicles then turned right onto Wilson Street and left.  Doc. 73-1 ¶ 12.  After leaving the scene, Elizalde commented, "I don't know why the fuck I had to do that . . . but at that point we just needed to get out of there."  Axon_Body_4_Video_2025-10-12_1345_D01A2797W at 3:00–3:25.  Harvick testified that the use of CS gas was appropriate because the scene was an enforcement action, not a planned protest, and so the agents were not necessarily equipped with helmets, gas masks, or other additional protection they might have for planned protests.  Doc. 75 at 21:14–25.

### 5.   East Chicago (October 14, 2025)

On October 14, 2025, CBP agents observed two "suspicious" men sitting in a Ford Escape and attempted to "conduct a consensual encounter." Doc. 172-38 at 52.  The driver of the Ford Escape proceeded to drive away, allegedly hitting the agents' rental car in the process.  *Id.*  The agents then chased the Ford Escape through a residential neighborhood until the agents conducted a precision immobilization technique ("PIT") maneuver, causing both cars to crash at the intersection of 105th Street and South Avenue North.  Doc. 57 at 5 n.11; Axon_Body_3_Video_2025-10-14_1119_X60A79913 at 3:20–3:30 (driver saying "I'm gonna PIT him bro, fuck it.").  While DHS has publicly claimed that the PIT maneuver was "authorized," Doc. 57 at 5

n.11, the agent who conducted the maneuver was not certified in the technique, Axon_Body_3_

Video_2025-10-14_1119_X60A79913 at 2:34–2:41.

Following the crash, approximately two dozen CBP agents responded to the scene to

secure the area and wait for tow trucks to arrive. Doc. 173-2 ¶ 52. CPD officers also responded

to the scene to conduct an accident investigation. Doc. 172-38 at 50. Protesters and journalists

began to gather, and the crowd grew to include between fifty and 150 people. Doc. 73-11 ¶ 8

(stating that there were "about 50 civilians"); Doc. 172-38 at 50 (stating that there was a crowd

"of approximately 150 protesters").

While some protesters were angry and yelling at the agents, *see* Doc. 173-2 ¶¶ 52–53,

multiple agents noted that the crowd remained relatively calm and under control. Axon_Body_

4_Video_2025-10-14_1139_D01A2115V at 57:58–58:10 ("We're actually doing pretty good . . .

with this crowd. It's really pretty chill all things considered. So far so good."); Axon_Body_

4_Video_2025-10-14_1156_D01A2797W at 39:38–40:19 ("It's mellowed out a little bit . . . this

is all neighborhood people . . . it's actually pretty normal, pretty easy.").[59]

Regardless of the peaceful nature of the crowds, many of the agents believed that the

protesters would inevitably become violent once the tow trucks arrived and the agents began

leaving the scene. *See* Axon Body 4 Video 2025-10-14 1130 D01A4281B at 41:49–41:53 ("The

longer we stay here the worse it's going to get. And it's going to end up getting hairy."); *id.* at

1:06:30–1:06:35 ("It's going to be a nightmare getting out of here . . . we're probably going to

get stuff thrown at us."); Axon_Body_4_Video_2025-10-14_1150_D01A4257B at 19:11–19:22

---

[59] Despite the relative calm, multiple agents made derogatory comments about the protesters. *See* Axon
Body 4 Video 2025-10-14 1130 D01A41408 at 48:33 ("Yeah, these people got big mouths, don't they?
Fuck, man."); *id.* at 1:03:48–1:03:52 ("You can't reason with these people, they're nuts."); Chicago
Vehicle Wreck Riot at 51:40–52:00 ("Of course the spots where all the females going crazy, that's where
the crowds are the fucking most riled up. Like these dudes are just talking shit, but if the females came
over here, they'd get 'em all worked up.").

**SA129**

("I can tell you right now how it's going to go. We're going to try to get out, they're going to block our vehicles, we're going to tell them to move, they don't, we gas 'em.").

The agents therefore began making plans to deploy chemical munitions on their way out. *See* Axon Body 4 Video 2025-10-14 1151 D01A49557 at 1:19:37–1:19:40 ("Yeah, I'll drop 'em everywhere. But I need two more cans. I only got three on me."); *id.* at 1:27:05, 1:27:18–20 (repeatedly stating that "I'm going to gas this street"); *id.* at 1:29:17–1:29:30 ("I'm going to be the one deploying the gas . . . I'm going to gas this street. And then I'm waiting here and I'm looking for fucking with the bricks and shit to keep everybody safe."); Axon Body 4 Video 2025-10-14 1130 D01A4281B at 52:45–47 (agent miming throwing tear gas canisters and saying, "we're going to be ching ching-ing away, just booking it"); Chicago Vehicle Wreck Riot at 1:15:00–1:15:03 ("I have a feeling I'm going to get to use this [tear gas] finally."); *id.* at 1:22:14 ("We're definitely gassing them when we leave. Just start throwing shit."); *id.* at 1:28:56–1:28:58 ("We're definitely going to gas them when we get out of here."); Axon_Body_ 4_Video_2025-10-14_1251_D01A30574 at 29:52–30:00 ("We're going to gas the street . . . let [the other agents] know."); *id.* at 30:14–30:21 ("Hey guys. We're going to start gassing here in a little bit.").

Some agents recognized that they could deploy tear gas only if the crowds got violent. In particular, one agent stated: "[W]e gotta warrant the deployment. Like if they're just on the sides, that's fine. But if they're going to do shit, then we can fuck 'em up." Axon Body 4 Video 2025-10-14 1151 D01A49557 at 1:07:19–1:07:29. His colleague, however, responded, "I know that, but it's going to come to that. They've already deployed [smoke]." *Id.* at 1:07:29–1:07:35. Notably, the crowd was entirely peaceful during this exchange.

Meanwhile, at least some agents were also actively attempting to taunt or rile up the protesters. One neighborhood resident, Andrea Pedroza, attended the protest and reported that agents were "shouting at" and "taunting" her 18-year-old daughter. Doc. 73-15 ¶ 11. BWC footage corroborates her account. For example, one agent started an argument by walking up to a small group of peaceful protesters and telling them, "You're about to get gassed." Chicago Vehicle Wreck Riot at 1:00:23–1:00:52.[60] When the protesters pointed out that they were peaceful and under control, the agent further told them that it was just "a suggestion." *Id.* Eventually, a different agent had to step in and de-escalate the situation. *Id.* Another agent spoke about how they deployed smoke against protesters to "try and fake 'em out." Axon Body 4 Video 2025-10-14 1151 D01A49557 at 1:07:40–1:07:48. And yet another agent can be heard saying:

> I just love how completely untouched with reality these people actually are, it's like shocking the shit that comes out their mouth. It's hilarious. ***I like to poke the bear a little bit.*** But it is crazy cause like, nothing they're saying is like, the slightest bit of reality whatsoever.

Axon Body 4 Video 2025-10-14 1130 D01A4281B at 42:00–20 (emphasis added).

While the crowd was generally peaceful, there were some incidents of isolated aggression. First, agents arrested a protester after he threw a handheld smoke canister back at the agents who deployed it. Doc. 173-2 ¶ 53. Later, the agents tackled and arrested a fifteen-year-old boy on suspicion of throwing an egg. Doc. 73-17 ¶¶ 6–7; Doc. 172-38 at 63; Doc. 191-7 at 19. The agents also detained the teen's nineteen-year-old cousin for trying to push past the agents to help his family member. Axon_Body_3_Video_2025-10-14_1242_X60A76624 at 45:28–49:41. During this arrest, the nineteen-year-old yelled multiple times that he could not

---

[60] This was not a warning, because none of the protesters were doing anything that would warrant the deployment of tear gas at this time.

breathe because agents were choking him, but the arresting agent simply responded with "You're not breathing cause you're talking" and "You're fine, relax." *Id.* Notably, these protesters were all "released by the FBI and are not currently being charged with assault." Doc. 172-38 at 52.

Eventually, tow trucks arrived, and agents began preparing to leave the scene. To ensure their safe exit, CPD officers planned to form a line between the protesters and the agents. At this time, the CPD officers specifically requested that agents not deploy any tear gas. Axon_Body_ 4_Video_2025-10-14_1143_D01A4986A at 1:57:07–1:57:41 ("My guys are walking up so I'm going to ask for no tear gas."). A supervisory CBP agent responded, "that's fine," but asked what they should do if the line "start[s] to collapse." *Id.* at 1:57:13–1:57:19. He also told the CPD officers that protesters were starting to throw rocks. *Id.* at 1:57:29–1:57:31. The CPD officers did not appear concerned by this and told the agents that CPD officers would talk to the protesters so CBP could leave. *Id.* at 1:57:32–1:57:40 ("Alright. That's why the faster we get on, I mean [the protesters] should listen to us . . . we're just going to talk to them and try to get you guys out of here. I mean, that's what we are trying to do."). The supervisory CBP agent did not communicate CPD's request for a warning to any of the other agents on the scene, *id.* at 1:57:41–1:58:30, and agents began deploying tear gas almost immediately after the CPD officers lined up in front of the protesters. Axon Body 4 Video 2025-10-14 1151 D01A49557 at 1:47:31–1:48:10. Agents continued deploying additional canisters of tear gas even after the crowds had begun dispersing, and some agents threw canisters directly at peaceful observers who were simply standing on the sidewalk. *Id.* at 1:48:07–1:49:20. One agent commented that the others were "deploying [tear gas] like ICE over there." Chicago Vehicle Wreck Riot at 1:45:54–1:45:56.

A CBP incident report claims that agents deployed tear gas because the protesters were "enraged towards CPD," "began pushing and shoving CPD officers," and "began throwing objects including what appeared to be bottles, rocks, eggs, and pieces of concrete." Doc. 172-38 at 51. BWC video, however, calls this account into question. BWC footage shows that, when CPD officers formed a line in front of the protesters, protesters began cheering for CPD and chanting "get 'em out!" with respect to the CBP agents. Axon Body 4 Video 2025-10-14 1151 D01A49557 at 1:47:21–1:47:45. The footage does not show protesters pushing or shoving any of the CPD officers. *Id.* at 1:47:21–1:48:05. Instead, it appears that agents began deploying tear gas, without warning, after one or two protesters threw objects in their direction. *Id.* at 1:47:57–1:48:06.

Agents also shot protesters with rubber bullets and/or sponge cartridges during this time. Doc. 73-8 ¶ 10; Doc. 191-7 at 13. BWC video shows one agent shooting directly at a peaceful protester who had been yelling and holding a sign stating, "Know Your Rights." Axon_Body_4_Video_2025-10-14_1251_D01A30574 at 50:08–50:10.

Manuel Garcia witnessed agents putting on gas masks, but he "didn't hear any warnings that the agents were planning to use tear gas or any instructions to leave." Doc. 73-8 ¶¶ 6, 10. He then "noticed that there was tear gas" and "started to look for [his] four-year-old daughter and girlfriend," both of whom were "near the intersection" and "needed [Garcia's] help to get home." *Id.* ¶ 10. When he was helping them, he "was shot by what felt like rubber bullets coming from the direction of the agents." *Id.* He later "saw a woman calling for help with her baby" and helped them escape the tear gas as well. *Id.* ¶¶ 13–14.

Maya Rodriguez arrived at the protest around 11:30 a.m. and observed that the "situation remained a peaceful standoff for a long period of time." Doc. 73-17 ¶¶ 3, 6. While she

witnessed the agents arrest the two teenagers suspected of throwing an egg at agents, Rodriguez

observed that the "crowd settled back down" after these arrests were made. *Id.* ¶¶ 6–8.

However, once the tow trucks arrived, Rodriguez "observed the federal officers begin to put on

gas masks during this period of relative calm." *Id.* ¶ 8. Then, "without any audible warning,

multiple federal officers threw silver cannisters of tear gas into the crowd and onto the street and

sidewalks." *Id.* ¶ 9. Rodriguez did not see any "apparent provocation for this deployment of tear

gas." *Id.* At one point, an agent "appeared to throw a cannister directly toward the sidewalk"

where Rodriguez was recording, even though there "were no protesters in the vicinity let alone

anyone doing anything violent." *Id.* ¶ 11. The tear gas caused Rodriguez to become nauseous

and experience "a strong burning sensation in [her] eyes, throat, and face." *Id.* ¶ 12.

Similarly, Matthew Kaplan, a professional photojournalist and documentary

photographer, witnessed federal agents put on gas masks and suddenly "launch[ ] many canisters

of tear gas into the crowd" without warning. Doc. 73-11 ¶¶ 18, 20, 21. He also saw agents

"point[ ] weapons into the smoke which was jarring because it didn't seem they would be able to

aim properly in that cloud of tear gas." *Id.* ¶ 20. At one point, "an agent threw a tear gas canister

towards [Kaplan] and another obvious photographer." *Id.* ¶ 22. He took the following

photographs:

126

**SA134**





**SA135**

*Id.* ¶ 20.  Kaplan was personally "caught up" in the tear gas and "was blinded and coughing

badly."  *Id.* ¶ 23.  Other members of the crowd helped him wash his eyes out with water for ten

minutes.  *Id.*

Kaplan also witnessed an agent point a gun at an older man with a phone, captured in the

following photo:



*Id.* ¶ 14.  Kaplan believes this picture "captures the dynamic of the day—community residents

with only phones standing before heavily armed federal agents."  *Id.* ¶ 14.

Pedroza also observed agents throwing tear gas without any warning.  Doc. 73-15 ¶¶ 14–

15.  She was "surprised that they used tear gas because Chicago Police Department officers who

were there were not wearing any protective equipment."  *Id.* ¶ 16.  Pedroza described being

"blinded by the tear gas as [she] was running away and ha[ving] difficulty breathing," and she

remained lightheaded for the rest of the day.  *Id.* ¶ 17.  She "spent the whole rest of the day

thinking about how [she] never thought something like this would happen in front of [her] house."  *Id.* ¶ 18.

### 6.    Little Village

#### a.    October 22, 2025

On October 22, 2025, Bovino and other CBP agents conducted immigration enforcement operations in Chicago's Little Village neighborhood.  Doc. 173-2 ¶ 57.  Several protesters gathered in a parking lot near a laundromat in the 3100 block of South Pulaski Road, recording and expressing their opinions about CBP's actions.  Doc. 90 at 1; Doc. 173-2 ¶ 57.  According to Parra, these individuals "insulted individual Agents and then physically began encroaching on the Agents despite being told to back up."  Doc. 173-2 ¶ 57.  Four or five agents, including Bovino, confronted a woman standing and recording.  Doc. 90 at 1; *id.* at 2 (linking video posted by Ismael Cordová-Clough, Facebook, *ICE EN LITTLE VILLAGE* (Oct. 22, 2025), https://www.facebook.com/watch/?v=834647139017054&surface_type=vod&referral_source=vod_newsfeed_unit) (hereinafter, "Cordová-Clough Facebook Video")).  Parra claims that "[b]ased on preliminary reports, [this woman] threatened to kill Chief Bovino," Doc. 173-2 ¶ 59, but no threat can be heard on video of the incident that Plaintiffs provided, Cordová-Clough Facebook Video, and Defendants did not provide the Court with any BWC footage from the incident.  As agents approached the woman, Bovino said "What'd you say?  Did you make a threat?"  Doc. 90 at 1; Cordová-Clough Facebook Video at 1:03–1:10.  The woman denied making a threat, at which point Bovino instructed the agents to take her phone.  Doc. 90 at 1.  Agents grabbed her and pulled her to the ground, placing a knee on her back.  *Id.* at 1–2; Cordová-Clough Facebook Video.



Cordová-Clough Facebook Video at 1:47 (screenshot).  Although agents released the woman, the case was referred to the FBI for further investigation, including to subpoena the footage she shot of the incident.  Doc. 173-2 ¶ 59.

That same morning, CBP agents engaged in immigration enforcement operations near the Home Depot at Ogden Avenue and 26th Street in Cicero, about ten minutes west of Little Village.  Doc. 90-1 ¶¶ 3–4; Doc. 173-2 ¶ 60.  Defendants only submitted two short clips of BWC footage from these events.  Agents claim that two cars had been following them for about three miles when one of them, a blue pickup truck, began driving in an aggressive manner as if to ram the CBP vehicles head on.  Doc. 172-39 at 1; Doc. 173-2 ¶ 60.  According to agents, around 11 a.m., the blue truck pulled in front of a CBP QRF vehicle, which warned the civilian driver not to impede and indicating that he otherwise faced arrest.  Doc. 172-39 at 1.  Agents maintain that the blue truck then drove through a red light, crashing into a gray Toyota Corolla.  Doc. 172-39 at 1;

Doc. 173-2 ¶ 60.  A crowd formed at the scene, which Alderman Sigcho-Lopez joined.  Doc. 90-1 ¶¶ 3–4.  Individuals shouted "fuera ICE!" and insults, asked agents for identification, indicated agents were violating the judge's orders, carried signs that said "Fuck ICE" or similar, and waved flags.  Doc. 90-1 ¶¶ 5, 7, 8; Doc. 172-39 at 1; Doc. 173-2 ¶ 61; *see also* Doc. 172-40 at 5 (CBP agent describing the crowd's behavior as "display[ing] aggressive and hostile behavior towards CBP personnel to include yelling in the faces of CBP personnel, middle fingers being pointed, and audible verbal threats of hurting CBP personnel").  As Bovino approached the crowd, he told everyone to step back, and Sigcho-Lopez observed protesters comply.  Doc. 90-1 ¶ 6.

CBP agents notified local police of the accident, with local police rendering aid to the injured Corolla driver and arresting the pickup driver.  Doc. 173-2 ¶ 61.  When local police arrived, CBP personnel reported that they sought to leave.  Doc. 172-40 at 5; Doc. 173-2 ¶ 62.  Around 11:30 a.m., a CBP SRT agent sat in an unmarked government vehicle when three to four individuals approached the passenger side of the vehicle.  Doc. 172-40 at 5; Doc. 173-2 ¶ 62.  According to the agent, one of the individuals shouted obscenities "in a threatening manner" and "aggressively kick[ed] the side of the vehicle."  Doc. 172-40 at 5.  Sigcho-Lopez, however, did not see any provocation.  Doc. 90-1 ¶ 9.  And the agent did not engage the sound on his BWC, making it difficult to confirm whether the individuals who approached the car did anything aside from record the scene and raise their middle finger at the agents in the car.  Axon_Body_3_ Video_2025-10-22_1234_X60AB554J at 1:10–1:30.  In response to the individuals near his vehicle, the agent lowered his window and deployed OC spray in a short burst, allegedly targeted solely at one individual.  Doc. 172-40 at 5; Doc. 173-2 ¶ 62.  The agent reported that windy conditions caused the spray to affect two to three other individuals who had also approached the

131

**SA139**

vehicle. Doc. 172-40 at 5; Doc. 173-2 ¶ 62. Parra represented that the CBP agent did not give

explicit warnings before deploying the OC spray in a targeted fashion "because CBP personnel

had to act quickly to stop the individual from damaging government property." Doc. 173-2 ¶ 63.

The BWC, albeit without audio, does not bear this out. Axon_Body_3_Video_2025-10-

22_1234_X60AB554J at 1:10–1:30]].

### b. October 23, 2025

The following day, Bovino and CBP agents returned to Little Village for immigration

enforcement operations. DHS put out a statement on the incident the next morning, which

stated:

> Yesterday, Border Patrol Agents conducted enforcement
> operations near 27th and Whipple Ave. A large crowd of 75 to
> 100 rioters surrounded law enforcement who set up a perimeter
> after agents were boxed in by a large box truck. Rioters then shot
> at agents with commercial artillery shell fireworks.
>
> A Border Patrol transport van carrying illegal aliens attempting to
> get to the safety of the perimeter was then attacked. Border Patrol
> agents were able to secure the van and get it into the perimeter.
> The mob of rioters grew more hostile and violent, advancing
> toward agents and began throwing rocks and other objects at
> agents, including one that struck Chief Greg Bovino in the head.
>
> Border Patrol agents repeated multiple warnings to back up and
> that chemical agents would be deployed if warnings were ignored.
> Riot control measures were deployed, including by Chief Bovino,
> and arrests were made. Agents properly used their training. The
> use of chemical munitions was conducted in full accordance with
> CBP policy and was necessary to ensure the safety of both law
> enforcement and the public.

Homeland Security (@DHSgov), X (Oct. 24, 2025 8:39 a.m.), https://x.com/DHSgov/status/

1981717145089098111. DHS also put out a highly stylized and edited video showing the

violent and hostile mob it claimed CBP agents faced. Homeland Security (@DHSgov), X (Oct.

28, 2025 9:56 a.m.), *supra*. In a Fox News interview that Bovino gave after the Little Village

events that day, he stated: "[W]e had a protest there in the Little Village area of Chicago just

now, and I watched our agents.· They operate with extreme·professionalism.  They do

everything right.· I've·not seen one instance of something that was out of·control or wrong."

Doc. 190-1 at 5.[61]  In a Telemundo interview, referencing the events in Little Village on October

23, 2025, Bovino said: "Did Judge Ellis get hit in the head with a rock, like I did this morning?  I

had to apply gas this morning, against people."  Doc. 190-2 at 1.[62]  Parra and agents' use of force

reports similarly echo these statements and video, noting that the gathered crowed was "shouting

and gesturing aggressively, incessantly blowing whistles, honking car horns, and throwing

fireworks at CBP personnel."  Doc. 173-2 ¶ 64; Doc. 191-5 at 1.  The evidence presented to the

Court, however, undercuts Defendants' version of the events, and the Court sets forth its findings

with respect to this incident below.

On October 23, around 9:50 a.m., agents reported that a big box truck tried to ram agents

at West 27th Street and South Sacramento Avenue.[63]  Doc. 173-2 ¶ 64; Doc. 191-5 at 1.  Video

of the incident actually shows that agents' vehicles surrounded the big box truck.  REL146 at

0:00 (aerial view of box truck blocked in by several agents' vehicles); *see also* Axon_Body_

4_Video_2025-10-23_1032_D01A2737M at 24:30–24:37 (describing that the truck had been

following agents, causing CBP agents to block the truck in).

---

[61] Video available at https://youtu.be/CAFQn0eBgpA.

[62] Video available at https://www.telemundo.com/noticias/edicion-noticias-
telemundo/inmigracion/video/conversamos-con-gregory-bovino-el-jefe-de-los-operativos-de-la-patrulla-
fronteriza-en-tmvo13045343.

[63] Although Parra's declaration and agents' preliminary report notes that the box truck tried to ram agents'
vehicles at 27th and Sacramento, it actually occurred at 27th and Whipple.  REL146 at 0:00 (aerial view
of box truck blocked in by several agents' vehicles).



REL146 at 0:01 (screenshot).  Even Hewson's testimony at the preliminary injunction hearing describing what happened suggests that the potential that the truck would have rammed a government vehicle arose because of agents' actions.  *See* Doc. 255 at 232:16–18 ("So one of our vehicles made a left turn onto Whipple northbound, and that box truck almost T-boned them.").  Agents arrested two U.S. citizens in the truck.  Doc. 191-5 at 1.

After surrounding the box truck, agents reported being blocked in on all sides.  Doc. 173-2 ¶ 64; Doc. 191-5 at 1; Doc. 255 at 235:15–16 (Hewson testifying that "the north side was already blocked off from that box truck").  But aerial footage, BWC, and other testimony indicate that agents had plenty of time and space to leave the area.  Doc. 255 at 83:5–17 (Bodett testifying that agents were not blocked in and had several paths of egress); REL146 (aerial footage that zooms in and out and shows bird's eye view of potential exits, agents' vehicles leaving); REL147 (showing clear means of egress down 27th Street to Sacramento or going the wrong way on Whipple); Axon_Body_4_Video_2025-10-23_1125_D01A2282F at 3:55–4:05 (showing path of egress).

134

**SA142**



Axon_Body_4_Video_2025-10-23_1125_D01A2282F at 3:56 (screenshot).  If anything, the

aerial footage suggests that agents caused gridlock, with people unwittingly driving into the

scene, given that it occurred around a shopping plaza, and then attempting to get around the

agents, backing up, turning around, or waiting for agents to move their cars.  REL146.

Additionally, what agents called a "large crowd of rioters" began as only several

individuals, none of whom posed any apparent threat to agents, nor does the crowd appear to

reach 100, as Defendants claimed.  REL146 at 6:20–6:47 (aerial view showing more agents than

protesters); Axon_Body_4_Video_2025-10-23_1106_D01A32103 at 10:12–10:35, 21:55–22:02

(showing crowd size from agents' perspective at different points in time); Axon_Body_4_

Video_2025-10-23_1108_D01A45488 at 2:22–2:33, 6:50–7:23, 21:30–22:05 (showing crowd

size from agents' perspective at different points in time).



REL146 at 6:30 (screenshot).  For an extended period of time, agents outnumbered protesters,

suggesting that agents could have made their way out before the crowd grew and without using

any type of force.  *See, e.g.*, Axon_Body_4_Video_2025-10-23_1043_D01A49397 at 11:30–

15:55 (showing agents standing around and waiting over a spread out area, with only a few

protesters and observers in sight and cars able to clear the area and leave); Axon_Body_4_

Video_2025-10-23_1050_D01A2282F at 2:25–3:50 (showing two protesters and a crowd of

agents); Axon_Body_3_Video_2025-10-23_1051_X60AB834E at 4:13–5:30 (showing several

protesters and lines of federal agents standing around); Axon_Body_4_+_Flex_Video_2025-10-

23_1053_D01A2898X (showing more agents than protesters and free areas for movement for

over seven minutes, even though someone on radio traffic says that they "are blocked in").  At

one point, all units aside from SRT were instructed to leave, with vehicles able to do so without

issue.  *See, e.g.*, Axon_Body_4_Video_2025-10-23_1107_D01A31902 (almost thirteen-minute

video showing more agents than protesters, instruction for all units but SRT to leave, and agents'

vehicle able to leave).

**SA144**

John Bodett described the protesters as "a hodgepodge group of people," with "[a] lot of people recording, a guy walking his dog, somebody honking, another person blowing a whistle, a couple of people yelling at ICE to leave, and a couple of people cussing them out."  Doc. 255 at 79:25–80:3.  Yohanna Sotelo observed and recorded people screaming at agents and agents pushing and shoving people, including her, for no reason.  Doc. 94-1 ¶ 6.[64]  People yelled things like "You gotta go," "you're not welcome here," this is "our neighborhood," and "you should be ashamed," while also calling agents "cowards."  *See, e.g.*, Axon_Body_4_Video_2025-10-23_1057_D01A43998 at 4:00–4:30; Axon_Body_4_Video_2025-10-23_1125_D01A2282F at 1:58–3:08.  When an agent pointed a PLS at protesters, one protester told him to put it down and noted that pointing weapons did not de-escalate the situation.  Axon_Body_4_Video_2025-10-23_1057_D01A43998 at 4:46–5:03; *see also id.* at 24:30–25:00 (similar).

CBP agents noted several people on the roofs of nearby buildings, calling them spotters giving directions to people below.  Axon_Body_4_Video_2025-10-23_1050_D01A2282F at 00:00–00:04, 1:48–1:57; Axon_Body_4_Video_2025-10-23_1052_D01A4763A at 8:14–10:19; Axon_Body_4_Video_2025-10-23_1125_D01A2282F at 4:47, 9:10–9:35.  True, DHS had publicized investigations into "[s]potter networks" in Little Village, claiming that gang members could be found "on rooftops equipped with firearms and radio communications" to "track ICE and CBP movements in real-time" and "relay[ ] coordinates" that "enable[ ] ambushes and disruptions during routine enforcement actions."  DHS Oct. 14, 2025 Press Release; Doc. 172-1 at 1.  But nothing in the record suggests that the particular individuals on the roofs on October 23, 2025 posed any threat to agents or did anything illegal.  *See* Doc. 255 at 238:22–24 (Hewson admitting that he did not see any individuals on the roofs with firearms); *id.* at 240:12–241:21

---

[64] Video accompanying Sotelo's declaration can be found at Doc. 89 ¶ 3, https://spaces.hightail.com/space/BDqwV97J8x.

(Hewson acknowledging that at the time of the events, he did not see anybody in the crowd with a firearm and had no knowledge that anyone physically at the scene had guns); REL146 at 12:05–12:10 (aerial close-up of individual on roof filming with cell phone).

Similarly, while a firework went off at least a block away, Axon_Body_4_Video_2025-10-23_1058_D01A39542 at 3:20–3:27; Axon_Body_4_Video_2025-10-23_1052_D01A4763A at 9:32, nothing suggests that the firework posed a threat to agents, *see* Doc. 255 at 83:24–84:9 (Bodett noting that fireworks are an everyday occurrence in Little Village). Hewson testified that a pellet from the firework mortar "ended up striking one of [his] agents," Doc. 255 at 234:7–16, but this is not reflected in the preliminary use of force report in evidence or in any of the BWC footage produced to the Court. To the extent that individuals arguably posed a threat, agents had the ability to address those threats directly with the individual, with some protesters even helping point agents to an individual who had thrown water bottles. *See* Axon_Body_4_Video_2025-10-23_1057_D01A43998 at 5:25–5:33 (individual pointing agents to a person who had been throwing water, whom agents then tackled and arrested); Axon_Body_4_Video_2025-10-23_1053_D01A38302 at 5:38–7:07 (agents tackling and arresting a woman who hit a federal vehicle with her keys). Hewson even acknowledged that he specifically warned individuals who told him that they would "get [their] homies and bring the guns" or "bring the rammers to come ram [agents'] vehicles" that those statements constituted threats and they could be arrested for making them. Doc. 255 at 238:10–15, 239:10–23.

Bovino deployed tear gas around 10:01 a.m., admitting that he did not give a warning. Doc. 238 at 11:25–12:3; REL146 at 9:17–10:09 (aerial view of sequence of events involving tear gas deployment).



Doc. 88 ¶ 4.  One agent told a small group of people to "back up, the gas is coming out," but it appears that only a small number of people were in earshot of this warning.  Axon_Body_4_Video_2025-10-23_1052_D01A4063B at 10:35–11:30.  And on other video, no warning can be heard, with instead the only indication of the deployment being an agent on the radio stating "gas, gas, gas" after Bovino had deployed the first can of gas.  Axon_Body_4_Video_2025-10-23_1056_D01A4610B at 7:10–7:40.  Similarly, Sotelo and Bodett had not observed any violent action or physical threats to the agents at the time that Bovino threw tear gas, nor did they hear any warnings.  Doc. 94-1 ¶¶ 7, 9; Doc. 94-1 ¶ 8; Doc. 94-2 ¶¶ 7, 11; Doc. 255 at 88:16–92:2.  Bodett did, however, hear an agent scream "get 'em!" prompting agents to rush toward the protesters.  Doc. 94-2 ¶ 8; Doc. 255 at 82:6–7, 90:25–91:4.  A man kicked the canister back

139

**SA147**

toward the agents, and another threw the tear gas canister in the agents' direction,[65] prompting

agents to go after these individuals and arrest them.[66]  Axon_Body_4_Video_2025-10-

23_1125_D01A2282F at 11:00–12:03.  As people retreated, Bovino rolled a second canister of

tear gas at those fleeing, at least one agent fired his PLS, and at least one agent threw a flashbang

grenade.  *See* Axon_Body_4_Video_2025-10-23_1053_D01A38302 at 10:03–10:33;

Axon_Body_4_Video_2025-10-23_1056_D01A47477 at 7:43–7:46; Axon_Body_4_Video_

2025-10-23_1056_D01A4610B at 7:10–7:40.



Axon_Body_4_Video_2025-10-23_1053_D01A38302 at 10:25 (screenshot).

Around this same time, a small group of protesters gathered around the entrance to the

Discount Mall on 27th Street between Whipple and Troy.  Agents' transport van had several

people surround it, potentially hitting it or trying to rock it for several seconds, prompting the

---

[65] Presumably, the tear gas canister is what Bovino described as a rock being thrown at him.

[66] Hewson testified that kicking tear gas canisters back toward agents or otherwise exposing them to gas is considered "assaultive" behavior.  Doc. 255 at 261:19–23.

driver to announce over the radio that the van was "under attack." Axon_Body_4_Video_2025-10-23_1100_D01D03740 at 3:58–4:17. Agents helped the van get past other vehicles and into their perimeter. Axon_Body_4_+_Flex_Video_2025-10-23_1103_D01A2898X at 1:45–3:00; Axon_Body_4_Video_2025-10-23_1053_D01A38302 at 12:20–12:40. Bovino then came up to an agent and told him, "if you need to deploy gas, deploy fucking gas," to which the agent responded, "no, we're good. We're good. We're ready to move out whenever you are." Axon_Body_4_Video_2025-10-23_1052_D01A4063B at 14:15–14:25. Despite being told less than a minute earlier that no gas was needed, Bovino said over the radio "we're gonna gas, looks like we're gonna go ahead and gas." Axon_Body_4_+_Flex_Video_2025-10-23_1103_D01A2898X at 3:50–3:57. Agents did tell people to back up and move out of the way, but they did not warn what would happen if they did not. Axon_Body_4_Video_2025-10-23_1032_D01A2737M at 34:35–35:08; Axon_Body_4_Video_2025-10-23_1052_D01A4063B at 15:23–15:37. Without warning, an agent shot a pepper ball directly at Enrique Bahena from close range, followed by another agent throwing what appears to be a pepper ball behind Bahena at retreating protesters. Doc. 94-3 ¶¶ 11, 12; Doc. 94 ¶ 4 n.2 (video available at https://spaces.hightail.com/space/eY5Xi6D2qU); Axon_Body_4_Video_2025-10-23_1052_D01A4063B at 15:23–15:37. On the other side of the vehicle from where Bahena stood, an agent warned protesters to "get back, get back, get back or you will be gassed." Axon_Body_4_+_Flex_Video_2025-10-23_1103_D01A2898X at 4:10–4:17. About two seconds later, the agent tossed a tear gas canister at the crowd, around 10:05 a.m. *Id.* But the crowd had begun moving away from the agents and off the street already. *Id.*; Axon_Body_4_Video_2025-10-23_1052_D01A4063B at 15:23–15:37. A woman kicked the tear gas canister back in the direction of the agents, prompting an agent to run after the woman and place her under arrest.

Axon_Body_4_+_Flex_Video_2025-10-23_1103_D01A2898X at 4:20–4:30. After this tear gas deployment, an agent said over the radio "try to remember to give warnings for the gas." Axon_Body_3_Video_2025-10-23_1051_X60AB834E at 16:29–16:54.

About six minutes after the latest gas deployment, Bovino stated, "[t]his crowd is growing. We're probably going to need to ensure we have gas up here, guys. Um, it's gonna get pretty unruly. So, uh, hurry up with that transport." Axon_Body_4_Video_2025-10-23_1108_D01A3024X at 4:21–4:34. Agents again told protesters to move back and to the side of the street, but protesters already stood at some distance from the agents, and it is not clear that any agents' vehicles remained outside their so-called perimeter. Axon_Body_4_Video_2025-10-23_1112_D01A49397 at 3:18–3:40. Protesters continued chanting, but they did not threaten agents. *Id.* at 6:30–7:00. Instead, several apparent organizers instructed protesters to hold the line and move back, asking agents for direction in maintaining the peace. *Id.* One organizer told agents not to use excessive force and encouraged agents to leave by a different route because the area behind the protesters was blocked, but the area behind the agents was not. *Id.* at 7:00–8:30. As protesters advanced in a line toward agents, agents moved backwards, with some even turning their backs and others loafing in the background, suggesting that they did not perceive the protesters as a threat. *Id.* at 7:45–10:20; Axon_Body_4_Video_2025-10-23_1108_D01A45488 at 12:02–14:50.

Nonetheless, agents took their time leaving the area. One individual commented after agents had been there for some time that it appeared that agents were only putting on "a show." Axon_Body_4_Video_2025-10-23_1057_D01A43998 at 22:10–22:43. Another asked agents what they were still doing there, noting that they had "all that space back there" to leave. Axon_Body_4_Video_2025-10-23_1106_D01A32103 at 6:24–6:27;

Axon_Body_4_Video_2025-10-23_1053_D01A38302 at 19:44–20:00, 22:25–22:36. One agent even echoed these sentiments to another, asking "what are we doing here?" Axon_Body_4_Video_2025-10-23_1108_D01A45488 at 5:55–6:10.

After most vehicles left the area and CPD officers arrived, agents reported additional damage, claiming individuals threw rocks and other objects, broke the back window of a government vehicle near West 26th Street and South Sacramento Avenue, and punctured a tire on a government vehicle. Doc. 173-2 ¶ 66; Doc. 191-5 at 1. Agents also reported that an unknown male threw a rock directly at an agent and struck him in the head, but that the agent wore his ballistic helmet and did not sustain any injuries. Doc. 173-2 ¶ 65; Doc. 191-5 at 1. Video shows several projectiles thrown at agents and their retreating vehicles, as well as graffiti on two vehicles. Axon_Body_3_Video_2025-10-23_1056_X60AB787G at 32:11–32:27 (showing water bottle or similar projectile thrown from behind line of protesters toward agents as they were at intersection of 27th and Whipple); Axon_Body_4_Video_2025-10-23_1106_D01A32103 at 26:57–27:10 (showing graffiti on agents' vehicle); Axon_Body_4_Video_2025-10-23_1108_D01A45488 at 23:40–23:50 (same); Axon_Body_4_Video_2025-10-23_1108_D01A45488 at 26:58–27:00 (showing rock thrown at agent's vehicle). These thrown objects provoked no response from the agents. Axon_Body_4_Video_2025-10-23_1106_D01A32103 at 28:10–22 (showing rocks thrown as agents were leaving that provoked no response from agents); Axon_Body_4_Video_2025-10-23_1108_D01A45488 at 26:58–27:00 (same).

As agents left the scene and CPD began to clear the area, Chris Gentry, a military veteran working in the school system, stood along the east side of the crowd on Whipple near 27th Street. Doc. 94-4 ¶¶ 3–4. As Gentry stood there, a federal agent got into a white car and pointed a PLS at Gentry's face through the open window of the open door. *Id.* ¶ 6. As another federal

143

SA151

vehicle drove by, Gentry yelled something along the lines of "I am a combat veteran who served

my country, and what you're doing is the opposite!"  *Id.* ¶ 9.  An agent rolled down his window,

pointed a handgun out of it, and said "bang bang" followed by something like "you're dead,

liberal."  *Id.* ¶ 10.  Gentry was not armed or using any object as a weapon, and nothing was being

thrown at the car.  *Id.* ¶ 11.

Agents also reported that, in their attempts to leave the area, a crowd blocked them in at

West 26th Street and South Avers, about a mile away, which required them to deploy additional

gas.  Doc. 173-2 ¶ 66; Doc. 191-5 at 1.  Defendants did not submit BWC footage that shows this

deployment.  In listening to radio traffic concerning the incident, one agent commented, "[a]ll

we're doing is attracting a shit storm of attention.  We should get out of the area."  Axon_Body_

4_Video_2025-10-23_1150_D01A31902 at 2:50–3:00.  After leaving, another agent commented

"that was de-escalation, right?" and then emphasized, sarcastically, "de-escalation."

Axon_Body_4_Video_2025-10-23_1130_D01A33312 at 5:34–5:45.

### 7.    Lakeview (October 24, 2025)

On October 24, 2025, CBP agents conducted immigration enforcement activities near

West Henderson and North Lakewood in Chicago's Lakeview neighborhood, where several

individuals began following the agents on bicycles and in cars, blowing whistles and honking

their horns.[67]  Doc. 172-42 at 6; Doc. 173-2 ¶ 67; Axon_Body_4_Video_2025-10-24_1249_

D01A2282F at 1:55–2:02 (shows people following agents and blowing whistles in Lakeview).  A

little before 12 p.m., agents tried to arrest several construction workers eating lunch outside a

house, succeeding in apprehending one individual in the yard while others escaped.  Doc. 172-41

at 1–2; Doc. 173-2 ¶ 67.  A crowd of neighbors and other onlookers gathered, with CBP agents

---

[67] The Court notes that the use of force reports make clear CBP agents' unfamiliarity with Chicago, as
they report that they were conducting operations in the "Old Town Triangle neighborhood" instead of
Lakeview.  Doc. 172-42 at 6.

estimating the crowd numbered around fifty individuals. Doc. 140-1 ¶ 5; Doc. 172-41 at 1–2;

Doc. 173-2 ¶ 67; Doc. 190-13 ¶ 2. Protesters screamed at agents, shouting things like "go home"

and "we know our rights." Axon_Body_4_Video_2025-10-24_1258_D01A2282F at 2:59–4:26.

Notably, at least two of those in the crowd, Bruce Turner and Dallas Knapp, did not see anyone

touch agents, throw anything, or act violently toward agents. Doc. 140-1 ¶¶ 6–7; Doc. 190-13

¶¶ 7–8. An agent's BWC does show someone trying to deflate the front driver's side tire of one

of the agents' vehicles, although another protester pulls that person back. Doc. 172-41 at 1; Doc.

172-42 at 7; Doc. 173-2 ¶ 68; Axon_Body_4_Video_2025-10-24_1256_D01A2094R at 1:54–

1:57. Agents were in two SUVs, one going in the right direction and one reversing backwards

but facing the wrong direction on Lakewood. Doc. 190-13 ¶¶ 4–5. Although Defendants claim

that a civilian vehicle made its way toward the agents to prevent them from leaving the scene,

Doc. 172-42 at 7; Doc. 173-2 ¶ 68, Turner did not see anyone block the agents' vehicles' path,

Doc. 190-13 ¶ 10. At one point, an agent pulled out a whistle and started whistling back at the

gathered crowd, seemingly in jest. Axon_Body_4_Video_2025-10-24_1258_D01A2282F at

5:00–5:05.

     Knapp and Foster heard popping sounds, followed by tear gas coming from a canister

that Hewson, who was sitting in the white SUV, threw to the north, in the opposite direction

from which the SUV was moving. Doc. 140-1 ¶¶ 8–9, 13; Doc. 172-42 at 7; Doc. 190-13 ¶¶ 12–

13. The agent driving the SUV said to another agent, "Hey, throw it for fun," Axon_Body_4_

Video_2025-10-24_1256_D01A2094R at 4:05–4:09, and another agent commented to the

protesters "have fun" as the agents deployed tear gas, Axon_Body_4_Video_2025-10-24_1258_

D01A2282F at 6:44–6:46. Someone from the white SUV threw two additional tear gas canisters

about fifteen seconds after the first canister, thrown toward the sidewalks where people stood.

Doc. 140-1 ¶ 11; Doc. 190-13 ¶ 14.



Doc. 140 at 1 n.2 (Ex. 93 at 0:42, video available at

https://spaces.hightail.com/space/Xjig9u14vw) (screenshot).

Agents did give some warnings about the potential use of tear gas, Doc. 173-2 ¶ 68,

stating, for example, "[g]et out of the way of the cars or I'm going to push you away or I'm

going to throw gas," Doc. 173-2 ¶ 69; Axon_Body_4_Video_2025-10-24_1258_D01A2282F at

2:31–2:40, "You will be gassed if you don't back up," Axon_Body_4_+_Flex_Video_2025-10-

24_1250_D01A2898X at 11:17–11:20; *see also id.* at 13:55–14:00, 14:23–27, or "You want

this?  You want this?" and "You will be gassed if you don't stay back," Axon_Body_4_Video_

2025-10-24_1258_D01A2282F at 5:10–5:14, 6:25–6:28.  Simultaneously to deploying the first

tear gas canister, an agent screams "gas coming out, gas, gas, gas."  Axon_Body_4_+_Flex

_Video_2025-10-24_1250_D01A2898X at 14:38–14:45.  One agent also commented after the

146

fact that they "gave [the crowd] plenty of warning" before deploying the tear gas. Axon_Body_ 4_Video_2025-10-24_1302_D01A2094R at 5:10–5:20.

The driver of the white SUV commented that someone threw something at them, and the use of force report notes that protesters threw back a tear gas canister and also threw a pumpkin at the agents' car, Doc. 172-42 at 7; Doc. 173-2 ¶ 69. Video shows two individuals kicking two tear gas canisters in the direction of the agents' vehicle, Doc. 140-2 at 7 (Ex. B at 0:45, 1:07, available at https://spaces.hightail.com/space/eVIUNWmZh1), but the submitted video does not show anyone throwing a pumpkin; moreover, video demonstrates that regardless of someone kicking the canisters back toward the vehicle, wind was blowing the tear gas that agents had thrown back at the vehicle, Axon_Body_4_Video_2025-10-24_1302_D01A2094R at 2:20–3:45; Axon_Body_4_Video_2025-10-24_1302_D01A2094R at 5:10–5:20 (agent admitting that wind blew the tear gas back at the agents' car); Doc. 172-42 at 7 (agent acknowledging in use of force report that the wind blew gas into the vehicle). While agents claimed that they needed to throw the tear gas to clear the way for egress, Doc. 172-42 at 7, video does not indicate that anything blocked egress before they deployed tear gas and agents threw the tear gas in the opposite direction from which they were trying to go, Doc. 190-13 at 3 (Ex. A, available at https://spaces.hightail.com/space/35dl5EoEsD); Doc. 140 at 1 n.2 (Ex. 92, available at https://spaces.hightail.com/space/Xjig9u14vw/files). Moreover, video footage shows that at least two agents had to leave the vehicle to recover after being hit with the tear gas themselves, which further delayed the agents' exit, Doc. 140 at 1 n.1 (Ex. 91, available at https://spaces.hightail.com/space/Xjig9u14vw/files); Axon_Body_4_Video_2025-10-24_ 1302_D01A2094R at 2:20–3:45; Axon_Body_4_Video_2025-10-24_1258_D01A2282F at 7:01– 10:00.

### 8.    Old Irving Park (October 25, 2025)

On October 25, 2025, around 9:45 a.m., families in Old Irving Park in Chicago were getting ready for a neighborhood Halloween parade when agents arrived on North Kildare Avenue and arrested a man.  Doc. 118-1 ¶¶ 2, 4.  Neighbors gathered, some in costume, others in pajamas and with wet hair, and began yelling at the agents, protesting "vigorously."  Doc. 118-1 ¶¶ 3, 6, 8; Doc. 118-2 ¶ 5.  Agents' BWC footage from the interaction does not reflect that anyone threw anything at agents or that those gathered did anything but peacefully protest and record.  Axon_Body_4_Video_2025-10-25_1045_D01A36942; Axon_Body_4_Video_2025-10-25_1045_D01A38582; Kilder_Ave_Op_Midway-Blitz_4_Video_2025-10-25_1045_D01A2632Y.[68]  Brian Kolp, who lives on the 3700 block of North Kildare, ran out of his house when he heard a whistle and saw CBP agents tackling a man on his front lawn.  Doc. 118-2 ¶¶ 3–4.  Kolp told the agents to get off his property.  Doc. 118-2 ¶ 5; Axon_Body_4_Video_2025-10-25_1045_D01A36942 at 5:11–5:15.  George Witchek, who lives near the 3700 block of North Kildare, left his house in his duck costume and flip flops.  Doc. 190-3 ¶¶ 1–2.  While Witchek stood behind a federal vehicle that began backing up, agents tackled Witchek to the ground without warning, leaving him with a traumatic brain injury.  Doc. 118-1 ¶ 7; Doc. 190-3 ¶¶ 5–6, 9; Axon_Body_4_Video_2025-10-25_1045_D01A38582 at 9:14–9:20.

---

[68] The Court notes that this agent's BWC is blocked for a good portion of the events, with only sound audible.



Doc. 118-1 ¶ 7.  When Witchek asked the agents why they tackled him, they did not respond,

and they did not arrest him.  Doc. 190-3 ¶ 8.  Agents also grabbed at a woman who was walking

her dog and talking to agents on the parkway.  Doc. 118-1 ¶ 6.

At some point, James Hotchkiss, who lives on the 3800 block of North Kildare, heard

someone remark that agents were putting on their gas masks.  Doc. 118-1; *see also*

Axon_Body_4_Video_2025-10-25_1045_D01A38582 at 8:00–8:45 (showing agents in a car

saying they are blocked in and then getting instruction to and putting on their gas masks).

Shortly thereafter, as a federal vehicle slowly drove down the street, apparently attempting to

leave, a woman stood in front of the vehicle with her bike positioned in front of her.  Doc. 118-3

(Ex. 88, available at https://spaces.hightail.com/space/EVZTY9QHGw).  The vehicle accelerated

and ran into the woman, causing her to fall to the ground.  *Id.*  An agent then rolled a tear gas

canister toward people behind the agents' vehicle, while other agents surrounded a car that had

pulled up around the same time in front of the agents' vehicle.  *Id.*  The tear gas canister lit on

fire.  *Id.*; Doc. 118-1 ¶ 10.  Agents also ordered a seventy-year-old man to move his car, and when he got out of the car instead, they tackled him to the ground and arrested him, also shoving others who had gathered around that car.  Doc. 118-2 ¶ 6; Doc. 118-3 (Ex. 88, available at https://spaces.hightail.com/space/EVZTY9QHGw); Axon_Body_4_Video_2025-10-25_1045_D01A36942 at 11:55–14:11.  Hotchkiss and Kolp did not hear any warning or order given before the agents deployed the tear gas, Doc. 118-1 ¶ 10; Doc. 118-2 ¶ 7, although one agent's BWC includes him warning people to back up or else they will get gassed or hit and also yelling immediately before deploying the gas "gas, gas, gas, gas, gas." Axon_Body_4_Video_2025-10-25_1045_D01A38582 at 9:58–10:22, 11:43–11:56.  While agents claimed that the crowd prevented them from leaving and that they needed to use tear gas to allow them to leave, Doc. 172-43 at 1; Doc. 173-2 ¶¶ 71–72, their BWC footage instead suggests that they prolonged the encounter, Axon_Body_4_Video_2025-10-25_1045_D01A36942; Axon_Body_4_Video_2025-10-25_1045_D01A38582.  Parade organizers canceled the Halloween parade and kept activities on school grounds.  Doc. 118-1 ¶ 14.

Bovino agreed in a court hearing on October 28, 2025 that hypothetically, if "somebody had driven up in a car and they had been on a long run, so they're marathon training, and they got out of their car in their running clothes and . . . see a commotion and they're asking the agents what's going on . . . under those circumstances, that that person doesn't pose a level of threat such that taking them down to the ground and using a choke hold maneuver would be appropriate."  Doc. 144 at 28:13–29:20.

### 9.    Aurora (October 25 and 29, 2025)

On October 25, 2025, residents learned that federal agents had parked in a staff lot at Allen Elementary in Aurora.  Doc. 174 ¶ 2.  Ruben Morales, a concerned citizen who documents

federal immigration activity in the area, approached an unmarked vehicle and motioned for the driver to roll down the car's windows. *Id.* ¶ 3. An agent in the back seat rolled down the window and yelled at Morales to move away from the vehicle. *Id.* Morales complied, putting his hands in the air, turning around, and walking away. *Id.* ¶ 4. An agent then approached Morales from behind, pepper sprayed the back of Morales' head, and tackled Morales to the ground. *Id.* Morales felt multiple punches, after which agents handcuffed him. *Id.* Agents, who were in plain clothes, did not identify themselves before handcuffing Morales. *Id.* ¶ 5. Although Morales asked for medical attention, they refused provide it and instead took him to the FBI's Chicago office, where agents told an FBI agent that they did not have BWCs. *Id.* The FBI released Morales without a citation or charges. *Id.*

Jessi Olazaba, another Aurora resident, witnessed the assault on Morales. *Id.* ¶ 6. She filmed, blew a whistle, and shouted for the agents to leave. *Id.* As she tried to record the license plates of the vehicle into which agents placed Morales, an agent approached Olazaba with pepper spray in his hand. *Id.* ¶¶ 6–7. Without any apparent provocation or warning, the agent knocked off Olazaba's glasses, pepper sprayed her, and pushed her backwards so that she hit her head on the curb. *Id.* ¶ 7. Agents took Olazaba to Rush Copley Hospital, where additional protesters gathered to document and film the agents. *Id.* ¶ 8. Agents cited Olazaba for impeding an arrest, and they left her children, who had been in her car, with local police. Courtney Sisk, *U.S. Citizens From Aurora Arrested by Federal Agents Recount the Experience*, NBC Chicago (October 26, 2025), https://www.nbcchicago.com/news/local/u-s-citizens-from-aurora-arrested-by-federal-agents-recount-the-experience/3843754/.

On October 29, 2025, also in Aurora, Elizabeth Pineda, who belongs to a rapid response team, heard whistles and pulled into the El Paso Grande grocery store parking lot. Doc. 174

¶ 11; Doc. 174-1 at 2. She unintentionally blocked a federal agent's vehicle in the process. Doc. 174 ¶ 11; Doc. 174-1 at 2. An agent raised his weapon and fired projectiles at Pineda's car as another agent approached Pineda's open window and began yelling at her to get out of the car. Doc. 174 ¶ 12. Pineda had her two young children, ages one and three, in her car and she repeatedly made that known to the agents. *Id.* ¶ 13. Video of the incident does not reflect any verbal warnings, though an article about the incident states that Pineda "was warned to get out of the way" and the agent who told her to get out of the car says after the fact on video that he warned Pineda. *Id.* ¶ 14; Doc. 174-1 at 2; Republicans against Trump (@RpsAgainstTrump), X (Oct. 29, 2025 9:13 p.m.), https://x.com/RpsAgainstTrump/status/1983718841529061798. No one warned Pineda that agents would deploy projectiles, however, and agents did not give Pineda time to move her car before they fired the projectiles and removed her from the car. Doc. 174 ¶ 14. Pineda represents that she "was not instigating anything," and agents ultimately let her go. Doc. 174 ¶ 16; Doc. 174-1 at 3. Because her window was down when the agent fired the pepper ball projectiles, she took herself and her children to the emergency room later that day. Doc. 174 ¶ 17.

### 10. Gurnee (October 30, 2025)

Benjamin Squires, a pastor at Bethel Lutheran Church and a volunteer greeter at Warren Township High School ("WTHS") in Gurnee, Illinois, was greeting students at the entrance of WTHS's O'Plaine Road campus, which serves 9th and 10th grade students, on October 30, 2025. Doc. 190-9 ¶¶ 3–5. As the school day started, a car skidded into the parking lot and crashed. *Id.* ¶ 6. Two men fled toward the building, with federal agents detaining one in the parking lot and the other after he entered the school. *Id.* ¶¶ 6–7. As Squires attempted to record the scene, prompted by his faith to do so, an agent threatened to pepper spray Squires. *Id.* ¶¶ 14–16. As

Squires walked back toward the school, the agent again threatened Squires and others gathered in the parking lot with pepper spray. *Id.* ¶ 19.

### 11. Evanston (October 31, 2025)

On October 31, CBP agents conducted federal immigration enforcement operations in the Evanston area. Residents, rapid responders, and other protesters came out to observe, document, and protest the federal agents' actions. Plaintiffs highlight two interactions. The first occurred around 11 a.m. near Lincolnwood Elementary School at Colfax and Bennett. Doc. 188-2 ¶¶ 5–8. Kelly Mack, an Evanston resident and bicycle shop owner, was on her bicycle when she heard extended helicopter noise and whistles. *Id.* ¶¶ 2–3, 5–7. When Mack arrived at the intersection, she saw her neighbor Clark, whose children attend Lincolnwood Elementary, talking to two federal immigration agents wearing fatigues, vests, and face coverings. *Id.* ¶¶ 11–12. Mack began recording, and she recalled hearing Clark say something about face coverings to the agents. *Id.* ¶¶ 13, 15. Mack recalls, and her video reflects, that agents then shoved Clark out of the street, after which a black SUV drove by with agents yelling "out of the way," followed by two more cars of federal agents. *Id.* ¶¶ 13–20; Doc. 188-2 at 4 (Ex. A, available at https://spaces.hightail.com/space/Y1GuNfhSaQ). Agents again shoved Clark without warning. *Id.* ¶ 23–24; Doc. 188-2 at 4 (Ex. A). A white SUV then stopped at the intersection, an agent stepped out of the car holding a PLS, and Mack began yelling that kindergarteners were in a classroom nearby. *Id.* ¶¶ 26–28; Doc. 188-2 at 4 (Ex. A). The crowd that gathered totaled about ten people, and no one proved menacing; instead, people stood in the roadway or crosswalk and yelled at agents to be kinder and get real jobs. Doc. 188-2 at 4 (Ex. A).

Not much later, around 12 p.m., federal agents again had a standoff with protesters in Evanston, this time near Chute Middle School at the intersection of Asbury and Oakton. Doc.

188-1 ¶¶ 5–6, 8.  Witnesses recounted that a group of civilian vehicles followed CBP vehicles,

which had been driving erratically and through stop signs and red lights.  Hope Perry,

*Community members describe confrontation with federal agents*, Evanston Roundtable (Nov. 1,

2025), https://evanstonroundtable.com/2025/11/01/evanston-immigration-clash-car-crash/.  As

"agents tried to make a fast right turn onto Asbury Avenue during a red light, [they] had to brake

to avoid hitting the car in front of them." *Id.*  This caused the "driver of the red sedan, who was

not part of the group following the agents, [to] rear-end[ ] the federal vehicle." *Id.*

Having heard that federal immigration agents had been in Evanston that day and had

detained landscapers from the alley near her house, Kerry Littel walked to the intersection when

she heard whistles and honking.  Doc. 188-1 ¶¶ 4–8.  As she approached, Littel saw the car

crash, as well as over a dozen community members on the street and sidewalk and federal

immigration agents in fatigues and vests. *Id.* ¶¶ 10–12.  Littel began recording when she saw

agents detaining people, including a young man whose shoes had been pulled off by agents and

was on all fours with agents on top of him and a woman on the street on her back with a federal

agent over her. *Id.* ¶¶ 14–16.  Jennifer Moriarty, one of the women detained, did not hear any

warnings to step back before an agent tackled her to the ground, causing her to lose her shoe.

Perry, *supra*.  Witnesses, including Littel, recounted and videos show agents violently twisting

the young man's wrist and arm, bashing the man's head on the street at least two times, and

striking his head at least two times.  Doc. 188-1 ¶¶ 18, 23–25; Doc. 188-1 at 5–7 (Exs. A–C,

available at https://spaces.hightail.com/space/hHtrXkj6em); Doc. 188-3 ¶ 11; Doc. 188-3 at 4

(Ex. A, available at https://spaces.hightail.com/space/ERClkyY4Cj); Jesus Freakin Congress

(@TheJFreakinC), X (Oct. 31, 2025 6:43 p.m.), https://x.com/TheJFreakinC/status/

1984405793001640085.  The man said several times that he could not breathe, and he appeared

dazed as agents stood him up and put him in their SUV.  Doc. 188-1 ¶ 26; Doc. 188-1 at 5–7

(Exs. A–C); Doc. 188-3 at 4 (Ex. A).

On the other side of the agents' vehicle, David Brooks, another Evanston resident,

observed an unmasked CBP agent wearing sunglasses violently shove a woman into the federal

vehicle, prompting him to start recording and yelling at the CBP agents.  Doc. 188-3 ¶ 5.

Although Brooks was at least a car door length away from the agent, the agent then turned and

looked at Brooks, saying, "step back or I'm going to shoot you," which prompted Brooks to take

a step back and say "you're gonna what?"  Doc. 188-3 ¶ 6; Doc. 188-3 at 4 (Ex. A).[69]  The CBP

agent pulled his gun and pointed it directly at Brooks, Brooks stepped back, and the agent

holstered his gun.  Doc. 188-3 ¶ 7; Doc. 188-3 at 4 (Ex. A); Jesus Freakin Congress, *supra*.



Doc. 188-3 at 4 (Ex. C at 0:16) (screenshot).  This was not the first time the agent had pointed

his gun at protesters, having done so less than a minute before.  Jesus Freakin Congress, *supra*.

---

[69] Note that Brooks stated in his declaration that the agent told him to "step back," while in the video, it
sounds like the agent said "get back."  The effect of the command is the same.

Brooks continued asking for the agents' names and badge numbers, but they refused to provide this information to him. Doc. 188-3 ¶¶ 9–10; Doc. 188-3 at 4 (Ex. A). Throughout the interaction, agents held out cans of chemical spray and threatened to use them on the crowd if they did not back up. Doc. 188-1 ¶ 19; Doc. 188-1 at 5–7 (Exs. A–C); Jesus Freakin Congress, *supra*. At some point, agents deployed pepper spray on the crowd. Doc. 188-1 ¶ 35; Doc. 188-3 ¶ 13.

The three people detained were all released without charges, with Moriarty noting that "[t]hey didn't fingerprint me, they didn't take any photographs of me, they didn't read me any rights," nor did the agents frisk the detainees before placing them in the car. Perry, *supra*. Moriarty further indicated that after the three individuals were placed in the vehicle, they drove for several hours around Evanston and Rogers Park, with the driver slamming on the brakes multiple times to try and create another accident. *Id.* One of the agents jumped out of the car several times and tried to mace people, and also threatened three different times to mace the detained individuals in the car. *Id.*

DHS posted to its X account the following about the incident:

> How convenient to leave out that our agent was ASSAULTED by this violent rioter.
>
> During an operation at Oakton Street and Ashbury Avenue in Evanston, agents were being aggressively tailgated by a red vehicle. As agents tried to make a U-turn, the red car crashed into Border Patrol.
>
> A hostile crowd then surrounded agents and their vehicle and began verbally abusing them and spitting on them. One physically assaulted a Border Patrol agent and kicked an agent. As he was being arrested, he grabbed the agent's genitals and squeezed them. As you know this is an extremely painful experience for most human beings and justifies certain responses, the agent delivered several defensive strikes to the agitator to free his genitals from the agitator's vise.

**SA164**

Homeland Security (@DHSgov), X (Nov. 2, 2025 9:01 a.m.), https://x.com/DHSgov/status/

1984999303656436070.  Bovino also posted on X in response to videos:

> You leave out the inconvenient fact that he grabbed the agent's
> genitals thus receiving immediate blows to the head. The BP Agent
> stopped a violent assault, you'd be NUTS to think otherwise. So
> proud of our agents.

Commander Op At Large CA Gregory K. Bovino (@CMDROpAtLargeCA), X (Nov. 1, 2025

2:18 p.m.), https://x.com/CMDROpAtLargeCA/status/1984701685898625522.  The video that

DHS reposted along with its message, however, which included the caption "ICE Nazi beating a

guy in Evanston, IL," does not clearly show the man grabbing an agent's genitals, and

Defendants also have not produced any other evidence that would support their account.  *See*

Homeland Security (@DHSgov), X (Nov. 2, 2025 9:01 a.m.), *supra*.

### 12.    Additional Incidents

On September 18, 2025, Arely Barrera learned that federal immigration agents were near

the intersection of Grand, North, and Kostner Avenues in Chicago.  Doc. 73-12 ¶ 5.  She drove

to that intersection and parked approximately fifty to 100 feet away from agents in a parking lot

across the street.  *Id.* ¶ 6.  She took photographs of the agents "to create greater accountability for

ICE actions" and "to convey that they were being watched and would be held responsible for any

constitutional or other legal violations."  *Id.* ¶ 7.  After agents saw her taking photographs, some

of them drove over and parked their car behind hers, blocking her into the parking space.  *Id.* ¶ 9.

They aggressively approached her from a car with no license plates and appeared to use their

phones to photograph and film her, prompting Barrera to also began filming them.  *Id.* ¶¶ 9–11.

The agents eventually left.  *Id.* ¶ 11.

On September 26, 2025, behind a Food 4 Less grocery store in Cicero, Illinois, CBP

agents reported making immigration arrests around 2:15 p.m.  Doc. 172-12 at 2, 5, 7, 9.  For

unexplained reasons, agents remained on the scene for some time, allowing a reported crowd of about fifteen protesters to form around them. *Id.*  In BWC footage, however, the "crowd" appears at least twenty-five feet away, often out of view behind trees and a grassy area separating the parking lot from the frontage road on which agents stood, and agents had a clear path of egress.  Axon_Body_4_Video_2025-09-26_1604_D01A31643 (twenty-eight-minute video starting at 3:02 p.m.); Axon_Body_4_Video_2025-09-26_1609_D01A37572 (almost nineteen-minute video of three agents standing around, while several protesters stand far away, many behind trees and most not appearing until about thirteen minutes into the video).  Agents reported that they gave several commands for the crowd not to move closer and to "stop interfering," Doc. 172-12 at 5, 10, although video footage does not reflect any potential interference, Axon_Body_4_Video_2025-09-26_1604_D01A31643; Axon_Body_4_Video_2025-09-26_1609_D01A37572, and the only instruction to stop interfering came after agents deployed tear gas, Axon_Body_4_Video_2025-09-26_1604_D01A31643 at 27:14–27:20. Almost from the beginning, agents prepared to deploy less lethal munitions, with two agents pulling out tear gas canisters and another holding a PLS.  Axon_Body_4_Video_2025-09-26_1609_D01A37572 at 1:50–2:40.



*Id.* at 2:34 (screenshot).  After instructing a woman to stay back, despite the fact that she already

was at a distance from them, agents discuss how they should get ready to throw gas "basically

right at" her, Axon_Body_4_Video_2025-09-26_1604_D01A31643 at 6:30–6:53.  About twenty

minutes later, around 3:30 p.m., agents finally prepared to leave when an object hit one of the

cars. Doc. 172-12 at 2–3, 6, 8, 10.  Agents reported that it damaged the front passenger side

door.  *Id.*  An agent almost immediately yelled "alright, gas, we just got hit by a rock, gas, gas

deployment" and then did yell out "less lethal gas" before throwing a canister.  Axon_Body_

4_Video_2025-09-26_1604_D01A31643 at 25:38–26:30; Doc. 172-12 at 3, 6, 8, 10.  It appears

that the first canister did not deploy, with agents questioning whether they pulled the pin, so

agents threw another canister, again screaming "less lethal gas" right before throwing the

canister over the tree line.  Axon_Body_4_Video_2025-09-26_1604_D01A31643 at 26:20–

26:39.  By the time agents followed the gas canisters, anyone who had thrown the rock was

nowhere in sight and agents kicked the canister toward a car, having to run through the gas to get

back to their vehicles.  *Id.* at 26:39–27:13.  The agent who deployed gas explained that he "was

159

**SA167**

concerned that more people in the crowd would throw objects, or attempt to attack [them] in other ways" and was "concerned that the crowd would hurt an agent, detainee, [him] or cause further damage to [the vehicles]."  Doc. 172-12 at 8.  Harvick assessed that this use of force was "within policy and effective in controlling the crowd."  *Id.* at 1.

On October 1, 2025, Leslie Cortez learned that agents were targeting day laborers at a Home Depot in Cicero, so she traveled there to observe, record the immigration actions, and monitor for harassment.  Doc. 73-13 ¶¶ 2–3; Doc. 255 at 66:14–67:3.  She parked in the parking lot, recorded agents arresting two men, and informed the men of their rights in Spanish.  Doc. 73-13 ¶ 4; Doc. 255 at 67:2–5.  As she stood outside her parked car, a vehicle pulled up near her and a CBP agent got out and aimed a gun at Cortez so that she "could see inside the barrel."  Doc. 73-13 ¶ 5; Doc. 255 at 68:15–69:1.  Cortez responded that she had the right to protest and observe, which prompted the agent to lower the gun, get inside his vehicle, and drive away.  Doc. 73-13 ¶ 5; Doc. 255 at 69:7–14.  Cortez testified that this left her "traumatiz[ed]" because she "never had a weapon dr[awn] at [her], especially for documenting and for witnessing," making her "reconsider if [it] is something that's safe to do, even though [she] wasn't doing anything to obstruct."  Doc. 255 at 70:12–16, 73:7–13.  Cortez further testified that she "question[s] her safety when [she] go[es] out" and "think[s] twice about [documenting and observing] every single day," and worries that she might be hurt.  *Id.* at 74:13–75:7.  She nonetheless has continued to observe and record immigration enforcement in her community.  Doc. 73-13 ¶ 6; Doc. 255 at 71:3–8, 72:6–13.

Around 11:45 a.m. on October 3, 2025, CBP agents stopped a father and son walking near West 25th Street and South Drake Avenue in Chicago, presumably on their way to the grocery store.  Doc. 172-31 at 5; Doc. 173-2 ¶ 33; Axon_Body_4_Video_2025-10-03_1242_

D01A3257U at 2:10–3:06; Axon_Body_4_Video_2025-10-03_1242_D01A2556T at 2:00–2:59.

In their use of force report, agents claimed that the son ignored their instructions to step away

and threw a closed-fist punch toward an agent's face, prompting the agent to execute a controlled

takedown and arrest him for assault on a federal officer.  Doc. 172-31 at 5; Doc. 173-2 ¶ 33.  But

agents' BWC footage paints a different picture, showing that as the son stood in front of his

father, breathing heavily, one of the agents pulled the son off his father, causing the son to

stumble into the other agent with his hand in front of him as if trying to brace himself against a

fall.  Axon_Body_4_Video_2025-10-03_1242_D01A3257U at 3:06–4:36; Axon_Body_4_

Video_2025-10-03_1242_D01A2556T at 2:59–4:28.  No closed-fist punch appears on video, and

the agent's use of force against the son is unnecessary, as is the subsequent takedown of the

father standing calmly as agents arrest his son.  Axon_Body_4_Video_2025-10-03_1242_

D01A3257U at 3:06–4:36; Axon_Body_4_Video_2025-10-03_1242_D01A2556T at 2:59–4:28.

On October 10, Crespo was in Hoffman Estates when her father, a state representative,

received a call about a federal presence at the Hoffman Estates Police Department building.

Doc. 73-6 ¶¶ 26–27.  They observed agents in front of unmarked vehicles, many of whom wore

face coverings and some of whom carried semi-automatic rifles.  *Id.* ¶ 28.  Some had vests

identifying them as part of ERO, but Crespo could not see badge numbers or names.  *Id.* ¶ 28.

Crespo learned that ICE had taken an eighteen-year-old U.S. citizen into custody, pulling her out

of a car, throwing her to the ground, and arresting her.  *Id.* ¶¶ 29–30, 33.  When Crespo inquired

of agents whether the woman had received medical attention, the agent who arrested her said she

did not need medical attention.  *Id.* ¶ 36.  Ultimately, the village police chief called paramedics

and, when the woman was placed into the ambulance, no federal officers followed her.  *Id.*

¶¶ 38–39.  Later, Crespo saw a statement that DHS Assistant Secretary McLaughlin put out

claiming that the video of the young woman's arrest did not involve ICE and instead was "from a burglary arrest Chicago police made over a year ago." Tricia McLaughlin (@TriciaOhio), X (Oct. 12, 2025 9:21 a.m.), https://x.com/TriciaOhio/status/1977378998071038129 ("Imagine being so desperate to demonize law enforcement you post a video from a burglary arrest Chicago Police made over a year ago. This isn't even ICE."); Doc. 73-6 ¶ 40.

Also on October 10, Jo-Elle Munchak, an attorney living in Chicago's Edgewater neighborhood, was driving north on Sheridan Road around 9 a.m. when she noticed two unmarked SUVs parked in front of and behind a vehicle with landscaping equipment. Doc. 77-1 ¶¶ 2–4; Doc. 255 at 92:25–93:4, 93:13–25. She pulled over to videotape, parking several feet in front of the front SUV but leaving enough room for that SUV to pull out if needed. Doc. 77-1 ¶¶ 5–6; Doc. 255 at 94:1–4. She stayed near her car and filmed for approximately five and a half minutes until the agents handcuffed the landscaper and put him in one of the SUVs. Doc. 77-1 ¶¶ 7–8; Doc. 255 at 94:5–6. She yelled out "It's almost like they're stormtroopers or something!" and "Smile nice, boys, for the Hague!" Doc. 77-1 at 3 (Ex. A at 1:30–1:33, 3:47–3:57, available at https://spaces.hightail.com/space/ssHR759SHJ). After the agents left, she continued home, turning onto her street. Doc. 77-1 ¶¶ 2, 10–16; Doc. 255 at 96:1–13. One of the federal vehicles stopped in the middle of the block, and the other one pulled behind her, blocking her in. Doc. 77-1 ¶¶ 17–18; Doc. 255 at 96:14–22. Agents surrounded her car, banging on her windows, trying to open her car doors, and demanding that she get out. Doc. 77-1 ¶¶ 19, 21; Doc. 255 at 96:25–97:21. One agent stood in front of her front bumper and aimed a long gun at Munchak's head. Doc. 77-1 ¶ 20; Doc. 255 at 97:4–7. Munchak tried to explain to the agents that she lived on that street, even showing them her driver's license with her address. Doc. 77-1 ¶¶ 22–23; Doc. 255 at 97:18–20. One agent took a picture of her license and car VIN. Doc. 77-

1 ¶ 23.  An agent told her "We'll let you go this time, but next time you'll be detained."  *Id.* ¶ 24.

They then got back in their cars and left.  *Id.* ¶ 25.

On October 10 around 10 a.m., after hearing of federal activity near where she lived, Tara

Goodarzi drove near the Wilson Red Line stop in Chicago and parked in an alley parking lot

where she saw federal agents.  Doc. 140-2 ¶¶ 2–3.  After a few minutes, they left, and she

followed.  *Id.* ¶ 3.  An agent angled their vehicle in front of Goodarzi's car so she could not pass,

with a second vehicle boxing her in on Buena Avenue.  *Id.* ¶ 4; *id.* at 7 (Ex. A, available at

https://spaces.hightail.com/space/eVIUNWmZh1).  Three agents then approached her car, with

one agent holding a semiautomatic weapon.  *Id.* ¶ 5.  An agent asked her why she was following

them, and when she responded that she was just driving, they asked for identification.  *Id.* ¶ 5; *id.*

at 7 (Ex. A).  Goodarzi provided her identification, and an agent took her photograph.  *Id.* ¶ 6.

She asked them for identification, but they refused to provide any identification number, which

Goodarzi told them violated this Court's TRO order.  *Id.* ¶ 7.  One agent had yellow duct tape on

his vest, but it did not have any identifying information on it.  *Id.* ¶ 8.  The agents warned

Goodarzi that if she continued following them, they would detain her because she was impeding

their operations.  *Id.* at 7 (Ex. A at 1:11–2:09).  Another woman approached filming, telling the

agents they were a disgrace, and the agent told her to be careful on the street because that was

how people got run over.  *Id.* ¶ 9*; Id.* at 7 (Ex. A at 2:20–2:35).

On October 25, Goodarzi heard that agents had deployed tear gas in Chicago's Avondale

neighborhood, so she traveled there to observe.  *Id.* ¶ 17.  She learned that agents were at Windy

City Produce on Pulaski, and when she arrived, she heard whistles on Roscoe and Harding.  *Id.*

¶ 18.  She parked and ran there, where she saw a Chrysler van driving slowly toward Harding

surrounded by federal agents.  *Id.* ¶ 18.  Goodarzi saw a woman standing in front of the van as it

advanced, and then an agent push her to the side, causing her to fall in the street behind the van. *Id.* ¶ 20. As the van approached Harding, agents threw a CS gas canister toward those standing on Roscoe and then drove away. *Id.* ¶ 21.

### G. Plaintiffs' Expert Declarations

#### 1. Gil Kerlikowske

Gil Kerlikowske, who has worked in law enforcement and policy for forty-seven years, served as the CBP Commissioner from 2014 to 2017 and as the Seattle Chief of Police from 2000 to 2009. Doc. 22-32 ¶ 1. He has had substantial training, developed expertise, and set policy on the appropriate law enforcement response to crowd control and civil unrest in the context of protests, use of force in protests, and use of force generally. *Id.* When serving as Seattle Chief of Police, he oversaw over 200 protests, including patrolling on the front lines. *Id.* ¶ 6. Kerlikowske introduced less lethal weapons to CBP, set up and reviewed CBP's Internal Affairs (Professional Standards) Department, and hired and oversaw the CBP assistant commissioner who reviewed and approved policies for receiving and investigating complaints, including for use of force. *Id.* ¶¶ 11–12. Kerlikowske served as a testifying expert in *Los Angeles Press Club v. Noem*, in which plaintiffs challenged similar actions that Defendants took toward protesters, the press, and legal observers in connection with immigration enforcement operations in Los Angeles. *Id.* ¶ 15.

Kerlikowske evaluated the use of force at Broadview and several other locations, and opined on the relief Plaintiffs proposed for a TRO.[70] *Id.* ¶ 2. First, Kerlikowske opined that

---

[70] Kerlikowske did not provide an updated opinion in connection with Plaintiffs' preliminary injunction motion, nor did he review any of the evidence that Defendants produced to Plaintiffs in response to their expedited discovery requests given that Defendants had identified all of those documents as being confidential for attorneys' eyes only. *See* Doc. 221 at 4. Although Defendants argued that the Court should exclude Kerlikowske's testimony because he only based it on materials Plaintiffs provided to him,

agents are "deploying force that exceeds a legitimate law enforcement purpose or accepted standards for use of force, including by using force against people who are not engaged in threatening acts, misusing less-lethal munitions and chemical irritants, and indiscriminately and disproportionately using force that needlessly injures people who pose no imminent threat to law enforcement." *Id.* He concluded that the use of force appeared to be part of a "widespread pattern that indicates, at minimum, a lack of guidance and leadership on the correct and widely accepted policing tactics to adopt and use in a protest setting." *Id.* ¶ 20.

Going further, although Kerlikowske does not think that DHS' use of force policies are designed for protest or civil disturbance settings, Kerlikowske does not believe that DHS agents have followed their own use of force standards. Doc. 77-2 ¶¶ 10, 57–58. For example, he indicated they are not complying with the reasonableness requirement, the de-escalation requirement, the verbal warning requirement, their duty to intervene, the pepper ball restrictions, and the OC spray restrictions. *Id.* ¶ 58. Kerlikowske also noted that agents' misuse of force is "highly ineffective and often counterproductive in calming unrest" as "public displays of force often inflame[ ] crowds." *Id.* ¶¶ 61–62. He stated that "[t]he purpose of law enforcement at these events is to de-escalate crowd tension so that necessary public operations and safety can continue while protest attendees can still exercise their rights." *Id.* ¶ 62. But when agents misuse force, "an isolated incident can become a crowd control issue" as others join in yelling, screaming, and gathering. *Id.* ¶ 63. For example, in East Chicago, Kerlikowske notes that agents engaged in a car chase and performed a PIT maneuver against a vehicle, which "[t]rained law enforcement officers know that if the public observes" will cause people to "react by expressing fear and anger." *Id.* ¶ 30.

---

*see* Doc. 202, the Court does not find this a proper basis for exclusion, although the Court keeps in mind the limitations on his opinions based on the fact that he did not review all the evidence in the record.

As to training, Kerlikowske highlighted a DHS inspector general report in 2020 that CBP and ICE agents lacked training for effectively policing protests at federal property, *id.* ¶ 41, as well as an internal comment by a CBP field liaison director during 2020 protests that CBP personnel "should not be placed in roles that put them in direct contact with the public since they do not possess the appropriate crowd control training and equipment," *id.* ¶ 42. Although in response DHS agreed to provide new policies and guidance for agents tasked with responding to civil disturbances and protests at federal property in 2021, DHS indicated in May 2025 that it had completed drafting those policies but had not yet approved them, suggesting that the same deficiencies remain today. *Id.* ¶¶ 44–45. Kerlikowske noted that city police officers receive different training than CBP agents, with most CBP agents not undertaking the "specific training modules and recurring training that is required to be equipped and properly guided for protest policing." *Id.* ¶¶ 37–38. He further noted that training in crowd control at detainment or confinement facilities does not carry over to public protests where First Amendment issues are "due significant and unique considerations," and that CBP agents primarily operate on the border and independently, meaning that they are used to taking individual initiative to deal with threats. Doc. 22-32 ¶¶ 115–16; *see also* Doc. 77-2 ¶ 48 ("CBP officers are trained to serve in the rugged areas of the border, where backup is often miles away and radio equipment frequently fails due to the rural terrain."). But to police crowds, Kerlikowske pointed out that "officers work in large formations and are instructed not to take individual actions, to essentially not break ranks, so as to ensure that responses are coordinated and measured." Doc. 22-32 ¶ 116. Kerlikowske further noted that "a well-trained federal agent should know to seek to pre-plan for interactions with protestors and facilitate opportunities for local law enforcement to handle the situation." Doc. 77-2 ¶ 19. He does not believe that DHS agents would have "received specific training

166

**SA174**

regarding how to issue a crowd dispersal order, how to deal with journalists covering a protest, and how to deescalate potentially volatile protest situations," given that when he oversaw training for less lethal force, "the specific task on which [CBP agents] were trained was the firing of pepper balls at border walls to deter individuals from scaling those walls."  Doc. 77-2 ¶ 50.

Kerlikowske further opined that agents should only use less lethal weapons and chemical irritants on "aggressive individuals who pose an immediate threat to law enforcement or to prevent an assault," not for compliance purposes or on those who non-violently disobey orders to disperse or stop blocking the roads.  Doc. 22-32 ¶ 35.  According to Kerlikowske, agents should also take care not to use these weapons in a way that would hit individuals above the waist, as serious injury could occur.  *Id.* ¶¶ 36, 57–58, 69.  He indicated that trained agents should plan for and assess the area and environmental factors when the possibility for use of tear gas exists, including "spatial proximity to businesses, residents, and bystanders, and considerations like wind direction," given the "significant adverse collateral effects" they can have on bystanders. *Id.* ¶ 45.  From his review, Kerlikowske believed that agents have often used tear gas indiscriminately "as an effort to forcibly end the protest" and disperse protesters, but the result has instead often been to block protesters' ability to retreat, often putting them in greater risk of confrontation with agents.  *Id.* ¶ 42.  He emphasized that throwing tear gas canisters should not be "a first resort tactic" and instead amounts to "a significant escalation permitted after lesser interventions are attempted and fail," and that tear gas should not be used "solely to move people engaged in civil disobedience, in particular while in a dense residential area like the Albany Park intersection appears to be."  Doc. 77-2 ¶¶ 20, 29.

Instead of indiscriminately using less lethal weapons or otherwise using excessive force, Kerlikowske opined that, "[i]n circumstances where demonstrators are using non-violent civil

**SA175**

disobedience to block ingress or egress or to commit an alleged trespass, . . . the appropriate

response is to apprehend the person, with proportionate force, and arrest them for the alleged

lawbreaking." Doc. 22-32 ¶ 77; *see also* Doc. 77-2 ¶ 19. Kerlikowske indicated that "[n]o

training or standard permits using a vehicle to strike any non-violent demonstrator, much less

one who is walking away from the vehicle after expressing his opposing viewpoints and posing

no imminent threat to law enforcement." Doc. 22-32 ¶ 81. Kerlikowske highlighted the

apparent disproportionate use of force in Broadview on September 26, 2025, on a sixty-year-old

woman who was attempting to retreat but was pushed to the ground while in the street and

agents' continued pursuit of her while on the ground. *Id.* ¶ 83. In another situation on

September 19, 2025, where a man tried to de-escalate a situation with another protester, agents

instead tackled the man and pummeled him while he was on the ground. *Id.* ¶ 85. Similarly, on

September 26, 2025, Kerlikowske opined that agents could have taken steps to move a protester

from blocking a departing van from leaving a driveway, but they instead strayed from accepted

practice and training by pointing a pepper ball gun at her face and chest, forcefully shoving her

to the ground, and firing pepper balls at her from the roof while she was on the ground. *Id.* ¶ 86.

Kerlikowske also highlighted as inappropriate an interaction from October 3, 2025, between

Bovino and a protester, where Bovino tackled the protester and then a second person who was

recording, knocking the phone out of his hand, with other agents then knocking down journalists

covering the incident. *Id.* ¶ 88.

     Kerlikowske indicated that "[a]bsent exigent circumstances in which an individual poses

an imminent threat to law enforcement or others, law enforcement is trained to issue audible

warnings and wait for an opportunity for compliance, and generally to use de-escalation

techniques, before using force." *Id.* ¶ 22. Kerlikowske also noted that warnings "must be a

caution about the use of force to be used close in time to that use, with a direction on how to avoid the force against you, and providing time to comply," with warning to be used "where a crowd is acting lawlessly or violently turning into a riot, not toward a peaceful demonstration." *Id.* ¶ 32. But instead, Kerlikowske highlighted a September 27, 2025 incident at Broadview where Bovino told an agent to "light 'em up," after which, with no warning, the agent began shooting pepper balls at protesters standing on the sidewalk steps away from any agent. *Id.* ¶ 24. In the same video, Kerlikowske observed an agent telling a journalist "this is the last time we're warning you" without providing clear direction about what the journalist should do or what use of force would follow. *Id.* ¶ 25. The fact that agents gave audible warnings to disperse, followed by crowd compliance, in some instances indicated to Kerlikowske that agents can do so at all times but just chose not to in many instances. *Id.* ¶ 31.

Finally, Kerlikowske noted that, "[e]ven if a valid dispersal order had been issued to demonstrators by federal agents during these events at Broadview Processing Center, the standard best practice is that it is both unnecessary and improper to disperse or assault journalists . . . because members of the press, peacefully recording or reporting on what is occurring and not interfering with law enforcement, pose no threat to law enforcement." *Id.* ¶ 91. Kerlikowske noted that police often have journalists behind their lines. *Id.* ¶ 92.

As for the terms of the TRO, Kerlikowske opined they allowed "officers to use proportionate force in response to imminent threats of violence and to make arrests where there is probable cause of lawbreaking." *Id.* ¶ 2. According to Kerlikowske, the restraints "are consistent with well-established law enforcement standard practices and accepted training, are the methods that policing forces in urban centers already use in areas across the country, and are safe for law enforcement to follow in these circumstances." *Id.* ¶ 120. With respect to requiring

169

identification, Kerlikowske noted that identification is a "key part of maintaining public trust," and "also serves to protect the officer, lessening the risk that an officer following standard and accepted practices and training would be incorrectly accused of acting improperly." *Id.* ¶ 124. Kerlikowske further opined that the terms of the TRO were workable, with difficulties in its implementation "more likely to arise from lack of training and experience working in dense urban environments and lack of leadership that is experienced in urban civil disturbances/unrest, not from the lack of workability of limiting the misuses of force that exceed standard practices and procedures." *Id.* ¶ 2. He highlighted the apparent lack of unity of command for Operation Midway Blitz, stating that the "absence of a unity of command typically lead[s] to chaotic and dangerous policing." *Id.* ¶ 133.

### 2.    Dr. Rohini Haar

Dr. Rohini Haar, a licensed physician specializing in emergency medicine, researches the impacts of the uses and abuses of crowd control weapons. Doc. 22-33 ¶¶ 1, 3, 4, 6, 7, 8. According to Dr. Haar, research shows that crowd control weapons, and especially irritants and projectiles, can have significant and long-lasting health harms. *Id.* ¶ 15.

Chemical irritants include various agents, including the following four most widely cited chemical compounds: chlorobenzalmalononitrile (agent CS), chloroacetophenone (agent CN), oleoresin capsicum (agent OC, known as pepper spray), and OC's synthetic form, PAVA. *Id.* ¶ 23. Chemical irritants "produce sensory irritation and pain in the eyes, skin and upper respiratory tract," and they may also cause anxiety, panic reactions, and increases in heart rate and blood pressure *Id.* ¶¶ 29, 37, 42, 45. According to Dr. Haar, people perceive that chemical irritants do not cause permanent injury or death and instead only have short-term effects. *Id.* ¶ 22. Studies have linked tear gas to lasting physical symptoms, however, including allergic

reactions, respiratory damage, mental distress, anxiety, and post-traumatic stress disorder.  *Id.*
¶ 16.  The Chemical Weapons Convention bars the use of chemical irritants as a method of
warfare.  *Id.* ¶ 35.  While that convention allows the use of chemical irritants for law
enforcement including domestic riot control purposes as long as they are used in the types and
quantities consistent with such purposes, *id.*, in 2020, the American Thoracic Society called for a
moratorium on the use of tear gas and other chemical agents against protesters, *id.* ¶ 16.  Because
law enforcement officers often continually discharge sprays and most chemical irritants do not
have dose controls or cut-off trigger mechanisms, the result is that officers typically disperse
large quantities of chemical irritants of unknown concentration.  *Id.* ¶ 32.  As far as Dr. Haar
knows, all tear gas manufacturers instruct that their products not be fired directly into crowds or
be used as projectiles to target individuals.  *Id.* ¶ 44.  Canisters can cause severe burns if they hit
individuals directly because they function by explosive, and research shows that direct trauma
from canisters and grenades is the leading cause of death from chemical irritants.  *Id.* ¶¶ 17, 43.
Chemical irritants are indiscriminate by nature, and may affect innocent bystanders, especially in
windy conditions or where people move around.  *Id.* ¶ 34.  Older people, children, pregnant
women, and those with respiratory problems are particularly susceptible to chemical irritants.  *Id.*
¶ 47.

Kinetic impact projectiles ("KIPs") are a range of projectiles used in crowd control
settings made from rubber, plastic, PVC, metals, wood, hard foam, and wax, including foam
batons and rubber pellets.  *Id.* ¶ 56.  Law enforcement agencies often use combination weapons
that merge the force of projectiles with chemical irritants, with the projectiles bursting on impact
to release a powdered form of the active ingredients in pepper spray.  *Id.* ¶ 58.  According to Dr.
Haar, firing multiple rounds of KIPs at once proves inaccurate, indiscriminate, and arbitrary, and

also makes it more likely that the projectile will strike the head, face, or other sensitive body parts. *Id.* ¶ 57. Pepper balls can cause blunt force trauma upon impact and also lead to the respiratory, ocular, and dermal effects associated with pepper spray. *Id.* ¶ 58. Dr. Haar stated that "[t]heir dual-action nature increases the likelihood of both immediate injury and longer-term health consequences, underscoring the urgent need for stricter use protocols and more rigorous health impact assessments." *Id.*

Flashbang or stun grenades are disorientation or distraction devices, "bomb-like instruments designed to daze or warn groups or individuals through some combination of noise, light, overpressure, or fragmentation." *Id.* ¶ 60. Because the detonation occurs with significant force, individuals standing near the explosion could suffer traumatic injury from the resulting pressure and also from flying shrapnel. *Id.* ¶ 64. Flashbang grenade use could also lead to blast injury, including internal hemorrhage, eardrum rupture, lung injury, amputation, fractures, and degloving injuries. *Id.* ¶ 66. They also burn very hot, which can cause life-threatening thermal injuries. *Id.* ¶ 68. Dr. Haar opined that the disorientation caused by flashbang or stun grenades in crowd control contexts has a greater likelihood to exacerbate rather than alleviate safety concerns. *Id.* ¶ 20.

In summary, according to Dr. Haar's research, five critical misuse categories of crowd control weapons exist that each contribute to increased morbidity and mortality and violate international standards: (1) directly firing canisters at individuals or dense crowds, which can lead to severe injury or death; (2) the inappropriate use of crowd control weapons against peaceful demonstrators that violates the principal of necessity and exposes more people to crowd control weapons; (3) the deployment in confined spaces exacerbates harmful effects by concentrating the chemical; (4) using excessive quantities amounts to a disproportionate use of

172

**SA180**

force and increase exposure and injuries; and (5) using crowd control weapons in the presence of vulnerable individuals amplifies harm due to their indiscriminate nature and these individuals' greater injury risk. *Id.* ¶ 71.

### H.    Defendants' Workability Opinions

Defendants submitted the declaration of Eddy Wang, the Special Agent in Charge of HSI's Los Angeles Field Office, which they had also submitted in connection with the *L.A. Press Club* case. Doc. 35-2. Wang opines that the relief requested in that case (and by extension in this case) is unworkable *Id.* ¶ 23. For example, he notes that agents may not be able to differentiate between members of the press and other participants in a protest, and that some individuals may fraudulently pose as journalists. *Id.* He also notes that any delays in compliance to dispersal orders "pose[ ] a risk to officer safety, public safety, and the safety of any press or legal observers who may be present." *Id.* Wang claims that prohibitions on the use of less lethal devices, chemical munitions, and diversionary devices "ignore[ ] the realities of protecting officers and the public from violent protestors who use the anonymity of crowds to assault law enforcement officers." *Id.* ¶ 24. With respect to warnings, Wang notes that "[i]t is the subject's behavior that dictates the use of these tools and if the subject or crowd behavior requires a more immediate response, officers cannot and should not compromise safety to meet an arbitrary two warning standard." *Id.* ¶ 26.

Harvey, CBP's less lethal weapons training director, opines that prohibiting the use of crowd control or less lethal weapons could lead agents to use physical force to control crowds. Doc. 35-4 ¶ 9. Harvey also notes that the act of throwing an object at an agent, regardless of what it is, "raises the level of force by a subject or subjects to assaultive resistance," which authorizes agents to respond "with force up to and including kinetic impact with specific less-

lethal devices." *Id.* ¶ 10. He also notes that CBP officers should be able to use less lethal weapons where protesters obstruct transportation and do not comply with law enforcement orders, even if no specific imminent threat of harm exists to a person. *Id.*

Brian Szemes, the Assistant Field Director of the Los Angeles ICE ERO Field Office, indicates that the preliminary injunction granted in *L.A. Press Club* poses risks to the safety of law enforcement personnel and the public. Doc. 35-5 ¶¶ 1, 4. He notes that ICE officers are subject to an expedited internal review process set forth in 8 C.F.R. § 287.10 for public complaints lodged against them, which ICE's Office of Public Responsibility investigates. *Id.* ¶ 15.

Manuel Molina, the CBP incident commander supporting Operation at Large in Los Angeles, Doc. 35-6 ¶ 2, indicates that the *L.A. Press Club* preliminary injunction order "adds additional uncertainty and complications to an already complex and potentially dangerous operational environment when CBP agents are confronted by people protesting, rioting, or actively interfering with enforcement operations," and also "creates circumstances that could be easily exploited by bad actors, something that puts both agents and the public at a greater risk of harm," *id.* ¶ 7. He notes that ad hoc protests typically "involve[ ] active public interference, where crowds quickly grow, often outnumbering and surrounding agents, in an effort to impede agents carrying out their lawful enforcement actions." *Id.* ¶ 8. He further indicates that this interference "escalates the risk of harm to CBP agents and the public as it creates an even more chaotic and rapidly evolving threat environment in which agents must monitor multiple potential risks, respond to those actively interfering or attacking, all while trying to complete their enforcement action safely and protect themselves and others." *Id.* ¶ 8.

Hott indicated that ICE officers may have difficulty differentiating between members of the press, religious observers, and other protesters, particularly given that "[p]ress markings are publicly available and . . . [officers'] ability to differentiate between actual press and those who have come by press markings through fraudulent means cannot be determined in real-time." Doc. 173-1 ¶ 61. According to Hott, "ICE law enforcement officers' responsibility is to ensure the scene is safe for law enforcement personnel and the community, and anyone who does not comply with lawful dispersal commands may be considered a potential threat to law enforcement depending on subsequent actions and continued refusal to leave a restricted area." *Id.* ¶ 63. Hott views delays in compliance with dispersal orders to "pose[ ] a risk to officer safety, public safety, and the safety of any press who may be present." *Id.* ¶ 61. He further notes that "[d]ue to the nature of some crowd control devices, such as CS gas and flash-bangs, persons who fail to disperse pursuant to lawful orders, but are not posing an immediate threat to law enforcement officers may be impacted due to their proximity to persons who are engaged in violent and/or criminal behavior." *Id.* ¶ 62. A blanket requirement for two separate warnings, according to Hott, "would prevent officers from responding to exigent circumstances where the utilization of these tools could prevent harm to the public or officers." *Id.* ¶ 64. All that said, Hott admitted that ICE agents had not faced any real challenges in implementing the TRO given that ICE had not had to deploy any munitions since its issuance. Doc. 191-4 at 155:3–6.

Parra indicated that the TRO has "adversely affect[ed] CBP law enforcement operations" in part because it "requires additional considerations outside of the CBP and DHS Use of Force Policy that agents are thoroughly trained on," causing agents to "improperly hesitat[e] before they can appropriately deploy less lethal munitions." Doc. 173-2 ¶ 74; Doc. 191-9 at 98:6–24. Parra indicated that, in response to the TRO, CBP has had to "increase [its] size of security at

times." Doc. 191-9 at 104:2–11. Parra noted that "[l]ess lethal munitions are an important force

de-escalation tool for law enforcement" and "permit agents to successfully disperse crowds that

are engaging in active resistance and assaultive behavior," meaning that "[a]n order that would

prohibit officers from using less lethal munitions would likely lead to more violent engagements,

not less." Doc. 173-2 ¶ 75. He therefore believes "that the issuance of a preliminary injunction

in this case would adversely impact CBP operations, potentially endanger CBP personnel, and

would have a negative impact on public safety." *Id.*

### IV.    Procedural History

Plaintiffs filed this case on October 6, 2025. In connection with the filing of their

complaint, Plaintiffs sought a TRO to enjoin Defendants from continuing to violate their

constitutional rights to peacefully protest, exercise their religion, and/or report in the Northern

District of Illinois. Doc. 21. Plaintiffs based their TRO request on their First Amendment,

RFRA, and Fourth Amendment claims. *Id.* The Court held hearings on October 6, 8, and 9

2025. Docs. 34, 44, 45. The Court orally set forth its ruling on October 9, 2025, Doc. 45,

followed by a written order, Doc. 43, and a separate document setting forth the terms of the TRO

that same day, Doc. 42.

Defendants disseminated the TRO as required. Doc. 53. Byers represented that Lyons,

the acting ICE director, sent the TRO to all ICE agents nationally and that Hott sent it to all local

staff. Doc. 75 at 90:3–9. ICE agents did not have to acknowledge or sign that they received the

TRO, and ICE did not hold briefings on the TRO. Doc. 75 at 90:10–23. Byers did, however,

speak with the ICE SRT trainer and commander about the TRO. Doc. 75 at 91:6–11. Harvick

indicated that CBP "take[s] these TROs very seriously" and "want[s] to ensure [it is] operating"

properly, so that in addition to disseminating the TRO electronically, CBP reviewed the TRO

terms verbally at morning briefings and answered any questions and would do the same with new agents who joined the operation. Doc. 75 at 45:25–46:11.

On October 16, the Court held an additional hearing and ordered the modification of the TRO to require agents to use BWCs if equipped and trained to do so. Doc. 52. The Court entered the modification on October 17. Doc. 66. The modified TRO was disseminated as required. Doc. 70; Doc. 74; Doc. 173-1 ¶¶ 58–59. On October 20, the Court held a hearing at which Harvick and Byers answered the Court's questions about CBP's and ICE's operations, Operation Midway Blitz, and the TRO. Doc. 75.

On October 21, Plaintiffs filed an amended complaint, Doc. 80, as well as a motion for class certification, Doc. 81, and a motion for preliminary injunction, Doc. 86. Plaintiffs also filed numerous notices of violations of the TRO, Docs. 89, 90, 94, 118, 140, 143, 174, 188, 201, 220, as well as a notice to enforce the TRO, Doc. 57, and to modify the TRO to prevent the use of tear gas, Doc. 142. The Court allowed the parties to engage in expedited discovery, setting forth in great detail the terms of what Plaintiffs could obtain through expedited discovery and the limits on the length of the three depositions they could take. Docs. 75, 87.

On October 28, the Court held a hearing at which Bovino appeared and testified under oath. Doc. 144. The Court reviewed the terms of the TRO with Bovino, explaining the meaning of the requirements in more detail, and sought to ensure that Bovino and Defendants were on the same page as the Court with respect to the TRO's meaning. *Id.* To clear up confusion as to the requirement about identifiers, the Court agreed with Bovino that agents should place an identifier "conspicuously on their uniform where one can easily view it and the Agent's equipment does not obscure it." Doc. 146; *see also* Doc. 144 at 13:22–16:4. The Court also ordered Defendants to provide the Court with all CBP use of force reports related to Operation Midway Blitz from

177

**SA185**

September 2 through October 25, 2025 and BWC video corresponding to those reports by October 31, 2025, as well as any additional use of force reports and corresponding BWC video within twenty-four hours of finalization. Doc. 146. The Court also ordered Defendants to provide a chart containing the names, dates of arrest or detention, charges or citations, and resolution of the arrest or detention for all those detained or arrested by CBP from September 2 through October 29, 2025 that were not directly related to an immigration enforcement violation. Doc. 146. Finally, the Court ordered Bovino to appear in court in person every day at the end of the day to report on the use of force activities for that day. Doc. 146. Defendants filed a petition for writ of mandamus with respect to the order requiring Bovino to appear in court every day, with the Seventh Circuit issuing a stay of the order and then granting the petition for mandamus. Doc. 182.

The Court held a preliminary injunction hearing on November 5, 2025. Doc. 255. On November 6, 2025, the Court issued an oral ruling granting Plaintiffs' motions for preliminary injunction and class certification, Doc. 256, entered the preliminary injunction order, Doc. 250, and memorialized its class certification ruling in writing, Doc. 252.

## LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must satisfy three threshold requirements: (1) some likelihood of success on the merits; (2) an inadequate remedy at law; and (3) irreparable harm if the relief is not granted. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). If Plaintiffs satisfy these three factors, the Court conducts a balancing test, "weigh[ing] the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays*, 974 F.3d at 818. "This balancing process involves a 'sliding scale' approach: the more likely the

plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and

vice versa." *Id.* The Court also considers the public interest, which includes taking into account

any effects on non-parties. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir.

2018).

**ANALYSIS**

I.      **Standing**

        A.      **Individual Plaintiffs**

        Before turning to the merits of Plaintiffs' motion for a preliminary injunction, the Court

must address Plaintiffs' standing, which Defendants continue to challenge. To establish standing

to seek injunctive relief, Plaintiffs must allege (1) "an actual or imminent threat of suffering a

concrete and particularized 'injury in fact,'" which (2) Plaintiffs can fairly trace to Defendants'

conduct and that (3) a favorable judicial decision will likely prevent or redress. *Common Cause

Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019). Plaintiffs "must face a 'real and immediate'

threat of future injury." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (citation

omitted).

        Defendants argue that Plaintiffs have not established that their injuries are likely to recur

so as to warrant injunctive relief, but the Court disagrees. Despite what Defendants would like

the Court and the public to believe, the record reflects that Defendants have engaged in an

officially sanctioned common practice of violating the First and Fourth Amendment rights of

protesters, journalists, and religious practitioners. Plaintiffs have set forth specific injuries and

indicate that they intend to continue their protesting, reporting, and ministering. Their risk of

future injury is not speculative, given the ongoing, sustained pattern of conduct that they have

documented over the previous two months, even after the Court entered a TRO, with no sign of

179

stopping.  *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023) (noting appellate court's conclusion that a plaintiff established a "credible threat" of future enforcement based on a "history of past enforcement against nearly identical conduct"); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'" (citation omitted)).  While some of the evidence on which Plaintiffs rely to show this ongoing, sustained pattern of conduct comes from non-named Plaintiffs, "the experience of other journalists, legal observers, and protestors bears directly on the operative question of whether Plaintiffs 'will again be wronged in a similar way.'"  *L.A. Press Club v. Noem*, --- F. Supp. 3d ----, 2025 WL 2658327, at *14 (C.D. Cal. Sep. 10, 2025) (quoting *Villa v. Maricopa Cnty.*, 865 F.3d 1224, 1229 (9th Cir. 2017)).

And even though incidents have calmed down at Broadview after the establishment by state and local officials of a Unified Command and designated protest zone, protests have continued there, and no guarantee exists that state and local police will continue to patrol there, in which case control over the facility's security would revert back to federal agents, who have consistently shown a disregard for protesters', journalists', and religious practitioners' First Amendment rights, suggesting that such an officially sanctioned course of retaliation would continue.[71]  Unlike in *Lyons*, where the plaintiff could avoid being choked by conducting his activities within the law, thus avoiding exposure to future injury, Plaintiffs cannot avoid injury as

---

[71] Similarly, although a number of CBP agents reportedly left the Chicagoland area after the Court entered its preliminary injunction order, this does not make Plaintiffs' threat of future injury speculative, particularly where ICE maintains a constant presence in the Chicagoland area, and Defendants do not acknowledge that they have slowed operations or are leaving Chicago.  *See, e.g.* Tricia McLaughlin (@TriciaOhio), X (Nov. 11, 2025 6:40 a.m.), https://x.com/TriciaOhio/status/1988225302594523323 ("We aren't leaving Chicago."); America Reports, *Border chief vows to intensify immigration crackdowns as judge orders migrant release*, Fox News Channel (Oct. 13, 2025 at 2:05–2:57), https://www.foxnews.com/video/6385069122112 (Bovino stating that "If [Pritzker] thinks operations are being ratcheted down, well, just the opposite is gonna occur, Sandra.  We're ratcheting operations up in Chicago. . . . We're not going anywhere out of Chicago.").

they are being threatened and harmed for acting firmly within the law and exercising their First

Amendment rights. *See id.* ("Unlike in *Lyons*—where plaintiff could avoid further injury by

'avoid[ing] . . . illegal conduct'—Plaintiffs were injured engaging in innocent activities. Here,

'no string of contingencies [is] necessary to produce an injury.'" (quoting *Hodgers-Durgin v. de

la Vina*, 199 F.3d 1037, 1041–42 (9th Cir. 1999)); *cf. City of Los Angeles v. Lyons*, 461 U.S. 95,

106 (1983). Similarly, contrary to *Noem v. Vasquez Perdomo*, where Justice Kavanaugh in a

concurrence found that plaintiffs "ha[d] no good basis to believe that law enforcement will

unlawfully stop *them* in the future based on the [allegedly] prohibited factors—and certainly no

good basis for believing that any stop of the plaintiffs is imminent," --- S. Ct. ----, 2025 WL

2585637, at *2 (Kavanaugh, J., concurring), "Plaintiffs' injuries recurring does not depend on

them happening to be in the wrong place at the wrong time, such that they, as opposed to

someone else, encounter law enforcement's unlawful actions," *L.A. Press Club*, 2025 WL

2658327, at *14 n.14. Instead, because Plaintiffs have indicated an intent "to continue to be

present at ongoing protests, protests at which Defendants target or fire indiscriminately upon"

protesters, the press, and religious practitioners, "the risk of recurrence of their injuries is not

speculative in the way it was in *Lyons* or *Vasquez Perdomo*." *Id.* The Court, therefore, finds that

Plaintiffs have standing to pursue their claims. *See Schirmer v. Nagode*, 621 F.3d 581, 588 (7th

Cir. 2010) ("a record showing a persistent pattern of similar police misconduct" could provide a

basis for "persons intending to engage in protected speech and expression" to have standing for

prospective injunctive relief against future misconduct); *Smith v. City of Chicago*, 143 F. Supp.

3d 741, 752 (N.D. Ill. 2015) ("Plaintiffs have alleged ongoing constitutional violations pursuant

to an unconstitutional policy or practice in tandem with allegations that CPD officers repeatedly

subjected them to unconstitutional stops and frisks, which leads to the reasonable inference of the likelihood that CPD officers will unlawfully stop and frisk Plaintiffs in the future.").

Plaintiffs additionally have standing regarding their First Amendment claims based on the chilling effect of Defendants' conduct. *See Speech First, Inc. v. Killeen*, 968 F.3d 628, 638–39 (7th Cir. 2020) (to establish injury in fact for First Amendment claim, "a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result"). Plaintiffs have set forth the concrete and particularized threats required to show a chilling effect. *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012) ("The plaintiff must substantiate a concrete and particularized chilling effect on his protected speech or expressive conduct to pursue prospective relief."). For example, Leslie Cortez testified that looking down the barrel of a gun "was a traumatizing experience because [she] never had a weapon dr[awn] at her," "so it made [her] really reconsider if this is something that's safe to do even though [she] wasn't doing anything to obstruct." Doc. 255 at 70:12–16, 73:7–13, 74:13–75:7. And Rev. Black testified that it took him several weeks before he went back to the Broadview facility, it was difficult for him to do it, and he has taken additional precautions in light of the direct attacks on him and other clergy members outside of the Broadview facility. Doc. 255 at 131:10–132:15, 147:2–25, 156:20–158:2. Ramirez testified that her experiences and those of her constituents in Brighton Park have left them feeling unsafe, with Ramirez not "feel[ing] safe enough to even approach a federal agent to have a conversation about how [to] move things forward in that October 4th incident." Doc. 255 at 52:17–54:25. Muñoz testified that after his arrest outside the Broadview facility on October 3, he has not been back to protest at that facility. Doc. 255 at 61:3–13. Bodett testified that "seeing the projectile shot at head height" in Little Village "would make [him] much more fearful of . . . documenting in the future." Doc. 255 at 84:18–22. Munchak

similarly testified that the agents' actions and threats toward her, including pointing a gun at her, have caused her to be "very hesitant . . . to even observe or record anymore because [she] fear[s] for [her] personal physical safety."  Doc. 255 at 98:1–100:13, 105:3–14.  Reidy-Hamer indicated she hesitated to stop and record an immigration enforcement action she saw in her neighborhood because of her experiences with agents deploying less lethal munitions outside the Broadview facility and not "want[ing] to experience that again."  Doc. 255 at 112:3–17.  She also noted that although she returned to the Broadview facility several times, she was afraid of excessive force being used, was "jittery around loud noises" because of the flashbang grenade that agents deployed, and "was afraid that [she] would be detained because it seemed like they were just arbitrarily picking people out and detaining them for not doing anything."  Doc. 255 at 115:24–117:1.  Countless other declarants made similar statements about the chilling effects of agents' actions.  *See, e.g.*, Doc. 22-2 ¶¶ 33–41; Doc. 22-6 ¶¶ 23–24; Doc. 22-8 ¶ 20; Doc. 22-19 ¶ 22; Doc. 73-16 ¶¶ 6–7; Doc. 94-3 ¶ 16; Doc. 140-2 ¶ 25.

It is irrelevant that a particular person demonstrates courage in the face of Defendants' use of force and disrespect for their Constitutional rights to speak, assemble, and pray.  The issue is whether the chilling effect is objectively reasonable, *Speech First*, 968 F.3d at 638–39, and changes how individuals behave in light of the First Amendment violation, *see Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 728 (7th Cir. 2025) (plaintiffs established a chilling effect where "journalists claim to have engaged in self-censorship by changing how they behave when conducting newsgathering activities near Indiana police officers out of fear that the buffer law will be invoked against them").  Plaintiffs have clearly established such an objectively reasonable chilling effect that has caused many protesters, journalists, and religious practitioners to adjust their activities, providing them another basis for standing with respect to their First

Amendment claims. *See, e.g.*, *Brown v. Kemp*, 86 F.4th 745, 767 (7th Cir. 2023) (plaintiffs showed self-censorship and an actual fear of enforcement where they "limited their monitoring, filming, and documenting activities" and when they did monitor, they took certain precautions).

### B.    News Organizations

The news organizations—Chicago Headline Club, Block Club Chicago, Chicago Newspaper Guild Local 34071, and NABET-CWA Local 54041—have standing to sue on behalf of their members and for their own injuries. An organization has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). As discussed above, members of the news organizations have standing to sue in their own right, and Defendants have not made any arguments that the other requirements for associational standing are lacking. *See L.A. Press Club*, 2025 WL 2658327, at *15 (finding news organization had associational standing).

To have standing in their own right, organizations must show that "defendants' conduct impaired (i.e., 'directly affected and interfered with') their ability to" conduct their business or services "(i.e., a 'core business activity')." *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18 C 839, 2025 WL 975967, at *7 (N.D. Ill. Mar. 31, 2025) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 396 (2024))). Under certain circumstances, an organization can use its diversion of resources from one aspect of its mission to another to demonstrate an injury. *See Havens*, 455 U.S. at 379; *Common Cause Ind.*, 937 F.3d at 951–53 (discussing the organization's diversion of resources as

one form of the broader economic injury).  However, as the Supreme Court elaborated in

*Alliance for Hippocratic Medicine*, a defendant does not have standing based purely on "a

setback to the organization's abstract social interests" and "cannot spend its way into standing by

simply expending money to gather information and advocate against the defendant's action."

602 U.S. at 394.  Further, "organizations [do not] have standing based solely on the baseline

work they are already doing.  They 'cannot convert ordinary program costs into an injury in

fact.'  The question is what additional or new burdens are created by the law the organization is

challenging."  *Common Cause Ind.*, 937 F.3d at 955 (citations omitted).

Here, Chicago Headline Club is a nonprofit dedicated to supporting journalists and

promoting a free press, "offering training, networking opportunities, legislative advocacy, and

scholarships for young journalists," as well as a legal defense fund.  Doc. 22-26 ¶¶ 2, 4.  Its

president, Jeff Arnold, stated that Chicago Headline Club has diverted "significant time and

resources from other organizational activities to address press rights violations by law

enforcement personnel," with Arnold himself spending at least ten hours personally responding

to such incidents between September 27 and October 4.  Doc. 22-26 ¶ 9.  The Chicago News

Guild and NABET-CWA Local 54041 are labor unions that advocate for the working conditions,

pay, and benefits of their members.  Doc. 22-24 ¶¶ 2–3 (NABET-CWA Local 54041); Doc. 22-

25 ¶ 2 (Chicago News Guild); Doc. 255 at 29:21–30:1 (Chicago News Guild).  Emily

Steelhammer, the Chicago News Guild's executive director, testified that in response to

Defendants' activities, she has "had to spend a significant amount of time reaching out to folks

. . . repeatedly to see how they have been impacted and to make sure that they are comfortable

asking their employer for what they need," noting that while members "regularly cover protests,"

"the amount of force that they're seeing and the indiscriminate use of force is really quite

unusual from what they would normally experience at . . . a crowd control protest." Doc. 255 at 30:8–31:11; *see also* Doc. 22-25 ¶¶ 18–19 (Andrew Grimm, president of the Chicago News Guild, stating that from September 12 to October 4, 2025, he estimated that he and Chicago News Guild's staff had spent at least thirty hours responding to press rights violations involving DHS agents, "responding in real time to reports," "arranging meetings with publishers and station managers to discuss safety concerns and infringements on [its] members' civil rights and their ability to cover the ongoing events," "confer[ring] with members of other NewsGuild locals in Los Angeles about their similar experiences . . . and the tactics and equipment they were able to use to better protect the health and safety of their members," and meeting "with leadership of other unions" representing affected journalists). Stephen Griswold, NABET-CWA Local 54041's president, reported "divert[ing] significant time and resources from other organizational activities to address press rights violations by law enforcement personnel against [its] members," prompting the union to explore additional training opportunities and dedicate advocacy work for its affected members. Doc. 22-24 ¶¶ 5, 8. Block Club Chicago has adopted a policy of requiring staff to attend protests in teams of two or more to keep them safe, which limits their ability to report on relevant events. Doc. 22-19 ¶ 22; Doc. 22-20 ¶¶ 28–29 (Stephanie Lulay, Block Club Chicago's executive editor and co-founder, describing how she pulled a journalist from the Broadview protests when their photographer partner had left, meaning that Block Club Chicago was "not able to report on the events that continued that evening because of our fear for our journalists' safety"). Therefore, the news organizations have established organizational standing because Defendants' activities have interfered with the news organizations' core business activities and forced them to divert resources away from these core activities to address Defendants' actions. *See Common Cause Ind.*, 937 F.3d at 954 (explaining that an organization

186

SA194

showed standing where the defendants concretely disrupted their operations such that they needed to divert time and money in response); *L.A. Press Club*, 2025 WL 2658327, at *15 n.16 (news organizations had organizational standing where "DHS' activities have frustrated their core purpose of defending journalists' safety and working conditions").

With standing established, the Court turns to the substantive requirements for issuance of a preliminary injunction.

## II.    Likelihood of Success

The first factor for injunctive relief is likelihood of success.  To meet this requirement, the "plaintiff must demonstrate that 'its claim has some likelihood of success on the merits.'" *Mays*, 974 F.3d at 822 (citation omitted).  "What amounts to 'some' depends on the facts of the case at hand because of [the Seventh Circuit's] sliding scale approach," *id.*, but it at least requires a "strong" showing that "normally includes a demonstration of how the applicant proposes to prove the key elements of its case," *see Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020).  A "mere possibility of success" does not meet this standard.  *Id.* at 762.  The Court considers each of Plaintiffs' claims in turn.

### A.    First Amendment

The First Amendment bars the government from "prohibiting the free exercise [of religion]; or abridging the freedom of speech, or of the press; or the right of the people to peaceably to assemble."  U.S. Const. amend. I.  "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental."  *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937).  "[O]f all constitutional rights, the freedoms of speech and of assembly are the most perishable, yet the most vital to the preservation of American democracy." *Wolff v. Selective Serv. Loc. Bd. No. 16*, 372 F.2d 817, 822 (2d Cir. 1967); *see, e.g., Thomas v.*

*Collins*, 323 U.S. 516, 530 (1945) ("It was not by accident or coincidence that the rights to

freedom in speech and press were coupled in a single guaranty with the rights of the people

peaceably to assemble and to petition for redress of grievances. All these, though not identical,

are inseparable.").

The government "has no power to restrict expression because of its message, its ideas, its

subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting

*Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). Protest participation is a "pristine

and classic" form of protected speech. *Edwards v. South Carolina*, 372 U.S. 229, 335–36

(1963). Undeniably, group demonstrations are quintessentially protected speech. *See Snyder v.*

*Phelps*, 562 U.S. 443, 458 (2011) (holding that the Westboro Baptist Church's "picketing" on

public land near a soldier's funeral "is entitled to special protection under the First Amendment"

(internal quotation marks omitted)); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of*

*Boston, Inc.*, 515 U.S. 557, 568–69 (1995) (in finding private parade protected by First

Amendment, noting that "the inherent expressiveness of marching to make a point explains our

cases involving protest[s]" (citing *Gregory v. Chicago*, 394 U.S. 111, 112 (1969); *Edwards*, 372

U.S. at 235)).

Sidewalks and other public ways "occupy a special position in terms of First Amendment

protection because of their historic role as sites for discussion and debate." *McCullen v.*

*Coakley*, 573 U.S. 464, 476 (2014) (internal quotation marks omitted). These public spaces—

which courts have labeled "traditional public fora"—"have immemorially been held in trust for

the use of the public and, time out of mind, have been used for purposes of assembly,

communicating thoughts between citizens, and discussing public questions." *Hague v. Comm.*

*for Indus. Org.*, 307 U.S. 496, 515 (1939). "In a traditional public forum—parks, streets,

sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). The same analytical framework applies whether the First Amendment right being exercised is speech or other expressive activity such as assembly. *See, e.g.*, *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991).

Defendants agree that the First Amendment protects individuals' right to peacefully protest, report, and exercise religion in traditional public fora. Doc. 173 at 39. As Defendants' counsel stated during the preliminary injunction hearing, "[t]here is no dispute that every individual has the right to vocally and forcefully express their objections, whether those objections take the form of demonstrations, marches, loud chants, or even profanity-laced screams." Doc. 255 at 11:8–12. Instead, Defendants primarily argue that Plaintiffs have not engaged in First Amendment-protected activity because they intermingled themselves with "rioters, obstructors, and other lawless actors." Doc. 173 at 38.

### 1.    Protected Speech and Newsgathering

#### a.    Speech

Plaintiffs assert that demonstrating, protesting, documenting, objecting to, and observing government action, as well as expressing religious views, is core protected speech and conduct. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."); *Widmar v. Vincent*, 454 U.S. 263, 269 (1981) (engaging "in religious worship and discussion" is a "form[ ] of speech and association protected by the First Amendment"); *Nicodemus v. City of S. Bend*, 137 F.4th 654, 663 (7th Cir. 2025) ("One's ability to access these sacrosanct places—be it

to lead a rally or to 'protest by silent and reproachful presence'—is a First Amendment concern in and of itself." (quoting *Brown v. Louisiana*, 383 U.S. 131, 142 (1966)); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 585 (7th Cir. 2012) ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording.").  Defendants argue that Plaintiffs are not engaging in activity protected by the First Amendment because they continually intermingle themselves with rioters, obstructors, and other lawless actors.  They contend that because of this intermixed nature of the crowd, law enforcement may disperse a crowd before it becomes "unmanageable or overtly dangerous," Doc. 173 at 42, when "a clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears."  *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940).  In their opposition to Plaintiffs' preliminary injunction motion, Defendants devote multiple pages detailing what they describe as unlawful, obstructive, and violent acts committed by crowds outside the Broadview facility and around Chicagoland.  Defendants claim that Plaintiffs' unlawful behavior includes, among other acts: (1) blocking traffic and public roads; (2) trespassing on government property; (3) physically battering law enforcement personnel; (4) throwing and shooting objects at law enforcement personnel, including bottles, rocks, eggs, and fireworks; (5) resisting arrest; (6) threatening to kill law enforcement officers; (7) bringing explosive devices, firearms, knives, and tear gas to demonstrations; and (8) impairing federal immigration enforcement activities.

First, Defendants attempt to paint all protesters as rioters, knowing that, as one political science professor put it, "[y]ou can't shoot protesters, but you can shoot insurrectionists," meaning that "if you lie that protesters are insurrectionists, you're granting yourself new

powers."  Daniel Vock, *'Devil's Ideology': President Donald Trump's darkening rhetoric escalates attacks and often targets Illinois*, Chicago Tribune (Oct. 19, 2025), https://www.chicagotribune.com/2025/10/19/trump-language-opponents-illinois/ (quoting Nicholas Grossman, a political science professor at the University of Illinois at Urbana-Champaign).  But Defendants cannot genuinely argue that comparing ICE and CBP agents to "the secret police, or Gestapo, of Nazi Germany, amounts to a threat," particularly where "[p]oliticians frequently use over-the-top historical comparisons to attack their enemies, . . . including Trump who during last year's presidential campaign called former Vice President Kamala Harris a 'communist,' a 'Marxist' and a 'fascist.'"  *Id.*; *see City of Houston v. Hill*, 482 U.S. 451, 461 (1987) ("Speech is often provocative and challenging. . . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." (alterations in original) (quoting *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)).  But as extensively discussed above, the Court does not find Defendants' retelling of these "violent" and "unlawful" acts credible.

Second, even if some individuals have engaged in violent and unlawful acts, Plaintiffs here do not contend that the First Amendment protects these individuals.  Perhaps recognizing that the First Amendment provides no protection for speech that constitutes true threats of violence or incitement of imminent lawless action, *see Counterman v. Colorado*, 600 U.S. 66, 74 (2023); *Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969), Plaintiffs do not include individuals engaged in this behavior in the relief they seek.  In fact, Plaintiffs agree that "individuals who may have committed isolated acts of vandalism, assault on or true threats against officers, or forcible obstruction, may be arrested and prosecuted."  Doc. 196 at 21.  Plaintiffs only include

non-violent individuals in their proposed class definition.  Doc. 80 at 42–43 (defining the class as

those who "*non-violently* protest, observe, or record" DHS operations); *see also* Doc. 252

(certifying class).

Third, Defendants cannot use individual or isolated unprotected acts or speech to justify

indiscriminately restricting others' First Amendment rights.  The Supreme Court has stated that it

is "obvious" that the government "may not unduly suppress free communication of views,

religious or other, under the guise of conserving desirable conditions." *Cantwell*, 310 U.S. at

308.

While government officials may stop or disperse public demonstrations or protests where

"clear and present danger of riot, disorder, interference with traffic upon the public streets, or

other immediate threat to public safety, peace, or order, appears," *id.*, an official's "[f]ear of

serious injury cannot alone justify suppression of free speech and assembly," *United States v.

Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995).  Rather, to "justify suppression of free

speech there must be reasonable ground to fear that serious evil will result if free speech is

practiced." *Id.*  "The First and Fourteenth Amendment do not permit a State to make criminal

the exercise of the right of assembly simply because its exercise may be annoying to some

people." *Coates v. City of Cincinnati*, 402 U.S. 611, 615 (1971) (internal quotation marks

omitted).

From reviewing the evidence in the record, including the parties' declarations, hours of

videos, and witness testimony, the Court finds that Plaintiffs have made a strong showing that

they engaged in protected speech.  Every witness who submitted a declaration or testified at the

preliminary injunction hearing indicated that they and the surrounding crowd, while spirited,

remained peaceful and did not constitute a riot or imminent threat to public safety.  *See, e.g.*,

Doc. 22-2 ¶¶ 15–16, 20–21; Doc. 22-34 ¶¶ 3, 5, 7, 9; Doc. 94-3 ¶¶ 4–5, 8–9, 12, 14; Doc. 140-1 ¶¶ 5–7, 10; Doc. 190-3 ¶¶ 3, 10. The Court does not find any evidence that any of Plaintiffs engaged in unlawful or violent conduct, and the certified class expressly excludes individuals who did. *See* Doc. 252 at 3 (certifying a class of "[a]ll persons who are or will in the future *non-violently* demonstrate, protest, observe, document, or record" (emphasis added)). And Defendants cannot disperse a demonstration based on unsubstantiated speculation that violence *may* occur because of past experiences. *See Milk Wagon Drivers Union of Chicago, Loc. 753 v. Meadowmoor Dairies*, 312 U.S. 287, 296 (1941) ("Right to free speech in the future cannot be forfeited because of dissociated acts of past violence."). Nor can Defendants' "intermixed" or "intermingled" justification for restricting speech stand because the unlawful activity by a few protesters does not transform a peaceful assembly into an unlawful assembly. *See Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 834 (9th Cir. 2020) ("The many peaceful protestors, journalists, and members of the general public cannot be punished for the violent acts of others."); *Collins v. Jordan*, 110 F.3d 1363, 1373 (9th Cir. 1996) ("[T]he proper response to potential and actual violence is for the government to ensure an adequate police presence . . . and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure.").

### b. Newsgathering

"[T]here is practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs[.]" *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011) (alteration in original) (citation omitted) (internal quotation marks omitted). This agreement "reflects our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* (citation

193

**SA201**

omitted) (internal quotation marks omitted).  Moreover, "the First Amendment goes beyond protection of the press and self-expression of individuals to prohibit the government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978).  The freedom of speech and press "embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Id.* at 767 (citation omitted).

Here, the First Amendment protects non-violent newsgathering.  The record indicates that Plaintiffs Block Club Chicago (Doc. 22-20), Raven Geary (Doc. 22-17), Stephen Held (Doc. 22-18), and Charles Thrush (Doc. 22-16) all wear clear press identification when reporting, do not engage in protests, and do not talk with (or to) federal officers unless to ask them journalistic questions.  *See also* Doc. 22-19 ¶¶ 7, 16 (Colin Boyle); Doc. 22-22 ¶¶ 7, 10 (Shawn Mulcahy).  The Court rejects Defendants' implication that Plaintiffs are suggesting that members of the press should receive special treatment.  Instead, "the Supreme Court has long recognized a qualified right of access for the press and public to observe government activities." *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012).

### 2.     Content-Based Discrimination Under Strict Scrutiny

Having found that Plaintiffs have made a strong showing that they engaged in protected speech, the Court must now consider whether the record shows that Defendants have restricted Plaintiffs' protected activities in a content or viewpoint-based discriminatory fashion, or if instead the government has applied its restrictions content neutrally.  While Plaintiffs argue a First Amendment viewpoint-based discrimination claim, the Court does not reach this claim's merits because it finds a likelihood of success on the merits of Plaintiffs' content-based claim.

194

Government restrictions that target speech based on its communicative content are "presumptively unconstitutional." *Reed*, 576 U.S. at 163. To determine whether a challenged regulation is content based, the Court first asks whether the regulation "draws distinctions [on its face] based on the message a speaker conveys." *Id.* (citation omitted). *Reed* explained that facial distinctions include those which define regulated speech "by particular subject matter" or "its function or purpose." *Id.* Laws that are facially content-neutral may still be considered content-based restrictions on speech if they "'cannot be justified without reference to the content of the regulated speech' or that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also Price v. City of Chicago*, 915 F.3d 1107, 1118 (7th Cir. 2019) (a law is content based "if enforcement authorities must 'examine the content of the message that is conveyed to determine whether a violation has occurred'" (quoting *McCullen*, 573 U.S. at 479)). In other words, following *Reed*, "[a]ny law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification." *Norton v. City of Springfield*, 806 F.3d 411, 412 (7th Cir. 2015).

The Court finds that Plaintiffs are likely to show that Defendants have restricted Plaintiffs' speech, assembly, and press based on their content. Plaintiffs have been open and vocal about their dislike for Defendants' actions, and, in return, Defendants have publicly announced their intention to target such protesters. Plaintiffs' declarations and testimony at the preliminary injunction hearing clearly establish that protesters have gathered at the Broadview facility and around the Chicagoland area to non-violently express their views opposing Operation Midway Blitz. Plaintiffs' declarations describe the specific language that protesters have used to voice their views opposing the government's immigration enforcement efforts and tactics in

Chicago. *See, e.g.*, Doc. 22-2 ¶¶ 15, 21 (describing verbal protest, chanting, yelling, and expressing views opposing ICE); Doc. 22-7 ¶ 4 (noting that people were holding signs that said "immigrants welcome here" and chanting); Doc. 22-9 ¶ 11 (chanting "Free Isaac"); Doc. 22-31 ¶ 10 (describing a protester using a megaphone to denounce violence that ICE perpetuated against detainees and protesters); Doc. 22-34 ¶ 5 (chanting "get out of our neighborhood," "you don't belong here," and "how do you sleep at night?"). At the preliminary injunction hearing, several of Plaintiffs' witnesses testified about the statements they and others around them made in opposition to the government's immigration enforcement efforts in the Chicagoland area. *See, e.g.*, Doc. 255 at 67:2–5 (Cortez testifying that she informed day laborers of their rights); *id.* at 79:23–80:3 (Bodett describing people at Little Village protest as including those "blowing a whistle," "yelling at ICE to leave," and "cussing [agents] out"); *id.* at 95:10–14, 102:6–25 (Munchak explaining that she told agents to "smile for the Hague" because she believes the "draconian measures," "lack of due process," and "conditions of detentions centers probably do constitute human rights violations"); *id.* at 107:1–5, 108:22–109:3 (Reidy-Hamer testifying that she protested at Broadview to "lend [her] voice," express that she does not "agree with what's happening" at Broadview, and let people know that what agents were doing to protesters at Broadview "is not acceptable" and that people have the right to "express concern with [the Broadview] facility"). Even Hott acknowledged that social media, signs, vandalism, and other forms of protest have "showcased disdain for the mission" of Operation Midway Blitz. Doc. 191-4 at 67:3–22. And media members have worn clear press identification and not engaged in violent behavior, while vigorously covering immigration officials' activities. *See, e.g.*, Doc. 22-16; Doc. 22-17; Doc. 22-18; Doc. 22-19; Doc. 255 at 34:13–23, 36:2–23.

In response, Secretary Noem commented that the more people protest, the harder the government will come after them.  Doc. 79 ¶ 36; *see also* Benny Johnson (@bennyjohnson), *supra*.  President Trump encouraged federal officers to use physical violence against protesters if they get too close.  Doc. 79 ¶ 46; *see also* TIME, *supra* (President Trump stating that any protesters at his military parade "will be met with very big force").  And Defendants have consistently expelled and targeted Plaintiffs with various uses of force who hold signs, chant, shout, and otherwise assemble against Operation Midway Blitz.  *See, e.g.*, Doc. 73-8 ¶¶ 6–7, 10–11; Doc. 73-18 ¶¶ 6, 9–11.  Further, while permitting exclusive access to journalists who portray them in a more favorable light, *see* Doc. 22-18 ¶ 11; Doc. 73-9 ¶ 17, 19, 22; Doc. 73-18 ¶ 13, Defendants have tackled and arrested at least one member of the media covering the Broadview facility, *see* Doc. 22-18 ¶ 21–30, and deployed less lethal munitions directly at others, *see, e.g.*, Doc. 22-16 ¶ 14–16, 24–26; Doc. 22-17 ¶ 9; Doc. 22-19 ¶¶ 17–19; Doc. 255 at 33:19–34:23.  This suggests that strict scrutiny applies.  *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658–59 (1994) ("[S]peaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say).")

Defendants contend that their actions are content-neutral because they have only expelled those engaged in violent and obstructive conduct, or those intermingled with such people.  This assertion, however, ignores many examples in the record where Defendants restricted the speech or behavior of those who were not acting violently or obstructively.  *See, e.g.*, Doc. 22-6 ¶¶ 13–18; Doc. 22-7 ¶¶ 4, 8–9; Doc. 22-8 ¶¶ 4, 8–13, 17–19; Doc. 94-3 ¶¶ 4–6, 9; Doc. 118-1 ¶¶ 6–7, 10; Doc. 188-2 ¶¶ 11–17, 22–24; Doc. 188-3 ¶¶ 6–7.  Tellingly, Defendants admit that they would treat pro-ICE and CBP demonstrators more favorably.  *See* Doc. 238 at 99:7–19.

197

**SA205**

Accordingly, the Court finds that Plaintiffs are likely to show that Defendants have placed content-based restrictions on Plaintiffs.

As content-based restrictions, Defendants' actions can stand only if they survive strict scrutiny. *Reed*, 576 U.S. at 171. Defendants therefore must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* (quoting *Ariz. Free Enter. Club's Freedom Club PAC*, 564 U.S. at 734). An action "is narrowly tailored only if it targets and eliminates no more than the exact source of the evil it seeks to remedy." *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 646 (7th Cir. 2006) (citation omitted). In other words, an action "is not narrowly tailored if a less restrictive alternative would serve the Government's purpose." *Id.* (citation omitted) (internal quotation marks omitted). Defendants only address the strict scrutiny analysis in response to Plaintiffs' RFRA claim, so the Court takes that argument and applies it here.

The Court agrees that Defendants have a compelling interest in the protection of federal property and personnel and enforcement of federal laws.[72] Defendants argue that "the use of lawful, less-lethal crowd control devices" is narrowly tailored to achieve these goals, Doc. 173 at 57, and point to a declaration describing these devices as "the most effective method" that law enforcement has to push an "entire crowd back" from destroying property and blocking traffic, while claiming that such less lethal devices do not cause permanent harm, Doc. 35-4. Yet the Court does not find that Defendants will likely succeed in showing that their use of tear gas, pepper balls, and other less lethal force is sufficiently narrowly tailored to achieve these interests.

---

[72] The Court questions, however, whether Defendants have the right to issue dispersal orders on non-federal property given that "the United States Constitution reserves the general police power to the states." *Index Newspapers LLC*, 977 F.3d at 832 (noting that "the Federal Defendants' suggestion that [40 U.S.C.] § 1315 confers authority to take action to disperse members of the public who are neither on nor threatening federal property is dubious"). If this is the case, many of Defendants' actions likely cannot be justified by referring to a compelling government interest in protecting federal property.

Kerlikowske, Plaintiffs' police practices expert, opined that "[t]here is no law enforcement

purpose to use less-lethal weapons or chemical irritants other than . . . in narrow circumstances

addressing a riot or imminent violent actions, and to minimize bodily injury to specific targets."

Doc. 22-32 ¶ 122.  He further concluded that federal agents significantly deviated from standard

and accepted practices for how officers are trained to manage the First Amendment rights of

individuals, protesters, and journalists.  Doc. 77-2 ¶¶ 24-34.  And Dr. Haar notes that research

actually shows that crowd control weapons, and especially irritants and projectiles, can have

significant and long-lasting health harms.  Doc. 22-33 ¶ 15.  The Court has already found that

Defendants' allegations of riots and violence—and therefore their justification for the use of this

force—lack credibility.  Moreover, the Court notes that, in many instances, agents appear to

actually inflame the situation with the use of less lethal force by, for example, deploying tear gas

canisters as they prepare to leave a scene or for no legitimate reason, tackling non-threatening

individuals who are complying with orders or who have not been given orders, and intentionally

driving into people standing in front of agents' vehicles.  *See, e.g.*, Doc. 73-5 ¶ 6 (agents shoved,

grabbed, and handcuffed Fuentes, who did not touch or impede agents but instead only was

asking questions about agents' presence at the hospital); Doc. 174 ¶¶ 3–4 (agent pepper sprayed

and tackled a citizen in Aurora who was retreating from the agent's vehicle, as ordered); Doc.

255 at 47:13–18 (Ramirez testifying that in Brighton Park, agents would send another car of

agents through the crowd, "riling" them up and "shooting them with PepperBalls" for nearly an

hour in what appeared to be an "organized" fashion); Axon Body 4 Video 2025-10-04 1541

D01A83204 at 16:14–17:40 (agents forcefully tackling a protester to the ground in Brighton Park

and then, after they let him go, again tackling him to the ground, pushing and kneeling on his

head and neck); Axon_Body_4_Video_2025-10-12_1332_D01A2669A at 7:50–8:10 (agent

driving into protesters who stood in front of his vehicle while the agent filmed the interaction);

Axon_Body_4_+_Flex_Video_2025-10-23_1103_D01A2898X at 4:10–4:17 (agent deploying

tear gas canister despite the fact that the crowd had begun moving away from agents);

Axon_Body_4_Video_2025-10-24_1256_D01A2094R at 4:05–4:09 (agent commenting to

another agent that he should throw a tear gas canister at the crowd in Lakeview "for fun").  The

Court therefore does not find that Defendants are likely to show that their use of force is

narrowly tailored and can withstand strict scrutiny.  *See Brown v. Ent. Merchs. Ass'n*, 564 U.S.

786, 804 (2011) (act failed to meet strict scrutiny where it was "vastly overinclusive"); *Boos v.

Barry*, 485 U.S. 312, 329 (1988) (although a statute served a compelling interest, it did not meet

strict scrutiny because a "less restrictive alternative [was] readily available," meaning it was "not

narrowly tailored"); *Index Newspapers LLC*, 977 F.3d at 834 ("The many peaceful protesters,

journalists, and members of the general public cannot be punished for the violent acts of others.

'[T]he proper response to potential and actual violence is for the government to ensure an

adequate police presence . . . and to arrest those who actually engage in such conduct, rather than

to suppress legitimate First Amendment conduct as a prophylactic measure.'" (alterations in

original) (quoting *Collins*, 110 F.3d at 1373)).

### 3.    Content-Neutral Restriction Under Intermediate Scrutiny

The Court believes that Plaintiffs have shown they are likely to succeed on the merits of

their First Amendment content-based discrimination claim.  But even if Plaintiffs can show only

that Defendants' actions have regulated speech and assembly neutrally, Plaintiffs are also likely

to succeed in showing that Defendants' actions do not meet intermediate scrutiny.  The

government can impose "reasonable time, place and manner restrictions" consistent with the

First Amendment, so long as the restrictions are narrowly tailored to serve a significant

government interest and leave alternative avenues to communicate the same information. *Graff v. City of Chicago*, 9 F.3d 1309, 1319 (7th Cir. 1993). Again, the Court agrees that Defendants have a significant interest in protecting federal property and personnel and conducting their immigration enforcement actions. But the Court finds that Plaintiffs are likely to succeed in showing that Defendants' actions are not narrowly tailored to those interests.

Courts consider whether "a reasonably close fit" exists between the government's "means and its ends." *Nicodemus*, 137 F.4th at 668. Here, for example, the Court cannot find that shooting pepper balls at Rev. Black praying outside the Broadview facility, even if he was a foot onto federal property instead of the sidewalk, serves Defendants' interests in a narrowly tailored way, particularly where no credible evidence exists that agents warned Rev. Black to move before shooting at him or that Rev. Black threatened or blocked any vehicle or agents from entering or leaving the Broadview facility. *See* Doc. 255 at 125:8–131:9, 140:1–144:10, 149:8–150:11, 155:9–156:19. Defendants also have not provided any explanation as to why agents targeted Geary, Kunkel, Held, and others when they apparently posed no threat to agents or federal property, nor did they impede agents' ability to continue immigration enforcement actions. *See, e.g.*, Doc. 22-8 ¶¶ 7–13; Doc. 22-17 ¶ 9; Doc. 22-18 ¶¶ 17–18, 27–32. Nor does the record support a close fit between the need to safely leave the scene of immigration enforcement actions or protect agents from serious physical harm in East Chicago, Little Village, Lakeview, or Old Irving Park so as to warrant the deployment of tear gas or other less lethal munitions, as discussed above. Instead, the record before the Court suggests that agents have indiscriminately used force when confronted with any type of resistance, even peaceful, which the Court finds indicative of their claimed safety and immigration enforcement rationales being pretextual. *See, e.g.*, Axon_Body_4_Video_2025-10-03_1249_D01D00220 at 2:07–3:14 (agents

using less lethal munitions in an attempt to move a motorcycle that had stopped in front of it on a

street); Axon_Body_4_Video_2025-10-03_1855_D01A3449X at 1:30–1:55 (agent shooting

pepper balls at a bicyclist standing in the crosswalk away from the agent's vehicle who allegedly

refused to clear the roadway and shouted insults at the agent, despite agents having room to

leave).  But under intermediate scrutiny, Defendants cannot "sacrific[e] speech for efficiency" or

"regulate expression in such a manner that a substantial portion of the burden on speech does not

serve to advance its goals."  *McCullen*, 573 U.S. at 486 (citations omitted).  Therefore, the Court

finds that under either level of scrutiny, Plaintiffs are likely to succeed on their First Amendment

claim.

### B.    First Amendment Retaliation

To prevail on a First Amendment retaliation claim, Plaintiffs must ultimately show that

they "(1) [ ] engaged in activity protected by the First Amendment; (2) [ ] suffered a deprivation

that would likely deter First Amendment activity in the future; and (3) the First Amendment

activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory

action."  *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citations omitted).

Here, the allegations in the amended complaint, supported by Plaintiffs' submitted

evidence, establish that this claim has some likelihood of success.  Despite Defendants' attempts

to paint all protesters as violent or disobedient, as discussed above, Plaintiffs have provided

evidence that they engaged in newsgathering, religious exercise, and/or protesting, all activities

protected by the First Amendment.  *See, e.g.*, *L.A. Press Club*, 2025 WL 2658327, at *16

("Newsgathering, observing government conduct, and protest are each considered paradigmatic

protected activities.").  Further, the evidence before the Court indicates that individuals have

been hit with less lethal munitions, gassed, pepper sprayed, threatened with arrest for recording

and observing, tackled, and had guns pointed at them.  *See, e.g.*, Doc. 22-6 ¶¶ 9, 17–18; Doc. 22-

7 ¶¶ 7–9; Doc. 73-7 ¶¶ 14, 16, 19–20; Doc. 73-13 ¶ 5; Doc. 73-18 ¶ 11; Doc. 77-1 ¶¶ 17–25;

Doc. 140-2 ¶¶ 4–6; Doc. 140-2 at 7 (Ex. A at 1:11–2:09); Doc. 255 at 74:4–10, 96:15–97:21.  As

is clear from Plaintiffs' evidence, *see, e.g.*, Doc. 22-2 ¶¶ 33–41; Doc. 22-6 ¶¶ 23–24; Doc. 22-8

¶ 20; Doc. 22-19 ¶ 22; Doc. 73-16 ¶¶ 6–7; Doc. 94-3 ¶ 16; Doc. 140-2 ¶ 25; Doc. 255 at 52:17–

54:25, 61:3–13, 70:12–16, 73:7–13, 74:13–75:7, 84:18–22, 98:1–100:13, 105:3–14, 112:3–17,

115:24–117:1, 131:10–132:15, 147:2–25, 156:20–158:2, such actions "would likely deter a

person of ordinary firmness from continuing to engage in protected activity," *Surita v. Hyde*, 665

F.3d 860, 878 (7th Cir. 2011); *see L.A. Press Club*, 2025 WL 2658327, at *16 ("Neither can

Defendants meaningfully dispute that being subjected to rubber bullets, tear gas, pepper balls,

and other crowd control weapons would deter individuals of ordinary firmness from continuing

to engage in the protected activity."); *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 117 (D.

Minn. 2021) (agreeing that "dispersal orders, harassment, use of chemical agents and less-lethal

weapons, threats, detention, and arrests, would chill a person of ordinary firmness").

Finally, Plaintiffs have sufficiently suggested at this stage that they can meet the third

element of this claim, that their First Amendment activities were motivating factors in

Defendants' conduct.  Plaintiffs can establish proof of motive through either direct or

circumstantial evidence, including "suspicious timing, ambiguous oral or written statements, or

behavior towards or comments directed at other [people] in the protected group."  *Kidwell v.

Eisenhauer*, 679 F.3d 957, 965–66 (7th Cir. 2012) (quoting *Long v. Teachers' Ret. Sys. of Ill.*,

585 F.3d 344, 350 (7th Cir. 2009)); *see Cosby v. Rodriquez*, 711 F. Supp. 3d 983, 1005 (N.D. Ill.

2024) (inferring motivation where police officers insulted and used excessive force against

peaceful protesters "who were protesting *police violence*"); *Abay v. City of Denver*, 445 F. Supp.

3d 1286, 1292 (D. Colo. 2020) ("[I]t also seems likely that [police officers'] actions were motivated by the content of plaintiffs' demonstrations against police violence."); *L.A. Press Club*, 2025 WL 2658327, at *17 ("Defendants' excessive and indiscriminate response evinces strong and persuasive evidence of retaliatory intent.").

Plaintiffs have provided such evidence here, including public statements made by Defendants regarding protesters. For example, Secretary Noem admonished agents at Broadview to go hard against people for "the way that they're talking, speaking, who they're affiliated with, who they're funded with, and what they're talking about as far as consequences for what we're doing by protecting this country," statements that Bovino then echoed. Benny Johnson (@bennyjohnson), *supra*; *see also* Forbes Breaking News, *supra* (Noem stating that violence includes "doxing" and "videotaping" federal agents, including sharing "where they're out on operations"). President Trump has suggested that critical coverage of him is illegal and does not fall under free speech. Sentner, *supra*. Bovino suggested that "someone step[ping] in the way . . . may not work out well for them." Doc. 190-6 at 8–9. Agents also have made comments about protesters, for example, noting during the East Chicago incident that "[y]ou can't reason with these people, they're nuts." Axon Body 4 Video 2025-10-14 1130 D01A41408 at 1:03:48–52. In East Chicago, BWC video shows a CBP agent shooting directly at a peaceful protester who had been yelling and holding a sign stating, "Know Your Rights." Axon_Body_4_Video_2025-10-14_1251_D01A30574 at 50:08–50:10. In Little Village, after Gentry shouted at agents that he was a "combat veteran who served [his] country, and what [agent were] doing is the opposite," an agent pointed his gun out the window and said "bang bang," followed by something approximating "you're dead, liberal." Doc. 94-4 ¶¶ 9–10.

Further, as detailed in the Court's factual findings, agents have used excessive force in response to protesters' and journalists' exercise of their First Amendment rights, without justification, often without warning, and even at those who had begun to comply with agents' orders. *See, e.g.*, Doc. 22-22 ¶¶ 9–11; Doc. 22-23¶¶ 8, 10–12; Doc. 73-14 ¶¶ 18–19; Doc. 73-15 ¶¶ 9–14; Doc. 73-18 ¶¶ 10–11. While the Court acknowledges that some unruly individuals have been present during these gatherings, their presence among "peaceful protestors, journalists and legal observers does not give Defendants a blank check to employ unrestricted use of crowd control weapons," and, in many of the instances in which agents deployed less lethal munitions, they did not direct the force anywhere near such bad actors. *See L.A. Press Club*, 2025 WL 2658327, at *17. The Court also does not find persuasive Defendants' argument that the fact that agents refrained from using less lethal munitions in some situations where agents encountered protesters indicates a lack of retaliatory motive. Agents' "use of indiscriminate weapons against all protesters—not just the violent ones—supports the inference that federal agents were substantially motivated by Plaintiffs' protected First Amendment activity." *Id.* at *18 (quoting *Black Lives Matter Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1214 (W.D. Wash. 2020) (internal quotation marks omitted). The record before the Court, therefore, suggests that Plaintiffs are likely to succeed on the merits of their First Amendment retaliation claim.

## C. Free Exercise and RFRA

The First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. "The Free Exercise Clause prohibits the government from 'plac[ing] a substantial burden on the observation of a central religious belief or practice' without first demonstrating that a 'compelling governmental interest justifies the

burden.'" *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 631 (7th Cir.

2007) (alteration in original) (citation omitted).  But "laws incidentally burdening religion are

ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral

and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021).

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or

restricts practices because of their religious nature," while a law is generally applicable if it does

not "'invite[ ]' the government to consider the particular reasons for a person's conduct by

providing 'a mechanism for individualized exemptions.'" *Id.* (quoting *Emp. Div., Dep't of Hum.

Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990)).

The RFRA prohibits the federal government "from imposing substantial burdens on

religious exercise, absent a compelling interest pursued through the least restrictive means."

*Tanzin v. Tanvir*, 592 U.S. 43, 45 (2020); *see* 42 U.S.C. § 2000bb-1.  In passing the RFRA,

Congress sought to "create[ ] a broad statutory right," *Korte v. Sebelius*, 735 F.3d 654, 671 (7th

Cir. 2013), that "provide[s] greater protections for religious exercise than is available under the

First Amendment," *Holt v. Hobbs*, 574 U.S. 352, 357 (2015).  Under the RFRA's burden-shifting

framework, "[o]nce a RFRA claimant makes a prima facie case that the application of a law or

regulation substantially burdens his religious practice, the burden shifts to the government to

justify the burden under strict scrutiny." *Korte*, 735 F.3d at 673 (citing *Gonzales v. O Centro

Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006)).

Earlier this year, the Seventh Circuit, analyzing a line of relevant Supreme Court cases,

identified three ways a plaintiff can prove a government policy or act substantially burdens their

religious practice: if the governmental policy or act "(1) compelled them to perform acts

undeniably at odds with fundamental tenets of [their] religious beliefs, (2) put[ ] substantial

pressure on [them] to modify [their] behavior and to violate [their] beliefs, or (3) bears direct, primary, and fundamental responsibility for rendering [a] religious exercise effectively impracticable." *Soc'y of Divine Word v. U.S. Citizenship & Immigr. Servs.*, 129 F.4th 437, 450 (7th Cir. 2025) (quoting *Korte*, 735 F.3d at 682) (internal quotation marks omitted). "In assessing whether a burden is substantial, we 'focus[ ] primarily on the intensity of the coercion applied by the government' and not the centrality of the religious practice in question." *West v. Radtke*, 48 F.4th 836, 845 (7th Cir. 2022) (quoting *Korte*, 735 F.3d at 683).

Rev. Black, Rev. Holcombe, Rev. Johnson, Fr. Curran, and the religious exercise sub-class argue that they are likely to succeed on a RFRA claim because Defendants' use of violent force against people peacefully praying, including clergy members and lay practitioners alike, substantially burdens their exercise of religion. Plaintiffs contend that Defendants have engaged in a policy, pattern, and practice of targeting people visibly engaged in prayer and other religious exercise with pepper balls, tear gas, and other physical violence without provocation. In support, Plaintiffs have submitted declarations and testimony from Rev. Black, Rev. Holcombe, Rev. Johnson, Fr. Curran, and others describing Defendants' targeted actions against religious practitioners, including shooting pepper balls and other projectiles at Rev. Black and Rev. Holcombe while they prayed outside the Broadview facility. *See, e.g.*, Doc. 22-1 ¶¶ 4–6 (Rev. Black describing Defendants (1) shooting him with multiple pepper balls, including to the head; (2) pushing and shoving him; and (3) spraying him directly in the face with liquid chemicals); Doc. 22-3 ¶¶ 5–11 (Rev. Johnson describing Defendants deploying tear gas, pepper balls, and rubber bullets against religious groups praying and singing hymns); Doc. 22-17 ¶¶ 10 (journalist describing Defendants firing "less-lethal" munitions at clergy praying); Doc. 73-14 ¶¶ 18–19

(Rev. Holcombe describing how an agent began shooting projectiles at her as she prayed for him).

Further, Plaintiffs argue that Defendants' actions force the religious exercise sub-class to choose between their health and safety on the one hand or authentically practicing their faith on the other. For example, Father Curran has restricted whom he invites to join prayer vigils at Broadview and stopped using the vigils as an opportunity to provide religious education to Catholic students because of the high risk of violence. Doc. 22-2 ¶¶ 33–40; Doc. 255 at 22:17-23:21. Rev. Johnson had to leave a gathering at the Broadview facility because she has asthma and the pepper balls and tear gas affected her ability to breath, which continued for days. Doc. 22-3 ¶¶ 7, 12. Rev. Holcombe indicates that members of her congregation, as well as other clergy members, have told her that they will not go to Broadview to express their faith and protest "because of the fear of violence." Doc. 73-14 ¶ 25. While Defendants claim that their "attempts to manage protests at the Broadview facility" only "restricted 'one of a multitude of means' by which Plaintiffs could practice their religious beliefs," Doc. 173 at 56 (quoting *Henderson v. Kennedy*, 253 F.3d 12, 15 (D.C. Cir. 2001)), the Court finds this unpersuasive here, where Defendants have not suggested how Rev. Black, Rev. Holcombe, Rev. Johnson, Fr. Curran, and the religious exercise sub-class interfered with their alleged "efforts to control chaotic and often violent protests," *id.* This alleged coercion suffices to show that Plaintiffs are likely to establish that Defendants have substantially burdened the religious exercise sub-class' religious practice. *See West*, 48 F.4th at 845 (holding substantial burden occurs when the government "attaches some meaningful negative consequence to [a person's] exercise of religious exercise, forcing him to choose between violating his religion and incurring that negative consequence").

Because Rev. Black, Rev. Holcombe, Rev. Johnson, Fr. Curran, and the religious exercise sub-class are likely to show a substantial burden, the Court then considers whether Defendants will be able to demonstrate that their policy, pattern, and practice of using force against people praying or otherwise practicing their religion "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1. The compelling interest test generally requires a "high degree of necessity." *Ent. Merchs. Ass'n*, 564 U.S. at 804. The government must "identify an 'actual problem' in need of solving, and the curtailment of [the right] must be actually necessary to the solution." *Id.* at 799 (citations omitted). In the free exercise context, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). As discussed above, the Court recognizes that Defendants have a compelling interest in protecting federal property, personnel, and governmental functions. But even assuming this, the Court does not find it likely that the government can carry its burden to demonstrate that its unprovoked use of force against Rev. Black, Rev. Holcombe, Rev. Johnson, and others engaged in religious exercise is the least restrictive means of furthering this governmental interest. The record is replete with evidence of Defendants using less lethal force against religious personnel. As discussed, Defendants have targeted Rev. Black, visibly attired in clerical garb, with multiple pepper ball shots, including in the head, *see* Doc. 22-1 ¶¶ 2, 5, and have fired tear gas, pepper balls, and rubber bullets against religious groups praying and singing hymns, Doc. 22-3 ¶¶ 9, 11. Certainly, less restrictive means exist to protect federal property, personnel, and governmental functions, particularly given the peaceful nature of Rev. Black's, Rev. Holcombe's, Rev. Johnson's, Fr. Curran's, and others' exercise of their religion.

Accordingly, the Court finds that Rev. Black, Rev. Holcombe, Rev. Johnson, Fr. Curran, and the religious exercise sub-class have shown that they are likely to succeed on their RFRA claim.[73]

### D.    Fourth Amendment[74]

Plaintiffs contend that Defendants' actions constitute excessive force in violation of the Fourth Amendment. "Excessive force is a form of unreasonable seizure in violation of the Fourth Amendment." *Tate v. City of Chicago*, No. 19 C 7506, 2020 WL 6715660, at *4 (N.D. Ill. Nov. 16, 2020). These types of claims "are evaluated based on whether the officer's actions were objectively reasonable under the circumstances." *Watson v. Fulton*, No. 15 C 11559, 2020 WL 1248678, at *6 (N.D. Ill. Mar. 16, 2020) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "[C]ourts give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations," but "[that] latitude ends . . . when police officers employ force that is clearly excessive or unreasonable under the circumstances." *Baird v. Renbarger*, 576 F.3d 340, 342 (7th Cir. 2009). Reasonableness "must be judged from the perspective of a reasonable officer on the scene" and not on hindsight. *Graham*, 490 U.S. at 396. The "proper application [of the standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an

---

[73] Because the RFRA potentially provides greater protections than the First Amendment's free exercise clause, the Court finds it unnecessary to address the likelihood of success with respect to the free exercise claim at this time.

[74] Plaintiffs also advance a Fourth Amendment claim based on arrests without probable cause. The Court does not reach this theory at this time and so does not base its preliminary injunction order on this theory. That said, the Court notes that, again, Defendants appear to be operating under a mindset of "act first, justify later." With respect to making arrests without probable cause, the information that Defendants provided to the Court about arrests that CBP made between September 2 and October 29, 2025 that do not directly relate to an immigration enforcement violation bear this out. Doc. 191-12. Of the ninety-two arrests listed, all but two individuals remained in custody at the time of filing, with those two in custody for immigration-related reasons. *Id.* Twenty-six received violation notices, four have pending misdemeanor charges against them, and six have pending felony charges. *Id.* Defendants reported that they have pending investigations as to twenty-six of the arrested individuals, while thirty individuals had charges either declined or dismissed. *Id.*

immediate threat to the safety of others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

Plaintiffs have shown a likelihood of success on their Fourth Amendment excessive force claim. Initially, Defendants argue that the proper standard is the Fourteenth Amendment shocks the conscience standard for substantive due process, not the Fourth Amendment, because agents have not seized any individuals. But the Court disagrees. A seizure occurs under the Fourth Amendment when an officer "by means of physical force or show of authority has in some way restrained the liberty of a citizen." *Duran v. Sirgedas*, 240 F. App'x 104, 110 (7th Cir. 2007). The application of physical force need not stop the person in order to constitute a seizure. *Torres v. Madrid*, 592 U.S. 306, 311–12, 325 (2021). "The appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context." *Id.* at 317. The seized person's subjective perceptions also are not relevant. *Id.*

As discussed above, Plaintiffs presented declarations and evidence that federal agents deployed tear gas, pepper balls, rubber bullets, flashbang grenades, and other munitions against and physically assaulted peaceful protesters. Defendants maintain that agents undertook these measures to disperse unruly crowds, not restrain them, meaning no seizure could have occurred. *See Puente v. City of Phoenix*, 123 F.4th 1035, 1052 (9th Cir. 2024) ("[A]n application of force with an objective intent merely to *disperse* or *exclude* persons from an area—and *without* any measures objectively aimed at detaining or confining them in the process—does not involve the necessary 'intent to *restrain*' that might give rise to a 'seizure.'"). But the evidence in the record calls Defendants' characterization of the agents' use of force into question.

The Court may consider the "design, intent, and use of munitions" in "determining whether deployment manifests an objective intent to restrain." *Cheairs v. City of Seattle*, 145 F.4th 1233, 1241 (9th Cir. 2025). The ICE use of force policy treats the "use of impact weapons to strike the neck or head" and "strangulation techniques, including chokeholds or carotid restraints," as deadly force. Doc. 191-11 § 5.5(3); *see also* Doc. 35-10 § 3.B.1.a (CBP use of force policy prohibits the use of "choke-holds, neck restraints, and/or any other restraint technique that applies prolonged pressure to the neck that may restrict blood flow or air passage, . . . absent circumstances where deadly force would be objectively reasonable"); Doc. 173-3 § III.C.2 (DHS use of force policy prohibiting the use of chokeholds and carotid restraints unless deadly force is authorized). Similarly, the CBP use of force policy provides that, in using compressed air launchers, agents should not "intentionally target the head, neck, spine, or groin of the intended subject, unless the use of deadly force is reasonable," Doc. 35-10 at § 3.B.7.g, and they also should not "intentionally target the head, neck, groin, spine, or female breast" when using less-lethal specialty impact-chemical munitions, like tear gas canisters, *id.* § 3.B.8.d. Agents may use compressed air launchers as a kinetic impact delivery system on those demonstrating assaultive resistance. *Id.* § 3.B.7.b. CBP's use of force policy also indicates that flashbang grenades are intended to "momentarily disorient and confuse subjects and give agents a brief tactical advantage." *Id.* § 3.B.9.

In this case, for example, at Broadview, agents threw tear gas canisters in front of and behind protesters, as well as deployed flashbang grenades, which caused protesters to become disoriented and prevented them from leaving because they were trapped by tear gas. *See, e.g.*, Doc. 22-1 ¶ 6 (Rev. Black describing agents engaging in a kettling maneuver by, among other things, "deploy[ing] canisters of chemical weapons indiscriminately," spraying chemicals at him

and others, pushing and shoving protesters, and brandishing weapons); Doc. 22-6 ¶¶ 16–19

(Paulson describing becoming blocked in by the deployment of flashbang grenades and tear gas

canisters both in front of and behind him); Doc. 22-32 ¶ 42 (Kerlikowske noting that "the federal

agents deployed tear gas in a manner that at the same time blocked many demonstrators' ability

to retreat, forcing them into greater risk of physical confrontation with federal agents").  In

Logan Square, an agent threw tear gas, and other agents launched other less lethal munitions, at a

motorcyclist stopped in front of agents' vehicle, with the use of tear gas and other chemical

irritants at least temporarily freezing the motorcyclist in place.  *See, e.g.*, Doc. 173-2 ¶ 35; Doc.

190-14 (Ex. 133, available at https://spaces.hightail.com/space/4VxbTIA8CM at 0:22–0:27).  At

Broadview and in Little Village, agents shot projectiles directly at protesters, the press, and

religious practitioners.  *See, e.g.*, Doc. 22-1 ¶¶ 5 (Rev. Black describing being hit seven times on

his head, face, arms, and torso with pepper balls); Doc. 22-8 ¶ 9–12 (Kunkel describing how an

agent shot her with a pepper ball); Doc. 22-17 ¶ 9 (Geary describing how an agent shot her

directly in the face with pepper bullets); Doc. 73-20 ¶¶ 4, 12 (Vaughan, who has limited

mobility, describing how she could not get up after being hit with a projectile outside the

Broadview facility); Doc. 94-3 ¶ 6 (Bahena explaining that an agent without warning shot him

from five feet away with a pepper ball aimed at his neck).  Agents also tackled protesters,

placing some in headlocks or chokeholds, as well as kneeing and punching others.  *See, e.g.*,

Doc. 118-1 ¶ 7 (describing agents pushing a man to the ground and putting him in a headlock in

Old Irving Park); Doc. 174 ¶¶ 3–4 (describing an agent pepper spraying and tackling a citizen in

Aurora who was retreating from the agent's vehicle, as ordered);  Doc. 188-1 ¶¶ 14, 18, 23, 25

(describing agents wrestling a young man to the ground, sitting on him, bashing his head into the

ground, and punching him in Evanston); Doc. 255 at 61:17-63:11 (Muñoz testifying that after he

was tackled, agents held him for approximately eight hours and never told him he was free to leave).

In light of this evidence, the Court finds that Plaintiffs have made a strong showing that agents' uses of force objectively manifested an intent to restrain or confine protesters. Defendants took direct aim at protesters, including at areas of the body that their own agency policies indicate should only be targeted if deadly force is authorized, suggesting an intent to incapacitate. *See, e.g.*, *Cheairs*, 145 F.4th at 1241 ("A reasonable fact finder could certainly decide that a device like a pepperball was designed to incapacitate."); *Sanderlin v. Dwyer*, 116 F.4th 905, 913 (9th Cir. 2024) (concluding that a reasonable factfinder could find an officer showed an objective intent to restrain the plaintiff when he used a 40mm launcher to fire a foam baton round at the plaintiff's groin, a method of force that, "by its nature, [is] intended to incapacitate its target"); *Nelson v. City of Davis*, 685 F.3d 867, 874, 877 (9th Cir. 2012) (use of pepper balls to clear partygoers from apartment complex constituted seizure where police officers launched them directly at the partygoers and caused at least the plaintiff to immediately collapse).[75] Even the manner in which agents deployed tear gas and other less lethal devices in many instances shows an objective intent to restrain or confine, with agents indiscriminately throwing tear gas canisters and pepper balls or shooting pepper balls at a crowd or both in front of and behind a crowd, leaving protesters with little ability to escape and sometimes even pushing them back toward the agents. *See Cheairs*, 145 F.4th at 1242 ("Throwing a blast ball grenade into a crowd would also be less likely to create space between the protesters and the police line because, for people standing near the front of a crowd, moving *away* from a cloud of

---

[75] After *Torres*, the Ninth Circuit explained that it would have reached the same result in *Nelson* because the officers "objectively manifested an intent to restrain by firing projectile pepperballs into the crowd, knowing there was a significantly high risk that one such projectile could strike and incapacitate a member of the group." *Sanderlin*, 116 F.4th at 917 n.2.

pepper spray emerging behind them would require moving *toward* the police line.  Had the blast

ball been deployed overhand and into the crowd, rather than into the space *between* the crowd

and the police line, the use would not be consistent with an objective intent to push the crowd

back and away from the police.").  The fact that these seizures in many cases were temporary

does not matter, for "brief seizures are seizures all the same."  *Torres*, 592 U.S. at 318.  Nor does

the fact that some of the uses of force came in the course of agents attempting to disperse

protesters, given that agents used force that objectively manifests an intent to detain or confine.

*See Puente*, 123 F.4th at 1053 (noting that a seizure could occur where, "in the course of

accomplishing such an intended dispersal or exclusion, a person uses measures that objectively

aim to detain or confine another person").  Therefore, the Court finds it appropriate to address

Plaintiffs' claims under the Fourth Amendment.

Under the Fourth Amendment, based on the record before it, the Court sees little

justification for the extent of the use of force that federal agents have used against Plaintiffs and

other peaceful protesters, journalists, and religious practitioners.  Pointing guns, pulling out

pepper spray, throwing tear gas, shooting pepper balls, and using other less lethal munitions do

not appear to be appropriate uses of force in light of the totality of the circumstances.  *See*

*Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009) ("[O]fficers may not, without

provocation, start beating, pepper-spraying, kicking, and otherwise mistreating people standing

around a restaurant parking lot (even in the middle of the night)."); *Duran*, 240 F. App'x at 112–

113 (use of pepper spray could be considered excessive force if used without justification, noting

that "[a]ssaulting citizens who are safely detained without any provocation violates clearly

established constitutional principles"); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)

("[P]olice officers do not have the right to shove, push, or otherwise assault innocent citizens

without any provocation whatsoever."); *Nelson*, 685 F.3d at 879–83 (use of projectile filled with pepper spray was unreasonable where the plaintiff posed no visible threat and did not demonstrate an unwillingness to comply with officers' orders). This is particularly cause for concern given that Plaintiffs' evidence suggests that agents used force indiscriminately rather than in a targeted manner. *See, e.g.*, Axon Body 4 Video 2025-10-14 1151 D01A49557 at 1:19:37–1:19:40 (an agent commenting about deploying tear gas in East Chicago, stating, "Yeah, I'll drop 'em everywhere. But I need two more cans. I only got three on me."); *id.* at 1:48:07– 1:49:20 (agents continuing to deploy additional canisters of tear gas even after crowds had begun dispersing, with some canisters thrown directly at peaceful observers simply standing on the sidewalk).

Finally, even if Plaintiffs' claim should instead be analyzed as an alleged substantive due process violation under the Fourteenth Amendment, the Court would find that Plaintiffs are likely to succeed in establishing that federal agents' use of force shocks the conscience. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). "Substantive due process claims can address harmful, arbitrary acts by public officials." *Geinosky v. City of Chicago*, 675 F.3d 743, 750 (7th Cir. 2012). While Defendants argue that they used less lethal force as a de-escalation technique to reduce the risk of harm to both agents and the public, Plaintiffs have marshaled ample evidence that agents intended to cause protesters harm and that no legitimate governmental interest justified their actions. *See Lewis*, 523 U.S. at 849 ("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). For example, repeatedly shooting pepper balls or pepper spray at clergy members shocks the conscience. *See, e.g.*, Doc. 22-1 ¶¶ 5 (Rev. Black describing being hit seven times on his head, face, arms, and torso with pepper balls); Doc. 73-14

¶¶ 18–19 (Rev. Holcombe describing how an agent began shooting projectiles at her as she prayed for him). Tear gassing expectant mothers, children, and babies shocks the conscience. Doc. 73-8 ¶¶ 10, 13–14 (Garcia helping his four-year old daughter and a woman with her baby escape tear gas in East Chicago); Doc. 118-1 ¶¶ 2, 14 (tear gas deployed in Old Irving Park while neighborhood prepared for an annual Halloween parade, prompting the parade to be canceled and activities to remain on school grounds); Doc. 255 at 49:13–16 (Ramirez, herself eight and a half months pregnant at the time, testifying that there were kids on the scene when agents deployed tear gas in Brighton Park). Shooting a pepper ball at a protester from about five feet away shocks the conscience. Doc. 94-3 ¶¶ 11–12; Axon_Body_4_Video_2025-10-23_1052_D01A4063B at 15:23–15:37; *see also* Axon_Body_4_Video_2025-10-14_1251_D01A30574 at 50:08–50:10 (shooting directly at a peaceful protester holding a "Know Your Rights" sign). Pointing a gun at someone for exercising their First Amendment rights shocks the conscience. *See, e.g.*, Doc. 73-11 ¶ 14 (picture of an agent pointing a pepper ball launcher at a man holding his phone up in East Chicago); Doc. 77-1 ¶ 20 (agent pointing a gun at Munchak's head, presumably for videotaping an arrest of a landscaper); Doc. 188-3 ¶ 7 (agent pulling his gun and pointing it directly at someone recording him); Doc. 255 at 68:15–69:1 (agent pointed a gun at Cortez for recording agents and informing arrested individuals of their rights in Spanish). Videotaping while driving into concerned neighbors standing in the street shocks the conscience, particularly when the agent later explains it just happened despite "driving slowly." Axon_Body_4_Video_2025-10-12_1332_D01A2669A at 7:50–8:10; Axon_Body_3_Video_2025-10-12_1337_X60AB340G at 2:32–2:40, 4:00–4:14. Tackling someone dressed in a duck costume to the ground and leaving him with a traumatic brain injury, and then refusing to provide any explanation for the action, shocks the conscience. Doc. 190-3

¶¶ 5–6, 9; Doc. 118-1 ¶ 7; Axon_Body_4_Video_2025-10-25_1045_D01A38582 at 9:14–9:20;
*see also* Doc. 188-1 ¶¶ 18, 23–25 (agents in Evanston kneeling on the back of a young man,
bashing his head on the street, and punching his head).  Because Plaintiffs likely can show that
Defendants engaged in gratuitous uses of force untethered to any legitimate law enforcement
purposes, the Court finds that treating Plaintiffs' claim under the Fourteenth instead of the Fourth
Amendment makes no difference to the outcome.  *Cf. Puente*, 123 F.4th at 1056 (concluding that
the use of chemical irritants and flashbang grenades to disperse a crowd was "not so gratuitous as
to give rise to a reasonable inference that it was applied for the purpose of inflicting harm rather
than for the 'legitimate law enforcement objectives' of 'self-protection, and protection of the
public,' particularly "given the undisputed record evidence about the officers' overall restrained
management of the protest" before deciding to use less lethal munitions to disperse the crowd).

## II.   Irreparable Harm/Inadequate Remedy at Law

Having found that Plaintiffs have demonstrated a likelihood of success on their claims,
the Court next considers whether Plaintiffs have shown irreparable harm and that they have an
inadequate remedy at law as to each of their claims.

### A.   First Amendment and the RFRA

The "loss of First Amendment freedoms, for even minimal periods of time,
unquestionably constitutes irreparable injury."  *Alvarez*, 679 F.3d at 589 (quoting *Elrod v. Burns*,
427 U.S. 347, 373 (1976) (plurality opinion)).  Accordingly, "[u]nder Seventh Circuit law,
irreparable harm is presumed in First Amendment cases."  *Int'l Ass'n of Fire Fighters, Loc. 365
v. City of E. Chicago*, 56 F.4th 437, 450–51 (7th Cir. 2022) (citing *Christian Legal Soc'y v.
Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).  Also, "[a]lthough the claim is statutory, RFRA
protects First Amendment free-exercise rights," so courts apply the First Amendment irreparable

harm analysis to RFRA claims. *Korte*, 735 F.3d at 666. Moreover, quantifying a First

Amendment injury "is difficult and damages are therefore not an adequate remedy." *Flower Cab*

*Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982).

Because the Court concludes that Defendants' conduct likely violates the First

Amendment and the RFRA, Plaintiffs have established they will suffer irreparable harm and that

they have an inadequate remedy at law if the Court does not issue a preliminary injunction. *See*

*Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 992 (N.D. Ill. 2025) (finding that the

plaintiff made a sufficient showing of irreparable harm because plaintiff established a likelihood

of success on the merits of its First Amendment claim).

## B.    Fourth Amendment

A Fourth Amendment violation stemming from an illegal search or seizure does not

presumptively cause irreparable harm or suggest an inadequate remedy at law because it is a

"constitutional tort" analogous to a "personal-injury" claim where money damages will be

awarded. *Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004). An "[i]nadequate remedy at

law does not mean wholly ineffectual," however, although "the remedy must be seriously

deficient as compared to the harm suffered." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th

Cir. 2003). Here, Plaintiffs have shown irreparable harm because of the ongoing nature of the

alleged violation of their Fourth Amendment rights, with monetary damages insufficient to

compensate them for the repetitive constitutional violations. *See Campbell*, 373 F.3d at 835

(noting that the right party to bring suit for injunctive relief for Fourth Amendment violations is

someone to whom "the same events are likely to happen again"); *Preston v. Thompson*, 589 F.2d

300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes

proof of an irreparable harm, and its remedy certainly would serve the public interest." (citing

*Burns v. Elrod*, 509 F.2d 1133 (7th Cir. 1975), *aff'd*, 427 U.S. 347 (1976))); *see also Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (collecting cases); *Back v. Carter*, 933 F. Supp. 738, 754 (N.D. Ind. 1996) ("'When violations of constitutional rights are alleged, further showing of irreparable injury may not be required' if what is at stake is not monetary damages." (quoting *Milwaukee Cnty. Pavers Ass'n v. Fiedler*, 707 F. Supp. 1016, 1032 (W.D. Wis. 1989), *modified on other grounds*, 710 F. Supp. 1532)). The Court acknowledges that some limited legal remedies exist under the Federal Tort Claims Act, 28 U.S.C. § 2680(h), and *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971) for at least some Fourth Amendment violations, but given their limited nature, the Court does not find that their existence precludes injunctive relief.

### III. Balance of Harms/Public Interest

Next, the Court "weigh[s] the harm the denial of the preliminary injunction would cause the plaintiff[s] against the harm to the defendant[s] if the [C]ourt were to grant it." *Mays*, 974 F.3d at 818. "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Id.* "When the government is a party, the balance of equities and the public interest factors merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Generally, Defendants argue that the public has an interest in ensuring public safety and order, as well as preventing attacks on federal property and personnel. But Defendants have not explained how the preliminary injunction would preclude them from protecting these interests, particularly where the order does not prevent agents from responding to actual violence or threats of violence. Moreover, while the public does have an interest in public safety and order, it also has an interest in bodily integrity, the right to peaceful protest, the right to assemble, the right to

a free press, and the right to peaceful free exercise of religion. Moreover, "the public has a strong interest in having a [government] that conducts itself fairly and according to its stated regulations and policies." *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D. Haw. 1995); *see also Eight N. Indian Pueblos Council, Inc. v Kempthorne*, No. CV 06-745, 2006 WL 8443876, at *5 (D.N.M. Sep. 15, 2006) ("It is in the public interest that federal agencies comply with their own policies and with federal statutes.").

Defendants have also argued that the order would enjoin or restrain their "implementation and enforcement of the immigration laws governing the inspection, apprehension, examination and removal of aliens." Doc. 173 at 37 (citation omitted). While Defendants make this argument only with regard to jurisdiction, the Court nevertheless finds it necessary to address in the context of the balance of harms because the Supreme Court has indicated that the government "suffers a form of irreparable injury" where it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Vasquez Perdomo*, 2025 WL 2585637, at *3 (Kavanaugh, J., concurring) (citing *Trump v. CASA, Inc.*, 606 U.S. 831, 835 (2025)). Fundamentally, however, Defendants' argument misses the mark. The order here clearly does not enjoin Defendants from effectuating statutes or enforcing the law, as no law allows Defendants to indiscriminately use force against non-violent protesters, observers, reporters, and/or religious practitioners. *See Vasquez Perdomo*, 2025 WL 2585637, at *13 n.12 (Sotomayor, J., dissenting) ("At the outset, this TRO plainly does not enjoin the Government from effectuating any statute. No statute authorizes the Government to stop individuals based on these four factors alone."). Rather, the order simply requires Defendants to comply with the Constitution and their own stated policies, which Defendants can—and should—do during the implementation and enforcement of immigration laws. This does not constitute irreparable harm.

*See Exodus Refugee Immigr., Inc. v. Pence*, 165 F. Supp. 3d 718, 740 (S.D. Ind.) ("[I]t is difficult to conceive of how an injunction requiring [a party] to comply with the Constitution could be harmful."), *aff'd*, 838 F.3d 902 (7th Cir. 2016). And the public has a clear interest in ensuring that Defendants implement and enforce immigration laws in a manner that complies with the Constitution. *See Mehrdad v. Noem*, No. 3:25CV337, 2025 WL 2497988, at *4 (N.D. Ind. Apr. 24, 2025) ("The public has every right to care deeply about the enforcement of duly-enacted and constitutional immigration laws. But the same vigor that might reasonably voice support for enforcement of these laws should equally call out the government when it oversteps its authority[.]").

Specifically with respect to the First Amendment and the RFRA, once the moving party establishes a likelihood of success on the merits in First Amendment cases, the balance of harms "normally favors granting preliminary injunctive relief" because "injunctions protecting First Amendment freedoms are always in the public interest." *Alvarez*, 679 F.3d at 590 (quoting *Christian Legal Soc'y*, 453 F.3d at 859). And just as with irreparable harm, the same analysis applies to Plaintiffs' RFRA claim. *See Korte*, 735 at 666 (applying First Amendment balancing analysis to a RFRA claim). Because Defendants' conduct likely violates the First Amendment and the RFRA, the balance of equities on these two claims weighs in favor of a preliminary injunction. *See Chicago Women in Trades*, 778 F. Supp. 3d at 993 (finding the balance of harms and public interest weighed in favor of granting a preliminary injunction because "injunctions protecting the First Amendment freedoms are always in the public interest" (quoting *Alvarez*, 679 F.3d at 589)).

The balance of equities also favors Plaintiffs with respect to their Fourth Amendment claim because, without a preliminary injunction, they will be subject to Defendants' ongoing

violation of their Fourth Amendment right to be free from excessive force, and when courts

uphold constitutional rights, that serves the public interest. *See Gutierrez v. City of E. Chicago*,

No. 2:16-CV-111, 2016 WL 5819818, at *3 (N.D. Ind. Sep. 6, 2016) (finding the balance of

harms favored the plaintiff because, without injunctive relief, "she will be faced with an ongoing

violation of her [Fourth Amendment] right to be free from warrantless criminal searches; and the

public interest is served when constitutional rights are upheld"), *report & recommendation

adopted*, 2016 WL 5816804 (N.D. Ind. Oct. 5, 2016).  Nonetheless, the government argues that

Fourth Amendment decisions are too fact-sensitive to allow for injunctive relief.  *See* Doc. 173 at

65–66 ("'[I]t is difficult for a court to pronounce how the Fourth Amendment might apply to a

general set of facts,' because that would require 'predict[ing] all of the factual scenarios that

might arise and answer[ing] exactly how the Fourth Amendment would apply to all of them.'"

(alterations in original) (quoting Orin S. Kerr, The Limits of Fourth Amendment Injunctions, 7 J.

Telecomm. & High Tech. L. 127, 133 (2009))).  While the Court acknowledges that the Fourth

Amendment does involve fact-specific determinations, where, as here, agents indiscriminately

use force untethered to a specific threat that they perceive and fail to conduct an individualized

assessment as to the appropriate use of force based on the facts facing the agents on the ground,

an injunction ordering agents to make the individualized assessments that the Constitution

requires them to make cannot harm Defendants.  *See Exodus Refugee Immigr., Inc.*, 165 F. Supp.

3d at 740 ("[I]t is difficult to conceive of how an injunction requiring [a party] to comply with

the Constitution could be harmful.").

Therefore, the Court finds that Plaintiffs have satisfied the requirements for entry of a

preliminary injunction with respect to their First Amendment, First Amendment retaliation,

RFRA, and Fourth Amendment excessive force claims.  The Court now turns to the scope and workability of the relief that Plaintiffs seek.

## IV.    Scope of Relief[76]

### A.    Jurisdiction

Defendants argue that the Court should deny Plaintiffs' motion because the Court lacks jurisdiction to enjoin DHS' immigration enforcement operations.  Specifically, Defendants point to Section 1252(f)(1) of the Immigration and Nationality Act ("INA"), which provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain the operation of [§§ 1221–1232]*, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1) (emphasis added).  The Supreme Court has explained that this provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions."  *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).  However, this provision does not "categorically insulate immigration enforcement from 'judicial class-wide injunctions.'"  *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 812 (9th Cir. 2020).

To trigger § 1252(f)(1)'s bar, a classwide injunction must directly enjoin or restrain the operation of the specified statutory provisions, §§ 1221–1232.  A classwide injunction that only collaterally impacts the operation of the specified statutory provisions will not implicate § 1252(f)(1).  *See, e.g.*, *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 209–10 (5th Cir.

---

[76] To the extent that Defendants merely incorporated arguments by reference that they had made in their opposition to the motion for TRO, *see* Doc. 173 at 66, the Court refers back to its order addressing these arguments, Doc. 43 at 9–11.

2024) (holding that "§ 1251(f)(1) of the INA does not bar the injunction Texas seeks" because "Texas does not seek to enjoin the operation of any of the provisions listed in § 1252(f)(1)" and the requested injunction "would, at most, have only a 'collateral effect on the operation' of the covered statutes"); *Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1233 (9th Cir. 2007) (affirming district court's conclusion that § 1252(f)(1) did not bar injunction because it was "one step removed" from the specified statutory provisions); *L.G.M.L. v. Noem*, No. CV 25-2942, 2025 WL 2671690, at *11 (D.D.C. Sep. 18, 2025) ("[A]ny potential 'collateral effect[s]' on a covered provision would not implicate § 1252(f)(1)."); *Flores v. Bondi*, No. CV 85-4544, 2025 WL 2633183, at *5 (C.D. Cal. Aug. 15, 2025) ("Court's enforcement of the FSA has only 'some collateral effect on the operation of [the] covered provision[s],' which does not amount to 'enjoin[ing] or restrain[ing]" the Government's ability to carry out sections 1225, 1226, or 1231.'"); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306, 2025 WL 1825431, at *53 (D.D.C. July 2, 2025) ("To the extent the relief that Plaintiffs seek . . . might have downstream effects on removal proceedings, those effects are merely incidental to Plaintiffs' permissible challenges . . . and such 'collateral effect[s]' do not trigger § 1252(f)(1).").

Here, Plaintiffs seek to (1) enjoin Defendants from violating their First and Fourth Amendment rights, and (2) require Defendants to have visible identification affixed to their uniforms and prominently displayed. *See* Doc. 80 at 62–63 (detailing specific relief). The only connection between this relief and § 1252(f)(1)'s specified statutory provisions is that Plaintiffs allege that Defendants violate their First and Fourth Amendment rights while they are observing, recording, and/or protesting immigration enforcement operations. Thus, to the extent that the requested injunctive relief would have any impact on the operation of the specified statutory provisions, such an effect would be entirely collateral in nature and not barred by § 1252(f)(1).

### B.   Universal Injunction

Defendants additionally argue that Plaintiffs improperly request a universal injunction and seek relief on behalf of nonparties.  In June 2025, the Supreme Court clarified that federal courts cannot issue universal injunctions, in other words, injunctions that "prohibit enforcement of a law or policy against *anyone*."  *CASA*, 606 U.S. at 837.  Pursuant to *CASA*, then, the Court must ensure that it does not issue an injunction "broader than necessary to provide complete relief to each plaintiff with standing to sue."  *Id.* at 861.  But this does not mean that the Court's injunction cannot incidentally benefit a nonparty.  *See id.* at 851.  Here, in awarding complete relief to Plaintiffs, the injunction will necessarily incidentally benefit other protesters, journalists, and religious figures present at protests.  Plaintiffs contend that Defendants have indiscriminately used force against them, even though they have not engaged in any violent or noncompliant actions.  Given the scale of the protests, Defendants likely cannot determine who among protesters, journalists, and religious practitioners is a Plaintiff in this case.  Moreover, Plaintiffs could not be assured that the injunction has any force if Defendants could engage in the crowd control tactics addressed in the injunction with respect to other protesters, journalists, or religious figures present near them, given the fact that, generally, these crowd control tactics are designed to have an impact beyond just one individual.  For this reason, the injunction does not violate *CASA*'s prohibition on universal injunctions, because the effects on nonparties are incidental to the need to provide complete relief to the named Plaintiffs.  *See Reps. Comm. for Freedom of the Press*, 147 F.4th at 733–34 (noting, without deciding, that "[t]o the extent the plaintiff media organizations rely on information and observations from ordinary citizens going about their day as source material for stories, enjoining the buffer law's enforcement statewide may be necessary to provide the *plaintiffs themselves* with complete relief"); *L.A. Press Club*, 2025 WL 2658327,

at *22 (finding that "an injunction applying to journalists, legal observers, and protesters in this judicial district is necessary to afford Plaintiffs complete relief"). Only Plaintiffs, however, can enforce the preliminary injunction's terms. *See CASA*, 606 U.S. at 852 (noting that an "injunction's protection extends only to the suing plaintiff—as evidenced by the fact that only the plaintiff can enforce the judgment" and that if another individual not party to the suit wants to enjoin similar conduct, "she must file her own suit").

Moreover, the relief that the Court orders—enjoining all chilling of First Amendment rights—is in line "with other well-accepted jurisdictional and remedial principles" with respect to the First Amendment claims. *Chicago Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 3034056, at *6 (N.D. Ill. Oct. 30, 2025). First Amendment challenges, "if successful," justify "an expansive remedy . . . suspending *all* enforcement of the challenged [practice], to protect an uninhibited marketplace of ideas and reduce the social costs caused by the withholding of protected speech." *Id.* Furthermore, the Court's certification of a class of protesters, observers, press, and religious practitioners, as well as religious exercise and media subclasses, moots Defendants' arguments about a universal injunction. *See* Doc. 252 (class certification opinion); *CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring) ("[I]n the wake of the Court's decision, plaintiffs who challenge the legality of a new federal statute or executive action and request preliminary injunctive relief may sometimes seek to proceed by class action under Federal Rule of Civil Procedure 23(b)(2) and ask a court to award preliminary classwide relief that may, for example, be statewide, regionwide, or even nationwide.").

## C.   Interference with the Executive Branch

Finally, Defendants raise a concern about the Court micromanaging the internal operations of law enforcement with a preliminary injunction. Defendants emphasize that the

Court cannot intrude into personnel management decisions of the Executive Branch.  But the

Court is doing no such thing with this preliminary injunction.  The Court's preliminary

injunction order does not instruct Defendants how to staff their operations or whom to hire.

Rather, the preliminary injunction, like the TRO before it, directs Defendants to comply with

DHS, CBP, and ICE policies on use of force, agent identification, and the use of BWCs.  In other

words, the Court's order should break no new ground, and indeed it tracks similar orders entered

in other crowd control cases across the country.  *See, e.g.*, *L.A. Press Club*, 2025 WL 2658327, at

\*24–25 (setting forth terms of preliminary injunction in almost identical case in Los Angeles);

*id.* at \*23 n.32 (collecting other cases where "sister courts in Portland, Seattle, Los Angeles,

Oakland, and other major cities have issued similar restrictions on the use of crowd control

weapons"); *Alsaada v. City of Columbus*, No. 2:20-cv-3431, 2021 WL 3375834, at \*1–2 (S.D.

Ohio June 25, 2021) (enjoining the City of Columbus and its police from, among other things,

"using non-lethal force, including tear gas, pepper spray, flash-bang grenades, rubber bullets,

wooden pellets, batons, body slams, pushing or pulling, or kettling, on nonviolent protestors to

enforce dispersal orders, traffic laws, such as clearing the streets or sidewalks, and/or

misdemeanors, that were not committed with actual or imminently threatened physical harm or

property destruction" and also requiring the use of body and vehicle cameras "during every

interaction with "nonviolent protestors" and the prominent display of "bad numbers and/or

identity cards . . . in each such interaction, even when riot gear is being worn"); *Black Lives

Matter L.A. v. City of Los Angeles*, No. 20-cv-5027, Doc. 102 (C.D. Cal. May 10, 2021) (setting

forth the manner in which the Los Angeles Police Department could use 40 mm and 37 mm

launchers in public demonstrations).

Moreover, although objecting to the entry of any injunctive relief, acknowledging the Court's intention to grant such relief, Defendants themselves requested the level of specificity included in the Court's TRO and preliminary injunction order. *See, e.g.*, Doc. 34 at 91:1–8 ("I would ask that – that we specify exactly which weapons and not leave it sort of open-ended. Here we have large riot control weapons. I don't know what that means. I'm not sure our DHS officers know what that means. There are examples, but then those examples don't necessarily seem to be exclusive. I would at least request that the types of weapons that this covers are specifically delineated."); Doc. 44 at 32:9–16 (the Court noting that "I see in the government's draft [ ] that they split out the weapons, right, and different things to be used, that certain of these can be used only when the officer is experiencing assaultive resistance and others would be limited or used for active resistance. And so if we've got everything kind of listed here, it does make it a bit messy"); Doc. 44 at 33:19–23 (the Court clarifying that "where we're delineating specific weapons, because some of those weapons can be used in one instance and other weapons cannot be used, I am – what I don't want to do is kind of go contrary to either CBP's or DHS's use of force policies that are consistent with the Fourth Amendment"); *see also* Doc. 35-11 (Defendants' proposed modifications to Plaintiffs' proposed TRO). Additionally, to the extent Defendants have any concerns with the Court micromanaging its efforts to implement the Court's orders, the Court indicated that it did not seek any attorney-client privileged materials concerning implementation of the Court's orders and suggested that a suitable way to comply would be a simple dissemination of the order with an instruction to follow it. *See* Doc. 44 at 70:13–73:24. And, as evident from the docket, Defendants have complied with this aspect of the TRO and preliminary injunction order without issue. *See* Docs. 53, 70, 74, 265. The TRO and preliminary injunction's final language reflect the Court's extensive conversations with the

**SA237**

parties to ensure the workability of the order. *See* Doc. 34 at 62:7–107:5; Doc. 44 at 3:21–5:17, 20:21–77:20.

Finally, both Hewson and Bovino indicated that they had been following the terms of the TRO without any negative effects and stated that the TRO did not actually constitute a change from what they already were doing. *See Harris Faulkner, Interview with Greg Bovino*, *Fox News Channel* (Oct. 29, 2025 at 6:58–7:37), https://www.foxnews.com/video/6384251017112 (Bovino stating, "The temporary restraining order and . . . all the other accoutrements that comes with what [the Court's] orders are, have no effect on Operation Midway Blitz. The Border Patrol, ICE, and those allied law enforcement teams are legal, ethical, and moral and we always have been. So we've never been in violation of any TRO, any law or regulation. . . . And now we're even going to go harder now, Harris, we go harder now and I'm not worried about it at all."); Doc. 255 at 216:5–16, 218:10–13 (Hewson stating that "everything that I have done and my team has done has abided by the TRO from the get-go"); *id.* at 220:11–24 ("To my knowledge, everything that I have encountered [in the TRO], it hasn't affected me. Your TRO has not affected me."); *id.* at 221:1–4 ("Q. So there's nothing about the TRO that impedes your legitimate law enforcement ability that you know of? A. That I know of, to my knowledge, no."); *see also* Doc. 191-4 at 155:3–6 (Hott testifying that, "based on the fact that we had not had to deploy any munitions [after entry of the TRO] is an indication . . . that there really were no challenges in implementing" the TRO). Given this testimony, the Court finds Defendants' complaints about the impositions of the Court's preliminary injunction order disingenuous.

V. **Security**

Rule 65(c) provides that, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, "the case law has somewhat weakened the force of the 'no order shall issue' language" in Rule 65(c). *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980) (citing *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 700 (7th Cir. 1977) ("Under appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)")); *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972) (the district court retains discretion to determine if a bond must be posted despite the mandatory language in Rule 65(c)).

Seventh Circuit case law identifies two scenarios in which a district court may forgo requiring a bond. First, a court may not require bond if the enjoined party does not demonstrate it will "incur any damages from the injunction." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). Second, a court may forgo a bond when "a bond that would give the opposing party absolute security against incurring any loss from the injunction would exceed the applicant's ability to pay, and the district court balances (often implicitly) the relative cost to the opponent of a smaller bond against the cost to the applicant of having to do without a preliminary injunction that he may need desperately." *Id.*

Both scenarios support waiving the bond requirement here. First, the Court does not find any training costs with respect to implementing the preliminary injunction significant, particularly because the order essentially directs agents and officers to follow the training they have already received on crowd control, as well as what the Constitution demands of them.

231

**SA239**

More importantly, when a court implicitly balances the potential cost of injunctive relief against the harm to speech if an injunction is denied, free speech prevails. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 239 (7th Cir. 2015) (waiving bond after imposing a preliminary injunction to prevent the violation of First Amendment rights); *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 695 (N.D. Ill. 2023) (same). That is the case here. The Court therefore declines to require Plaintiffs to post a bond.

## VI.    Stay Pending Appeal[77]

Finally, Defendants have requested the Court stay any relief pending appeal. When deciding whether to issue a stay pending appeal, courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (2009). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34. Here, Defendants did not address any of these factors in their request for a stay or explain why a stay would be warranted. Because Defendants did not meet their burden and none of the factors favor a stay, the Court refuses to stay its order pending appeal.

## CONCLUSION

For the foregoing reasons and those set forth on the record on November 6, 2025, the Court grants Plaintiffs' motion for a preliminary injunction [82, 86]. The Court has set forth the terms of the preliminary injunction order in a separate order [250] pursuant to Rule 65(c).

---

[77] While the Court includes this section in its Opinion to further explain its decision, the Court acknowledges that the Seventh Circuit granted Defendants' motion for stay pending appeal on November 19, 2025. *See Chicago Headline Club v. Noem*, No. 25-3023, Doc. 28 (7th Cir. Nov. 19, 2025).

Dated: November 20, 2025

_____
SARA L. ELLIS
United States District Judge